IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES STEEL CORPORATION; NIPPON STEEL NORTH
AMERICA, INC.; and NIPPON STEEL CORPORATION,

*Petitioners*,

v.

THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES;
JOSEPH R. BIDEN, in his official capacity as President of the United States;
JANET L. YELLEN, in her official capacity as Secretary of the Treasury and
Chairperson of the Committee on Foreign Investment in the United States; and
MERRICK B. GARLAND, in his official capacity as Attorney General of the
United States,

*Respondents*.

## PETITION FOR REVIEW

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-
Driemeier@ropesgray.com

Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
APincus@mayerbrown.com

*Counsel for Petitioners Nippon Steel
North America, Inc. and Nippon Steel
Corporation*

*Counsel for Petitioner United States
Steel Corporation*

*(Additional counsel listed on signature page)*

For the first time in history, actions by the President and by the Committee on Foreign Investment in the United States (CFIUS or the Committee) have blocked the acquisition of an American company by a foreign company based in Japan, a nation that is one of the United States' closest allies. That transaction is the combination of United States Steel Corporation (U. S. Steel) and Nippon Steel Corporation through a U.S. subsidiary (collectively Nippon Steel), by which U. S. Steel will become a wholly owned subsidiary of Nippon Steel.

In taking these unprecedented actions, the President and CFIUS corrupted and compromised a critical mechanism for the protection of America's national security in order to serve the President's personal political agenda. They purported to rely on Section 721 of the Defense Production Act (DPA), 50 U.S.C. § 4565, which confers carefully circumscribed authority to suspend or prohibit transactions with foreign companies that threaten to impair national security. The process begins with a review by CFIUS, a committee composed of Presidential Cabinet members and advised by White House offices and councils. The President is empowered to act only after CFIUS has completed a *bona fide* investigation to identify credible national security risks and referred the transaction to the President, with each CFIUS agency expressing its view regarding the transaction's effect on national security. The President can prohibit a transaction only when there is credible evidence that it threatens national security *and* the President cannot adequately address that threat

through other federal laws.

Here, the President turned this process on its head. He publicly announced his decision to block the merger before CFIUS's review even began. His March 14, 2024 formal, White House-issued "Statement from President Biden on US Steel" said: "I told our steel workers I have their backs, and I meant it. U.S. Steel has been an iconic American steel company for more than a century, and it is vital for it to remain an American steel company that is domestically owned and operated." Exhibit A. The President publicly reaffirmed that decision three separate times before receiving CFIUS's analysis—leaving no doubt that his decision was predetermined and that the statutory national security review "process" was a sham.

The President's decision had nothing to do with national security: how could it when the national security evaluation had not even started? Indeed, almost immediately after the review began, Secretary of the Treasury Janet Yellen—the Chairperson of CFIUS—confirmed that the preordained outcome had nothing to do with national security, stating that she "certainly accept[s] the President's view . . . that [U. S. Steel] should remain in American hands" for "the good of the workers in the country" even though the President "ha[d]n't said specifically that it's an issue of national security."

The public record makes clear that the President's decision was based on illegitimate and self-serving political considerations—a clear violation of the entire

CFIUS process, which was created as an apolitical safeguard to protect national security. The impetus for this abuse of the CFIUS process came from David McCall, the president of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (United Steelworkers). McCall opposed the merger because he had made a deal with Cleveland-Cliffs Inc. (Cliffs)—one of U. S. Steel's competitors—to support only Cliffs' efforts to acquire U. S. Steel. When Cliffs submitted an objectively inferior final bid and lost to Nippon Steel, McCall and Cliffs worked to obtain a presidential decision to block the transaction. McCall and Cliffs hoped that, with Nippon Steel out of the picture, Cliffs would be able to acquire U. S. Steel or, alternatively, that U. S. Steel would be eliminated as an effective competitor to Cliffs.

Support from the United Steelworkers' leadership was critical to President Biden's reelection campaign in the swing state of Pennsylvania. The President's March 2024 decision to block the transaction secured the United Steelworkers' endorsement and political support (and the support of other unions).

Public statements by the President, other senior government officials, and United Steelworkers and Cliffs leadership leave no doubt that the President's decision was motivated entirely by politics:

- In February 2024, after the merger was announced, the United Steelworkers issued a press release stating that President Biden had "personal[ly] assur[ed]" the union that he "has our backs" in opposing the deal.

- Cliffs' CFO stated in a February 2 investor call that the United Steelworkers "have already been clear that they don't want the deal to go through. So I think the administration has made it clear that the decision's already been made. They're not gonna allow the deal to go through."

- Senator Bob Casey of Pennsylvania stated on March 13 that he had called the White House and told the Chief of Staff that if the President did not block the merger, his inaction would "creat[e] an opening" for Donald Trump in swing states such as Pennsylvania.

- The very next day, March 14, President Biden issued his statement that he had decided the merger should be blocked.

- That same day, Cliffs CEO Lourenco Goncalves said in a media interview, "We have been in total contact with the administration, so I know what's going on." And the next day, after the President's decision, Goncalves stated in an investor call that "[t]his is not going to be a process. CFIUS is just cover for a President to kill a deal."

- On March 20, Goncalves stated on a call with investors that the United Steelworkers had been in touch with the White House, that the President had requested the union's endorsement "now," and that the United Steelworkers and Goncalves had in return received assurances that CFIUS would block the transaction.

- That same day, the United Steelworkers endorsed President Biden.

- In an April 2024 visit to the United Steelworkers' headquarters, President Biden again "promise[d]" that U. S. Steel would "remain a totally American company." At a September 2024 campaign rally in Pennsylvania attended by United Steelworkers President McCall, President Biden said: "I made it clear last time I was in Pittsburgh: United States Steel . . . is going to remain an American company."

Because the President had made his decision in March, CFIUS deviated dramatically from its usual review procedures, employing a Potemkin process designed and conducted to support the President's predetermined result of blocking the merger. CFIUS did not engage in the *bona fide* investigation of potential national

security risks—and negotiation of mitigation measures if risks are identified—that the statute expressly requires.

Since late March 2024, Petitioners have presented CFIUS with information establishing that the transaction will strengthen, not impair, U.S. national security. Nippon Steel has operated in the United States for decades, owns several American steel manufacturers, and has thousands of U.S. employees, hundreds of whom are represented by the United Steelworkers. As a result of the merger, Nippon Steel will invest almost $18 billion to protect and grow U. S. Steel's existing U.S. operations and save American jobs. And U. S. Steel and Nippon Steel offered to enter into a national security agreement with CFIUS, including binding commitments to:

- maintain ownership of U. S. Steel in the United States under a board with a majority of U.S. citizen directors and with its headquarters in Pittsburgh, Pennsylvania;

- ensure that key U. S. Steel management positions would be held by U.S. citizens;

- maintain and enhance U. S. Steel's production capabilities in the United States, with commitments that far exceed any assurance that would exist in the absence of the transaction;

- ensure that Nippon Steel does not interfere with U. S. Steel's decisions on trade matters; and

- subject these commitments to monitoring and verification measures, including by CFIUS-approved, U.S.-citizen U. S. Steel directors with relevant expertise.

Given the transaction's national security benefits, CFIUS—following President Biden's March 2024 decision to block the merger—was unable to

articulate any national security concerns (let alone engage in discussions about mitigating such concerns, as is customary) for the first several months of its review. Finally, on a Saturday afternoon in the middle of Labor Day weekend—five months after the review process began—CFIUS sent a letter to Petitioners purporting to identify various national security risks. CFIUS demanded a response within *one business day*. As Petitioners were preparing their response on CFIUS's rushed timeline, the President appeared at a Pittsburgh rally with the Vice President (by then the Democratic nominee) and again "made it clear" that "United States Steel . . . is going to remain an American company"—the phrase he used in March to announce his decision to block the merger. Petitioners provided a point-by-point response to each of CFIUS's stated concerns and an explanation of how the merger will strengthen, not endanger, national security. Petitioners also submitted a national security agreement with proposed measures to address any such concerns.

Later in September, CFIUS granted Petitioners' request to extend the review period, but the President confirmed, just days later, that he had not "changed [his] mind" on blocking the transaction. The CFIUS process remained a charade. In meetings with Petitioners, CFIUS staff admitted that they were not authorized by their superiors, the politically appointed CFIUS members, to have substantive discussions on the proposed national security agreement and other potential mitigation measures. That refusal to engage was an unprecedented deviation from

CFIUS's usual process, in which mitigation measures are routinely the focus of back-and-forth substantive discussions between staff members and representatives of the transaction parties.

At the same time, CFIUS members continued to ally themselves with the transaction's opponents. For example, U.S. Trade Representative Ambassador Katherine Tai, a voting member of CFIUS, appeared at an October event at a Cliffs facility in Pennsylvania with Cliffs' CEO Goncalves and the United Steelworkers' Pennsylvania director. Goncalves again reiterated that President Biden "has the backs of the workers"—the same expression President Biden had used in announcing his opposition to the merger—and Ambassador Tai promised to continue her push for "worker-centered trade policy." Soon thereafter, President Biden announced McCall's appointment to the U.S. Trade Representative's Advisory Committee for Trade Policy and Negotiations.

Then, with just nine days left in the extended review period, CFIUS sent Petitioners (again on a Saturday and with virtually no warning) a letter, plainly drafted in anticipation of Petitioners' legal challenge, that was riddled with inaccuracies, omissions of key facts, and completely illogical statements about purported national security risks and the review process. Petitioners immediately submitted a detailed letter correcting CFIUS's errors but received no substantive response and no engagement on their proposed national security agreement.

Instead, on December 20, the Deputy Secretaries of the CFIUS cabinet departments held a conference call with Petitioners. But again, CFIUS refused to engage in any substantive discussion regarding its purported concerns or the national security agreement submitted by Petitioners. Indeed, Petitioners' representatives and employees, including local steelworkers who had joined the call to explain the benefits of the merger, were not permitted to speak in the planned order, state their key points, or engage with the Committee or each other before the call was terminated. By contrast, President Biden and his cabinet members had at least five in-person meetings with McCall while the CFIUS process was underway.

President Biden's plan to manipulate the CFIUS process to support his predetermined result worked as intended. On December 23, CFIUS referred the transaction to the President. CFIUS informed Petitioners that it was unable to "reach [a] consensus" about whether the transaction presented a national security concern that could not be mitigated. *See* Exhibit B. Petitioners understand that the key national security agencies, including the Departments of Defense, State, and Treasury (and likely others), concluded that any national security concerns would be mitigated by the proposed national security agreement. The opposition by others, led by Ambassador Tai, prevented CFIUS from reaching a consensus and produced the referral of the transaction to the President, enabling him to make good on his earlier promise.

And that is exactly what he did. On January 3, 2025, President Biden issued an executive order stating that Nippon Steel—a company headquartered in one of our Nation's staunchest allies and its American subsidiary—"might take action that threatens to impair the national security of the United States." *See* Exhibit C. Given that President Biden was simply formalizing the decision that he had made in March 2024, it is not surprising that his statement accompanying the executive order mentioned "steel workers" in the very first sentence, and repeated, virtually word-for-word, his March announcement: that "U. S. Steel will remain a proud American company - one that's American-owned, American-operated, by American union steelworkers." Nor is it surprising that, just hours after the order was issued, the United Steelworkers leadership commended him for "mak[ing] good on [his] promise to have steelworkers' backs."

Never before has a President prohibited an acquisition by a company based in Japan, one of our closest allies. Nor, for that matter, has a President ever prohibited the acquisition of a U.S. company when the company is not a core supplier to the defense industrial base, not an owner or operator of critical infrastructure, not a developer of sensitive technology that is controlled for transfer to a country of concern (*e.g.*, China), not proximate to a sensitive military installation, and not a collector of any sensitive data of Americans. Indeed, as the CFIUS record makes clear, the acquisition of U. S. Steel by Nippon Steel would improve national security

by enhancing and expanding domestic manufacturing and technological capabilities, preserve jobs in America, and enhance U.S. competitiveness.  But none of that mattered.

Instead, the President's motivation was clear:  politics.  CFIUS's and the President's actions are unconstitutional, unlawful, and *ultra vires*, and they should be set aside.

*First*, CFIUS's and the President's actions violated U. S. Steel's and Nippon Steel's rights under the Due Process Clause.  Meaningful consideration free from prejudgment is a basic tenet of due process.  By making his decision before the CFIUS review process even began, the President denied Petitioners their right to a fair and impartial process.  Because President Biden had publicly announced his intent to block the transaction in March, just as he ultimately did, Petitioners were subjected to a sham CFIUS process designed to enable the President's predetermined outcome.  Singling out Petitioners' transaction in these ways also violated the fundamental guarantee of equal protection of the law.

*Second*, CFIUS's actions violated Section 721 of the DPA and the Administrative Procedure Act (APA).  CFIUS's failure to conduct a reasoned risk-based national security analysis of the transaction, its refusal to follow long-established CFIUS procedures, its disregard of the evidence, and the failure of each CFIUS agency to express its views regarding the transaction's effect on national

security and whether the proposed national security agreement mitigated any risks to national security are contrary to law and arbitrary and capricious. With the outcome a foregone conclusion, it is not surprising that the record lacks the factual support necessary for CFIUS to act under Section 721.

A minority of CFIUS members apparently drummed up flimsy national security concerns, and the political appointees responsible for the process prevented the career national security professionals from providing any feedback to Petitioners regarding the multiple efforts to address any conceivable risk through a comprehensive national security agreement. Nor, for that matter, did CFIUS even afford Petitioners an opportunity to engage with Ambassador Tai, the Committee member who reportedly was advancing national security objections, apparently at the behest of the White House. Finally, the CFIUS members could not even agree on referring the transaction or a recommendation for what the President should do with the referral. CFIUS also failed to follow its own procedures on confidentiality and timing, including by discussing its review with third parties opposed to the merger, such as the United Steelworkers leadership.

*Third*, the President's actions were *ultra vires*. Congress established a specific process to address the rare transaction that presents a genuine national security threat that cannot be mitigated through other laws, and that justifies the extraordinary measure of the President interfering in a transaction between private parties. The

President can block such a transaction only after CFIUS completes the required national security review and investigation of the transaction and refers the transaction to the President, and then "only if the President finds . . . credible evidence" of a national security risk that cannot be addressed through other federal laws, such as those governing imports. 50 U.S.C. § 4565(d). Here, the President acted well outside his statutory authority. The President announced his intention to block the merger before CFIUS had even begun its review, without considering any evidence—let alone "credible evidence"—of any national security risks. His decision was instead based entirely on political considerations.

Accordingly, the Court should set aside CFIUS's action and the President's order, and order CFIUS to review the merger consistent with due process and the DPA. Petitioners are confident that a fair review, untainted by the President's political agenda, will conclude that any possible national security concerns are addressed fully by the proposed national security agreement or could be addressed by a revised agreement—and that therefore they will be able to consummate the transaction and benefit Petitioners' stockholders, U. S. Steel employees, and America's national security.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over Petitioners' challenges, including because Petitioners bring claims arising under the Constitution and laws

of the United States, including the Due Process Clause of the Fifth Amendment to the U.S. Constitution; the DPA, 50 U.S.C. § 4565; and the APA, 5 U.S.C. § 702 *et seq*. This Court has original and exclusive jurisdiction to hear Petitioners' challenges. 50 U.S.C. § 4565(e)(2); *see also Ralls Corp. v. CFIUS*, 758 F.3d 296, 311 (D.C. Cir. 2014).

For the benefit of the Court, Petitioners are filing a more detailed petition than required by the Federal Rules of Appellate Procedure. Petitioners reserve any and all rights to raise additional facts and arguments in their briefing on the merits. *See CropLife Am. v. EPA*, No. 02-1057, 2002 WL 1461788, at *1 (D.C. Cir. July 8, 2002) (per curiam).

## BACKGROUND

### A.    U. S. Steel's Business

Founded in 1901, U. S. Steel has a long and successful history in the United States. The company is headquartered in Pittsburgh, Pennsylvania, and is publicly traded.

U. S. Steel is the third largest steel producer in the United States—behind Nucor Corporation and Cliffs—and the 24th largest steel producer in the world. For its fiscal year ending on December 31, 2023, U. S. Steel had net earnings of $895 million and had almost 22,000 employees, including approximately 13,995

employees in the United States and 7,832 employees in its additional production operations in Slovakia.

The U. S. Steel of today is a far cry from the U. S. Steel of its founder, Andrew Carnegie. Its employment was greatest in 1943 and its production peaked in 1953. U. S. Steel was dropped from the Dow Jones Industrial Average in 1991 and from the S&P 500 in 2014. For a long time, the company has not produced the steel used in building America's infrastructure or military equipment. Its largest market is for automotive steel.

U. S. Steel is not a defense supplier. It does not supply products to the U.S. military, and its manufacturing technologies and processes are not designed specifically to produce steel for military applications. Nor does U. S. Steel have any products, capability, or know-how that are specific to, or customized for, U.S. government applications, including U.S. military applications. For example, it does not produce, and does not have the capabilities to produce, steel plate at the thickness needed for armor plating or ships.

Prior to 2021, U. S. Steel had been losing money every year for 10 years. In 2019, it started cutting costs, idling older facilities, and investing in new technologies. Substantial additional investment is needed to make U. S. Steel's blast furnace facilities competitive. As part of the proposed merger, Nippon Steel has pledged to invest no less than $2.7 billion in U. S. Steel's United Steelworkers-

staffed facilities, including those in Pennsylvania and Indiana. That investment is essential for U. S. Steel to remain economically competitive and to keep workers employed in the domestic production of steel. U. S. Steel would not be able to make that investment on its own if the merger is blocked and could be forced to close U.S. facilities and significantly reduce its domestic steel production capacity.

### B.    Nippon Steel's Business

Nippon Steel Corporation is a Japanese corporation headquartered in Tokyo, Japan. It is Japan's largest steelmaker and one of the world's leading steel manufacturers. Nippon Steel Corporation employs 28,000 people in Japan and, along with its subsidiaries, employs approximately 106,000 people worldwide. In the United States, Nippon Steel Corporation and its subsidiaries and joint ventures employ approximately 4,000 people. Nippon Steel Corporation has conducted business in the United States since 1972 through Nippon Steel North America, a U.S. company and wholly owned subsidiary.

Nippon Steel Corporation is a publicly traded company with highly diversified stockholders. The vast majority of Nippon Steel Corporation's public stockholders are Japanese, American, and European. Neither the Japanese government, nor any other government or any stockholder, controls Nippon Steel Corporation. Its 10 biggest stockholders include large, U.S.-based funds such as

State Street and JPMorgan, and none is affiliated with the Japanese government or any other government.

Nippon Steel Corporation manufactures and sells a range of steel products, including steel plates, steel sheets, bar and rod materials, structural steel, pipes and tubes, railway/automotive/machinery parts, titanium, stainless steel, and steel slag. Its product offerings serve a range of industrial sectors, including automotive, appliances, energy, infrastructure, design metals, and consumer electronics. Nippon Steel Corporation's existing manufacturing base is located in Japan, although it has a manufacturing presence in 15 other countries. Its global crude steel production capacity is approximately 72.5 million tons annually.

Nippon Steel Corporation prioritizes cutting-edge research and employs approximately 800 research and development personnel. Its research and development expenses in FY2023 were approximately 72,700,000,000 Japanese Yen (or approximately $500 million). From 2014 to 2023, Nippon Steel Corporation was granted approximately 37,000 patents globally.

Nippon Steel Corporation has worked closely with U.S. companies for over 70 years. For example, Nippon Steel Corporation has developed and maintained close relationships with the coal industry since it first began purchasing metallurgical coal from U.S. companies in the 1950s. It also has invested heavily in

the United States for the past four decades. It currently has stakes in 28 subsidiaries and affiliates in the United States, including Nippon Steel North America.

Nippon Steel North America is headquartered in Houston, Texas. Its U.S. operations include Standard Steel, LLC (Burnham, Pennsylvania); Wheeling-Nippon Steel, Inc. (Follansbee, West Virginia); International Crankshaft, Inc. (Georgetown, Kentucky); and AM/NS Calvert LLC (Calvert, Alabama), a joint venture with steel producer ArcelorMittal, which Nippon Steel Corporation has agreed to divest substantially concurrently with the consummation of the merger—and at a significant loss—to proactively address any antitrust concerns that may have arisen from Nippon Steel's ongoing ownership in Calvert following the merger.[1]

In 1986, one of Nippon Steel Corporation's predecessors entered into a joint venture with Wheeling Pittsburgh Steel. Through that joint venture, Wheeling-Nippon Steel, Nippon Steel Corporation worked closely with the United Steelworkers. In 2008, Nippon Steel Corporation assumed full control of the joint venture. Under Nippon Steel Corporation's control, Wheeling-Nippon Steel has expanded its operations significantly. Wheeling-Nippon Steel has become the first zinc, aluminum, magnesium alloy-coated steel producer in the United States, and it

---

[1] Nippon Steel Corp., *News Release, Notice of the Transfer of Equity Interests in AM/NS Calvert LLC at Closing of USS Acquisition* (Oct. 11, 2024), https://www.nipponsteel.com/common/secure/en/news/20241011_300.pdf.

is now the only steel producer in North America that can produce all five major hot-dip coated products.

In 2011, one of Nippon Steel Corporation's predecessors acquired Standard Steel. Standard Steel produces forged wheels and axles for the railroad industry. Like Wheeling-Nippon Steel, Standard Steel has expanded its U.S. operations in the time since Nippon Steel Corporation took ownership. Today, Standard Steel is the only producer of forged steel wheels for railcars and locomotives in North America.

## C. The Merger

For much of the 2010s, U. S. Steel faced challenges due to high steelmaking costs and low steel prices. Around 2020, U. S. Steel began to invest in higher-value products and newer technologies. Despite those significant capital investments, U. S. Steel's stock price did not reflect its performance, even though its returns improved in 2021 and 2022. As a result of U. S. Steel's relatively strong financial performance and comparatively low stock price, it became an attractive merger target.

In mid-2023, U. S. Steel received multiple unsolicited bids to purchase some or all of the company. Cliffs (but not Nippon Steel) was one of those bidders, and Cliffs threatened to go public when U. S. Steel refused its unsolicited offer. The United Steelworkers agreed with Cliffs, in writing, to support only its bid and no others.

U. S. Steel's Board of Directors rejected the unsolicited bids and began a strategic review process to systematically solicit and evaluate bids consistent with their fiduciary duties. U. S. Steel's review process was robust, and it contacted more than 50 parties, including outreach to Nippon Steel. At the end of that months-long process, the Board selected Nippon Steel's bid, the only bid that would have kept U. S. Steel intact.

The Board concluded that Nippon Steel's purchase of U. S. Steel would provide the company with a long-term partner that will protect and grow existing operations. It determined that Nippon Steel's bid was superior to alternative bids that were riskier and likely would result in cost-reduction strategies such as layoffs and divested facilities. And it found that Nippon Steel's bid would deliver significantly more value and certainty to U. S. Steel stockholders than other bids, including Cliffs' bid.

The Board determined that the bid submitted by Cliffs was inferior to Nippon Steel's bid for several reasons. Cliffs offered a lower price per share and offered a combination of cash and stock, in contrast with Nippon Steel's all-cash offer. Cliffs later issued public statements indicating that it would no longer be willing to pay its own proposed sale price. In addition, Cliffs' bid carried significant antitrust risks, and Cliffs, unlike Nippon Steel, would not agree to commit in advance to divestments that likely would be needed to address such risks. Further, the Board

concluded that Cliffs could engage in cost-reduction practices (as it has done in prior transactions) resulting in layoffs.

In December 2023, U. S. Steel and Nippon Steel announced the merger. Through the merger, Nippon Steel North America will acquire all of the issued and outstanding shares of U. S. Steel at a price of $55 per share in cash.  The overall transaction value represents the equity value of approximately $14.1 billion plus the assumption of debt, for a total enterprise value of $14.9 billion.  Pursuant to the terms of the merger agreement, U. S. Steel will continue to operate as a wholly owned subsidiary of Nippon Steel North America.

In April 2024, the merger was overwhelmingly approved by U. S. Steel's stockholders.  It had been expected to close in 2024, subject to required CFIUS approval and other customary closing conditions.  The merger agreement, which is governed by Delaware law, provides for an "End Date" of June 18, 2025, to obtain regulatory approvals and complete the merger.

### D.    CFIUS's Authority Over Certain Transactions Involving Foreign Companies

CFIUS is an inter-agency committee of the United States government authorized to review any transaction that results in a foreign person acquiring control of a U.S. business as well as certain other investments by foreign persons in U.S.

businesses. CFIUS's statutorily-defined role is solely to evaluate whether such transactions pose a risk to the national security of the United States.

The Secretary of the Treasury is the Chairperson of CFIUS. The other members of CFIUS are the heads of the Department of Justice, the Department of Homeland Security, the Department of Commerce, the Department of Defense, the Department of State, and the Department of Energy, as well as the U.S. Trade Representative and the Director of the White House Office of Science and Technology Policy. The Director of National Intelligence and the Secretary of Labor are non-voting members of CFIUS.

Additionally, five White House offices observe and participate in CFIUS activities: the Office of Management and Budget, the Council of Economic Advisors, the National Security Council, the National Economic Council, and the Homeland Security Council.

Congress delineated CFIUS's authority in the DPA. The DPA directs CFIUS to "review" and "investigat[e]" a "covered transaction" to "determine the effects of the transaction on the national security." 50 U.S.C. § 4565(b)(1)(A)-(B). Congress defined a "covered transaction" to include, among other things, "[a]ny merger, acquisition, or takeover . . . by or with any foreign person that could result in foreign control of any United States business." *Id.* § 4565(a)(4)(B)(i).

Typically, the CFIUS review process is initiated by the parties filing a joint voluntary notice. 31 C.F.R. § 800.501. CFIUS's formal acceptance of that notice begins a 45-day review period, during which CFIUS "shall review the covered transaction to determine the effects of the transaction on the national security of the United States." 50 U.S.C. § 4565(b)(1)(A)(i). Congress specified that CFIUS "shall consider" 10 factors specified in subsection (f) of Section 721—all of which relate to national security—and other factors related to national security that the Committee and the President deem appropriate. *Id.* § 4565(b)(1)(A)(ii); *see also id.* § 4565(f) (specifying that the relevant factors be considered in light of "the requirements of national security").

For certain transactions, CFIUS may follow the 45-day review period with an investigation that may last for an additional 45 days. 50 U.S.C. § 4565(b)(2); 31 C.F.R. § 800.505.

Based on its review and, if applicable, subsequent investigation, CFIUS must choose one of three options for its final action. First, it may approve the transaction if it finds the transaction does not present any unresolved national security concerns or that any such concerns are adequately addressed by laws other than Section 721 and the International Emergency Economic Powers Act. *See* 50 U.S.C. § 4565(b)(3)(A); *see also id.* § 4565(d)(4)(B).

Second, if CFIUS identifies a national security concern that is not addressed by such other laws, then CFIUS may "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction." 50 U.S.C. § 4565(*l*)(3)(A)(i). A decision to pursue mitigation must be based on a well-developed risk-based assessment that "shall include credible evidence demonstrating the risk and an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." 31 C.F.R. § 800.102; *see also* 50 U.S.C. § 4565(*l*)(4)(A).

Third, if CFIUS determines that the transaction poses unresolved national security concerns and that mitigation measures are not adequate or appropriate to resolve those concerns, it may "refer the transaction to the President." 50 U.S.C. § 4565(*l*)(2). That decision must also be based on a thorough risk assessment and, by law, a determination that statutory authorities other than Section 721 and the International Emergency Economic Powers Act are insufficient to address the risk identified by CFIUS. *Id.* § 4565(*l*)(4)(A). CFIUS members must express their views regarding the risk-based analysis and explain why their national security concerns cannot be resolved through a mitigation agreement; and any CFIUS member that disagrees must also express its view regarding those issues. *Id.* § 4565(*l*)(4)(B); *see also id.* § 4565(*l*)(2) (requiring that CFIUS "complete the action of

the Committee with respect to the transaction" before referral to the President). Without that risk-based analysis and expression of views, there is no authority for CFIUS to refer the transaction to the President. In addition, if CFIUS rejects mitigation, it must send a letter to the entity detailing the unclassified basis of its findings and affording an opportunity to respond before determining whether to issue a report to the President. *See Ralls*, 758 F.3d at 319.

If CFIUS refers a transaction to the President, the President may block the transaction only under the particular circumstances specified by Congress. The President may "suspend or prohibit any covered transaction" *only* "if the President finds that" (a) "there is credible evidence" that the transaction threatens to impair national security and (b) no other "provisions of law . . . provide adequate and appropriate authority" to protect national security. 50 U.S.C. § 4565(d)(1), (4). This mandatory analysis requires a *bona fide* consideration of security risks and mitigation options before the President takes the extraordinary step of blocking a transaction.

Since the enactment of the DPA, Presidents have invoked their authority under Section 721 to block transactions in only eight other instances—none involving an allied nation such as Japan, or a company already heavily invested in the United States, or the domestic steel industry, where there already is very

substantial foreign investment.[2]   Seven of the blocked transactions involved Chinese-backed entities and one involved the Singaporean acquisition of a leading U.S.-based chipmaker, which was also driven by concerns about China.  And in each of those cases, the President waited to review CFIUS's findings before making a decision to prohibit a transaction.  *See Ralls*, 758 F.3d at 320; *see also* 50 U.S.C. § 4565(d).

###   E.   The Merger Will Enhance U.S. National Security And Also Benefit U.S. Workers And The Economy

The merger will provide important benefits to the strategic and national security interests of the United States, including by providing significant benefits to the United States steel industry and its steelworkers.  Nippon Steel has committed publicly, as well as through binding written commitments that would be enforceable by CFIUS, to ensuring that U. S. Steel maintains its domestic production capabilities and continues to provide high-quality products to American customers.

Nippon Steel's strategic goal is to enter into the U.S. steel production market through the merger by contributing its technologies and resources to U. S. Steel to help it grow and capture increasing demand for high-grade steel products.  Indeed, Nippon Steel is spending approximately $14.1 billion to purchase U. S. Steel,

---

[2] More than four dozen steel production facilities in the United States are owned in whole or in part by foreign entities or foreign parent entities.

assuming $800 million of U. S. Steel's debt, and investing an additional $2.7 billion precisely because it wants to be able to manufacture steel products in the United States. It would make no sense for Nippon Steel to invest nearly $18 billion to acquire and dramatically upgrade U. S. Steel, only to close its plants and limit its manufacturing capabilities. Petitioners provided CFIUS with a detailed economic analysis demonstrating that importing steel slabs from Japan is not economically viable compared to producing them in the United States.

Consistent with this business objective, Nippon Steel has repeatedly made public commitments to keep U. S. Steel's headquarters in Pittsburgh and move Nippon Steel North America's headquarters from Houston to Pittsburgh. Nippon Steel also has committed that it will not shift U. S. Steel's production to locations outside of the United States and that it will maintain the production capacity of existing U. S. Steel facilities. U. S. Steel also will keep its name post-merger.

The merger is critical to U. S. Steel's continued success. U. S. Steel does not have the money or advanced technology to make these critical investments on its own. Without the merger, U. S. Steel could be forced to close steel mills, cut jobs, and possibly move its headquarters out of Pittsburgh. U. S. Steel also could be forced to idle its largest blast furnace (in Gary, Indiana).[3] Nippon Steel Corporation

---

[3] Bob Tita, *Biden Prepares to Block $14 Billion Steel Deal: U.S. Steel warns of plant closings if sale to Nippon Steel collapses*, Wall St. J. (Sept. 4, 2024), https://www.wsj.com/business/u-s-steel-warns-of-plant-closings-if-sale-collapses-

is a leader in improving blast furnace technologies and, if the merger is approved, plans to revamp that blast furnace to extend its operation by up to 20 years.

Nippon Steel has committed to invest no less than $2.7 billion to help secure the future of U. S. Steel's facilities. The auto industry understands the significant benefits of the transaction. The leading association representing U.S. operations of international automakers explained to CFIUS that these investments will "secure the domestic supply chain for critical steel products for the American auto industry."

Nippon Steel has also committed to maintain existing production capacity at U. S. Steel's facilities in the United States unless CFIUS approves a shutdown—a 10-year commitment for more than a dozen production facilities and a two-year commitment for the Granite City Works facility, all of which would be enforceable through Petitioners' proposed national security agreement. Even after those periods end, no facility could be permanently idled without the approval of the CFIUS-approved directors and consultation with CFIUS. Those commitments grant the U.S. government authority it now lacks, even with U. S. Steel under U.S. ownership.

The merger will benefit U.S. steelworkers. Nippon Steel has committed—publicly, repeatedly, and in writing—to honor all existing agreements between U. S. Steel and the United Steelworkers. Nippon Steel has also made commitments to the

4ef45756.

United Steelworkers above and beyond what is required by the current labor agreements. The investments in U. S. Steel facilities also will secure union jobs for the future. Moreover, Nippon Steel has pledged to give U. S. Steel employees a bonus of $5,000 each when the transaction closes—a bonus that demonstrates Nippon Steel's long-term commitment to sharing the success of U. S. Steel and providing a more secure future for employees, their families, and communities. Consistent with that promise, Nippon Steel has also formally committed, including in the proposed national security agreement, that the merger will result in no layoffs, and no idling or closures of any existing U. S. Steel facilities under operation at the time of closing except in the event of "acts of God or other 'force majeure' events," through at least the term of the current labor agreement, which expires in 2026.

Further, the merger will increase the ability of U. S. Steel to invest in research and development, including advanced steel-making technology. Nippon Steel's research and development expenses in fiscal year 2023 were approximately $500 million—over 12 times that of U. S. Steel's research budget, and more than the entire U.S. steel industry's combined annual research and development expenditures. Nippon Steel has committed to transferring its own highly advanced technology to U. S. Steel as a part of the acquisition. In other words, Japan, not the United States, will be sharing its technology. This, in turn, will ultimately strengthen—not

undercut—the competitive edge of the United States in the steel manufacturing industry.

By ensuring that U. S. Steel maintains its domestic production capabilities and continues to provide high-quality products, Nippon Steel's investment will enhance other American industries. Specifically, the merger will strengthen U. S. Steel's ability to supply steel for the American economy, including the automotive, renewable energy, appliance, and construction sectors. Further, by bringing Nippon Steel's advanced green steelmaking technologies to the United States, the merger also will contribute to the United States' clean energy objectives and help meet growing demand for environmentally friendly steel.

In short, the merger will strengthen—not undermine—U.S. national security.

## F.    Japan Is An Important U.S. Ally And Investor

Japan has been one of the United States' strongest allies for over 70 years. Indeed, 54,000 American troops and the United States' only forward-deployed aircraft carrier strike group are based in Japan.[4]

Nippon Steel Corporation's proposed investment in U. S. Steel is consistent with the United States' historical practice of encouraging Japanese investment in the

---

[4] Simon Lewis & Tim Kelly, *U.S. upgrades military command in Japan, warns of China threats*, Reuters (July 28, 2024), https://www.reuters.com/business/aerospace-defense/us-announce-military-command-revamp-japan-official-says-2024-07-28/.

United States.  Japan is the single largest provider of foreign direct investment in the United States, having invested over $775 billion in 2022 alone.[5]  In addition to direct investment in the United States, Japanese-based companies have a long history of investing in metals and industrial equipment in the United States.  Indeed, Japan is the number one foreign employer in the American manufacturing sector, employing nearly one million total workers in the United States.[6]

Just days before the merger was announced, the U.S. House of Representatives' Select Committee on the Chinese Communist Party issued a bipartisan report recommending that Japan be added to CFIUS's "whitelist" of "Excepted Foreign States," meaning that its qualifying companies would be exempt from certain aspects of the CFIUS regulations, as well as mandatory filing requirements.[7]  This recommendation was made because of how unlikely any Japan-based company is to pose a threat to the national security of the United States.

---

[5] U.S. Dep't of Commerce, *Foreign Direct Investment (FDI):  Japan* (Aug. 2023), https://www.trade.gov/sites/default/files/2023-09/Japan.pdf.

[6] Japan External Trade Org., *Japan's U.S. Investment Dynamic* (Mar. 2023), https://www.jetro.go.jp/usa/japan-us-investment-report/.

[7] *See* House Select Comm. on the Strategic Competition Between the U.S. and the Chinese Communist Party, 118th Cong., *Reset, Prevent, Build:  A Strategy to Win America's Economic Competition with the Chinese Communist Party* 32 (Dec. 12, 2023), https://selectcommitteeontheccp.house.gov/sites/evo-subsites/select committeeontheccp.house.gov/files/evo-media-document/reset-prevent-build-scc-report.pdf (suggesting that Congress add Japan to the list of excepted foreign states because it was an "allied countr[y] that [did] not pose substantial national security

No President has ever blocked an acquisition by a Japanese company in the history of CFIUS. Rather, large transactions involving Japanese companies and sensitive industries consistently close without government interference, including, recently:

- Renesas Electronics Corp.'s (Renesas) announced 2024 acquisition of Altium Ltd., a printed circuit board design software company, for $5.9 billion; Renesas's 2024 acquisition of Transphorm, Inc., a semiconductor company, for $339 million; and Renesas's 2019 acquisition of Integrated Device Technology, a semiconductor manufacturer, for $6.7 billion;

- Komatsu Ltd.'s 2023 announced acquisition of American Battery Solutions, a lithium-ion battery manufacturer for an undisclosed sum;

- Toppan Photomasks Inc.'s 2019 acquisition of the semiconductor photomask foundry business of GlobalFoundries Inc. for an undisclosed sum;

- Komatsu Ltd.'s 2016 acquisition of Joy Global Inc., a manufacturer of mining equipment, for $3.7 billion;

- Kubota Corporation's 2016 acquisition of Great Plains Manufacturing, Inc., a manufacturer of agricultural implements, for $430 million;

- Nippon Steel predecessor Sumitomo Metal Industries Ltd.'s 2011 acquisition of Pittsburgh-based Standard Steel LLC, a maker of train wheels and axles, for $340 million; and

- Toshiba Corporation's 2006 acquisition of Westinghouse Electric, a builder of nuclear power plants, for $5.4 billion.

Several of these transactions involved industries and technologies (*e.g.*, chipmaking, circuit boards, and semiconductors) that present national security vulnerabilities

---

risks").

(unlike the types of steel produced by U. S. Steel), yet none was blocked by the President. In fact, from 2021 to 2023, Japanese investors filed joint voluntary notices with CFIUS regarding 56 transactions, and not one was blocked by the President.

Moreover, other U.S.-based steel companies have been acquired by foreign investors without any CFIUS or Presidential action and without any impact on national security. These include International Steel Group, owned by ArcelorMittal based in the Netherlands (and at the time Indian-owned), and Evraz Oregon Steel Mills, owned by Evraz Group based in Russia. As Wilbur Ross, the former U.S. Secretary of Commerce and chairman of International Steel Group, observed in connection with this merger, "[t]here was no hubbub when I sold International Steel Group to Indian entrepreneur Lakshmi Mittal in 2005, or when Severstal, a Russian company, bought Ford Motor's steelmaking unit. So why the clamor today?"[8]

Even the U.S. Ambassador to Japan immediately praised the merger after it was announced, stating that it will "deepen [the] bonds" between Japan and the United States while also "defining the future of the key steel industry" as both companies "face a more competitive environment."[9]

---

[8] Wilbur Ross, *Xenophobia Drives Foes of Nippon Steel's Deal*, Wall St. J. (Jan. 1, 2024), https://www.wsj.com/articles/xenophobia-drives-foes-of-nippon-steels-deal-japan-national-security-union-cc7ad53a.

[9] @USAmbJapan, X (Dec. 18, 2023, 7:03 AM), https://x.com/USAmbJapan/

### G. United Steelworkers Leadership And Cliffs Aggressively Pursued A Presidential Decision Blocking The Merger

Since the merger was first announced, United Steelworkers President McCall and Cliffs have conspired in a multi-pronged effort to prevent it from closing. United Steelworkers' leadership placed great pressure on President Biden to oppose the merger before the CFIUS review had even begun. That opposition reflects a preexisting agreement union leadership made with U. S. Steel's competitor, Cliffs, to support Cliffs, and only Cliffs, in its attempted acquisition of U. S. Steel.[10]

Cliffs is an aspiring monopolist in the production of domestic iron ore (a critical input for steelmaking) and several key steel markets, including exposed automotive steel and electrical steel. U. S. Steel and Nippon Steel detailed Cliffs' attempted monopolization of these U.S. markets in violation of the antitrust law in a July 12, 2024, letter to the Department of Justice. *See* Exhibit D. Since then, Cliffs has continued to expand and entrench its dominance, including through its November 2024 acquisition of Canadian steelmaker Stelco, which gave Cliffs the option to control up to 79% of U.S. iron ore reserves (and 70% of North American reserves).[11]

---

status/1736718950841634972.

[10] Cleveland-Cliffs, Inc., *Cleveland-Cliffs Reminds U.S. Steel: You Have No Path to Close* (May 21, 2024), https://www.clevelandcliffs.com/news/news-releases/detail/638/cleveland-cliffs-reminds-u-s-steel-you-have-no-path-to.

[11] *See* U. S. Steel Corp., Annual Report (Form 10-K) at 38-40 (Feb. 2, 2024)

Speaking to investors following the announcement of that acquisition, Cliffs'

Senior Vice President of Finance made clear that Cliffs coveted U. S. Steel and

explained the reason why: "There will be less competition. There will be one less

competitor pushing down prices, technically two less competitors with Stelco taken

out as well." And without any competitors—indeed, a Cliffs acquisition of U. S.

Steel would place 100% of U.S. iron ore reserves under Cliffs' control—Cliffs CEO

Goncalves has been clear about his intentions: "We like higher prices . . . . So, that's

why we push prices up. We go until we can't go no more."[12]

Seeking to cement its ability to raise prices and fearing the prospect of

increased competition from a vastly strengthened U. S. Steel, Cliffs first tried to

acquire U. S. Steel for itself. Cliffs was confident that it would prevail because

United Steelworkers leadership agreed with Cliffs to oppose any offers to purchase

---

(reporting U. S. Steel's iron ore reserves); Cleveland-Cliffs, Inc., Annual Report (Form 10-K) at 36 (Feb. 8, 2024) (same for Cliffs); AcelorMittal, Fact Book 2023 25 (Apr. 22, 2024) (same for ArcelorMittal); U. S. Steel Corp., Annual Report (Form 10-K) at 44 (Feb. 12, 2021) (reporting Stelco's 25% option on U. S. Steel's iron ore reserves at Minntac).

[12] Cleveland-Cliffs, Inc., *Full-Year and Fourth Quarter 2023 Earnings Conference Call* (Jan. 30, 2024), https://www.clevelandcliffs.com/investors/news-events/ir-calendar/detail/11715/full-year-and-fourth-quarter-2023-earnings-conference-call.

U. S. Steel from anyone else—no matter how good the offer was for U. S. Steel, its employees and stockholders, U.S. consumers, and U.S. national security interests.[13]

After U. S. Steel accepted Nippon Steel's objectively superior proposal, Cliffs used its close relationship with United Steelworkers leadership to prevent the merger in a different way:  by placing immense political pressure on the President to block the merger.  In January 2024—after the merger had already been announced—United Steelworkers leadership issued a statement indicating that Senator Sherrod Brown of Ohio wanted U. S. Steel to be sold to Cliffs.[14]  (Senator Brown was then running for reelection in Cliffs', and McCall's, home state.)  Within a month, and even before the CFIUS review process had begun, Senator Brown was publicly "pushing the president" to block the merger.[15]

Then, Cliffs' CEO Lourenco Goncalves pressured President Biden to block the merger.  In a televised interview on January 30, 2024, he said:  "I can't believe

_____

[13] Cleveland-Cliffs, *supra* note 10.

[14] United Steelworkers, *Planned U.S. Steel Sale Meets Anger, Skepticism:  USW Vows to Fight to Make Sure Company Lives Up to Obligations* (Feb. 13, 2024), https://m.usw.org/news/media-center/articles/2024/planned-u-s-steel-sale-meets-anger-skepticism-usw-vows-to-fight-to-make-sure-company-lives-up-to-obligations.

[15] Press Release, Senator Sherrod Brown, *Brown to President: Sale of U.S. Steel to Nippon Threatens U.S. Trade Enforcement and American Workers – and Should Not Move Forward* (Mar. 15, 2024), https://web.archive.org/web/20241204010101/https://www.brown.senate.gov/newsroom/press/release/sherrod-brown-president-sale-us-steel-nippon-threatens-trade-enforcement-american-workers.

that the most union-friendly President that the United States has ever had will allow for the slap on the face of the [United Steelworkers]."[16]  The White House reaction was swift:  One day after Goncalves' interview, it issued a press release stating that President Biden is "the most pro-union president we've had," and that his "foremost" concern was making sure that there was "a level, fair playing field for steelworkers."[17]  Three days later, United Steelworkers President McCall stated in a press release that he had received "personal assurances" that President Biden had their "backs."[18]  That same day, Cliffs' CFO Celso Goncalves, CEO Lourenco Goncalves' son, stated in an investor call that the United Steelworkers "have already been clear that they don't want the deal to go through.  So I think the administration has made it clear that the decision's already been made.  They're not gonna allow the deal to go through."  The younger Goncalves went so far as to predict that even

---

[16] CNBC, *Cleveland-Cliffs CEO Lourenco Goncalves on Q4 results* (Jan. 30, 2024), https://www.cnbc.com/video/2024/01/30/cleveland-cliffs-ceo-lourenco-goncalves-on-q4-results.html.

[17] The White House, *Press Briefing by Press Secretary Karine Jean-Pierre and NSC Coordinator for Strategic Communications John Kirby* (Jan. 31, 2024), https://www.whitehouse.gov/briefing-room/press-briefings/2024/01/31/press-briefing-by-press-secretary-karine-jean-pierre-and-nsc-coordinator-for-strategic-communications-john-kirby-44/.

[18] United Steelworkers, *Biden Supports Steelworkers as USW Continues Opposition to Proposed USS-Nippon Deal* (Feb. 2, 2024), https://m.usw.org/news/media-center/releases/2024/biden-supports-steelworkers-as-usw-continues-opposition-to-proposed-uss-nippon-deal.

if CFIUS failed to "find any evidence of a supply chain problem or a national security problem . . . Joe Biden can take a look at that and say, 'Okay, that's great. But my buddy, Dave McCall, the . . . international president of the [United Steelworkers] doesn't want the deal. So, I'm going to side with him. And I'm gonna block.'"

Using those "personal assurances" as leverage, Cliffs next attempted to accomplish through a pressure campaign what it had been unable to accomplish through the bidding process: acquire U. S. Steel for itself. On February 12, 2024, Cliffs CEO Lourenco Goncalves called an investment banker for Nippon Steel and stated that he had inside information that the White House would act to block the merger unless Nippon Steel engaged with Cliffs and agreed to divide U. S. Steel between the two companies. Goncalves stated that the United States government would block the merger on national security grounds. Rebuffing those overtures, Nippon Steel confirmed its commitment to U. S. Steel.

### H.  Before The CFIUS Review Began, President Biden Announced That He Would Block the Merger

Before the CFIUS process had even begun, President Biden announced that he would kill the deal. Just a week after his announcement, the United Steelworkers formally endorsed him for reelection.

On March 1, 2024, United Steelworkers President David McCall sent a letter to the U.S. Senate claiming he was "actively engaged with [CFIUS] to raise our

concerns about the ramifications this proposed deal will have on our national security, critical infrastructure, and supply chain, which includes Nippon Steel Corporation's current export practices and its financial interests in the People's Republic of China."[19]

Less than two weeks later, Cliffs CEO Lourenco Goncalves told a group of investors: "I can't force U.S. Steel to sell to me, but I can work my magic to make a deal that I don't agree with not to close. . . . [I]t's not closing, and Biden hasn't spoken yet. He will."

That same day, Senator Bob Casey of Pennsylvania (who was then running for reelection) called the White House to "deliver a warning about the proposed sale of U. S. Steel"; he told the White House Chief of Staff that if the President did not block the merger, the President's silence would "creat[e] an opening for presumptive GOP presidential nominee Donald Trump" in key swing states like Pennsylvania.[20]

The very next day, March 14, President Biden delivered on Goncalves' promise that he would make a public statement regarding the transaction: the

---

[19] Letter from David McCall, President, United Steelworkers, to U.S. Senators (Mar. 1, 2024), https://usw.org/workplaces/metals/uss-sale/USW_USSteel.pdf.

[20] Gavin Bade, *Biden's US Steel decision highlights 'deference' given to Rust Belt senators, steelworkers*, Politico (Mar. 22, 2024), https://www.politico.com/news/2024/03/22/bidens-us-steel-decision-highlights-deference-given-to-rust-belt-senators-steelworkers-00148477.

President issued his unprecedented, formal public statement announcing that he would block the merger. Under the heading "Statement from President Biden on US Steel," the President emphatically stated his view that U. S. Steel should remain "domestically owned and operated":

> It is important that we maintain strong American steel companies powered by American steel workers. I told our steel workers I have their backs, and I meant it. U.S. Steel has been an iconic American steel company for more than a century, and it is vital for it to remain an American steel company that is domestically owned and operated.

Exhibit A. The statement did not identify any national security reason for opposing the merger. The CFIUS process had not yet even begun.

That same day, the United Steelworkers and the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO), on whose executive council McCall sits, issued statements praising President Biden. United Steelworkers leadership issued a press release stating that it "welcome[d] President Biden's statement on the proposed USS-Nippon deal and share[d] his concerns over the sale's long-term implications for our economic and national security" (even though President Biden's statement did not reference national security).[21] The AFL-CIO posted on social media that "President @JoeBiden promised steelworkers he'd

---

[21] United Steelworkers, *USW Welcomes Biden's Call for U.S. Steel to Remain Domestically Owned and Operated* (Mar. 14, 2024), https://m.usw.org/news/media-center/releases/2024/usw-welcomes-bidens-call-for-u-s-steel-to-remain-domestically-owned-and-operated.

always have their backs, and that's precisely what he did today with his call to keep U.S. Steel American owned and operated."[22]  At the same time, Cliffs CEO Lourenco Goncalves said on an investor call:  "We have been in total contact with the administration, so I know what's going on."  Speaking to a major U. S. Steel stockholder about President Biden's announced opposition to the merger the day before, Goncalves claimed that he "was behind all that."  And Goncalves told a reporter:  "There is no more lobbying, there's no more negotiation.  It's over."[23]

Goncalves then took credit for President Biden's decision to block the merger. On March 15, he told Pentwater Capital, U. S. Steel's third-largest investor: "[T]here is no process. . . . CFIUS is just cover for a President to kill a deal."  On March 19, Goncalves said in a media interview:  "The President of the United States has already spoken. . . . We have assurances from the Biden administration."  Then on a March 20 investor call about the merger, Goncalves said that President Biden had assured him and United Steelworkers President McCall that CFIUS would block the transaction.

---

[22]  @AFLCIO, X (Mar. 14, 2024, 1:28 PM),  https://x.com/AFLCIO/status/1768328422818820252.

[23]  Joe Deaux, *US Steel Rival Is Ready to Pick Up the Pieces If Nippon Deal Collapses*, Bloomberg (Mar. 14, 2024), https://www.bloomberg.com/news/articles/2024-03-14/cliffs-ceo-weighs-lowball-bid-for-us-steel-with-union-backing.

That same day—less than a week after the President announced his intent to block the merger—the United Steelworkers leadership announced its endorsement of President Biden for reelection.[24]  On Cliffs' April 23 earnings call, Goncalves said that the President "will do what he already promised, publicly, to the workers of the USW, to the President of the USW, Dave McCall . . . . So it's game over."[25]

## I.    CFIUS Conducted A Sham Review Process

President Biden's decision to block the merger, made before the CFIUS review process even began, irrevocably tainted CFIUS's review of the merger and deprived Petitioners of any meaningful process.

U. S. Steel and Nippon Steel submitted their notice for CFIUS review on March 11.  On March 26, CFIUS formally accepted the notice and opened a case.

Shortly thereafter, President Biden reiterated that he would block the merger. On April 17—in a speech at United Steelworkers headquarters in Pittsburgh— President Biden repeated that "U.S. Steel has been an iconic American company for more than a century," and that "it should remain a totally American Company . . .

---

[24] United Steelworkers, *USW Endorses Joe Biden for Reelection as President* (Mar. 20, 2024), https://m.usw.org/news/media-center/releases/2024/usw-endorses-joe-biden-for-reelection-as-president.

[25] Cleveland-Cliffs, Inc., *First-Quarter 2024 Earnings Conference Call* (Apr. 23, 2024), https://d1io3yog0oux5.cloudfront.net/_bed724023dcecc40c91d93fa25776e61/clevelandcliffs/db/1111/11757/file/Q1+2024+Earnings+Call+Transcript.pdf.

American owned, American operated, by American steelworkers." The President emphasized: "[T]hat's going to happen. I promise you."[26] Secretary of the Treasury Janet Yellen then reiterated President Biden's "view" "that [U. S. Steel] should remain in American hands" for "the good of the workers in the country."[27] She also stated that the President "ha[d]n't said specifically that it's an issue of national security."[28]

On May 9, CFIUS notified Petitioners that the case would be moving to the investigation phase. On May 23, Petitioners met with CFIUS and indicated their willingness to engage in mitigation to address any potential national security concerns. Petitioners then requested to voluntarily withdraw and immediately refile the notice pursuant to the DPA, which CFIUS approved. *See* 50 U.S.C. § 4565(b)(1)(C)(ii). On July 22, Petitioners met with CFIUS—again at Petitioners' request—to discuss Nippon Steel's commitments to the United Steelworkers and

---

[26] The White House, *Remarks by President Biden on New Actions to Protect U.S. Steel and Shipbuilding Industry from China's Unfair Practices* (Apr. 17, 2024), https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/04/17/remarks-by-president-biden-on-new-actions-to-protect-u-s-steel-and-shipbuilding-industry-from-chinas-unfair-practices-pittsburgh-pa/.

[27] Kyodo News, *Yellen says she thinks U.S. Steel should remain in American hands* (Apr. 17, 2024), https://english.kyodonews.net/news/2024/04/3b2d9343be30-corrected-update1-yellen-says-she-thinks-us-steel-should-remain-in-american-hands.html.

[28] *Id.*

reiterate Petitioners' willingness to implement these commitments and others through an agreement with the government. The next week, Petitioners submitted these commitments in writing. CFIUS nonetheless signaled that it again would move the case to the investigation stage and planned to complete its review by September 23.

Most unusually, CFIUS consistently refused to engage in any discussions with Petitioners about potential national security concerns and proposed mitigation measures, even though such discussions are a routine element of CFIUS reviews and Section 721 of the DPA expressly contemplates such discussions. *See* 50 U.S.C. § 4565(*l*)(3)(A). CFIUS also did not provide Petitioners with a draft national security agreement, as is customary during the investigation phase of a review for a transaction where CFIUS identifies national security concerns.

Accordingly, on August 23, Petitioners requested to once again withdraw and refile the notice to provide additional time for CFIUS to review their commitments that would enhance the U.S. domestic industrial base, supply chain security, and U.S. national security. But rather than grant that request to refile—which it should "ordinarily" do, 31 C.F.R. § 800.509(a)—CFIUS did nothing.

**J. CFIUS For The First Time Identified Purported National Security Concerns, And The President Reiterated His Intent To Block The Merger**

After months without identifying any national security concerns, on August 31—the Saturday of Labor Day weekend—CFIUS sent Petitioners a 17-page letter. *See* Exhibit E. That letter, which mirrored many of the talking points advanced by United Steelworkers leadership, for the first time purported to identify national security concerns relating to the merger, including that it poses "risks to the national security of the United States" because of "potential decisions by [Nippon Steel Corporation] that could lead to a reduction in domestic steel production capacity." Although Petitioners had repeatedly made clear that they were willing to commit to enforceable mitigation measures, CFIUS's letter did not mention the potential mitigation measures Petitioners had suggested.

CFIUS demanded a response to the letter by the opening of business on Wednesday, September 4, just one business day later. That was a marked departure from the customary response time to CFIUS requests of three business days, which is specified by regulation for other responses. *See* 31 C.F.R. § 800.504(a)(4).[29] When, on September 1, Petitioners requested an explanation for this unusual timing,

---

[29] U.S. Department of the Treasury, *CFIUS Overview*, https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius/cfius-overview (last accessed January 5, 2025).

they were told that the CFIUS staff had been instructed to be in "listen mode" only, and therefore could not offer any substantive response or explanation for the timing.

While Petitioners were working over Labor Day weekend to respond to CFIUS's letter, President Biden and Vice President Harris held a campaign rally in Pittsburgh attended by United Steelworkers President McCall.  At the rally, President Biden doubled down on his earlier commitment, declaring:  "I made it clear last time I was in Pittsburgh:  United States Steel . . . is going to remain an American company."[30]  Vice President Harris, then the Democratic nominee for President, echoed the President's position that U. S. Steel must remain "American-owned and American-operated."[31]

### K.    Petitioners' Response To CFIUS's Risk Letter Established That There Are No Substantiated National Security Concerns

Petitioners submitted a detailed, 100-page response to CFIUS's August 31 letter on September 3, within one business day after receiving the letter.  *See* Exhibit F.  Petitioners addressed CFIUS's purported concerns in detail, corrected material factual inaccuracies and omissions in CFIUS's letter, and attached, among other things, a formal proposed mitigation term sheet.  Petitioners reaffirmed their

---

[30] The White House, *Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA* (Sept. 2, 2024), https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/09/02/remarks-by-president-biden-and-vice-president-harris-at-a-campaign-event-pittsburgh-pa.

[31] *Id.*

commitment to enhancing U. S. Steel's domestic steel production and Nippon Steel Corporation's intent to enter into a legally enforceable agreement to make investments to extend the life of U. S. Steel's facilities, and they highlighted mitigation measures that Nippon Steel was prepared to implement to satisfy any purported national security concerns. Petitioners also renewed their request to withdraw and refile their notice to provide additional time for CFIUS to review commitments that would enhance the U.S. domestic industrial base, supply chain security, and U.S. national security.

CFIUS's August 31 letter contained assertions that make no sense. For example, the letter suggested that, because Nippon Steel Corporation has not been an active user of U.S. trade remedies, it likely would interfere with U. S. Steel's longstanding practice of actively participating in trade remedy actions. Far from being supported by credible evidence, that claim distorted the legal and commercial considerations involved in trade remedy proceedings. As a foreign producer, Nippon Steel Corporation could not invoke U.S. trade measures to contest harmful trade actions, which may be done only by U.S. producers of a particular product; and Nippon Steel's U.S. subsidiaries had in fact participated in support of U.S. trade remedy proceedings. Post-acquisition, Nippon Steel Corporation would have every incentive to support, initiate, and maintain any relevant trade measures to maximize the company's U.S. domestic profits. In addition, before the August 31 letter,

Nippon Steel Corporation had repeatedly communicated to CFIUS that it was prepared to enter into a binding commitment to refrain from interfering with U. S. Steel's decisions to pursue trade cases.

The letter also speculated that Nippon Steel might increase its imports into the United States in the future, including from its affiliates in Japan and India. But that speculation was contradicted by the actual evidence. Trade barriers—including Section 232 tariffs, antidumping and countervailing duties, and high transportation costs—make foreign imports uncompetitive in the North American steel markets. The United States-Mexico-Canada Agreement, which requires that automobile assemblies contain a certain percentage of components sourced in North America, further limits demand for foreign-produced steel in the United States. It simply would not benefit Nippon Steel Corporation to introduce competition and cannibalize sales from an affiliate, U. S. Steel, in which it would have just invested nearly $18 billion.

All evidence about Nippon Steel Corporation's actual operations—and the operations of other similar publicly-traded Japanese investors operating in the United States—demonstrates that Nippon Steel is a rational economic actor that does not cannibalize its American subsidiaries to help foreign affiliates. Indeed, doing so would directly contradict the basis for the merger, which is to enable Nippon Steel's

participation in a growing U.S. market that it cannot effectively reach with foreign imports.

The letter also cited numerous challenges facing the U.S. domestic steel industry, including underutilized production capacity, aging facilities, and alleged dependence on low-quality imports to mitigate critical domestic shortages. However, as Petitioners explained in detail in their response, those challenges are not national security concerns resulting from the merger. And, in any event, those challenges will be remedied by the merger. The letter failed to account for the raft of evidence that Nippon Steel Corporation's investment will help address these challenges, including through the investment of significant capital, the sharing of world-leading technologies, and a commitment to support and extend the life of U. S. Steel's blast furnace facilities (which now risk being idled).[32]

These are just some examples of the stark departures from credible evidence and from logical, risk-based analysis that pervaded CFIUS's August 31 letter—all of which were conclusively rebutted in Petitioners' September 3 response.

### L. Public Scrutiny Yielded More Perfunctory CFIUS Process, While The President Reiterated That He Would Block The Merger

On September 6, following a barrage of media reports that the President was about to block the merger, CFIUS attempted to cure its blatantly inadequate process

---

[32] Tita, *supra* note 3.

and conceal its deviation from usual procedures by offering Petitioners a brief meeting with Committee staff. That meeting did not provide Petitioners any meaningful insight into CFIUS's claimed national security concerns, and CFIUS did not offer any suggestions for mitigation or respond to Petitioners' mitigation term sheet. On the very same day, United Steelworkers President McCall greeted President Biden shortly after the President stepped off of Air Force One in Michigan for another campaign stop, their second meeting in a week.

On September 9, Petitioners presented CFIUS with a proposed national security agreement, in the hopes that it would prompt a dialogue on mitigation measures. Two days later, Petitioners met with CFIUS to reiterate the merger's benefits to the United States, the negative consequences of blocking the merger for U. S. Steel and its employees and their communities, and Petitioners' willingness to enter into binding commitments with CFIUS to address any national security concerns. But CFIUS continued to keep Petitioners in the dark about its review of the merger.

Meanwhile, President Biden's stance remained crystal clear. On September 13, a White House spokesperson re-emphasized that the President opposed the merger: "The president's position is that it is vital for U.S. Steel to remain an

American steel company that is domestically owned and operated. . . . The president told our steelworkers he has their backs, and he meant it."[33]

On September 17, amidst substantial public scrutiny of the government's actions and Petitioners' repeatedly expressed concerns about the procedural irregularities to date, CFIUS finally granted Petitioners' August 23 request to withdraw and refile, with the new review period commencing on September 24. That nearly one-month delay was a stark departure from CFIUS's ordinary practice of routinely agreeing to withdraw-and-refile requests without hesitation. It set the transaction on a path for CFIUS to take its final action by December 23.

In late September, Petitioners' counsel notified CFIUS that an arbitration panel had rejected the United Steelworkers' position and concluded that Nippon Steel's commitments to U. S. Steel and its workforce satisfied the successorship obligations under their labor agreement, removing one of the last hurdles to closing the transaction. On October 16, at Petitioners' request, Petitioners met with CFIUS staff to discuss the mitigation framework in Petitioners' proposed national security agreement. At that meeting, however, the staff stated that they lacked authority from CFIUS political leadership to commit to a mitigation framework (or even to provide comments on the draft national security agreement). Instead, the CFIUS staff

_____
[33] Alan Rappeport et al., *Biden Administration Is Likely To Delay Decision Over U.S. Steel*, N.Y. Times (Sept. 13, 2024), https://www.nytimes.com/2024/09/13/business/us-steel-nippon-biden.html.

indicated that all they could do was accept Petitioners' offer to revise their proposed national security agreement. Soon thereafter, Petitioners submitted the updated proposed national security agreement, continuing their good-faith attempts to engage with CFIUS, notwithstanding the lack of any engagement in return.

The White House continued to make clear that the decision had already been made. On September 25, Vice President Harris (by then the Democratic nominee for President) flew to Pittsburgh, was greeted on the tarmac by McCall,[34] and met with U. S. Steel union workers to "reiterate[] her position that the company should remain American owned and operated."[35]

President Biden, asked on September 27 whether the CFIUS extension indicated a softening of his stance against the merger, stated, "I haven't changed my mind."[36]

---

[34] Evan Robinson-Johnson, *Kamala Harris clarifies her opposition to a U.S. Steel sale to Japan's Nippon*, Pittsburgh Post-Gazette (Sept. 26, 2024), https://www.post-gazette.com/business/powersource/2024/09/26/harris-us-steel-nippon-sale/stories/202409260104.

[35] Matt Viser & Jeff Stein, *Harris urges investment in industry and cites her middle-class roots*, Wash. Post (Sept. 25, 2024), https://www.washingtonpost.com/politics/2024/09/25/harris-economy-manufacturing-policy-pittsburgh/.

[36] Reuters, *Biden Still Opposes Nippon Steel[]'s bid for U.S. Steel* (Sept. 27, 2024), https://www.reuters.com/markets/deals/biden-says-he-hasnt-changed-his-mind-nippon-steel-deal-2024-09-27/.

On October 1, the Vice President explicitly tied her opposition to the merger to the United Steelworkers' endorsement, stating her view that "U. S. Steel needs to remain a U.S. company, and that the people working there need to be American workers, [and] I think that is also why . . . I do have the support of the steelworkers union."[37]

On October 11, United States Trade Representative Katherine Tai, a voting member of CFIUS, appeared at an event at a Cliffs facility in Pennsylvania with CEO Lourenco Goncalves and the United Steelworkers Pennsylvania director where Ambassador Tai promised to continue her push for "worker-centered trade policy," and Goncalves reiterated that President Biden "has the backs of the workers."[38] That, of course, was the exact phrase used by President Biden in announcing, and reiterating, his decision to block the transaction.

President Biden underlined his close ties to McCall, and McCall's ties to Ambassador Tai when, a few weeks later, on October 31, President Biden appointed McCall to the Advisory Committee for Trade Policy and Negotiations of the U.S.

---

[37] John Delano, *Kamala Harris defends position of blocking Nippon's purchase of U.S. Steel*, CBS News (Oct. 1, 2024), https://www.cbsnews.com/pittsburgh/news/kamala-harris-us-steel-nippon-deal/.

[38] Cleveland-Cliffs Inc., *Press Conference with USTR Katherine Tai and Secretary of Labor Julie Su*, YouTube (Oct. 11, 2024), https://www.youtube.com/watch?v=pUI-LHKwQxo (16:55; 36:00).

Trade Representative,[39] the very CFIUS member agency headed by Ambassador Tai. The next day, on November 1—his first full day as an advisor to a CFIUS member agency—McCall issued a press release on behalf of the United Steelworkers that said: "We remain confident that our elected leaders will . . . take action to block this deal."[40]

### M. CFIUS Continued Its Sham Review Process After The Election

On November 5, 2024, former President Trump defeated Vice President Harris in the presidential election. On November 7, CFIUS notified Petitioners that its review again was moving to the investigation phase. Although that provided an opportunity for CFIUS to conduct an impartial review outside the glare of the Presidential election, the Potemkin process continued. United Steelworkers President McCall promised to "continue to talk to the CFIUS committee."[41]

---

[39] Office of the U.S. Trade Representative, *USTR Announces New Members to Serve on Advisory Committee for Trade Policy and Negotiations* (Oct. 31, 2024), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2024/october/ustr-announces-new-members-serve-advisory-committee-trade-policy-and-negotiations.

[40] Mike Millsap & David McCall, United Steelworkers, *USS Can Afford to Stand Alone, Invest in Steelmaking* (Nov. 1, 2024), https://m.usw.org/union/mission/industries/metals/resources/bargaining-with-uss/uss-can-afford-to-stand-alone-invest-in-steelmaking.

[41] WTAE-TV Pittsburgh , *USW President McCall: Nippon Steel's promises short-term, jeopardize US steelmaking*, YouTube (Nov. 15, 2024), https://www.youtube.com/watch?v=2ogbeZEYg-Y (13:46).

Alarmed by the irregular CFIUS review, the Chair of the Subcommittee on Oversight and Investigations of the House Financial Services Committee, and other members of Congress, sent CFIUS a preservation request letter on November 22, 2024. The members expressed concern that public statements by senior officials and reports of potential White House involvement in ongoing CFIUS reviews "called into question the integrity of [CFIUS's] decision-making process" and raised the concern that "the statutory mandate . . . to prioritize national security considerations ha[d] been subordinated to political interests."[42] As a result, the letter asked CFIUS to preserve internal communications, and communications with the White House, Cliffs, and United Steelworkers, regarding the transaction. That same day, Ambassador Tai met with United Steelworkers President McCall, her advisor, at the White House.[43]

Petitioners continued to engage in good faith despite the political constraints that obviously were controlling the CFIUS investigation and lack of substantive engagement by CFIUS staff. On December 2, Petitioners submitted a third round of

---

[42] *See* Josh Wingrove, *U.S. Steel Review Targeted by Republicans for Potential Probe*, Bloomberg News (Nov. 25, 2024), https://www.bloomberg.com/news/articles/2024-11-25/us-steel-review-targeted-by-republicans-for-potential-probe.

[43] Evan Robinson-Johnson, *Threatened by foreign investment, Cleveland-Cliffs teamed up with its union to unravel U.S. Steel deal*, Pittsburgh Post-Gazette (Dec. 22, 2024), https://www.post-gazette.com/business/powersource/2024/12/22/cleveland-cliffs-usw-ussteel-foreign-investment/stories/202412220064.

updates and revisions to their proposed national security agreement. In ensuing meetings with CFIUS members and staff, Petitioners presented extensive information demonstrating the national security benefits of the merger and requested, but once again did not receive, feedback from CFIUS. The career CFIUS staff continued to tell Petitioners that they were not authorized by their political-appointee bosses to provide comments or offer counterproposals. CFIUS staff regularly asked Petitioners about any interactions with the United Steelworkers' leadership, making clear that the union's opposition—not any national security risk—was CFIUS's principal focus.

On December 14, CFIUS sent Petitioners another letter repeating many of the same inaccuracies in the August 31 letter, but adding still more errors. *See* Exhibit G.

On December 17, Petitioners submitted a detailed, 60-page response addressing, again, the inaccurate and misleading statements in the CFIUS letter. *See* Exhibit H. Among other things, CFIUS fixated on the possibility that Nippon Steel could cut American steel production, but ignored the fact that U. S. Steel had plans to cut production prior to the merger announcement—and that Petitioners' national security agreement included binding commitments by Nippon Steel to maintain and enhance domestic production. Similarly, CFIUS's letter ignored the unprecedented commitments in the national security agreement to ensure that decisions on trade

matters are made by U.S. citizen directors and officers of U. S. Steel without interference by Nippon Steel.  For example, Nippon Steel would ensure that, going forward, a majority of U. S. Steel's Board of Directors will be non-dual U.S. citizens, including three independent directors approved by CFIUS, and that any material decisions regarding U. S. Steel's participation in trade actions, including those directed at Nippon Steel itself, would be overseen by a trade committee (independent of Nippon Steel).

On December 20, the Deputy Secretaries of the CFIUS cabinet departments held a conference call with Petitioners to discuss the concerns that Petitioners had raised.  Again, the purported "process" was a sham.  Petitioners and supporting participants, including local representatives of steelworkers, were muted and cut off prematurely by the operator managing the call for CFIUS.  There were no questions or engagement by the CFIUS Deputies (who, again, were in "listen mode" only) and the Deputy Secretary of the Treasury, who led the call, failed even to identify who was attending from the government side and ended the call without asking any questions or providing Petitioners with any feedback or update regarding the status of the review.  It was evident that the call was designed to allow the Deputies to claim they had provided Petitioners with "process" while moving forward with the predetermined plan to refer the matter to the President so that he finally could implement his March decision to block the transaction.

**N.    CFIUS Referred The Transaction So That President Biden Could Block The Merger Before Leaving Office**

Despite Petitioners proposing a robust national security agreement with unprecedented mitigation measures, and Petitioners' multiple revisions of that agreement, CFIUS on December 23 reached its predetermined conclusion:  referring the transaction to the President, the necessary predicate for the President to implement his March 2024 decision to block it.

CFIUS informed Petitioners of its decision in a December 23 letter.  *See* Exhibit B.  The letter stated that CFIUS was unable to "reach [a] consensus" on whether Petitioners' proposed measures to mitigate national security risk were sufficient—ignoring that CFIUS consistently refused even to discuss, let alone substantively address, those measures throughout the entire review.  *Id.*  The letter did not indicate any recommendation by CFIUS regarding the action the President should take.  That is not surprising:  Petitioners believe that approximately two-thirds of the CFIUS agencies, including the key national security agencies such as the Departments of Defense, State, and Treasury, found the proposed mitigation measures sufficient. [44]   A minority of agencies, and perhaps only one, led by Ambassador Tai, reached a contrary conclusion.  Those agencies were determined

---

[44] Demitri Sevastopulo et al., *Biden administration split over US Steel deal*, Financial Times (Dec. 11, 2024), https://www.ft.com/content/c86cebe1-6ece-42cc-9d89-65d96bbd69c6.

to refer the transaction to the President to enable him to formalize his already-made decision to block the transaction. It is not clear whether each CFIUS agency provided the President with its recommendation and justification, as the DPA requires.

The December 23 letter identified just one purported national security risk: "[*P*]*otential* reduced output by U.S. Steel *could* lead to supply shortages and delays that *could* affect industries critical to national security." (emphasis added). That speculation is unfounded and the letter elsewhere acknowledged that this is not a legitimate national security risk in any event because "the U.S. government does not directly procure the kind of steel produced by U. S. Steel," which is neither a "critical component" nor a "critical technology" of defense production. Given that fabricated national security "risk," it is unsurprising that CFIUS did not reach a consensus to recommend blocking the transaction.

The next day, United Steelworkers President McCall told union members that the decision to block was now "solely the president's responsibility."[45] Indeed, McCall was so eager to claim credit for his corrupt "victory" that he, once again, publicly underscored his close communication with the administration and parroted

---

[45] Mike Millsap & David McCall, *Nippon Ownership of USS Threatens Long-Term Security*, United Steelworkers (Dec. 24, 2024), https://m.usw.org/union/mission/industries/metals/resources/bargaining-with-uss/nippon-ownership-of-uss-threatens-long-term-security.

the very promise that President Biden made to him nine months earlier: "Given everything we've heard over the past year, we continue to believe that means keeping U.S. Steel domestically owned and operated."

On December 30, Petitioners submitted a fourth iteration of their national security agreement that further addressed the President's and CFIUS's purported concerns. Among other enhancements, the revised national security agreement proposed that Petitioners also would be prohibited, for a full decade, from reducing production capacity at any of its facilities (except for one, which would maintain its capacity for at least two years) without CFIUS approval. It further proposed appointment of a full-time Board observer, subject to CFIUS approval, to attend all meetings of the U. S. Steel Board and its committees to monitor compliance with the national security agreement. Neither the President nor CFIUS responded.

President Biden blocked the merger on January 3, 2025—formalizing the decision he made in March. Exhibit C.[46] In his executive order, President Biden made no findings other than the blanket, speculative assertion that Nippon Steel—a

---

[46] The executive order states that Petitioners "shall take all steps necessary to fully and permanently abandon the Proposed Transaction no later than 30 days after the date of this order, unless such date is extended by the Committee on Foreign Investment in the United States (CFIUS), on such conditions as CFIUS may require." Exhibit C § 2(b). Petitioners intend to address with the Government whether it intends to enforce the 30-day period prior to this Court's decision on the merits, which could require Petitioners to seek preliminary relief from this Court.

company based in one of our closest allies with an American subsidiary that has a five-decade track record of steel operations in the United States—"*might* take action that threatens to impair the national security of the United States." *Id.* (emphasis added). Ironically, just one day earlier, the United States approved the sale to Japan of $3.64 billion worth of advanced air-to-air missiles and associated advanced-technology military equipment—undermining any claim that Japanese investment in the United States could present a national security risk.[47] Indeed, press reports indicate that the President's own National Security Advisor and Secretary of State urged him not to block the merger.[48] But while several of the President's closest advisors, including CFIUS members, argued against his decision, a U.S. government official frankly admitted that, for the President, "[t]he argument came down to politics and legacy."[49]

---

[47] *US approves $3.64bn AMRAAM sale to Japan*, Airforce Technology (Jan. 3, 2025), https://www.airforce-technology.com/news/us-approves-amraam-sale-japan/.

[48] Alexander Ward et al., *Biden's National-Security Aides Wanted to Keep Steel Deal Alive*, Wall St. J. (Jan. 4, 2025), https://www.wsj.com/politics/national-security/bidens-national-security-aides-wanted-to-keep-steel-deal-alive-8de93003.

[49] Ellen Nakashima et al., *Biden rejected appeals of several top advisers in blocking U.S. Steel bid*, Wash. Post (Jan. 4, 2025), https://www.washingtonpost.com/business/2025/01/04/biden-steel-nippon-advisers/.

President Biden's statement accompanying the executive order misleadingly asserted that "a committee of national security and trade experts across the executive branch determined [that] this acquisition would place one of America's largest steel producers under foreign control and create risk for our national security and our critical supply chains."[50]

In fact, multiple CFIUS agencies reached the conclusion that, to the extent the transaction presented any risk, it could be mitigated by a national security agreement. But CFIUS took the President's predetermined route, claiming it could not reach a consensus and punting the matter to him without any apparent recommendation—contrary to the requirements of the DPA—to enable President Biden to implement the decision he had made in March. Indeed the President's only "rationale" was to repeat almost word-for-word what he had said in March: that he had a "responsibility to block foreign ownership of this vital American company" and that "U.S. Steel will remain a proud American company – one that's American-owned, American-operated, by American union steelworkers."[51]

---

[50] Alexander Ward et al., *supra* note 48.

[51] The White House, *Statement from President Joe Biden* (Jan. 3, 2025), https://www.whitehouse.gov/briefing-room/statements-releases/2025/01/03/statement-from-president-joe-biden-13/.

Hours after President Biden's order and statement, McCall commended him for "mak[ing] good on [his] promise to have steelworkers' backs."[52]

## GROUNDS ON WHICH RELIEF IS SOUGHT

Petitioners seek review and invalidation of CFIUS's actions and the President's order on grounds that include, without limitation, the following.

## I. CFIUS'S ACTIONS AND THE PRESIDENT'S ORDER VIOLATED THE U.S. CONSTITUTION

U. S. Steel and Nippon Steel North America acquired protected property and liberty interests when they entered into the merger agreement, triggering the protections of the Due Process Clause. The President and CFIUS violated Petitioners' due process rights arising from those protected interests in three independent ways. *First*, the result was predetermined from the outset; the evidence overwhelmingly establishes that the President decided to block the merger before the DPA review process had even begun. *Second*, Petitioners were deprived of a meaningful opportunity to be heard and to respond to any purported national security concerns. CFIUS conducted a sham process that was designed and conducted to enable the President to implement his predetermined and publicly announced course of action: blocking the transaction. *Third*, CFIUS and the President denied

---

[52] Mike Millsap & David McCall, *Biden Makes Good on Promise to Have Steelworkers' Backs*, United Steelworkers (Jan. 3, 2025), https://m.usw.org/union/mission/industries/metals/resources/bargaining-with-uss/biden-makes-good-on-promise-to-have-steelworkers-backs.

Petitioners' right to equal protection of the laws by unjustifiably treating the merger differently from other similarly situated transactions.

***Petitioners have protected property and liberty interests***.  The Fifth Amendment to the U.S. Constitution provides:  "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 59 (1999).  Here, CFIUS's review and referral and the President's order blocking the transaction deprived Petitioners of constitutionally protected property and liberty interests.

"[T]he existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law."  *Ralls*, 758 F.3d at 315 (quotations omitted).  The merger agreement contains a Delaware choice of law clause.  Merger Agreement § 9.4.  Under Delaware law, "contingent contractual rights . . . are 'property' . . . if and to the extent that they are capable of vesting."  *In re Krafft-Murphy Co.*, 82 A.3d 696, 703 (Del. 2013).  Because the merger agreement is capable of fully vesting at closing, Petitioners have property interests recognized by Delaware law.  That "is enough to trigger the protections of the Due Process Clause."  *Ralls*, 758 F.3d at 316.

In addition, this Court has recognized that liberty interests extend to the freedom of contract. *See Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 961-62 (D.C. Cir. 1980) ("[A] corporation may contract and may engage in the common occupations of life, and should be afforded no lesser protection under the Constitution than an individual to engage in such pursuits."). Accordingly, Petitioners also have a protected liberty interest in closing the merger agreement.

***The President's prejudgment and the political interference during the transaction review violated due process***. This Court has long held that Executive Branch actions violate due process if the decisionmaker approaches the process with a closed mind. Executive officials may not "prejudge cases or . . . make speeches which give the appearance that [a] case has been prejudged." *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 590 (D.C. Cir. 1970); *see Am. Cyanamid Co. v. FTC*, 363 F.2d 757, 767 (6th Cir. 1966). In those circumstances, "the probability of actual bias on the part of the . . . decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Such "extreme cases [that] cross constitutional limits" demand court "intervention." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 887 (2009).

Similarly, this Court has held that administrative action is "invalid if based in whole or in part" on "extraneous pressure." *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971). "[E]xtraneous factors" may "so taint[] the

administrative process" that they "violate[] the right of a party to due process of law." *ATX, Inc. v. DOT*, 41 F.3d 1522, 1527 (D.C. Cir. 1994). "The test is whether extraneous factors intruded into the *calculus of consideration* of the individual decisionmaker." *Id.* (quotations omitted).

The DPA permits the President to block a transaction following a CFIUS referral only if the President finds that there is credible evidence that a foreign person acquiring an interest in a U.S. business through the transaction might take action that threatens national security, and that other laws do not provide adequate and appropriate authority for the President to protect the national security. 50 U.S.C. § 4565(d)(4). Congress directed the President to consider only national security factors in making those determinations. *Id.* § 4565(d)(5). The President's review must be preceded by a valid "risk-based analysis, conducted by [CFIUS], of the effects on the national security . . . of the covered transaction." *Id.* 4565(*l*)(4)(A). These are mandatory requirements before the President can block a transaction.

But here, President Biden made his decision to block the merger before ever considering any possible national security risks. He made his decision on March 14, before the CFIUS review had even commenced, and repeated it publicly multiple times before receiving CFIUS's referral. His predetermined decision, made while campaigning and plainly based on political considerations and not on any national security concerns, deprived Petitioners of due process.

In addition, the President's prejudgment unconstitutionally infected CFIUS's determination—in this Court's words, its "calculus of consideration." *ATX*, 41 F.3d at 1527 (emphasis removed). This was a sham process from the beginning—because it was designed and conducted with the goal of providing support for the President's predetermined decision, which tainted CFIUS's process as well as its findings. That, too, violated due process.

CFIUS's process also was poisoned by improper outside influence. Congress required that CFIUS not disclose "any information or documentary material filed" during the review process. 50 U.S.C. § 4565(c). CFIUS's practice is that all information about that process—including "[t]he fact of a filing"—must remain confidential.[53] Here, even before U. S. Steel and Nippon Steel Corporation submitted their notice to CFIUS, Cliffs CEO Lourenco Goncalves stated that he was in regular communication with the Secretary of Commerce, a CFIUS member and co-lead for the transaction review. Further, United Steelworkers President McCall claimed that he was "actively engaged with [CFIUS] to raise our concerns about the ramifications" of the proposed deal.[54] These "ex parte communications" with third

---

[53] Office of Inv. Sec., U.S. Dep't of the Treasury, *CFIUS Confidentiality*, https://home.treasury.gov/system/files/206/CFIUS-Confidentiality.pdf (last accessed January 5, 2025).

[54] United Steelworkers, *Letter to Congress* (Mar. 1, 2024), https://usw.org/workplaces/metals/uss-sale/USW_USSteel.pdf.

parties intent on sinking the deal for their own self-interested reasons are contrary to the strictly confidential CFIUS process, and they "irrevocably tainted [the review process] so as to make the ultimate judgment of the agency unfair." *Press Broad. Co. v. FCC*, 59 F.3d 1365, 1369 (D.C. Cir. 1995).

***The lack of meaningful opportunity to participate in the transaction review violated due process***. Due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). In other words, an individual deprived of his property or liberty must be afforded a genuine opportunity to "present reasons, either in person or in writing, why proposed action should not be taken," *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985), "at a time when the deprivation can still be prevented," *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).

In the context of Section 721, this Court has held that "due process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls*, 758 F.3d at 319. CFIUS must afford that opportunity before a decision has been made. *See Fuentes*, 407 U.S. at 81; *Ralls*, 758 F.3d at 319. The affected party also must have "the opportunity to tailor its submission to the [President's and CFIUS's] concerns [and] rebut the factual

premises underlying the President's action," through "[a]dequate process at the CFIUS stage." *Ralls*, 758 F.3d at 320. Crucially, the mere "opportunity [for an affected party] to present evidence in its favor in both its voluntary notice filing and during follow-up conversations with—and a presentation to—CFIUS officials" is "plainly not enough to satisfy due process." *Id.* at 319-20.

Here, CFIUS's sham review of the merger was marked by significant well-documented irregularities that denied Petitioners a meaningful opportunity to address, and mitigate, if necessary, any purported national security concerns. Those include CFIUS:

- detailing purported national security concerns for the first time over a holiday weekend, after reviewing and investigating the transaction for over five months; providing Petitioners only one business day to respond; informing Petitioners that CFIUS staff had been "instructed" only to listen and not provide any response to Petitioners when questioned about the extraordinary letter and timeline for response; and all while President Biden reiterated his decision to block the merger during a campaign event with an opponent of the transaction;

- delaying action on Petitioners' routine request to withdraw and refile their notice to allow more time to engage with CFIUS on any potential concerns, *see* 50 U.S.C. § 4565(b)(1)(C)(ii)-(iii), until public pressure built to grant the request;

- declining to provide a formal national security agreement draft or proposed mitigation terms at any point in the process or even to comment on the multiple draft agreements provided by Petitioners, as CFIUS staff admitted they could not substantively engage with Petitioners on the draft agreement because they lacked authorization from the President's appointees; and

- issuing a referral to the President without each agency expressing a view on the extent to which the mitigation measures proposed by Petitioners

addressed the alleged national security risks or the ultimate action the President should take with respect to the transaction.

Tainted by the President's clear and publicly announced prejudgment of the transaction, this process provided Petitioners a wholly inadequate opportunity to correct CFIUS's claimed misunderstandings of material facts about the transaction or to engage with CFIUS on Petitioners' proposed terms to mitigate any national security risks. Even after granting the withdraw-and-refile request, the CFIUS process was an exercise in futility as the conclusion was predetermined. The CFIUS process therefore has not provided an opportunity for Petitioners to be heard "at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333, when the deprivation of their property rights could "still be prevented," *Fuentes*, 407 U.S. at 81.

***The unjustified decision to block the merger denied Petitioners equal protection of the laws***. The Due Process Clause of the Fifth Amendment forbids the federal government from denying equal protection of the laws. That constitutional guarantee requires that persons who are similarly situated receive equal treatment from the federal government. *See, e.g.*, *Schlesinger v. Ballard*, 419 U.S. 498, 500 n.3 (1975); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

The President and CFIUS violated Petitioners' right to equal protection because the merger was treated differently from other similarly situated transactions. Japan is a longstanding ally of the United States, and CFIUS has routinely permitted

Japanese investments into similar U.S.-based manufacturing companies over the past decade. None was blocked for any reason. Nor have other acquisitions of United States steel facilities been blocked, even when the acquiring entities were located in countries that posed direct national security threats to the United States, such as Russia. As explained, there was no valid national security basis for blocking the merger; the decision was a foregone conclusion based entirely on political considerations.

Accordingly, there was no rational basis for the President's and CFIUS's differential treatment of Nippon Steel's proposal to acquire U. S. Steel. Petitioners were "singled out by the government" for unjustified and unequal treatment, *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008), violating Petitioners' constitutional right to due process by denying them equal protection under the laws.

## II. CFIUS'S ACTIONS VIOLATED THE DEFENSE PRODUCTION ACT AND THE ADMINISTRATIVE PROCEDURE ACT

In making its referral, CFIUS violated both the DPA, 50 U.S.C. § 4565, and the APA, 5 U.S.C. § 500 *et seq.* It did so in three ways. *First*, it failed to conduct the required reasoned risk-based analysis of the effects on national security of the merger; it deviated dramatically from its usual process in order to try to create a gerrymandered record with manufactured, pretextual national security concerns that would support the President's predetermined result. *Second*, it made a contrived decision that ran counter to the evidence before the agency because the President

had already decided to block the merger. *Third*, it did not follow the procedures required by the DPA.

Both the DPA and the APA provide causes of action to challenge CFIUS's actions. The DPA states that aggrieved parties may challenge "an action or finding under" the DPA. 50 U.S.C. § 4565(e)(2). CFIUS's August 31 and December 14 letters assessing the national security risks posed by the merger are "findings" within the meaning of 50 U.S.C. § 4565(e)(2), and CFIUS's referral of the transaction to the President pursuant to 50 U.S.C. § 4565(*l*)(2) is an "action" within the meaning of 50 U.S.C. § 4565(e)(2).[55]

CFIUS's referral to the President is final agency action subject to APA review. The APA provides judicial relief to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. CFIUS's transaction review is an "[a]ction[] . . . to address national security risks" that CFIUS "complete[s] . . . with respect to the transaction." 50 U.S.C. § 4565(*l*). The referral to the President marks the "'consummation' of [CFIUS's] decisionmaking process," and "legal consequences . . . flow" from that decision. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Specifically, once CFIUS completes its investigation or makes the referral,

---

[55] Because an aggrieved party may challenge an "action *or finding*," 50 U.S.C. § 4565(e)(2) (emphasis added), the DPA cause of action is broader than a cause of action under the APA.

the President "shall announce" within 15 days "the decision on whether or not to take action." 50 U.S.C. § 4565(d)(2).

Whether the claim arises under the DPA or the APA, the standard of review is the same. Section 721 of the DPA does not specify a review standard, and when Congress is silent, the Court's review is guided by the APA's standard of review. *See Sierra Club v. Glickman*, 67 F.3d 90, 96 (5th Cir. 1995); *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982); *see also* 33 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8393 (2d ed.). Under the APA's standard, a court will "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to a constitutional right, power, privilege, or immunity," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

CFIUS's actions were arbitrary, capricious, and contrary to law. To survive arbitrary-and-capricious review, an agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The agency must "offer[] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (alteration and quotations omitted). An agency's decision is arbitrary and capricious if political pressure caused the agency to make its decision

based on considerations other than those permissible under the relevant statute. *Connecticut v. DOI*, 363 F. Supp. 3d 45, 63-64 (D.D.C. 2019) (citing *ATX*, 41 F.3d at 1529).

Here, CFIUS's referral was based on pretextual reasons. CFIUS simply provided a referral to enable the President to implement his predetermined, and preannounced, decision, based on political considerations, reached before the review process even began. To the extent CFIUS explained its reasoning at all, it did so with pretext based primarily on speculation, mirroring United Steelworkers leadership's talking points, that the merger may reduce steel production in the United States and interfere with U. S. Steel's longstanding practice of participating in trade remedy actions. As explained above, CFIUS's asserted concerns do not even pertain to national security.

Petitioners have demonstrated that these concerns are baseless. Petitioners repeatedly committed to securing U. S. Steel's domestic operations and expanding—not shrinking—domestic steel production. Indeed, this long-term growth strategy is why Nippon Steel is investing almost $18 billion in U. S. Steel. It would defy common sense for Nippon Steel, a public company trying to maximize profit for its stockholders, to invest so heavily in U. S. Steel's steelmaking facilities only to turn around and shutter them.

Consistent with its investment goals, Nippon Steel has committed to maintaining U. S. Steel's headquarters in Pittsburgh and not transferring jobs or steel production overseas. It has also committed to ensure no layoffs or plant closures through the current term of the existing basic labor agreement between the United Steelworkers and U. S. Steel. It has committed to maintain the production capacity of U. S. Steel's facilities. Further, Nippon Steel committed to leveraging its technological capabilities to improve U. S. Steel's manufacturing capabilities. These are not abstract goals. Nippon Steel committed to invest at least $1 billion in improving U. S. Steel's yield, energy efficiency, and product quality at the Mon Valley Works facilities and approximately $300 million to revamp its largest blast furnace in Gary, Indiana. CFIUS staff and CFIUS agency political appointees refused to discuss Petitioners' commitments or the adequacy of the proposed national security agreement that included them.

CFIUS's referral also ran counter to evidence Petitioners submitted demonstrating that the merger will strengthen the domestic steel industry and that blocking the merger will weaken it—the precise result that CFIUS identified as a national security risk. As Petitioners explained to CFIUS, U. S. Steel cannot modernize its blast furnace facilities without Nippon Steel's injection of significant capital and cutting-edge technology. Without the merger, U. S. Steel could be forced to idle its Gary blast furnace, resulting in reduced domestic steel production and

exacerbated shortages, and to permanently idle its Granite City facility. CFIUS refused to consider these risks—and the fact that the transaction would prevent them—even though the DPA requires CFIUS to consider any risk that "arises as a result of the covered transaction." 50 U.S.C. § 4565(*l*)(3)(A)(i).

The sham referral process was the result of the President's prejudgment. The President's repeated public statements that he would block the merger before and during CFIUS's review ensured that CFIUS would not base its referral on the risk-based assessment that Section 721 requires. It therefore is no surprise that "the evidence tells a story that does not match the explanation [CFIUS] gave for [its] decision." *Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019). The circumstances surrounding the review process underscore the inadequacy of CFIUS's rationale for its actions.

Separately, CFIUS violated Section 721's procedural requirements. Any referral to the President "shall be based on a risk-based analysis . . . of the effects on the national security of the United States of the covered transaction." 50 U.S.C. § 4565(*l*)(4)(A). Further, that assessment "shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." *Id*. Again, Congress's clear direction is that CFIUS must consider each of those factors—and that each CFIUS member must express a view regarding the national

security risk.  *Id*. § 4565(*l*)(4)(A) & (B).  CFIUS may "refer [a] transaction" to the President only after it "complete[s]" that "action."  *Id.* § 4565(*l*)(2).

Here, President Biden decided that he would block the merger before the CFIUS review even began.  Then CFIUS sought to conjure up a national security rationale to support the President's decision.  CFIUS worked backwards to try to come up with a national security justification for the President's decision.  CFIUS therefore did not conduct the genuine risk-based analysis that Section 721 requires and CFIUS members did not provide the explanation for their positions that the statute requires.  Without that risk-based analysis, and by basing the referral on impermissible political considerations and not on national security concerns, CFIUS's referral violated the DPA.

CFIUS violated other DPA requirements in the course of its review.  CFIUS must conduct a closed proceeding between the government and the parties to the transaction.  *See* 50 U.S.C. § 4565; 31 C.F.R. § 800.802.  But here, CFIUS opened up the process, repeatedly taking input from those publicly opposed to the merger and who hope to benefit from its failure, including United Steelworkers leadership and the Cliffs CEO—third parties that had vigorously opposed the merger even before CFIUS began its review.  Further, CFIUS's communications with United Steelworkers leadership violated its obligation to maintain confidentiality during the review process.  These procedural violations confirm that the CFIUS review process

was a sham and its outcome preordained, without regard for Section 721's procedural safeguards.

## III.  THE PRESIDENT'S ACTION WAS *ULTRA VIRES*

The President's order exceeded the scope of his authority under Section 721. That order was *ultra vires* because the President decided to block the merger before he received CFIUS's national security analysis—indeed, before the CFIUS process even began—and because he made that decision for partisan political reasons wholly unrelated to national security.  *See* 50 U.S.C. § 4565(b)(1)(A), (d)(4).

Where the Executive Branch's "powers are limited by statute, . . . actions beyond those limitations are . . . not sovereign actions."  *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).  Courts accordingly may "grant relief" where the Executive does not "obey [the] statutory commands" of Congress.  *Dart v. United States*, 848 F.2d 217, 223 (D.C. Cir. 1988).  Even when the President purports to interfere with private rights on the basis of national security, the courts have a critical role to play in ensuring that the President has either statutory or independent constitutional authority to do so.  *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583, 585-87 (1952) (setting aside the President's seizure of steel mills to address labor issues in the midst of the Korean War as lacking independent constitutional authority or Congressional authorization); *id.* at

637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . .").

Section 721 allows the President to "suspend or prohibit any covered transaction" "only if the President finds that" (A) "there is credible evidence that leads the President to believe" that the transaction "threatens to impair the national security" and (B) other "provisions of law . . . do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security." 50 U.S.C. § 4565(d)(4). In making these findings, the President must "consider . . . as appropriate," *id.* § 4565(b)(1)(A)(ii), the listed national security "factors," *id.* § 4565(f). Section 4565(d)(4) therefore empowers the President to act only if he finds evidence of a threat to national security that he cannot address through other authorities. The President has *no* authority to block a merger simply because he disagrees with it and certainly not for political reasons.

The President's order was not within the scope of Section 721's limited grant of authority. As discussed above, the President faced significant political pressure and decided before the CFIUS review even began that he would block the merger, receiving the United Steelworkers' endorsement a week later. While CFIUS sought to conjure up a national security rationale to support that decision, the President repeatedly reiterated his commitment to blocking the merger, giving United

Steelworkers President McCall every assurance of the outcome ahead of the election—and nine months before receiving any information from CFIUS.

Section 721 imposes clear, critical guardrails on the President's authority. He cannot act until CFIUS conducts a risk-based analysis after which CFIUS members refer the transaction to the President, concluding that the transaction poses unresolved national security concerns and expressing their views on why those concerns cannot be resolved through a mitigation agreement—or expressing contrary views if the CFIUS agencies disagree. 50 U.S.C. § 4565(*l*)(2), (4)(B). Even then, the President may prohibit a transaction only if he finds that there is credible evidence that the transaction threatens to impair national security and other provisions of law do not provide authority to protect the national security. *Id.* § 4565(d)(4).

But here, the President acted before the required events occurred and the timing of his decision makes clear that he did not base his decision on permissible national security grounds but rather on his own political interests. The President also failed to make an evidence-based finding that the merger presents a national security risk that cannot adequately be addressed through other authorities. Nor did the President address Petitioners' mitigation proposals, or acknowledge the credible evidence that blocking the transaction will *diminish* domestic production, or explain why other laws are insufficient to address any concerns. Instead, President Biden

decided in March 2024, without any evidence, that it was "vital for [U. S. Steel] to remain an American steel company that is domestically owned and operated," and then he reiterated in January 2025, still without evidence, that "U. S. Steel will remain a proud American company – one that's American-owned, American-operated, by American union steelworkers." But the DPA does not authorize the President to block private commercial transactions based on political expediency. And, in any event, the substance of the executive order ultimately does not matter because the President made his decision long before he was presented with any national security information about the merger.

Section 721 does not foreclose review of Petitioners' *ultra vires* argument. Section 721 bars judicial review of the President's "action" to "suspend or prohibit any covered transaction" and the President's "find[ings]" that "there is credible evidence" that the transaction presents a national security threat and other laws "do not, in the judgment of the President, provide adequate and appropriate authority" to address it. 50 U.S.C. § 4565(e)(1), (4). But it is well established that *ultra vires* action is reviewable notwithstanding a provision that precludes judicial review of action that might, in other circumstances, be authorized. *See Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003); *Dart*, 848 F.2d at 224.

Concluding that the President's order was *ultra vires* is necessary to avoid a serious constitutional question concerning the separation of powers. Separation-of-

powers principles preclude Congress from "transfer[ring] to another branch powers which are strictly and exclusively legislative." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (quotations omitted). Congress therefore may delegate legislative functions to another branch only if "Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.*

If Section 721's clear limits on the President's authority are not enforceable, and the President can ignore the procedural and substantive limits on his authority and block private sector transactions for any reason he chooses, with no judicial review, then that statute lacks any intelligible principle to guide or constrain the President's actions. That constitutional infirmity would be especially pronounced here, because the delegation in Section 721 involves "major national policy decisions" that "must be made by Congress and the President in the legislative process." *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari discussing *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 685-86 (1980) (Rehnquist, J., concurring in judgment)).

The Court should hold that the President acted without authorization and that the order must therefore be set aside. Alternatively, if the Court concludes that the DPA imposes no enforceable procedural or substantive constraints on the President's authority, and allows him to decide to block a transaction at any time or for any

reason he chooses, even political expediency, as occurred here, the Court should hold Section 721 unconstitutional.

## REQUESTED RELIEF

Petitioners request that this Court hold unlawful, vacate, enjoin, and set aside CFIUS's actions and the President's order; order CFIUS to review the merger consistent with due process and the DPA; and grant any further relief that may be appropriate. Given the June 2025 deadline for closing the transaction, Petitioners request that the Court consider this matter on an expedited basis.

Dated:  January 6, 2025

/s/ David B. Hennes
David B. Hennes
Alexander B. Simkin
Andrew S. Todres
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
David.Hennes@ropesgray.com
Alexander.Simkin@ropesgray.com
Andrew.Todres@ropesgray.com

Douglas H. Hallward-Driemeier
Stefan P. Schropp
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-
Driemeier@ropesgray.com
Stefan.Schropp@ropesgray.com

*Counsel for Petitioners Nippon Steel North America, Inc. and Nippon Steel Corporation*

/s/ Andrew J. Pincus
Andrew J. Pincus
Nicole A. Saharsky
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, Northwest
Washington, DC 20006
(202) 263-3000
APincus@mayerbrown.com
NSaharsky@mayerbrown.com
WMallat@mayerbrown.com

Avi M. Kupfer
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
AKupfer@mayerbrown.com

Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
BBright@mayerbrown.com

*Counsel for Petitioner United States Steel Corporation*

# CORPORATE DISCLOSURE STATEMENT

United States Steel Corporation ("U. S. Steel") is a publicly traded company incorporated in Delaware. U. S. Steel has no parent and its business is steel manufacturing. No publicly traded company owns 10% or more of U. S. Steel's stock.

/s/ Andrew J. Pincus
Andrew J. Pincus

*Counsel for U. S. Steel Corporation*

Nippon Steel North America, Inc. ("NSNA") is a privately held corporation incorporated in the state of New York. NSNA is a wholly owned subsidiary of Nippon Steel Corporation ("NSC") and is the company through which NSC owns businesses that conduct steel manufacturing operations in the United States. NSNA has no other parent company. NSC is a publicly traded corporation incorporated in Japan and is one of the world's leading steel manufacturers. NSC has no parent company, and no publicly traded company owns 10% or more of NSC's stock.

/s/ David B. Hennes
David B. Hennes

*Counsel for Nippon Steel Corporation
and Nippon Steel North America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of January, 2025, I caused copies of the foregoing Petition for Review and Corporate Disclosure Statement to be served upon the following recipients:

By certified mail, postage prepaid:

Joseph R. Biden
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Committee on Foreign Investment in the United States
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

Janet L. Yellen
Secretary of the Treasury of the United States
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Matthew M. Graves
United States Attorney
601 D Street, NW
Washington, DC 20579

/s/ Andrew J. Pincus
Andrew J. Pincus