ORAL ARGUMENT NOT YET SCHEDULED

No. 25-1004

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES STEEL CORPORATION; NIPPON STEEL NORTH
AMERICA, INC.; and NIPPON STEEL CORPORATION,

*Petitioners*,

v.

THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED
STATES, ET AL.,

*Respondents*.

On Petition for Review of Actions of President Biden and of the
Committee on Foreign Investment in the United States

**BRIEF OF PETITIONERS**

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-
Driemeier@ropesgray.com

Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
APincus@mayerbrown.com

*Counsel for Petitioners Nippon
Steel North America, Inc. and
Nippon Steel Corporation*

*Counsel for Petitioner United
States Steel Corporation*

*(Additional counsel listed on signature page)*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**1.    Parties and Amici**

There were no district court proceedings in this case.

The parties in this Court are:

> Petitioners: United States Steel Corporation; Nippon Steel North America, Inc.; and Nippon Steel Corporation.

> Respondents: The Committee on Foreign Investment in the United States; Donald J. Trump, in his official capacity as President of the United States; Scott Bessent, in his official capacity as Secretary of the Treasury and Chairperson of the Committee on Foreign Investment in the United States; and James R. McHenry III, in his official capacity as Acting Attorney General of the United States.

No intervenors or amici have appeared in this case.

**2.    Rulings under Review**

Petitioners seek review of (a) President Biden's order blocking the merger between United States Steel Corporation, Nippon Steel North America, Inc., and Nippon Steel Corporation; and (b) the action of the Committee on Foreign Investment in the United States referring the transaction to President Biden.

**3.    Related Cases**

This case has not previously been before this Court or any other court.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

United States Steel Corporation (U. S. Steel) states that it is a publicly traded company incorporated in Delaware. U. S. Steel has no parent and its business is steel manufacturing. No publicly traded company owns 10% or more of U. S. Steel's stock.

/s/ Andrew J. Pincus
Andrew J. Pincus
*Counsel for U. S. Steel Corporation*

Nippon Steel North America, Inc. (NSNA) states that it is a privately held corporation incorporated in the state of New York. NSNA is a wholly owned subsidiary of Nippon Steel Corporation (NSC) and is the company through which NSC owns businesses that conduct steel manufacturing operations in the United States. NSNA has no other parent company. NSC is a publicly traded corporation incorporated in Japan and is one of the world's leading steel manufacturers. NSC has no parent company, and no publicly traded company owns 10% or more of NSC's stock.

/s/ David B. Hennes
David B. Hennes
*Counsel for Nippon Steel Corporation and Nippon Steel North America, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

JURISDICTION ................................................................. 9

ISSUES ........................................................................... 9

STATEMENT ................................................................... 10

    A.   Statutory And Regulatory Background. ................... 10

    B.   The U. S. Steel–Nippon Steel Transaction. ............. 14

    C.   President Biden's March 2024 Decision To Block The
        Transaction. ................................................... 15

    D.   The CFIUS Review Process .................................... 19

    E.   The CFIUS Referral And Presidential Order. ........... 28

SUMMARY OF THE ARGUMENT .......................................... 30

STANDING ..................................................................... 32

STANDARD OF REVIEW ................................................... 33

ARGUMENT ................................................................... 33

I.    THE PRESIDENT'S ORDER AND CFIUS'S ACTION EACH
    VIOLATED DUE PROCESS. ............................................ 33

    A.   Petitioners Have A Protected Property Interest ........ 35

    B.   President Biden's Determination Violated Due Process. ........ 37

        1.   Petitioners received no process before President Biden
            decided to block the transaction. ....................... 37

        2.   President Biden prejudged the transaction. ........... 39

        3.   President Biden's action is not saved by CFIUS's
            "consideration" of the transaction. ..................... 42

    C.   CFIUS's Referral Violated Due Process. ................. 49

II.   CFIUS's Actions Violated The Defense Production Act And The
    Administrative Procedure Act. ...................................... 51

    A.   CFIUS's Actions Are Subject To Judicial Review Under The
        Defense Production Act And APA. ......................... 52

    B.    CFIUS's Findings And Action Were Arbitrary And Capricious And Contrary To Law. ............................................................. 54

        1.    CFIUS acted based on President Biden's predetermination, not the governing statutory standards. ............................ 54

        2.    CFIUS's review was suffused with multiple procedural violations. ................................................................... 56

        3.    CFIUS's referral did not comply with Section 721's requirements. ................................................................. 62

        4.    CFIUS's findings and action were wholly unsupported by the evidence before the Committee. .................................. 63

III.  PRESIDENT BIDEN'S DECISION TO BLOCK THE MERGER WAS *ULTRA VIRES*. ....................................................... 67

CONCLUSION ..................................................................... 70

CERTIFICATE OF COMPLIANCE ........................................... 71

CERTIFICATE OF SERVICE ................................................... 71

STATUTORY ADDENDUM ................................................... A-1

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aera Energy LLC v. Salazar,*
   642 F.3d 212 (D.C. Cir. 2011) ........................................................ 56, 58

*Alaska Dep't of Envtl. Conservation v. EPA,*
   540 U.S. 461 (2004) ................................................................................ 53

*In re Altaba, Inc.,*
   264 A.3d 1138 (Del. Ch. 2021) ............................................................ 36

*Am. Mfrs. Mut. Ins. v. Sullivan,*
   526 U.S. 40 (1999) .................................................................................. 35

*Ass'n of Nat'l Advertisers, Inc. v. FTC,*
   627 F.2d 1151 (D.C. Cir. 1979) .......................................................... 40

*ATX, Inc. v. U.S. Dep't of Transp.,*
   41 F.3d 1522 (D.C. Cir. 1994) ............................................................ 47

*Bd. of Regents of State Colls. v. Roth,*
   408 U.S. 564 (1972) ................................................................................ 35

*Burns v. Office of Workers' Comp. Programs,*
   41 F.3d 1555 (D.C. Cir. 2004) ............................................................ 50

*Cinderella Career & Finishing Schs., Inc. v. FTC,*
   425 F.2d 583 (D.C. Cir. 1970) ...................................................... 39, 41

*Cleveland Bd. of Educ. v. Loudermill,*
   470 U.S. 532 (1985) ................................................................................ 34

*Connecticut v. DOI,*
   363 F. Supp. 3d 45 (D.D.C. 2019) ...................................................... 54

*D.C. Fed'n of Civic Ass'ns v. Volpe,*
   459 F.2d 1231 (D.C. Cir. 1971) .......................................... 7, 47, 54, 56

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ................................................................ 37

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) ............................................... 69

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019) ......................................................... 39, 49

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ................................................................ 64

*Fuentes v. Shevin*,
    407 U.S. 67 (1972) ........................................................... 34, 48

*Gray Panthers v. Schweicker*,
    652 F.2d 146 (D.C. Cir. 1980) ......................................... 34, 49

*Hostrop v. Bd. of Jr. Coll. Dist. No. 515*,
    523 F.2d 569 (7th Cir. 1975) .................................................. 42

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
    92 F.3d 1248 (D.C. Cir. 1996) ............................................... 57

*In re Krafft-Murphy Co.*,
    82 A.3d 696 (Del. 2013) .......................................................... 36

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ................................................................ 67

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................ 33

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ......................................................... 33, 48

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
    Auto. Ins.*,
    463 U.S. 29 (1983) .................................................................. 63

*Nat'l Small Shipments Traffic Conf., Inc. v. ICC*,
    725 F.2d 1442 (D.C. Cir. 1984) ............................................. 40

*Neustar, Inc. v. FCC,*
  857 F.3d 886 (D.C. Cir. 2017) ........................................................... 41

*Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio,*
  301 U.S. 292 (1937) ........................................................................... 49

*Ohio v. EPA,*
  603 U.S. 279 (2024) ........................................................................... 64

*Press Broad. Co. v. FCC,*
  59 F.3d 1365 (D.C. Cir. 1995) ........................................................... 61

*Ralls Corp. v. CFIUS,*
  758 F.3d 296 (D.C. Cir. 2014) ............. 1-2, 30-31, 33-38, 43, 47, 48, 49

*Rock River Health Care, LLC v. Eagleson,*
  14 F.4th 768 (7th Cir. 2021) ............................................................. 36

*Soundboard Ass'n v. FTC,*
  888 F.3d 1261 (D.C. Cir. 2018) ......................................................... 53

*Staton v. Mayes,*
  552 F.2d 908 (10th Cir. 1977) ........................................................... 42

*Withrow v. Larkin,*
  421 U.S. 35 (1975) ............................................................................. 40

*XP Vehicles, Inc. v. Dep't of Energy,*
  118 F. Supp. 3d 38 (D.D.C. 2015) ................................................ 57, 58

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ..................................................................... 10, 67

**Statutes**

5 U.S.C.
  § 702 .............................................................................................. 9, 53
  § 706(2) .............................................................................................. 54
  § 706(2)(A) ......................................................................................... 33
  § 706(2)(C) ......................................................................................... 33
  § 706(2)(D) ......................................................................................... 33

50 U.S.C.

    § 4565 ...................................................................................... 2, 9, 10

    § 4565(b)(1)(A) .............................................................................. 11

    § 4565(b)(1)(A)(i) .......................................................................... 58

    § 4565(b)(1)(A)(ii) ......................................................................... 11

    § 4565(b)(1)(B) .............................................................................. 11

    § 4565(b)(2) .................................................................................... 58

    § 4565(b)(3)(A) .............................................................................. 11

    § 4565(d)(1) ................................................................................... 13

    § 4565(d)(4) ............................................................................. 13, 68

    § 4565(d)(4)(B) ......................................................................... 11, 50

    § 4565(d)(5) ................................................................................... 68

    § 4565(e)(1) ................................................................................... 68

    § 4565(e)(2) ........................................................................ 9, 52, 53

    § 4565(f) ................................................................................... 11, 68

    § 4565(*l*)(2) ................................................................. 12, 28, 53, 62

    § 4565(*l*)(3) ................................................................................... 44

    § 4565(*l*)(3)(A) .............................................................................. 21

    § 4565(*l*)(3)(A)(i) .......................................................................... 12

    § 4565(*l*)(4)(A) ................................................................. 12, 50, 62

    § 4565(*l*)(4)(B)(i) ..................................................................... 28, 62

    § 4565(*l*)(4)(B)(ii) .................................................................... 28, 62

## Regulations

31 C.F.R. § 800.504(a)(4) ...................................................................... 21

31 C.F.R. § 800.508(d) ......................................................................... 12

31 C.F.R. § 800.509(a) ......................................................................... 59

31 C.F.R. § 800.802(a) ......................................................................... 24

## Other Authorities

U.S. Const., Amend. V
    Due Process Clause............................................................................. 9

Cathleen D. Cimino-Isaacs & Karen M. Sutter, Cong. Rsch. Serv., IF10177, Committee on Foreign Investment in the United States (CFIUS) (last updated Dec. 9, 2024) ........................... 13

Cleveland-Cliffs Inc., Press Conference with USTR Tai and Secretary of Labor Julie Su, YouTube (Oct. 11, 2024) ....................... 24

CNBC, *Cleveland-Cliffs CEO Lourenco Goncalves on Q4 results* (Jan. 30, 2024) ........................................................................ 17

House Select Comm. on the Strategic Competition Between the U.S. and the Chinese Communist Party, 118th Cong., Reset, Prevent, Build: A Strategy to Win America's Economic Competition with the Chinese Communist Party (Dec. 12, 2023) ........................................................................ 13

*Russia's Evraz completes Oregon Steel acquisition*, Reuters (Aug. 9, 2007) ..................................................................................... 57

WTAE-TV Pittsburgh, *USW President McCall: Nippon Steel's promises short-term, jeopardize US steelmaking*, YouTube (Nov. 15, 2024) ................................................................... 25

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| CFIUS | Committee on Foreign Investment in the United States |

## INTRODUCTION

In *Ralls Corp. v. CFIUS*, 758 F.3d 296 (D.C. Cir. 2014), this Court upheld a procedural due process challenge to the President's exercise of statutory authority to block, on national security grounds, foreign investment in a U.S. company. The President's action must be set aside, the Court held, when a transaction party is not given an opportunity to "tailor its submission to the [government's] concerns or rebut the [unclassified] factual premises underlying the President's action." *Id.* at 320.

The present case involves an even more blatantly unconstitutional exercise of that same statutory authority: President Biden's decision to block the $14.9 billion combination of United States Steel Corporation (U. S. Steel) with Nippon Steel Corporation through a U.S. subsidiary (collectively Nippon Steel).

Petitioners were not given the constitutionally required opportunity to be heard, because President Biden made and announced his decision before the statutorily mandated national security review began. The record makes clear that President Biden's decision was driven by election-year politics, not national security—in particular his effort to

1

gain a critical labor union's support for his reelection campaign in the battleground state of Pennsylvania.

The governing statute is Section 721 of the Defense Production Act, 50 U.S.C. § 4565, which grants the President carefully circumscribed authority to suspend or prohibit transactions with foreign companies that threaten to impair national security. The process is supposed to begin with a review by the Committee on Foreign Investment in the United States (CFIUS, or the Committee), which is composed of Presidential Cabinet members. The President may act only after CFIUS has completed a *bona fide* investigation and identified credible national security risks—and the President may prohibit a transaction only when there is credible evidence that it threatens national security *and* those concerns cannot adequately be addressed by other means.

Just as in *Ralls*, Petitioners here were not permitted an opportunity to tailor their submission to the President's concerns or rebut the premises underlying his action. President Biden made his decision to block the transaction in March 2024—*before* the CFIUS process began—announcing it in a formal White House statement. He declared unequivocally that U. S. Steel would "remain an American steel company

that is domestically owned and operated." App.7. The timing of the decision, alone, requires that President Biden's action be invalidated.

President Biden's decision had nothing to do with national security. How could it when he made it before the national security evaluation had even begun? Nippon Steel is based in Japan, one of America's closest allies and leading trade partners—and home to more than 50,000 U.S. troops. Never before has a President blocked the acquisition of an American company by a company based in Japan. President Biden's own Treasury Secretary stated that the decision was not based on national security concerns.

The public record leaves no doubt that both the timing and the substance of the President's decision rested on illegitimate political considerations—a clear violation of the entire CFIUS process, which was created as an apolitical safeguard to protect national security.

David McCall, the president of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (United Steelworkers), opposed the merger because he had made a deal with Cleveland-Cliffs Inc. (Cliffs)—one of U. S. Steel's competitors—to support only Cliffs' efforts to acquire U. S.

Steel. McCall made clear that blocking the merger was critical to the United Steelworkers leadership.

Endorsement by the United Steelworkers' leadership was critical to President Biden's reelection campaign in the swing state of Pennsylvania.

On February 2, McCall issued a statement saying that he had received "personal assurances" that President Biden had the union's "back[]." App.593. That same day, Cliffs' CFO told investors that the United Steelworkers leadership "ha[s] already been clear that they don't want the deal to go through. So, I think the Administration has made it clear that the decision's already been made. They're not gonna allow the deal to go through." App.582.

And that is exactly what happened. On March 14, President Biden announced his decision to block the transaction. Less than a week later, the United Steelworkers endorsed his reelection.

The members of CFIUS—politically-appointed agency heads—knew that President Biden had decided to block the transaction: he eliminated any doubt by publicly reaffirming that decision three times while the CFIUS process was underway. And they knew that President

Biden could implement that decision only if CFIUS referred the transaction to him. CFIUS therefore ran a Potemkin process designed from the beginning to reach President Biden's predetermined result.

To effectuate this sham process, CFIUS violated its own procedures in multiple ways. *First*, following an initial period of questions and answers, CFIUS went months with virtually no substantive engagement with Petitioners regarding the transaction. Then, suddenly, on the Saturday of Labor Day weekend, CFIUS issued a letter to Petitioners that purported to identify national security "risks," and gave them only one business day for a response, in contravention of CFIUS's normal practice.

*Second*, the Committee failed to engage at all with Petitioners' proposal to enter into a national security agreement, enforceable by the government in court, that would mitigate any purported national security risk. Notwithstanding the statutory directive to consider mitigation measures, and the Committee's longstanding, consistent practice of active back-and-forth negotiations regarding appropriate national security agreement terms, the CFIUS staff told Petitioners that

their political superiors required them to be in "listen-only mode" with respect to Petitioners' proposals.

*Third*, CFIUS violated its confidentiality obligation, leaking confidential information about its deliberations to McCall and U. S. Steel competitor Cliffs.

*Fourth*, the administrative record contains no indication that CFIUS complied with the statutory requirement that any Presidential referral must include the position of each agency and an explanation of the reasons for the agency's position. CFIUS's letter to Petitioners stated only that the Committee was "unable to reach [a] consensus" on whether Petitioners' proposed measures were sufficient to mitigate the purported national security risk identified by the Committee. App.606.

All of these unprecedented deviations from CFIUS's usual procedures can be traced back to CFIUS's need to reach a predetermined result—referral of the transaction to President Biden—so that his March decision could be formally implemented. Because CFIUS "took into account 'considerations that Congress could not have intended to make relevant,'" its referral to President Biden "proceeded from an erroneous

premise and . . . cannot stand." *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1247 (D.C. Cir. 1971).

*Finally*, because the record makes clear that any possible national security risk could be mitigated by the proposed national security agreement, the CFIUS referral is arbitrary and capricious.

Petitioners presented CFIUS with overwhelming information establishing that the transaction will strengthen, not impair, U.S. national security. Nippon Steel has operated in the United States for decades, owns several American steel manufacturers, and has thousands of U.S. employees. As a result of the merger, Nippon Steel will invest billions to protect and grow U. S. Steel's existing U.S. operations and save American jobs, and also bring to U. S. Steel cutting-edge technology to improve the efficiency of its operations. And U. S. Steel and Nippon Steel offered to enter into a national security agreement with CFIUS that would have imposed unprecedented binding commitments to:

- Assure the continued ownership of U. S. Steel in the United States, subject to U.S. law, and maintain U. S. Steel as a standalone company headquartered in Pennsylvania;

- Require a majority U.S. citizen board of directors, including three independent directors approved by CFIUS with responsibility for overseeing compliance with the national security agreement;

- Ensure that key U. S. Steel management positions are held by U.S. citizens;

- Maintain and enhance U. S. Steel's production capacity in the United States and supply to the U.S. market, including binding commitments from Nippon Steel for investments across U. S. Steel's union-represented facilities, with specific investments in U. S. Steel's blast furnace facilities in Western Pennsylvania and Gary, Indiana;

- Prioritize steel production by U. S. Steel, including a commitment not to import foreign-produced steel slab to reduce U. S. Steel production;

- Ensure that U. S. Steel and its management continue to pursue trade measures under U.S. law free from interference by Nippon Steel; and

- Provide numerous monitoring, verification, and enforcement mechanisms to assure compliance with these commitments.

CFIUS offered no explanation why these extraordinary protective measures were unenforceable or insufficient; indeed, it refused to engage on them at all. In addition, CFIUS did not, and could not, explain why the other statutory remedies available to the President would be inadequate to protect national security.

President Biden and CFIUS did not have unreviewable authority to block the transaction simply by reciting "national security" when the decision had already been made for other reasons. President Biden's decision and CFIUS's referral each violated the Constitution's due

process guarantee; CFIUS's actions violated Section 721 and the Administrative Procedure Act; and President Biden's action was *ultra vires*. The Court should invalidate those actions and order CFIUS to engage in a new review of the transaction, consistent with the Constitution and governing statute. The rule of law demands it.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to Article III, section 2 of the Constitution because Petitioners' claims arise under the Constitution and laws of the United States, including the Due Process Clause of the Fifth Amendment; the Defense Production Act, 50 U.S.C. § 4565; and the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq*. This Court has original and exclusive jurisdiction over Petitioners' claims. 50 U.S.C. § 4565(e)(2).

## ISSUES

1.    Whether President Biden's decision to block the transaction violated Petitioners' procedural due process rights.

2.    Whether CFIUS's referral of the transaction to President Biden violated Petitioners' procedural due process rights.

3.    Whether CFIUS's referral of the transaction was contrary to law or arbitrary and capricious.

4.    Whether President Biden's action was *ultra vires*.

## STATUTE

The relevant provisions of Section 721 of the Defense Production Act, 50 U.S.C. § 4565, are reproduced in an Addendum.

## STATEMENT[1]

### A.    Statutory And Regulatory Background.

The Supreme Court has made clear that, as a general matter, the President may not unilaterally interfere with private property rights simply by asserting a national security interest. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

Section 721 of the Defense Production Act, 50 U.S.C. § 4565, provides a narrow exception to that fundamental limitation, including detailed guardrails to ensure any Presidential action is taken only for genuine national security reasons.

The process begins with CFIUS, an interagency committee composed of the heads of the Departments of Treasury, Justice,

---

[1] Because this proceeding includes challenges that, under Section 721(e)(2), must be brought in an original action in this Court, as well as claims under the APA with respect to CFIUS's determination, Petitioners are filing an appendix that includes expert declarations and judicially noticeable materials, as well as excerpts from the CFIUS administrative record.

Homeland Security, Defense, State, Commerce, and Energy, as well as the U.S. Trade Representative and the Director of the White House Office of Science and Technology Policy. Section 721 directs CFIUS to "review" and "investigat[e]" a "covered transaction" to "determine the effects of the transaction on the national security." 50 U.S.C. § 4565(b)(1)(A)-(B).

Congress specified that CFIUS "shall consider" ten factors specified in Section 721(f)—all of which relate to national security—and other factors related to national security that the Committee and the President deem appropriate. 50 U.S.C. § 4565(b)(1)(A)(ii); *see also id*. § 4565(f) (relevant factors considered in light of "the requirements of national security").

After reviewing a transaction, CFIUS has three options. *First*, it may complete its review and allow the transaction to proceed if it finds no unresolved national security concerns or that any such concerns are adequately addressed by laws other than Section 721 and the International Emergency Economic Powers Act. *See* 50 U.S.C. § 4565(b)(3)(A); *see also id*. § 4565(d)(4)(B).

*Second*, if CFIUS identifies a national security concern with the transaction that is not addressed by such other laws, it may "negotiate,

enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security." 50 U.S.C. § 4565(*l*)(3)(A)(i).

*Third*, if CFIUS determines that the transaction poses unresolved national security concerns, other laws are insufficient to address those concerns, and mitigation measures do not resolve those concerns—or is unable to reach a consensus—it may "refer the transaction to the President." 50 U.S.C. § 4565(*l*)(2). Any referral "shall be based on a risk-based analysis, conducted by the Committee . . . which shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." *Id.* § 4565(*l*)(4)(A).

The President may take action only if CFIUS refers the transaction to him. 31 C.F.R. § 800.508(d) (if the Committee concludes "all deliberative action under section 721 . . . without sending a report to the President, action under section 721 shall be concluded").

If CFIUS refers a transaction to the President, the President may "suspend or prohibit any covered transaction" *only* by finding that (a) "there is credible evidence" that the transaction threatens to impair national security, and (b) no other "provisions of law . . . provide adequate

and appropriate authority" to protect national security. 50 U.S.C. § 4565(d)(1), (4). This mandatory analysis requires a *bona fide* consideration of security risks and mitigation options.

Since the enactment of the Defense Production Act, Presidents have blocked only eight other transactions under Section 721.[2] Never before has the President blocked a transaction involving an allied nation such as Japan, one of the United States' most important economic and military partners and home to more than 50,000 U.S. troops. AR_004807; AR_010555. In fact, in late 2023, a House of Representatives committee recommended that qualifying Japanese companies be partially exempt from the CFIUS regulations, given the closeness of the U.S.-Japan relationship.[3]

---

[2] Cathleen D. Cimino-Isaacs & Karen M. Sutter, Cong. Rsch. Serv., IF10177, Committee on Foreign Investment in the United States (CFIUS) (last updated Dec. 9, 2024), https://crsreports.congress.gov/product/pdf/IF/IF10177.

[3] House Select Comm. on the Strategic Competition Between the U.S. and the Chinese Communist Party, 118th Cong., Reset, Prevent, Build: A Strategy to Win America's Economic Competition with the Chinese Communist Party 32 (Dec. 12, 2023), https://selectcommittee-ontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.-gov/files/evo-media-document/reset-prevent-build-sccreport.pdf.

**B.     The U. S. Steel–Nippon Steel Transaction.**

U. S. Steel—headquartered in Pittsburgh, Pennsylvania—is the third-largest steel producer in the United States. AR_004863; AR_004885. Once one of the most valuable companies in the world, U. S. Steel has been shrinking for decades, reducing employee headcount, cutting costs, idling older facilities, and foregoing investments in innovative technologies. AR_010459. U. S. Steel does not have any products, capability, or know-how that are specific to, or customized for, U.S. government or military applications. AR_004835.

In mid-2023, after rejecting multiple unsolicited takeover attempts, U. S. Steel began a months-long strategic review to solicit bids to acquire the company. AR_004805; AR_010453. During this process, U. S. Steel's financial advisors contacted or were contacted by fifty-four potential counterparties, including Nippon Steel, headquartered in Tokyo, Japan, one of the world's leading steel manufacturers. App.264 ¶13 (Lewis Decl.).

In December 2023, U. S. Steel announced that Nippon Steel's Texas-based subsidiary, Nippon Steel North America, would acquire U. S. Steel, for a total enterprise value of $14.9 billion. AR_004805. Under the deal,

Nippon Steel will make significant capital investments and contribute cutting-edge technologies to U. S. Steel, which are critical to help secure the company's future. The merger has been overwhelmingly approved by U. S. Steel's stockholders. App.267 ¶21 (Lewis Decl.) The merger agreement, which is governed by Delaware law, provides for an "End Date" of June 18, 2025 to obtain regulatory approvals and close the transaction. AR_005117.

### C.    President Biden's March 2024 Decision To Block The Transaction.

On March 14, 2024—before the CFIUS process had even begun—President Biden issued a formal public statement, posted on the official White House website, announcing his decision to block the merger. Under the heading "Statement from President Biden on US Steel," the President declared that U. S. Steel should remain "domestically owned and operated":

> It is important that we maintain strong American steel companies powered by American steel workers. I told our steel workers I have their backs, and I meant it. ***U.S. Steel has been an iconic American steel company for more than a century, and it is vital for it to remain an American steel company that is domestically owned and operated.***

App.7 (emphasis added).

15

The events leading up to that statement make clear that President Biden made a considered, final decision to block the transaction.

United Steelworkers President McCall opposed the merger as soon as it was announced in December 2023. That is because the union's leadership had a preexisting arrangement with U. S. Steel's competitor, Cleveland-Cliffs Inc. (Cliffs), to support only Cliffs in its attempt to acquire U. S. Steel. App.584.

Everyone knew that Pennsylvania would be a critical battleground state in the upcoming Presidential election. And support from the United Steelworkers' leadership was critical to President Biden's reelection campaign. United Steelworkers President McCall, together with Cliffs CEO Lourenco Goncalves, engaged in an aggressive, coordinated campaign to convince President Biden to block the merger—a campaign that culminated in Biden's March 2024 decision, which, in turn, secured the union's endorsement:

- Cliffs' CEO Goncalves spoke with the Secretary of Commerce and her staff about the transaction on at least three occasions in January 2024. AR_000126-41.

- On January 30, 2024, Goncalves—criticizing the transaction—said: "I can't believe that the most union-friendly President that the

United States has ever had will allow for the slap on the face of the [United Steelworkers]."[4]

- One day later, the White House issued a press release stating that President Biden is "the most pro-union president we've had" and that his "foremost" concern was making sure that there was "a level, fair playing field for steelworkers." App.59.

- Three days later, the United Steelworkers issued a press release stating that President Biden had "personal[ly] assur[ed]" the union that he "has our backs" in opposing the deal. App.593.

- Cliffs' CFO stated in a February 2 investor call that the United Steelworkers "have already been clear that they don't want the deal to go through. So I think the Administration has made it clear that the decision's already been made. They're not gonna allow the deal to go through." App.582.

- On March 13, Goncalves stated that the transaction is "not closing, and Biden hasn't spoken yet. He will." App.583.

- Also on March 13, Senator Bob Casey of Pennsylvania stated that he had called the White House and told the Chief of Staff that if the President did not block the merger, his inaction would "creat[e] an opening" for Donald Trump in swing states such as Pennsylvania. App.109.

The very next day, March 14, President Biden issued his formal statement announcing his decision to block the merger.

On March 15, Cliffs CEO Goncalves stated that he was "behind" President Biden's decision and that he had been "postponing that [Biden]

---

[4] CNBC, *Cleveland-Cliffs CEO Lourenco Goncalves on Q4 results* (Jan. 30, 2024), https://www.cnbc.com/video/2024/01/30/cleveland-cliffs-ceo-lourenco-goncalves-on-q4-results.html.

statement for a while" because he was hoping that Nippon Steel would negotiate a deal with Cliffs. App.310. He added that "[t]his is not going to be a process. CFIUS is just cover for a President to kill a deal." App.311.

On March 20, Goncalves told investors that the United Steelworkers had been in touch with the White House, that the President had requested the union's endorsement "now," and that the United Steelworkers and Goncalves had in return received assurances that the transaction would be blocked. App.584. That same day, less than a week after the President announced his decision, the United Steelworkers endorsed President Biden. App.598; App.584.

Any doubt that the March 14 decision was final is eliminated by President Biden's express, public reaffirmations of that decision:

- In an April 2024 visit to the United Steelworkers' headquarters, President Biden reiterated that U. S. Steel "should remain a totally American company . . . American owned, American operated, by American union steelworkers" and "***that's going to happen. I promise you***." App.11 (emphasis added).

- In September 2024, at a campaign rally in Pennsylvania attended by McCall, President Biden said: "I made it clear last time I was in Pittsburgh: ***United States Steel . . . is going to remain an American company***." App.28 (emphasis added).

- On September 27, President Biden denied that an extension of the CFIUS review process indicated that he was softening his decision to block the merger, stating, "I haven't changed my mind." App.41.

**D.    The CFIUS Review Process.**

The CFIUS review of the merger began on March 26, 2024, when CFIUS accepted Petitioners' notice of the transaction. Given that CFIUS's members were all political appointees chosen by President Biden, his March 14 announcement and subsequent reaffirmations of his decision necessarily overshadowed the entire process. Treasury Secretary Yellen, who chaired CFIUS, stated that she "certainly accept[ed]" President Biden's "view" "that [U. S. Steel] should remain in American hands" for "the good of the workers and the country," adding that he "ha[d]n't said specifically that it's an issue of national security." App.120.

Members of Congress recognized that President Biden's statements led CFIUS to ignore its usual process. They sent a letter to CFIUS "express[ing] serious concerns about the impartiality and independence of CFIUS" in connection with the transaction. AR_000371. They stated that "public statements by senior officials and reports of potential White House involvement in ongoing CFIUS reviews "call[] into question the integrity of [CFIUS's] decision-making process" and whether CFIUS's "statutory mandate . . . to prioritize national security considerations has been subordinated to political interests." *Id*.

Richard Sofield, who represented the Justice Department in CFIUS reviews for ten years and was involved in examining approximately 1500 transactions, concluded that "the conduct of CFIUS's review of Nippon Steel's proposed acquisition of U. S. Steel is so far outside the standards of my experience with the mandatory or customary process that these deviations appear to have been motivated by interests other than national security." App.155 ¶7 (Sofield Decl.).

*First*, notwithstanding the substantial amount of information that Petitioners provided to CFIUS between February and July, Petitioners received no formal indication from CFIUS regarding the status of its review. App.272-73 ¶¶32-34 (Lewis Decl.). Then, on August 31—the Saturday of Labor Day weekend—CFIUS sent Petitioners a seventeen-page letter. App.315-28. That letter, for the first time, purported to identify national security concerns relating to the merger, including "potential decisions by Nippon Steel that could lead to a reduction in domestic steel production capacity." App.315.

CFIUS demanded a response by the opening of business on September 4, just one business day later. App.328. That was a marked departure from the customary response time to CFIUS requests of three

business days, specified by regulation for other responses. 31 C.F.R. § 800.504(a)(4); App.178-81 ¶¶55-60 (Sofield Decl.). When, on September 1, Petitioners requested an explanation for this unusual timing, they were told that the CFIUS staff had been instructed to be in "listen-only" mode and therefore could not offer any substantive response or explanation for the timing. App.332.

That Labor Day weekend, President Biden publicly reaffirmed his March decision to block the transaction, at a rally in Pennsylvania attended by United Steelworkers President McCall. App.22-23.

On September 3, Petitioners provided a comprehensive 100-page response to the August 31 letter. App.332-431.

*Second*, CFIUS consistently refused to engage in mitigation discussions with Petitioners. If CFIUS identifies a potential national security concern, its review virtually always involves back-and-forth discussion of ways to mitigate that concern, including through a national security agreement—a binding agreement between the transaction parties and the government, enforceable in court, that requires the parties to take specified steps after the transaction is consummated. *See* 50 U.S.C. § 4565(*l*)(3)(A) (providing that CFIUS "may . . . negotiate, enter

into or impose, and enforce any agreement or condition . . . in order to mitigate any risk" to U.S. national security resulting from the transaction); App.172-73 ¶43 (Sofield Decl.).

Here, CFIUS would not engage in any mitigation discussions with Petitioners—even after Petitioners offered to enter into a national security agreement. *See* App.333; App.274-89 ¶¶36-62 (Lewis Decl.). CFIUS refused to provide Petitioners with an initial draft national security agreement or comment on Petitioners' multiple draft agreements, as is customary once CFIUS identifies a purported national security concern. *See* App.172-78 ¶¶43-54 (Sofield Decl.); AR_010545.

Petitioners provided a draft agreement on September 9. In a meeting with senior CFIUS officials on September 11, CFIUS did not provide any feedback regarding the agreement's terms. AR_009220-21; App.275-77 ¶¶38-40 (Lewis Decl.). On October 16, at Petitioners' request, Petitioners met with CFIUS staff to discuss the mitigation framework in Petitioners' proposed national security agreement. The staff asked questions about how the agreement would work in practice, but stated that they lacked authority from CFIUS political leadership to commit to

a mitigation framework and again declined even to provide comments on the draft agreement. AR_010545; App.277-78 ¶¶42-43 (Lewis Decl.).

Less than two weeks later, on October 29, Petitioners submitted a revised draft of the agreement. App.278-79 ¶45 (Lewis Decl.). At a meeting on November 25, CFIUS staff again asked questions about the agreement, but identified no deficiencies in its provisions. The staff indicated that they had comments on the draft that they would have liked to share with Petitioners, but were not permitted to do so. App.281-82 ¶51 (Lewis Decl.).

On December 2, notwithstanding the lack of feedback, Petitioners submitted a third round of enhancements to their proposed national security agreement. *See* App.436-72. At a December 9 meeting, career CFIUS staff again told Petitioners that they were not authorized by their politically appointed superiors to provide comments or offer counterproposals but "were instructed just to be in listening mode." App.284-85 ¶¶54-55 (Lewis Decl.); *see* App.332.

In sum, during the entire review, Petitioners never received any substantive feedback from CFIUS regarding their four different mitigation proposals. But CFIUS "always engages in detailed discussions

with the parties regarding proposed mitigation measures [including] exchanging term sheets or drafts of mitigation agreements . . . . CFIUS departed from this norm multiple times during its review of this transaction." App.173 ¶45 (Sofield Decl.).

*Third*, the CFIUS process is subject to a strict confidentiality requirement: with narrow exceptions, "no . . . information or documentary material [submitted by the transactions parties] may be made public." 31 C.F.R. § 800.802(a). But the record shows that CFIUS members did not just receive, but also shared, confidential information about the review process.

Soon after the merger was announced, Goncalves spoke with Commerce Secretary Gina Raimondo and her staff at least three times, including at her request. AR_000126-41. On October 11, Goncalves hosted United States Trade Representative Katherine Tai, a CFIUS member, for an event at one of Cliffs' Pennsylvania facilities.[5]

United Steelworkers President McCall also had multiple interactions with government officials. On March 1, he sent a letter to

---

[5] Cleveland-Cliffs Inc., Press Conference with USTR Tai and Secretary of Labor Julie Su, YouTube (Oct. 11, 2024), https://www.youtube.com/watch?v=pUI-LHKwQxo (16:55).

the U.S. Senate stating he was "actively engaged with [CFIUS]" regarding the transaction. App.294. He met with President Biden during two campaign rallies, and with Vice President Harris at one of those rallies. *Supra*, page 18; App.22-23. The merger was addressed by both officials during their campaign speeches. *Supra*, page 18; App.28, 38. McCall also had several post-election conversations with President Biden and his advisors. App.279-81 ¶¶47 & 50 (Lewis Decl.). On October 31, President Biden appointed McCall to a committee responsible for advising Ambassador Tai, App.138, and McCall met with Ambassador Tai in November, App.144. He publicly stated that he would "continue to talk to the CFIUS committee."[6]

McCall and Goncalves each made public statements indicating that their interactions with government officials had given them inside information about CFIUS's deliberations. Goncalves revealed that he knew from direct communications with CFIUS members, including Commerce Secretary Raimondo, that the deal would be blocked. App.580; AR_00126-40. In March, Goncalves told a U. S. Steel shareholder that

---

[6] WTAE-TV Pittsburgh, *USW President McCall: Nippon Steel's promises short-term, jeopardize US steelmaking*, YouTube (Nov. 15, 2024), https://www.youtube.com/watch?v=2ogbeZEYg-Y (13:46).

"[w]e have been in total contact with the administration, so I know what's going on." App.583. He elaborated the next day: "This is not going to be a process. CFIUS is just cover for a President to kill a deal." *Id.* Goncalves told investors in November that they had confirmation that CFIUS would be referring the transaction to the President so that he could block the merger. App.580.

This disclosure of the course of a CFIUS review was unprecedented. As Mr. Sofield explains, "CFIUS violates its confidentiality obligations where it is not just *receiving* information, but impermissibly sharing confidential information gathered during the CFIUS review process, including information regarding CFIUS's intended decision making regarding the review." App.171 ¶41.

*Fourth*, on December 14, CFIUS sent a letter to Petitioners purporting to identify national security concerns. App.487-515. This letter repeated virtually verbatim the contentions in its August 31 letter, ignoring Petitioners' September 3 response. *Compare* App.487-97 *with* App.315-28; *see also* App.332-43 (Petitioners' September response). Petitioners responded on December 17, *see* App.517-99—and just one day later, on December 18, CFIUS completed the risk analysis that was the

26

stated basis for referring the transaction to President Biden, AR_004557-604.

CFIUS's December 14 letter did not provide any reason why the mitigation measures in Petitioners' multiple draft national security agreements failed to address any possible national security risk. *See* App.517-20. Notwithstanding Petitioners' response, which highlighted those measures, *see, e.g.*, App.521; App.523, the December 18 risk analysis mentioned Petitioners' national security agreement only in an appendix, AR_004603-04. It did not include a recommendation for how to address the supposed national security concerns (including any assessment of Petitioners' proposals or other available legal regimes) nor did it indicate any competing viewpoints among CFIUS's members, merely saying that CFIUS "is exploring all options for confronting the risks expressed." AR_004587.

CFIUS's refusal to engage on the substance of Petitioners' mitigation proposals continued at the final interaction between Petitioners and CFIUS: a December 20 conference call with the Deputy Secretaries of the CFIUS Cabinet departments. App.607. The purpose of the call was to discuss Petitioners' December 17 response to CFIUS's

December 14 letter, but it was another "listen-only" session. Petitioners and supporting participants, including local steelworker representatives, were cut off by the operator managing the call for CFIUS. *See* AR_000111. There were no questions or engagement by the CFIUS Deputies. *Id.*

### E.    The CFIUS Referral And Presidential Order.

On December 23, CFIUS referred the transaction to President Biden, the step necessary to enable him to formalize his March 2024 decision to block the merger. App.605.

CFIUS's letter to Petitioners stated that it was unable to "reach [a] consensus" on whether Petitioners' proposed measures to mitigate national security risk were sufficient. App.606. The letter did not indicate that there had been any recommendation by CFIUS regarding the action the President should take. Nor did it state whether each CFIUS agency provided the President with its recommendation and justification, as Section 721 expressly requires. 50 U.S.C. § 4565(*l*)(4)(B)(i) & (ii); *see also id.* § 4565(*l*)(2).

Instead, the letter identified just one purported national security risk: "[*P*]*otential* reduced output by U.S. Steel *could* lead to supply shortages and delays that *could* affect industries critical to national

security." App.605-06 (emphasis added). Nonetheless, it also conceded that "the U.S. government does not directly procure the kind of steel produced by U. S. Steel," which is neither a "critical component" nor a "critical technology" of defense production. *Id.*

On December 30, Petitioners submitted a fourth iteration of their national security agreement that further addressed CFIUS's purported concern. AR_010681-778. Among other enhancements, Nippon Steel expanded its commitments to maintain existing steel production capacity at all of U. S. Steel's facilities in the United States. Petitioners could not permanently idle any U. S. Steel facility (except for one) for 10 years without approval from CFIUS; for the remaining facility, which is currently indefinitely idled, this protection would apply for two years. AR_010691-95. The draft agreement also provided for appointment of a full-time Board observer, subject to CFIUS approval, to attend all meetings of the U. S. Steel Board and its committees to monitor compliance with the national security agreement. AR_010688-91. Neither the President nor CFIUS ever responded.

On January 3, 2025, President Biden blocked the merger— formalizing the decision he had made and announced nine months

29

earlier. App.151-52. The order repeated the relevant statutory language and stated without elaboration that Nippon Steel "might take action that threatens to impair the national security of the United States." App.151.

In a separate statement, President Biden asserted the same "rationale" for the decision as his March 14 statement: that he had a "responsibility to block foreign ownership of this vital American company" and that "U.S. Steel will remain a proud American company— one that's American-owned, American-operated, by American union steelworkers." App.149.

## SUMMARY OF THE ARGUMENT

I. The President's decision to block the transaction violated Petitioners' due process rights. Under Delaware law, Petitioners have a protected property interest in the merger. Due process principles therefore require that Petitioners be afforded the opportunity to be heard at a meaningful time and in a meaningful manner *before* the government deprived them of the benefits of that agreement. In particular, Petitioners had "the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action." *Ralls*, 758 F.3d at 318.

But Petitioners received *no* process at all before President Biden made his March 2024 decision to kill the merger—the review process had not even begun. The government therefore necessarily denied Petitioners "'adequate notice of why [merger approval was] being denied and a genuine opportunity to explain why it should not be.'" *Ralls*, 758 F.3d at 318. By prejudging the merger, President Biden also improperly predetermined the result of the CFIUS review process. Moreover, subsequent review by CFIUS could not cure the President's violation, both because it post-dated the President's decision and because that review was itself riddled with procedural irregularities, providing Petitioners with no coherent explanation of, or meaningful opportunity to rebut, any purported national security concerns about the merger.

CFIUS's flawed review independently denied Petitioners due process. Because CFIUS's decision to refer a matter to the President is necessary to trigger the President's authority to reject the transaction, CFIUS's action must itself comport with due process. Here, it did not: the Committee did not adequately identify its factual premises or concerns and did not provide Petitioners with a meaningful opportunity to counter those concerns.

II. President Biden's block and CFIUS's referral must also be set aside because the referral violated the Defense Production Act and APA in several respects. *First*, CFIUS's referral was made to enable President Biden to implement his already-announced decision to kill the transaction, not based on the statutory standards. *Second*, CFIUS committed multiple procedural violations, treating similar cases inconsistently and ignoring its own procedural requirements. And *third*, any suggestion of a national security risk in the merger is arbitrary and capricious, and inconsistent with both the record and common sense.

III. Because President Biden only had statutory authority to block the merger for national security reasons, his action should be set aside as *ultra vires*. Section 721 precludes judicial review of "actions of the President under" the Defense Production Act, but President Biden's action was not "under" the Act because it was not based on an assessment of the transaction's impact on national security.

## STANDING

Petitioners' transaction is the "object of [the challenged government actions]," leaving "little question that the [actions have] caused

[Petitioners'] injury, and that a judgment [invalidating] the action[s] will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992).

## STANDARD OF REVIEW

This Court addresses Petitioners' constitutional claims *de novo*. It addresses *de novo* Petitioners' claims that CFIUS's actions were "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C) & (D). It reviews the merits of CFIUS's action to determine whether it was "arbitrary [or] capricious." *Id*. § 706(2)(A).

## ARGUMENT

## I.  THE PRESIDENT'S ORDER AND CFIUS'S ACTION EACH VIOLATED DUE PROCESS.

The constitutional principles that govern here are well-settled. When depriving a party of a protected property interest, the government must employ procedures that "'comport with due process.'" *Ralls*, 758 F.3d at 315. These procedures must afford the affected party "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

33

The party facing a deprivation of property must be allowed to "present reasons, either in person or in writing, why proposed action should not be taken," *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985), "at a time when the deprivation can still be prevented," *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). That opportunity to affect the proposed governmental decision must be "genuine." *Ralls*, 758 F.3d at 318; *Gray Panthers v. Schweicker*, 652 F.2d 146, 166 (D.C. Cir. 1980), such that the party's explanation *actually* is taken into account by the governmental decisionmaker.

Here, Petitioners were denied any meaningful opportunity (indeed, any opportunity at all) to understand the evidence supporting President Biden's action, and had no meaningful opportunity to respond to that evidence—indeed, no opportunity to be heard at all—before President Biden made and announced his decision in March 2024. In addition, because the President prejudged the merger, Petitioners' participation in the process *could not* have been meaningful; and CFIUS's process *could not* have been adequate, both because that process post-dated the President's decision and because it gave Petitioners no "opportunity to

tailor [their] submission[s] to [CFIUS's] concerns or rebut the factual premises underlying the President's action." *Ralls*, 758 F.3d at 320.

## A.    Petitioners Have A Protected Property Interest.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 59 (1999); *see Ralls*, 758 F.3d at 315. Here, President Biden's order blocking the merger deprived Petitioners of property—their contractual interest in the merger agreement.

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). In this case, the merger agreement included a Delaware choice of law provision, AR_005123-24 (Merger Agreement § 9.4(a)), so the existence of a property interest is determined by reference to Delaware law.

That law provides that "contingent contractual rights . . . are 'property' . . . if and to the extent that they are capable of vesting." *In re*

*Krafft-Murphy Co.*, 82 A.3d 696, 703 (Del. 2013). Thus, so long as it can vest, a "contractual commitment to a counterparty" is a "significant thing" under Delaware law and gives the counterparty a "bargained-for property interest." *In re Altaba, Inc.*, 264 A.3d 1138, 1165 (Del. Ch. 2021).

Here, that condition is satisfied: the merger agreement is capable of fully vesting at closing. AR_005046 (Merger Agreement § 2.4). Delaware law expressly recognizes that contractual right as a property interest—and "the fact that the property interest is recognized under state law is enough to trigger the protections of the Due Process Clause." *Ralls*, 758 F.3d at 316.

That is so even though consummation of the merger here is contingent on CFIUS approval. AR_005115-16 (Merger Agreement § 7.1(c)). "A protected property interest exists where substantive criteria clearly limit discretion such that the plaintiff cannot be denied the interest unless specific conditions are met." *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 773-74 (7th Cir. 2021) (internal quotation marks omitted). That is true here: the decisions of CFIUS and the President are subject to governing constitutional, statutory, and regulatory standards. *Supra*, pages 10-13; *see Ralls*, 758 F.3d at 316-17

36

(distinguishing *Dames & Moore v. Regan*, 453 U.S. 654 (1981), on this ground).

**B.     President Biden's Determination Violated Due Process.**

Because Petitioners have a property interest in the merger, they are entitled to meaningful "procedural protections . . . before the Presidential Order prohibits the transaction." *Ralls*, 758 F.3d at 320. But they received no such protections here. President Biden determined the outcome of the inquiry before it even began, which precluded any fair consideration of Petitioners' interests. And even if, contrary to the record, CFIUS's consideration had a role in the outcome, Petitioners were deprived of due process because that review was itself constitutionally flawed.

**1.     Petitioners received no process before President Biden decided to block the transaction.**

President Biden's decision to block the transaction before the CFIUS review process had even begun denied Petitioners the procedural protections recognized as essential in *Ralls*, in circumstances closely analogous to those here. There, setting aside another Presidential prohibition of a transaction on national security grounds, the Court held that "due process requires, at the least, that an affected party be

37

informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." 758 F.3d at 319. Petitioners here therefore had "the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action." *Id*. at 318. But Petitioners received none of that.

Quite the contrary: Petitioners received *no* process at all before President Biden decided to kill the merger. He formally announced his decision in March 2024, before the review process began, and reiterated that decision on three separate occasions before he received CFIUS's referral. *Supra*, pages 15-18.

With President Biden having made and announced his decision before he had any substantive interaction with Petitioners—and before the CFIUS process had even begun—the government necessarily denied Petitioners "'adequate notice of why [merger approval was] being denied and a genuine opportunity to explain why it should not be.'" *Ralls*, 758 F.3d at 318. Petitioners also "never had the opportunity to tailor [their] submission to the [President's] concerns or rebut the factual premises

underlying the President's action." *Id*. at 320. That "lack of process constitutes a clear constitutional violation." *Id.*

The government cannot plausibly assert that President Biden's decision was made in January 2025 when the Order was issued. There was no ambiguity or equivocation in the President's consistent and definitive statements disapproving the merger, starting in March 2024; his September statement actually declared that his mind had been made up and hadn't "changed." App.41. Any attempt now to disavow those firm statements would be "incongruent with what the record reveals about the [President's] . . . decisionmaking process." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

## 2. President Biden prejudged the transaction.

Blocking the merger also was constitutionally flawed for a similar but distinct reason: President Biden prejudged the transaction.

This Court has long held that case-specific Executive Branch actions violate due process if the decisionmaker approaches the inquiry with a closed mind. Executive officials may not "prejudge cases or . . . make speeches which give the appearance that [a] case has been prejudged." *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d

583, 590 (D.C. Cir. 1970). In those circumstances, "the probability of actual bias on the part of the . . . decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). There is no "meaningful" opportunity to comment in advance of a governmental decision when the decisionmaker already has made up their mind.

That prejudgment rule plainly applies here. This is not a case that involves policymaking, where "[n]o specific facts about individual parties are in issue, and the regulations adopted have general, prospective application industry-wide." *Nat'l Small Shipments Traffic Conf., Inc. v. ICC*, 725 F.2d 1442, 1448 (D.C. Cir. 1984); *see, e.g., Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1161-63 (D.C. Cir. 1979). In that sort of situation, Executive Branch officials typically have wide discretion and may come to the decision with established, and outcome-determinative, policy views.

Instead, this case is closely akin to an adjudication, turning on an assessment of case-specific facts under a governing legal standard set by Congress. In assessing a transaction under Section 721, the President, as in an adjudication, "applies existing rules and regulations . . . in a fact-

40

intensive determination that occur[s] on a case-by-case basis." *Neustar, Inc. v. FCC*, 857 F.3d 886, 895 (D.C. Cir. 2017); *see supra*, pages 10-13 (describing Section 721 criteria). Accordingly, the well-established rule that adjudicators may not prejudge a case, or give the appearance of prejudging a case, applies directly to President Biden's decision.

As already explained, President Biden left no doubt about his position even before CFIUS's review began, announcing in March 2024 that he opposed the merger. *Supra*, pages 15-18. He repeated that position on multiple occasions while CFIUS was still reviewing the transaction. *Id.* In fact, President Biden's decision was especially defective because he manifestly did not consider the statutory national security standard *at all*, instead grounding his decision in politics. But regardless of *why* he decided, there can be no dispute that he decided the dispositive question—whether to reject the merger—long before he could have taken Petitioners' submissions into account.

Such predetermination violates the Due Process Clause. In *Cinderella Career*, this Court found a constitutional violation in pre-adjudication statements by the FTC Chair that spoke to the merits of an adjudicatory dispute. Such statements "may have the effect of

41

entrenching [an adjudicator] in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record." 425 F.2d at 590. It thus violates due process for an adjudicator to make statements "which give the appearance that he has already prejudged the case and that the ultimate determination of the merits will move in predestined grooves." *Id.*; *see also Staton v. Mayes*, 552 F.2d 908, 914 (10th Cir. 1977).

President Biden prejudged this transaction in just that way—and by repeating that prejudgment publicly multiple times, he unmistakably signaled that the CFIUS review process would move in "predestined grooves." Consequently, Petitioners were "never offered a fair hearing" and "the [President] prejudged [their] case before making any hearing available to [them]." *Hostrop v. Bd. of Jr. Coll. Dist. No. 515,* 523 F.2d 569, 575 (7th Cir. 1975). For this reason, too, President Biden's order blocking the transaction violated the Due Process Clause.

### 3. President Biden's action is not saved by CFIUS's "consideration" of the transaction.

President Biden's prejudgment and the failure to provide constitutionally adequate process prior to the March announcement of

his decision to block the merger, by themselves, require invalidation of his decision. But even if it were assumed (counter-factually) that the President did not make his decision until January 2025, and that CFIUS's interactions with Petitioners were a part of the process leading to the block, the President's decision still cannot survive: CFIUS *also* did not offer Petitioners constitutionally sufficient process, providing no meaningful explanation of any concerns about the merger or of the facts upon which it relied in developing those concerns.

This Court instructed in *Ralls* that the affected party must have "the opportunity to tailor its submission to the [President's and CFIUS's] concerns [and] rebut the factual premises underlying the President's action," through "[a]dequate process at the CFIUS stage." 758 F.3d at 320. Absent information about those "factual premises," the mere "opportunity [for an affected party] to present evidence in its favor in both its voluntary notice filing and during follow-up conversations with—and a presentation to—CFIUS officials" is "plainly not enough to satisfy due process." *Id.* at 319-20. But here, that is all Petitioners received.

*First*, and most significantly, Petitioners were not given a meaningful opportunity to respond to CFIUS's purported national

43

security concerns—in particular, why at least one CFIUS agency believed Petitioners' commitment to a national security mitigation agreement did not fully mitigate any national security concerns.

During the first five months of the review process, CFIUS failed to articulate *any* national security concerns about the merger. When CFIUS finally sent Petitioners a letter on August 31 that purported to identify national security risks, it ignored substantial submissions by Petitioners. App.315-31. Petitioners responded, requesting that CFIUS correct numerous misstatements in its letter and engage with Petitioners regarding mitigation proposals. App.332-431. That was an especially important consideration, given the statutorily-mandated role of mitigation in ameliorating risks to national security. *See* 50 U.S.C. § 4565(*l*)(3).

But in subsequent meetings from September through December, CFIUS staff consistently refused to provide any substantive response to Petitioners' multiple mitigation proposals, stating that they had been instructed by their political superiors not to engage on those issues and be in "listen-only" mode. *Supra*, pages 21-24. That refusal to engage was squarely contrary to CFIUS's standard practice. As Mr. Sofield explains,

CFIUS "in my experience always engages in detailed discussions with the parties regarding proposed mitigation measures intended to address the national security concerns identified" by CFIUS App.173 ¶45 (Sofield Decl.).

On December 14, CFIUS sent Petitioners another letter, just nine days before the extended review period ended. App.487-515. Rather than address Petitioners' proposed mitigation measures in any meaningful way, CFIUS limited its treatment to two sentences of speculation that it was "possible" that Petitioners "might in the future" act in ways that "could" lead to reductions in domestic steel production. App.497. CFIUS did not articulate how this might happen or indicate any specific deficiency in the mitigation proposal that might lead to rejection of the merger, instead acknowledging that CFIUS "ha[d] not yet reached consensus on whether the mitigation measures" proposed by Petitioners "would be effective." *Id*.

Petitioners responded promptly, on December 17. App.517-99. Again, Petitioners corrected numerous clear errors made by CFIUS. And again, CFIUS did not meaningfully reply. Instead, on December 23, CFIUS informed Petitioners by letter that it had referred the transaction

to the President after the Committee was still unable to "reach [a] consensus" about whether the transaction presented a national security concern that could not be mitigated. App.605-07. CFIUS again refused to engage on the proposed national security agreement, simply repeating that it "ha[d] not reached consensus on" whether the agreement would resolve the purported national security concerns. App.606.

To be sure, CFIUS provided Petitioners a document that it labeled "[u]nclassified [i]nformation [c]onsidered by the Committee," consisting of 146 discrete bulleted points spread over 18 pages. App.498-515. But this document, sent to Petitioners on a Saturday afternoon just nine days before the end of the CFIUS review, hardly offered Petitioners meaningful process. It did not indicate which of the multitudinous points actually motivated the Committee, or individual members of the Committee, to oppose the transaction—or, given that there was disagreement on the Committee, which of those points concerned the President. And it gave Petitioners no more guidance on what CFIUS found problematic about the mitigation agreement.

Thus, during the entirety of the CFIUS process, CFIUS never told Petitioners anything about its concerns regarding the mitigation

proposals; and Petitioners therefore were not given the constitutionally required "opportunity to tailor [their] submission to [those] concerns or rebut the factual premises underlying the President's action." *Ralls*, 758 F.3d at 320. Saying, in effect, that "we won't tell you why your legally binding and detailed mitigation agreement *might* not be good enough," hardly facilitates a meaningful response. So even assuming that "[a]dequate process at the CFIUS stage . . . would . . . satisfy the President's due process obligation," *id*., there was no adequate process here.

*Second*, again assuming, contrary to the clear public record, that the President made his decision in January 2025 and that CFIUS's review informed that decision, other deficiencies in the CFIUS process also fatally tainted the President's action. This Court has held that administrative action is "invalid if based in whole or in part" on "extraneous pressure." *Volpe*, 459 F.2d at 1246. "[I]nterference so tainting the administrative process violates the right of a party to due process of law." *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994). "The test is whether 'extraneous factors intruded into the calculus of consideration.'" *Id*. (emphasis and quotations removed). Again, the

47

reason is obvious: an affected party can have no meaningful opportunity to respond to considerations that are external to, and unacknowledged by, the decisionmaker.

Here, the President's prejudgment was clearly an extraneous consideration that fatally infected CFIUS's consideration. It would have been impossible for the members of CFIUS, all political appointees selected by the President, *not* to have been affected by his firm statement that "it is vital for [U. S. Steel] to remain an American steel company that is domestically owned and operated," a statement that he "promise[d]" to implement.

The CFIUS process therefore did not provide an opportunity for Petitioners to be heard "at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333, when the deprivation of their property rights could "still be prevented," *Fuentes*, 407 U.S. at 81. In *Ralls*, this Court made clear that any party subject to CFIUS review "must receive the procedural protections . . . before the Presidential Order prohibits the transaction." 758 F.3d at 320. Given that "the procedure makes clear that the President acts only after reviewing the record compiled by CFIUS and CFIUS's recommendation" (*id.*), and that

Petitioners were not afforded "[a]dequate process at the CFIUS stage" (*id*.), consideration by CFIUS here did not avoid the constitutional injury.[7]

* * * *

For all of these reasons, President Biden's rejection of the merger denied Petitioners due process. The Court therefore should vacate that decision, vacate CFIUS's action, and remand the case for reconsideration in accordance with the Constitution and statute.

## C. CFIUS's Referral Violated Due Process.

The flaws in CFIUS's review of the merger also independently denied Petitioners due process. Section 721 gives CFIUS its own, separate role to play: the President may not block a transaction unless CFIUS refers the matter to him. *Supra*, page 12. Therefore, CFIUS's

---

[7] The President magnified the due process violation by offering a pretextual reason for disapproving the merger when he made his formal decision in January 2025. At that time, he invoked national security concerns, the only lawful basis for disapproval under Section 721. But as the President's prior (and more candid) statements make clear, his actual rationale was political, a point confirmed by the entirety of the irregular CFIUS process. This misdirection contravened the "core requirement[] of due process" that decisionmakers offer "adequate notice of why" they acted. *Gray Panthers*, 652 F.2d at 165; *see Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*, 301 U.S. 292, 302 (1937); *cf. Dep't of Commerce*, 588 U.S. at 783 (noting "significant mismatch between the decision the Secretary made and the rationale he provided").

decision to refer the matter—the action necessary to trigger the President's authority to reject the transaction—must itself comport with due process. Failure to do so is an independent violation of Petitioners' constitutional right. *Cf. Burns v. Office of Workers' Comp. Programs*, 41 F.3d 1555, 1561-62 (D.C. Cir. 2004) (holding an interim agency order reviewable and noting that "[e]ven if this provision of the Administrative Procedure Act did not apply, logic and *due process would require that this Court be able to review the decision*") (emphasis added)). Because the process leading to CFIUS's actions was constitutionally defective, CFIUS's decision must be set aside.

*First*, as described above, CFIUS's decision must be based on a thorough risk assessment and a determination that statutory authorities other than Section 721 are insufficient to address the risk identified by CFIUS. 50 U.S.C. § 4565(d)(4)(B) & (*l*)(4)(A).

Without that risk-based analysis and expression of views, there is no authority for CFIUS to refer the transaction to the President and no authority for the President to block a transaction. Defects in the process leading to a referral therefore make possible an act (Presidential disapproval) that causes the deprivation of property.

*Second*, for reasons also described above, CFIUS's process *was* inconsistent with due process in multiple respects: the Committee did not adequately identify its factual premises or concerns and did not provide Petitioners with a meaningful opportunity to counter those concerns. *Supra*, pages 43-49.

*Third*, given Petitioners' substantial arguments in favor of the merger—in particular, Petitioners' proposed national security agreement provisions—a review process that accorded with due process, with meaningful consideration of Petitioners' submissions would have resulted in no referral to the President. *See also infra*, pages 54-67.

Consequently, there is every reason to believe that *due* process at the CFIUS stage would have led to approval of the merger and no referral to the President. Denial of that CFIUS due process caused Petitioners independent injury.

## II.  CFIUS'S ACTIONS VIOLATED THE DEFENSE PRODUCTION ACT AND THE ADMINISTRATIVE PROCEDURE ACT.

Beyond the constitutional violation in referring the merger to President Biden, CFIUS violated the Defense Production Act and the APA, for several reasons: (1) CFIUS acted based on the President's

51

predetermination, not the statutorily mandated national security considerations, in referring the transaction to the President; (2) CFIUS's process here violated the statute and the Committee's settled practices; (3) CFIUS failed to comply with Section 721's requirements for a referral to the President; and (4) CFIUS's decision is wholly unsupported by the record evidence.

### A.    CFIUS's Actions Are Subject To Judicial Review Under The Defense Production Act And APA.

Congress limited judicial review of the *President's* determination, but *CFIUS's* referral is subject to the same review that this Court applies to other federal agency decisions, for two reasons. First, Section 721 expressly provides for review; and, second, CFIUS's referral is reviewable under the APA. Although Section 721 grants the President narrow statutory authority to block a transaction, a key check on the President is the requirement that CFIUS refer a transaction—and that CFIUS action is reviewable.

Petitioners are entitled to review of CFIUS's actions under the express terms of Section 721, which provides that aggrieved parties may challenge "an action or finding under" the statute before this Court. 50 U.S.C. § 4565(e)(2). CFIUS's August 31 and December 14 letters,

purporting to identify national security risks posed by the merger, are reviewable "findings" within the meaning of 50 U.S.C. § 4565(e)(2). *See* App.315; App.476. CFIUS's referral of the transaction to the President pursuant to 50 U.S.C. § 4565(*l*)(2) is an "action" within the meaning of 50 U.S.C. § 4565(e)(2).

Moreover, CFIUS's referral to the President is the agency's *final* action, and is therefore subject to judicial review under the APA. *See* 5 U.S.C. § 702. An agency action is "final if two independent conditions are met: (1) the action marks the consummation of the agency's decisionmaking process . . . ; and (2) it is an action by which rights or obligations have been determined, or from which legal consequences will flow." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (cleaned up). Both conditions are satisfied here. Referral to the President "conclude[d]" the agency process, as expressly stated in CFIUS's December 23 letter. App.607. And "legal consequences . . . flow[ed]" from that decision: the referral was a precondition to his review (and action) regarding the merger. *Supra*, pages 12-13.

Because Section 721 does not specify a review standard, the APA's standard governs. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540

U.S. 461, 496-97 (2004). Under that standard, a court will "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

## B. CFIUS's Findings And Action Were Arbitrary And Capricious And Contrary To Law.

CFIUS's review of the merger and its referral to President Biden violated these principles in multiple interrelated ways. Each one independently requires that the CFIUS referral be set aside and, because that referral is a necessary precondition for the President's order, that order also must be vacated and the matter remanded for redetermination in compliance with Section 721 and the APA.

### 1. CFIUS acted based on President Biden's predetermination, not the governing statutory standards.

Agency action is "invalid" under the APA "if based in whole or in part on the pressures emanating from [political actors]." *Volpe*, 459 F.2d at 1246, 1248. Indeed, "[e]ven 'the appearance of bias or pressure' may be sufficient to render a quasi-judicial agency decision arbitrary." *Connecticut v. DOI*, 363 F. Supp. 3d 45, 63-64 & n.16 (D.D.C. 2019) (citing *ATX*, 41 F.3d at 1529). "This standard involves two requirements. First,

Plaintiffs must demonstrate that political pressure was applied to the agency's decisionmakers. . . . Second, Plaintiffs must demonstrate that the pressure caused those decisionmakers to rely on improper factors." *Id.* at 63-64.

Here CFIUS's action was driven by President Biden's March decision, not Section 721's standards. The CFIUS members, all of whom were President Biden's political appointees, necessarily were subjected to significant political pressure by the President's clear and repeated public statements—both before the review commenced, and in April and September while the review was pending—that the issue had been decided. Indeed, Secretary of the Treasury Yellen, who served as Chair of CFIUS, candidly acknowledged, before CFIUS purported to identify any national security concerns, that she "certainly accept[s] the President's view . . . that [U. S. Steel] should remain in American hands." App.120.

Mr. Sofield concluded, based on his deep familiarity with the CFIUS process, that President Biden's "unprecedented statements" "suggest that the President was motivated by interests other than national security to reach the predetermined outcome" of blocking this

transaction, and CFIUS's dramatic deviations from its usual procedures were designed "to position the CFIUS review process to end with a lack of consensus among the CFIUS member agencies, thus ensuring that the President would make [his] pre-determined decision." App.155-56 ¶7, App.158-59 ¶15.

In *Volpe*, the Court set aside administrative action where the agency responded to pressure from a House of Representatives subcommittee chair. 459 F.2d at 1235-36, 1246-49. Here, the extraneous pressure was far greater, coming not from a House member but from the President of the United States, based on his political determination in the context of a hotly contested political campaign, and was exerted on Executive Branch officials who were directly subject to his authority. That invalidates CFIUS's action: "where political considerations have tainted agency action, [this Court has] consistently" set the action aside to "give[] the agency an opportunity to issue a new, untainted decision." *Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011).

### 2. CFIUS's review was suffused with multiple procedural violations.

CFIUS's action also was marked by multiple procedural violations requiring that it be set aside under the APA.

*First*, an agency must "treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996); *see XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 79 (D.D.C. 2015) (Brown Jackson, J.). Here, there is no legitimate reason for CFIUS's unprecedented and inconsistent treatment of the merger.

CFIUS has *never* referred to the President a transaction involving a Japanese company. *Supra*, page 13. Numerous large transactions involving Japanese companies and sensitive industries have closed without adverse CFIUS action over the past decade—indeed, a House of Representatives committee recommended a CFIUS exemption for qualifying Japanese companies. *Supra*, page 13. Meanwhile, other U.S.-based steel companies, including International Steel Group and Evraz Oregon Steel Mills, have been acquired by foreign investors, including those based in hostile countries like Russia, without any CFIUS (or Presidential) action.[8]

CFIUS's anomalous treatment of this transaction—which involves

---

[8] *Russia's Evraz completes Oregon Steel acquisition*, Reuters (Aug. 9, 2007), https://www.reuters.com/article/markets/russias-evraz-completes-oregon-steel-acquisition-idUSL24307335/.

neither a sensitive technology nor a hostile nation—was arbitrary and capricious because Petitioners were "treated differently from other applicants without any legitimate justification." *XP Vehicles*, 118 F. Supp. 3d at 79.

*Second*, CFIUS violated the APA by disregarding its own procedures and the APA's procedural requirements. "Certainly, courts reviewing agency decisions involving political interference must be attuned to the heightened possibility that political influence will have caused agencies to cut corners." *Aera Energy LLC*, 642 F.3d at 224. That happened here.

To begin with, CFIUS's management of the review process was aberrational. After months of inaction, it suddenly sent a letter to Petitioners on Labor Day weekend, giving Petitioners only one business day to respond. *Supra*, page 20. Mr. Sofield states that "[i]n my experience, CFIUS has never before required the parties to a transaction to respond to a risk letter in only one business day." App.180 ¶58.

CFIUS also deviated from its standard practice in other ways. Because CFIUS reviews are subject to strict time limits, *see* 50 U.S.C. § 4565(b)(1)(A)(i) & (b)(2), "CFIUS routinely allows parties to withdraw

and refile their notices in order to provide more time to evaluate a transaction for national security concerns and determine whether mitigation is adequate and appropriate to address any identified national security concerns." App.182 ¶62; *see* 31 C.F.R. § 800.509(a) (requests "ordinarily" granted). But when Petitioners filed such a request on August 23, CFIUS required Petitioners to submit a written justification for their request, App.183-84 ¶65 (Sofield Decl.), and did not grant it until September 17, AR_000076-79. That was "abnormal," according to Mr. Sofield: "I have never seen an instance where CFIUS has appeared reluctant to grant a request to withdraw and refile before engaging with parties to negotiate risk mitigation measures to address national security concerns." App.184 ¶65.

These unusual events occurred just before President Biden's Labor Day rally in Pennsylvania with United Steelworkers President McCall, at which President Biden repeated that he had decided to block the merger. The conclusion is inescapable that the CFIUS process was being managed to accord with President Biden's political schedule. App.181 ¶60 (Sofield Decl.) ("the issuance of the risk letter and potential presidential action appears timed to coincide with the Labor Day rally").

*Third*, the directive that CFIUS staff not engage substantively on mitigation measures (*see supra* pages 21-24), was a marked deviation from CFIUS's usual procedures. Mr. Sofield explained: "At each opportunity to engage with the parties substantively on risk mitigation measures, CFIUS chose not to discuss or provide input on such potential measures . . . . I have never seen CFIUS choose not to engage with parties when it is working toward a goal of determining adequate and appropriate risk mitigation measures. This failure to engage with the parties suggests that CFIUS was instead motivated to ensure that its identified concerns would not be mitigated." App.177 ¶54; *see also* App.192 ¶76 ("CFIUS's refusal to engage with the parties regarding the mitigation proposals cannot be justified by the nature of the parties' proposals. . . . [T]he parties' risk mitigation proposals consisted of tried-and-true terms that CFIUS has described implementing in its annual reports").

*Finally*, CFIUS improperly permitted communications with third parties, violating the confidentiality requirement imposed by its statute and regulations. *Supra*, pages 24-27. Even worse, the people involved were not just third parties, but individuals determined to block the

merger, including United Steelworkers and Cliffs leadership. The public statements of McCall and Goncalves leave no doubt that they had inside information about the CFIUS process. *Supra*, pages 25-26.

That was another unprecedented deviation from CFIUS's usual practice. "While CFIUS does occasionally receive information from interested parties regarding a transaction, in my experience, with the exception of this transaction, CFIUS members have never actually engaged in consultations with a third party as part of the CFIUS decision making process nor told an interested third party that the President would use CFIUS as a pretext to block a deal." App.169 ¶38 (Sofield Decl.). "CFIUS scrupulously seeks to avoid becoming involved in business disputes between parties." App.170 ¶39.

Mr. Sofield concluded, based on his review of the record, that "the third-party communications with CFIUS go much further than CFIUS passively receiving information relevant to its review" and "violate[d] CFIUS's confidentiality obligations." App.171 ¶41. These communications "irrevocably tainted [the review process] so as to make the ultimate judgment of the agency unfair." *Press Broad. Co. v. FCC*, 59 F.3d 1365, 1369 (D.C. Cir. 1995).

The combination of these clear violations of CFIUS's statutory and regulatory obligations requires that CFIUS's referral be invalidated.

### 3.    CFIUS's referral did not comply with Section 721's requirements.

Section 721 states that any referral to the President "shall be based on a risk-based analysis" of the transaction's effects on U.S. national security, "which shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." 50 U.S.C. § 4565(*l*)(4)(A). CFIUS members who support a referral must contribute to the risk-based analysis. *Id.* § 4565(*l*)(4)(B)(i). Any CFIUS member who supports "an alternative recommendation shall produce . . . (I) a written statement justifying the alternative recommendation; and (II) as appropriate, a risk-based analysis that supports the alternative recommendation." *Id.* § 4565(*l*)(4)(B)(ii); *see also id.* § 4565(*l*)(2).

CFIUS's December 23 referral letter does not come close to satisfying these requirements. It states only that the agencies could not "reach [a] consensus" on whether Petitioners' proposed national security agreement was sufficient to mitigate any potential risks. App.605-07. There is no recommendation to the President; no justification from any

agency for finding the mitigation measures insufficient; and no explanation from member agencies why they found the measures to be sufficient. *See id.*

The purpose of this referral requirement is to provide the President with the agencies' views on the transaction together with the reasons for those views. Because the referral here failed to comply with Section 721's express statutory requirement, CFIUS's action must be set aside.[9]

### 4. CFIUS's findings and action were wholly unsupported by the evidence before the Committee.

Because President Biden's political determination infected the CFIUS review, it is unsurprising that CFIUS's findings and referral "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

To survive arbitrary-and-capricious review, agency determinations

---

[9] The Department of Justice informed Petitioners that CFIUS provided a separate "report to the President" but has refused to include that report in the administrative record, or even to provide Petitioners with a redacted version of the report, on the ground that it is privileged. For those reasons, the government may not rely on that report to argue that CFIUS complied with the statutory requirements discussed in the text.

must "be reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), offering "a satisfactory explanation for [agency] action, including a rational connection between the facts found and the choice made," *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (alteration and quotation marks omitted). Here, neither CFIUS's findings nor its referral to the President was "reasonable or reasonably explained."

Each of the purported national security concerns articulated in CFIUS's August 31 and December 14 letters is devoid of reasoned analysis, and contrary to both the evidence presented to the Committee and common sense.

*First*, as CFIUS conceded in its final letter to Petitioners, the U.S. government does not buy the kind of steel that U. S. Steel produces, which is not "critical" to defense production. App.605-07. That reality substantially undercuts any possible national security justification for blocking the merger.

*Second*, CFIUS suggested that, because Nippon Steel Corporation has not been an active user of U.S. trade remedies, it likely would interfere with U. S. Steel's longstanding practice of actively participating

in trade-remedy actions. App.318-20. But according to Christopher Padilla, who oversaw the administration of U.S. trade remedy laws as a senior official at the Department of Commerce and the U.S. Trade Representative's Office, this purported risk is "entirely speculative and relies upon multiple, interdependent, and erroneous assumptions about private parties' economic incentives and actions, independent government agencies' decisions, and the outcome of data-intensive government investigations subject to judicial review." App.212 ¶7 (Padilla Decl.); *see also* App.332-431 (Nippon Steel Corporation's U.S. subsidiaries have participated in support of U.S. trade remedy proceedings).

Moreover, CFIUS's reliance on U. S. Steel's invocation of trade remedies is premised on "outsourc[ing] to a private party the President's constitutional obligation to protect national security"—ignoring that the President and Executive Branch departments have the authority, and the responsibility, to invoke trade remedies when appropriate to protect domestic industries. App.229 ¶35 (Padilla Decl.).

In addition, Petitioners' proposed national security agreement contained a binding commitment by Nippon Steel to refrain from

interfering with U. S. Steel's decisions to pursue trade cases—and to leave those decisions to U. S. Steel's board. AR_009230-31. Notwithstanding these "extraordinary" commitments, App.250-52 ¶¶67-69, 72 (Padilla Decl.), CFIUS refused to engage.

*Third*, CFIUS's August 31 letter speculated that Nippon Steel might increase its imports into the United States in the future. App.317-19. But, if anything, that would be a consequence of *rejecting* the merger, not approving it. It is irrational to believe that Nippon Steel would spend billions of dollars to expand its U.S. production capacity, with massive and guaranteed investments in several aging U.S.-based facilities, if it could simply import substitute product from Japan. Moreover, trade barriers such as Section 232 tariffs and antidumping and countervailing duties provide a strong additional incentive for Nippon Steel to use its newly-acquired U.S. facilities to produce steel rather than substitute foreign imports. App.366; App.225-26 ¶30 (Padilla Decl.).

*Fourth*, CFIUS speculated that Nippon Steel *might* cut American steel production. App.487. Indeed, this was the only purported national security risk set forth in the December 14 letter. But, again, it would make no sense for Nippon Steel to invest in U. S. Steel and then reduce

domestic capacity. Moreover, CFIUS's speculation ignores the undisputed facts that U. S. Steel had plans to cut (and had actually cut) production prior to the merger announcement, *see* App.577-78; App.523; that the merger is the only path to avoid such cuts; and that Petitioners' national security agreement included written binding commitments by Nippon Steel to maintain and enhance domestic production post-merger. App.517-20.

For these reasons, the determination by a CFIUS agency that the record supports a Presidential block of the transaction must be set aside as arbitrary and capricious.

## III.    PRESIDENT BIDEN'S DECISION TO BLOCK THE MERGER WAS *ULTRA VIRES.*

The President lacks independent constitutional authority to interfere with private property on grounds of national security. *See Youngstown*, 343 U.S. at 587-89. Section 721 grants the President narrow statutory authority to prohibit a transaction, but delineates clear, circumscribed limits on that authority. President Biden manifestly exceeded those limits in blocking the merger. His actions are thus "not sovereign actions" and must be set aside as *ultra vires. See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

67

As explained above, *supra*, pages 12-13, Section 721 authorizes the President to "suspend or prohibit any covered transaction" "only if the President finds," based on "credible evidence," that the transaction "threatens to impair the national security" and other provisions of law are not adequate to protect national security. 50 U.S.C. § 4565(d)(4). In making these findings, the President "shall consider . . . as appropriate," *id*. § 4565(d)(5), the ten listed national security "factors," *id*. § 4565(f). Thus, the President has no lawful authority to prohibit a transaction for reasons other than national security.

President Biden's decision to block the merger in March 2024 makes clear that his decision was not based on "credible evidence" that the merger would "threaten[] to impair the national security," as required by statute. Whatever national security "findings" or other information CFIUS ultimately provided to President Biden at the end of its review is beside the point; his decision was made over nine months earlier, and nowhere mentioned national security. Rather, the record makes clear it was driven by politics. It was therefore *ultra vires*.

Section 721's preclusion-of-review provision, 50 U.S.C. § 4565(e)(1), does not bar an *ultra vires* claim. It precludes judicial review only of

"actions of the President under" Section 721(d)(1) and of findings made in support of such an action. Here, the President's action was *not* an action "under" Section 721(d)(1) because it was predetermined and not based on an assessment that the transaction would impair national security.

This Court addressed an analogous situation in *Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988). The relevant statute there contained provisions precluding judicial review, but the Court held that "[i]f the wording of a preclusion clause is less than absolute," "[j]udicial review is favored when an agency is charged with acting beyond its authority"—that is, when the challenged action "'on its face' violated a statute." *Id.* at 221-22. While this Court may not second-guess the President's findings and actions to the extent they are authorized by the statute, the Court must set aside actions not taken under the statute at all. That is what occurred here.

## CONCLUSION

The Court should grant the petition for review, vacate President Biden's order and the CFIUS referral, and remand the matter for reconsideration in accordance with the requirements imposed by the Constitution and Section 721.

Respectfully submitted.

/s/ David B. Hennes
David B. Hennes
Alexander B. Simkin
Andrew S. Todres
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
David.Hennes@ropesgray.com
Alexander.Simkin@ropesgray.com
Andrew.Todres@ropesgray.com

Douglas H. Hallward-Driemeier
Stefan P. Schropp
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-
Driemeier@ropesgray.com
Stefan.Schropp@ropesgray.com

*Counsel for Petitioners Nippon Steel North America, Inc. and Nippon Steel Corporation*

/s/ Andrew J. Pincus
Andrew J. Pincus
Nicole A. Saharsky
Charles A. Rothfeld
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, Northwest
Washington, DC 20006
(202) 263-3000
APincus@mayerbrown.com
NSaharsky@mayerbrown.com
CRothfeld@mayerbrown.com
WMallat@mayerbrown.com

Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
BBright@mayerbrown.com

*Counsel for Petitioner United States Steel Corporation*

Dated:  February 3, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,951 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook 14-point type for text and footnotes.

/s/ Andrew J. Pincus
Andrew J. Pincus

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

/s/ Andrew J. Pincus
Andrew J. Pincus

**ADDENDUM**

Section 721 of the Defense Production Act, 50 U.S.C. § 4565

## § 4565. Authority to review certain mergers, acquisitions, and takeovers

\* \* \* \* \*

**(b)   National security reviews and investigations**

**(1)   National security reviews**

**(A)   In general**.   Upon receiving written notification under subparagraph (C) of any covered transaction, or pursuant to a unilateral notification initiated under subparagraph (D) with respect to any covered transaction, the President, acting through the Committee—

**(i)**   shall review the covered transaction to determine the effects of the transaction on the national security of the United States; and

**(ii)**   shall consider the factors specified in subsection (f) for such purpose, as appropriate.

**(B)   Control by foreign government**.   If the Committee determines that the covered transaction is a foreign government-controlled transaction, the Committee shall conduct an investigation of the transaction under paragraph (2).

**(C)   Written notice**

**(i)   In general**

**(I)   In general**.   Any party or parties to any covered transaction may initiate a review of the transaction under this paragraph by submitting a written notice of the transaction to the Chairperson of the Committee.

**(II)   Comments and acceptance**

**(aa)   In general**.  Subject to item (cc), the Committee shall provide comments on a draft or formal written notice or accept

A-1

a formal written notice submitted under subclause (I) with respect to a covered transaction not later than the date that is 10 business days after the date of submission of the draft or formal written notice.

**(bb)  Completeness**.  If the Committee determines that a draft or formal written notice described in item (aa) is not complete, the Committee shall notify the party or parties to the transaction in writing that the notice is not complete and provide an explanation of all material respects in which the notice is incomplete.

**(cc)  Stipulations required**.  The timing requirement under item (aa) shall apply only in a case in which the parties stipulate under clause (vi) that the transaction is a covered transaction.

**(ii)  Withdrawal of notice**.  No covered transaction for which a notice was submitted under clause (i) may be withdrawn from review, unless a written request for such withdrawal is submitted to the Committee by any party to the transaction and approved by the Committee.

**(iii)  Continuing discussions**.  A request for withdrawal under clause (ii) shall not be construed to preclude any party to the covered transaction from continuing informal discussions with the Committee or any member thereof regarding possible resubmission for review pursuant to this paragraph.

*  *  *  *  *

**(F)  Timing**.  Any review under this paragraph shall be completed before the end of the 45-day period beginning on the date of the acceptance of written notice under subparagraph (C) by the chairperson, or beginning on the date of the initiation of the review in accordance with subparagraph (D), as applicable.

**(G)  Limit on delegation of certain authority**.  The authority of the Committee to initiate a review under subparagraph (D) may not be delegated to any person, other than the Deputy Secretary or an

A-2

appropriate Under Secretary of the department or agency represented on the Committee.

*   *   *   *   *

### (2)   National security investigations

**(A)   In general**.  In each case described in subparagraph (B), the Committee shall immediately conduct an investigation of the effects of a covered transaction on the national security of the United States, and take any necessary actions in connection with the transaction to protect the national security of the United States.

**(B)   Applicability**.  Subparagraph (A) shall apply in each case in which—

**(i)**    a review of a covered transaction under paragraph (1) results in a determination that—

**(I)**    the transaction threatens to impair the national security of the United States and the risk has not been mitigated during or prior to the review of a covered transaction under paragraph (1);

**(II)**    the transaction is a foreign government-controlled transaction; or

**(III)** the transaction would result in control of any critical infrastructure of or within the United States by or on behalf of any foreign person, if the Committee determines that the transaction could impair national security, and that such impairment to national security has not been mitigated by assurances provided or renewed with the approval of the Committee, as described in subsection (l), during the review period under paragraph (1); or

**(ii)**    the lead agency recommends, and the Committee concurs, that an investigation be undertaken.

A-3

**(C)   Timing**

   **(i)   In general**. Except as provided in clause (ii), any investigation under subparagraph (A) shall be completed before the end of the 45-day period beginning on the date on which the investigation commenced.

   **(ii)   Extension for extraordinary circumstances**

      **(I)   In general**.  In extraordinary circumstances (as defined by the Committee in regulations), the chairperson may, at the request of the head of the lead agency, extend an investigation under subparagraph (A) for one 15-day period.

      **(II)   Nondelegation**. The authority of the chairperson and the head of the lead agency referred to in subclause (I) may not be delegated to any person other than the Deputy Secretary of the Treasury or the deputy head (or equivalent thereof) of the lead agency, as the case may be.

      **(III) Notification to parties**.  If the Committee extends the deadline under subclause (I) with respect to a covered transaction, the Committee shall notify the parties to the transaction of the extension.

* * * * *

**(5)   Submission of additional information**.  No provision of this subsection shall be construed as prohibiting any party to a covered transaction from submitting additional information concerning the transaction, including any proposed restructuring of the transaction or any modifications to any agreements in connection with the transaction, while any review or investigation of the transaction is ongoing.

**(6)   Notice of results to parties**. The Committee shall notify the parties to a covered transaction of the results of a review or investigation under this section, promptly upon completion of all action under this section.

**(7) Regulations**. Regulations prescribed under this section shall include standard procedures for—

**(A)** submitting any notice of a covered transaction to the Committee;

**(B)** submitting a request to withdraw a covered transaction from review;

**(C)** resubmitting a notice of a covered transaction that was previously withdrawn from review; and

**(D)** providing notice of the results of a review or investigation to the parties to the covered transaction, upon completion of all action under this section.

**(8) Tolling of deadlines during lapse in appropriations**. Any deadline or time limitation under this subsection shall be tolled during a lapse in appropriations.

**(c) Confidentiality of information**

**(1) In general**. Except as provided in paragraph (2), any information or documentary material filed with the President or the President's designee pursuant to this section shall be exempt from disclosure under section 552 of Title 5, and no such information or documentary material may be made public.

**(2) Exceptions**. Paragraph (1) shall not prohibit the disclosure of the following:

**(A)** Information relevant to any administrative or judicial action or proceeding.

**(B)** Information to Congress or any duly authorized committee or subcommittee of Congress.

**(C)** Information important to the national security analysis or actions of the Committee to any domestic governmental entity, or to any foreign governmental entity of a United States ally or partner, under the exclusive direction and authorization of the chairperson,

only to the extent necessary for national security purposes, and subject to appropriate confidentiality and classification requirements.

**(D)**  Information that the parties have consented to be disclosed to third parties.

**\*  \*  \*  \*  \***

## (d)   Action by the President

**(1)   In general**.  Subject to paragraph (4), the President may take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States.

**(2)   Announcement by the President**.  The President shall announce the decision on whether or not to take action pursuant to paragraph (1) with respect to a covered transaction not later than 15 days after the earlier of—

**(A)**  the date on which the investigation of the transaction under subsection (b) is completed; or

**(B)**  the date on which the Committee otherwise refers the transaction to the President under subsection (l)(2).

**(3)   Enforcement**.  The President may direct the Attorney General of the United States to seek appropriate relief, including divestment relief, in the district courts of the United States, in order to implement and enforce this subsection.

**(4)   Findings of the President**.  The President may exercise the authority conferred by paragraph (1), only if the President finds that—

**(A)**  there is credible evidence that leads the President to believe that a foreign person that would acquire an interest in a United States business or its assets as a result of the covered transaction might take action that threatens to impair the national security; and

**(B)** provisions of law, other than this section and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President.

**(5) Factors to be considered**. For purposes of determining whether to take action under paragraph (1), the President shall consider, among other factors each of the factors described in subsection (f), as appropriate.

**(e) Actions and findings nonreviewable**

**(1) In general**. The actions of the President under paragraph (1) of subsection (d) and the findings of the President under paragraph (4) of subsection (d) shall not be subject to judicial review.

**(2) Civil actions**. A civil action challenging an action or finding under this section may be brought only in the United States Court of Appeals for the District of Columbia Circuit.

**(3) Procedures for review of privileged information**. If a civil action challenging an action or finding under this section is brought, and the court determines that protected information in the administrative record, including classified or other information subject to privilege or protections under any provision of law, is necessary to resolve the challenge, that information shall be submitted ex parte and in camera to the court and the court shall maintain that information under seal.

**(4) Applicability of use of information provisions**. The use of information provisions of sections 1806, 1825, 1845, and 1881e of this title shall not apply in a civil action brought under this subsection.

**(f) Factors to be considered**. For purposes of this section, the President or the President's designee may, taking into account the requirements of national security, consider—

**(1)** domestic production needed for projected national defense requirements,

**(2)**    the capability and capacity of domestic industries to meet national defense requirements, including the availability of human resources, products, technology, materials, and other supplies and services,

**(3)**    the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security,

**(4)**    the potential effects of the proposed or pending transaction on sales of military goods, equipment, or technology to any country—

    **(A)**    **identified by the Secretary of State—**

        **(i)**    under section 4605(j) of this title, as a country that supports terrorism;

        **(ii)**    under section 4605(l) of this title, as a country of concern regarding missile proliferation; or

        **(iii)**    under section 4605(m) of this title, as a country of concern regarding the proliferation of chemical and biological weapons;

    **(B)**    identified by the Secretary of Defense as posing a potential regional military threat to the interests of the United States; or

    **(C)**    listed under section 2139a(c) of Title 42 on the "Nuclear Non-Proliferation-Special Country List" (15 C.F.R. Part 778, Supplement No. 4) or any successor list;

**(5)**    the potential effects of the proposed or pending transaction on United States international technological leadership in areas affecting United States national security;

**(6)**    the potential national security-related effects on United States critical infrastructure, including major energy assets;

**(7)**    the potential national security-related effects on United States critical technologies;

**(8)** whether the covered transaction is a foreign government-controlled transaction, as determined under subsection (b)(1)(B);

**(9)** as appropriate, and particularly with respect to transactions requiring an investigation under subsection (b)(1)(B), a review of the current assessment of—

**(A)** the adherence of the subject country to nonproliferation control regimes, including treaties and multilateral supply guidelines, which shall draw on, but not be limited to, the annual report on "Adherence to and Compliance with Arms Control, Nonproliferation and Disarmament Agreements and Commitments" required by section 2593a of Title 22;

**(B)** the relationship of such country with the United States, specifically on its record on cooperating in counter-terrorism efforts, which shall draw on, but not be limited to, the report of the President to Congress under section 7120 of the Intelligence Reform and Terrorism Prevention Act of 2004; and

**(C)** the potential for transshipment or diversion of technologies with military applications, including an analysis of national export control laws and regulations;

**(10)** the long-term projection of United States requirements for sources of energy and other critical resources and material; and

**(11)** such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation.

**\* \* \* \* \***

**(k)    Committee on Foreign Investment in the United States**

**(1)    Establishment**.  The Committee on Foreign Investment in the United States, established pursuant to Executive Order No. 11858, shall be a multi agency committee to carry out this section and such other assignments as the President may designate.

**(2)   Membership**.   The Committee shall be comprised of the following members or the designee of any such member:

    **(A)**   The Secretary of the Treasury.

    **(B)**   The Secretary of Homeland Security.

    **(C)**   The Secretary of Commerce.

    **(D)**   The Secretary of Defense.

    **(E)**   The Secretary of State.

    **(F)**   The Attorney General of the United States.

    **(G)**   The Secretary of Energy.

    **(H)**   The Secretary of Labor (nonvoting, ex officio).

    **(I)**   The Director of National Intelligence (nonvoting, ex officio).

    **(J)**   The heads of any other executive department, agency, or office, as the President determines appropriate, generally or on a case-by-case basis.

**(3)   Chairperson**.  The Secretary of the Treasury shall serve as the chairperson of the Committee.

*  *  *  *  *

**(l)   Actions by the Committee to address national security risks**

**(1)   Suspension of transactions**.  The Committee, acting through the chairperson, may suspend a proposed or pending covered transaction that may pose a risk to the national security of the United States for such time as the covered transaction is under review or investigation under subsection (b).

**(2)   Referral to President**.  The Committee may, at any time during the review or investigation of a covered transaction under subsection (b), complete the action of the Committee with respect to the

A-10

transaction and refer the transaction to the President for action pursuant to subsection (d).

**(3)   Mitigation**

   **(A)   Agreements and conditions**

   **(i)    In general**.  The Committee or a lead agency may, on behalf of the Committee, negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction.

   **(ii)   Abandonment of transactions**.  If a party to a covered transaction has voluntarily chosen to abandon the transaction, the Committee or lead agency, as the case may be, may negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction for purposes of effectuating such abandonment and mitigating any risk to the national security of the United States that arises as a result of the covered transaction.

   **(iii) Agreements and conditions relating to completed transactions**.  The Committee or lead agency, as the case may be, may negotiate, enter into or impose, and enforce any agreement or condition with any party to a completed covered transaction in order to mitigate any interim risk to the national security of the United States that may arise as a result of the covered transaction until such time that the Committee has completed action pursuant to subsection (b) or the President has taken action pursuant to subsection (d) with respect to the transaction.

   **(B)   Treatment of outdated agreements or conditions**.  The chairperson and the head of the lead agency shall periodically review the appropriateness of an agreement or condition imposed under subparagraph (A) and terminate, phase out, or otherwise amend the agreement or condition if a threat no longer requires mitigation through the agreement or condition.

**(C)   Limitations**.   An agreement may not be entered into or condition imposed under subparagraph (A) with respect to a covered transaction unless the Committee determines that the agreement or condition resolves the national security concerns posed by the transaction, taking into consideration whether the agreement or condition is reasonably calculated to—

**(i)**   be effective;

**(ii)**   allow for compliance with the terms of the agreement or condition in an appropriately verifiable way; and

**(iii)** enable effective monitoring of compliance with and enforcement of the terms of the agreement or condition.

**(D)   Jurisdiction**.  The provisions of section 4556(b) of this title shall apply to any mitigation agreement entered into or condition imposed under subparagraph (A).

**(4)   Risk-based analysis required**

**(A)   In general**.  Any determination of the Committee to suspend a covered transaction under paragraph (1), to refer a covered transaction to the President under paragraph (2), or to negotiate, enter into or impose, or enforce any agreement or condition under paragraph (3)(A) with respect to a covered transaction, shall be based on a risk-based analysis, conducted by the Committee, of the effects on the national security of the United States of the covered transaction, which shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction.

**(B)   Actions of members of the Committee**

**(i)   In general**.  Any member of the Committee who concludes that a covered transaction poses an unresolved national security concern shall recommend to the Committee that the Committee suspend the transaction under paragraph (1), refer the transaction to the President under paragraph (2), or negotiate, enter into or impose, or enforce any agreement or condition under paragraph

(3)(A) with respect to the transaction. In making that recommendation, the member shall propose or contribute to the risk-based analysis required by subparagraph (A).

**(ii)  Failure to reach consensus**. If the Committee fails to reach consensus with respect to a recommendation under clause (i) regarding a covered transaction, the members of the Committee who support an alternative recommendation shall produce—

**(I)** a written statement justifying the alternative recommendation; and

**(II)** as appropriate, a risk-based analysis that supports the alternative recommendation.

**(C)  Definitions**. For purposes of subparagraph (A), the terms "threat", "vulnerabilities", and "consequences to national security" shall have the meanings given those terms by the Committee by regulation.

\* \* \* \* \*

**(6)   Negotiation, modification, monitoring, and enforcement**

**(A)  Designation of lead agency**. The lead agency shall negotiate, modify, monitor, and enforce, on behalf of the Committee, any agreement entered into or condition imposed under paragraph (3) with respect to a covered transaction, based on the expertise with and knowledge of the issues related to such transaction on the part of the designated department or agency. The lead agency may, at its discretion, seek and receive the assistance of other departments or agencies in carrying out the purposes of this paragraph.

**(B)  Reporting by designated agency**. The lead agency in connection with any agreement entered into or condition imposed with respect to a covered transaction shall—

**(i)** provide periodic reports to the Committee on any material modification to any such agreement or condition imposed with respect to the transaction; and

**(ii)** ensure that any material modification to any such agreement or condition is reported to the Director of National Intelligence, the Attorney General of the United States, and any other Federal department or agency that may have a material interest in such modification.

**(C)  Compliance plans**

**(i)    In general**. In the case of a covered transaction with respect to which an agreement is entered into under paragraph (3)(A), the Committee or lead agency, as the case may be, shall formulate, adhere to, and keep updated a plan for monitoring compliance with the agreement.

**(ii)    Elements**. Each plan required by clause (i) with respect to an agreement entered into under paragraph (3)(A) shall include an explanation of—

**(I)** which member of the Committee will have primary responsibility for monitoring compliance with the agreement;

**(II)** how compliance with the agreement will be monitored;

**(III)** how frequently compliance reviews will be conducted;

**(IV)** whether an independent entity will be utilized under subparagraph (E) to conduct compliance reviews; and

**(V)** what actions will be taken if the parties fail to cooperate regarding monitoring compliance with the agreement.

**(D)  Effect of lack of compliance**. If, at any time after a mitigation agreement or condition is entered into or imposed under paragraph (3)(A), the Committee or lead agency, as the case may be, determines that a party or parties to the agreement or condition are not in compliance with the terms of the agreement or condition, the Committee or lead agency may, in addition to the authority of the Committee to impose penalties pursuant to subsection (h)(3) and to unilaterally initiate a review of any covered transaction under subsection (b)(1)(D)(iii)—

**(i)** negotiate a plan of action for the party or parties to remediate the lack of compliance, with failure to abide by the plan or otherwise remediate the lack of compliance serving as the basis for the Committee to find a material breach of the agreement or condition;

**(ii)** require that the party or parties submit a written notice under clause (i) of subsection (b)(1)(C) or a declaration under clause (v) of that subsection with respect to a covered transaction initiated after the date of the determination of noncompliance and before the date that is 5 years after the date of the determination to the Committee to initiate a review of the transaction under subsection (b); or

**(iii)** seek injunctive relief.

**(E)  Use of independent entities to monitor compliance**.  If the parties to an agreement entered into under paragraph (3)(A) enter into a contract with an independent entity from outside the United States Government for the purpose of monitoring compliance with the agreement, the Committee shall take such action as is necessary to prevent a conflict of interest from arising by ensuring that the independent entity owes no fiduciary duty to the parties.

**(F)  Successors and assigns**.  Any agreement or condition entered into or imposed under paragraph (3)(A) shall be considered binding on all successors and assigns unless and until the agreement or condition terminates on its own terms or is otherwise terminated by the Committee in its sole discretion.

**(G)  Additional  compliance  measures**.  Subject  to subparagraphs (A) through (F), the Committee shall develop and agree upon methods for evaluating compliance with any agreement entered into or condition imposed with respect to a covered transaction that will allow the Committee to adequately ensure compliance without unnecessarily diverting Committee resources from assessing any new covered transaction for which a written notice under clause (i) of subsection (b)(1)(C) or declaration under clause (v) of that subsection has been filed, and if necessary, reaching

A-15

a mitigation agreement with or imposing a condition on a party to such covered transaction or any covered transaction for which a review has been reopened for any reason.

\* \* \* \* \*