ORAL ARGUMENT NOT YET SCHEDULED
No. 25-1004

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES STEEL CORPORATION; NIPPON STEEL NORTH
AMERICA, INC.; and NIPPON STEEL CORPORATION,

*Petitioners*,

v.

THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED
STATES; ET AL.,

*Respondents*.

On Petition for Review of Actions of President Biden and of the
Committee on Foreign Investment in the United States

**APPENDIX TO BRIEF OF PETITIONERS
VOLUME I OF II (Pages 1-290)**

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-
Driemeier@ropesgray.com

Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
APincus@mayerbrown.com

*Counsel for Petitioners Nippon
Steel North America, Inc. and
Nippon Steel Corporation*

*Counsel for Petitioner United
States Steel Corporation*

*(Additional counsel listed on inside cover)*

David B. Hennes
Alexander B. Simkin
Andrew S. Todres
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
David.Hennes@ropesgray.com
Alexander.Simkin@ropesgray.com
Andrew.Todres@ropesgray.com


Stefan P. Schropp
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600
Stefan.Schropp@ropesgray.com

*Counsel for Petitioners Nippon Steel
North America, Inc. and Nippon
Steel Corporation*

Dated:  February 3, 2025

Nicole A. Saharsky
Charles A. Rothfeld
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, Northwest
Washington, DC 20006
(202) 263-3000
NSaharsky@mayerbrown.com
CRothfeld@mayerbrown.com
WMallat@mayerbrown.com


Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
BBright@mayerbrown.com

*Counsel for Petitioner United
States Steel Corporation*

# TABLE OF CONTENTS

**Page**

**VOLUME I**

Declaration of Andrew J. Pincus......................................................... App.1

    Ex. A: Statement from President Biden on US Steel
        (Mar. 14, 2024) ............................................................ App.6

    Ex. B: Remarks by President Biden on New Actions to
        Protect U. S. Steel and Shipbuilding Industry from
        Unfair Practices (Apr. 17, 2024) ................................. App.8

    Ex. C: Remarks by President Biden and Vice President
        Harris at a Campaign Event (Sept. 2, 2024) .......................... App.21

    Ex. D: Alexandra Alper, et al., *Biden Still Opposes Nippon
        Steel Deal's Bid for U.S. Steel*, Reuters (Sept. 27, 2024)....... App.40

    Ex. E: Press Briefing by Press Secretary Karine Jean-
        Pierre and NSC Coordinator for Strategic
        Communications John Kirby (Jan. 31, 2024) ........................ App.43

    Ex. F: United Steelworkers, *Biden Supports Steelworkers
        as USW Continues Opposition to Proposed USS-Nippon
        Deal* (Feb. 2, 2024)................................................... App.80

    Ex. G: Transcript of Raymond James Investor Webinar
        (Feb. 2, 2024) .......................................................... App.84

    Ex. H: Joe Deaux, *Cliffs Weighs Lowball Bid for US Steel
        With Union Backing*, Bloomberg (Mar. 14, 2024) ................ App.97

    Ex. I: United Steelworkers, *USW Endorses Joe Biden for
        Reelection as President* (Mar. 20, 2024)............................. App.102

    Ex. J: Gavin Bade, *Biden's US Steel decision highlights
        'deference' given to Rust Belt senators, steelworkers*,
        Politico (Mar. 22, 2024) ...................................... App.107

Ex. K: Alan Rappeport, *Furor Over U.S. Steel Bid Puts Secretive Government Panel In Spotlight*, N.Y. Times (May 3, 2024) ........................................................ App.115

Ex. L: Letter from U. S. Steel Corporation and Nippon Steel Corporation to Jonathan Kanter, Assistant Attorney General, U.S. Department of Justice, Antitrust Division (July 12, 2024) ...................................... App.121

Ex. M: Ricky Sayer, *Pittsburgh union members throw support behind Harris as she opposes sale of U.S. Steel*, CBS News (Sept. 3, 2024) .................................... App.132

Ex. N: Press Release, USTR Announces New Members to Serve on Advisory Committee for Trade Policy and Negotiations (Oct. 31, 2024) ................................. App.136

Ex. O: Evan Robinson-Johnson, *Threatened by foreign investment, Cleveland-Cliffs teamed up with its union to unravel U.S. Steel deal*, Pittsburgh Post-Gazette (Dec. 22, 2024) .................................................... App.141

Ex. P: Statement from President Joe Biden (Jan. 3, 2025) ..... App.147

Ex. Q: Order Regarding the Proposed Acquisition of United States Steel Corporation by Nippon Steel Corporation (Jan. 3, 2025) .................................... App.150

Declaration of Richard Sofield ..................................... App.153

   Appx. A: Curriculum Vitae ...................................... App.204

Declaration of Christopher Padilla ............................... App.209

   Appx. A: Curriculum Vitae ...................................... App.255

Declaration of Kevin Lewis ......................................... App.259

## VOLUME II

Submission to CFIUS regarding USW's claim of engagement (Mar. 5, 2024) .................................... App.291

Email from Parties to CFIUS
on Goncalves statements (Apr. 2, 2024).................................. App.305

Email from Parties to CFIUS
(Jul. 30, 2024) .......................................................................... App.313

Letter from CFIUS to Parties
(Aug. 31, 2024) ........................................................................ App.315

Letter from Parties to CFIUS
(Sept. 3, 2024) .......................................................................... App.332

Letter from Nippon Steel to Secretaries
Raimondo and Yellen (Sept. 4, 2024) ..................................... App.432

Letter from U. S. Steel to Secretaries
Raimondo and Yellen (Sept. 4, 2024) ..................................... App.434

Revised Draft National Security
Agreement (Dec. 2, 2024)........................................................ App.436

White Paper Submission to CFIUS
(Dec. 11, 2024).......................................................................... App.473

Supplemental Submission to CFIUS
(Dec. 13, 2024).......................................................................... App.486

Letter from CFIUS to Parties
(Dec. 14, 2024).......................................................................... App.487

Letter from Burritt to Secretaries
Raimondo and Yellen (Dec. 16, 2024)..................................... App.516

Letter from Parties to CFIUS
(Dec. 17, 2024).......................................................................... App.517

Statement from Allegheny Conference
(Dec. 17, 2024).......................................................................... App.600

Letter from Mayors of Gary, Birmingham, and Southwestern
Pennsylvania to Biden (Dec. 17, 2024).................................... App.602

Letter from CFIUS to Parties regarding Referral
   (Dec. 23, 2024)............................................................................ App.605

No. 25-1004

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES STEEL CORPORATION; NIPPON STEEL NORTH
AMERICA, INC.; and NIPPON STEEL CORPORATION,

*Petitioners*,

v.

THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED
STATES; ET AL.,

*Respondents*.

## DECLARATION OF ANDREW J. PINCUS

I, Andrew J. Pincus, hereby declare:

1.    I am a Partner in Mayer Brown LLP and am counsel for Petitioner United States Steel Corporation in the above-captioned matter. In this position I have personal knowledge of the matters set forth herein.

2.    Attached hereto as "Exhibit A" is a true and correct copy of a statement from President Joe Biden, which is dated March 14, 2024, and entitled "Statement from President Biden on US Steel."

3.    Attached hereto as "Exhibit B" is a true and correct copy of a

transcript of remarks made by President Biden, which is dated April 17, 2024, and entitled "Remarks by President Biden on New Actions to Protect U. S. Steel and Shipbuilding Industry from Unfair Practices."

4.    Attached hereto as "Exhibit C" is a true and correct copy of a transcript of remarks made by President Biden and Vice President Kamala Harris, which is dated September 2, 2024, and entitled "Remarks by President Biden and Vice President Harris at a Campaign Event."

5.    Attached hereto as "Exhibit D" is a true and correct copy of an article by Alexandra Alper, et al., which is dated September 27, 2024, and entitled "Biden still opposes Nippon Steel deal's bid for U.S. Steel."

6.    Attached hereto as "Exhibit E" is a true and correct copy of a transcript of a press briefing by Press Secretary Karine-Jean Pierre and NSC Coordinator for Strategic Communications John Kirby, which is dated January 31, 2024.

7.    Attached hereto as "Exhibit F" is a true and correct copy of a press release by the United Steelworkers, which is dated February 2, 2024, and entitled "Biden Supports Steelworkers as USW Continues Opposition to Proposed USS-Nippon Deal."

8.    Attached hereto as "Exhibit G" is a true and correct copy of a

transcript of a Raymond James Investor Webinar, which is dated February 2, 2024.

9.    Attached hereto as "Exhibit H" is a true and correct copy of an article by Joe Deaux, which is dated March 14, 2024, and entitled "Cliffs Weighs Lowball Bid for US Steel With Union Backing."

10.    Attached hereto as "Exhibit I" is a true and correct copy of a press release by the United Steelworkers, which is dated March 20, 2024, and entitled "USW Endorses Joe Biden for Reelection as President."

11.    Attached hereto as "Exhibit J" is a true and correct copy of an article by Gavin Bade, which is dated March 22, 2024, and entitled "Biden's US Steel decision highlights 'deference' given to Rust Belt senators, steelworkers."

12.    Attached hereto as "Exhibit K" is a true and correct copy of an article by Alan Rappeport, which is dated May 3, 2024, and entitled "Furor Over U.S. Steel Bid Puts Secretive Government Panel In Spotlight."

13.    Attached hereto as "Exhibit L" is a true and correct copy of a letter from U. S. Steel Corporation to Jonathan Kanter, Assistant Attorney General of the Antitrust Division at the U.S. Department of

Justice, which is dated July 12, 2024.

14.    Attached hereto as "Exhibit M" is a true and correct copy of an article by Ricky Sayer, which is dated September 3, 2024, and entitled "Pittsburgh union members throw support behind Harris as she opposes sale of U.S. Steel."

15.    Attached hereto as "Exhibit N" is a true and correct copy of a press release by the United States Trade Representative, which is dated October 31, 2024, and entitled "USTR Announces New Members to Serve on Advisory Committee for Trade Policy and Negotiations."

16.    Attached hereto as "Exhibit O" is a true and correct copy of an article by Evan Robinson-Johnson, which is dated December 22, 2024, and entitled "Threatened by foreign investment, Cleveland-Cliffs teamed up with its union to unravel U.S. Steel deal."

17.    Attached hereto as "Exhibit P" is a true and correct copy of a statement from President Biden, which is dated January 3, 2025.

18.    Attached hereto as "Exhibit Q" is a true and correct copy of the Order Regarding the Proposed Acquisition of United States Steel Corporation by Nippon Steel Corporation, which is dated January 3, 2025, and published in the Federal Register at 90 Fed. Reg. 2605.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 3, 2025.

/s/ Andrew J. Pincus
Andrew J. Pincus

# Exhibit A

MARCH 14, 2024

# Statement from President Biden on US Steel

It is important that we maintain strong American steel companies powered by American steel workers. I told our steel workers I have their backs, and I meant it. U.S. Steel has been an iconic American steel company for more than a century, and it is vital for it to remain an American steel company that is domestically owned and operated.

###

# Exhibit B

USCA Case #25-1004    Document #2098076    Filed: 02/03/2025    Page 15 of 297

9/5/24, 12:28 PM    Remarks by President Biden on New Actions to Protect U.S. Steel and Shipbuilding Industry from China's Unfair Practices | Pittsbur…

APRIL 17, 2024

# Remarks by President Biden on New Actions to Protect U.S. Steel and Shipbuilding Industry from China's Unfair Practices | Pittsburgh, PA

United Steelworkers Headquarters
Pittsburgh, Pennsylvania

2:29 P.M. EDT

THE PRESIDENT:  Hello, Pittsburgh.  (Applause.)  Please have a seat.

Robert, thank you for that introduction and for sharing your story about being a third-generation steelworker and a Marine Corps veteran.  Where are you?  Are you over on this side?  There you are.

Well, I want to thank you for the — your new president, by the way.  Dave McCall has been a friend of mine and a friend of a former president.  We — we miss him, but it's great to have you, Dave.  You've been a good friend.  And we're both longtime friends — (applause) — we're both longtime friend of Tom's as well.  We miss him dearly.

Dave, you're doing a great job in his footsteps and — and it's just going to get better, in my view.

There's an expression that comes to mind: "You go home with them that brung you to the dance."  And you brought me to the dance.  (Applause.)  No joke.

The Mayor and I are buddies.  I told the Mayor — and I mean it sincerely — the first outfit ever to endorse me as a 29-year-old kid running in a tough year for United States Senate, making me the second youngest man ever elected to the Senate, was a guy named Hughie Carcella.  And back in those days, the s-

**App.9**

— we had a big steelworkers — we had a lot of steelworkers in Claymont, Delaware, where I was from, because they worked in Worth Steel Company.

And — and I'll never forget coming to me and saying, "We're going to get you help." And I came out to Pittsburgh and you — and the steelworkers endorsed me. It changed everything. (Applause.)

Nixon won my state — Nixon won my state of Delaware with 60 percent of the vote, and I won with an astounding 3,100 majority — (laughter) — 3,100 majority. And it's thanks to you. I really mean it.

I'm Pittsburgh and — because of — and I really mean it: My love for Pittsburgh goes back to my Scranton days. My Grandfather Finnegan always talked about Pittsburgh.

Any rate, to make a long story short, the bottom line, for all kidding aside, is I'm president because of you guys. I really am. And I'm proud, as was mentioned earlier — I'm proud to be the most pro-union president in American history, for real. (Applause.)

Where I was raised, it ain't labor; it's unions — unions. (Applause.)

I had an uncle. He'd say, "Joey, you are union from belt buckle to shoe sole." (Laughter.)

Well, I want to thank some folks who had my back and — and had to stay back in Washington and couldn't be here today. Representatives Summer Lee and — you know, I — she — by the way, there are votes going on — and Chris DeLuzio. And Senator Bobby Casey is one of my closest friends, as his dad was. And John Fetterman, who I want to stay on his side no matter what. (Laughter and applause.)

And thank you to all the state and local leaders here, including the Mayor of Pittsburgh, Ed Gainey. Ed, you're the best buddy. You've — you've really stepped up. (Applause.)

And a great leader, JoJo Burgess, an Army veteran from a steelworking family. He was my guest at the State of the Union just a couple of years ago.

**App.10**

He came back home to Washington, Pennsylvania, and decided to run for mayor, and he won.  (Applause.)  And he's still working as a steelworker.  But that's America.

 Look, folks, it was — I was — almost exactly five years ago that I began my campaign for president right here in Pittsburgh, where I announced.

 I said one of the reasons I was running was to rebuild the backbone of America, the middle class.  And it was already mentioned — it's been mentioned a thousand times, thankfully, since then — that the backbone of America has a steel spine.  It really does have a steel spine.

 You heard me say it before: Wall Street didn't build America; the middle class didn't build — built America, and you guys built the middle class.  Unions built it.

 And that's why I'm here today to announce a series of actions that I stand by you, the American steelworker.

 Look, first, U.S. Steel has been an iconic American company for more than a century.  And it should remain a totally American company — (applause) — American owned, American operated, by American union steelworkers — the best in the world.  And it's — that's going to happen.  I promise you.  (Applause.)

 Second, American steelworkers can outwork, outcompete as long as they have fair competition.  But for too long, the Chinese government has poured state money into Chinese steel companies, pushing them to make so much steel — as much as possible — subsidized by the Chinese government.

 Because Chinese steel companies produce a lot more steel than China needs, it ends up dumping the extra steel into the global markets at unfairly low prices.  And the prices are unfairly low because Chinese steel companies don't need to worry about making a profit, because the Chinese government is subsidizing them so heavily.

 They're not competing.  They're cheating.  They're cheating.  And we've seen the damage here in America.

**App.11**

USCA Case #25-1004    Document #2098076    Filed: 02/03/2025    Page 18 of 297

9/5/24, 12:28 PM          Remarks by President Biden on New Actions to Protect U.S. Steel and Shipbuilding Industry from China's Unfair Practices | Pittsbur…

You know, back in the early 2000s, the Chinese steel began floating the mar- — flooding the market wi- — in steel towns all across Pennsylvania and Ohio, who were hit very hard.

Between those years, 2000 and 2010, more than 14,000 steelworkers [and ironworkers] in Pennsylvania and Ohio lost their jobs — 14,000.

Let me ask you: Are we going to let that happen again?

AUDIENCE:  No!

THE PRESIDENT:  I promise you that I'm not going to let that happen again.

Look, right now, my U.S. Trade Representative is investigating trade practices by the Chinese government regarding steel and aluminum.  If that investigation confirms these anti-competitive trade practices, then I'm calling on her to consider tripling the tariff rates for both steel imports and aluminum imports from China.  (Applause.)

And we know that Chinese steel and aluminum are being imported into America through Mexico that avoids the tariff.  And just yesterday, I had a delegation down in Mexico meeting with AMLO, the Mexican president, to address this issue.

Mexico and the United States are going to work together to solve it, I promise you.  I promise you.

My administration is also taking a real hard look at the Chinese government's industrial practices when it comes to global shipbuilding, which is critical to our economy.  We depend on a fleet of commercial shipping vessels that carry American products around the world.

Shipbuilding is critical to our national security, including the strength of the United States Navy.

That's why my administration takes it very seriously that U.S. Steelworkers, along with four other unions, have asked us to investigate whether the

**App.12**

Chinese government is using anticompetitive practices to artificially lower prices in the shipbuilding industry.

We've heard you.

And if the Chinese government is doing that and the unfair tactics to undermine free and fair trade competition in the shipping industry, I will take action.  That investigation is going on.

Taken together, these are strategic and targeted actions that are going to protect American workers and ensure fair competition.

Meanwhile, my predecessor and the MAGA Republicans want across-the-board tariffs on all imports from all countries.  That could badly hurt American consumers.  It's estimated it would cost the average American family an average of $1,500 a year if they succeeded in doing that.

Trump simply doesn't get it.

For years, I've heard my — many of my Republican and even Democratic friends say that China is on the rise and America has been falling behind.  You may have noticed, the last two years, I've been the only one disagreeing with that.

I've always believed we've [they've] got it all wrong.  America is rising.  And we have the best economy in the world, which we do.  (Applause.)

And since I've come to office, our GDP is up, our trade deficit with China is down to the lowest level in over a decade, and we're standing up against the Chinese government unfair economic practice and industrial over-capacity.

And we are the strongest economic — economy in the world.

In addition — and, by the way, China has got more — I always say to my colleagues — when I meet other world leaders, I say, "Would you trade places with China?  Would you trade places with their problems?"  They've got a population that is more people in retirement than working.  They're not in-— they're not importing any — they're not bringing — they're xenophobic —

**App.13**

no — nobody coming — else coming in.  They've got real problems.

I'm not looking for a fight with China.  I'm looking for competition, but fair competition.

In addition, we're standing up for peace and stability across the Taiwan Straits.  I've revitalized our partnerships in — and our alliances in the Pacific with India, Australia, South Korea, the Philippines, and other Pacific Island nations.

I've made sure that we have the most advanced technologies that we've developed and invented, and they can't be sent to China or undermine our — because it'll undermine our national security.

When I spoke with Xi Jinping, he said, "Why?"  I said, "Because you use it for all the wrong reasons, so you're not going to get those advanced computer chips."

Finally, for all this tough talk on China, it never occurred to my predecessor to do any of that.

The bottom line is that I want fair competition with China, not conflict, and we're in a stronger position to win the economic competition of the 21st century against China or anyone else because we're investing in America and American workers again, finally.  (Applause.)

You know, there's a law, back in the '30s, that passed when we — about whether unions could exist.  There's a provision that no — very few people — very few presidents ever paid attention to.  If a president is sent money from the Congress to do something for the public, he must use American products and must use American workers, unless you couldn't find them.  Well, guess what?  A lot of them didn't find them, except me.  (Laughter and applause.)  No, I mean it.  Not a joke.

Everything we build, we build with American product and with American workers, period.  (Applause.)  And it doesn't violate any trade agreement.

Thanks to my Bipartisan Infrastructure Law, we announced over 51,000 new

**App.14**

infrastructure projects all across America — (applause) — so far — we're just getting started — including roads, bridges, ports, airports, clean water systems, high-speed affordable Internet, all across America.

 You may remember, my predecessor promised "Infrastructure Week" after week after week — (laughter) — for four years and never built a damn thing. (Applause.)  Nothing.  No, I'm serious: Nothing.

 And, by the way, these projects are going to be using — using American-made materials, like American steel and American concrete, creating good-paying American jobs — union jobs.  (Applause.)

 Why?  As I said — I've already said it, but since the '30s, the law has said we could do that.  And that's exactly what I'm doing.

 And we're buying American.  We are selling American.  It's all about America.  We buy America.

 And past administrations, including my predecessor, failed to uphold that "Buy American" provision.  Not anymore.  That's — that's over.  We — American products and American workers.

 Look, folks, you know, I signed the Inflation Reduction Act, the most significant law taking on climate change ever anywhere in the world — anywhere in the world.

We didn't get anybody to vote for it, other than my Democratic friends. Okay?

 Well, guess what?  That includes billions of dollars in investments in industries of the future, including clean American steel.  It's clean because the way we produce it here emits much less carbon than the steel made in China.

 Last month, my administration announced the largest investment ever in clean manufacturing in American history — in all of American history. (Applause.)  It included up to $1.5 billion in six clean steel projects across America — $1.5 billion.  It's going to create and support thousands of union

**App.15**

jobs, including at — at Butler Works in — in Lyndora, Pe- — over in Lyndora, Pennsylvania.

My predecessor and his Republican friends in Congress want to repeal that law that would cut those jobs. And it would cut the jobs if you repeal the law. I'm serious.

The — I know when I say these things, you wonder can that — could they be — possibly be that stupid? (Laughter.) I — I shouldn't say it that way. (Laughter.)

But I'm serious. Think about it. Just check it out. That's what they want to do. But that's not all.

My predecessor rolled back protections for American workers. He opposed the increase overall for federal minimum wage. He put union busters on the National Labor Relations Board.

AUDIENCE: Booo —

THE PRESIDENT: For real. Well, you know he did. Think — think of what the board looked like before I became president. Not a joke. Not a joke.

Meanwhile, since I was sworn in as president, because of you, look at what we've achieved together. Through my American Rescue Plan, I enacted the Butch Lewis Act, the most significant law — (applause) — the most significant law for union workers and retirees in 50 years.

Think of what would happen if we didn't get that passed. And none of them wanted to help me. But we got it done.

It protected the hard-earned pensions of more than 120,000 steelworkers. (Applause.) Folks, you've had my back, and I promise I have your back.

We made that happen while my predecessor never lifted a finger to help.

I also increased the federal minimum wage for federal contracts. The people I've appointed to the National Labor Relations Board actually care about

**App.16**

American workers.

So far, we've created 15 million — as mentioned earlier — new jobs — a record in a — in a term of a president — (applause) — 492,000 new jobs so far in Pennsylvania alone. (Applause.) Under my predecessor, who is busy right now — (laughter) — Pennsylvania lost 275,000 jobs. I mean, let's — let's look at the facts.

On my watch, unemployment hasn't been this low for this long in 50 years. (Applause.) That's 50 years. Wages are rising. American manufacturing is booming. We've created up close to 800,000 new manufacturing jobs since I became president, including 28,000 manufacturing jobs right here in Pennsylvania.

We've attracted $680 billion — let me say it again — $680 billion in private-sector investment in advanced manufacturing and clean energy here in America, including $4 billion just here in the state of Pennsylvania so far.

Folks, instead of importing foreign products and exporting American jobs, we're exporting American products and creating American jobs. Think about — think of all the time — think — think of the last years where they'd go — American — corporate America wanted to go find the cheapest labor in the world, send the jobs overseas, and then import the product home. Not anymore.

Together, we're doing what's always worked best for this country. We're investing in all of America, in all Americans.

And we're building an economy from the middle out — not — and the bottom up, not the top down. Because when we do that, the poor have a ladder up and the middle class do well and the wealthy still do very well. (Applause.) We all do well. No, for real.

Look, let me close with this. I just came from my hometown, Scranton, Pennsylvania, a place like Pittsburgh that sort of climbs into your heart and never leaves you. And it really doesn't.

My mom didn't live in — in Scranton since she was — 1954, but when you'd

**App.17**

USCA Case #25-1004    Document #2098076    Filed: 02/03/2025    Page 24 of 297

9/5/24, 12:28 PM          Remarks by President Biden on New Actions to Protect U.S. Steel and Shipbuilding Industry from China's Unfair Practices | Pittsbur…

ask Mom where is she from, she'd say, "Scranton." "Scranton." (Laughter.) Well, where you learn basic — a basic value set, like you do here.

 Money doesn't determine your worth, I would always be told.  Everyone is entitled to be treated with dignity and respect.

My dad used to say, "A job is about a lot more than a paycheck — worth a lot more than a paycheck, pal.  It's about your dignity.  It's about respect.  It's about being treated with respect."

 And he'd say — he'd always — and I give you my word.  These are phrases he'd always use.  He'd say, "You know, not only being able to give — have respect, but being able to look your kid in the eye and say, 'Honey, it's going to be okay,' and mean it — mean it."

 Look, everyone — everyone deserves a fair shot — just a fair shot.  And we're going to leave no one behind.

 Folks, that's my view of the economy — from Scranton, from Pittsburgh, from the thousands of working- and middle-class neighborhoods all across America.  It's a future we are building together.

 As I said, I always think of my dad.  I really mean it.  My Dad, during the war, he didn't get to go to college.  He got a — he was from Bal- — as they say in Baltimore, *Baltimore* — (pronounced in an accent) — (laughter) — he was from — he was from Baltimore, and then his father, then, worked for American Oil Company and moved to Wilmington and then to Scranton to open up business — to open up stations.

 And — but he always would come home and — and he'd go back and close the business.  He didn't own it; he was a — managed a dealership.  And he'd say, "A job is a lot more than a paycheck."  And it really is.  It's about treating people with dignity.  It's about treating them with respect.  And, look, it's going to be okay.  It's going to be okay.

 Folks, because of you, the American worker, I've never been more optimistic about America's future.  And I mean it.  I really, truly am.

**App.18**

When my son died, I decided I wa- — he had spent a year in Iraq, and he — unfortunately, his hooch was next to a burn pit. And he went one of the most fit guys in his — in his regiment, and he came home with stage four glioblastoma. They're more brain injuries for — for folks fighting in Iraq than any other place in the world.

Remember what happened to all those firemen in 9/11? Same thing happened because these burn pits are just awful. They put everything from human waste to — anyway —

And — and I — and so, I wasn't going to run. But what happened was, when he passed, you remember that — right after that — well, you don't remember him passing in 2015. And I w- — I wasn't going to run. I was going to write a book about inflection points in American history, where the actions we take in a short period of time determine what happens in the next five or six decades. Well, that's one of the places we're at right now.

And when those folks came walking out of those fields — down in Charlottesville, Virginia — carrying Nazi banners, singing the same garbage that they sang in Hitler's streets in Germany in the '30s, carrying torches, accompanied by the Ku Klux Klan, and a young woman was killed, I decided that I had to run. I had to run. Our democracy is at stake, and it really is.

But you know what changes it? When you make the economy grow. When you stand up and ordinary people have an even shot and they're not at all susceptible to the garbage that's fed from these guys. It's pure garbage.

I'm supposed to stop. I — I shouldn't keep going. (Laughter and applause.)

Well, folks, look — look, we've got to just remember who we are. And I can't — well, when I left Scranton today, I wanted to go to the war memorial that has the names of all the Scrantonians who died in World War Two etched into a granite wall, because I wanted to see where my uncle — "Uncle Bosie," Ambrose J. Finnegan — where his name was etched.

Back a- — when D-Day occurred and — on Sunday, the next day, my mother's four brothers all went down to the recruiting station and joined the military. Every one of them volunteered.

**App.19**

USCA Case #25-1004    Document #2098076    Filed: 02/03/2025    Page 26 of 297

9/5/24, 12:28 PM    Remarks by President Biden on New Actions to Protect U.S. Steel and Shipbuilding Industry from China's Unfair Practices | Pittsbur…

And my uncle — they called him Un- — Ambrose — instead of "Brosie," they called him "Bosie." My Uncle Bosie was a hell of an athlete, they tell me, when he was a kid. And he became an Army Air Corps, before the Air Force came along. He flew those single-engine planes as reconnaissance over war zones.

And he got shot down in New Guinea, and they never found the body because there used to be — there were a lot of cannibals, for real, in that part of New Guinea.

And — and then my son volunteered to go to Iraq for a year. And he came back with stage four glioblastoma. And they — and they gave — like many of you, risked your lives and you know people who gave their lives for the country. They're heroes.

But one of the things that I — as I was doing that today, I was reminded of what my opponent said in Paris not too long ago. They asked him if he would go visit American gravesites. He said, "No," he wouldn't do it, because they were all "suckers" and "losers."

 I'm not making that up. His staff who was with him acknowledge it today. "Suckers" and "losers." That man doesn't deserve to have been the Commander-in-Chief for my son, my uncle.

So, folks, we got a lot of work to do, but I'm confident we can do it. And I mean it. I've never been more optimistic about our possibilities as a nation.

So, let's go out and get (inaudible). (Applause.)

We're the United States of America. There's nothing beyond our capacity — nothing.

Thank you, thank you, thank you. (Applause.)

2:50 P.M. EDT

**App.20**

# Exhibit C

USCA Case #25-1004     Document #2098076     Filed: 02/03/2025     Page 28 of 297

9/5/24, 1:59 PM                Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA | The White House

SEPTEMBER 02, 2024

# Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA

IBEW Local 5
Pittsburgh, Pennsylvania

5:26 P.M. EDT

THE PRESIDENT:  Hello!  (Applause.)  Hello, hello, hello!  (Applause.)  Hello, Pittsburgh!  (Applause.)

AUDIENCE:  Thank you, Joe!  Thank you, Joe!  Thank you, Joe!

THE PRESIDENT:  Thank you.

AUDIENCE:  Thank you, Joe!  Thank you, Joe!  Thank you, Joe!

THE PRESIDENT:  Thank you, thank you, thank you.

AUDIENCE:  Thank you, Joe!  Thank you, Joe!  Thank you, Joe!

THE PRESIDENT:  Folks, I've celebrated many Labor Days in Pittsburgh.  (Applause.)  And it's always good to be back with so many great friends, many of whom flew with me on Air Force One today — represent the unions that have been with me since the beginning of my career — they're not that old, but they — they're — (laughter) — since I was a 29-year-old kid.

I want to thank Liz Shuler of the AFL-CIO — (applause) — and Kenny of the IBEW — (applause) — for that strong endorsement.

By the way, we have an expression in Delaware.  The IBEW, when I ran for president, they're the ones that "brung me to the dance" starting off.  Not a joke.  (Applause.)

**App.22**

And Dave McCall and the Steelworkers. (Applause.) Dave, in 1972 — Steelworkers were the first union to endorse a 29-year-old kid named Joe Biden who wasn't old enough to be senator when he got elected. It mattered. (Applause.)

A guy named Hughie Carcella was the district president, because we used to have one of the largest labor forces in Claymont, Delaware, and north — over 4,000 workers. And it was — anyway, it all went lo- — it went south.

But Hughie — Hughie went to the national president, I. — I.W. Abel, and he said he wanted me — he wanted me to get ele- — endorsed. Everybody thought it was crazy. I literally wasn't old enough to be sworn in the day I got elected. (Laughter.)

But guess what? President Abel stuck with me. (Applause.) And they got stuck with me for the rest of their — my career. (Laughter.)

Eric Dean and the Iron Workers. (Applause.) Tim Driscoll of Bricklayers. (Applause.) April Verrett and SEIU. (Applause.)

Lee Saunders of AFSCME and a great friend. Where are you, Lee? (Applause.)

And Jimmy Williams and the Painters and Allied Trades. And his dad. His dad is a really good man. (Applause.)

And Mike Coleman and the Sheet Metal Workers. (Applause.)

We've also got some of the best elected officials in America. Governor Josh Shapiro is doing an incredible job. (Applause.) And the great Lieutenant Governor Austin Davis. (Applause.) And one of America's best — where is Ed Gainey? Ed, you're doing a hell of a job. (Applause.)

And Sara Innamorato. County executive, I think, is the hardest job in American politics. Everybody knows where you live, and they think you can solve all the problems. You don't have enough money.

But I tell you one thing, I'm the first president ever — I used to be a county official when I was 26 years old, and it always bothered me that the county — the sta- — the federal government would send money to the state to be

App.23

distributed to the county.  What the hell is the state going to send to the county for?  All the state reps need the money.  (Laughter.)

But guess what?  Under my administration, it goes straight to the county.  (Applause.)

And one of my best friends — my name is Joe Biden; I'm from Scranton, Pennsylvania.  (Applause.)  Bobby Casey has been a great friend.  His dad was a great friend as well.  And, by the way, we grew up three blocks from one another.  Three blocks.  And they still worry about us not showing up.  (Laughter.)

And guess what?  I was on North Washington Avenue; he was on Adams.  Guess what?  They've renamed North Washington Avenue down where I lived "Biden Way."  (Inaudible.)  (Applause.)  And, Bobby — Bob, we'll make sure we get — you get reelected again.

And while he couldn't be here, I want to thank his partner in the Senate, John Fetterman.  (Applause.)  If you're in a foxhole, you want Fetterman in there with you.  (Applause.)  He couldn't be here today, but guess what?  He sent the best part of the family, Gisele.  She's here.  (Applause.)

Let me just say it means so much to be with a true friend — a true friend: the vice president and the next great president of the United States of America, Kamala Harris.  (Applause.)

Look, folks, I come from two neighborhoods where it's not hard to say the word "union."  But you know what?  The fact of the matter is an awful lot of politicians have trouble saying "union."  (Inaudible) working people.

Guess what?  I'm not one of them.  Neither is Kamala.  We know the simple truth.  Wall Street did not build America; the middle class built America, and unions built the middle class.  That's a fact.  (Applause.)

And, by the way, that is a not a slogan.  That's a fact.  I asked the Treasury Department to do a study, and it shows that when unions do well, all workers in America do better.  That's a fact.  That's a fact.  (Applause.)

It's the biggest reason why our economy is the strongest economy in the world today without question — because of unions.  (Applause.)

**App.24**

You know, my dad, like many of his generation, going into World War II, wasn't able to go to — to college. My dad was a really well-read guy, and he was always engaged. And he'd come home from work before he'd go back and close up his shop and — for dinner.

And the dinner was a place where we had discussions and, incidentally, ate. You know, my dad taught me — my dad would say this all the time: "Remember, Joey, a job is" — and I give you my word to this — "a job is about a lot more than a paycheck. It's about your dignity. It's about community. It's about your place in the community. And it's about being able to look your kid in the eye and say, 'Honey, it's going to be okay,' and mean it."

Well, that's why — (applause) — that's why Kamala and I are so proud — so proud of the greatest job creation record of any president in a single term in American history. (Applause.)

Sixteen million new jobs so far. (Applause.) Eight hundred thousand manufacturing jobs. (Applause.)

Eight years ago, how many times you hear about we can no longer be the manufacturing capital of the world? Where the hell is that written? We are the greatest manufacturing city — or county in the world — state in the world — (inaudible) the world. (Applause.) And we're going to remain that way.

And I'll tell you something. Kamala and I are damn proud that we protected the pensions of over 1 million workers and retirees. (Applause.)

Remember all those years of promising we were going to do something about it? Well, damn it, we finally did it with the Butch Lewis Act. (Applause.) Over 52,000 workers and retirees across Pennsylvania alone are benefitting from that.

Not only did we restore the full amount, we got them their back pay as well. (Applause.) We made them whole again.

And as I once said to Barack, "That's a big deal." (Laughter.) Yeah. Long story. (Laughter.)

You just heard Liz and Kenny describe another big deal. Union workers are rebuilding American infrastructure and building new factories here in

America.

They told me we couldn't get anything done in infrastructure.  A trillion two hundred billion dollars we got done.  (Applause.)

Remember Trump, for four years, promised every month "Infrastructure Week."  For four years, he promised that.  He didn't build a damn thing.  Nothing. (Applause.)  I mean it.  Not — nothing.  (Applause.)

Well, thanks to our infrastructure law, Pennsylvania, so far, has received $17 billion — $17 billion.  (Applause.)  Over 2,000 projects, from clean water to affordable high-speed Internet for every Pennsylvanian to projects that include $858 million to expand the Montgomery Lock better — to accommodate bigger barges to get millions of tons of goods and shel- — on shelves faster and more reliable and create thousands of union jobs. (Applause.)

I was working on the Great Lakes, and I got a call from Bobby — from Senator Casey.  He's been — no bigger champion than Casey for this.  You know what I call them?  I call them the "Casey Locks."  (Laughter and applause.)  Not Goldilocks.  The Casey Locks.

Bobby is also a champion of Pennsylvania's energy communities.  We passed what's called the Casey Credit, available to 45 Pennsylvania counties where energy jobs such as coal — where coal mining and — had been before it disappeared, before we came to office.

The Casey Credit provides major incentives for companies to build new battery factories, wind turbines, and more to create high-paying jobs in those coal and natural gas communities.  (Applause.)

And on top of that, there's over $4 billion that private companies have committed to invest in clean energy and advanced manufacturing here in Pennsylvania — $4 billion.  (Applause.)

And guess what?  With your support, I signed an executive order to make sure large federal construction projects all use project labor agreements. (Applause.)

**App.26**

For folks at home who may be watching this on television know what project labor agreement is, it's when contractors, subcontractors, and unions put in place before construction begins what the rules are — before it begins.

These agreements make sure construction is top-notch, on time, on task, and, by the way, on budget.  (Applause.)

There's another big deal.  "Buy American" — that's been the law since 1930.  I've got to admit, I've been around — I'm only 40, but I've been around a long time. (Laughter.)  But I, quite frankly, until 10 years ago, wasn't aware — you know, back in the '30s, when they were trying to make sure unions could organize and businesses couldn't interfere, they put — a law was passed that said every penny the president gets from the Senate, the House, and Congress to spend on a project, he should hire an American worker and use an American product.

But past administrations — (applause) — seriously.  Past administrations, including my pres- — predecessor, failed to buy American.  They shipped jobs overseas where labor was cheaper and brought home the product that was more expensive.

But not anymore.  Federal projects build American roads, bridges, highways, and they'll be made with American products by American workers.  That's why — (applause) — that's why we're creating all these — I'm serious.  It's simple and basic.  That's why we're creating so many good-paying jobs.

In fact, we're requiring those kinds of projects to pay Davis-Bacon prevailing wages so they're jobs you can raise a family on.  (Applause.)

Many of those jobs don't require a college degree.  In fact, we expanded registered apprenticeships.  Remember all the hell I got for doing that — we got for doing that?  Well, guess what?  It resulted in hiring over 1 million apprentices since we came to office.  (Applause.)

And lots of folks don't realize getting an apprenticeship is like getting a college degree.  Why?  You have to train for four or five years to get that.  And some of the best workers in the world are why the — why we are where we are.

You know — (applause) — when you're in Pittsburgh, you're standing with steelworkers.  Let's be clear.  I believe in American steel companies — American-owned-and-operated steel companies.  (Applause.)  A simple reason — it's not hyperbole — American steelworkers are the best steelworkers in the world.

And I made it clear last time I was in Pittsburgh: United States Steel, an iconic American company for more than a century, is going to remain an American company.  (Applause.)

I remember as a young senator why the N- — National Labor Relations Board was sometimes so anti-labor.  It was set up to help labor, to be pro-labor.

Well, guess what?  That's why one of the most significant things we've done, Kamala and I, is appointing a National Labor Reser- — Board — Relations Board that actually believes in unions and believes in recognizing the right to organize.  (Applause.)  It's a big deal.  It's a big deal.

Remember — we have short memories.  I'm all for forgiveness.  I'm not for this: Trump appointed union busters on that board.

AUDIENCE:  Booo —

THE PRESIDENT:  No, that's a fact.  But it's real.  It affects people's lives.

Are we going to let that son of a gun do that again?

AUDIENCE:  No!

THE PRESIDENT:  Folks, we've made a lot of progress, and Kamala and I are going to build on that progress, and she's going to build on it.  I'll be on the sidelines, but I'll do everything I can to help.  (Applause.)

But, look, I'm not joking when I say — this is not a joke.  When I said this when I was running in 2020, a lot of people didn't believe me.  You did, but a lot didn't believe me.  It's all at risk because of Donald Trump, literally.  With a stroke of the pen, he can get rid of a lot of this.

And do you think this guy gives a damn about your pensions?

AUDIENCE:  No!

THE PRESIDENT:  No, I'm serious.  Do you think he lo- — loses even an instant of sleep over it?

AUDIENCE:  No!

THE PRESIDENT:  Do you think he cares about all the work you do every day and how hard it is?

AUDIENCE:  No!

THE PRESIDENT:  Do you think he cares about good-paying jobs for hardworking people who built this economy?

AUDIENCE:  No!

THE PRESIDENT:  Hell — (laughter) — he regards picket lines — he'd rather cross one than walk one.  (Applause.)

But I have no problem walking a picket line.  (Applause.)  Never have.  Neither — nor does Kamala.  (Applause.)  We'll always walk aside — alongside you.

Union workers built this country.  And, again, that's not hyperbole.  That's a fact.  These are — these are facts.  These are not campaign slogans.

Let me close with this.  Five years ago, I began my campaign for president right here in Pittsburgh.  I said one of the reasons I was running was to rebuild the backbone and spine of America — the middle class and working-class folks.  Not a joke.  Think about it.  Think about it.

Well, five years later, we've done just that.  (Applause.)

I'm back in Pittsburgh on Labor Day again with a simple message as we look at this election.  I ~~spelt~~ [spent] my — my whole career believing in unions.  I'm not joking when I say that.  I'm honored to be considered the most pro-union president ever.  (Applause.)

By the way, remember all the talk?  "Biden got elected, and he's going to do a planned economy.  We're going to collapse, and there's going to be all this

**App.29**

caving in.  Interest rates are going to go through the ceiling."  Come on, man.  (Laughter.)

I'm here to tell you it's about increasing the strength of your unions, which it's all about.  If you care about hardworking people, just give them a fair shot.  Everyone in America deserves a fair shot.  No guar- — a fair shot.  (Applause.)

If you care about the dignity of work — if you care about the dignity of work — and I mean it; it matters — the dignity of work, the way you're treated, the decency.

I remember when my great-grandfather was one of the — only the second Catholic elected statewide to the state senate here in — in Pennsylvania.  And I remember they talked about when he — when they were running against him in 1906, they said, "Guess what?"  They said, "He's a Molly Maguire."

You know what a Molly Maguire was?  Well, those of you who don't, a Molly Maguire, back in the — in the old days, when we Irish and the Catholics came and then the Poles and others that were Catholic — when they came to the United States of America in the beginning, the 1840s and — late 1840s, they made their way down into Pennsylvania, a lot of them.  And there — there's a tier in this — in the coal mines.  Those guys who got there last ended up being the last people in the coal mines.

But a lot of the English owned the coal mines.  And what they did was they'd really beat the hell out of the — the mostly Catholic population who was in the mines.  Not — not a joke.  Not a joke.

But there was a group.  They're called the Molly Maguires.  And the Molly Maguires, if they'd find out the foreman who was taking advantage of an individual — and they'd literally kill him.  Not a joke.  And they'd bring his body up and put him on the doorstep of his family.  Kind of crude.

But I've got to admit, they accused my great-grandfather of being Molly — he wasn't.  But we were so damn disappointed.  But, you know — (laughter) — I — that's a joke.  That's a joke.  (Applause.)

Look, it's about the dignity of work.  It's about how you're treated.

And when I met with the IBEW when I started off this last campaign first, I said, "There's two things that — asking of me." You're — and I said, "Two things I'm asking of you. One, you got to open up your unions to more women." (Applause.) Not joke. "And, two, to more minorities."

You've done both that. (Applause.) And guess what? Instead of having the support of 30 percent of the American people, it's now over 65 percent of the American people support the American union movement. (Applause.)

Look, it really is all about the dignity of work. And there's only — if you care about the dignity of work, there's only one person you have a rational choice with this time, and that's Kamala Harris. Not a — (applause).

AUDIENCE: Kamala! Kamala! Kamala!

THE PRESIDENT: Let me tell you about this woman.

AUDIENCE: Kamala! Kamala! Kamala!

THE PRESIDENT: I know her. I trust her. Not a joke. I trust her.

Number two, the first decision I made the nomina- — as nominee in 2020 was selecting her as my vice president. (Applause.) And, by the way, it was the single best decision I made as president of the United States of America. (Applause.)

And I was — I was watching something sent to me: When they asked Barack — they said Barack picked me as vice president because he knew I could be president. Well, I know she'll be a good president. (Applause.) I know it.

I've watched her when all the experts, foreign and domestic policy, would give us advice, then we'd sit alone in a room, and she has a backbone like a ramrod. (Applause.) And she has the moral compass of a saint. This woman knows what she's doing. (Applause.)

Folks, I promise you, if you elect Kamala Harris as president, it will be the best decision you will have ever made. (Applause.)

And Kamala believes, as I do, that unions are the spine of this economy. She'll be a historic pro-union president.

**App.31**

So, folks, we got one more job to do together.

Let me ask you: Are you ready to fight?

AUDIENCE:  Yeah!

THE PRESIDENT:  Are you ready to win?

AUDIENCE:  Yeah!

THE PRESIDENT:  Are you ready to elect Kamala Harris our next president of the United States of America?  (Applause.)

And, in the process, are you ready to make Donald Trump a loser again?

AUDIENCE:  Yeah!  (Applause.)

THE PRESIDENT:  I've never been more optimistic about America's future. We have to remember who we are.  We're the United States of America. There's nothing, nothing — I mean this from the bottom of my heart — there's nothing beyond our capacity — nothing — when we do it together. (Applause.)

And that means elect my friend, our great vice president, president of the United States.  Kamala Harris.  (Applause.)

THE VICE PRESIDENT:  Good afternoon, Pittsburgh!  (Applause.)

Thank you, Joe!  (Applause.)

AUDIENCE:  Thank you, Joe!  Thank you, Joe!  Thank you, Joe!

THE VICE PRESIDENT:  It is good to be in the house of labor.  (Applause.)  It is good to be in the house of labor.  And it is good to be back at IBEW Local 5. (Applause.)

And can we please give it up again for our president, Joe Biden?  (Applause.)

Now, I don't have to tell the brothers and sisters of labor that you really get to know somebody when you're in the middle of a fight, when times are hard,

**App.32**

when the forces are mighty, when people don't believe something can get done, and they have a thousand excuses for why it can't get done.

And I have spent more time with this extraordinary human being when the cameras were not in the room, when the stakes were high, when the heat was intense. And Joe Biden has always stood with the workers of America and labor unions of America. (Applause.) Always. Always.

I've been with him when he'll bring folks into the Oval Office. And you know how Joe can get sometimes. He doesn't spare words. It's good that sometimes the cameras are not in the room when he has those conversations. (Laughter.)

Because the thing about the Joe Biden I know — and I know you know, because he has been a frain- — friend of labor for so long, for his whole life — Joe Biden can be quite impatient, and that's a good thing for that kind of leader. (Laughter.) Quite impatient.

And I say to all of the friends here, the press that's in the room: History will show what we here know. (Applause.) Joe Biden has been one of the most transformative presidents in the United States that we have ever witnessed. (Applause.) And it comes from his heart. (Applause.)

And, you know, Joe and I talk a lot about the fact that we are so proud to be the most pro-union administration in America's history, and it's thanks to your leadership. (Applause.)

And, as we know, Joe has still got a lot of work to do, so let's — let's also understand that.

So, I want to thank all the incredible leaders who are here today, including the governor, Shapiro; Lieutenant Governor Davis; Senator Casey, who we will reelect this November — (applause); Mayor Gainey; President Shuler; President Cooper; all the leaders of labor who are here; all the union members who are here.

So, I'll just get right to a few points. I love Labor Day. (Laughter.) I love celebrating Labor Day. And Pittsburgh, of course, is a cradle of the American labor movement. (Applause.) It is the birthplace of the AFL, headquarters of

**App.33**

the Steelworkers, home to Fire Fighters Local 1, and, of course, the historic
IBEW Local 5.  (Applause.)

For more than 150 years, the brothers and sisters of labor have helped lead
the fight for fair pay, better benefits, and safe working conditions, and every
person in our nation has benefited from that work.

You know, everywhere I go, I tell people, "You may not be a union member,
but you better thank unions for that five-day work week.  Thank unions for
sick leave.  Thank unions for paid family leave.  Thank unions for your
vacation time."  (Applause.)

Because when union wages go up, everybody's wages go up.  When union
workplaces are safer, all workplaces are safer.  When unions are strong,
America is strong.  (Applause.)

And we are clear: Not only has Pittsburgh shaped the history of America's
labor movement, today you are also shaping its future.  (Applause.)

In 2021, with my dear friend, the Secretary, Marty Walsh, who the president
appointed to be Secretary of Labor, he and I hosted a meeting right here in
this Local, and it was part of the White House Labor Task Force that I lead.

That day, we met with a group of computer programmers who were working
to form a union.  One month later, they signed their contract and became the
first — one of the first technology unions in our nation — (applause) —
standing on the shoulder of all those who have been here and fought the good
fight.

So, Pittsburgh, I r- — I remind us of that to say, together, we are fighting to
build an economy that works for all working people.  (Applause.)  And that
has always been the vision of the labor movement.  And that is the vision of
our campaign.  (Applause.)

You know, in this election, there are two very different visions for our nation:
one, ours, focused on the future; the other focused on the past.

AUDIENCE:  Booo —

**App.34**

USCA Case #25-1004     Document #2098076     Filed: 02/03/2025     Page 41 of 297

9/5/24, 1:59 PM                    Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA | The White House

THE VICE PRESIDENT:  We fight for the future.  (Applause.)  We fight for a future of dignity, respect, and opportunity for all people.  (Applause.)

We fight knowing it's some backward thinking for those folks to have been suggesting for years that the — the measure of the strength of a leader is based on who you beat down.  You know, that's the stuff they're pushing — that the measure of the strength of a leader is based on who you beat down — when we know the true measure of the strength of a leader is based on who you lift up — (applause) — who you lift up.

Do you fight for workers?  Do you fight for families?  Do you fight for those who must be seen and heard and deserve the dignity that comes with hard work?  (Applause.)

That's what we fight for.  And when you know what you stand for, you know what to fight for.  (Applause.)

So, we're 64 days out from this election.  (Laughter.)  Ballots in Pennsylvania will start dropping in 14 days — (applause) — 14 days.  And this election is, as much as anything else, a fight for the promise of America — (applause) — for the promise of America.

We love our country.  (Applause.)  We love our country.  And we know it is one of the highest forms of patriotism to fight for the ideals of our country, and that's what this election is about, and about the promise of America.

And I don't need to tell unions what the promise looks like.  It's what you do every day.  (Applause.)

But as we fight to move forward, Donald Trump is trying to pull us backward, including back to a time before workers had the freedom to organize.

AUDIENCE MEMBER:  He's going to jail!

AUDIENCE MEMBER:  We're not going back!  We're not going back!

**App.35**

USCA Case #25-1004    Document #2098076    Filed: 02/03/2025    Page 42 of 297

9/5/24, 1:59 PM    Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA | The White House

THE VICE PRESIDENT:  Well, the courts will handle that, and we will handle November.  How about that?  (Laughter and applause.)  We'll handle November.  Let the courts handle that other thing.  But we're not going back.

AUDIENCE:  We're not going back!  We're not going back!  We're not going back!

THE VICE PRESIDENT:  We're not going back.  And —

AUDIENCE:  We're not going back!  We're not going back!

THE VICE PRESIDENT:  And one of the ways — one of the ways we're going to guarantee we don't go back is that we remember.  Right?  It is important to remember what that was and what it is.

Remember, as president, Donald Trump blocked overtime benefits for millions of workers.

AUDIENCE:  Booo —

THE VICE PRESIDENT:  He opposed efforts to raise the minimum wage.  As the president said, he appointed union busters to the National Labor Relations Board.

AUDIENCE:  Booo —

THE VICE PRESIDENT:  And don't forget, he supported so-called right-to-work laws.

AUDIENCE:  Booo —

THE VICE PRESIDENT:  And if Donald Trump were to be reelected, he intends to give more tax cuts to billionaires and big corporations.

AUDIENCE:  Booo —

THE VICE PRESIDENT:  He intends to cut Social Security and Medicare.

**App.36**

USCA Case #25-1004     Document #2098076     Filed: 02/03/2025     Page 43 of 297

9/5/24, 1:59 PM                Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA | The White House

AUDIENCE:  Booo —

THE VICE PRESIDENT:  He wants to impose what, in effect, would be a national sales tax.  I call it the "Trump national sales tax" on everyday products and basic necessities that would cost a typical American family — the economists have said this — almost $4,000 a year.

AUDIENCE:  Booo —

THE VICE PRESIDENT:  He intends to repeal the Affordable Care Act

AUDIENCE:  Booo —

THE VICE PRESIDENT:  — and take us back to what we remember — because it wasn't that long ago — was a time when insurance companies could deny people with preexisting conditions.  You remember what that was?  Children with asthma.  Breast cancer survivors.  Grandparents with diabetes.

Well, look, America has tried those failed policies before, and we are not going back.  (Applause.)  We are not going back.

AUDIENCE:  We're not going back!  We're not going back!  We're not going back!

THE VICE PRESIDENT:  And instead — and instead, we fight for a future where no person has to go broke just because they get sick.  (Applause.)

And so, building on the work of President Joe Biden and I and the work we have done in the White House, we will continue to strengthen the Affordable Care Act and make prescription drugs affordable for all Americans.

We — (applause) — we — we fight for a future where every worker has the freedom to organize.  And we will pass the PRO Act and end union busting once and for all, and Bob Casey will help us do that.  (Applause.)

We — we see and know and fight for a future where every person has the opportunity not just to get by but to get ahead.  (Applause.)

**App.37**

USCA Case #25-1004     Document #2098076     Filed: 02/03/2025     Page 44 of 297

9/5/24, 1:59 PM                    Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA | The White House

And so, we will continue to build what I call an "opportunity economy" so that every American has an opportunity to buy a home or start a business or build intergenerational wealth and have a future that matches their dreams and ambitions and aspirations.  (Applause.)

Because, of course, that's the nature of who we are as Americans.  We have dreams.  We can see what is possible, unburdened by what has been.  We have aspirations.  We have ambitions.  And the system that is a good system is one that supports that and allows people the opportunity to go where they can see and imagine themselves to be.

That's what I'm talking about when I talk about an opportunity economy.

We fight for a future where every senior can retire with dignity, and so we will continue to defend Social Security and Medicare and pensions.  (Applause.)  And pensions.  And pensions.  (Applause.)

And we will continue to strengthen America's manufacturing sector.

And on that point, the president mentioned it, U.S. Steel is an historic American company, and it is vital for our nation to maintain strong American steel companies.  And I couldn't agree more with President Biden, U.S. Steel should remain American-owned and American-operated.  (Applause.)

And I will always have the back of America's steelworkers — (applause) — and all of America's workers.

So, friends, 64 days until the most [important] election of our lives, and probably one of the most important in the life of our nation, truly.

And we know this is going to be a tight race to the very end.  It's going to be a tight race to the very end.  So, let's not pay too much attention to those polls.  Because as unions and labor knows best, we know what it's like to be the underdog.  And we are the underdog in this race, and we have some hard work, then, ahead of us.

But here's the beauty of us in this room: We like hard work.  Hard work is good work.  Hard work is joyful work.  (Applause.)

App.38

USCA Case #25-1004    Document #2098076    Filed: 02/03/2025    Page 45 of 297

9/5/24, 1:59 PM    Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA | The White House

And so, in this fight, I will continue to count on the strength, the determination, and the hard work of the leaders in this room to knock on doors, to get folks to the polls, and — bluntly put, because the people in here do it — to help us win Pennsylvania.  (Applause.)

So, today, I ask, are you ready to make your voices heard?

AUDIENCE:  Yes!  (Applause.)

THE VICE PRESIDENT:  Do we believe in freedom?

AUDIENCE:  Yes!  (Applause.)

THE VICE PRESIDENT:  Do we believe in opportunity?

AUDIENCE:  Yes!  (Applause.)

THE VICE PRESIDENT:  Do we believe in the promise of America?

AUDIENCE:  Yes!  (Applause.)

THE VICE PRESIDENT:  And are we ready to fight for it?

AUDIENCE:  Yes!

THE VICE PRESIDENT:  And when we fight —

AUDIENCE:  We win!

THE VICE PRESIDENT:  — we win.

God bless you.  God bless America.  (Applause.)


  6:27 P.M. EDT

# Exhibit D

www.reuters.com /markets/deals/biden-says-he-hasnt-changed-his-mind-nippon-steel-deal-2024-09-27/

## Biden still opposes Nippon Steel deal's bid for U.S. Steel

Reuters ⋮ 9/27/2024



U.S. President Joe Biden delivers remarks on climate at the Bloomberg Global Business Forum, on the sidelines of the 79th session of the United National General Assembly (UNGA) in New York City, U.S., September 24, 2024. REUTERS/Elizabeth Frantz/File Photo Purchase Licensing Rights, opens new tab

DOVER, Delaware Sept 27 (Reuters) - U.S. President Joe Biden said on Friday his opposition to Nippon Steel's $14.9 billion bid for U.S. Steel (X.N), opens new tab hadn't changed despite a decision by his administration to extend a national security review of the proposed tie-up.

"I haven't changed my mind," he told reporters, when asked if the extension indicated a change of heart.

Nippon Steel and U.S. Steel did not immediately respond to requests for comment.

Advertisement · Scroll to continue

The remarks threw cold water on hopes by deal supporters that the proposed tie-up could get a green light from the Committee on Foreign Investment in the United States, which reviews foreign investments for national security risks.

The proposed merger appeared set to be blocked when CFIUS alleged on Aug. 31 the transaction posed a risk to national security by threatening the steel supply chain for critical U.S. industries, as exclusively reported by Reuters.

Advertisement · Scroll to continue

But a move reported by Reuters earlier this month to delay a decision on the politically sensitive merger until after the Nov. 5 presidential election gave hope to proponents of the tie-up that it might yet win approval.

Biden, as well as his Vice President and Democratic presidential nominee Kamala Harris, and Republican challenger Donald Trump, have said U.S. Steel should remain American-owned.

1/2

**App.41**

The company is headquartered in Pennsylvania, a hotly contested swing state in the November presidential election.



Ad Break Coming Up NEXT StayNext OffEnglish 180p288p360p480p540p576p720pHD1080pHDAuto (180p) About ConnatixV557070 About ConnatixV557070 ⬛ 1/100:23Wall St. indexes end up as investors weigh earnings ▶ ⏸

🔊 🔇 🔊 🔇 Skip ✕    Continue watchingWall St. indexes end up as investors weigh earningsafter the ad

Loading Pods

Visit Advertiser websiteGO TO PAGE

AdChoices ▷

The United Steelworkers Union vehemently opposes the deal and both parties have sought to woo union voters.

In response to CFIUS's finding of an alleged national security risk, Nippon Steel wrote a 100-page response letter pledging to invest billions of dollars in U.S. Steel facilities that otherwise would have been idled, "indisputably" allowing it to "maintain and potentially increase domestic steelmaking capacity in the United States."

The company also reaffirmed a promise not to transfer any U.S. Steel production capacity or jobs outside the U.S. and said would not interfere in any of U.S. Steel's decisions on trade matters, including decisions to pursue trade measures under U.S. law against unfair trade practices.

Get the latest news and expert analysis about the state of the global economy with the Reuters Econ World newsletter. Sign up here.

Reporting by Gabriella Borter; Additional reporting and Writing by Alexandra Alper; Editing by Leslie Adler and Alistair Bell

Our Standards: The Thomson Reuters Trust Principles. ↗, opens new tab

**App.42**

# Exhibit E

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.

JANUARY 31, 2024

# Press Briefing by Press Secretary Karine Jean-Pierre and NSC Coordinator for Strategic Communications John Kirby

1:28 P.M. EST

MS. JEAN-PIERRE:  Good afternoon.  Hello.

Hi.  I have a few things at the top before we get started.

As the Presi- — as the President and his team continue working to deliver a historic bipartisan agreement on the border, House Republicans have a choice to make: They can keep playing po- — politics or they can work in a bipartisan way to secure the border.

Sadly, this is not new.  For years, they have refused to heed the President's requests for action on much-needed funding for border security.

For example, in the bill the President introduced in his first day in office, more than a thousand days ago, he requested funding to develop and deploy exped- — expediting screening technology to improve our ability to catch narcotics and contraband at every port of entry.  Republicans never acted on the bill.

Each year in office, President Biden has requested record-breaking border security funding into law.  But without exception, House Republicans have tried to stop the President from delivering the resources we need at the border.

As recently as October, President Biden submitted a supplemental request for

**App.44**

additional resources for border security; House Republicans did not take it up.

Now House Republicans are going further and signaling that they may refuse even to consider a historic bipartisan border security deal that would strengthen America's national security.

Perhaps Speaker Johnson and House Republicans should reflect on what they've had to say over just the past few months.

In October, Speaker Johnson said, "We must come together and address the broken border." And in November he said, "I think we can get a bipartisan agreement" on "border security."

But suddenly, we've heard a change of tune. One Republican member from Texas even said, why would they do anything to help President Biden?

This is about helping the President — this is about helping the American people. It's not about helping the President. It's about the American people. This is about securing the border.

Republicans in the Senate are working with us to do just that. Republicans in the House should as well.

Look no further than their effort to impeach Secretary Mayorkas, an impeachment that even conservatives say is unconstitutional.

The Wall Street Journal Editorial Board said, "Grandstanding is easier than governing, and Republicans have to decide whether to accomplish anything other than impeaching Democrats. Impeaching him accomplishes nothing beyond political symbolism. A better idea is to strike a deal with Mr. Biden on serious border security reforms." That's from the Wall Street Journal Editorial Board.

Former President Trump — Trump's own impeachment lawyer, Alan Dershowitz, urged Republicans to vote no.

House Republicans' own impeachment witness, Jonathan Turley, said there

**App.45**

is no basis for impeachment.

And former DHS Secretary Michael Chertoff, who served in Bush administration, said House Republicans should "drop this impeachment charade and work with Mr. Mayorkas to deliver for the American people."

Members of the House Republican Conference have said this is baseless. Congressman Ken Buck said, "Secretary Mayorkas did not commit an impeachable offense." And Congressman Tom McClintick — McClintock said, "These are not impeachable offenses."

So, our challenge to House Republicans is this: Will you go against the very voices you typically listen to play a dangerous, unconstitutional game, or will you listen to what many of you yourselves have — have been saying? Come to the table, work on a bipartisan border security solutions, finally fund our needs at the border, and actually tackle the problem instead of playing politics with it.

So, this is not about politics. This is about bipartisan solutions to help the American people and secure the border.

We hope, for the sake of the country, House Republicans challen- — change course from their years of playing politics with this issue.

So, now , yesterday, a new IMF report found that the United States is leading the global economic recovery. As Axios put it, "the U.S. is winning the world economic war." The United States economy grew faster than any other large, advanced econo- — economy last year by a wide margin and is on track to do so again in 2024.

And the Washington Post wrote earlier this week, "Falling inflation, rising growth give U.S. the world's best recovery." That's thanks to strong actions taken by this President to recover from the pandemic and invest in America.

And yesterday, we got new evidence Americans are seeing the results, with consumer confidence at the highest level in more than two years and inflation expectations falling to the lowest level since the start of the pandemic.

**App.46**

And before I turn it over to my colleague, Admiral John Kirby, as you all know, this Friday, the President and the First Lady are honored to attend the dignified transfer of the three U.S. Army soldiers we lost in Jordan.

As the President said, these service members represented the very, very best of our nation.

The President spoke to each of the families yesterday to offer his heartfelt condolences, and he and the First Lady will have an opportunity to meet with them in person in Dover on Friday.

As the Pentagon announced yesterday, the President and the First Lady will be joined by Secretary of Defense.

And so, with that, Admiral.

MR. KIRBY:  Thanks, Karine.  Just very briefly here at the top, I just want to note that the National Security Advisor, Jake Sullivan, had a chance to meet today with the Israeli Minister for Strategic Affairs, Ron Dermer, while he was here in town.

They, of course, discussed the situation on the ground in Gaza; also had an opportunity to talk about continued efforts to increase the flow of humanitarian assistance in to the people of Gaza.  And, of course, they talked about our ongoing collective efforts to get all the hostages released, get them back home with their families where they belong.  And those negotiations and discussions are — are certainly ongoing right now.

Now, this meeting comes on the heels of Jake's meeting yesterday with the families of the American hostages and his discussion yesterday as well with the Amir of Qatar, Sheikh Al-Thani, again, all really around trying to see what we can do to — to get another deal in place, another pause in place to get those hostages back with their families.

And with that.

MS. JEAN-PIERRE:  All right.  Go ahead, Aamer.

**App.47**

Q   Admiral, I want to make sure I get this right — Iran's ambassador to the U.N. warned today that Iran, quote, "would decisively respond to any attack on the country, its interests, and nationals under any pretext."  One, do you have any reaction to that warning?

And, two, more specifically, could that be read as a tacit acknowledgement by Iran that the U.S. can keep the Mid-East conflict from expanding if President Biden shows restraint in his response that may be forthcoming?

MR. KIRBY:  Well, the folks that need to show restraint are these groups that Iran backs.  But nevertheless, I would just say a couple of things.

 First of all, as we've said many times, we don't seek a war with Iran.  We're not looking for a broader conflict.  We're not looking for a war with Iran.  That's number one.

Number two, we have obligations in the region, including those to our troops and our facilities.  And now, as Karine reminded everybody, those attacks have taken the lives of three of them.  We will have to do — we will do what we need to do to make sure that — that those responsible are held properly accountable.

Q   Is there attribution yet of who — which militant group or groups were behind this?

MR. KIRBY:  We believe that the — the attack in Jordan was — was planned, resourced, and facilitated by an umbrella group called the Islamic Resistance in Iraq, which contains multiple groups, including Kata'ib Hezbollah.

Q   And was KH the principal behind it?  They seem to have the fingerprints of this sort of precise attack.

MR. KIRBY:  As I said, I mean, this certainly has the earmarks of the kinds of things that Kata'ib Hezbollah does.

But, again, for our purposes today and the question you're asking, the attribution that — that our intelligence community is comfortable with is

**App.48**

that this was done by the umbrella group called the Islamic Resistance in
Iraq.

MS. JEAN-PIERRE:  Go ahead, Nancy.

Q    Thank you.  John, can you tell us more about the latest hostage proposal
that is supported by the U.S. and the Qataris?  The U.S. Ambassador to the
U.N. said today that it — it envisions a much longer humanitarian pause than
we saw back in November, plus more food and water and medicine.  What
details can you tell us?

MR. KIRBY:  Not a lot.  And that's on purpose, because I don't want to say
anything from the podium that could torpedo these very sensitive
discussions.  Nothing is negotiated until everything is negotiated, and not
everything is fully negotiated at this point, Nancy.

I will tell you that, in broad strokes, we are looking at an extended pause is
the goal.  How long?  That's all part of the discussions, but longer than what
we saw in November, which was about a week.

We'd like to see a longer pause than that not just because that helps facilitate
the movement of so many more hostages out — you can get more people out
if there's a longer cease in the — a longer stoppage in the fighting — but so it
can also give us an opportunity to increase the flow of humanitarian
assistance in.

Q    We've heard 45 days.  Does that sound about right?

MR. KIRBY:  I'm not going to talk about the details.

Q    And can you talk also about — it's been shared that this would be a
multistage process where civilian women, the elderly would come out first,
then, perhaps, soldiers, corpses after that.  What can you tell us about the
notion of a multistage process and why that would be preferable?

MR. KIRBY:  The goal of an extended-level pause is so that you can get the
maximum amount of hostages out.  The modalities of that — should we be
able to get this in place — of who's coming out when and in what sequence is

**App.49**

all part of the discussions right now.  So, I'm just not going to get into that.

Q    Well, how has Hamas responded, if at all, to this latest proposal?

MR. KIRBY:  I would just tell you that the discussions that we've been having and will — and are continuing to have have been constructive.  They've been — we believe they're moving in the right direction.

But, again, I — I don't want to — I don't want to come across as too sanguine here.  And I certainly don't want to get into the actual details of it.  And I — I hope you all can understand that.  I mean, the last thing that I'd want to do is say something up — from here that all of a sudden gets inserted into the negotiations and becomes a sticking point.

We want to see this deal in place.  We want to see it in place as soon as possible.  These families are grieving, and they — they want to see their loved ones again.  And we want to see if we can facilitate that.  But — but obviously, you know, we're mindful of time.

MS. JEAN-PIERRE:  Go ahead.

Q    Thanks.  It has been three days since the attack in Jordan that killed three service members.  The President said yesterday that he had decided how to respond, but we haven't seen any public action — you know, at least publicly, we haven't seen any action.  So, with every day that passes and no response, are you missing an opportunity to signal resolve?

MR. KIRBY:  I think we've signaled resolve pretty well.  And as I said the other day, we'll respond on our own time, on our own schedule.  And — and we'll do that.

And I would — I would also caution you not to — not to think that the first thing you see — you talked about publicly seeing not — the first thing you see won't be the last thing.

Q    Can you confidently say that Iranian-backed forces have not begun moving assets out of the region in anticipation of a possible retaliatory strike?

**App.50**

MR. KIRBY:  We're monitoring as best we can.  I'm not going to speak about what the intelligence assessments tell us.  But — well, I'll just say that we're confident in the planning.  And we're confident in the — in the response that —

Q   Is it possible that —

MR. KIRBY:  — we're primed to undertake.

Q   — we're moving assets out of the region as they're getting ready for the U.S. to respond?

MR. KIRBY:  I'm not going to talk about intelligence assessments.

As the President said, we're going to respond.  And we'll — we'll respond in an appropriate way.

MS. JEAN-PIERRE:  Go ahead, Kelly O.

Q   Admiral, can you give us a little understanding of the process?  When the President said "yes," very definitively, he'd made a decision, and yet we know there's still ongoing work related to the attribution and assessment of potential targets and those sorts of things.  Is it a multipart decision process for the President?  Or is the "yes" he gave already put into, kind of, the action that the Pentagon would need to go forward?  Or would he come back and review the specific targets and that kind — can you shed any light on that longer process?

MR. KIRBY:  Just in — in terms of process, the — the — his decision to move forward was based on discussions that he had with his national security team over the previous three days, including yesterday.

And when you're talking about what we're anticipating here, which won't just be a one-off — as I said, the first thing you see will not be the last thing — there's a lot of moving pieces in that in terms of what you're going to choose to go after and what you're electing not to go after and why.  And — and he asks all those questions.  He did that in this case.

**App.51**

But it's a — it's an iterative process. And I would fully expect, Kelly, that because, as I said, this — this will be a response over time, you should expect that the President will continue to weigh options ahead of him, continue to ask tough questions, continue to talk to his national security team as things go forward.

Q   And does he want this to be a U.S.-only response, or would he welcome military action from partners who've been a part of some of the other work in the region?

MR. KIRBY:  We're — we're focusing on a U.S. response.  They killed American troops.

Q   When the Kata'ib Hezbollah says that they will suspend the attacks on U.S. forces, do you believe them?  Would that spare them retaliatory strikes?

MR. KIRBY:  I'd say a couple of things.  Number one, you can't take what a group like Kata'ib Hezbollah says at face value.  Number two, as I said in my answer to Aamer, they're not the only group that has been attacking us.  And they're certainly not the only group that is a participant in this Islamic Resistance of Iraq.

So, they're not the — they're not the — the sole proprietors here of the violence that had been — has been visited on our — on our people.

And number three, back to that point, there are three families that are going through the worst possible grief right now.  And let me tell you something. The — Karine talked about Dover.  That's — that's a tough day.  That is a tough day.  They killed American soldiers.  And I'd leave it at that.

Q   And just secondly, John, the Ron Dermer meeting, did Jake ask him about post-conflict Gaza, and do you have a better sense of how long this conflict is going to last?

MR. KIRBY:  I couldn't tell you how long it's going to last.  The Israelis have spoken about this themselves, that this could go on for months.  I'll let them speak to their operations and where they see it — it going.

**App.52**

We obviously want to see this conflict end. And — and certainly, we'd like to all see it end as soon as possible, but it has to end in a way that doesn't imperil the Israeli people from the threat of Hamas, which is right next door. So, we're going to continue to support them in their efforts to do that.

As for the discussion with Mr. Dermer, I know that was focused on humanitarian assistance, on the hostages specifically, and the general situation in Gaza. I don't have more detail than that.

Q   Thank you.

MS. JEAN-PIERRE: Go ahead, M.J.

Q   I just wanted to clarify Kelly's last question. The U.S.'s response, whenever it happens, it will be unilateral. It would not be, sort of, the joint exercise we saw with the Houthi assets earlier this month?

MR. KIRBY: That's our expectation.

Q   Okay. Does the President believe, John, that it is important for the U.S. to strike back immediately and quickly following the deaths of the three U.S. service members?

MR. KIRBY: The President believes that it is important to respond in an appropriate way now that three American soldiers have been killed. And what's appropriate? Well, you know, it depends on what your — what your response is going to look like and what you're going to go after.

And as I said earlier, we will respond in a time and in a manner of our choosing on our schedule. And just because you haven't seen anything in the last 48 hours, that doesn't mean that you're not going to see anything.

And as I said earlier, when you see the first thing, don't come to be thinking that that's going to be the last thing.

Q   Is the President open to maybe holding off on whatever strikes may come to give time and sta- — space for the ongoing hostage negotiations to continue moving in the right direction? Is — is that a consideration at all?

**App.53**

MR. KIRBY: As I said a few days ago, there should be no impact — we — there's no reason why what we're trying to do in terms of getting hostages out and what we have to do to respond appropriately to this latest attack in Jordan to be affe- — for one to affect the other.  So, we are going to respond. We are also going to continue to work on trying to get the hostages out.  Both can be done.  Absolutely, both can be done.

Q   Well, it could certainly be a complicating factor, though, right?

MR. KIRBY: As if it's not complicated already, M.J.  I mean, this is hard work.  This is hard diplomatic work that's going into trying to get those hostages out.  It's hard.

But that doesn't mean that you — that you put on — you put the brakes on that because you feel you have to respond, which we do.  And it doesn't mean that you don't respond to the attacks in Jordan because this diplomatic work is — is still going to remain difficult ahead of us.  We — we can and we will do both.

Q   So, you're saying the hostage negotiations, that those are not a factor in the President's thinking and deliberations over how to strike back — that those two things are totally separate in his mind?

MR. KIRBY: I don't think I'm going to parse out the President's decision-making process here.  I think, though, I — hopefully, I've adequately answered the question: We're going to respond to the killing of our three soldiers.  He's already — he told you that yesterday.  He's made his decision. There will be a response.

We are also going to continue to have the conversations that are needed.  And they have been good.  They've been — there have been — it has moved in a constructive way.

And, again, we're not — nobody is doing a touchdown dance here.  We got a long way to go.  But we still think that there's — there's real significant ability here to — possibility to get an extended pause in place to get these hostages out.

**App.54**

Q   And can I just quickly get your read on Kata'ib Hezbollah's statement yesterday saying that they would suspend military and security operations against U.S. forces?  What was the administration's read on that statement?

MR. KIRBY:  I think, as I said to Steve, we — we certainly read it, but we're not going to take it at face value.  And we recognize that they're not the only group that has been attacking our troops and our facilities in Iraq and Syria.

MS. JEAN-PIERRE:  Go ahead, Ken.

Q   John, just — separate the topic.  The FBI Director was on the Hill today.  He said Chinese hackers are preparing to wreak havoc and target critical U.S. infrastructure.  Has the ad- — administration seen any evidence that critical infrastructure could be compromised?  And what are you doing to strengthen those systems?

MR. KIRBY:  I would just tell you that this is something we're moni- — we monitor very closely all the time, and we take all these threats seriously.  You have to, each and every day.  There's not a day where we're not taking a look at cybersecurity, particularly when it comes to critical infrastructure.  And I think that's as far as I'm going to go on that.

Q   And Jake met with the Chinese Foreign Minister recently in — in Bangkok.  Did that issue come up at all?  Did he bring up cyber in their discussions?

MR. KIRBY:  I won't get into the specifics of the conversation.  This was a follow-up to the meeting out in San Francisco between President Xi, Pre- — President Biden and really meant to look at the ways in which both our countries are meeting the commitments coming out of that discussion, including the work on counternarcotics; the military-to-military communications, restoration of that; and a whole range of other issues, including cross-Strait tensions.

MS. JEAN-PIERRE:  Go ahead, Michael.

Q   Thanks, Karine.  John, do you have confidence that the Kenyan government has satisfied the requirements from the Kenyan Supreme Court

**App.55**

outlined for this multilateral force to be sent to Haiti?  And if not, what is your plan B?  Obviously, the U.S. has been pushing for this multilateral force to be led by the Kenyans for some time, and the U.N. Security Council resolution was predicated on their leadership.  So, do you have a plan B if that doesn't work out?

MR. KIRBY:  We were very grateful that Kenya had agreed to step up to lead that multinational security effort.  I'll let the Kenyans speak to where they are in the judicial process.  That's really not for us to speak to.  We're grateful that they had stepped up and volunteered to do that.

We still believe that that kind of multinational security presence in Haiti is important.  We'd still like to see it move forward.  And we're — we're obviously watching closely what happens in Kenya, but it's really for the Kenyans to speak to.

It won't change — regardless of how this comes out, won't change our central position that we believe some sort of multinational security force presence on the ground is important for the people of Haiti.  I mean, they still are suffering the violence of these criminal gangs and thugs and organizations that are just literally making life almost impossible for the people of Haiti.

So, we — we still believe that's important.

MS. JEAN-PIERRE:  Go ahead, Cristina.

Q    Thank you.  Admiral, given the Chinese hacking warning, can the American people be — feel a confidence in the electoral system?

MR. KIRBY:  What I can assure the American people of is that we take cybersecurity extremely seriously.  We put a new strategy out just last year — a cybersecurity strategy.  We — we are always mindful of the threats to critical infrastructure.

And one of the things the President believes is critical infrastructure is, of course, the — the free and fair election process here in the United States and making sure that — that that can — that can occur.  We — we were able to do that in 2022.

**App.56**

The President is confident that the national security team, the folks over at Cyber Command are all taking this as seriously as they — and the intelligence community is taking this as seriously as possible and that we will be able to ensure that.

MS. JEAN-PIERRE:  Go ahead, Anita.

Q    Thank you so much, John.  I've got a question on Turkey and another one on Venezuela.  Just starting with Turkey, we're seeking an update on their possible return to the F-35 program once or if they scrap their Russian defense missile system.  But I just wanted to ask you, you know, what this process would look like, would sanctions needed to be lifted.  And what does the White House want here?

MR. KIRBY:  There's no change to our view that the F-35 program for Turkey is incompatible with their use of the S-300 and S-400 missiles.  So, we're still having those discussions.  And should Turkey be able to resolve our concerns about that, then there could be a restoration of — of moving into the F-35 program.  But — but that's — that's where we are.  There's no change in that.

Q    On Venezuela.  Their leadership now says they'll suspend U.S.-Venezuela repatriation because of the U.S. threat of sanctions that you outlined on Monday.

Sorry, I was just trying to catch your eye.

How does the White House —

MR. KIRBY:  No, I'm listening.  I'm — I'm listening.

Q    Just texting somebody?  (Laughter.)

MR. KIRBY:  No, no.

MS. JEAN-PIERRE:  (Inaudible.)

Q    (Inaudible.)

**App.57**

MR. KIRBY:  I'm taking notes so that I don't screw this up.  (Laughter.)

Q    — see that affecting movement on the southern border, and what are you doing to prepare for that possible challenge?

MR. KIRBY:  So, I really don't have much more to give you today than what I gave you the other day.  They made — the Maduro regime made commitments back in the fall about what they were going to do to allow free and fair elections and allow for the active participation of opposition parties. They have until the spring to move forward on those commitments, and we're going to be watching that closely.

I'm not going to preview any economic levers at this point.  We're looking for the Maduro regime to step up and meet the commitments that it made in October.

Q    So, the President will host the Japanese Prime Minister Kishida for the (inaudible) on April the 10th.  It's still January, but what should we expect from the meeting?  And speaking with Japan, Japanese company Nippon Steel offered to buy U.S. Steel last December.  I know the President always welcome the investment from the foreign countries.  So, what is the President's opinion on this offer?

MR. KIRBY:  So, the President is looking forward very much to having Prime Minister Kishida here.  Japan, as you know, a terrific ally and great friend not just in the region, but the effect that they have around the world.  So, there's going to be a lot on the agenda.

It is January, and the — the state visit is in April.  I have no doubt that you'll hear more from us in greater detail as we get closer to it.

But, look, tensions in the Indo-Pacific; opportunities to improve our alliance, the capabilities; opportunities to improve trilateral cooperation with South Korea, Japan, and the United States together — there's going to be a lot to talk about.

I don't have anything new to say about this U.S. Steel potential purchase.

**App.58**

That would be inappropriate for me at this time. But I would just tell you that the President is the most pro-union president we've had. He absolutely wants to make sure that there's a level, fair playing field for steelworkers in this country. That will always be foremost in his mind. That's about as far as I think I can go.

MS. JEAN-PIERRE: Go ahead, Aurelia.

Q   Thank you so much. I will have a question on Ukraine. So, the E.U. said today that they would only be able to supply half of the million artillery rounds that they had pledged for Ukraine. And this comes at a time when U.S. assistance has stopped. So, how bad is all this for the Ukrainian forces? And do you see an impact on the battlefield already?

MR. KIRBY: It sure as heck ain't good. And this is why we need the supplemental funding. It's critical. And artillery rounds are one of the most expended munitions on the battlefield — continue to be. It's absolutely critical that we get this funding for Ukraine so that we can get back to leading the world in supporting Ukraine and their ability to defend themselves.

So, I can't speak for the European Union or other European nations. I — but I — I have said in the past that — that other nations will be looking to us for our leadership. They will be looking to us for decisions and certainty about what support for Ukraine is going to look like going forward. It's absolutely vital we get that funding.

MS. JEAN-PIERRE: Okay. A couple more. Go ahead, Andrew.

Q   Thank you. Admiral, right now, obviously the U.S. is contemplating retaliatory strikes that could be in Iraq or in and around Iran or other countries. U.S. and British planes have hit targets in Yemen. U.S. forces have come under attack in multiple countries in recent weeks. All these are part of the same larger conflict. At what point would the administration consider this to be at least a small regional war?

MR. KIRBY: Yeah, I absolutely don't agree with your description of a "same larger conflict." There's a conflict going on between Israel and Hamas.

**App.59**

Q   I didn't even mention that one.

MR. KIRBY:  Yeah, I'm mentioning it.  And we're going to make sure that we continue to get Israel the support that they need to defend themselves against a still viable threat.

We were being — there were attacks against our — our troops and facilities in Iraq and Syr- — Syria well before the 7th of October — certainly in the last administration as well.

And as for the Houthis, they can claim all they want that this is linked to Gaza, but two thirds of the ships that they're hitting have no connection to Israel whatsoever.  So, it's just not true.  It's a falsehood.

And we're going to continue to do what we have to do to protect that shipping.  And as we did just today, if we see an opportunity to prevent a missile from getting launched, we'll take it out.  We'll do what we have to do.

Q   And on the subject of Gaza.  Officials with the World Health Organization, the U.N. World Food Program, and UNICEF are all warning that the humanitarian situation there is quickly approaching the point of being a famine and that the decision by the U.S. and other countries to pull UNRWA funding will make the problem even worse because of UNRWA's unique capabilities in Gaza.  Does the White House share these concerns? And what's the administration prepared to do to fill any gap in aid to Gaza caused by the decision to defund UNRWA?

MR. KIRBY:  We absolutely share the concerns about the humanitarian crisis that's in Gaza right now.  Certainly, we know that severe hunger is one of those issues, which is why we're working so hard to get more security assistance in to the people of Gaza, which is why it's so important that these discussions that we've been having about an extended pause actually come to fruition.  Because it's not just — it is primarily about getting those hostages out, of course, but it also will give you a longer opportunity to increase that — that aid.  So, absolutely, we're concerned about that.  No question about it.

Now, look, we suspended funding temporarily to UNRWA as they do this

**App.60**

investigation. We believe it was the right thing to do to stop that funding while they investigate. And we'll see how that investigation goes. We'll see what they learn. And we'll see what accountability measures they put in place.

I would remind that — that it is a suspension. It is not a termination. We'll take a look at what our options are depending on how the investigation goes. And the money that was suspended — there wasn't a lot left in the allocation. And the money that was suspended was really designed more for their efforts in Jordan, not in Gaza.

MS. JEAN-PIERRE: Go ahead.

Q    Thank you. If the border bill plus Ukraine aid fails, is there an alternative legislative vehicle to get aid to Ukraine? And do you believe that House Republicans, in killing the bill, are helping Vladimir Putin?

MR. KIRBY: On your first question, no. The supp- — th- —

Q    No other alternative? No other —

MR. KIRBY: The — the national security supplemental is what we need. It was thoughtfully calibrated, thoughtfully arrived at through discussions with our Ukrainian counterparts. We need that funding.

Right now, as you and I are speaking, we aren't sending additional security assistance to Ukraine. There's nothing left. We've got to have that funding.

And on your first question — do I think House Republicans are supporting Vladimir Putin? — I — I'm not —

Q    In effect.

MR. KIRBY: I — yeah, look, I'm not going to get up here and impugn members of Congress.

We believe that there is strong bipartisan support and bicameral bipartisan support for Ukraine. And the leaders of the — on the House side of those

**App.61**

oversight committees for national security, intelligence, foreign affairs —
they all support supporting Ukraine.

But it is a matter of getting there, and there are active negotiations going on.
Now, I'm going to — I'm not going to get into Karine's lane here, because this
is really what she's been talking about, but there are active negotiations going
on, and we're doing that in good faith.

Q   But if — if that supplemental is the only vehicle for aid to Ukraine, if that
fails, there's no aid to Ukraine.

MR. KIRBY:  Well, look, that —

Q   Is that what you're saying?

MR. KIRBY:  What we need is a national security supplemental funding.
That is the discussion that's going on right now.  Your — I can't put myself 2
or 10 steps ahead of where we are right now and what that would look like.
We want to get the funding for Ukraine.  The President submitted the
supplemental in October.  We believe it's the right amount and we believe
that that's the right vehicle to get it — get it to them.

MS. JEAN-PIERRE:  We've got to wrap it up.  Way in the back.

Q   Thank you, Karine.  John, you've been saying since October 7th you don't
want to escalate.  And when you've been asked last time what do the Iranians
want, you referred us to the Iranians.  But what's the strategy behind
repeating the message, "We don't want to escalate"?  Did the Iranians convey
a message — a private message to you that they don't want to — to escalate
also?

MR. KIRBY:  I — I don't have any private communications with Iran to speak
to.  I'm not really — I probably don't understand the question as well as I
should.  Nothing has changed.  We don't want to see the conflict widen or
escalate.  And almost everything the President has done since the 7th of
October has been designed to prevent that escalation.

Now, of course, I'm mindful of the attacks by the Houthis.  We're mindful of

the lethal attacks in Jordan, which is why he is taking the actions that he's
taking and it's why he's about to take the actions we're going to take.

Q    One more question on the (inaudible) statement yesterday.  Was it — the
Kata'ib Hezbollah statement yesterday in Iraq.

MR. KIRBY:  Yeah, yeah.

Q    Was it a result of a diplomatic engagement with the Iraqi government
pressure?  Were you in contact with the Iraqis on this statement?  Or did you
pressure them, something like that?

MR. KIRBY:  No.

MS. JEAN-PIERRE:  Last question.  Go ahead.

Q    I want to go back to Dover for a moment.  If — in the past, when there has
been the transfer of remains, it has been done late at night and there's been
some photographs but no actual press coverage of that event.  Is this going to
be a different situation, given the fact that the President is about to — or has
already decided what his response is going to be to the drone strike that took
out those three Americans?

MR. KIRBY:  I'm not sure I follow.  What — why would the — why would the
dignified transfer be different —

Q    Will the President be —

MR. KIRBY:  — because the President decided to make a response?

Q    Will the President be making any statement at that event?

MR. KIRBY:  Oh, oh, oh.  No.  Just to level set here, the — the way these
dignified transfers happen, they — you talked about some coming in in the
middle of the night.  They come in — it — it's not — the arrival time is set by
the military.  It has nothing to do with who's going to be there to meet them.
That's number one.  So, they come in at whatever hour the U.S. military
system has that plane arriving.  It's completely independent of any other

**App.63**

factor.  That's point one.

Point two, on the press coverage, that is determined by the families — not by the administration, not by the U.S. military, not by the folks at Dover — the families get to determine whether they want media to be there.  And in some cases, when you have — when you — we've had multiple families involved, some families want it, some families don't.

And so, the media are allowed to witness a transfer or two and then they are taken away for the ones that the families don't want.  It is up to the families, not to — not to — to us.  We have nothing to do with that.

And, no, the President won't be speaking at Dover.  That's — that's not the appropriate venue for anybody to speak.  It is a very, very solemn, dignified ce- — ce- — well, I think you could call it a cemetery — the- — ceremony.  We call it a — a transfer.

But — but there is a ritual to it.  And it's very somber, and it's very solemn.  And — and that's not the place for speeches.

MS. JEAN-PIERRE:  Thank you so much, Admiral.

MR. KIRBY:  Thank you.

MS. JEAN-PIERRE:  Appreciate that.  Thank you.

Q    Thanks, John.

MS. JEAN-PIERRE:  All right, Aamer.

Q    Thanks.  On — on East Palestine.  Why — why did the administration decide that things have, I guess, coalesced and it's now time for President Biden to go?

MS. JEAN-PIERRE:  So, the mayor and community leaders invited the President to meet with East Palestine residents and also assess the recovery progress that's been going on for some time now, as you all know.  And so, the President had always said that he would go when it is most helpful to the

**App.64**

community.

And with this invi- — invitation — obviously, very recent — and the current status of the recovery, we felt that the time was right.  Again, we got an invitation from the mayor and community leaders to — to come a- — very, very recently, and so we are working with them to figure out the best time to do that in February.

Q    And there is- — there isn't a date yet that you've —

MS. JEAN-PIERRE:  There's no date yet, but obviously, we're working with community leaders, we're working with the mayor, elected officials to find the exact time and day to — to go in February.

Q    And can you just square — you know, the mayor has made some comments — reported comments that seem less than inviting to President Biden to come while praising former President Trump as actually having more impact on helping the situation and getting the ball moving as things have happened.  Does the mayor, one, want President Biden to come?  And, two, why is — from what you're saying —

MS. JEAN-PIERRE:  Yeah.

Q    — he's inviting him.

MS. JEAN-PIERRE:  Yeah, he is.

Q    But at the other end, he's —

MS. JEAN-PIERRE:  I mean, I'm assuming he wants him to come if he's inviting him.

Q    Yeah.  But wh- — what's — why is he also at the same time — have you got — have you guys gotten a sense, and does it matter —

MS. JEAN-PIERRE:  No —

Q    — to President Biden, that he's — at one end, he's, sort of, I don't know,

**App.65**

dunking on him while also calling him to come and visit, from what you're saying?

MS. JEAN-PIERRE: So, look, the — the invite came from — from the mayor —

Q    Right.

MS. JEAN-PIERRE: — and — and other folks on the ground. So, I think that's important. Right? The mayor obviously wants the President of the United States to be there.

The President has always said he is a president for folks who live in red states, folks who live in blue state — doesn't matter if you're in rural America, urban, suburban — he is a president for all. And so, let's just never forget that.

And I will — also want to take a step back. Look, the mayor is allowed to say whatever he wants to say. But he also invited the President — this — this President, this current President to — to come.

Look, this is — if you think about what happened in East Pales- — East Palestine, on day one — on day one, within hours of the derailment, we were on the ground, at the President's direction — within hours.

And — and he sent personnel there — this is the President — sent personnel — personnel there. EO- — EPA, DOT, FEMA, HHS have all been on the ground to support the community until this day. They're still on the ground today.

And so, look, the President has been very clear. Anytime there is a situation that happens in a community that is devastated by what — whether it's a — whether it's a derailment or a natural disaster, obviously, the President says this all the time: He is there for that community for as long as it takes. And he's proven that.

So, he's looking forward to going to East Palestine in February. We're going to find the day that works best for the folks on the ground. He always said

**App.66**

that when the time was right, when it was the most helpful for him to be there, he was going to be there.

Q    Just very quickly.  Tomorrow, is there any official business in Michigan for the President or is this solely a political trip?

MS. JEAN-PIERRE:  It's a political trip tomorrow.

Go ahead, Steve.

Q    Your topper about the border deal — are you now pessimistic that a border deal will get done?

MS. JEAN-PIERRE:  No, we're not pessimistic at all.  I mean, look, the conversations in the Senate with Republicans and Democrats that's been going on for about two months now, we believe have been going in the right direction.  They've been productive.  I've — I've said this before.  The President says this.  He's optimistic, and we appreciate that they have been doing this in good faith.

But we're also going to call out House Republicans.  And we're going to call out Speaker Johnson.  And I think it's important for us to do that because it's like upside-down world over there.  You know, they've been flip-flopping over there.

This is going to be a deal, if it is — actually goes into law, that is, yes, going to be tough.  But it's also going to be fair.  It is a bipartisan agreement.  That's how we move policy forward.  That's how we move legislation forward on behalf of the American people.

So, we're always going to be — we're always going to be very clear-cut and straightforward on how we the- — see things.  And so, that's why we — we're going to call out what we're seeing with House Republicans.

It is not in line — it is not in line with what they have been saying for years about what they wanted to see.

Q    The President has faced a lot of criticism in Michigan from the Arab

**App.67**

American community.  What does he say that — what's his message to them — those who feel disenchanted by the Gaza operation?

MS. JEAN-PIERRE:  So, a couple of things.  Obviously, as — as I — as Aamer was asking me, tomorrow he's going to be going to Michigan.  It's going to be a political-organized trip that is going to be done by the — the campaign.  So, any itinerary or pieces like that or related to that particular trip, the campaign could — could answer to that more broadly, obviously.

But what I wo- — want to say is that, you know, the President has met with Americans with varying — varying opinions about the conflict that we're seeing, sadly, in — in Israel and Hamas.  Officials at the White House have had numerous conversations and in regular contact with Muslim and Arab members — (aide coughs) — Americans — Americans leaders in — in Michigan — (aide coughs) — and across the country — hopefully Sam is okay.  Get some water.  Concerned for him.  (Laughter.)

And, look, the President is going to continue — continues to believe that Israel has a right to defend themself.  They have a right to defend itself, as long as they continue — they — it is done in accordance of humanitarian — international humanitarian law.  So, we will continue to have those conversations with them.

At the same time — at the same time, he is heartbroken –heartbroken by the suffering of innocent Palestinians.  That is, you know — you know, who have — who have who have been caught in the middle of this conflict, sadly, and — between, obviously, Israel and Hamas.

And he — you know, he continues to press for humanitarian aid.  You've heard the Admiral speak to that when he was getting a couple of questions on that.  And when we've had the humanitarian pauses in the past, we've been able to get about a hundred — a hundred hostages home to go back to their family and friends, right?  There are families and — families and loved ones who are heartbroken right now waiting for — for their loved ones to come home.  That is very important.  And also to make sure we get that much-needed humanitarian aid into Gaza.

And so, this is what this administration has been doing around the clock,

**App.68**

trying to get to another humanitarian pause so that we can get that much-needed assistance into Gaza and get those hostages home to their loved ones.

Go ahead, M.J.

Q   Karine, is the White House open to a separate bill that funds Israel and Ukraine and tabling the current supplemental package, as some Senate Republicans are discussing?

MS. JEAN-PIERRE:  Look, what we want — and to answer that question very straightforward is that we want the national security supplemental to be passed.  That's what we want.

As you know, we introduced that in October.  I've said this very, very often:  When a president asks for a supplemental bill, it is because it is a emergency request.  This is an emergency request that we believe is important for our national security, hence the name of the supplemental, for — for — not just for — for around the world but for us here — for Americans here in this country.

And so, we are going to be very focused on getting that done.  We appreciate the conversations, the — that's happening on the border secur- — on border security in the Senate, both Republicans and Democrats.  But we want to see the national — national security supplemental bill move forward as it stands, as it is al- — altogether.

Q   I understand that's your preference, obviously.

MS. JEAN-PIERRE:  Yeah.

Q   But is the White House open to a separate bill that just deals with Ukraine and Israel?

MS. JEAN-PIERRE:  That's — that's not the discussion we're having.  That's not what we're looking for.  That's not what we're moving towards for.  That is not the discussions that we're having.  That is not what we want to see.

We want to see the entire national — we want to see that national security

**App.69**

supplemental move forward.  That is what we're working towards.

Q   Just to clarify, when you just said, "That's not the discussion that we're having," do you mean that the White House has not been engaged with Senate leaders — Senate Republicans, in particular — about that idea, which is being discussed right now?

MS. JEAN-PIERRE:  So, what we have focused on — I mean, the answer is we're focused on getting the national security supplemental moved forward as is, in the way that the President requested it.  That's what we want to do.  That's how we're moving forward.  And that is, we believe, what has been asked in that bill.  Those different components, those different pieces are incredibly important.  It is what's needed for our national security.  And we need to move forward with it as is.

Q   But has anyone at the White House had discussions —

MS. JEAN-PIERRE:  I — look, I —

Q   — with members about that idea?

MS. JEAN-PIERRE:  There — look, I don't have any discussions to share with you about — about that.  I can tell you what we're moving towards.  We're moving towards on making sure that we get that national security supplemental moved forward as it is, as the President requested from Congress.

That's one of the reasons we're having these really important bipartisan conversation in the Senate to see what we can do at the border security, but we want that national security supplemental to move forward.  That's what we want.  We want that request to move forward.

Go ahead.

Q   Thanks, Karine.  Boeing's CEO said today that the company caused the problems with the 737 Max and needed to return focus to safety.  Obviously, in addition to the administration's role on ensuring air safety, the government is one of Boeing's biggest customers.  So, are you guys confident

**App.70**

that the leadership at Boeing can execute that pivot back to safety?

MS. JEAN-PIERRE:  Look, I — what we want to make sure and what FAA wants to make sure and it is their top priority that we make the safety — obviously, the safety of Americans as they fly across the country, obviously, and beyond is safe.  And that is what we want to be very, very clear about.

I can't speak to — obviously, there's an investigation going on.  They're looking into it.  I'm going to let that investigation go — go forth.  I don't want to get ahead of that.

But obviously, we're concerned.  You know, obviously, we're concerned.  We want to put Americans' safety — we put Americans' safety first.  That's what FAA does.  But I'm not going to get into the leadership of Boeing.  I'm not going to get into specifics of that.

FAA has acted.  They've taken action.  And we're going to let that process move forward.

Q   And in addition to the Max, the Osprey, which is made by Boeing, is under review.  I was just wondering if you have any update on the review there.

MS. JEAN-PIERRE:  So, don't have any — we don't have any updates for you at this time, Justin.  What I can say is that the Department of Defense is better to answer those specifics as it relates to the Osprey.

Q   And one last one.

MS. JEAN-PIERRE:  Yeah.

Q   A judge in Delaware yesterday ruled that Elon Musk's pay package at Tesla was excessive.  Elon then tweeted that companies shouldn't incorporate in the President's home state.  So, I'm wondering if you have any reaction to the ruling.  But barring that, thoughts on Delaware's corporate governance, legal system, anything you might want to share?

MS. JEAN-PIERRE:  So, I'm going to be really careful.  I'm not going to get

**App.71**

into a private company's legal cases.  Look, this ruling — and I'll just add a finer point: This ruling has — doesn't involve this administration at all.  It just doesn't.  So, I really don't have anything more to share from here.

Go ahead, Nancy.

Q    Thanks, Karine.  There's some big protests planned tonight in Dearborn, Michigan, on the eve of the President's visit to Michigan tomorrow — Arab Americans protesting the administration's handling of the war between Israel and Hamas.  Does the President have any plans to meet with any Arab American community leaders when he's in Michigan tomorrow?

MS. JEAN-PIERRE: So, as I stated, this is a political event.  They can — the campaign certainly can speak to — can speak to — you know, can speak to the different parts of the trip directly.

I'll say this, and I kind of said this at the — at the top when I was asked this question.  The — you know, the President has had meetings with Muslim and Arab leaders.  Obviously, we don't — we don't read out every meeting.  So, those — so has — White House officials here have been in regular contact with Muslim and Arab leaders, folks in those community.

Don't have anything else to share beyond — beyond that.  And I — you know, I've laid out that we understand — like, we get this is a very difficult time for people.  We get that.  We get that it's a very difficult time for folks.

And, you know, we — we always believe it's important, the President believes it's important for — for Americans to feel like their voices can be heard and to — and to do that in a peaceful way.  And so, that is where we're always going to be on that.

I laid out just moments ago, like, how — how — how heartbreaking it has been to see Palestinians — innocent Palestinians, you know, have been caught up — caught up in the middle of — of what we're seeing between the — obviously, Israel and Hamas.

And — and so, we're going to continue to push for these humanitarian pauses to make sure hostages come home to their loved ones and families and get

**App.72**

that all — very important, needed humanitarian aid into — into Gaza.

Go ahead.

Q   Does the President believe he may alienate Arab Americans with his policy?  And is he willing to sustain that kind of difficulty because he believes in his view about Israel's right to defend itself?  Is that a cost of this war that he's willing to sustain?

MS. JEAN-PIERRE:  Look, you know, when the President thinks about things, it's not about the politics, right?  It — it truly isn't.  It is — and we always do this — right? — we do a step back about what happened on October 7th.

Israel was attacked by a terrorist organization, Hamas, and those leaders in that organizations have said they want to see October 7th happen over and over and over again.  And the President is going to continue to believe that Israel has a right to defend themselves.  Of course — of course, they need to do it following the international humanitarian law.  We've been very clear about that.

And, of course, we are heartbroken by what we're seeing with innocent Palestinians being caught up in the middle of that.

And, of course, we understand how folks are feeling in the community.  And it's important for them to have their voices be heard.  And we respect that. We respect that.

But we cannot forget what happened on that day and what has led us to where we are today.

Q   On a separate topic.  There have been notable exchanges on Capitol Hill today with some of the tech company executives being questioned about their content and about protections for users and so forth.  Do you know if the President has had a chance to see any of that?  Does the White House have a view about how forthcoming these CEOs have been and if there's more they need to do?

**App.73**

MS. JEAN-PIERRE:  So, just a couple of things on that.  Obviously, we have been monitoring the hearing.  The country is experiencing an unprecedented youth mental health crisis.  That's a fact.  That's what we see in the data.  And there is now undeniable evidence, as I just stated, that social media and other online platforms have contributed to that.

It is exactly why this President, the Biden-Harris administration has made tackling the mental health crisis part of their Unity Agenda, which you've heard the President speak to in the last State of the Union and you've heard him speak — speak about this throughout the past three years.  It's a key priority.  And that is a key priority for the nation, obviously.

It's an issue that cuts across political — politics and affects red states and blue states.  You heard from the different — different congressional members — from Republicans and — and Democrats — speak to this today very passionately, asking difficult questions.  And it's why this administration has invested historic resources and launched new tools — new tools to ensure the safety of Americans here.

So, we know there's a lot more work to be done.  The work is far from over.  This administration is going to remain to be committed to providing Americans with the support and the resources needed as we're dealing — as we're dealing with this crisis right now.

Go ahead.

Q   Following up on that.  Senator Lindsey Graham said specifically to these CEOs, "You have blood on your hands.  You have a product that's killing people."  Is that the view of this administration?

MS. JEAN-PIERRE:  Look, I'm not going to — I'm going to let the Senator obviously speak to — for himself.

What I can state is that the data, the evidence — there is evidence that showed that — that, you know, this — these — these platform has been devastating to our young people's mental health.  And it's — it has been part of a mental health crisis that we see here, and that's why this President has taken action.

**App.74**

And look, we have to do everything that we can — this President believes we need to do everything that we can to have the resources to make sure that we — we as- — we help Americans as we're dealing with — through this mental health crisis.

We believe that particular issue is a — is a unity issue.  It brings people together.  Both Democrats and Republicans, they support this.  And it has been a key platform of this President.

I'm not going to dive into every — everything that congressional members said — a senator, specifically, said today.  But obviously, we are — this country is experiencing a crisis amongst our young people.  And we have to do something, and the work is far from over.

Q   At least one of the CEOs endorsed the Kids Online Safety Act.  Anything about that bill in particular that the White House might like?  Have you had conversations with Senator Schumer about trying to get it for a floor vote?

MS. JEAN-PIERRE:  So, I — I can't speak to that.  I haven't spoken to our legis- — legislative team on that particular piece, that act.  But obviously, we think Congress has — has a — has a place here to act, to move forward legislation, to strengthen protections for a child's — children's privacy.  We think that they can do that to protect the health of kids, to protect safety online for children.  They can act, and they can certainly do things to move forward the — move forward on that.

Q   And if I could ask just one on the immigration negotiations.  We've learned from some of our Senate sources — and it's been talked about a lot in a lot of other outlets — about part of the deal, including — the deal that is still being worked on, including these numbers, you know, that — that the border could be shut down specifically if migrant crossings increase above 5,000 per day.  Were those numbers acceptable to the White House?  Were they the numbers that the White House or the President was pushing for?

MS. JEAN-PIERRE:  I'm not going to get into specifics or details.  I just don't want to get involved from here — the podium — on what is being discussed, what is being negotiated.  I think it's just — it's just the right thing to do to

**App.75**

give folks the space as they're doing this in good faith in the Senate. I think it's important to do.

We've been very clear: We think the system is broken — the immigration system is broken. We have to do everything that we can to deal with the challenges at the border.

And it's good that we're — there are — there's bipartisan support in moving forward in that way from the Senate.

And so, that is what we've been very clear about. I'm just not going to get into numbers or specifics or dive into policy discussions from here.

Q    I get that. But from a messaging perspective, House Republicans are diving into these numbers. They're responding to them —

MS. JEAN-PIERRE: Yeah. Yeah.

Q    — and they are calling them out and saying this is a reason they can't support this kind of bill. So, are you guys doing yourself a disservice —

MS. JEAN-PIERRE: No.

Q    — by not talking about some of these specifics?

MS. JEAN-PIERRE: I'm going to be very clear here: House Republicans are actually getting in the way. They're not part of the discussion. They're not. They're not part of trying to figure out how to come to — to a bipartisan agreement. We would like them to be, but they're deciding not to.

And it's on them. The question to them is: Why aren't you all interested or wanting to work with your colleagues over at the Senate? We have said, if this law passes, it will be, yes, the toughest and the most fairest set of reforms to secure the border and deal with real, real solutions to — to reform the immigration system. That is what we believe.

And let's not forget what the President put in his supplemental. Right? He wants the border agents, drug detection equipment, immigration judges, and

asylum officers.  He wants resources.

And so, that's what the President is looking forward to doing — looking forward to do in the supplemental.  He laid it out very clearly.  But House Republicans are — you know, they're flip-flopping on this.  They're truly flip-flopping on this issue.

Go ahead, Jared.

Q   Is there a timeline or deadline for these talks or are you happy to just have them be open-ended as long as it takes?

MS. JEAN-PIERRE:  Well, we think — again, we think it's moving in the right direction.  We think it's happening in good faith.  We appreciate the conversations that are happening on the Hill with the bipartisan legislators in the Senate more specifically.  And we want this to move as quickly as possible, obviously.  Yeah.

Do we want it to happen today?  Did we want it to happen two weeks ago?  Obviously, yes.  But we want to give them the space to do this.

This is an issue that we have been dealing with for decades, even in the last administration, obviously — for decades — for decades.  And so, now we're at a moment where we can come to a bipartisan agreement, where this is happening in the Senate.  And so, we think that's a good thing.  We think that's a good thing.

As you heard me call out House Republicans — because it's important to do.  They're being disingenuous right now with where they are, where they've been on this issue.  And we're going to call them out.

Q   I ask because a lot of times these bipartisan talks that deal with, like, fiscal issues or whatever have a date certain — whether that's a government shutdown deadline or something else — right? — a trigger.  That's not the — so, there's not, like, a date circled on your calendar?

MS. JEAN-PIERRE:  I don't have a timeline for you, Jared.  I don't.  We want to get this done, obviously, as soon as possible.  Let's not forget I — I talked

about three year- — more than three years ago, more than a thousand days ago, we put forward — the President, his very first piece of comprehensive legislation was to deal with immigration. That's what he wanted to do on the first day. So, it's been three years. So, obviously, we want to get this done.

Go ahead, Phil.

Q    Two questions on East Palestine. First, has the White House coordinated or discussed with DOJ any type of damage settlement or compensation for folks there who were affected by the derailment?

MS. JEAN-PIERRE:  So, I don't have any specifics. I would have to refer you to Department of Justice on that piece. Obviously, we want to make sure that Norfolk ~~Suffolk~~ [Southern] is held to account. We're going to make sure that happens. We are determined to — to get that done.

I think you've heard that from the Department of — of Transportation, as well, from Secretary Buttigieg. You've heard that from us many times. We want to make sure that they pay — they pay for the derailment that they caused. And so, it's — obviously, that is — that is a priority.

Q    And then, next month, when the President is in East Palestine, will he drink the water there?

MS. JEAN-PIERRE:  I mean, look, what I can tell you is the President's focus has been to do everything that he can to support this community from day one. We get what's going on on the ground. We understand what's going — that's why we've had the EPA, that's why we had DOT, that's why we had HHS, that's why we've had FEMA on the ground.

You know, this is not about some sort of, like, political stunt here. This is not about — this is not what this is about. This is about this President being a president for everyone and showing up — showing up for this community. That's what this is about.

I'm not going to get into some sort of political stunts —

Q    But — right. (Inaudible) —

**App.78**

MS. JEAN-PIERRE:  — about drinking — about drinking water.

Q    (Inaudible.)

MS. JEAN-PIERRE:  What we're going to focus about is making sure they have what they need.  And the President was invited by the mayor, by community leaders.  He's going to show up.  He always said he would be there when it was the most helpful.

Q    The reason I ask is despite some of the — the federal assurances, there — there are folks on the ground who are not political —

MS. JEAN-PIERRE:  Yeah.

Q    — and are just very concerned, and they — they doubt some of the assurances they got from federal regulators.

MS. JEAN-PIERRE:  And we — and we understand that.  We get that.  We get that.  Something horrible happened to that community — a derailment happened in that community that caused a lot of — you know, some damage — real damage to folks who live there.  We get that.

That's why we've had, again, EPA, FEMA, HHS, DOT on the ground within hours by this President's direction.  So, we're taking this incredibly seriously, Phil, and the President is going to go down there in February when the time permits — right? — the best time to do this.  We're working with folks on the ground — to visit the community and be there.

And it's not going to be about politics.  It's not about being in a red state or a blue state.  You hear this — us say this over and over.  You hear it from the President over and over again, because he wants to be — make sure that he's there for this community.

I have to go.  I actually have to go into the Oval Office.  Thank you, everybody.

2:28 P.M. EST

**App.79**

# Exhibit F

# Biden Supports Steelworkers as USW Continues Opposition to Proposed USS-Nippon Deal

🌐 **m.usw.org**/news/media-center/releases/2024/biden-supports-steelworkers-as-usw-continues-opposition-to-proposed-uss-nippon-deal



Feb 02, 2024

**Contact:** Jess Kamm Broomell, (412) 562-2444, jkamm@usw.org

(PITTSBURGH) – *United Steelworkers (USW) International President David McCall today issued the following statement as workers continue to fight to enforce their contracts with U.S. Steel and protect the domestic steel industry:*

"Steel is vital to our national security and critical infrastructure, and USW members are proud to manufacture some of the highest quality products in the world.

"Unfortunately, the proposed sale agreement between Nippon Steel and U.S. Steel puts our members' and our nation's interests in jeopardy.

"Today we received personal assurances that President Joe Biden has our backs. He's always been a friend to the American worker and our union, and we're grateful he's taking an interest in this matter.

"It's essential that we continue to safeguard our domestic steelmaking capacity, and we appreciate the president's ongoing commitment to revitalizing our critical supply chains and rebuilding our nation's economic strength."

**App.81**

*The USW represents 850,000 workers employed in metals, mining, pulp and paper, rubber, chemicals, glass, auto supply and the energy-producing industries, along with a growing number of workers in health care, public sector, higher education, tech and service occupations.*

## Recent Releases / Advisories

Jan 03, 2025

### USW Commends Biden for Blocking USS-Nippon Sale

United Steelworkers (USW) International President David McCall today issued the following statement in response to President Joe Biden blocking the proposed U.S. Steel-Nippon sale:

Dec 03, 2024

### USW Welcomes Trump's Opposition to U.S. Steel-Nippon Deal

United Steelworkers (USW) International President David McCall today issued the following statement in response to President-elect Donald Trump reiterating his opposition to the proposed U.S. Steel-Nippon sale.

Nov 26, 2024

### Blanket Tariffs Will Hurt Workers on Both Sides of the Border: USW

United Steelworkers (USW) officials in both Canada and the United States today expressed their concern with President-elect Donald Trump's announcement that he would impose a blanket 25-percent tariff on goods from Canada imported into the United States.

Nov 22, 2024

### Logan Regional Medical Center Workers Vote to Join USW

The newly unionized workers at the 132-bed acute care facility in Logan, W. Va., include registered nurses, nursing assistants, patient care technicians, phlebotomists, pharmacy technicians, patient transporters, unit secretaries, and others.

Nov 22, 2024

### Pitt Graduate Workers Vote to Join USW

University of Pittsburgh graduate workers voted to join the United Steelworkers (USW) union.

## Press Inquiries

1.

2/3

**App.82**

2.
3.
4.
5.
6.
7.
8.

## Media Contacts

**Communications Director:**
Jess Kamm at 412-562-6961

**USW@WORK (USW magazine)**
Editor R.J. Hufnagel

**For industry specific inquiries,**
Call USW Communications at 412-562-2442

## Mailing Address

United Steelworkers
Communications Department
60 Blvd. of the Allies
Pittsburgh, PA 15222

**App.83**

# Exhibit G

**Raymond James Investor Webinar**
February 2, 2024

**Paul Shea (Raymond James, Event Driven Sales and Trading):** Good afternoon, all. My name is Paul Shea on the Raymond James risk arbitrage desk joining me today is my colleague, Ed Mills, who is our Raymond James Washington policy analyst. Before we get started, as we have always said for any questions, please email Ed at ed.mills@raymondjames.com or you can simply send me an IB at Paul Shea, like the old stadium, and I'll be happy to answer questions that you have. For those on the call, I'm pleased to welcome the Cleveland-Cliffs management team here today. We have with us Celso Goncalves, who is the executive Vice President, Chief Financial Officer of Cleveland-Cliffs, Robert Fisher, who's the Executive Vice President of Labor Relations with Cleveland-Cliffs. and Paul Finan, who's the Senior Vice President of Investor Relations with Cleveland-Cliffs. Gentlemen, welcome and thank you for taking the time with us. We really appreciate that. Celso, you and I had a nice call on Wednesday, and thanks again for joining us here on Friday. Maybe from where you sit as the CFO of Cleveland-Cliffs, appreciate hearing your thoughts on the U.S. Steel Nippon merger, and how Cleveland-Cliffs views the transaction, just to kick things off. We'd really appreciate that.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, absolutely. Hey, thanks, Paul. And thanks for everyone that that is with us today, we're happy to clarify any questions you might have. This is obviously a very important topic to us. You know, our view is that the transaction, as announced, has very little chance of closing. We think that U.S. Steel made a mistake. We think they chose a partner that's not in the best interest of all stakeholders. They ran a process as if they're sort of like a private equity company trying to sell off a portfolio asset. And that's not how it works when you have a unionized labor force that was very vocal about their intentions and their preferences in terms of a partner that they would like to see win the auction. We participated fairly in in in the sale process. We made a final proposal that we view provided more value to U.S. Steel shareholders than the deal that they took with Nippon Steel. And for various reasons that I'm sure we're going to talk through, we feel like this deal as announced with Nippon will not close. And we're happy to get into that. Paul, I think you're on mute.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** Sorry about that. So on the back of that, and building on that comment. Maybe it was noted, you know, I read the U.S. Steel proxy, as I know you did, intently. You know, and you brought it up here. How do we think about the antitrust concern on this deal, and, more importantly, the thoughts from a Cleveland-Cliffs standpoint. From an antitrust standpoint perspective. And then, maybe, secondarily, you know, what we've seen in other transactions in the past is certain companies that might be focusing on a target also file HSR. And is there any been thought there. So maybe there's two questions independent of each other, please.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, sure. So we did a lot of work. We spent a lot of time doing a lot of work. On the antitrust side we worked together with U.S. Steel's attorneys actually under what's called a joint defense agreement and we spent months working with them to identify potential areas of concern from an antitrust standpoint. And the conclusion was actually different than what's in the proxy. We found no proof of competitive harm to the customer base, including auto and other manufacturers. So there's a misperception that this deal would come with significant antitrust risk. We provided a package in our final proposal that addressed all of those concerns. But U.S. Steel had a bias against us throughout the whole process. In fact, one of the U.S. Steel Board members, this guy by the name of Murray Gerber, he's also on the board of Halliburton, and he's sort of traumatized by a deal that he failed to do when he was at Halliburton. When Halliburton tried to buy, I think the name of the company was Baker Hughes. He was, I believe, involved in that failed Baker Hughes Halliburton transaction, and he's got some PTSD from that experience. So I think he over-weighted the antitrust risk with Cliffs, and they completely under-weighted and under-appreciated the Union and the political risk of trying to sell the company to a foreign buyer.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** And along that line, if you, if you think about the work that you all did. Would it have made sense, or is there any thought given to possibly filing it, you know, HSR. I've noted in other situations around the US, that, you know, certain companies that have an interest in a particular target where that target might be, you know, pushing back, or, for that matter, not interested, what the potential buyer has done is filed HSR. Has that been something that you've thought about? Or is that something you possibly revisited? Now that U.S. Steel has gone down the path of announcing the merger with Nippon.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, our understanding is that it's very hard to file or try to get through HSR, kind of one off by yourself, and I'll ask Paul Finan to chime in here. But our strategy throughout the process was to get to a point where, together with U.S. Steel, had they chosen us as the winning bidder, together we would have attacked that that work stream, after announcing the transaction, but we never got them got them there with them. There are challenges of trying to do it on your own without the cooperation of the target, and maybe Paul can chime in and fill in here.

1

**App.85**

**Paul Finan (Cleveland-Cliffs, Investor Relations):** Yeah, Celso. So you nailed it that the hurdle is a lot higher when you do not have cooperation from the other side. It's something we attempted. But we did not get that cooperation that we needed. And I mean, now that a deal has been announced, we have publicly ruled out that our last proposal on December fifteenth still exists. So I mean that that deal is done.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah. So let's talk about all the different areas specifically where antitrust might be a concern. Number one would be in terms of if we were to win and acquire all of U.S. Steel, we would have all the iron ore mines in the country. So that's something that someone can say, okay, well, that's anti-competitive. You can't have one company owning all the iron ore mines. However, we would also own all the blast furnaces so iron ore wouldn't be sold commercially, we would be consuming all of them within our own
blast furnaces. So that's one thing. And then you're going to say, okay, well, what about automotive? You're going to own all the assets that are all the integrated assets that supply the majority of the auto companies. True, but the EAFs, you know, Nucor and others have been saying that they can supply everything and produce everything for the auto customers. You know Nucor has been a supplier of the year for General Motors for many years.
We've seen growing competition in terms of aluminum in automotive. So it's not like it would be something that would create a monopoly we would strengthen our position. But we would not have monopolistic power in automotive. The U.S. Steel market imports a lot of steel. The steel market is global in nature. The automotive market is global in nature. Nippon, for example, is already a large supplier of Toyota and Honda in Japan. So there's a lot of foreign OEMs in the US that already import a lot of a lot of steel. Mercedes and BMW, for example, they use a lot of steel in the US from Germany. So it's not like our position in automotive would create a
monopoly, and we were prepared. We had a mitigation plan for any kind of antitrust concerns that people may have had. And, Paul, if I forget anything, feel free to jump in.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So along that line, if we take it a step further and when you and I had a nice conversation on Wednesday. I think we were both in front of our screens and looking at, you know, Bloomberg, and seeing how the various elements of the transaction between U.S. Steel and Cliffs was trading. You know, I note here today, and the performance of your stock has been pretty impressive on the back of earnings. You know. I note here today that your offer, appreciating full well what Paul Finan just said, but that offer is still trading, you know, almost a dollar 50 through the offer from Nippon. How do we think about that? How do we look at that? How should investors be around that that element? And how do you take it from where you sit from a CFO perspective?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, no, look, absolutely. We crafted our final proposal in a way that we felt was advantageous for the U.S. Steel stockholders. We offered a combination of cash, stock and synergy value that would continue to provide further upside for the U.S. Steel shareholders. But I think the U.S. Steel board is a lot more risk averse than the U.S. Steel stockholders. Whereas the U.S. Steel Board was only looking at our stock from the risk standpoint and discounting the value of our stock, whereas shareholders, you know, if you own stock in in the US steel industry and companies of that that play in the US steel industry, you see the upside and you want that risk. So we had a combination of cash, stock, and synergies in a tax-efficient manner. That would have provided meaningful further upside beyond the $55 cash deal that they took, which, by the way, the stock never traded up to $55 you know. And now you're seeing all the risk associated with that deal even closing so we feel like we put in front of U.S. Steel a much better proposal for the U.S. Steel stockholders, but they chose to go a different direction.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So along that line. And I'm being very conscious of the comment that Paul Finan just made a moment ago. But maybe if we unpack that, I would say in general, there might be 3 questions to ask of you as CFO. And this sort of, you know, linked at the hip. Number one, I would say overall, how is it possible to get your shareholders back to the table relative to the offer that you put out there. You know it was in the proxy. Number 2, how do we think about Cleveland-Cliffs possibly taking an option of going directly to shareholders and saying, look, here's where our offer is, here's where it's been trading, and here's the value that we provide. Not to mention, we just said relative to the antitrust. Number 3 is, we think, about the next 60 days. And I'm being conscious of the proxy that was filed versus when I perceived that the U.S. Steel vote will happen late March early April. How do we think about those next 60 days. And I'm thinking constantly of Paul Finan's comments, but also trying to come from where you sit from a CFO perspective watching this spread.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, I mean, look, the U.S. Steel stockholders are the ones that are going to decide the outcome of this thing. At the end of the day. The Board is only there to do and to act in a fiduciary manner to do what the stockholders want. The stockholders have the ability to vote this thing down. Our deal, as presented, the $54 deal that you mentioned, is no longer on the table. That deal died when they didn't take it. So if there's going to be another deal to be done with Cliffs, it's going to be a different deal, and it's going to come on the back of this deal being blocked. Now, there's many avenues to block this deal. One is obviously the Union angle which I'm sure we're going to get into. Two is the U.S. Government can block it. And three, the U.S. Steel shareholders

2

**App.86**

can vote it down. You know if you're going to be voting in favor of this deal, you're going to be voting in favor of a deal that won't close. So that's another way to do it. But we're not going to take any more public action. We're not going to try to top the bid. There's no reason for us to do that, because we know we have conviction that the

deal, as announced, has no chance of going through. So we're going to wait for it to fall apart. And then we're going to see what we do on the other side. But the $54 deal plus synergies is no longer on the table.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** Okay, and I totally appreciate that. So, if we think about that not being on the table right now and they and they know we're hosting this call relative that deal now, not being on the table. Maybe this is good a time as any to turn it over to Ed Mills and start to unpack at, you know your thoughts with Robert Fisher and Paul around how to think further on the labor side. So, Ed, I'll turn it to you for questions, and then we'll continue to unpack this. Thank you, Ed.

**Edward Mills (Raymond James, Washington Policy):** So thanks, Paul, so let's go into kind of the Union in the Government. I think that I get a sense that the kind of better direct shot you would think is the Union opposition. Walk us through your relationship with unions where you think there are some pressure points how you can win them over. Things that we should be thinking about.

**Robert Fischer (Cleveland-Cliffs, Labor Relations):** Yeah. Thanks. Also appreciate it. The way the U.S. Steel managed this transaction with the USW is about as polar opposite as it could be from the way we've always handled these types of transactions. No one other than Cleveland-Cliffs has the depth of experience working through large scale corporate transactions with the USW. You know, we went through this process in 2020. Well, first in 2019, when we announced the deal to acquire AK Steel, and then in 2020, when we announced a deal to acquire the assets of our ArcelorMittal U.S.A. In each of those transactions, we engaged the USW from the beginning and treated them as the partner they are and sought their input in into the ideas before they became. So it's because of that fundamental different view and philosophy of having them as a partner of ours in our business. And we believe that because

we know for certain that we can only be successful if we have the full support of our workforce. If your workforce doesn't support what you're doing, then it's going to be very hard to be successful. Certainly in the steel industry, and you can't get this or that when you have a represented workforce by the USW without the admin support.

And so the way U.S Stee went about this transaction is just very, very different than the way we always have and what they've done by really shutting out the Union from the beginning is enabled the USW, after the fact, to challenge. They're laboring, which is what's happened. The USW has filed multiple grievances, multiple dispute resolution processes under labor agreement asserting very strong arguments that the agreement was violated here by virtue of them being closed out of the process and their rights violated and ultimately what we know from history is that those arguments, those provisions in the labor agreement that they believe are violated, have been used as effective tools to block a number of corporate transactions in the last 25 years and so we do believe that that the USW has a very significant a voice on what will happen moving forward and that their claims are very

strong and that they are pursuing them very vigorously against U.S. Steel and Nippon.

**Edward Mills (Raymond James, Washington Policy):** So, if we think about this, you know, part of the story, you know, bringing in the government is, you know, what I've talked to a lot of investors about is that Joe Biden is very different than most presidents as relates to unions. In many ways he's a throwback to kind of a different to labor. How much does kind of Joe Biden as president and kind of we've seen his support for unions play into that and I think, as a follow-on, if you are U.S. Steel, and you're able to kind of of get an agreement, you know, with your union. How much does that neutralize this or these grievance issues? Not really workable?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Let me take Rob. Let me take the first part of that. I think your audio is coming in a little fuzzy. I don't know if you can put on a headset or something like that, to make it more clear. But, Ed, just to address the first part of your question. Joe Biden has stated that he is the most Union friendly President in the history of our country, period. Full stop. So the Union has a voice within the White House that I think people completely under-appreciate that. Union people are different than finance people. For us finance professionals, we always feel like there's a price to everything. There's a there's a level where every trade can happen, and it's just a matter of Nippon coming in and offering more money, you know, offering to double their wages or triple their wages. There's got to be something that that Nippon can do to bring the Union on their side. That's not how Union people think that's not in their DNA. That's not how it is culturally with them. They've already made the decision that they are not going to support anyone other than Cleveland-Cliffs. And Nippon has made a clear statement on December eighteenth, when they were talking, when answering a question about the production

plan, as it relates to the path going forward, they said, we're going to stick with U.S. Steel's production plan which includes shutting down unionized assets in the Midwest in favor of non-Union plants in the South. That to the unions was fatal. There's nothing that Nippon can do that's going to bring the Union on their side. Nothing. The idea of them sweet talking the Union doesn't exist.

3

**App.87**

**Edward Mills (Raymond James, Washington Policy):** Is there a contract that you can commit to, or kind of some level of production at certain plants to kind of mitigate those concerns?

**Celso Goncalves (Cleveland-Cliffs, CFO):** They would have to basically say that we're going to do exactly what Cleveland-Cliffs would do. We're going to invest in the blast furnaces. We're going to keep all the plants open. This is what our proposal entailed, our final offer to U.S. Steel stated. We are not going to shut down any, any integrated plants. We are not going to lay off one single Union worker. That was in our final proposal. Nippon's didn't say that we're going to grow the Union workforce. We made two acquisitions in 2020 and 4 years later we have more union workers than we did before. So, we've grown the Union workforce. Nippon's plan is to shrink the Union workforce. So, these things are fatal to Union people. And I'll just give you an anecdote because anecdotes speak loudly. Tom Conway, who is the former international President of the USW. He passed away during this process, and Dave McCall was appointed the new International President. Tom Conway had two requests when he was on his deathbed in hospice, he said, Dave, do not let U.S. Steel sell to anyone other than Cliffs. That was his request. Number one, and request number 2 was, I want to be buried in a makeshift coffin with steel made by Cleveland-Cliffs. That was his last request before he died. So, these people know what happens when you allow foreign buyers to come in, you know, even if they sweet talk you in the beginning they always let you down. They always end up shutting down production. They always end up firing people, doing layoffs, the things that we committed that we wouldn't do. It's hard for someone sitting in an apartment in the West village in New York to understand the mentality of a union worker in Gary, Indiana. You know, these people have seen their families be let go. They've seen what unemployment in their communities does to their families. They've seen the opioid crisis penetrate their communities. There's a long, long history of disappointment when foreign buyers come in and try to run these plants, these unionized plants.

**Edward Mills (Raymond James, Managing Director, Washington Policy):** So, can we go into the blast furnaces? And why that is important to have the USW. I asked, because it's something that kind of comes up quite a bit and kind of the conversations we have a lot of investors on here who are not necessarily lifelong steel investors or analysts. So wanted to get a little bit detail there.

**Celso Goncalves (Cleveland-Cliffs, CFO):** So, Cleveland-Cliffs, is different from a lot of other steel makers, because, you know, the trend in steel making in particularly North America has been to move away from integrated blast furnace operations to what's called mini-mill EAF operations. The integrated blast furnace operations are the unionized integrated mills, particularly in the Midwest, and the trend of steel making in the US has been to abandon these types of production facilities in favor of what is perceived as more nimble, smaller, mini-mills, non-unionized plants in the South. Now, our philosophy is different, because what we're doing is we're reinvesting in the blast furnace steel making route, which creates a better steel product in the end. But it's more labor, intensive. And it's more kind of like an older way of making steel if you will. But what we've developed is a way to decarbonize the traditional steelmaking blast furnace route by using things like natural gas and now hydrogen and pellets and HBI in the production processes, which is something innovative that only Cleveland-Cliffs is doing in North America. So we have the ability to reinvest in the integrated unionized, whereas everyone else their philosophy is to abandon that route. That's why the Union likes Cliffs so much more.

**Edward Mills (Raymond James, Washington Policy):** And that just is that a blast furnace that requires 24-hour workforce, correct?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, that's right. I mean, they all do, but the integrated facilities are generally more, labor intensive than EAFs.

**Edward Mills (Raymond James, Washington Policy):** So we talk about Biden as kind of so pro union kind of largest pro union president of our lifetime. First President, to show up in a picket line for UAW and you highlighted some of the potential kind of issues that you know, people kind of push back on this acquisition. How can we be assured that we're not going to get pushback from the UAW, a union that Biden has also been kind of quite close with. How do you mitigate those issues?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, I mean, look, we have the united auto workers within our footprint as well. We have both. We have the USW and the UAW. In fact, our Dearborn plant, for example, which makes a lot of automotive steel is literally embedded within the Ford plant in Dearborn, Michigan. So we treat all unions very well, very fairly, and like I said earlier, you know it's not like this transaction would allow us to gouge our auto customers. That's not the plan here. You know. We're very union friendly organization. It's not just the USW. But also the UAW.

4

**App.88**

**Edward Mills (Raymond James, Washington Policy):** Alright. So assume I'm a member of Congress, and I kind of am trying to figure out some of the government aspects of this. you know, you saw a pretty quick kind of reaction out of DC, were you surprised by how quick it was out of DC. And thoughts on. Why, it was that quick?

**Celso Goncalves (Cleveland-Cliffs, CFO):** No, I mean, I think the surprising thing was that U.S. Steel even tried to sell this company to a foreign buyer. I mean, if you think about it. Nippon Steel. Yes, Japan is a friend. But Japan has a long history and an extensive track-record of unfair trade practices against the US. So from a trade standpoint, Japan is not a friend. So there's a lot of conflicts of interest on trade. There's obviously a lot of implications with supply chains and national security. The word Nippon literally means Japan. So it's United States steel selling to a company named Japan Steel. So, despite this whole facade of keeping the U.S. Steel name and keeping the headquarters in Pittsburgh, this company is going to be run by Japan. U.S. Steel has this nice slogan where they say: mined, melted, and made in America, right? But if they sell control the company to a Japanese entity, they're going to be: managed, monitored, and manipulated by Japan. You know, Nippon Steel is going to do what's best for Japan, not what's best for the United States. So I wasn't surprised at how quickly, you know, Washington came out and opposed the deal. And you're seeing it from all sides. This is one of the few things that unifies this country. No one
wants to see U.S. Steel be sold to a foreign entity. And the support for that statement goes from all the way to the left all the way to the right. I mean, you saw Trump come out and say that he would, I think, quote "absolutely and immediately block this deal". So this deal has no chance. In my opinion, you know, at the very worst, what's going to happen is the Union's going to delay this thing, and then and then Trump's going to come in office and block it, but I think it gets blocked way before then.

**Edward Mills (Raymond James, Washington Policy):** So you know one thing that was interesting to me as I was looking up kind of a different lobbying disclosures, and how like Nippon had no kind of lobby spend in DC, that's different from U.S Steel. As this moves forward kind of thinking about the D.C. angle. How do you kind of work with your D.C. teams to kind of make sure that your allies who came up pretty quickly, kind of, you know, stick with you, or kind of think about different legislative strategies. Where do you got some in Congress actually moving against this? Is that something that we could see here, or kind of like, how do we think about a D.C. strategy from your perspective?

**Celso Goncalves (Cleveland-Cliffs, CFO):** There's not much that we need to do as Cleveland-Cliffs to raise alarm bells in Washington. The Union is doing that on our behalf. You know the Union has a lot of influence in Washington and U.S. Steel has completely disregarded the wishes of the Union. And if we could circle back, you know, Rob's audio is hopefully better. I'd like to explain a little bit about how U.S. Steel has already violated the labor agreements and the mechanisms in place that the Union has in terms of successorship and things like that to block this deal. So maybe we go there. Rob, if that works.

**Edward Mills (Raymond James, Washington Policy):** Thanks, Celso.

**Robert Fischer (Cleveland-Cliffs, Labor Relations):** Yeah. Thanks Celso, can you hear me better now?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, much better. Thanks.

**Robert Fischer (Cleveland-Cliffs, Labor Relations):** Yeah. Good. Sorry about that. Yeah. So there's multiple provisions of the labor agreement that the USW has alleged already that have been violated here that they can use to effectively block this deal. The one that you mentioned. Also the successorship provisions require from the USW's perspective, their agreement to basically bless this transaction. And that certainly has not, nor will it
occur. The USW has been very clear that they will not support the sale of us deal to a foreign entity, and certainly not Nippon. They believe firmly that the successorship provisions have been violated here. U.S. Steel has said, as has Nippon, that they believe they have satisfied those by simply informing the USW that a subsidiary, Nippon Steel North America, that was formed for this transaction has agreed to assume the labor agreements. But that is simply not sufficient from the USW's perspective. They believe that they must agree to allow any buyer to assume the agreements. And so this is a position that they have taken repeatedly with similar language in response to other corporate transactions that they did not approve of. And they've been very successful in blocking those transactions. Cooper Tire attempt to sell to Apollo Tire, as an example. CSN is another example. There's just been multiple examples over the years where the USW's has been able to effectively block transactions. By asserting their rights under the successorship provisions, the USW is also strongly of the view that the Right to Bid language in their labor agreement has been violated. That Right to Bid language required, among other things, that they union be notified in and kept abreast of any type of offer and given all the same information that was provided to any potential purchasers and given specific timelines for the transaction. None of those things occurred, and so they've asserted their rights with respect to that. Those provisions as well, and taking the position that the deal isn't proper because it was reached without complying with the Right to Bid language which is required before a deal can be signed. So there's multiple avenues in the labor agreement that they can, and that

5

**App.89**

they have used already to challenge this transaction. Those will be heard ultimately by an arbitrator, and it's important to remember labor arbitration is a little bit different than going before a federal court or a different type of jurisdiction. Labor arbitration is much more about equity and the parties' intent. And it's clear here what was intended was the USW through these various provisions in their labor agreements would be given a seat at the table, and made part of any type of transaction like this, and that simply didn't occur here. So we're confident, as is the USW that ultimately they will block this transaction through these various claims.

**Edward Mills (Raymond James, Washington Policy):** And I have one more question before I turn it over to Paul back as the and this got emailed to me. So the question was, isn't the Union support tied to the neutrality agreement they gave USW over Big River, even though it isn't a right to work state and not likely to unionize. Anyways. Why can't Nippon match?

**Robert Fischer (Cleveland-Cliffs, Labor Relations):** Yeah, I'm not sure I understand the question. There is not a neutrality U.S. Steel would say. There's not a neutrality provision that applies to Big River and the USW might have a different view on that.

**Celso Goncalves (Cleveland-Cliffs, CFO):** I'm sorry the part about Nippon matching, let me jump in here. I think maybe what the question is trying to get at is well, Nippon has offered to keep the existing contracts in place. Maybe that's not what they're going. But this is an important point. Nippon has come out that look all the all the existing contracts labor agreements that are in place. We're going to honor all those. So don't worry about it. Well, that's not how it works, because the deal that the Union signed was with U.S. Steel. And now you can't just bring another company and say, we're going to just assume what you have with U.S. Steel because what the Union can do is say, look, I didn't agree to a deal with Nippon even if they're going to keep the same thing that I have with U.S. Steel. My deal was with U.S. Steel so you can't just say I'm going to assume the same contract, and you can't say anything about it. The language of the labor agreement clearly states that before a deal can close the Union, the new owner have to come to an agreement and it does say that the agreement can include accepting the existing contracts. But it can't be done unilaterally. Nippon can say we're going to keep the existing contracts in place. But the Union has to agree to that position. They can't just unilaterally say, we're going to assume everything that's there, and you can't do anything about it. The Union can say, okay, you're going to assume everything that's there and keep it in unchanged. But I didn't agree to that with you. I may choose to accept that position as well, but you can't unilaterally make that decision.

**Edward Mills (Raymond James, Washington Policy):** Well, why could they? I mean, it's seems what we've seen in other since situations bringing back Biden. You put a senior kind of official to monitor, not negotiate. You get Nippon and you the USW to come up with a new contract that is even more generous. It seems to me that you're saying that under no scenario, even with a kind of updated contract. no matter how generous it is, you would ever get the Union's to vote to support that contract? Is that what I'm hearing?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Because Nippon has already stated that they're going to close down plants that are unionized. So it doesn't matter if they say we're going to triple your wages for the next year. If they make no commitment to keep plants open, then what's the point of tripling your wages for a year, and then shutting down facilities in in 2 years.

**Edward Mills (Raymond James, Washington Policy):** What if there's an agreement that they don't shut down those facilities?

**Celso Goncalves (Cleveland-Cliffs, CFO):** They haven't shown willingness to keep the integrated plants open. In fact, if you go back through the proxy, it's pretty evident that the only thing Nippon Steel really wanted was Big River, the non-unionized plant. They assign no value to the unionized plants. I think at one point they bid $9.5 billion for the combined company, and they assign $9.2 billion of value to Big River and only $300 million dollars of value to the rest of the company, so that clearly indicates that they see no value in the integrated plans, and they have no plans to invest in it, and they stated as much. On December eighteenth, they said, we're going to execute under the existing plan of U.S. Steel which is to shut down unionized mills and to move production down to the non-union mills. So the Union sees all that there's an angle of intent as well. So you know, if they were to all of a sudden say, we're going to triple your wages just to close the deal. It still doesn't mean that there's a commitment there, and an intent and history and a track record of being in favor of integrated steelmaking. That's the point. If they try to do something, it'll be just to try to close the deal. But it doesn't mean that in their DNA they have a strategy of keeping integrated unionized mills open and the Union will see all through that. So, in my opinion, there's nothing, absolutely nothing that Nippon can do to change the minds of the unions.

6

**App.90**

**Edward Mills (Raymond James, Washington Policy):** And I guess my final thing. Oh, go ahead. Sorry mitigation plan. I'm that nosy kind of a Congressional staff for pushing back against this. I've read some things about possible antitrust I've read of things about the you know auto kind of concentration. And I'm telling us there are some things here that before you go all in, you need to know this. How are you mitigating that?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah. Well, let me start at the end. Because at the end and the final proposal, we included a $1.5 billion dollar reverse termination fee. That's how confident we were that we would get through regulatory review because we were comfortable offering that $1.5 billion because we know that we wouldn't have to pay it. But we were trying to put our money where our mouths are by offering $1.5 billion dollars of a reverse termination fee to U.S. Steel, which they didn't accept because we knew we wouldn't have to pay it. Well, let's get into what the mitigation plan would have been. We offer to divest any plant up to $2 billion dollars of revenues, which was more than sufficient if needed. And in the proxy it states that U.S. Steel viewed that that number should have been $7 billion. By the way, that $7 billion was never communicated to us ever, but we were willing to divest plants up to $2 billion in revenues. Paul, what else did we put in our remedy package?

**Paul Finan (Cleveland-Cliffs, Investor Relations):** There was also a supply agreements related to slabs, iron ore to keep the market competitive.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah. So there. There was plenty in there that would have gotten us through antitrust.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So Ed, maybe along that line. And this might be something good for Robert to think about. If, on the hypothetical. if we had a U.S. Steel Cleveland-Cliffs deal and appreciate full well what Celso was just saying in terms of may not have to divest, but on the hypothetical given what's been going on with the current DOJ and the FTC in terms of a number of other deals, what investments had to happen? Maybe, Robert, how do we unpack the whole notion of the Union in the event that Cleveland-Cliffs U.S. Steel deal to divest an asset. Dare I say, divest an asset to a non-union company, such as Steel Dynamics, or, for that matter, divested to a foreign buyer like an ArcelorMittal or Nippon. How would the Union act there relative to their support of your deal? In the event we had to go down that path, because that's not dissimilar to a foreign buyer owning U.S. Steel. In this case it would be a foreign buyer, dare say, owning former Cleveland-Cliffs assets, or, for that matter, U.S. Steel assets where the Union workers would now be under a foreign owner. For that matter, a non-Union owner?

**Robert Fischer (Cleveland-Cliffs, Labor Relations):** Yeah, Paul, you know, hard to speculate, because there's so many variations that could take depending upon what was required to be divested. But I can tell you is that our relationship with USW is strong enough to work through any challenges like that. We are very confident that we would be able to work with them in a cooperative way and come up with an agreement that would be acceptable to them relative to maintaining the maximum unionized assets as possible, the best of what may be necessary to satisfy those requirements. But to do in the best way possible way that that protects the most union jobs.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, to add to that. if there was something, it's a great question. If divestitures were part of something that was required in order to get the bigger picture done, the Union would favor that because they would be team players and they would do what's best for the aggregate. So we we're pretty confident that if we had to do divestitures they would be relatively small. But let's just give an example, let's say we had to sell our Dearborn plant as part of the of the remedies, there are buyers for that plant, for example, we could sell it to Stelco. The USW actually has a good relationship with Stelco, and if it's part of the package, and it's the path to getting the deal done for us to acquire U.S. Steel, they would be on board with that. So that's just one example. The other example would be, let's say we had to divest an iron ore mine to a foreign buyer. For whatever reason there are structures we can put in place where we can sell ownership. Let's say we had to divest one of our iron ore mines. We could also do a structure where we sell ownership of, let's say, Tilden to ArcelorMittal, or to someone else, and we can remain as the operators of the mine. So we can sell ownership but retain the operational responsibilities. That's something that would go a long way with the unions, because they know that we take care of safety. We take care of other things that they care about. So there's always ways around structuring. You know, the remedies that would not upset the unions if it meant that we were to get the bigger assets.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So I'm going to stop because I'm very conscious of yours and Roberts and Paul's time. It's possible that we go beyond 2:30. Is there a hard stop for you in the event we go beyond 2:30, because this has been a great conversation. I do not want to be rude to you and your team.

**Celso Goncalves (Cleveland-Cliffs, CFO):** No, we're good. We. We have a call with our bankers at 2:30, but they can wait where this is way more important.

7

**App.91**

**Paul Shea (Raymond James, Event Driven Sales and Trading):** Okay, I appreciate that. So you made a point and I think, both Paul and Robert made a point to talk about a foreign buyer, and I guess I'll ask it this way, and I'm not trying to be rude. It's more of a hypothetical. We talk about a foreign buyer. We talk about a Japanese buyer. Let's play the hypothetical. Nippon were to call you all and say, look, we're switching gears, and we're no longer interested in in U.S. Steel. We're actually interested in yourself. How does that transpire from your perspective relative to a foreign buyer relative to a Japanese buyer. Does that change the tune? And to the Union's point? Again, hypothetical, does that change the Union's tune from that standpoint? Would Cleveland-Cliffs be a similar situation from a steelworkers standpoint at Cleveland-Cliffs.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Great question. And what really matters is how you approach it with the Union. It's not like companies like U.S. Steel or Cliffs are unsaleable to foreign buyers, and we have nothing against Nippon. We have nothing against Japan. It it's not xenophobia or anything like that. It's just the way you approach it with the unions. If we were to ever run a process, we would not do it the way U.S. Steel did. We're not a private equity firm, and we're not selling portfolio assets. We are a company with unionized representation. We have to respect the Union. Labor is important. The first thing we would do if we were to run a process is bring the Union on board and say, Look, whatever we do, we're not trying to maximize value just for the stockholders. We're trying to maximize value for all the stakeholders, including yourselves, but also including our employees. We're not going to do anything bad for the communities. And that's where U.S. Steel's fatal mistake was. If they had brought the Union on board in the beginning, they wouldn't be in the position they are today. If they had given Dave McCall a seat at the table, kept him updated on the sale process, they wouldn't be in this position. Nippon would have better understood the desires of the Union, and that's what we would do if we were to ever run a process. So it'd be completely different.

**Paul Finan (Cleveland-Cliffs, Investor Relations):** Yeah, if you look at the precedent transaction of CSN trying to buy Willing Pitt in 2007, that was a deal that was blocked by the USW. And CSN admitted after it was blocked by the USW, if we just would have been more open with them up front, we probably would have had a path. And they admitted that was their fatal flaw. I mean, Rob likes to say half of labor law is communication, and that's where U.S. Steel made and error.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** And along that line, if we think about it, maybe take a step back. You mentioned early on the initial offer, that that sort of, you know, highlighted Big River sort of $9 billion dollars or so. Maybe if we put this deal on the back burner, has Cleveland-Cliffs thought about possibly reaching out to Nippon to say, how do we partner? And maybe, are there certain assets that you all wanted through the course of this transaction that maybe Nippon might be willing to sell? And again, I'm just thinking about how this transaction has unfolded and the comments about the Union. But, more importantly, the assets that I think you guys were desiring. Is there anything where Cleveland-Cliffs could work with Nippon to possibly take a portion of those assets there? I say Union assets and leave, you know, Nippon with, you know the Big River non-Union plants and allow you guys to support the union workers as you've been saying through the course of this transaction.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, I mean, look absolutely, you know, I think there's value across the portfolio of assets and the footprint that U.S. Steel has, and I think our interest is perhaps different than Nippon's, you know. I think it's pretty clear that their number one target was Big River, and to us Big River would have been a nice-to-have, so if Nippon were to reach out to us, look, we're not going to go and reach out to them. You know they have a transaction that's been agreed-to with U.S. Steel, but if they were to come to us, I think we would take the call and we'd be happy to listen to what their offer might be. You know, if they're willing to pay $12, $13 billion dollars for Big River and sell us the Union assets, that's something that could be an elegant solution. But again, we're not going to be the ones that are going to initiate that.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** I totally appreciate that. but I do appreciate your candor around the whole notion of what might be an elegant path at the end of the day. So if we, if we pull it up to a higher level, and Robert hit upon this early on, what's the process from here? From the Union? Because if I'm if I'm unpacking 3 things, I've unpacked sounds like national security is less of an issue, sounds like foreign buyer that might not have followed the path that they should have followed, for that matter, with respect to the Union again, another swim lane. But maybe if we focus it on the Union. What's the process from here? It's February 2nd. Where does the Union now move relative to the whole notion of the current grievance that was filed? Where does the Union move relative to an arbiter? Where does the Union move relative to getting to a place where they don't approve the deal, either around successorship or, for that matter, the current contract is in place, I guess, understanding that for the listeners on the call might be helpful as well.

**Robert Fischer (Cleveland-Cliffs, Labor Relations):** Yeah, Paul. So the process from here there's actually 2 paths forward. The first is related to all the grievances challenging the violations of the successorship provisions. Those

grievances, there's 5 in total, have their own dispute resolution process. And that process requires multiple meetings between the parties. And if issues can't be resolved ultimately to be referred to arbitration. That process could take months to even longer than that to unfold. There's a separate process that applies, resolution process that applies to the Right to Bid language that requires a meeting of the principals between U.S. Steel and the USW. We understand that that meeting may be imminent. But if the parties aren't able to resolve it at that level, then that goes to either an arbitration or federal lawsuit. Obviously, an arbitration is much faster than a federal lawsuit. So if the parties agree, they can opt to have this arbitrated separate from those other grievances, or you could file lawsuit in Federal court, which you know could take months to years to resolve. So those are the 2 paths forward.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** And maybe Robert, along that line, and it's been a long time since I've looked at Labor Law. But you mentioned the whole notion of the arbitration process. I read through one of the grievances, I think at a step 2, I did my due diligence reaching out to USW arbitration group. My understanding is that it doesn't necessarily have to go right to arbitration, that there's multiple steps from step 2 to step 5 step 6 where the parties collectively can work through their grievances, work through their issues before going to arbitration. How do we think about that? How do we think about the step 2 grievance to ultimately getting to arbitration number one. And from your experience. how do you think about that relative to their ability to resolve that grievance, or are you at a place right now that, irrespective of what step we're at, we're ultimately going to get to arbitration.

**Robert Fischer (Cleveland-Cliffs, Labor Relations):** Yeah, great question. And I think the first point, Paul, is time. those steps each take time. And that means that it's going to take longer for these issues to get resolved. I do think it's extraordinarily likely that we are headed to arbitration here. I do not foresee a way to resolve this dispute as difference in interpretation of the labor agreement on these points from the USW. That they could have, and I just cannot see them agreeing to the USW's interpretation, and I don't see the USW backing down. And so I do think this is headed arbitration. You're right. There's there's 5 steps that you go through before you get to that arbitration process. And so each one of those is going to take time. I don't think it's probable that anything gets resolved. And I think you'll we're going to find ourselves months down the road here waiting for an arbitrator to decide these issues.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So maybe back to you, you made a point early on. And I think I heard you say it. But I just want to make sure that that I don't misinterpret what you're saying. We're sitting here on February 2nd. We're talking about a vote between now and you know end of March early April, but I think you admit the point, and forgive me if I heard you wrong, that possibly the deal could be blocked beforehand. Dare I say, even ahead of the vote? Can you help the listeners understand how that might, how that process might work? You're clearly in a different position than I am, but maybe understand for us how that might might even unfold before even get to a vote.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, sure, I mean, look. We've all seen the political backlash that this deal is getting from the left to the right and in the middle and the way that the regulatory review process works as it relates to CFIUS, is, is pretty nebulous. But our understanding is that you know CFIUS will do you know their analysis, and they're going submit a recommendation to the President. Now, the President can take the recommendation,
or he can throw the recommendation in the trash and just do whatever he wants. So you know, between us, I don't think I don't think CFIUS is really the main concern. You know, CFIUS might even say, let's assume CFIUS does their work. They take their time, they do their work, and they say, look, we actually didn't find any evidence of a of a supply chain problem or a national security problem. So our recommendation is that, you know, this deal doesn't necessarily need to be blocked from a CFIUS standpoint. Joe Biden can take a look at that and say, okay, that's great, but my buddy, Dave McCall, the International President of the USW doesn't want the deal. So I'm going to side with him and I'm going to block. I'm not going to allow the deal to go through. So from that
standpoint he doesn't even need to wait for the CFIUS conclusion to come to him to get to that conclusion. And Dave McCall and the USW have already been clear that they don't want the deal to go through. So I think the Administration has made it clear that the decision's already been made. They're not going to allow the deal to go through. The Union doesn't want it, and they're going to side with the Union. And he doesn't have to wait until the conclusion of CFIUS to make that decision. Now, I have no inside knowledge or cameras or audio inside of the White House to know what the hell is going on over there. But it's my opinion that the decision has already been made that they're not going to let the steel go through. It's just a matter of a process of unwinding it in an elegant way with Japan. That's just my personal opinion. But I think there's no way that Joe Biden's going to let this go through, and we may wake up one day and there's an announcement or something that said that he's gotten to that
conclusion. And, by the way, Donald Trump has already said, he's going to do that without even reviewing anything. His words were, I am going to immediately and absolutely block the deal. So I think when you take all of those together the only the only rational conclusion is that the deal as proposes no chance of closing.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So from that perspective, if I'm if I'm hearing you correctly, it's not a function of traditional CFIUS, national security, or, or, for that matter, CFIUS doing their risk based

9

**App.93**

analysis, or, for that matter, how the contract is written relative to a proxy or national security letter or anything along those lines. If I'm hearing correctly, it has less to do with what we consider traditional national security, and more to do with the unions and the strength of the unions and the unions in Joe Biden's ear again, just relaying back what you said, as that's really the driver as to how CFIUS ultimately, even if they make a recommendation, how Joe Biden ultimately says, you know, thanks, but no thanks, if I'm hearing correctly, that's sort of what I'm perceiving from your commentary.

**Edward Mills (Raymond James, Washington Policy):** But to add to that, though, if the President doesn't have a real reason, and there's a lawsuit. So it's just, I think that's some of the pushback to kind of getting that as the final solution. You have to have a reason.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, I mean, his reason can be that the USW doesn't want it. He doesn't need to have any more reason than that. Who is going to sue the Government of the United States for a decision they made? Nippon? U.S. Steel? It's ultimately the decision of the President and the Union has a lot of influence in terms of what the President does, as it relates to this specific topic.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So let me let me put something back on you. Again. Totally appreciating what you said earlier, that the deal is off the table. But let me take a slightly different stance. Is it possible is even, is it even a thought? And I'm thinking about over the next 60 days quite frankly, that, as opposed to Nippon as opposed to Cleveland-Cliffs, you know, Cleveland-Cliffs puts it to the shareholders, and says, look, you know, we see value in the Union assets. We run Union plants before we have a very strong tied to the USW. The USW has been supportive of that. We're not going to be in the midst of agreements. We feel very comfortable from an antitrust standpoint. We have a billion and a half dollars available on the off chance of an antitrust. We can make the investments and feel still feel comfortable at the USW. For U.S. Steel shareholders and purely given also how strong your stock has been. Does it make sense to put it to them and say, hey, guys, look, we're here, Nippon is there. You know. Here's where we are relative to our offer. We see value in the assets and put it to the shareholders over the next 60 days, because here's the challenge I have if I'm working for Cleveland-Cliffs and I'm in their boardroom. The challenge is, you know. Come, March 30th or April 5th, irrespective of what Robert said in irrespective what you said relative to the Union. It's no longer in your hands. So how do you keep it in your hands? Given everything you're talking about here today, because clearly it's at least evident to me that you still see significant value in the in the USW assets.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, I mean, look, we have so much conviction that the deal will get blocked that that path is unnecessary. Once the deal is blocked, we will be vindicated and multiple avenues will open up for us to pursue the assets that we want. So there's no reason for us to get anxious and try to take it to the shareholders, or, you know, try to top the bid. That's not what's going to win this for us. Once the deal is blocked, then everything else is back on the table. But for now our offer is gone. They have a deal that they they're trying to close and we don't believe that they're going to be able to close. So we're waiting for it to fall apart. We're educating people in terms of our views. We're educating people in terms of the antitrust work that we did. We're explaining to people in terms of what we believe are the synergies and things, and the business plan that we would have for a potential combination. But there's no reason for us to go and offer more value or try to convince the Board or take it to the shareholders because the deal will fall apart, and when it does, we'll reevaluate.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** Was there anything to yesterday, and I don't work for them, so I don't want to speak to a competitor. But was there anything yesterday? So to the reporting that came across on JP Morgan and going restricted. Is there around your, you know, around your particular stock do we unpack that at all? Was it just noise? How do we think about that relative to what we saw yesterday in the reporting that came out?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah. Good question, I mean, look, JP Morgan's been working with us throughout the whole process, and they were restricted early on. And then, I think what happened was, you know, once the deal was announced, they started working to unwind their restricted position. I think they were too quick to pull the trigger. So they re-initiated research coverage only to realize on our public earnings call that we were very clear about our position, that the saga's not over. So I think, out of abundance of caution, they retreated back to their prior position of not publishing research. That's all that it was.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** Ed, I'm being conscious of time, but I know this is a great call and I'll go back to you because I bet you might have one or two more questions before we stop to close out this call.

**Edward Mills (Raymond James, Washington Policy):** Yeah, just trouble squaring up a little bit was this insistence that there's nothing that could have been done with the USW, but the comments that if they had just engaged them early on,

10

**App.94**

there was something that could have got gotten done. That to me is the, you know, you know, Paul, I think that was you know more from you as to like, how do I kind of reconcile those 2 comments.

**Paul Finan (Cleveland-Cliffs, Investor Relations):** Rob, do you? Do you want to take that about the importance of communication?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, I'll take it, Paul. Thanks. Yeah. I think 2 separate points that really you know, when I was speaking about the key to communication, and particularly when you're dealing with the USW. Rob was talking about how we've managed deals, and why we've been so successful in closing deals with their full support and backing. And why that's so important. Rob also did a nice job explaining why Nippon would never have been an acceptable outcome here for the USW, and had U.S. Steel engaged them and communicated with them, they would have understood that, and they would have varied the course, and I think we would have been the outcome. Obviously, we think our deal had more value. But we're also firmly of the view that we were the only acceptable outcome for the USW. And so I think they're 2 separate points there. I think the point is, the key takeaway is, had they engaged the Union in communication upfront, they never would have entertained the bid from Nippon. Does that make sense? Had they put weight in the desires of the Union, they would have accepted the offer from Cliffs, and they would have been more willing to understand and be more collaborative on the antitrust risk, and how we were going to address that, and they would have worked with Cliffs early on toward a deal as opposed to just rebuffing us the whole time, and finding a partner that offered even less value, and that the Union didn't want. So that's would have been the point of communicating with them early on. Now that they've betrayed the trust of the Union, there's nothing else they can do.

**Edward Mills (Raymond James, Washington Policy):** And besides, Dave Mccall, who else should I be watching on the Union side to understand the politics?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Dave McCall is the main, is the main person. He's the one that's in Washington. He's the international President, the other one that signs onto everything that you'll see when they put out letters is and the name escapes me. But Rob, you know who?

**Robert Fischer (Cleveland-Cliffs, Labor Relations):** Mike Millsap. So I encourage you to see all of them if you go to the USW website, you'll see all the letters that Mike Millsap and Dave McCall issue periodically to their Union members, which, by the way, they refer to them as brothers and sisters. So every time they address their brothers and sisters, you'll see that it's signed by Mike Millsap and Dave McCall.

**Celso Goncalves (Cleveland-Cliffs, CFO):** And 1 one last point I'll make if you allow me. You know, I think one thing that is astounding even to me is, how did U.S. Steel not anticipate this? How did U.S. Steel not know this was going to happen? How does U.S. Steel not understand their own labor agreement? How does U.S. Steel not have a good relationship with their Union. They are the United States Steel Corporation, the first company to have a board of directors, the first company to get to a billion dollars in market cap. You know U.S. Steel used to be like Apple. And I think the problem is that they've gotten so arrogant over time that they feel like they don't need to understand the Union. They're U.S. Steel, you know. It. It's pretty amazing that they didn't see this coming, and they stick with it. They're sticking with their viewpoint in their earnings. The release that they put out last night. They said that they still believe that the deal will close in or by the end of this year. So they lie to themselves, and they get into these positions. And if you look at the composition of their management team. Their CEO is a former accountant that was CFO of caterpillar. Their CFO is a former CFO of a beauty company and none of them live in Pittsburgh. So they have this facade about keeping the headquarters in Pittsburgh. The CEO lives in Chicago. The CFO lives in New York. There's no ties to the industry. Their board of directors are a collection of people from various very accomplished professionals, but none of them run deep in the steel industry. A lot of them haven't even been to their still mills. So there's no they don't even identify with their own workforce. Go back and see, do a Google on FDB, and you'll see what I'm talking about during their latest union negotiations. The Union put out signs all over their plants, saying, FDB And I won't tell you what it stands for. But I'll leave you with that, and you can Google what it means. And it doesn't mean fire. The CEO's name is David Burritt, and FDB. Is fire David Burritt, but the  first word is more powerful than fire. So it's another 4 letter word. So you'll see you can do a little bit of Google, and you'll see how contentious the relationship is. But it's just astounding that that management team and that board of directors didn't see this coming, but hey, and we told them about it so they didn't choose to listen to us. You know we were treated with a level of prejudice. Because you know, U.S. Steel has been a steel company for so many years, and Cleveland-Cliffs is technically only a steel company for the last 3 years. We transformed ourselves from a mining company to a steel company in 2020. So they treat us with a lot of prejudice. You know, we have this structure where the CEO and CFO are father and son, CEO and CFO. We're originally from Brazil, but we're very patriotic, naturalized Americans. But they treat us with prejudice, and we warned them about all this. And it's just amazing that they didn't see it coming.

11

**App.95**

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So 1 one question that a few folks have asked, and again, knowing that your offers off the table. But if Cleveland-Cliffs was so confident that the U.S. Steel workers were going to not go with Nippon, but go with yourselves, and there was no way that the company was going to be sold to Nippon or to a foreign buyer, why did Cleveland-Cliffs continue to chase the price of U.S. Steel and chase it up to $54 if you were so confident, was eventually going to come to you.

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, I mean, look, we weren't using our union position as leverage in negotiating the price down. Like, I said earlier, we participated in a fair way, and we didn't use the Union to try to buy the company on the cheap. That wasn't the strategy. And when we saw that there was a lot of interest from multiple parties, from multiple parts of the business. We were comfortable, paying a higher price, because we knew that if we won, we could sell off assets to other interested buyers. You know. Had we won with our final offer, we would probably be looking to sell Big River, for example, and we know that we could get a lot of value for that. So there's many reasons to offer the value that we did. We're the ones that bring the most synergies. There's no other buyer that could deliver 750 million dollars of cost synergies only cost synergies. And I'll leave it at that. So we were very comfortable paying that price for all those reasons.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** So if I if I and I'm being conscious of your meeting with your bankers, if we think about finishing here, and we are happy. Ed and I have done this together for a long period of time. Happy to have a follow up. Call with you all at any point in time, and I'll make sure we talk offline. But if we sort of unpack the call today, I think I walk away with a couple of different things. I think first and foremost top of top of mind is the view from Cleveland-Cliffs standpoint that the deal ultimately not go through either, you know, from a Union standpoint, not allowing it, or, for that matter, you know, President Biden, not allowing it. Secondarily, if I'm hearing from you that there's obviously great value in Cleveland-Cliffs, and there's a number of assets, maybe X Big River, that you would be more than you know, more than happy to own at the end of the day. And third, if I'm hearing from you, and really, from a standpoint of I'm just thinking about investors that are on the call. Really, what you're waiting for is for ultimately you know, is the deal to come to you, i.e. you know, deal not go through whether or not you're there or you're not there on the current price, but really waiting for this to unfold the deal with me being blocked, and U.S. Steel being in a situation where they've got one of 2 things to do, either go it alone or come back to you in terms of you know, trying to ink a deal. Is that at least a fair assessment of sort of that. I know there's a lot that we discuss. But is that at least a fair assessment of the key takeaways from the call?

**Celso Goncalves (Cleveland-Cliffs, CFO):** Yeah, I think everything you said is fair. You know. we continue to believe, for the various reasons we discussed, that the deal as announced, was a mistake, and that it won't close. Won't, you know it won't be able to get past all these hurdles. The deal that we offered on December fifteenth is no longer there. But as we discussed on the call. We're still interested. We see value in in a potential combination. It doesn't necessarily have to be a Cliffs and U.S. Steel deal for the whole thing and we're willing to take calls if they come to us. But we're not going to chase it. We're not going to go public with anything. We're not going to take it to the shareholders, and we're not going to go after U.S. Steel, if they or Nippon, or whoever wants to come to us, we're happy to facilitate finding a solution that works for everybody.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** I'll leave it. Ed and I always ask the same question of folks that we host calls on. You've been gracious with your time, your time, Robert's time, and Paul's time. What can we do for you on our end? What did we not talk about today? What did we miss? Or, more importantly, what can Raymond James, do you on our end to help you all out?

**Celso Goncalves (Cleveland-Cliffs, CFO): I** think the shareholders need to go to U.S. Steel and say, what the hell were you thinking? I think that's what's missing. And you know, express their concerns. Clearly the stock price is a display of people's growing skepticism in terms of the deal finding a path to close, and put pressure on them to find a solution with us. We're here. Our phones are always on and they know where to find us.

**Edward Mills (Raymond James, Washington Policy):** Thanks, guys, this has been really helpful.

**Paul Shea (Raymond James, Event Driven Sales and Trading):** Paul. Thank you very much, Robert. Thank you very much. So. So thank you very much. I'm always available. (212) 297-5600. On email. You have me and cell (201) 788-9559. This has been great, you know, Raymond James is here to continue to have this dialogue, and we look forward literally look forward to future conversations with you all. But more importantly, thank you for your time, and have a wonderful weekend.

12

**App.96**

# Exhibit H

# Cliffs Weighs Lowball Bid for US Steel With Union Backing

**Published: Thu Mar 14 19:47:49 EDT 2024**

- Cliffs CEO phones up USW during interview to confirm support
- Goncalves said he would offer bid if Nippon deal falls apart

By Joe Deaux

(Bloomberg) --

Cleveland-Cliffs Inc. Chief Executive Officer Lourenco Goncalves said he'd consider another bid — with union support — for United States Steel Corp., albeit at a significantly lower price than the existing offer from Nippon Steel Corp.

That potential bid, though, is dependent on the current Nippon-US Steel tie-up falling apart, Goncalves said in a phone interview. If he were to make an offer, the Cliffs CEO said he'd have the backing of the influential steelworkers union that's also blasted Nippon's takeover approach.

The Cliffs CEO, known in the industry for his colorful and combative approach, touted his closeness and support from the steel union — and then proved his point by dialing USW President David McCall into the call with Bloomberg News. In the call, McCall reiterated the union's support for a potential Cliffs bid.

Read More: US Steel Takeover's Fate May Hang on the Words of a Union Boss

Goncalves also said he's talking regularly to the White House.

The White House declined to comment.

A recent share plunge for US Steel shows that investors are increasingly concerned about the future of the Nippon deal. President Joe Biden on Thursday said the iconic Pennsylvania company should retain American ownership. Biden's move against a takeover by a the Japanese company came despite the risk of upsetting a key ally.

Biden's comments have also shone a fresh light on the influential position held by the USW and its leader. Biden called McCall Thursday morning, reiterating that "he has the steelworkers' back," the White House said in a statement. For its part, the union said Thursday afternoon in a statement that it welcomed Biden's call for US Steel to remain domestically owned and operated, saying that the president's statement should "end the debate."

**Bloomberg Law** ®

© 2025 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Cliffs Weighs Lowball Bid for US Steel With Union Backing

US Steel plunged as much as 11% on Thursday to $36.38, but pared gains after Bloomberg reported Goncalves' comments, closing at $38.26. The stock still dropped about 18% in two days, the biggest such loss since 2020, and is trading sharply below the Nippon offer of $55 per share.

Read More: US Steel Plunges for Second Day as Biden Comes Out Against Deal

If given the opportunity, Goncalves would consider a bid "in the $30s," he said in the interview Thursday. Cliffs shares also pared some earlier losses to close down 3.8%, after dropping as much as 5.9%.

Nippon Steel said in a statement on Thursday evening that "our transaction delivers clear benefits to US Steel, union workers, the broader American steel industry, and American national security."

"No other US steel company on its own can meet this challenge while also meeting antitrust requirements," the company added in the statement.

## Biden's Intervention

Biden's statement marks a rare presidential intervention in a transaction that outside an election year would have drawn less public scrutiny. Despite its storied history, US Steel's role in the economy has diminished over several decades, a period during which producers in Asia have risen to dominate the global steel market. And while Nippon Steel's proposed $14.1 billion acquisition targets a historic business name, a takeover in the US commodities industry by a company based in a friendly country is hardly unusual.

Still, the announcement of a Japanese company's acquisition triggered opposition from Republican and Democratic lawmakers as well as the union. Biden's allies have urged the administration to kill the deal over what they say are national security concerns and a threat to unionized steel jobs. Nippon Steel has said it will honor all agreements US Steel has with the USW.

Goncalves said he thinks it's a "foregone conclusion" the Nippon deal will fall apart.

"There is no more lobbying, there's no more negotiation. It's over. It's over," Goncalves said, referring to Nippon Steel's deal to buy US Steel. "And the only other buyer that the union would accept is Cleveland-Cliffs."

## Union Support

After dialing McCall into the phone interview, Goncalves said to the union leader: "I would like you to, if you can, express to him — to confirm or negate — if you disagree with me, that Cliffs is the only company the union would endorse to acquire."

## Bloomberg Law®

© 2025 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

"Yes, because you still have our right to bid," McCall responded to Goncalves. He was referring to a legal right the union had to launch a counteroffer for US Steel, which it transferred to Cliffs last year.

The Nippon bid remains on the table and it's not clear what implications Biden's remarks might actually have for an ongoing federal review.

Still, the reiteration of support from the union for Cliffs will be a blow to the Japanese company, which has been seeking to win over McCall and his labor group in order to reduce the political pressure against the deal.

Read More: No Labor Agreement, No Deal: Steel Union Draws Line for Nippon

US Steel was catapulted into the spotlight in August after revealing it had rejected an offer from Cliffs and begun a strategic review. The announcement kicked off a dramatic few weeks, as the USW threw its support behind Cliffs' pugnacious CEO, while a little-known buyer startled the industry with an even larger offer, before abruptly pulling its interest days later.

Nippon's agreement to buy US Steel in December ended months of uncertainty over the future of US Steel, which had been considering bids since it rejected an offer from rival Cleveland-Cliffs in August. Nippon Steel's all-cash bid is significantly higher than the roughly $7.25 billion Cliffs offered at the time.

Read More: Steel CEO Who Fights With Goldman Takes on US Industry Icon

The union had a transferable right — which it had said it would pass on to Cliffs — to counterbid after an offer for US Steel as part of its collective bargaining agreement. And former USW President Tom Conway, who died in September, told Bloomberg News in August that the union wouldn't support any foreign bidder.

Still, after the Nippon deal was announced in December, Cliffs in a statement congratulated US Steel on the deal and wished it well with the transaction. And Goncalves at the time said Cliffs would refocus its capital allocation priorities toward more aggressive share buybacks.

Read More: Cliffs CEO Lashes Out Over Losing US Steel Deal to Nippon

Much of Goncalves's newfound confidence now comes in light of both the union support and Biden's strongly-worded statement. Goncalves said he's been in regular contact with the Biden administration.

"I'm not surprised. We have been in total contact with the administration, so I know what's going on," Goncalves said. "The contact is about making it abundantly clear between me and Dave McCall that the only buyer the union accepts for the union-represented assets is Cleveland-Cliffs."

**Bloomberg Law** ®

© 2025 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**App.100**

Nippon Steel has told investors it expects the deal to close by the second or third quarter of this year, while Bloomberg News previously reported that people familiar with the matter say a US national security review is unlikely to conclude until late this year or into 2025.

"It's just naive to believe this process will be dragging through the election," Goncalves said. "This deal is dead. What the administration is trying to do is give Japan the opportunity to retreat."

(Updates with Nippon Steel statement, starting in 10th paragraph.)

--With assistance from Josh Wingrove and Yiqin Shen.

To contact the reporter on this story:
Joe Deaux in New York at jdeaux@bloomberg.net

To contact the editors responsible for this story:
Liezel Hill at lhill30@bloomberg.net
Millie Munshi

**Bloomberg Law**®

© 2025 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# Exhibit I

m.usw.org /news/media-center/releases/2024/usw-endorses-joe-biden-for-reelection-as-president

# USW Endorses Joe Biden for Reelection as President



Mar 20, 2024

**Contact**: Jess Kamm Broomell, (412) 562-2444, jkamm@usw.org

(PITTSBURGH) – The United Steelworkers (USW) union today proudly endorsed Joe Biden for a second term as president of the United States.

"President Biden proved time and again during his first term that he stands with working families," said USW International President David McCall. "His vision and leadership allowed our nation to strengthen workers' access to collective bargaining, grow the middle class, and embark on a path to widespread prosperity."

The union's endorsement was the culmination of a months-long process that included surveying USW members regarding their top priorities. The union also sent prospective presidential candidates in both parties a detailed questionnaire to determine where each of them stands on key issues affecting working people.

"Our members told us that they value retirement security, affordable health care and labor laws that support our ability to form unions and negotiate strong contracts," said McCall. "President Biden's record on all these issues speaks for itself. He also laid out a strong plan for building on this momentum well into the future."

1/4

**App.103**

In 2021, USW members led a union-wide effort backing large-scale infrastructure investment with strong Buy American provisions.

"President Biden, through the Infrastructure Investment and Jobs Act, Inflation Reduction Act and other pro-worker legislation, is making good on his promise to create good, union jobs and healthier communities across the country," McCall said. "Our nation has long needed this sort of sweeping investment. President Biden made it happen."

McCall noted that by strategically combining these historic investments with a worker-centered trade policy that is rebuilding supply chains and supporting critical industries, President Biden is promoting domestic manufacturing and widespread prosperity, not just in the short term but well into the future.

This is in addition to the many other ways in which Biden and his administration helped advance workers' interests, McCall said.

"President Biden's leadership revitalized the Department of Labor and National Labor Relations Board so that they are once again fulfilling their mission to empower working people.

"And he consistently held firm on protecting Americans' retirement security, fending off attacks on Social Security and Medicare.

"Among the many accomplishments of Biden's American Rescue Plan was shoring up the troubled multi-employer pension plans that put more than a million workers' retirements in jeopardy through no fault of their own – including 120,000 USW members and retirees. These workers can now look to the future with optimism rather than fear."

McCall said that workers and their families need their elected officials to share their priorities.

"Workers and their families are more secure than they were four years ago, thanks to President Biden's leadership. From infrastructure to retirement security, international trade to safer workplaces, President Biden got the job done," McCall said. "We're honored to back him as he runs for reelection."

*The USW represents 850,000 workers in metals, mining, pulp and paper, rubber, chemicals, glass, auto supply and the energy-producing industries, along with a growing number of workers in health care, public sector, higher education, tech and service occupations.*

## Recent Releases / Advisories

Jan 03, 2025

### USW Commends Biden for Blocking USS-Nippon Sale

United Steelworkers (USW) International President David McCall today issued the following statement in response to President Joe Biden blocking the proposed U.S. Steel-Nippon sale:

**App.104**

Dec 03, 2024

## USW Welcomes Trump's Opposition to U.S. Steel-Nippon Deal

United Steelworkers (USW) International President David McCall today issued the following statement in response to President-elect Donald Trump reiterating his opposition to the proposed U.S. Steel-Nippon sale.

Nov 26, 2024

## Blanket Tariffs Will Hurt Workers on Both Sides of the Border: USW

United Steelworkers (USW) officials in both Canada and the United States today expressed their concern with President-elect Donald Trump's announcement that he would impose a blanket 25-percent tariff on goods from Canada imported into the United States.

Nov 22, 2024

## Logan Regional Medical Center Workers Vote to Join USW

The newly unionized workers at the 132-bed acute care facility in Logan, W. Va., include registered nurses, nursing assistants, patient care technicians, phlebotomists, pharmacy technicians, patient transporters, unit secretaries, and others.

Nov 22, 2024

## Pitt Graduate Workers Vote to Join USW

University of Pittsburgh graduate workers voted to join the United Steelworkers (USW) union.

## Press Inquiries

1.
2.
3.
4.
5.
6.
7.
8.

## Media Contacts

**Communications Director:**

Jess Kamm at 412-562-6961

**App.105**

**USW@WORK (USW magazine)**

Editor R.J. Hufnagel

**For industry specific inquiries,**

Call USW Communications at 412-562-2442

## Mailing Address

United Steelworkers
Communications Department
60 Blvd. of the Allies
Pittsburgh, PA 15222

**App.106**

# Exhibit J

www.politico.com /news/2024/03/22/bidens-us-steel-decision-highlights-deference-given-to-rust-belt-senators-steelworkers-00…

# Biden's US Steel decision highlights 'deference' given to Rust Belt senators, steelworkers

Gavin Bade ⋮ 3/22/2024



Trade

Biden's decision to oppose the sale of the iconic American firm to a Japanese rival highlights the influence that Rust Belt Democrats and their union allies continue to have in shaping major trade and industrial policy decisions.

**App.108**

Sen. Bob Casey and other Democratic Rust Belt senators have been pushing Biden toward ever-more-populist trade and economic policies. | Jim Watson/AFP via Getty Images

Earlier this month, Democratic Pennsylvania Sen. Bob Casey placed a call to the White House to deliver a warning about the proposed sale of U.S. Steel to a Japanese rival.

Casey told White House chief of staff Jeff Zients that allowing the sale of the iconic American firm would put thousands of union steel jobs at risk in his state and electoral battlegrounds across the Midwest — creating an opening for presumptive GOP presidential nominee Donald Trump. The next day, the president sided with Casey, saying it is "vital" for U.S. Steel to "remain domestically owned and operated."

The episode is just one illustration of how influential Casey and other Democratic Rust Belt senators — including Sherrod Brown of Ohio and Tammy Baldwin of Wisconsin — have been pushing Biden toward ever-more-populist trade and economic policies. Many of Biden's biggest trade policy moves have come

**App.109**

after close consultations with the three senators and their allies in organized labor — on issues including trade negotiations with Asian countries, tariff policies and the highly unusual decision to weigh in publicly on the U.S. Steel sale before a national security review is complete.

Casey wasn't the only Rust Belt Democrat backchanneling with the White House on the political risks of selling U.S. Steel to Tokyo-based Nippon Steel. Brown — a top Republican target in 2024 — had multiple conversations with White House economic adviser Lael Brainard about the potential acquisition of U.S. Steel in recent months, and even had a phone call with Biden himself on trade and industrial policy topics earlier this year, according to an official with knowledge of the calls, granted anonymity to detail confidential discussions.

The episodes reflect how intensely Democrats are focused on denting Trump's economic message with blue collar workers in Midwestern states that could determine which party controls the Senate and the White House after the 2024 election.

"For both presidential politics and Senate politics there appears to be a lot of deference to trying to figure out how to hold those states in the Democratic column," said Peter Harrell, who led the international economics team on Biden's National Security Council until late 2022.

Biden has also worked the phones with union leadership, calling the president of the powerful United Steelworkers union, David McCall, on the same day that the White House announced his opposition to the Nippon deal. On Wednesday, less than a week after the president's statement on the sale, USW announced it would endorse Biden in the 2024 election. While the administration and senators say that endorsement didn't ride on the U.S. Steel deal alone, they acknowledge the issue loomed large in recent weeks.

'The choice is clear': UAW president endorses Biden

Video Player is loading.

Current Time 0:00

/

Duration 0:27

Loaded: 35.62%

0:00

Stream Type LIVE

Remaining Time -0:27

1x

- 2x

**App.110**

- 1.75x
- 1.5x
- 1.25x
- 1x, selected
- 0.75x
- 0.5x

- Chapters

- descriptions off, selected

- captions settings, opens captions settings dialog
- captions off, selected

- en (Main), selected

This is a modal window.

Beginning of dialog window. Escape will cancel and close the window.

```
┌ Text ─────────────────────────────────────────────┐
│                                                    │
└────────────────────────────────────────────────────┘
┌ Background ───────────────────────────────────────┐
│                                                    │
└────────────────────────────────────────────────────┘
┌ Window ───────────────────────────────────────────┐
│                                                    │
└────────────────────────────────────────────────────┘

┌ Font Size ────────────────────────────────────────┐
│                                                    │
└────────────────────────────────────────────────────┘
┌ Text Edge Style ──────────────────────────────────┐
│                                                    │
└────────────────────────────────────────────────────┘
┌ Font Family ──────────────────────────────────────┐
│                                                    │
└────────────────────────────────────────────────────┘
```

End of dialog window.

This is a modal window. This modal can be closed by pressing the Escape key or activating the close button.

This is a modal window. This modal can be closed by pressing the Escape key or activating the close button.

This is a modal window.

The deal is "one of many" issues that played into the union's decision, said Brown, a longtime USW ally. "It's a pretty important one, but it's one of many."

**App.111**

Those close to Biden stress that the president has long had positive relations with organized labor, and say he likely would have scrutinized the sale of U.S. Steel even without pressure from the senators or the union. While Biden's team declined to comment on the recent calls with senators, the White House acknowledges the close coordination with lawmakers whose reelection prospects are closely intertwined with his own.

"President Biden knows that a vibrant domestic steel industry keeps our economy strong and our country safe," said White House spokesperson Robyn Patterson. "He also knows few people understand that fact better than the Democratic senators who fight for steelworkers every day."

Few lawmakers are more essential to the Democratic party's electoral prospects this year than the Midwestern trifecta of Brown, Casey and Baldwin. The party will likely have to defend their seats — plus win tough elections in Montana, Nevada and Arizona — to keep control of the Senate. And the Electoral College votes from those states — particularly Pennsylvania and Wisconsin — will also be essential for any candidate trying to win the White House.

They are also states where Trump is surging as he revives his protectionist economic message. While most Democrats acknowledge that Ohio is likely out of reach for Biden, he only trails Trump in Wisconsin and Pennsylvania by single digits, while Baldwin and Casey hold slim leads over their challengers. And the senators have not been shy about pointing out that trade issues like the U.S. Steel acquisition resonate with their voters.

"After making the point about not losing those union jobs … I also made the point that I thought the Republican nominee would make [the U.S. Steel deal] a big issue," Casey said of his call with Zients, adding that he meant both Trump and his own challenger for the Senate, likely GOP nominee David McCormick.

Casey also prevailed on Biden to start talking about "shrinkflation" on the campaign trail as he tries to show voters the administration is tackling their economic concerns, even earning a shoutout in Biden's recent State of the Union address.

Brown, Baldwin and Casey all said they support and appreciate Biden's move on U.S. Steel and his decision — after their urging — to walk away from Asia-Pacific trade negotiations last fall. Though Baldwin's state does not have any U.S. Steel facilities, she said she also believes the deal deserves serious scrutiny, and appreciates the White House's coordination with the Midwestern senate trio on trade and economic policy.

"There has been a lot of dialogue, and I think that we have done so much during this administration to bring jobs back," Baldwin said. "We don't want to do anything to lose ground."

But aides close to the senators stress that the administration has not been in lock-step with the Rust Belt lawmakers. Brown, for instance, has urged the administration in recent months to slap tariffs on steel from Mexico, while Baldwin and Casey joined with the USW president last week to call on Biden to investigate Beijing's shipbuilding subsidies, a move they hope will result in higher tariffs on Chinese ships.

## MOST READ

**App.112**

Looking ahead, the lawmakers will be watching closely to make sure Biden follows through on his announced opposition to the U.S. Steel acquisition. While Biden's statement expressed his personal desire that U.S. Steel remain domestically owned, he did not announce any policy action to block the deal, or weigh in on the ongoing national security review of the acquisition by the Committee on Foreign Investment in the U.S., a government panel led by the Treasury Department that scrutinizes foreign companies' acquisitions of major U.S. assets.

The president's open-ended statement has led to confusion in Tokyo and Washington over the nature of Biden's opposition to the deal. While any eventual decision from the foreign investment committee would have to go to Biden's desk for review, those close to the president note that Biden's opposition stems predominantly from domestic economic factors, and not national security concerns. That's left even the Rust Belt senators guessing on what will come next, and they don't expect a resolution any time soon.

"CFIUS will take a while," Casey said. "I'm hoping there are some other steps we can take, but I don't think there's anything immediate."

## Playbook

The unofficial guide to official Washington, every morning and weekday afternoons.

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Loading



You will now start receiving email updates



You are already subscribed



Something went wrong

! Please make sure that the email address you typed in is valid

* All fields must be completed to subscribe.

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

**App.113**

**App.114**

# Exhibit K

www.nytimes.com /2024/05/03/us/politics/us-steel-nippon-steel-biden-cfius.html

# Furor Over U.S. Steel Bid Puts Secretive Government Panel In Spotlight

Alan Rappeport ⋮ 5/3/2024



SKIP ADVERTISEMENT

At a campaign event last month in Pennsylvania, the heartland of American steel manufacturing, President Biden made clear that he does not want the proposed takeover of U.S. Steel by Japan's Nippon Steel to happen.

"We're finally making sure that United States Steel stays United States Steel," Mr. Biden said. "It's not going to be anybody else's steel."

How that promise will be kept has yet to be determined. U.S. Steel said this week in its first-quarter earnings release that it expected the acquisition to be completed in the second half of this year, but noted that timing depended on getting regulatory approvals.

On Friday, Nippon Steel said it was delaying its timeline for the deal to close, from the middle of the year to the end of 2024, because it had been asked to provide more information about the transaction to the Department of Justice, which is reviewing the deal.

SKIP ADVERTISEMENT

1/5

**App.116**

The intensifying scrutiny of the acquisition has raised expectations that the $15 billion buyout could ultimately be scuttled by the Biden administration. It has also called attention to the secretive interagency panel that could be the ultimate arbiter of the merger: the Committee on Foreign Investment in the United States.

With a presidential election six months away and opposition to the deal strong among union members and some Senate Democrats, the opaque committee is facing pressure to conclude that a deal involving a company of a top American ally threatens national security.

The committee, known as CFIUS, was created in the 1970s to screen international mergers and acquisitions for national security concerns. Over the years the definition of national security has broadened, and in many cases the work of the panel has been consumed by political considerations, often with a focus on keeping Chinese investments out of America.

But scrutiny of Nippon's bid for U.S. Steel is unlike recent transactions involving companies such as China's ByteDance or Singapore's Broadcom, which President Donald J. Trump blocked from acquiring the American chipmaker Qualcomm in 2018.

SKIP ADVERTISEMENT

Instead, it appears to be the 1980s all over again — when anxiety over trade with Japan ran high.

In 1983 the threat of a CFIUS intervention caused another metals merger involving the same Nippon Steel Corporation to unravel. At that time, Nippon wanted to acquire the specialty metals unit of the Pittsburgh-based Allegheny International. The U.S. metals business was struggling because of the slumping airline industry, which was one of its major markets, and Nippon was interested in gaining a foothold and a factory in the United States.

Image

**App.117**



The Biden administration has made supply chain resiliency a priority since the pandemic.Credit...Gene J. Puskar/Associated Press

The Reagan administration had other ideas, however, and at the request of the Department of Defense, the transaction was reviewed by CFIUS. The Pentagon was concerned that the Allegheny unit's technology could make its way to the Soviet Union, and classified the metal that the U.S. firm produced as critical to national security on the basis it was used to make military aircraft. Faced with that complication, Nippon reluctantly withdrew its offer.

"In 1983 there was a real bona fide concern of technology leakage to the former Soviet Union," said Mario Mancuso, who leads the international trade and national security practice at the law firm Kirkland & Ellis.

Mr. Mancuso noted that the situation 40 years ago differed significantly from the current case because it was hard to argue that the Nippon Steel bid could somehow benefit an adversary like Russia or China.

"Now, no one is alleging that U.S. Steel technology is going to China, because U.S. Steel and Nippon want to compete against China," he said.

SKIP ADVERTISEMENT

The investment review panel was established in 1975 through an executive order by President Gerald R. Ford amid concerns about investments that members of the Organization of the Petroleum Exporting Countries were making in American portfolio assets, according to the Congressional Research Service.

The purview of CFIUS, which is led by the Treasury secretary and made up of officials from federal agencies, has broadened in scope in recent decades along with what the United States considers a threat to national

3/5

**App.118**

security. Today, technology such as semiconductors and quantum computing are considered matters of national security, a departure from the early days when the concerns stemmed mostly from access to American innovations that could be used to build traditional military equipment such as tanks and planes.

Over the years, the powers of CFIUS and the types of transactions that it can review have been expanded by Congress as political crosswinds changed course or intensified.

Following a political firestorm in 2006 after a state-owned Dubai company, DP World, sought to manage some terminal operations at six American ports, Congress intervened to deter the deal. It also moved to impose greater transparency on CFIUS and ensure that it was screening international transactions rigorously.

Image



During a news conference last week, Treasury Secretary Janet L. Yellen declined to confirm whether Cfius was reviewing the U.S. Steel deal.Credit...Alex Wong/Getty Images

SKIP ADVERTISEMENT

In 2018, amid concern about Chinese investments, Congress passed legislation that gave the committee more time to scrutinize transactions and the authority to review land purchases near military installations.

By 2022, CFIUS reviewed more than 400 transactions and 20 were abandoned after the committee raised national security concerns that could not be mitigated, according to the panel's most recent report to Congress. For cases that require a full investigation, the committee makes a recommendation to the president, who has the final say about whether a transaction should be blocked on national security grounds.

**App.119**

The U.S. Steel acquisition will be particularly thorny because Japan is a close ally — Mr. Biden hosted its prime minister, Fumio Kishida, for a formal state dinner last month.

However, the Biden administration has made supply chain resiliency a priority since the pandemic, when shortages of products like semiconductors revealed America's dependency on foreign sources for critical materials. The committee could argue that there are national security concerns related to any loss of U.S. control over domestic steel supplies. The committee could also try to require Nippon to agree to safeguards that would protect American jobs and ensure a sufficient level of steel supplies are available.

During a news conference last week, Treasury Secretary Janet L. Yellen declined to confirm whether CFIUS was reviewing the U.S. Steel deal, noting the confidentiality of its work. However, she acknowledged the concerns about the company's ownership.

SKIP ADVERTISEMENT

"I certainly accept the president's view, which he has stated, that the company should remain in American hands," Ms. Yellen said. "He hasn't said specifically that it's an issue of national security, but one that has to do with the good of the workers and the country."

After Mr. Biden's comments in April, Nippon Steel released a statement pushing back against suggestions that the deal posed a threat. The company promised that jobs would be protected and that it planned to invest in Pennsylvania.

"There will be no plant closures, and production and jobs will remain in America," the company said.

The timing of the outcome remains an open question. It could depend on whether Nippon wants to see the process through and if Mr. Biden wants to take action to ensure that U.S. Steel remains an American company before the election.

To some experts, the possibility that such a deal, involving a close American ally, could unravel is a case of politics eclipsing policy.

"It's an election year and the notion of a foreign company buying an iconic brand in the U.S. in a swing state just invites a kneejerk political response," said John Kabealo, a Washington-based lawyer who specializes in cross-border transactions.

The comments section is closed. To submit a letter to the editor for publication, write to letters@nytimes.com.
Get the full Times experience.

You're currently a news-only subscriber. Upgrade to enjoy all of The Times.

Upgrade nowCancel anytime.

5/5

**App.120**

# Exhibit L

# Milbank



July 12, 2024


<u>**VIA EMAIL**</u>
<u>**CONFIDENTIAL TREATMENT REQUESTED**</u>

Jonathan Kanter
Assistant Attorney General
U.S. Department of Justice
Antitrust Division
450 5th St. NW, Suite 8700
Washington, DC 20530

Dear Assistant Attorney General Kanter:

We represent Nippon Steel Corporation (together with its subsidiary Nippon Steel North America Inc., "NSC") and the United States Steel Corporation ("U. S. Steel"). As you are aware, on December 18, 2023, NSC and U. S. Steel entered into a merger agreement pursuant to which NSC agreed to acquire U. S. Steel (the "Transaction"), subject to customary closing conditions, including approval by the Antitrust Division of the U.S. Department of Justice (the "Division"). Given the advanced technology and innovation NSC brings to this Transaction, it is certain to enhance U. S. Steel's competitiveness in the U.S. and North American steel markets and provide much needed competition against dominant U.S. steel suppliers such as Cleveland-Cliffs Inc. ("Cleveland-Cliffs").

While the Transaction has been under regulatory review, Cleveland-Cliffs—an unsuccessful bidder for U. S. Steel—has mounted a vocal public campaign and engaged in extensive anticompetitive conduct aimed at preventing the Transaction from closing. Cleveland-Cliffs and its Chairman, President, and Chief Executive Officer, Lourenco Goncalves, have freely admitted that this is their goal, declaring that they plan to scoop up U. S. Steel on the cheap once they have succeeded in tanking the Transaction. Less appreciated is Cleveland-Cliffs' motive in attacking the Transaction—to monopolize, or maintain its existing monopoly, in certain key steel markets by thwarting the competitive threat that the Transaction poses. Cleveland-Cliffs' anticompetitive practices have harmed, and threaten further harm to, American consumers.

Over the past decade, Cleveland-Cliffs has gained its monopoly position—not through superior products, innovation, or business acumen—but through competitor acquisitions and market consolidation. For years, Cleveland-Cliffs has abused its dominance by engaging in practices designed to artificially inflate prices in several key domestic markets—most notably, steel used in

**App.122**

July 12, 2024

exposed parts for automotive applications ("exposed automotive steel") and electrical steel—such that it now monopolizes or is attempting to monopolize those markets. CEO Goncalves has even boasted about Cleveland-Cliffs' deliberate strategy to limit the supply of key steel products for the purpose of increasing prices for American consumers, telling Cleveland-Cliffs' stockholders: "[T]hat's why we push prices up. We go until we can't go no more."[1] As it happens, these are markets in which the Transaction poses the greatest competitive threat to Cleveland-Cliffs' dominance. Cleveland-Cliffs' conduct is not only exclusionary and unlawful, it also threatens significant harm to American consumers.[2] As the Alliance for Automotive Innovation warned, a successful campaign by Cleveland-Cliffs to acquire U. S. Steel will drive up automobile prices and stifle innovation and competition in U.S. steel markets.[3]

Cleveland-Cliffs' attack on this competitive threat has taken two forms. First, as detailed in our prior correspondence of April 12, 2024, Cleveland-Cliffs initially tried to acquire U. S. Steel to prevent it from merging with a competitor. Second, having lost a competitive auction for U. S. Steel to NSC, CEO Goncalves and Cleveland-Cliffs then worked publicly and privately to derail the Transaction and preserve Cleveland-Cliffs' monopolies, principally by manipulating the United Steelworkers ("USW") into agreeing to oppose any deal involving U. S. Steel other than a sale to Cleveland-Cliffs—an unusual exclusionary practice that enjoys none of the protections of the *Noerr-Pennington* doctrine. Cleveland-Cliffs has also misled the markets and the public at large about the viability and benefits of the Transaction; lied to NSC and U. S. Steel to attempt to cause them to breach their merger agreement; and generally sowed confusion, uncertainty, and xenophobia in the marketplace.[4] These practices continue to this day.

Accordingly, we are writing to alert the Division to the serious anticompetitive behavior of Cleveland-Cliffs' campaign in clear violation of applicable antitrust laws. We strongly believe that the Division should promptly commence an investigation, and in doing so, it will readily conclude that Cleveland-Cliffs in fact has engaged in exclusionary practices aimed at maintaining supracompetitive pricing in markets it now monopolizes or seeks to monopolize, in violation of Section 2 of the Sherman Act. These practices deserve serious attention by the Division lest they

---

[1]    FULL-YEAR AND FOURTH QUARTER 2023 EARNINGS CONFERENCE CALL, https://www.clevelandcliffs.com/investors/news-events/ir-calendar/detail/11715/full-year-and-fourth-quarter-2023-earnings-conference-call (last visited May 7, 2024).
[2] *See U.S. v. Griffith*, 334 U.S. 100, 107 (1948) ("[T]he use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.").
[3] *See* Letter from John Bozzella, Alliance for Automotive Innovation President and CEO, to Amy Klobuchar, U.S. Senator, Mike Lee, U.S. Senator, Thomas Massie, U.S. Representative, and Luis Correa, U.S. Representative (Oct. 31, 2023), https://www.autosinnovate.org/posts/letters/Auto%20Innovators%20Letter%20to%20Congress%20on%20Cleveland-Cliffs%20U.S.%20Steel%20October%202023.pdf.
[4] As we previously advised you in our April 12 correspondence, CEO Goncalves represented to one of U. S. Steel's largest investors that he is calling the shots on the U.S. Government's review of the Transaction.

- 3 -                                    July 12, 2024

succeed in thwarting a pro-competitive deal and further entrenching Cleveland-Cliffs' monopoly positions in these key markets.

*** 

## I.    Legal Standards

Section 2 of the Sherman Act makes it illegal to acquire or maintain monopoly power through improper means.[5]  Unlawful monopolization under Section 2 of the Sherman Act is present when: (i) the monopolist possesses a monopoly power in the relevant market and (ii) the monopolist willfully acquires or maintains that power, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[6]  "Monopoly power includes 'the power to control prices or exclude competition.'"[7]  "The pertinent inquiry in a monopolization claim, then, is whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power."[8]  Section 2 of the Sherman Act also prohibits attempted monopolization, which occurs when an entity (i) "'has engaged in predatory or anticompetitive conduct with'" (ii) "'a specific intent to monopolize,'" and with (iii) "'a dangerous probability of achieving monopoly power.'"[9]  Entities can be liable for attempted monopolization even where they already possess a monopoly.[10]

As detailed below, there is clear and compelling evidence that Cleveland-Cliffs (i) already possesses or is attempting to possess monopoly power in certain key domestic steel markets and (ii) has engaged—and continues to engage—in intentional, anticompetitive, and exclusionary conduct to preserve its monopoly power or obtain such power.

## II.    Cleveland-Cliffs Monopolizes Several Domestic Steel Markets

Over the past five years, Cleveland-Cliffs, through a series of acquisitions, has significantly expanded its North American footprint.  In 2020 alone, Cleveland-Cliffs completed acquisitions of

---

[5] 15 U.S.C. § 2.
[6] *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 997 F. Supp. 2d 142, 151 (D.R.I. 2014).
[7] *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 378 (S.D.N.Y. 2022) (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002)).
[8] *Id.* at 379 (quoting *PepsiCo, Inc.*, 315 F.3d at 108) (holding that the use of business practices and business knowledge to maintain or attempt to maintain a monopoly can be impermissible, anticompetitive conduct); *see also In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700 (E.D. Pa. 2007) (finding that mushroom producers' alleged intentional efforts to limit mushroom production to keep mushroom prices artificially high was sufficient to state a claim for monopolization); *Steward Health Care Sys., LLC,* 997 F. Supp. 2d at 156-57 (holding that a private business's "right to deal" is not unlimited; where a private business refuses to deal with a competitor with the intent to create or maintain a monopoly, such anticompetitive conduct is not permitted).
[9] *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d at 700 (quoting *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir.1998)) (holding that an alleged campaign to control regional and national supply of mushrooms was sufficient to state a claim for attempted monopolization).
[10] *Id.* at 701.

**App.124**

- 4 -                                                                July 12, 2024

AK Steel and ArcelorMittal USA.[11]  While these acquisitions received U.S. antitrust regulatory approval under prior administrations,[12] they ultimately enabled Cleveland-Cliffs to become the largest flat-rolled steel producer in North America and bolster its dominant position in numerous domestic steel markets.[13]  These acquisitions have also given Cleveland-Cliffs control over materially more union-organized steel operations, and thus more leverage over the USW.

In addition to pursuing market dominance through acquisitions, a court has found facts sufficient to conclude that Cleveland-Cliffs also engaged in classic, anticompetitive conduct designed to stifle its competitors.  For example, in an adversary proceeding in U.S. Bankruptcy Court, Mesabi Metallics Company LLC ("Mesabi") accused Cleveland-Cliffs of: (i) manipulating Mesabi's workers and suppliers to stop working on Mesabi projects; (ii) acquiring land around Mesabi's projects for the sole purpose of delaying Mesabi's projects; and (iii) conducting back-channel negotiations with a government entity.[14]  The court concluded during a preliminary injunction hearing that there were facts in the record that could "support a determination . . . that Mesabi's rights under federal antitrust law" had been violated by Cleveland-Cliffs' conduct.[15]

At present, Cleveland-Cliffs monopolizes or is attempting to monopolize domestic markets for (i) exposed automotive steel and (ii) electrical steel.

---

[11] Press Release, Cleveland-Cliffs Inc., Cleveland-Cliffs Completes Acquisition of AK Steel (Mar. 13, 2020), https://www.clevelandcliffs.com/news/news-releases/detail/35/cleveland-cliffs-completes-acquisition-of-ak-steel; Press Release, Cleveland-Cliffs Inc., Cleveland-Cliffs Inc. Completes Acquisition of ArcelorMittal USA (Dec. 9, 2020) https://www.clevelandcliffs.com/news/news-releases/detail/8/cleveland-cliffs-inc-completes-acquisition-of; *see also* Press Release, Cleveland-Cliffs Inc., Cleveland-Cliffs Completes Acquisition of Ferrous Processing and Trading Company (Nov. 18, 2021) https://www.clevelandcliffs.com/investors/news-events/press-releases/detail/538/cleveland-cliffs-completes-acquisition-of-ferrous#:~:text=Cleveland%2DCliffs%20Completes%20Acquisition%20of%20Ferrous%20Processing%20and%20Trading%20Company,-November%2018%2C%202021&text=CLEVELAND%2D%2D(BUSINESS%20WIRE)%2D%2D,entities%20(%E2%80%9CFPT%E2%80%9D).

[12] Press Release, Cleveland-Cliffs Inc., Cleveland-Cliffs and AK Steel Receive Final Required Regulatory Approvals to Complete Acquisition (Feb. 21, 2020) https://www.clevelandcliffs.com/investors/news-events/press-releases/detail/42/cleveland-cliffs-and-ak-steel-receive-final-required; Press Release, Cleveland-Cliffs Inc., Cleveland-Cliffs Receives Antitrust Clearance from US Department of Justice for the Acquisition of ArcelorMittal USA (Nov. 25, 2020) https://www.clevelandcliffs.com/news/news-releases/detail/9/cleveland-cliffs-receives-antitrust-clearance-from-us.

[13] Press Release, Cleveland Cliffs Inc., Cleveland-Cliffs Inc. Completes Acquisition of ArcelorMittal USA (Dec. 9, 2020) https://www.clevelandcliffs.com/news/news-releases/detail/8/cleveland-cliffs-inc-completes-acquisition-of.

[14] Plaintiffs' Motion for a Preliminary Injunction to Enjoin Defendants from Executing State Leases, *Mesabi Metallics Co. LLC v. Cleveland-Cliffs Inc.*, No. 17-51210-CTG (Bankr. D. Del. May 12, 2023), ECF No. 715 (sealed); *see also* Plaintiffs' Motion for a Preliminary Injunction to Enjoin Defendants from Executing State Leases, *Mesabi Metallics Co. LLC v. Cleveland-Cliffs Inc.*, No. 17-51210-CTG (Bankr. D. Del. June 1, 2024), ECF No. 744 (redacted version of the sealed, May 12, 2023 motion).

[15] Transcript of Oral Argument at 182, *Mesabi Metallics Co. LLC v. Cleveland-Cliffs Inc.*, No. 17-51210-CTG (Bankr. D. Del. May 25, 2023), ECF No. 739.

- 5 -                                              July 12, 2024

***Exposed Automotive Steel.***   With a market share estimated to be approximately 50%, Cleveland-Cliffs dominates the exposed automotive steel market.[16]  Cleveland-Cliffs advertises itself as "the largest supplier of steel to the automotive industry in North America."[17]  Cleveland-Cliffs attributes its pricing power to reducing supply, or "supply discipline."  As CEO Goncalves said on a 2022 earnings call: "[Could we sell[] more tonnage?  Absolutely, but we'll be selling more tonnage for lower prices. . . .  So, tonnage is not the answer; the answer is profitability. . . .  That's what we're doing at Cleveland-Cliffs."[18]  CEO Goncalves has also explained that through a string of acquisitions, Cleveland Cliffs has become the only supplier of certain exposed automotive products, boasting: "we're the only ones—only ones—supplying exposed parts."[19]

***Electrical Steel.***   Cleveland-Cliffs is "the only U.S. producer" of domestic electrical steel.[20]  This electrical steel is used in the manufacturing of motors for electrical vehicles.  In a February 2023 earnings call, CEO Goncalves highlighted Cleveland-Cliffs' "unprecedented price increases" for electrical steel.[21]  Moreover, Cleveland-Cliffs' electrical steel production plants are inadequate to meet the enormous demand for electrical steel.  The resulting supply shortage reinforces Cleveland-Cliffs' ability to charge more for its product than customers would pay in a competitive market.  As CEO Goncalves told stockholders: "[T]hat's why we push prices up.  We go until we can't go no more."[22]  Despite acknowledging the inevitability of a surge in demand for electrical steel, Cleveland-Cliffs has stated it does not "have any intentions to . . . grow [its] footprint."[23]  As a result of

---

[16] In 2023 Cleveland-Cliffs generated over $7.4 billion through its automotive steelmaking business.  *See* Cleveland-Cliffs Inc., Annual Report (Form 10-K) (Feb. 8, 2024).

[17] Press Release, Cleveland-Cliffs Inc., Cleveland-Cliffs to Publish Monthly Hot Rolled Coil Spot Price (Apr. 26, 2024), https://www.clevelandcliffs.com/news/news-releases/detail/636/cleveland-cliffs-to-publish-monthly-hot-rolled-coil-spot#:~:text=Cleveland%2DCliffs%20is%20the%20largest%20supplier%20of%20steel%20to%20the,of%20flat%2Drolled%20steel%20products.

[18] First Quarter 2022 Earnings Conference Call, https://www.clevelandcliffs.com/investors/news-events/press-releases/detail/547/cleveland-cliffs-reports-first-quarter-2022-

results#:~:text=First%2Dquarter%202022%20consolidated%20revenues,or%20%241.50%20per%20diluted%20share.

[19] Third Quarter 2022 Earnings Conference Call, https://www.clevelandcliffs.com/investors/news-events/ir-calendar/detail/11339/third-quarter-2022-earnings-conference-call (last visited May 7, 2024) ("In the past" there were several competitors, CEO Goncalves has said, but, after a string of acquisitions and market exits, "[t]hey are all Cleveland-Cliffs, now.  So, car manufactures [*sic*] know that.  And that's a very important part of our negotiation.").

[20] Electrical steel can come in two forms: grain oriented electrical steel ("GOES") and non-grain oriented electrical steel ("NOES").  NOES is isotropic—that is, its magnetic properties are uniform in all directions.  It is used in applications where the direction of magnetic flux is changing, such as electric motors, generators, and high-frequency converters.  GOES, by contrast, is tailored to have optimal magnetic properties in a particular direction.  It is more expensive to produce but is more efficient in static equipment, including the cores of power and distribution transformers.  American Steel Products, Cleveland-Cliffs Inc., https://www.clevelandcliffs.com/products (last visited May 8, 2024); Cleveland-Cliffs Inc., Quarterly Report (Form 10-Q) (July 26, 2023).

[21] Full-Year and Fourth Quarter 2022 Earnings Conference Call, https://www.clevelandcliffs.com/investors/news-events/ir-calendar/detail/11471/full-year-and-fourth-quarter-2022-earnings-conference-call (last accessed May 7, 2023).

[22] Full-Year and Fourth Quarter 2023 Earnings Conference Call, https://www.clevelandcliffs.com/investors/news-events/ir-calendar/detail/11715/full-year-and-fourth-quarter-2023-earnings-conference-call (last visited May 7, 2024).

[23] Second Quarter 2022 Earnings Conference Call, https://www.clevelandcliffs.com/investors/news-events/ir-calendar/detail/11295/second-quarter-2022-earnings-conference-call (last visited May 7, 2024).

- 6 -                                        July 12, 2024

Cleveland-Cliffs' "supply discipline" practices, American businesses are faced with the threat of dependence on imports, which may carry its own geopolitical risks, to meet increasing domestic demand.

**III.**     **Cleveland-Cliffs Has Engaged in an Unlawful Campaign to Block the Transaction to Eliminate the Competitive Threat Posed by a Strengthened U. S. Steel and Preserve its Monopoly Power**

The Transaction promises enhanced competition to Cleveland-Cliffs in each of these markets. In addition to establishing U. S. Steel as a more viable competitor with the strong financial backing of NSC, the Transaction will enable NSC to contribute advanced production technology and know-how to U. S. Steel. NSC will bring advanced technologies for auto and electrical steel production and "green steelmaking," including its hydrogen injection technology for blast furnaces, into the United States, advancing the United States' clean energy objectives, helping to meet the growing customer demand for environmentally friendly steel, and reducing the emissions to which workers and nearby communities can be exposed. As regulations require U.S. automakers to use increasingly greener steel, NSC's technology will benefit millions of American car buyers each year. In addition to technology, NSC brings the necessary capital to invest in domestic production capacity and to meet surging demand. NSC has committed to make no less than $1.4 billion in capital expenditures from 2024 to 2026 at USW-represented facilities alone. That is in addition to the $1 billion commitment that U. S. Steel has already made under its agreement with the USW. U. S. Steel is the only potential threat to Cleveland-Cliffs' monopoly on electrical steel and its ability to compete will only be enhanced by the NSC transaction.[24] Confronted with these threats, Cleveland-Cliffs has used every weapon in its arsenal to try to derail the Transaction and preserve its monopoly power.

*Cleveland-Cliffs' Manipulation of Labor and the USW.* In July 2023, Cleveland-Cliffs made an unsolicited bid to acquire U. S. Steel in a cash and stock offer valued at $35 per share. In an attempt to force U. S. Steel's hand, Cleveland-Cliffs simultaneously secured the USW's "right-to-bid" on the transaction under the collective bargaining agreement between U. S. Steel and the USW, which permits the USW to submit an offer in connection with a sale of U. S. Steel (the "Right-to-Bid Agreement"). We understand that, under the Right-to-Bid Agreement, the USW not only agreed to support an acquisition of U. S. Steel by Cleveland-Cliffs but also to oppose any other acquisition.[25] There would be no legitimate economic purpose to this agreement once, as set out below, U. S. Steel agreed to a merger with NSC, finding its offer superior to the Cleveland-Cliffs bid. But Cleveland-Cliffs is using its sway over the USW as one of its biggest employers to get them to continue to

---

[24] On October 12, 2023, U. S. Steel cut the ribbon on its new NOES production line at Big River Steel in Arkansas. The new line has an annual capacity of 200,000 tons and represents one of the only challenges to Cleveland-Cliffs' NOES monopoly in North America through 2030. *U. S. Steel Celebrates Launch of New Electrical Steel Line with Ribbon Cutting in Osceola, Arkansas*, UNITED STATES STEEL (Oct. 12, 2023, 3:59 PM), https://investors.ussteel.com/news-events/news-releases/detail/648/u-s-steel-celebrates-launch-of-new-electrical-steel-line.

[25] Cleveland-Cliffs shared its agreement with the USW with U. S. Steel on August 5, 2023 and publicly announced the agreement on August 17. Press Release, Cleveland-Cliffs Inc., Cleveland-Cliffs Receives Exclusive Agreement of Right to Bid from United Steelworkers (Aug. 17, 2023), https://www.clevelandcliffs.com/news/news-releases/detail/601/cleveland-cliffs-receives-exclusive-assignment-of-right-to.

support Cleveland-Cliffs and oppose U. S. Steel's acquisition by NSC. Indeed, when counsel for NSC pressed counsel for the USW on whether the USW was contractually obligated to oppose the NSC-U. S. Steel merger, counsel for the USW refused to respond.

In August 2023, Cleveland-Cliffs went public with its takeover campaign, undertaking a course of conduct designed to deceive U. S. Steel shareholders, other potential bidders, and the public at large into believing that the only possible acquirer of U. S. Steel was Cleveland-Cliffs. Cleveland-Cliffs relied on misinformation to spread its message. For example, on August 14, 2023, in an appearance on CNBC, CEO Goncalves falsely promised with "certainty" that Cleveland-Cliffs' proposed deal would close and that the USW could "unilaterally" prevent any other deal from closing.[26]

Ultimately, on December 17, 2023, the U. S. Steel Board of Directors unanimously approved an agreement for U. S. Steel to be acquired by NSC in which NSC would acquire all of the outstanding shares of U. S. Steel's common stock for $55 per share in cash—representing a superior offer for the company relative to all other offers, including Cleveland-Cliffs'. Among other reasons, the Board found the NSC deal superior because it did not present the significant antitrust issues raised by a Cleveland-Cliffs deal for which Cleveland-Cliffs refused to give adequate assurances that it would agree to the remedies that likely would be required to clear the transaction.

***Cleveland-Cliffs' Campaign to Block the Transaction.*** Since losing the auction for U. S. Steel, and now facing an even greater competitive threat to its monopolies given NSC's financial strength and technological sophistication, Cleveland-Cliffs has engaged in a continuous and multi-faceted campaign to derail the Transaction. Cleveland-Cliffs has locked arms with the USW in its efforts to obstruct the Transaction; lied to USW members, American steelworkers, and the public at large; attempted to improperly induce NSC to abandon the Transaction in breach of its contract with U. S. Steel; and, more generally, attempted to cloud the Transaction in uncertainty in the marketplace and among the public at large. Each of these efforts is directed towards excluding NSC—along with its superior technology and deep capital reserves—from the domestic steel markets and to eliminating the competitive threat represented by a strengthened U. S. Steel.

Cleveland-Cliffs' attack on the Transaction began the day it was announced. On December 18, 2023, CEO Goncalves appeared on CNBC and invoked anti-foreign sentiment while claiming that the Transaction would cost American steelworkers their jobs, stating: "We can't allow foreign ownership. We can't allow for a foreign company to come to just liquidate American jobs and take over what we have here."[27] CEO Goncalves' suggestion that the Transaction would destroy jobs was false. NSC has repeatedly and publicly confirmed that it does not intend to close steel manufacturing facilities in the United States and that it will not shift American jobs overseas. To the contrary, through the Transaction, NSC will introduce new technologies to U. S. Steel and invest in U. S. Steel

---

[26] CNBC, *Watch CNBC's Full Interview with Cleveland-Cliffs CEO Lourenco Goncalves on U.S. Steel Offer*, CNBC (Aug. 14, 2023), https://www.cnbc.com/video/2023/08/14/watch-cnbcs-full-interview-with-cleveland-cliffs-ceo-lourenco-goncalves-on-us-steel-offer.html.
[27] Closing Bell: Overtime, *MicroStrategy's Saylor on Bitcoin Surge; Masimo CEO on Apple Patent Dispute*, CNBC, at 13:28 (Dec. 18, 2023), https://podcasts.apple.com/us/podcast/closing-bell/id162281974?i=1000639001389.

facilities, which, in turn, will increase America's competitiveness both in the steel industry and in those industries that rely upon it, and reduce dependence on unreliable alternatives, such as Chinese steel products.

Since then, CEO Goncalves has repeated this falsehood and many more to attempt to cause the Transaction to fail. Many of these false statements have been specifically designed to mislead U. S. Steel investors into opposing the Transaction, as detailed in our April 12 letter, and to stoke USW opposition to the Transaction. For example, on a January 30, 2024 earnings call, CEO Goncalves falsely claimed that U. S. Steel, through the Transaction, was trying to "break the back of the United Steelworkers."[28] On that call, he again invoked anti-foreign sentiment, stating: "[W]e could not deliver the superior value to the U. S. Steel stockholders because the U. S. Steel board stood in the way and was hell bent to sell to a foreign entity."[29] Then, on February 2, 2024, CEO Goncalves's son, Celso Goncalves, the CFO of Cleveland-Cliffs, falsely claimed during a public webinar hosted by investment bank Raymond James that NSC planned to shut down U. S. Steel's unionized mills and shift work to non-union mills (despite the repeated public commitments NSC has made to the contrary).[30] CFO Goncalves also stated: "There's nothing that [NSC] can do that's gonna bring the [USW] on their side. Nothing."[31] He continued: "[T]hese people know what happens when you allow foreign buyers to come in . . . even if they sweet talk you in the beginning, they always let you down. They always end up shutting down production."[32] And on March 19, in another appearance on CNBC, CEO Goncalves discussed his coordination with the USW and all but admitted that Cleveland-Cliffs was leveraging the Right-to-Bid Agreement to block the Transaction, stating: "I have full conviction that this deal between Nippon Steel and the Union will never happen. We have an agreement with the USW. We have the right to bid on their behalf. . . . [W]e are going to prevail."[33]

And, in addition to its efforts to mislead U. S. Steel investors and union workers and manufacture USW opposition to the Transaction, Cleveland-Cliffs has also tried to induce NSC to abandon the Transaction, again presenting itself as having outsized influence with the U.S. government. On February 3, a banker in Japan acting on behalf of Cleveland-Cliffs contacted NSC to try to organize a call between CEO Goncalves and NSC senior management. On that call, Cleveland-Cliffs' banker claimed that CEO Goncalves had inside information into the White House's views regarding the Transaction and that the White House would act to block it unless NSC engaged with Cleveland-Cliffs to agree to a different deal to carve up U. S. Steel (which, according to CEO Goncalves, the White House would in turn support). And again, on February 12, CEO Goncalves

---

[28] FULL-YEAR AND FOURTH QUARTER 2023 EARNINGS CONFERENCE CALL, https://www.clevelandcliffs.com/investors/news-events/ir-calendar/detail/11715/full-year-and-fourth-quarter-2023-earnings-conference-call (last visited May 7, 2024).

[29] *Id.*

[30] Enclosure 1 at 00012, *Raymond James Webinar with Celso Goncalves of Cleveland-Cliffs* (broadcast Feb. 2, 2024) (transcript provided). All documents cited in this letter are publicly available, except the transcript of the Raymond James webinar, which is attached to this letter as Enclosure 1.

[31] *Id.* at 00007.

[32] *Id.*

[33] CNBC Television, *Cleveland-Cliffs CEO: Have Full Conviction a Nippon Steel-USW Deal 'Will Never Happen,'* YOUTUBE (Mar. 19, 2024), https://www.youtube.com/watch?v=IltyeT9AIqQ.

himself contacted an NSC banker and claimed that it was a "fact" that the United States government will block the Transaction "on national security grounds." During the call, CEO Goncalves proposed an alternative deal in which NSC and Cleveland-Cliffs would carve up U. S. Steel and claimed that he had the Government's support for the alternative deal.

Cleveland-Cliffs' efforts to thwart the Transaction extend far beyond the kind of ordinary lobbying activity that would be protected by the *Noerr-Pennington* doctrine. To be sure, Cleveland-Cliffs clearly has been a vocal critic of the Transaction in Washington and has been aggressively soliciting opposition to the deal by elected representatives. Although NSC and U. S. Steel strongly disagree with the substantive criticisms Cleveland-Cliffs has advanced, NSC and U. S. Steel take no issue with Cleveland-Cliffs' right to engage with their elected representatives. But what Cleveland-Cliffs has done goes much further, ranging from spreading lies and disinformation about the Transaction to trying to induce NSC to abandon it. Indeed, Cleveland-Cliffs has even gone so far as to procure the agreement of the USW to block any transaction other than one that favors Cleveland-Cliffs and has paraded that agreement to all relevant stakeholders with the goal of thwarting any possible competition to its monopoly position. Cleveland-Cliffs has done that even though there is no legitimate economic basis for Cleveland-Cliffs to hold the union to that agreement now that NSC's bid has been chosen as the superior bid and Cleveland-Cliffs has made clear that it will not seek to top it (on the contrary, it is waiting for the deal to fall apart so that it can acquire U. S. Steel for a significantly lower price[34]). Cleveland-Cliffs' wide-ranging misconduct in no way implicates the right to advocate before elected representatives and is instead part of a multi-faceted campaign to stifle competition that plainly violates Section 2's prohibition on exclusionary practices designed to obtain or maintain a monopoly.

*        *        *

In sum, Cleveland-Cliffs has monopolized several key domestic steel markets—or is attempting to do so—in order to exclude the competition, including by trying to torpedo a Transaction that promises to promote competition in the steel industry and drive down prices for American consumers that Cleveland-Cliffs has intentionally and artificially inflated. This pattern of misconduct and unlawful business practices constitutes a violation of Section 2 of the Sherman Act.[35] The

---

[34] CEO Goncalves has recently re-confirmed his intent to acquire U. S. Steel at a significantly lower price than NSC agreed to pay if his and Cleveland-Cliffs' campaign to undermine the Transaction is successful, stating that "30 bucks is a very good offer." Anirban Sen, *Cleveland-Cliffs CEO Mulls much Lower Bid for US Steel if Nippon Deal Falls Apart*, REUTERS, Mar. 15, 2024, https://www.reuters.com/markets/commodities/cleveland-cliffs-ceo-mulls-much-lower-bid-us-steel-if-nippon-deal-falls-apart-2024-03-15/; Guillermo Molero & James Attwood, *Cliffs CEO Still Keen on US Steel as Doubts Linger on Nippon Deal*, BLOOMBERG, Apr. 25, 2025, https://www.bloomberg.com/news/articles/2024-04-25/cliffs-ceo-still-keen-on-us-steel-as-doubts-linger-on-nippon-steel-s-deal. And as his son, CFO Goncalves, reiterated on the April 23, 2024 earnings call: "The valuation reset lower is far from over. We will have to reassess everything, including value, once we have the chance to reengage in M&A due diligence, as everything we saw last year is now stale." FIRST QUARTER 2024 EARNINGS CONFERENCE CALL, https://www.clevelandcliffs.com/investors/news-events/ir-calendar/detail/11742/first-quarter-2024-earnings-conference-call (last visited Mar. 7, 2024).

[35] *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022) (sustaining monopolization claims where several anticompetitive activities formed part of a "broader alleged pattern of conduct" designed to preserve

- 10 -                                    July 12, 2024

consequences of Cleveland-Cliffs' actions are far-reaching. Cleveland-Cliffs' efforts to maintain its monopoly positions have prevented and will continue to prevent the United States from achieving key objectives, including environmental commitments to a cleaner energy economy.

Should Cleveland-Cliffs succeed in blocking the Transaction, it will further entrench itself as a monopolist in key domestic steel markets, with no incentive to reduce prices or invest in research and development. The resulting harm to American consumers and businesses is hard to overstate. At a minimum, we think it is clear that Cleveland-Cliffs' opposition to the Transaction, with the clear goal of furthering its longer-running pattern of exclusionary, anti-competitive activity, is worthy of serious scrutiny by the Division. As such, we strongly believe that the Division should promptly commence an investigation.

We would appreciate an opportunity to meet with you to provide further information and perspective on these matters, and to answer any questions that you may have or provide any additional information that you may require.

Sincerely,


 /s/ Richard Parker                                  /s/ David B. Hennes
Richard Parker                                        David B. Hennes
MILBANK LLP                                           ROPES & GRAY LLP
1850 K Street, NW, Suite 1100                         1211 Avenue of the Americas
Washington, D.C. 20006                                New York, NY 10036
rparker@milbank.com                                   David.Hennes@ropesgray.com
(202) 835-7530                                        (212) 596-9000

 /s/ Fiona A. Schaeffer                               *Counsel to Nippon Steel Corporation*
Fiona A. Schaeffer
MILBANK LLP
30 Hudson Yards
New York, NY 10001
fschaeffer@milbank.com
(212) 530-5651


*Counsel to United States Steel Corporation*

---

monopoly power); *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F.Supp.2d 683 (E.D. Pa. 2007) (allegations that defendants engaged in a supply control campaign are sufficient to indicate willful acquisition or maintenance of monopoly power as distinguished from legitimate growth or development").

# Exhibit M

www.cbsnews.com /pittsburgh/news/kamala-harris-joe-biden-us-steel-nippon-steel-sale/

# Pittsburgh union members throw support behind Harris as she opposes sale of U.S. Steel

Ricky Sayer ⋮ 9/3/2024



Politics

Pittsburgh-area union members throw support behind Harris as she opposes sale of U.S. Steel

▶  Pittsburgh-area union members throw support behind Harris as she opposes sale of U.S. Steel 02:45

PITTSBURGH (KDKA) -- Union members who attended the Biden-Harris rally on Monday left feeling excited about Harris and Biden's remarks.

One of those issues discussed was the deal that would see Japan-based Nippon Steel take over U.S. Steel.

"I think everything they said about American workers, about unions, is right on point," said Tim Wisyanski, the IBEW Local 5 apprenticeship training director. "My heart was pounding when they came on the stage."

Watching on the outside among a small crowd was retired union nurse Deborah Nelson.

**App.133**

"It's great to hear because I remember my time at the VA when Trump was in office. He dismantled the union," Nelson said.



The video player is currently playing an ad. You can skip the ad in 5 sec with a mouse or keyboard

David McCall, the International President of United Steelworkers, agreed with the sentiment that Harris and Biden delivered what they wanted to hear.

He and other union leaders spoke directly with Biden and Harris for about 15 to 20 minutes.

"It was just a conversation about how we want to work hard to make sure our members understand the real issues," McCall said.

## More from CBS News

In:
- Joe Biden
- Kamala Harris
- Pittsburgh

## Featured Local Savings

As described in our Privacy Policy, we process personal information to inform which ads you see on our services and disclose certain personal information in connection with advertising our services to you on third-party sites and for other ad-related purposes.

If you live in certain U.S. states (e.g., California, Colorado, Connecticut, Montana, Oregon, Texas, Utah and Virginia), some of these activities may be considered "sales" or "sharing" of your personal information, or "processing" of your personal information for "targeted advertising" purposes (as each term is defined under applicable state privacy laws), and you may have the right to opt out of these activities. Please visit the Additional Information: US States section of our Privacy Policy for more information about your rights and our privacy practices.

If you would like to exercise this opt-out right, please follow the instructions below:

**App.134**

*Email Address*

To exercise your opt-out rights (as described above) in connection with the email address you provided to us (such as through account registration, newsletters or marketing subscriptions) please submit your request here.

*Device Information*

To opt out of our use of personal information associated with a device that may be considered "sales," "sharing" or "targeted advertising" move the toggle to the left, uncheck the box, or otherwise select your preferences. You will need to renew this choice in each Paramount Service you visit, if you clear your browser cookies, or if you return to this Paramount Service using a different browser or device.

**App.135**

# Exhibit N

ustr.gov /about-us/policy-offices/press-office/press-releases/2024/october/ustr-announces-new-members-serve-advisory-committe…

## USTR Announces New Members to Serve on Advisory Committee for Trade Policy and Negotiations



**Breadcrumb**

**App.137**

October 31, 2024

WASHINGTON – The Office of the United States Trade Representative today announced the recent appointments of four new members by President Biden to serve a four-year term on USTR's Advisory Committee for Trade Policy and Negotiations (ACTPN). These four members will join the twenty-two active members currently on the committee.

"Today's appointments bring diverse perspectives to the committee and impact how we think about U.S. trade policy and negotiations. I value the input and ideas from all USTR advisory committee members, and thank them for volunteering their time and experience," **said Ambassador Katherine Tai**. "I am looking forward to collaborating with these leaders to deliver on the Biden-Harris Administration's worker-centered trade agenda."

**Appointed Members:**

- Jeni Britton, Founder, Jeni's Splendid Ice Creams; Founder and CEO, Floura & Co.
- David McCall, United Steelworkers International President
- John W. Miller, Principal, Arenberg Holdings
- Philip Recht; Co-Leader, Public Policy, Regulatory & Government Affairs practice, Mayer Brown LLP.

The ACTPN is a statutory non-discretionary trade advisory committee established to provide overall policy advice to the U.S. Trade Representative on matters arising in connection with the development, implementation, and administration of the trade policy of the United States. USTR's Advisory Committee for Trade Policy and Negotiation (ACTPN) was established through section 4(d) of Executive Order 11846 of March 27, 1975, and section 135(b) of the Trade Act of 1974 (19 U.S.C. § 2155(b)) (Trade Act), as amended.

**Biographies**

**Jeni Britton, Founder, Jeni's Splendid Ice Creams; Founder and CEO, Floura & Co.**

Jeni Britton is an American entrepreneur and New York Times best-selling author. She founded Jeni's Splendid Ice Creams in 2002, pioneering innovative flavors and quality ingredients, and transforming it into a beloved national brand. As a Certified B Corporation, Jeni's embodies her commitment to social and environmental responsibility. Her latest venture, Floura & Co., addresses food waste and chronic illness by repurposing produce trimmings into nutritious, fiber-rich foods. Jeni is a Henry Crown Fellow at the Aspen Institute, a U.S. Culinary Diplomat, recognized by Fast Company as one of the Most Creative People in Business, and a champion of American entrepreneurship.

**David McCall, United Steelworkers (USW) International President**

**App.138**

The USW International Executive Board appointed David McCall the union's ninth International President on Sept. 26, 2023.

McCall, a fourth-generation Steelworker, was born and raised in Gary, Ind. He was 18 when he joined USW Local 6787 and went to work as a millwright at Bethlehem Steel's Burns Harbor Works in northwestern Indiana. McCall was elected a grievance committeeman in 1971, then elected grievance committee chair in 1975 and Local 6787 vice president in 1985.

While working shifts in the mill, he was able to attend and graduate from Indiana University Northwest with a degree in labor studies in 1975. He also graduated from the Harvard Trade Union Program in 1989.

Those experiences helped to prepare him for future battles as he joined the USW staff in 1986, serving first as a Staff Representative and then as Sub-District Director in Gary, Ind., from 1989 until his appointment as Assistant Director of District 7 in 1997.

He became the District 1 Director in January 1999 and was elected to five consecutive terms (20 years) in the position, leading tens of thousands of USW members in Ohio. In 2019, the International Executive Board elected him as International Vice President (Administration).

McCall is currently a member of Local 979 in Cleveland, the chairman of the Steelworkers Health and Welfare Fund, and a trustee for the Steelworker Pension Trust. He is also a member of the AFL-CIO Executive Council.

**John W. Miller, Principal, Arenberg Holdings**

John W. Miller is the Founder and Principal at Arenberg Holdings, a Venture Capital fund established in 2015 to make investments in early stage companies, with an emphasis on manufacturing companies located in the Midwest.

Miller began his career as a Congressional staffer, serving as the chief tax and trade policy advisor for Wisconsin Congressman Jerry Kleczka, who served on the Committee on Ways and Means.  In 2006 Miller joined Miller-St. Nazianz, Inc., his family's farm equipment manufacturing business and became the 5th generation of his family to lead the company as President & CEO.  During his tenure he vastly expanded international sales into markets such as Ukraine, Russia, Kazakhstan, Bulgaria, South Africa and Australia. In late 2014 Miller sold his company to CNH Industrial (NYSE: CNHI), its largest customer.

Miller holds a B.A. from Marquette University, a M.A. from Georgetown University and a J.D. from the University of Wisconsin Law School.

**Philip Recht; Co-Leader, Public Policy, Regulatory & Government Affairs practice, Mayer Brown LLP**

Philip Recht is a senior partner at Mayer Brown LLP, an international law firm where he co-leads both the firm's Public Policy, Regulatory & Government Affairs product team and the global Litigation, Regulatory &

**App.139**

Enforcement practice. Based in Los Angeles, Phil provides strategic counsel to clients on legislative, regulatory, and enforcement matters at the federal, state, and local government levels. His expertise spans various sectors, including transportation, infrastructure, healthcare, tribal gaming, energy, and election law.

Before joining Mayer Brown, Phil held significant roles in government, including serving in the Clinton Administration as chief counsel and deputy administrator of the National Highway Traffic Safety Administration. He also gained experience working as a legislative assistant in the Congress and as a member and vice-chair of the Los Angeles Board of Transportation Commissioners.  Beyond his professional work, Phil is deeply engaged in civic activities, serving on the boards of the Los Angeles Area Chamber of Commerce, Los Angeles Business Council, and Public Counsel.

###

**App.140**

# Exhibit O

**NewsRoom**

12/22/24 Pitt. Post-Gazette (No Page)
2024 WLNR 24919410

Pittsburgh Post-Gazette (PA)
Copyright © 2024 Pittsburgh Post-Gazette

December 22, 2024

Threatened by foreign investment, Cleveland-Cliffs teamed up with its union to unravel U.S. Steel deal

Evan Robinson-Johnson; Pittsburgh Post-Gazette

Dec. 22—Two weeks after Cleveland-Cliffs lost its bid to buy U.S. Steel last year, the Ohio steelmaker welcomed a former union negotiator as its newest board member.

"We have recently seen a case of stunning disrespect to the wishes of labor in our industry, and Ron Bloom being on our board will ensure that all stakeholders have a voice," Cliffs CEO Lourenco Goncalves said in his 2023 announcement.

Now managing partner at the private equity firm Brookfield Asset Management, Mr. Bloom had previously worked in the Obama and Trump administrations, including as an industrial policy adviser. He also served as a key negotiator for the United Steelworkers union.

In 2006, Mr. Bloom helped the union block the sale of Wheeling-Pittsburgh Steel to a foreign buyer. That effort relied on the successorship clause of the USW's basic labor agreement — the same type of provision the USW tried to use this year to block the U.S. Steel takeover by Japan's Nippon Steel. "What we're best at is stopping things," Mr. Bloom told the Wall Street Journal at the time.

The appointment to the Cliffs board came as the steelmaker and the USW were working in tandem to thwart the foreign purchase of U.S. Steel. Nippon and U.S. Steel announced their $14.9 billion agreement in December 2023, setting up a lengthy regulatory review that took place against a backdrop of election year politics. President Joe Biden now appears poised to decide the deal's fate in the final days of his presidency.

While it's not uncommon for a domestic rival to worry about foreign investment, experts say Cliffs' campaign of opposition — including fiery public statements, meetings with key regulators and behind the scenes lobbying — has been surprisingly effective.

Other domestic steelmakers are worried about the proposed deal, too, Keybanc analyst Phil Gibbs said. But "Cliffs has been the most outspoken because they have the most to lose."

The union exclusively backed Cliffs during last year's bidding process for U.S. Steel and Mr. Goncalves continued to use that as leverage to try to unravel the deal with Nippon this year. Union President David McCall, meanwhile, refused to negotiate with the Japanese steel company's executives and remained unmoved by every commitment they offered.

**App.142**

Nippon Steel resolved "every single legitimate objection that the union raised," said Allegheny County Councilman Sam DeMarco, a Republican. "At some point, you seem to be left with no other option — if you're trying to figure out his motivation — than that he's doing the bidding of Cleveland-Cliffs and wants to kill U.S. Steel."

FGS Global, a communications firm hired by Cliffs, has continued to send updates to reporters with news that threatens the transaction, including union salvos, a year after U.S. Steel rejected Cliffs' pursuits.

Mr. McCall worked at Cliffs for years as he ascended the union ranks. He took the USW's top spot last fall after the death of his friend, Tom Conway, who had promised to keep U.S. Steel in American hands.

Another friend of Mr. Conway was Mr. Biden, who wrote in a eulogy that "Tom was someone I confided in. He had my absolute trust."

Fresh reports last week suggest Mr. Biden is still opposed to the sale, which is being reviewed by the Committee on Foreign Investment in the United States for potential national security threats.

Mr. McCall has continued to make statements questioning whether Nippon aims to "eliminate a U.S. competitor" or "subvert our trade system from within."

The union boss argued that a deal with Nippon "would undermine the viability of the domestic steel industry," a concern shared in leaked Committee on Foreign Investment documents.

A monopoly rejected

Cliffs set off the bidding war that triggered interest from Japan in July 2023, when a bullish Mr. Goncalves made an unsolicited offer for his Pittsburgh rival to establish a "national champion" of steel. The joint company would have been one of the few suppliers to Detroit automakers like General Motors and Ford — sparking monopoly concerns.

It also would have consolidated the United Steelworkers union, which represents 14,000 Cliffs employees and 11,000 at U.S. Steel.

As the bids for an industrial icon gained national attention, workers have said they were left in the dark by both union and company leaders. Regulatory filings would later reveal that Nippon and Cliffs went back and forth, driving up the price Nippon finally agreed to pay.

Ohio Sen. JD Vance, a Republican who now is waiting to be sworn in as U.S. vice president, and other senators were furious with the outcome. They urged Mr. Biden to block a sale that they believed had "dire implications" for the U.S. industrial base.

For his part, Mr. Goncalves congratulated U.S. Steel and wished the company executives "luck in closing the transaction."

Two weeks later, he used his testimony in a federal trade case to bash U.S. Steel executives for "ignoring the negative consequences of their divestiture to the supply chains of critical products and to national security." By the end of the month, he'd taken the concerns public.

"They were dead-set against it, because, of course, they had incentive for it to not happen," Gimme Credit analyst Evan Mann said of the Ohio steelmaker.

By February, Trump, then a candidate for president, was threatening to block the sale if re-elected. Mr. Biden followed with announcing his own opposition in March, signaling to both Mr. Goncalves and Mr. McCall that the deal was dead.

**App.143**

U.S. Steel workers cross a bridge walking toward the Clairton Mill Works after a rally in support of the company's proposed $15 billion sale to Nippon Steel, outside of the Mill Works in Clairton Thursday, Dec. 12, 2024. (Sebastian Foltz/Post-Gazette)

"There is no more lobbying, there's no more negotiation. It's over," Mr. Goncalves told Bloomberg News. "And the only other buyer that the union would accept is Cleveland-Cliffs."

By May, Mr. Goncalves was calling the deal "un-closeable." He noted that his union counterpart, Mr. McCall, was "working in Washington" to stop it.

U.S. Steel fired back, accusing Cliffs of "a relentless and unbridled effort to derail the transaction."

Since then, Cliffs and the USW have had a series of events and meetings with senior officials who will decide the deal's fate, including U.S. Trade Representative Katherine Tai, who is seen as a key holdout against Nippon.

Ms. Tai spoke alongside Mr. Goncalves and acting labor secretary Julie Su at an Oct. 11 event at a Cliffs facility in Pennsylvania. She also met with Mr. McCall at a Nov. 22 event at the White House, according to multiple sources. Ms. Su visited a second Cliffs facility in October and spoke with chief financial officer Celso Goncalves in a "Made in America" roundtable.

Experts told the Post-Gazette that influence from Cliffs could jeopardize the integrity of the federal review process, which observers — including the congressional committee that oversees the Committee on Foreign Investment — are already concerned has become politicized.

That House panel has specifically called for the preservation of documents between federal agencies, the USW and Cleveland-Cliffs.

Influence in Washington

In a call with investors the day of the 2024 election, Mr. Goncalves said: "We have worked very consistently to position the company to benefit no matter what candidate or political party is in power.

"It's clear to us that with either Donald Trump or Kamala Harris as president of the United States, our executive branch will work to improve conditions and support a domestic steel industry owned and operated by American producers. We have had a thorough dialog with surrogates from each campaign."

That included Energy Secretary Jennifer Granholm. She visited Cliffs' Butler Works in April, speaking and taking questions alongside Mr. Goncalves, who used the opportunity to say U.S. Steel has "hate for unions." As for the deal with Nippon, he said: "It's game over. And now we just need to schedule their funeral."

Some analysts said Cliffs' argument is straightforward:

"If I'm the CEO of Cleveland-Cliffs, I'm calling my lieutenants in the government and having a very small conversation," said Mr. Gibbs, of Keybanc. "The conversation is: 'This is bad for my business, and you don't want that on your hands.' It doesn't really have to be any more complicated than that."

Mr. Gibbs said the argument is particularly convincing because government officials have spent the past decade bailing out the American steel industry with tariffs and infrastructure provisions.

Some of those officials felt "slighted" by U.S. Steel's sellout, he said.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    3

**App.144**

"Domestic steel makers have asked for a lot. They've asked for tariffs. They've asked for infrastructure. They've asked for a lot of government intervention to help the industry. And now you have a player that basically says, 'Well, we want to bestow those benefits to a non-U.S. company.'"

Cliffs' talking points reflect broader sentiment throughout the domestic sector, he said. "All the steelmakers are against the transaction, Cliffs is just the most vocal about it."

Domestic players are afraid of a new entrant with deep pockets, especially given Nippon's subsidies from the Japanese government. For Cliffs, there's a specific threat to the company's primary market: automotive.

Cliffs is already financially vulnerable, having posted losses for a couple of quarters, a trend that Mr. Gibbs said "probably will continue ... in this current pricing environment."

The company idled a blast furnace in Cleveland last quarter after closing its tinplate mill in Weirton, W.Va., in April.

"Cliffs has already seen the effects of a more competitive automotive dynamic show up in their contract book this year, and that's the place where they make the most money, and that's also where Nippon has pretty global reach in terms of their technical capabilities to perhaps take more of that business over the long run," Mr. Gibbs said.

Nippon Steel has argued that its investments in a legacy American producer would strengthen the domestic market.

"I completely get the competitive landscape piece. If you're Cleveland-Cliffs, you'd rather this investment not be made, because it will make it more competitive. It'll make it more difficult for you and your company," said Mike Pompeo, who was secretary of state in the first Trump administration. Nippon hired him as a consultant earlier this year.

"America has always built its economy on competition ... and the Mon Valley can deliver that," Mr. Pompeo told the Post-Gazette in a phone interview from Dubai. "I hope we won't let politics get in the way."

Changing minds on the ground

Nippon's extensive ground campaign to win over individual union members has done little to change the mind of Mr. McCall, whose stoicism has puzzled and frustrated some union members.

Forrest Wietseld, a Nippon Steel worker and USW local president in West Virginia, said his union leaders are backing the wrong horse.

"Cliffs would have a monopoly. How could that possibly be good for workers? Look at [the] history with Andrew Carnegie."

But other union members, including district directors Bernie Hall and Mike Millsap, continue to criticize Nippon. They argue the Japanese steelmaker will eventually shift production to newer facilities outside of Western Pennsylvania.

Mr. Gibbs, the Keybanc analyst, said it's "irrelevant" whether the rank-and-file agree with Mr. McCall. The USW has a long history of endorsing Democrats and Mr. Biden has tried to cement his legacy as the most pro-union president.

"If the leadership says we don't approve a deal, you're not going to approve it. That would be career suicide," he said. "The only way this changes is if the union leadership has a mea culpa. It's too big a faction."

Others argued the union split could provide a path for Mr. Biden to save the deal and his legacy.

**App.145**

"I do think it makes a difference," said David Plotinsky, a former Department of Justice official charged with reviewing foreign investment. The lack of unanimity at the USW means "that a clearance isn't inherently anti-union."

**---- Index References ----**

Company: UNITED STATES STEEL CORPORATION; NIPPON STEEL CORPORATION; CLEVELAND-CLIFFS INC.; GENERAL MOTORS COMPANY; United Steelworkers; KEYBANC CAPITAL MARKETS INC.; BROOKFIELD ASSET MANAGEMENT LTD.

News Subject: (Business Management (1BU42); HR & Labor Management (1HR87); Labor Relations (1LA21); Labor Unions (1LA31))

Industry: (Base Metals (1BA71); Manufacturing (1MA74); Metal Fabrication (1ME43); Metals & Mining (1ME07); Natural Resources (1NA60); Steel & Iron (1ST73))

Region: (Americas (1AM92); Asia (1AS61); Eastern Asia (1EA61); Far East (1FA27); Japan (1JA96); North America (1NO39); Ohio (1OH35); Pennsylvania (1PE71); U.S. Mid-Atlantic Region (1MI18); U.S. Midwest Region (1MI19); U.S. Southeast Region (1SO88); USA (1US73); West Virginia (1WE81))

Language: EN

Other Indexing: (USW; FGS Global; Committee on Foreign Investment; Department of Justice; U.S. Steel; Nippon Steel; Cleveland-Cliffs; General Motors; United Steelworkers; Keybanc; Brookfield Asset Management)

Word Count: 2014

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.



**App.146**

# Exhibit P

This is historical material "frozen in time". The website is no longer updated
and links to external websites and some internal pages may not work.

JANUARY 03, 2025

# Statement from President Joe Biden

As I have said many times, steel production—and the steel workers who produce it—are the backbone of our nation.  A strong domestically owned and operated steel industry represents an essential national security priority and is critical for resilient supply chains.  That is because steel powers our country: our infrastructure, our auto industry, and our defense industrial base. Without domestic steel production and domestic steel workers, our nation is less strong and less secure.

For too long, U.S. steel companies have faced unfair trade practices as foreign companies have dumped steel on global markets at artificially low prices, leading to job losses and factory closures in America. I have taken decisive action to level the playing field for American steelworkers and steel producers by tripling tariffs on steel imports from China.  With record investments in manufacturing, more than 100 new steel and iron mills have opened since I took office, and U.S. companies are producing the cleanest steel in the world. Today, the domestic steel industry is the strongest it has been in years.

We need major U.S. companies representing the major share of US steelmaking capacity to keep leading the fight on behalf of America's national interests. As a committee of national security and trade experts across the executive branch determined, this acquisition would place one of America's largest steel producers under foreign control and create risk for our national security and our critical supply chains.

So, that is why I am taking action to block this deal. It is my solemn responsibility as President to ensure that, now and long into the future, America has a strong domestically owned and operated steel industry that can continue to power our national sources of strength at home and abroad;

**App.148**

and it is a fulfillment of that responsibility to block foreign ownership of this vital American company. U.S. Steel will remain a proud American company – one that's American-owned, American-operated, by American union steelworkers – the best in the world.

Today's action reflects my unflinching commitment to utilize all authorities available to me as President to defend U.S. national security, including by ensuring that American companies continue to play a central role in sectors that are critical for our national security. As I have made clear since day one: I will never hesitate to act to protect the security of this nation and its infrastructure as well as the resilience of its supply chains.

###

# Exhibit Q

# Presidential Documents

**Order of January 3, 2025**

## Regarding the Proposed Acquisition of United States Steel Corporation by Nippon Steel Corporation

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 721 of the Defense Production Act of 1950, as amended (section 721), 50 U.S.C. 4565, it is hereby ordered as follows:

**Section 1**. *Findings*. I hereby make the following findings:

(a) There is credible evidence that leads me to believe that (1) Nippon Steel Corporation, a corporation organized under the laws of Japan (Nippon Steel); (2) Nippon Steel North America, Inc., a New York corporation (Nippon Steel NA); and (3) 2023 Merger Subsidiary, Inc., a Delaware corporation (together with Nippon Steel and Nippon Steel NA, the Purchasers), through the proposed acquisition by the Purchasers of United States Steel Corporation, a Delaware corporation (U.S. Steel), might take action that threatens to impair the national security of the United States; and

(b) Provisions of law, other than section 721 and the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*), do not, in my judgment, provide adequate and appropriate authority for me to protect the national security in this matter.

**Sec. 2**. *Actions Ordered and Authorized*. On the basis of the findings set forth in section 1 of this order, considering the factors set forth in subsection 721(f) of the Defense Production Act of 1950, as appropriate, and pursuant to my authority under applicable law, including section 721, I hereby order that:

(a) The proposed acquisition of U.S. Steel by the Purchasers (Proposed Transaction) is prohibited, and any substantially similar transaction between the Purchasers and U.S. Steel, whether effected directly or indirectly by the Purchasers, through the Purchasers' shareholders or shareholders' immediate, intermediate, or ultimate foreign person beneficial owners, or through the Purchasers' partners, subsidiaries, or affiliates is also prohibited.

(b) The Purchasers and U.S. Steel shall take all steps necessary to fully and permanently abandon the Proposed Transaction no later than 30 days after the date of this order, unless such date is extended by the Committee on Foreign Investment in the United States (CFIUS), on such conditions as CFIUS may require. Immediately upon completion of all steps necessary to abandon the Proposed Transaction, the Purchasers and U.S. Steel shall certify in writing to CFIUS that such abandonment has been effected in accordance with this order and that all steps necessary to fully and permanently abandon the Proposed Transaction have been completed.

(c) From the date of this order until the Purchasers and U.S. Steel provide a certification of abandonment of the Proposed Transaction to CFIUS pursuant to subsection (b) of this section, the Purchasers and U.S. Steel shall certify to CFIUS on a weekly basis that they are in compliance with this order and include with that certification a description of all efforts to fully and permanently abandon the Proposed Transaction, and a timeline for projected completion of remaining actions necessary to effectuate the abandonment.

(d) Any transaction or other instrument entered into or method employed for the purpose of, or with the effect of, evading or circumventing this order is prohibited.

(e) Without limitation on the exercise of authority by any agency under other provisions of law, and until such time as the Purchasers and U.S. Steel provide a certification of abandonment of the Proposed Transaction and such certification is verified to the satisfaction of CFIUS, CFIUS is further authorized to implement measures it determines necessary and appropriate with regard to the Proposed Transaction to protect the national security of the United States, including measures available to it under section 721 and its implementing regulations, which include the remedies available for violations of any order, agreement or condition entered into or imposed under section 721.

(f) If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby. If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements.

(g) The Attorney General is authorized to take any steps necessary to enforce this order.

**Sec. 3.** *Reservation.* I hereby reserve my authority to issue further orders with respect to the Purchasers or U.S. Steel as shall in my judgment be necessary to protect the national security of the United States.

**Sec. 4.** *Publication and Transmittal.* (a) This order shall be published in the *Federal Register.*

(b) I hereby direct the Secretary of the Treasury to transmit a copy of this order to the parties to the Proposed Transaction named in section 1 of this order.

THE WHITE HOUSE,
*January 3, 2025.*

[FR Doc. 2025–00621
Filed 1–10–25; 8:45 am]
Billing code 3395–F4–P

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, et al., *Petitioners*, v. THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES, et al., *Respondents*. | No. 25-1004 |

## DECLARATION OF RICHARD C. SOFIELD

I, Richard C. Sofield, declare as follows:

## I.    INTRODUCTION AND SUMMARY OF CONCLUSIONS

1.    In this declaration I set out the Committee on Foreign Investment in the United States's ("CFIUS") statutory and regulatory obligations and standard practices. I then identify the ways in which CFIUS's review of the proposed acquisition of United States Steel Corporation ("U. S. Steel") by Nippon Steel Corporation ("Nippon Steel") diverged from these obligations and practices.

2.    My analysis is based on my substantial experience with

CFIUS reviews. I served in government national security roles for approximately 25 years, including as a U.S. Department of Justice representative on CFIUS where I participated in approximately 1,500 CFIUS reviews. I have also spent more than six years in private practice, devoting a meaningful portion of my practice to advising clients on filings before CFIUS.

3.      My principal conclusions are that CFIUS's review of the proposed acquisition of U. S. Steel by Nippon Steel diverged from CFIUS's obligations and practices in at least three significant ways that were far outside the standards of my experience with CFIUS's mandatory and customary processes.

4.      *First*, the unprecedented public statements by both the President and Vice President regarding the desired outcome of CFIUS's review of the transaction—prior to the beginning of the formal CFIUS review process—are contrary to CFIUS's norms. This indicates the outcome of CFIUS's review was predetermined, thus violating CFIUS's statutory and regulatory obligations and practices.

5.      *Second*, CFIUS violated its norms related to its national security review process, including CFIUS's breach of confidentiality

obligations, its failure to engage with parties on potential risk mitigation measures, its imposition or attempted imposition of arbitrary deadlines related to considering potential risk mitigation measures, and its failure to build consensus among CFIUS member agencies regarding the efficacy of risk mitigation. Each of these norm deviations appeared to be motivated by factors outside of CFIUS's purpose, which is to review and address national security concerns related to foreign investment.

6. *Third*, the parties' risk mitigation proposals were *prima facie* adequate and appropriate to address the CFIUS-identified national security concerns and, therefore, warranted consideration by CFIUS, which should have resulted in engagement through negotiations with the parties. CFIUS's failure to engage with the parties on risk mitigation cannot be justified by the nature of the parties' mitigation proposals and must have been motivated by other factors.

7. In sum, the conduct of CFIUS's review of Nippon Steel's proposed acquisition of U. S. Steel is so far outside the standards of my experience with the mandatory or customary process that these deviations appear to have been motivated by interests other than national security. Specifically, this interest appears to have been to

position the CFIUS review process to end with a lack of consensus among the CFIUS member agencies, thus ensuring that the President would make a pre-determined decision for stated political reasons, not a fully-informed determination on the basis of U.S. national security.

## II. QUALIFICATIONS AND BASIS FOR OPINION

8.    I came to these conclusions after spending a significant portion of my career, in both government and private practice, working with CFIUS. My complete curriculum vitae is provided as Appendix A.

9.    I served in the U.S. government for approximately 25 years, holding a variety of national security-related legal roles.

10.    From May 1994 to October 1998, I worked for the U.S. Department of Defense as an Attorney Advisor on procurement matters, including matters related to classified U.S. government contracts. From October 1998 to July 2003, I worked at the U.S. Department of Justice ("DOJ") as a Trial Attorney on False Claims Act enforcement matters, including those involving classified U.S. government contracts. From July 2003 to August 2008, I worked at DOJ as an Attorney Advisor on counterintelligence and counterterrorism investigations, including the preparation of applications for electronic surveillance and physical

searches pursuant to the Foreign Intelligence Surveillance Act. From August 2008 to September 2018, I served as the Director, Foreign Investment Review Staff and Principal Deputy Chief, Foreign Investment Review Section ("FIRS") at DOJ. In these roles I served as DOJ's representative on CFIUS and as the chair of "Team Telecom" which is now known as the Committee for the Assessment of Foreign Participation in the Telecommunications Services Sector, a CFIUS-like process which evaluates national security concerns related to Federal Communications Commission licensing determinations.

11.    During my time with FIRS, I was involved in approximately 1,500 CFIUS reviews including approximately one hundred reviews which resulted in CFIUS mitigation.

12.    Since my U.S. government service, I have been in private practice for more than six years. I am currently the co-head of the national security practice group at Debevoise & Plimpton LLP, where I advise on a variety of national security issues. CFIUS is a significant part of my practice, and I counsel clients on hundreds of transactions each year and have participated directly and indirectly in dozens of filings before CFIUS, including filings which have resulted in CFIUS

mitigation.

13.  I relied on both my government and private practice experiences to explain the ways that this CFIUS action diverged from the standard CFIUS process.

14.  In preparing this declaration, I reviewed: (*i*) the CFIUS administrative record for this transaction; (*ii*) the petition filed by U. S. Steel and Nippon Steel in the U.S. Court of Appeals for the District of Columbia Circuit; (*iii*) the complaint filed by U. S. Steel and Nippon Steel in the U.S. District Court for the Western District of Pennsylvania; and, (*iv*) other public information about the acquisition of U. S. Steel by Nippon Steel.

## III.  THE OUTCOME OF CFIUS'S REVIEW APPEARS TO HAVE BEEN PREDETERMINED AND MOTIVATED BY ISSUES OTHER THAN NATIONAL SECURITY

15.  In deviating from CFIUS's mandatory and customary processes, the CFIUS review for the acquisition of U. S. Steel by Nippon Steel first involved the President making unprecedented statements about his intent to ensure that U. S. Steel remains an American company before the formal CFIUS review process began. These statements suggest that the President was motivated by interests other than national

6
**App.158**

security to reach the predetermined outcome of blocking Nippon Steel's acquisition of U. S. Steel.

16.    By way of background, CFIUS is an interagency body whose sole responsibility is to assess the national security risks arising from foreign investment in U.S. businesses. CFIUS is an executive branch interagency committee that Congress, through 50 U.S.C. § 4565(k)(3), has designated the Department of the Treasury ("Treasury") to lead.

17.    CFIUS is statutorily governed by Section 721 of the Defense Production Act of 1950, as amended by the Exon-Florio Amendment of 1988, the Foreign Investment and National Security Act of 2007, and the Foreign Investment Risk Review Modernization Act of 2018.

18.    CFIUS is also primarily subject to two executive orders: (*i*) Executive Order 11858, as amended by Executive Order 13456, which defines the relationship among CFIUS member agencies and between CFIUS and the President; and (*ii*) Executive Order 14083, which publicly elaborates and expands the list of factors that CFIUS considers, as appropriate, when reviewing transactions, and which describes potential national security implications in key areas.

19.    Additionally, in practice, CFIUS follows certain internally

established norms that logically follow the purpose of the CFIUS legal authorities to protect U.S. national security to ensure that its review processes are consistent with standards of due process. For instance, CFIUS's processes require that Assistant or Deputy Secretaries at the CFIUS member agencies—who are political appointees—review and approve recommendations of the CFIUS staff. Generally, the Assistant or Deputy Secretaries above the CFIUS staff are not heavily involved in the day-to-day activities of the CFIUS review process. Instead CFIUS's reviews and management of the review process are conducted by the CFIUS staff at the respective agencies.

20.    As discussed in more detail in Section IV, CFIUS took a series of actions far and apart from its normal process. These deviations began before CFIUS started its formal review process for Nippon Steel's acquisition of U. S. Steel, when the President and his staff publicly discussed the transaction—and their desired outcome of the transaction.

21.    Parties filing a voluntary notice for CFIUS's review often engage in preliminary meetings or discussions with CFIUS, which are encouraged pursuant to 31 C.F.R. § 800.501(g). Along with consultation, parties that intend to file a voluntary notice also often file a draft notice

with CFIUS, which is also encouraged pursuant to 31 C.F.R. § 800.501(g). Filing a draft notice allows CFIUS to review the draft notice and provide comments to the parties, which the parties then incorporate into a final notice filing submission to CFIUS. Parties to a transaction will then submit a voluntary notice filing to CFIUS, to include information required by 31 C.F.R. § 800.502. CFIUS will inspect a submitted notice for completeness and compliance with the information required, and then begin the formal review process, per 31 C.F.R. § 800.503.

22.    On January 29, 2024, the parties filed a draft joint voluntary notice of the proposed transaction with CFIUS (AR_000146), thus beginning informal communications with CFIUS, with CFIUS not beginning its formal review until March 26, 2024 (AR_000034).

23.    With the transaction on the government's radar but without the full benefit of a CFIUS review, the President and his staff began making public pronouncements about the transaction stating that it should fail. For example, despite the applicability of the CFIUS confidentiality protections, as discussed more fully in Section IV, on March 14, 2024—before the parties' final joint voluntary notice had been accepted and the review period formally started—President Biden issued

a statement regarding the transaction—formally released by the White House—saying that "U.S. Steel has been an iconic American steel company for more than a century, and it is vital for it to remain an American steel company that is domestically owned and operated."[1] That issue—whether to approve the acquisition of U. S. Steel by a foreign corporation—was the very issue that the parties were at the same time asking CFIUS to decide.

24.     These public pronouncements continued after the start of the formal review period, but before its completion. On April 17, 2024, less than one month into CFIUS's review and while the parties were still receiving questions from CFIUS, President Biden visited the headquarters of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("United Steelworkers"), stating that U. S. Steel "has been an iconic American company for more than a century. And it

---

[1]     *See* Statement from President Biden on US Steel (Mar. 14, 2024), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2024/03/14/statement-from-president-biden-on-us-steel/ [hereinafter, "Biden March 14, 2024 Statement"].

should remain a totally American company."[2] Again, on September 2, 2024, while CFIUS's review remained ongoing, at a campaign rally in Pittsburgh, Pennsylvania, Vice President Kamala Harris stated that U. S. Steel "should remain American-owned and American-operated," calling it "an historic American company" that "is vital for our nation to maintain strong American steel companies," while President Biden, who also attended the rally, declared: "I made it clear last time I was in Pittsburgh: United States Steel . . . is going to remain an American company."[3]

25.    To my knowledge, neither the President nor representatives from CFIUS's member agencies have ever previously appeared at political rallies with interested parties to discuss a transaction, or

---

[2]    *See* Remarks by President Biden on New Actions to Protect U.S. Steel and Shipbuilding Industry from China's Unfair Practices | Pittsburgh, PA (Apr. 17, 2024), https://bidenwhitehouse.archives.gov/briefing-room/speeches-remarks/2024/04/17/remarks-by-president-biden-on-new-actions-to-protect-u-s-steel-and-shipbuilding-industry-from-chinas-unfair-practices-pittsburgh-pa/ [hereinafter, "Biden April 17, 2024 Remarks"].

[3]    *See* Remarks by President Biden and Vice President Harris at a Campaign Event | Pittsburgh, PA (Sept. 2, 2024), https://bidenwhitehouse.archives.gov/briefing-room/speeches-remarks/2024/09/02/remarks-by-president-biden-and-vice-president-harris-at-a-campaign-event-pittsburgh-pa/ [hereinafter, "Biden & Harris September 2, 2024 Remarks"].

otherwise publicly discussed a transaction, that was pending before CFIUS, let alone declare that the eventual outcome of a CFIUS review would be that a U.S. business "is going to remain an American company."

26.    Statements made before CFIUS has the opportunity to complete its review are particularly egregious because the President and CFIUS should not be making judgments before reviewing all of the facts and circumstances surrounding the transaction and its national security implications, including the efficacy of national security risk mitigation measures. Based on my experience and familiarity with CFIUS, vocalizing a judgment on a transaction actively being reviewed by CFIUS, especially at a time before CFIUS's non-politically appointed staff has completed its assessment, suggests that the judgment is motivated by interests other than national security.

IV.    **CFIUS'S REVIEW DEPARTED FROM NORMS IN WAYS THAT ILLUSTRATE THE REVIEW PROCESS WAS MOTIVATED BY INTERESTS OTHER THAN NATIONAL SECURITY**

27.    CFIUS has established standard practices for its review process guided by CFIUS's statutory and regulatory authorities, and CFIUS violated the following of these mandatory and customary practices during the review of Nippon Steel's acquisition of U. S. Steel: (*i*)

confidentiality of CFIUS's review; (*ii*) engaging in substantive discussions with the parties related to mitigation; (*iii*) adequate time to engage in mitigation negotiations; and (i*v*) exhaustive efforts to build consensus among CFIUS member agencies related to proposed mitigation measures.

## A. CFIUS Breached Confidentiality Norms Through the President Publicly Discussing the Transaction and By Engaging with Third Parties Regarding the Transaction

28.    CFIUS is subject to strict confidentiality provisions under 40 U.S.C. § 4565(c) and 31 C.F.R. § 800.802, which require information submitted or filed with CFIUS to not be publicly disclosed. Per 31 C.F.R. § 800.802(a), CFIUS extends that confidentiality to pre-notice consultations encouraged under 31 C.F.R. § 800.501(g) and when the transaction is no longer before CFIUS. Indeed, in prior CFIUS rulemaking, Treasury declined to publicly provide redacted descriptions and assessments of transactions for which CFIUS had completed its review, because doing so "would implicate significant potential national security and confidentiality concerns." 73 Fed. Reg. 70,702, 70,707–08 (Nov. 21, 2008).

29.    Such information is exempt from disclosure under the

Freedom of Information Act and shall not otherwise be made public with few exceptions provided at 31 C.F.R. § 802(b), none of which apply to the disclosures of the information related to Nippon Steel's acquisition of U. S. Steel described herein.

30.   In my experience, the CFIUS confidentiality provisions are strictly followed because breaches of confidentiality would disincentivize future filings. Parties rely on the confidentiality of the CFIUS process and would be reluctant to subject themselves to voluntary participation in such a process absent such confidentiality given the regulatory risks to their transaction and potential economic harm that can attach to such regulatory risks.

31.   CFIUS violated its confidentiality requirements through both public statements by the President and his staff and through communications with third parties interested in the transaction.

32.   First, as stated in Section III, the President and his staff publicly discussed the transaction before and during the CFIUS review, doing so despite the applicability of the CFIUS confidentiality protections. President Biden made statements on March 14, 2024 and April 17, 2024 about his desire that U. S. Steel remain an American-

owned company, and both President Biden and Vice President Kamala Harris made similar statements on September 2, 2024.[4]

33.    Second, third parties—to include a rival bidder and a labor union—suggested that they had meetings or discussions with CFIUS decision makers regarding the proposed transaction.

34.    Specifically, Mr. Lourenco Goncalves, the Chief Executive Officer of U. S. Steel's rival Cleveland-Cliffs, Inc., told Pentwater Capital, U. S. Steel's third largest investor, that he has "frequently" been in contact with President Biden and then President-elect Trump, "so this deal can be killed very quickly . . . I was behind all that." AR_010398; AR_010394. Pentwater Capital asked for further confirmation that Goncalves was "behind the President Biden statement" about the transaction and Goncalves responded: "Oh, yeah, 100%, 100%, yes sir, yes, yes, the answer is yes. I have been postponing that statement for a while." AR_010398. Asked about the CFIUS process, Goncalves shockingly doubled down and explained, "[n]o, there's no process. This is not going to be a process. [CFIUS] is just cover for a President to kill a

---

[4]    *See* Biden March 14, 2024 Statement, *supra* n.1; Biden April 17, 2024 Remarks, *supra* n.2; Biden & Harris September 2, 2024 Remarks, *supra* n.3.

deal . . . [and] means the President can do whatever he wants." AR_010399; AR_010395. Goncalves separately had conversations with other senior Biden officials, including Secretary of Commerce Gina Raimondo. AR_010394.

35.     Additionally, in a March 1, 2024 letter to the U.S. Senate, David McCall, the International President of United Steelworkers, asserted that "we are actively engaged with the Committee on Foreign Investment in the United States (CFIUS) to raise our concerns about the ramifications this proposed deal will have on our national security, critical infrastructure, and supply chain." AR_000203.

36.     Goncalves also asserted to U. S. Steel investors that he has worked to ensure that CFIUS would prohibit the acquisition of U. S. Steel by Nippon Steel, and that senior Cabinet and White House officials (including Secretary Raimondo, who led a CFIUS member, and National Security Advisor Jake Sullivan) were keeping him apprised of the government's deliberations, and that he had received assurances from these officials that CFIUS would prohibit the acquisition. AR_010399; AR_010394.

37.     Indeed, the government has documented arranging at least

three phone calls between Goncalves and Secretary Raimondo, one on or around January 10, 2024 (AR_000126), and two more the week of January 15, 2024 (AR_000135–40; AR_000141), all of which had the purpose of discussing Nippon Steel's acquisition of U. S. Steel. The government has documented email correspondence between United Steelworkers and representatives of the U.S. Department of Commerce and the U.S. Trade Representative regarding the CFIUS review of Nippon Steel's acquisition of U. S. Steel and offering to discuss. The U.S. Department of Commerce is a CFIUS member agency by statute, and the U.S. Trade Representative is a CFIUS member agency by executive order. 50 U.S.C. § 4565(k)(2); Exec. Order 11858 § 3(b).

38. While CFIUS does occasionally receive information from interested parties regarding a transaction, in my experience, with the exception of this transaction, CFIUS members have never actually engaged in consultations with a third party as part of the CFIUS decision making process nor told an interested third-party that the President would use CFIUS as a pretext to block a deal. Examples of prior third-party engagement include: (*i*) "tips" about transactions involving foreign

investment that have not been affirmatively filed with CFIUS,[5] and (*ii*) information that, if related to a transaction under review, CFIUS will consider, but will not engage in a discussion with the third-party regarding the merits of a particular transaction.

39.    Importantly, CFIUS scrupulously seeks to avoid becoming involved in business disputes between parties, instead focusing solely on its one responsibility: to assess whether there are any national security concerns arising from a transaction.

40.    CFIUS seeks to avoid becoming embroiled in business disputes because doing so would: (*i*) undermine the legitimacy of the CFIUS process generally; (*ii*) potentially breach CFIUS confidentiality; (*iii*) disincentivize future voluntary filings; (*iv*) disincentivize future foreign investment in the United States; and (*v*) provide a basis for foreign propaganda regarding the illegitimacy of U.S. governmental processes. While CFIUS has certainly made decisions that favor one interested party over another, to my knowledge, CFIUS has never before put its thumb on the scale to ensure the outcome of a favored political

---

[5]    U.S. Dep't of the Treasury, *Tips and Referrals*, https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius/tips-and-referrals.

constituency.

41.    Based on my review of available information, the third-party communications with CFIUS go much further than CFIUS passively receiving information relevant to its review. When the Government shares or discloses confidential facts about a CFIUS review, let alone the *outcome* of that review, this is materially different from receiving tips from third parties. Based on my reading of the law and personal experience, CFIUS violates its confidentiality obligations where it is not just *receiving* information, but impermissibly sharing confidential information gathered during the CFIUS review process, including information regarding CFIUS's intended decision making regarding the review.

## B. CFIUS Failed to Engage With the Parties to Negotiate Risk Mitigation Measures Upon Identifying National Security Concerns

42.    Only when "CFIUS determines that the transaction poses unresolved national security concerns **and that mitigation measures are not adequate or appropriate to resolve such concerns**," does

CFIUS refer the transaction to the President.[6] CFIUS determines national security concerns through its member agencies identifying such concerns and documenting them in a risk-based analysis ("RBA"), with any agency disagreeing with the risk identified preparing a response. 50 U.S.C. § 4565(l)(4)(b). Politically appointed leadership at the CFIUS member agencies provide input into the RBA or the written response to an RBA. During a transaction's review or investigation period, CFIUS representatives discuss potential national security concerns for a subject transaction at standing weekly meetings.

43.    Accordingly, when an RBA identifies a potential national security concern and CFIUS has determined that the risk posed by the transaction is not adequately addressed by other provisions of law, as prescribed in Section 7(a) of Executive Order No. 11858, CFIUS communicates any potential unclassified national security concerns identified in the RBA to the transaction parties. CFIUS then often proposes risk mitigation measures to address the identified national

---

[6]    U.S. Dep't of the Treasury, *Committee on Foreign Investment in the U.S. Annual Report to Congress* (2023), at xi, https://home.treasury.gov/system/files/206/2023CFIUSAnnualReport.pdf [hereinafter, "2023 CFIUS Annual Report"] (emphasis added).

security concerns and invites the parties to provide additional information, including alternative proposals to mitigate identified national security concerns.

44.    Pursuant to 50 U.S.C. § 4565(k)(5), Treasury designates a CFIUS member agency to be the lead agency in negotiating mitigation agreements or other conditions necessary to protect national security based on an RBA. For Nippon Steel's acquisition of U. S. Steel, Treasury designated the Department of Commerce as the lead agency, AR_000036–37)—this agency was headed by Secretary Raimondo, who, as noted above, Mr. Goncalves claimed was keeping him apprised of government deliberations regarding the transaction.

45.    CFIUS in my experience always engages in detailed discussions with the parties regarding proposed mitigation measures intended to address the national security concerns identified in the RBA. This engagement includes CFIUS and the transaction parties exchanging term sheets or drafts of mitigation agreements, with one side marking up the other's proposed mitigation terms.

46.    CFIUS departed from this norm multiple times during its review of this transaction. After receiving the August 31, 2024 risk letter,

the parties provided proposed risk mitigation terms in four separate instances—a term sheet on September 3, 2024; a draft National Security Agreement ("NSA") on September 9, 2024; a revised draft NSA on October 29, 2024, with a rider of potential additional terms; and another revised draft NSA on December 2, 2024. AR_009132–35; AR_009222–50; AR_009297–328; AR_009402–38. At no point did CFIUS provide any mark up to the draft mitigation terms provided by the parties, nor did CFIUS otherwise provide any meaningful comment on these terms.

47.    At each instance where CFIUS had an opportunity to provide meaningful input to the parties regarding their risk mitigation proposal, CFIUS chose not to engage. This started with the September 1, 2024 call to discuss the August 31, 2024 risk letter, where the CFIUS staff stated that they were instructed to only "listen" and not provide any response to the parties. AR_009120.

48.    After the parties proposed their draft NSA on September 9, 2024 (AR_000356–57; AR_009297–326), and had a meeting with the Deputy Secretaries to discuss the possibility of withdrawing and refiling (Petition for Review ("Pet.") at 49), CFIUS did not address the NSA with the parties for more than a month, until finally meeting with the parties

on October 16, 2024—ostensibly to discuss the NSA. At that meeting, however, the attending CFIUS staff stated that they lacked authority from CFIUS political leadership to commit to a mitigation framework or even provide comments on the draft NSA. Pet. at 50–51. Therefore, at no point during this meeting did CFIUS engage in any meaningful discussion with the parties regarding whether their proposals were adequate and appropriate to address the national security concerns identified in the August 31, 2024 risk letter. Instead, CFIUS provided a written request for some minor clarifications regarding the NSA proposal to which the parties responded. AR_004617–20.

49.    The parties then provided a revised NSA to CFIUS on October 29, 2024. AR_009295–326. There was no meeting to discuss this NSA, with CFIUS only asking some minor clarifying questions regarding the revised NSA. AR_004606–10. Again, at no point did CFIUS engage in any meaningful discussion with the parties regarding whether their revised proposals were or could be further revised to be adequate and appropriate to address any national security concerns identified by CFIUS.

50.    In a final attempt to divine a package of risk mitigation

measures that would be adequate and appropriate to address any national security concerns identified by CFIUS, the parties submitted another revised draft NSA to CFIUS on December 2, 2024. AR_009399; AR_009402–38. Yet again, CFIUS failed to engage in any meaningful discussion with the parties regarding whether their revised proposals were adequate and appropriate to address any national security concerns identified by CFIUS.

51.     Rather, CFIUS sent another risk letter to the parties on December 14, 2024, in which CFIUS provided no discussion of why risk mitigation measures proposed by the parties were not adequate and appropriate to address the identified national security concerns. AR_000082–110. The parties responded to this risk letter on December 17, 2024. AR_009439; AR_009441–523. In a December 20, 2024 call with the Deputy Secretaries of the CFIUS member agencies, there was no discussion of risk mitigation measures. AR_000111. In short, the call was another listening-only meeting that afforded the parties no meaningful opportunity to engage with the CFIUS Deputy Secretaries.

52.     In fact, CFIUS had finalized its RBA for Nippon Steel's

acquisition of U. S. Steel on December 18, 2024 (AR_004557–604), prior to the December 20, 2024 call. Not only did this RBA include only scant references to the parties' proposed risk mitigation measures, but the timing reflected a one-day consideration of the parties' 83-page December 17, 2024 response to the December 14, 2024 risk letter, and an inability to consider the content of the December 20, 2024 call.

53.    In my view, CFIUS's multiple meetings with the parties without substantive dialogue amount to no more than a due process box-checking exercise rather than a meaningful opportunity for the parties to be heard on the merits of their risk mitigation proposals.

54.    At each opportunity to engage with the parties substantively on risk mitigation measures, CFIUS chose not to discuss or provide input on such potential measures, thereby hindering its ability to determine whether any risk mitigation measures were adequate and appropriate to address its identified national security concerns. I have never seen CFIUS choose not to engage with parties when it is working toward a goal of determining adequate and appropriate risk mitigation measures. This failure to engage with the parties suggests that CFIUS was instead motivated to ensure that its identified concerns would not be mitigated.

If CFIUS was making any effort at all to identify adequate and appropriate mitigation measures, it would have engaged with the parties instead of halting any engagement that could have resulted in the parties identifying mitigation measures on which CFIUS could come to a consensus. A consensus-building exercise would involve dialogue, not silence.

### C. CFIUS Imposed, or Attempted to Impose, Arbitrary and Unreasonable Deadlines That Impacted Its Review of the Transaction

55.    Along with engaging substantively with parties on risk mitigation measures, CFIUS generally follows a standard process in providing adequate time to review a transaction for national security concerns and consider mitigation proposals should CFIUS identify any national security concerns in an RBA. CFIUS's timeframe to review a voluntary notice begins with a 45-day review period upon accepting the voluntary notice filing. 31 C.F.R. § 800.503. During the review period, CFIUS will send questions to the transaction parties, to which they are obligated to respond within three business days (or within a longer time frame if granted by CFIUS) or risk CFIUS rejecting the notice. 31 C.F.R. § 800.504(a)(4).

56.   If necessary to continue its review of a transaction, CFIUS will enter into a second stage 45-day investigation period following the initial 45-day review period. 31 C.F.R. §§ 800.505-.508. During any investigation period, CFIUS will continue to send questions to the transaction parties with the same parameters of the initial 45-day review period. In 2023, more than 50% of CFIUS notice filings went to a second stage investigation.[7]

57.   In CFIUS's evaluation of the proposed U. S. Steel and Nippon Steel transaction, CFIUS imposed, or attempted to impose, arbitrary and unreasonable deadlines that violated established processes. These actions were unnecessary in light of the time that CFIUS had to complete its review and negotiate potential risk mitigation measures.

58.   First, the timing of CFIUS's August 28, 2024 RBA and August 31, 2024 risk letter is unusual, particularly in requesting a response to the risk letter within significantly less time than all other standard CFIUS time periods. In submitting the risk letter on the Saturday of Labor Day weekend after months of relative silence and requesting a response before the start of business that Wednesday,

_____

[7]   2023 CFIUS Annual Report, *supra* n.6, at 15.

CFIUS provided the parties only one business day to respond. AR_000068. In my experience, CFIUS has never before required the parties to a transaction to respond to a risk letter in only one business day. In fact, CFIUS recently finalized regulations which prohibited CFIUS from requiring parties to provide responses to mitigation proposals in less than three days. 31 C.F.R. § 800.504(d); 89 Fed. Reg. 93,179, 93,182 (Nov. 26, 2024). This amendment to the CFIUS regulations was predicated on CFIUS's recognition of "the importance of allowing sufficient time for consideration and negotiation" of risk mitigation measures. 89 Fed. Reg. at 93,182.

59.    In my opinion, there was no national security-related basis for CFIUS to require a response to the risk letter within one business day given the time remaining in CFIUS's investigation. The investigation period pending at the time was not set to conclude until September 23, 2024 (AR_000052), providing CFIUS at least 23 days to receive and consider a response from the parties, including any risk mitigation proposals. Even if CFIUS did not believe that three weeks was enough time to consider a response to the risk letter, CFIUS could extend the investigation period an additional 15 days per 31 C.F.R. § 800.508(e).

Further, the parties had already requested to withdraw and refile on August 23, 2024 (AR_009118), and thus the parties had signaled a willingness for the CFIUS review to continue beyond the September 23, 2024 conclusion of the investigation period.

60.    In reality, it appears that the timing of the risk letter response corresponded with the President and Vice President's appearances at a political rally which addressed the acquisition of U. S. Steel by Nippon Steel.[8] The August 31, 2024 risk letter was provided to parties two days before this Labor Day campaign rally, and, therefore, the issuance of the risk letter and potential presidential action appears timed to coincide with the Labor Day rally. Thus, as opposed to any of CFIUS's norms and usual practice for setting time limits for risk letter responses, the contrived, one-business day response appears tethered to political interests outside national security.

61.    Second, CFIUS seemed prepared to deny the parties an opportunity to have a third review period, essentially seeking an outside date for the parties' completed CFIUS review process to be on September 23, 2024. This would have been effectuated had CFIUS denied

---

[8]    *See* Biden & Harris September 2, 2024 Remarks, *supra* n.3.

the parties' request to withdraw and refile their notice, which the parties submitted to CFIUS on August 23, 2024.

62.    CFIUS routinely allows parties to withdraw and refile their notices in order to provide more time to evaluate a transaction for national security concerns and determine whether mitigation is adequate and appropriate to address any identified national security concerns. Withdrawals occur pursuant to 31 C.F.R. § 800.509 and can be requested "at any time." In 2023, the most recent year for which public information is available, 43 of 233 notices (18.45%) were withdrawn and refiled.[9]

63.    In this review, CFIUS exhibited a reluctance to allow the second withdrawal and refiling of the transaction's voluntary notice, and even submitted a question set to the parties asking them to justify this request and explain what further information they would provide during a subsequent review and investigation period. In my experience, CFIUS liberally grants requests to withdraw and refile, and this is particularly true when, as here, the parties have not had an opportunity to discuss potential mitigation and the transaction under review has not yet closed so no national security harm arising from the foreign acquisition can

---

[9]    2023 CFIUS Annual Report, *supra* n.6 at 14.

accrue.

64.    Indeed, longer CFIUS reviews through the withdraw-and-refile process occur on a regular basis; as previously stated, 18.45% of notice filed in 2023 were withdrawn and refiled.[10] Additionally, a well-known public example is the merger of Genworth Financial, Inc. and China Oceanwide Holdings Group Co., Ltd. There, parties disclosed that their voluntary notice for that transaction was withdrawn and refiled multiple times while the parties negotiated mitigation measures with CFIUS before finally receiving CFIUS approval by the fourth review period.[11]

65.    Yet, here, CFIUS was reluctant to grant the parties' routine

---

[10]    2023 CFIUS Annual Report, *supra* n.6, at 14.

[11]    *See* Sec. & Exch. Comm'n, Form 8-K, Exh. 99.1 (Feb. 7, 2017), at 2, https://www.sec.gov/Archives/edgar/data/1276520/000119312517033414/d259779dex991.htm (first notice); Sec. and Exch. Comm'n, Form 8-K, Exh. 99.1 (May 2, 2017), at 2, https://www.sec.gov/Archives/edgar/data/1276520/000119312517154210/d375730dex991.htm (withdrawal and refiling second notice); Sec. & Exch. Comm'n, Form 8-K, Exh. 99.1 (Nov. 2, 2017), at 2, https://www.sec.gov/Archives/edgar/data/1276520/000119312517331312/d439808dex991.htm (withdrawal and refiling third notice); Sec. & Exch. Comm'n, Form 10-K (Feb. 28, 2018), at 5–6 https://www.sec.gov/Archives/edgar/data/1276520/000119312518064038/d492876d10k.htm (withdrawal and refiling fourth notice); Sec. & Exch. Comm'n, Form 8-K (June 11, 2018) at 2, https://www.sec.gov/Archives/edgar/data/1276520/000119312518188688/d600137d8k.htm (CFIUS approval).

request for a second withdrawal and refiling and asked the parties to further explain their request to withdraw and refile. AR_004632. This is abnormal. I have never seen an instance where CFIUS has appeared reluctant to grant a request to withdraw and refile before engaging with parties to negotiate risk mitigation measures to address national security concerns.

66.    Together, CFIUS's requirement for the parties to respond to the August 31, 2024 risk letter within one business day, and CFIUS's hesitance to allow the parties to withdraw and refile their notice in September 2024, illustrate the imposition or attempted imposition of deadlines that would inhibit CFIUS's ability to complete its review of a transaction and negotiate meaningful mitigation. Tying its own hands with unnecessary deadlines does not serve CFIUS's stated purpose to identify adequate and appropriate mitigation measures to address national security concerns, and thus, such deadlines must have been motivated by other factors, such as the optics for a campaign rally or ahead of a presidential election date.

**D. In Failing to Build Consensus Among CFIUS Member Agencies on Risk Mitigation Measures CFIUS Ensured That the President Would Make the Final Decision**

67.  As part of its customary review processes, CFIUS member agencies work to build consensus on whether any national security concerns exist and, if so, whether mitigation measures are adequate or appropriate to resolve such concerns. This consensus-building often includes meetings among the CFIUS member agencies at the political level to include Assistant Secretary- or Deputy Secretary-level meetings. Should CFIUS reach consensus that mitigation measures are adequate and appropriate to address identified national security concerns, CFIUS concludes action without sending the transaction to the President for a determination.

68.  In this case, CFIUS failed to build consensus on a final position for the transaction. In the December 14, 2024 risk letter, CFIUS noted that its members had not reached consensus on whether risk mitigation measures would be effective in addressing national security concerns. AR_000092. Despite a response from the parties regarding the risk letter three days later on December 17, 2024 (AR_009439), CFIUS finalized its RBA on December 18, 2024 (AR_004557–604), and chose to

refer the case to the President instead of continuing to work toward consensus as has been its customary practice. AR_000112–14.

69. Based on my knowledge, no other prohibition of a transaction by the President has been based on a lack of consensus among the CFIUS member agencies regarding whether mitigation measures are adequate and appropriate to resolve any identified national security concerns. In order to build the necessary consensus, CFIUS, in my experience follows the standard processes discussed above, such as engaging with parties to put forth the best mitigation terms possible and always providing parties adequate time to respond to CFIUS concerns when the transaction has not yet closed and no national security concerns are accruing. Even in rare circumstances where CFIUS may identify national security concerns that could manifest during a review, CFIUS can impose interim risk mitigation measures on the parties and/or suspend the transaction from closing if CFIUS believes the parties may close prior to the completion of CFIUS's review and investigation, thus still providing the CFIUS member agencies time to come to a consensus.

70. As described above, that was not the case here. CFIUS exhibited consistent failures to engage in mitigation negotiations,

including instances where CFIUS staff were prevented from engaging and developing mitigation measures, and where CFIUS imposed or attempted to impose deadlines to limit the time it had to consider mitigation. Such limitations are abnormal when it is CFIUS's objective to determine mitigation that is adequate and appropriate to address national security concerns. Instead of taking the time to build consensus as it had in every previous transaction with which I am familiar, CFIUS's ultimate failure to reach consensus ensured that this matter would be referred to the President who had already pre-determined his position.

71. In fact, CFIUS appeared to be barreling toward a final announcement on the transaction timed around the September 2, 2024 Labor Day campaign rally, during the final months before the 2024 presidential election. The political influence on CFIUS's timing decisions was illustrated by: (*i*) CFIUS providing the August 31, 2024 risk letter on the Saturday of Labor Day Weekend, after what appears to have been months of relative silence from CFIUS, and requiring a response within one business day; (*ii*) the September 1, 2024 call to discuss the August 31, 2024 risk letter, during which the CFIUS staff had been instructed to only "listen" and not engage or respond to the parties; and, (*iii*) CFIUS

asking the parties to justify the withdrawal and refiling in what appears to have been an attempt to avoid extending CFIUS's review beyond the 2024 presidential election. Altogether, CFIUS taking these actions in the final 23 days remaining in the then-pending investigation period suggests that CFIUS was closing off its review in a manner that ensured that the President could execute his pre-determined decision, while limiting the parties' ability to meaningfully respond or further engage with CFIUS on that determination. This violated CFIUS's norms because, other than for political expediency, there was no basis to halt the CFIUS review at that time, when the transaction still had months before potentially closing, which would have given CFIUS time to engage with the parties to negotiate risk mitigation measures or at least articulate why the proposed measures were not adequate and appropriate to address the identified national security concerns.

72.    In another example of the politically expedient timing of CFIUS's review process, in December 2024, CFIUS took action to allow President Biden to make the final decision on the transaction before the end of his presidency, even though it had not yet completed its review process by coming to consensus. In the December 14, 2024 risk letter,

CFIUS noted that the parties had not reached consensus on whether risk mitigation measures would be effective in addressing national security concerns, and despite a response from the parties regarding the risk letter three days later on December 17, 2024, CFIUS finalized its final RBA on December 18, 2024 and chose to refer the case to the President instead of continuing to work toward consensus as has been its customary practice.

73.    Taken together, CFIUS's actions suggest that CFIUS was attempting to close off its review with an incomplete recommendation to the President and with no opportunity for the parties to meaningfully engage with senior CFIUS officials. This violated CFIUS's norms because, other than ensuring that the decision went to President Biden before his term ended, there was no basis to halt the CFIUS review when CFIUS has in the past liberally granted repeated opportunities to withdraw and refile, the transaction could have been suspended with any necessary interim measures to address any short-term national security concerns, and CFIUS could have continued to work toward consensus on whether the proposed risk mitigation measures are adequate and appropriate to address national security in the long-term.

74.    The ultimate referral to the President was not the result of the time-tested evaluation and consensus-building process of the career, professional CFIUS and member agency staff. CFIUS's staff was ultimately stymied in its efforts to achieve consensus by the instructions from political appointees not to engage with the parties on mitigation. CFIUS was simply not permitted to develop the factual underpinnings necessary for a fully informed recommendation to the President, particularly regarding whether mitigation measures were adequate and appropriate to address any identified national security concerns. Given the prohibition on engaging with the parties regarding mitigation, it is unsurprising that CFIUS was unable to reach a consensus and that the final RBA failed to make any mention of the efforts undertaken by CFIUS to reach consensus.

## V.    THE PARTIES' RISK MITIGATION PROPOSALS PROVIDED A BASIS FOR CFIUS TO ADDRESS THE IDENTIFIED NATIONAL SECURITY CONCERNS

75.    When evaluating whether the national security concerns that have been identified during its review of a transaction can be resolved, CFIUS considers a variety of risk mitigation measures many of which are

identified in the CFIUS annual reports to Congress.[12] In my experience, CFIUS always engages with the parties regarding potential mitigation measures in order to explore whether any national security concerns can be resolved short of the President prohibiting the transaction. Such mitigation discussions are an important part of the process because they often allow the government to obtain commitments from the parties that improve the United States's national security posture beyond the *status quo ante*. For example, a U.S. company may intend to cease certain business operations because they are not profitable or otherwise inconsistent with business objectives. However, as part of mitigation negotiations regarding the sale of the U.S. company to a foreign acquirer, CFIUS could compel the company to continue its operations in the interests of national security. In this way, CFIUS could act as the U.S. government's only tool to compel action that may not be in the company's business interests, whether or not the transaction closes, but is in the United States's national security interest. For these reasons, CFIUS's refusal to engage with the parties to evaluate mitigation terms that could potentially enhance the United States's national security posture was a

---

[12]  *See, e.g.*, 2023 CFIUS Annual Report, *supra* n.6, at 30–31.

significant departure from CFIUS's ordinary process.

76.    CFIUS's refusal to engage with the parties regarding the mitigation proposals cannot be justified by the nature of the parties' proposals. While CFIUS may not be comfortable negotiating novel, untested mitigation measures, the parties' risk mitigation proposals consisted of tried-and-true terms that CFIUS has described implementing in its annual reports.

77.    Further, a primary purpose of mitigation discussions is to afford CFIUS an opportunity to identify proposals of its own. For example, if CFIUS were concerned that a foreign acquirer might make "commercial decisions to reduce production" or "decline to support [the] use of trade remedy tools" (AR_004560), then, through discussions with the parties, CFIUS could work with the parties to craft mitigation measures that prohibit the company from making such commercial decisions and require the company to support the use of trade remedy tools.

78.    Additionally, CFIUS's refusal to discuss the parties' risk mitigation proposals cannot be supported by a claim that the proposed terms are neither monitorable nor enforceable. In my experience CFIUS

has always engaged with parties to a transaction regarding risk mitigation proposals, even where the acquirer was from an adversary nation to the point where CFIUS believed the acquirer would ignore its commitments, force CFIUS to attempt to catch violations, and then thwart efforts by CFIUS to remedy any violations. While CFIUS might believe at the outset that mitigation with such an untrustworthy foreign acquirer would be futile, in my experience, CFIUS has always explored potential avenues of mitigation with the parties before concluding mitigation was not monitorable or enforceable.

79.    Here, CFIUS acknowledged in the final RBA that the foreign acquirer is from a nation that is "a critical ally" of the United States (AR_004561) and proffered no concerns at all regarding the parties' willingness to comply with risk mitigation measures. Accordingly, the parties' risk mitigation proposals warranted engagement by CFIUS to explore whether a package of risk mitigation measures would be adequate and appropriate to address the identified national security concerns. Instead, CFIUS's lack of engagement suggests that it was not interested in allowing this transaction to be mitigated at all.

### A. The Parties' Risk Mitigation Proposals Contained Terms That Were Consistent With Mitigation Measures CFIUS Typically Negotiates and Approves in Resolving National Security Concerns

80.    In their risk mitigation proposals, the parties offered a variety of risk mitigation terms to address CFIUS's asserted national security concerns—each of which is similar to terms that CFIUS has negotiated and agreed to in other transactions. Some of the proposed mitigation terms are typical or standard across most CFIUS mitigation agreements, such as the implementation of a compliance policy, the appointment of a security officer, recordkeeping and reporting obligations, and CFIUS inspection and audit rights. AR_009135; AR_009231–39; AR_009307–15; AR_009419–27. CFIUS has described these terms as "tools to monitor and enforce compliance by the companies that are subject to mitigation measures."[13] Others of the proposed mitigation terms are specific measures to address the specific national security concerns identified by CFIUS as arising from this transaction.

81.    To address concerns about foreign leadership that might make commercial decisions that are harmful to U.S. national security,

---

[13]    2023 CFIUS Annual Report, *supra* n.6, at 31–32.

the parties offered mitigation terms that would require U. S. Steel to remain headquartered in Pittsburgh, Pennsylvania with a governance structure that includes (i) a majority of non-dual U.S. citizens on its board of directors, (ii) three independent directors that are non-dual U.S. citizens as approved by CFIUS to specifically oversee compliance with mitigation measures, (iii) core senior management members that are U.S. citizens, (iv) a designated security officer approved by CFIUS that will ensure compliance with CFIUS mitigation measures; and (v) in the event the parties violate the mitigation agreement, a non-voting board observer approved by CFIUS that will participate in board proceedings to monitor national security-related matters. AR_009133; AR_009225–28; AR_009300–03; AR_009406–11.

82.    These types of governance terms for U. S. Steel align with mitigation terms to resolve general national security concerns related to concerns about foreign leadership by ensuring that important decision making is still controlled by U.S. citizens, including a security officer that is specifically required to ensure compliance with CFIUS mitigation measures. CFIUS has agreed to similar mitigation terms, as documented in annual reports, such as "establishing a corporate security committee,

voting trust, and other mechanisms to limit foreign influence and ensure compliance, including the appointment of a U.S. Government-approved security officer, member of the board of directors, or board observer." [14]

83.    To address concerns about U.S. domestic production, the parties offered mitigation terms to (i) prioritize production at U. S. Steel to meet demand in the U.S. steel market, including providing briefings every six months to provide full transparency into capacity plans and production decisions; (ii) commit to substantive investments in production locations at U. S. Steel facilities; (iii) not transfer any U. S. Steel production capacity or jobs outside of the United States; (iv) not conduct any layoffs, plant closures, or idling of U. S. Steel facilities as a result of the transaction, (v) not reduce production capacity, subject to certain exceptions such as requiring a majority vote of the independent directors, whose appointments would require CFIUS approval; and (vi) transfer Nippon Steel's enhanced manufacturing and technology capabilities to U. S. Steel on arm's length terms. AR_009134–35; AR_009228–30; AR_009303–05; AR_009412–16.

84.    These types of operations-related guarantees align with

---

[14]   2023 CFIUS Annual Report, *supra* n.6, at 30–31.

CFIUS mitigation terms to resolve national security concerns related to a U.S. business losing its capability to support important U.S. initiatives as the result of new foreign ownership. CFIUS has agreed to similar mitigation terms such as "ensuring that certain facilities, equipment, and operations are located only in the United States," "assurances of continuity of supply to the U.S. Government for defined periods, notification and consultation prior to taking certain business decisions, and reservation of certain rights for the U.S. Government in the event that the company decides to exit a business line," and "establishing meetings to discuss business plans that might affect U.S. Government supply or raise national security considerations."[15]

85.    To address concerns about trade, the parties offered mitigation terms to (i) ensure that Nippon Steel does not interfere with U. S. Steel decision on trade matters; and (ii) establish an internal officer-level "trade committee" comprised of U.S. citizens and that require majority approval by independent U.S. directors for U. S. Steel decisions on trade matters. AR_009135; AR_009230–31; AR_009305–06; AR_009416–19.

---

[15]  2023 CFIUS Annual Report, *supra* n.6, at 30–31.

86.    The proposed parameters around U. S. Steel's decision making regarding trade matters (e.g., restricting the involvement of Nippon Steel), is consistent with the manner in which CFIUS has addressed issues of unwelcome foreign influence regarding matters of U.S. national security in the past. In viewing trade decisions by U. S. Steel as analogous to a project or specific operation, and the "trade committee" as a corporate committee, CFIUS has agreed to similar terms such as "ensuring that only authorized persons have access to certain . . . projects" and "establishing a corporate security committee, voting trust, and other mechanisms to limit foreign influence and ensure compliance."[16]

87.    Accordingly, the parties' proposed mitigation terms fall squarely within, or are closely analogous to, the risk mitigation measures CFIUS typically negotiates and approves. The parties' mitigation proposals therefore warranted consideration by CFIUS to determine whether such measures would be adequate and appropriate to resolve national security concerns, and CFIUS should have at least attempted to negotiate with the parties, or engaged in some meaningful way,

---

[16]    2023 CFIUS Annual Report, *supra* n.6, at 30–31.

regarding the mitigation terms. In fact, if CFIUS had been acting rationally and with a focus on U.S. national security, rather than summarily dismissing the parties' proposals, CFIUS would have proposed heightened mitigation measures that went beyond what the parties proposed.

### B. The Nature of the Parties Does Not Justify CFIUS's Failure to Engage on Mitigation Proposals

88.    CFIUS traditionally negotiates mitigation measures with transaction parties in a variety of contexts, including with foreign actors associated with countries that are generally considered to represent a risk to U.S. national security, such as China. Accordingly, in my experience prior to this transaction, CFIUS has always been able to identify adequate and appropriate mitigation measures with foreign acquirers from close allies such as Japan. As a parallel to the CFIUS process, for the mitigation of foreign ownership, control, or influence pursuant to the National Industrial Security Program Operating Manual at 32 C.F.R. Part 117, low threat actors are allowed to ultimately own U.S. subsidiaries doing even "Top Secret" work. In the same vein, CFIUS frequently negotiates risk mitigation measures that are adequate and appropriate for low threat actors, even if the same measures would not

be adequate and appropriate for high threat actors.

89.    Nippon Steel is based in a country that is a close ally of the United States, and based on publicly available information, neither Nippon Steel nor other Japanese companies have a history of consistently or intentionally failing to comply with CFIUS risk mitigation measures or related national security regulatory regimes.

90.    Further, the mitigation proposals provided by the parties offer terms that do more than just resolve national security concerns—in some instances, the terms have the potential to bolster U.S. national security. For instance, the parties' first draft NSA proposed to commit to have Nippon Steel invest at least $2.7 billion in U. S. Steel and transfer its enhanced manufacturing and technology capabilities to U. S. Steel on arm's length terms, which are terms that would benefit production capabilities in the U.S. steel market. AR_009134–35. Such a potential benefit to U.S. national security would appear more likely to incentivize CFIUS, if acting rationally, to negotiate mitigation terms with the parties, not avoid engagement.

91.    The December 18, 2024 RBA makes scant references to the parties' mitigation proposals, and nowhere does the RBA explain why

such proposals are not worth negotiating. In fact, what little the RBA discusses about the parties' mitigation proposals suggests that mitigation, if negotiated, could resolve a national security concern. In describing the parties' proposal relating to an independent "trade committee" to address trade matter concerns, the RBA states that "[w]hether such a committee could fully address the national security concerns raised would depend on numerous factors, including the enforcement mechanisms." AR_004601. However, CFIUS never took the step to attempt to discuss such factors or how they might be mitigated, including through strengthened enforcement mechanisms. Rather, CFIUS's musing on mitigation was left unresolved and illustrates how CFIUS's failure to meaningfully engage with the parties impacted its ability to come to consensus on adequate and appropriate mitigation measures.

## VI. CONCLUSION

92.    Based on my experience, the conduct of CFIUS's review of Nippon Steel's proposed acquisition of U. S. Steel was far outside the standards of the mandatory or customary CFIUS process. These deviations appear to have been motivated by interests other than

national security. In multiple instances, CFIUS failed to substantively engage with the parties and appeared willing to, or did in fact, cut its review of the transaction short at politically strategic points in time, which ultimately guaranteed that CFIUS would fail to reach consensus on national security risk mitigation. In failing to reach a consensus, CFIUS ensured that the President would make a pre-determined decision for stated political reasons, apparently informed by improper third-party communications, and not a fully informed determination on the basis of U.S. national security.

93.    There does not appear to be any national security-related basis behind these discrepancies in the CFIUS process. The publicly stated political interests of the President have never before interfered with the work of the CFIUS staff, who, in my experience, have always taken the time to complete their analysis and work toward consensus before sending a transaction to the President. But such political interference appears to have occurred here. There is no other explanation for the significant deviations from the mandatory and customary CFIUS processes regarding the review of Nippon Steel's acquisition of U. S. Steel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this day February 2, 2025.

_____
Richard C. Sofield

# Appendix A

## Richard Sofield
(202) 383-8054 | rcsofield@debevoise.com | Washington, D.C.

**PROFESSIONAL SUMMARY**

Richard Sofield has approximately 25 years of experience in government national security roles, including as a U.S. Department of Justice representative on CFIUS, where he participated in approximately 1,500 CFIUS reviews. He has since spent more than six years in private practice, devoting a meaningful portion of his practice to advising clients on filings before CFIUS.

**EXPERIENCE**

**Debevoise & Plimpton LLP** (Washington, D.C.)                    **Jan. 2024 - Present**
*Partner,* Co-Head of National Security Group
- Represents financial institutions, private equity sponsors, & public & private companies on cross-border transactions & investments with national security implications.
- Advises on security reviews by CFIUS, the mitigation of foreign ownership, control or influence, & the review of FCC license applications by Team Telecom.

**Vinson & Elkins** (Washington, D.C.)                    **Sept. 2021 – Jan. 2024**
*Partner,* Member of National Security & International Trade practice group

**Wiley Rein** (Washington, D.C.)                    **Oct. 2018 – Sept. 2021**
*Partner,* Co-Head of CFIUS practice group

**U.S. Department of Justice** (Washington, D.C.)                    **Aug. 2008 – Sept. 2018**
*Director,* Foreign Investment Review Staff; *Principal Deputy Chief*
- Represented the Department of Justice on CFIUS.
- Chair of "Team Telecom," now know as the Committee for the Assessment of Foreign Participation in the Telecommunications Services Sector.
- Involved in approximately 1,500 CFIUS reviews, including approximately 100 reviews which resulted in CFIUS mitigation.

1

**App.205**

**U.S. Department of Justice** (Washington, D.C.)    **July 2003 – Aug. 2008**
*Attorney Advisor*, Office of Intelligence Policy and Review
- Supported counterintelligence & counterterrorism investigations before the Foreign Intelligence Surveillance Court.
- Prepared applications for electronic surveillance & physical searches pursuant to the Foreign Intelligence Surveillance Act.

**U.S. Department of Justice** (Washington, D.C.)    **Oct. 1998 – July 2003**
*Trial Attorney*, Fraud Section, Civil Division
- Litigated Civil False Claims Act enforcement matters, including those involving classified U.S. government contracts.

**U.S. Department of Defense** (Washington, D.C.)    **May 1994 – Oct. 1998**
*Attorney Advisor*
- Acquisition law attorney & fraud remedies attorney with the Defense Logistics Agency & the Department of the Air Force.

**EDUCATION**
J.D.  Hofstra University School of Law                                      1994
A.B.  Harvard University                                                   1991

**PUBLICATIONS**
- Sofield et al., *National Security*, 24 The Private Equity Report Quarterly 15, January 2025.
- Dembosky, Sofield et al., *National Security Update: DOJ Unveils Rules Restricting Sensitive Bulk Data Transfers*, Debevoise In Depth, January 10, 2025.
- Borut, Sofield et al., *Treasury Issues Final Rule on CFIUS Review & Enforcement*, Debevoise In Depth, December 24, 2024.
- Amirfar, Sofield et al., *Debevoise National Security Update: Increase UFLPA Enforcement*, Debevoise Update, December 10, 2024.
- Borut, Sofield et al., *National Security Update: Court Upholds Divest-or-Ban Law Impacting Tik Tok U.S. Operations*, Debevoise Update, December 9, 2024.
- Borut, Sofield et al., *To File, or Not to File: The Changing Calculus for Voluntary CFIUS Filings*, 24 The Private Equity Report Quarterly 8, 2024.
- Sofield et al., *FCC Proposes New Rules to Strengthen National Security in Submarine Cable Systems*, Debevoise In Depth, November 26, 2024.

2

**App.206**

- Kini, Sofield et al., *Charges Against Virginia Company Showcase U.S. Government's Focus on Enforcing Sanctions and Export Controls*, Debevoise In Depth, November 19, 2024.
- Kini, Sofield et al., *Treasury Finalizes U.S. Outbound Investment Restrictions*, Debevoise In Depth, November 8, 2024.
- Kini, Sofield et al., *Biden Administration Proposes to Limit Access to Sensitive Personal Data by Countries of Concern*, Debevoise Data Blog, November 6, 2024.
- Borut, Sofield et al., *CFIUS 2023 Annual Report in Context: Focus on Monitoring and Enforcement Continues*, Debevoise In Depth, October 3, 2024.
- Borut, Sofield et al., *CFIUS*, 24 The Private Equity Report Quarterly 18, August 2024.
- Amirfar, Sofield et al., *Preparing For Increased Scrutiny Of Tech Supply Chains*, Law360, July 23, 2024.
- Kini, Sofield et al., *Treasury Proposes New U.S. Outbound Investment Rule*, Debevoise In Depth, July 11, 2024.
- Sofield et al., *Debevoise National Security Update: D.C. Circuit Weighs in on When FARA's Registration Duty Ends in Attorney General v. Wynn*, The Debrief, June 25, 2024.
- Amirfar, Sofield et al., *Debevoise National Security Update: Department of Commerce Issues First Final Determination under ICTS Regime*, Debevoise Update, June 25, 2024.
- Kini, Sofield et al., *DOJ National Security Division Issues First-Ever Declination Under Enforcement Policy*, The Debrief, May 29, 2024.
- Rubin, Sofield et al., *Debevoise National Security and Life Sciences Update: The BIOSECURE Act*, Debevoise In Depth, May 22, 2024.
- Amirfar, Sofield et al., *Debevoise National Security Update: UFLPA Entity List Expansion*, Debevoise Update, May 22, 2024.
- Sofield et al., *CFIUS Developments and Forecast: What Private Equity Sponsors Should Know*, 24 The Private Equity Report Quarterly 11, May 2024.
- McIver, Sofield et al., *FDI Scrutiny of Private Equity Secondary Deals on the Rise*, 24 The Private Equity Report Quarterly 13, May 2024.
- Borut, Sofield et al., *President Biden Issues Order Unwinding Chinese-Owned Cryptocurrency Mining Company Real Estate Acquisition*, The Debrief, May 15, 2024.
- Kini, Sofield et al., *New National Security Law Represents Significant Sanctions Expansion*, Debevoise In Depth, April 29, 2024.

3

- Borut, Sofield et al., *Treasury Proposes Rule to Enhance CFIUS Review & Enforcement*, Debevoise In Depth, April 29, 2024.
- Amirfar, Sofield et al., *Debevoise National Security Increased UFLPA Enforcement*, The Debrief, April 12, 2024.
- Kini, Sofield et al., *U.S. Acts to Limit Export of Sensitive Personal Data*, Debevoise In Depth, March 19 2024.
- Amirfar, Sofield et al., *Debevoise National Security Update: Supply Chain Security in 2024*, Debevoise In Depth, March 11, 2024.

## PROFESSIONAL MEMBERSHIP
- Admitted, Maryland Bar.
- Admitted, District of Columbia Bar.

## AWARDS & RECOGNITIONS
- Assistant Attorney General's Award for National Security          2018
- Attorney General's Award for Exceptional Service                 2011
- Intelligence Community Legal Award                               2011

4

**App.208**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| UNITED STATES STEEL CORPORATION, et al., <br><br>       *Petitioners,* <br><br>   v. <br><br> THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES, et al., <br><br>       *Respondents.* | No. 25-1004 |

## <u>DECLARATION OF CHRISTOPHER PADILLA</u>

I, Christopher Padilla, under penalty of perjury, hereby declare as follows:

1.   Through their Counsel, I have been retained by Petitioners United States Steel Corporation (U. S. Steel) and Nippon Steel Corporation (Nippon Steel) to offer an opinion on the trade-related justifications given by CFIUS in its review of the acquisition of U. S. Steel by Nippon Steel.

2.   From 2002 to 2008, I served in several senior international trade positions at the U.S. Department of Commerce and the Office of the

U.S. Trade Representative, where I participated actively in CFIUS reviews by the government, oversaw the administration of U.S. trade remedy laws, and frequently interacted with the domestic steel industry on trade matters. From 2009 to 2024, I was the global head of government and regulatory affairs for IBM Corporation, during which time I represented the company on two transactions reviewed by CFIUS, and was a signatory to two National Security Agreements.

3.    The power of the President to prohibit or unwind private foreign investment transactions derives from a grant of authority by Congress under Section 721 of the Defense Production Act of 1950, 50 U.S.C. § 4565.

4.    Notably, the President's power to review foreign investment is not unlimited. Through the Defense Production Act and two subsequent significant amendments (the Foreign Investment and National Security Act (FINSA) of 2007,[1] and Foreign Investment Risk Review Modernization Act (FIRRMA) of 2018[2]), Congress carefully and deliberately circumscribed the President's authority to review foreign

---

[1] Pub. L. 110-49.
[2] Pub. L. 115-232, Sec. 1701.

2

**App.210**

investment so that denial of transactions would not be arbitrary, made on a whim, or made for political reasons. Instead, the law requires a specific national security justification under specified criteria,[3] a risk-based analysis of the transaction, a determination that an identified national security risk cannot be mitigated, and a determination that no other provision of law other than Section 721 or the International Emergency Economic Powers Act[4] is available to address the risk.

5.    Denying a transaction should thus be a last resort. It is a power that can *only* be used when a specific national security risk is identified that cannot be mitigated and when no other provision of law is sufficient to protect national security.

6.    In the case of Nippon Steel's acquisition of U. S. Steel, the Committee on Foreign Investment in the United States (CFIUS or the Committee) did not follow the mandates of Congress, particularly regarding the trade-related risk that CFIUS claimed to identify in its review of the transaction, and on which the President purported to rely in blocking it.

---

[3] *See* 50 U.S.C. § 4565(f).

[4] 50 U.S.C. §§ 1701-09.

**App.211**

7.    First, the alleged trade "risk" identified by CFIUS and relied on by the President as a justification to block the transaction on national security grounds is contrary to facts, prejudicial, and dangerous. CFIUS identified as a national security risk the possibility that under the ownership of Nippon Steel, U. S. Steel might file and support fewer petitions for import relief under the Antidumping and Countervailing Duty (AD/CVD) Laws. This would allegedly harm, without the possibility of mitigation, the President's ability to impose import tariffs on imported steel to protect domestic production. This alleged trade "risk" is entirely speculative and relies upon multiple, interdependent, and erroneous assumptions about private parties' economic incentives and actions, independent government agencies' decisions, and the outcome of data-intensive government investigations subject to judicial review. Moreover, in articulating its alleged trade "risk" CFIUS implies that the President's power to impose tariffs is extremely weak and that he lacks the authority to levy tariffs on steel (or other products) to protect national security and domestic industry *unless private industry first files AD/CVD petitions* for import relief. This position is not only unprecedented and dangerous but is starkly different than that articulated by President Trump just within

4

**App.212**

the last two weeks, where he has made clear in a directive to his Cabinet that he believes he has the power to impose a wide range of new tariffs on *all U.S. trade* under a wide range of legal authorities, regardless of what one private company may or may not do.[5]  Should the trade argument CFIUS relied on in this case prevail, it could substantially limit the President's power to use tariffs to protect national security and domestic industry.

8.    Second, the President and CFIUS failed to consider, or improperly dismissed, other provisions of trade law that could have mitigated the alleged trade "risk."  As detailed below, there are at least five other provisions of U.S. trade law that can and have been used by Presidents to protect national security and domestic production with import tariffs. CFIUS only fully considered one of them, dismissing it under reasoning that was illogical, contradictory, and contrary to the statements and actions of two recent Presidents. It entirely ignored three

---

[5] *America First Trade Policy*, THE WHITE HOUSE (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/america-first-trade-policy/. The authorities referenced in this Memorandum include the Wilson-Gorman Tariff of 1894; Sections 337 and 338 of the Tariff Act of 1930; Section 232 of the Trade Expansion Act of 1962; Sections 202, 203, and 301 of the Trade Act of 1974; the International Emergency Economic Powers Act; and trade agreement implementing acts.

other trade laws, two of which have been used by recent Presidents to protect domestic steel production for economic and national security reasons. And it dismissed, under errors of fact and law, the government's ability to self-initiate AD/CVD cases, preferring private petitions mainly for reasons of convenience, not national security.

9.    Third, CFIUS refused to consider a comprehensive National Security Agreement proffered by the Parties that would have mitigated the alleged trade "risk." Even if CFIUS had fulfilled its responsibility to conduct a more fulsome analysis of other laws and concluded they were insufficient to mitigate the alleged trade "risk," CFIUS *still* could have addressed the risk through a mitigation agreement, a remedy envisioned by FINSA and FIRRMA and outlined in Treasury Department regulations. It steadfastly refused to do so, despite the Parties' willingness to grant the government unprecedented oversight of their decisions on using trade remedy laws.

10.    The most logical explanation for the contradictory and contrived arguments CFIUS made regarding the national security trade "risk" of fewer U. S. Steel filings under AD/CVD laws is that the Committee was grasping for a rationale to justify a decision the President

6

**App.214**

had already publicly announced. It is, therefore, my opinion that the trade-related analysis of CFIUS in this transaction was not supported by evidence or logic, and did not comply with the requirements set forth by Congress.

## A.    QUALIFICATIONS

11.    I served from 2007 to 2008 as Under Secretary of Commerce for International Trade, a Senate-confirmed position at the Commerce Department leading the International Trade Administration, which is responsible for developing U.S. trade policy, promoting exports, reviewing foreign direct investment in the United States, monitoring compliance with trade agreements, representing U.S. commercial interests to foreign governments, and administering trade remedy laws.

12.    As Under Secretary, I was the lead Commerce Department official on the Deputies Committee of CFIUS, coordinating the department's position on cases under review and investigation by the Committee. I also participated in drafting regulations to implement FINSA, which was the first significant revision of foreign investment law by Congress in nearly 20 years.

7

**App.215**

13.    As Under Secretary, I also oversaw the work of the Commerce Department's Import Administration, which conducts investigations to determine whether foreign companies are selling goods in the United States at unfairly low prices (dumping) or receiving unfair subsidies from their governments under Title VII of the Tariff Act of 1930, as amended.[6] If dumping or subsidies are found, the Import Administration imposes Antidumping (AD) or Countervailing (CVD) duties on the imported goods.

14.    From 2006 to 2007, I served as Assistant Secretary of Commerce for Export Administration, a Senate-confirmed position overseeing policies and regulations to control the export of dual-use items to protect national security and advance U.S. foreign policy interests. As Assistant Secretary, I oversaw the Bureau of Industry and Security's office (now called the Office of Strategic Industries and Economic Security), responsible for analyzing and safeguarding the U.S. defense industrial base and conducting national security reviews of imports under Section 232 of the Trade Expansion Act of 1962 (Section 232).[7] As

---

[6] 19 U.S.C. §§ 1671-1677.
[7] 19 U.S.C. § 1862.

8

**App.216**

Assistant Secretary, I frequently participated in CFIUS cases, attending inter-agency meetings and providing input to the Committee on how a particular foreign investment might impact the government's ability to control sensitive national security goods and technology, as well as the impact of proposed transactions on the nation's defense industrial base.

15.    From 2002 to 2005, I served as an Assistant United States Trade Representative, responsible for liaising with private sector companies, labor unions, and others interested in U.S. trade policy. In this role, I interacted with the steel industry during the conclusion of a safeguard action imposed on steel imports under Section 201 of the Trade Act of 1974 (Section 201).[8] I also worked with the steel industry, among other U.S. industries, to understand its concerns during the negotiation of bilateral and regional free trade agreements and multilateral negotiations of the World Trade Organization.

16.    I also have experience with CFIUS from a private sector perspective. From 2009 to 2024, I was Vice President for Government and Regulatory Affairs for IBM Corporation. In this position, I oversaw IBM's export and import regulatory compliance teams and led the company's

---

[8] 19 U.S.C. § 2251.

9

**App.217**

efforts on two divestitures to foreign buyers that CFIUS reviewed. I was the company's lead negotiator and signatory on National Security Agreements with CFIUS lead agencies in each case. Given my government and private sector experience, I was asked to testify before the Senate Committee on Banking, Housing, and Urban Affairs on proposed CFIUS reform in January 2018, during congressional consideration of FIRRMA.[9] A copy of my curriculum vitae is attached hereto as Appendix 1.

## B.    <u>THE HISTORICAL STANDARD OF REVIEW BY CFIUS</u>

17.    During my experience participating in CFIUS reviews as a government official, the Committee's consideration of cases was governed by a set of clearly understood and publicly articulated review standards published in 2008. The historical context that led to these procedures and standards is set out below.

18.    In 2006, Dubai Ports World (DP World), a state-owned company from the United Arab Emirates, proposed to purchase

---

[9] *CFIUS Reform: Examining the Essential Elements: Hearing before the S. Comm. on Banking, Hous. and Urb. Affs.*, 115th Cong. (2018) (statement of Christopher A. Padilla, Vice President, Government and Regulatory Affairs IBM Corporation), https://www.banking.senate.gov/-imo/media/doc/Padilla%20Testimony%201-18-18.pdf.

**App.218**

Peninsular and Oriental Steam Navigation Company (P&O), a British firm that managed operations at six major U.S. seaports. The acquisition raised concerns about port security and the potential risks of having a foreign company manage critical U.S. port operations. After CFIUS initially did not block or put conditions on the deal, there was significant political opposition in Congress, with many lawmakers arguing that the deal could compromise U.S. port security. Among other things, lawmakers criticized CFIUS for having procedures that were too opaque and informal, lacking clear standards of review, and conducted at a staff level without the involvement of senior Executive Branch officials or notification to Congress about the outcome of investigations.

19.    Partly in response to the DP World controversy, Congress passed FINSA in 2007, the first significant revision in foreign investment review law in almost twenty years. Among other things, FINSA formally established CFIUS in statute, expanded the scope of transactions subject to review, required senior-level (sub-Cabinet) involvement in the review process, increased oversight by Congress, and introduced more formalized standards for mitigation, tracking, and post-consummation monitoring of approved transactions.

20.    Following the passage of FINSA, the President issued Executive Order 13456 on January 23, 2008, and the Treasury Department issued implementing regulations[10] as well as guidance to the public regarding the types of transactions it has reviewed.[11] As a senior sub-Cabinet official during this time, I participated actively in the process that led to the drafting and publication of these measures. Collectively, they created a much more formalized process for CFIUS reviews by the Executive Branch.

21.    In my experience on the Committee post-FINSA, CFIUS used two clear standards of review in conducting national security investigations:

> a.    that CFIUS initiates an investigation only when the transaction threatens to impair the national security of the United States and that threat has not been mitigated;[12] and

---

[10] Regulations Pertaining to Mergers, Acquisitions, and Takeovers by Foreign Persons, 73 Fed. Reg. 70702 (Nov. 21, 2008) (codified at 31 CFR Part 800).

[11] Guidance Concerning the National Security Review Conducted by the Committee on Foreign Investment in the United States, 73 Fed. Reg. 74567 (Dec. 08, 2008).

[12] An exception to this rule is that, per FINSA, CFIUS must investigate whenever a state-owned firm seeks to invest in critical infrastructure.

12

**App.220**

b.    that CFIUS will seek a mitigation agreement only if provisions of law other than Section 721 of the Defense Production Act of 1950, as amended, and the International Emergency Economic Powers Act do not adequately address the identified risk.

22.    These standards were intended to prevent CFIUS from stopping foreign investment on specious grounds and prevent agencies from demanding mitigation agreements when other provisions of law could adequately address an identified national security risk.

**C.    THE TRADE "RISK" IDENTIFIED BY CFIUS IS CONTRARY TO THE FACTS, SPECULATIVE, PREJUDICIAL, AND DANGEROUS**

23.    In this case, CFIUS identified as a national security risk the possibility that under the ownership of Nippon Steel, U. S. Steel might file and support fewer AD/CVD petitions for import relief, or participate less in such cases. This would allegedly harm, without the possibility of mitigation, the President's ability to impose effective and timely AD/CVD tariffs on imported steel to protect domestic production.

24.    AD/CVD tariffs, which I was responsible for administering in my role as Under Secretary of Commerce, can be imposed only after a

13

**App.221**

finding of dumping or unfair subsidization following an investigation of fact by the Commerce Department. There must also be a separate finding of injury to the domestic industry by the United States International Trade Commission (USITC), an independent agency. AD/CVD investigations are fact-intensive, often lengthy, and subject to judicial review. They may be initiated by petitions filed by domestic parties, including companies, labor unions, trade associations, or others. They may also be "self-initiated" by the Commerce Department itself.[13]

25.    CFIUS argues that "there is a risk that Nippon Steel-owned U. S. Steel could reduce its participation in U.S. trade remedy investigations and reviews, with a possible adverse impact on the commercial viability of the domestic steel industry to the extent that U. S. Steel's non-participation impairs Commerce's ability to order remedies pursuant to such investigations and reviews."[14]

26.    Essentially, the trade "risk" identified by CFIUS is that U. S. Steel *might* file fewer AD/CVD petitions and participate less in AD/CVD proceedings under the ownership of Nippon Steel, thereby impairing the

---

[13] *See* Sections 702(a) and 732(a)(1) of the Tariff Act of 1930, as amended.
[14] AR_000086.

14

**App.222**

President's ability to protect the domestic steel industry through the imposition of import tariffs.

27.    There are several problems with this highly speculative analysis. First, it entirely disregards Nippon Steel's economic self-interest in U. S. Steel continuing to file AD/CVD petitions to protect the considerable investment (approximately $18 billion) it would be making in U.S. domestic steel production. Second, it depends upon a series of prejudicial assumptions about private parties' actions and the outcome of fact-intensive government investigations subject to judicial review. Finally, it sets a dangerous precedent by outsourcing the President's responsibility to protect national security to private parties.

### a.    Nippon Steel Has No Economic Interest in Weakening the AD/CVD Process.

28.    Nippon Steel proposed investing nearly $18 billion in U. S. Steel, both to make the acquisition and upgrade outdated U. S. Steel facilities. It has every economic and commercial incentive to use those facilities to supply U.S.-based customers and to avoid taking any actions that would undermine its investment. Yet in its August and December letters to the Parties, CFIUS baselessly claims there is a "risk" that Nippon Steel would import steel from Japan and/or India, thus

15

undermining domestic production. CFIUS provided no evidence for the claim, and when the Parties pointed out the economic irrationality of spending billions to buy domestic production facilities only to import competitive products, CFIUS was silent except to claim that Nippon Steel "might" prevent U. S. Steel from participating in or filing AD/CVD petitions, notwithstanding the Parties' written and legally-enforceable commitments to the contrary. As evidence for its claim, CFIUS argued that Nippon Steel participated in relatively few U.S. trade remedy cases.[15]

29.    This claim is wrong on the facts and the law: as a foreign producer, Nippon Steel *cannot* be a petitioner in most U.S. trade remedy cases, which can only be brought by U.S. producers. Nippon Steel's U.S. affiliates produce a limited range of products that do not give them U.S. producer status in most ongoing AD/CVD proceedings. However, the company *has* participated in support of U.S. trade remedy actions in cases where it has the status to do so, such as a recent filing by Wheeling-Nippon Steel Inc. Wheeling-Nippon Steel is currently a petitioner in ongoing U.S. AD/CVD investigations into corrosion-resistant steel from

---

[15] AR_000059; AR_000096.

**App.224**

Australia, Brazil, Mexico, the Netherlands, South Africa, Taiwan, Turkey, the United Arab Emirates, and Vietnam.[16] Notably, this case includes four countries where Nippon Steel affiliates produce corrosion-resistant steel (Brazil (USIMINAS), Mexico (Tenigal), Vietnam (China Steel and Nippon Steel Vietnam JSC and NS BlueScope Vietnam), and UAE (Al Ghurair Iron & Steel LLC)).  U. S. Steel itself also has played a lead role in supporting AD orders targeting imports of steel products from Japan, including from Nippon Steel, during the pendency of the merger.[17]

30.    The Parties attempted to deal with the ever-changing trade "risks" that CFIUS raised by making legally enforceable commitments *not to do* what CFIUS alleged they might, and *to do* what CFIUS alleged they might not. First, they pointed out the economic illogic of undermining a multi-billion dollar domestic investment with imported products. The Parties then committed not to import steel from Japan, India, or other countries in a manner that would reduce U. S. Steel's production capacity.[18] They pointed out Nippon Steel's economic self-

---

[16] 89 Fed. Reg. 80196 (Oct. 2, 2024); 89 Fed. Reg. 80204 (Oct. 2, 2024).

[17] Tin- and Chromium-Coated Steel Sheet from Japan, Inv. No. 731-TA-860 (Fourth Review), USITC Pub. 5507 at 248 (May 2024).

[18] AR_010681.

17

**App.225**

interest in U. S. Steel continuing to participate in AD/CVD cases to protect its considerable investment in U.S. production.[19] When that was not enough for CFIUS, they proposed a National Security Agreement that gave unprecedented and extraordinary powers to CFIUS to influence the actions of a private party participating in a legal proceeding before the government.[20]

31.    Despite all these assurances, CFIUS continued stubbornly to refuse to engage with the Parties on a National Security Agreement that would have mitigated the purported trade "risk."

### b.    The "Risk" CFIUS Identified Is Prejudicial

32.    To my knowledge, CFIUS has never before identified the possibility that a single private party might file fewer AD/CVD petitions as a national security risk. Perhaps that is because in invoking this trade-related "risk," CFIUS is effectively *pre-judging the outcome of petitions* that are, according to law, supposed to be independently adjudicated by Commerce and USITC based on findings of fact involving a specific product at a given time.

---

[19] AR_009120; AR_009441.

[20] AR_010681.

18

**App.226**

33.    There can be no legal assurance that if U. S. Steel under Nippon Steel's ownership filed as many AD/CVD petitions (or even ten times more AD/CVD petitions), this would result in equal or greater protection for domestic industry via import tariffs. To call the unsupported allegation that U. S. Steel might file fewer trade remedy petitions a trade "risk" means that CFIUS is *assuming in advance the legal outcome of these cases*: that when U. S. Steel files an AD/CVD petition, Commerce *will* find that dumping or subsidization exists, that USITC *will* find injury to domestic industry, and that tariffs *will* be imposed. CFIUS further assumes that in the absence of a private party petition from U. S. Steel (and *only* U. S. Steel), it will be impossible for the President to impose tariffs on imported steel sufficient to support domestic production, thereby weakening national security.

34.    This is, at best, a highly attenuated "risk" entirely dependent upon a series of questionable assumptions about the outcome of legally justiciable claims of dumping, subsidization, and injury.[21] The existence

---

[21] Note that the U.S. Court of International Trade and the U.S. Court of Appeals for the Federal Circuit have the power to reverse Commerce antidumping or countervailing duty determinations and often remand such determinations for different action, including in steel cases.

19

of "risk" further depends entirely upon the argument that the participation of a *single private party*, U. S. Steel, is indispensable to the administration of U.S. trade remedy laws, ignoring that many other private parties, such as labor unions and trade associations, can and do file AD/CVD steel petitions. CFIUS did not consider the wide range of other parties who can (and have) filed AD/CVD petitions on steel, as evidenced by the lack of discussion of this in the Commerce Risk-Based Analysis. Commerce can also self-initiate steel AD/CVD actions. In recent years this power has generally been used to self-initiate investigations into circumvention of existing AD/CVD orders. Even putting aside that a Nippon Steel-owned U. S. Steel would have the same – or greater – economic incentives to participate in trade remedy cases and the Parties' legally enforceable commitment to continue doing so, the alleged absence of U. S. Steel from the AD/CVD process would not create a risk to national security and a single company's participation is most certainly not a prerequisite for the AD/CVD process to continue to work.

### c.    CFIUS Seems to Outsource a Critical National Security Function to Private Parties

35.    It is crucial to consider the broader implications of the CFIUS conclusion that the petition of a private party is an essential prerequisite

for the President to protect national security through import tariffs. This conclusion is not only bizarre but also dangerous. It would outsource to a private party the President's constitutional obligation to protect national security and undermine the delegated power Congress has given him through multiple statutes to self-initiate action to impose trade remedies.

36.    To illustrate, suppose we accept for a moment the CFIUS argument that the existence of a particular private party petitioner in AD/CVD cases is essential to protect national security steel production. But what if an independent U. S. Steel or another domestic steelmaker decides to file fewer AD/CVD petitions because of the extensive cost involved in filing such petitions? Or what if the board and CEO of a domestic steelmaker decide not to file any more AD/CVD petitions because they no longer believe the company needs protection from imports or because they have a new-found ideological aversion to import remedies?

37.    CFIUS contends that privately filed AD/CVD petitions are indispensable to protect national security. Therefore, we must assume the President also needs *the power to compel private parties to file petitions for import relief against their wishes.* This makes no sense, yet

21

it flows logically from the reasoning CFIUS applied in this case to formulate a national security trade "risk" that allegedly could not be mitigated.

38. CFIUS implies that the President's power to impose tariffs is extremely weak and that he lacks the authority to levy tariffs on steel (or other products) to protect national security and domestic industry *unless private industry first files AD/CVD petitions* for import relief. This position is not only unprecedented and dangerous but is starkly different than that articulated by President Trump just within the last two weeks, where he has made clear in a directive to his Cabinet that he believes he has the power to impose a wide range of new tariffs on *all U.S. trade* under a wide range of legal authorities, regardless of what one private company may or may not do.[22] Should the trade argument CFIUS relied on in this case prevail, it would substantially limit the President's power to use tariffs to protect national security and domestic industry.

39. Overall, CFIUS concocted a Rube Goldberg of trade "risk," a convoluted construct that relies upon multiple, interdependent, and erroneous assumptions about private parties' economic incentives and

---

[22] *See America First Trade Policy, supra* note 5.

actions, independent government agencies' decisions, and the outcome of data-intensive government investigations subject to judicial review. It is also a construct that would sharply curtail powers delegated by Congress to the President over trade and tariffs, conditioning that authority on private-sector petitions for relief.

40.    Even if one gives CFIUS the benefit of the doubt that such trade "risk" exists, the question before CFIUS is whether the alleged risk can be mitigated by other provisions of law or by a National Security Agreement. These are the remedies to address national security risks under CFIUS regulations and practice. Both remedies were available, but CFIUS declined to consider either one.

**D.    THE PRESIDENT HAS AMPLE AUTHORITY UNDER OTHER PROVISIONS OF LAW TO PROTECT NATIONAL SECURITY FROM THE ALLEGED TRADE "RISK"**

41.    That the government does not need to rely on private party AD/CVD petitions to protect domestic steel production via import tariffs is further underscored by the fact that at least five other statutes give the President broad authority to impose comparable or even higher tariffs. Many have been used to protect domestic steel production for national security reasons, some quite recently. These are:

23

a. **Section 232 of the Trade Expansion Act of 1962**, which gives the President authority to impose tariffs or other trade restrictions on imports that threaten national security. In recent years, Section 232 has been used by Presidents Trump and Biden to impose tariffs on imported steel that remain in effect today.

b. **Section 301 of the Trade Act of 1974**, which gives the President authority to impose tariffs or other trade restrictions in response to foreign practices that are unjustified, unreasonable, or discriminatory and burden or restrict U.S. commerce. Section 301 has been used, including quite recently by President Biden, to impose tariffs on imported steel to protect national security and domestic production.

c. **Section 201 of the Trade Act of 1974**, which allows the President to take action, including imposing import tariffs, to provide temporary relief to U.S. industries that are seriously injured or threatened with serious injury due to a surge in imports. Section 201 was used in 2001-03 by President Bush to

24

impose tariffs on imported steel that were justified on economic and national security grounds.

    d.    **Self-initiated AD/CVD cases under Title VII of the Tariff Act of 1930**, which can be launched on the initiative of the Commerce Department without the need for a private party petition.

    e.    **Section 338 of the Tariff Act of 1930,**[23] which grants the President the authority to impose "new or additional duties" on countries that have discriminated against U.S. commerce when a foreign country has either imposed an unreasonable charge, exaction, regulation, or limitation on U.S. products that is not equally enforced on like articles from other countries, or has discriminated against U.S. commerce in respect to customs, tonnage, or port duties. Section 338 has not been employed in recent years but remains in effect, and trade experts believe it provides wide authority to impose tariffs or even ban imports entirely.[24] Indeed, President Trump recently directed members of

---

[23] 19 U.S.C. § 1338.

[24] *See, e.g.,* John Veroneau, et al., *The President's Long-Forgotten Power to Raise Tariffs,* Law 360 (Dec. 14, 2016), https://www.cov.com/-

**App.233**

his Cabinet to consider Section 338, among other trade laws, for possible use in applying new tariffs on a wide range of imports.

42.    It is essential to note that in each of the significant trade remedy laws, Congress expressly gave the President *the power to self-initiate action* to avoid the government needing to rely upon a private party to initiate action to protect national security or domestic industry. In this case, CFIUS argues that the participation of U. S. Steel is indispensable to protect domestic steel production via AD/CVD cases, implying that the President is helpless to act without private petitioners. But Congress vested the President with ample authority to act, independently of what any private party may choose to do or not do. Indeed, Presidents have not hesitated to use this power.

**E.    <u>OTHER PROVISIONS OF LAW HAVE BEEN USED EXTENSIVELY TO PROTECT NATIONAL SECURITY AND DOMESTIC STEEL PRODUCTION</u>**

43.    Despite acknowledging, in a December 14, 2024 letter to the Parties, that CFIUS has a responsibility under Section 721 to consider "… whether other laws provide adequate and appropriate authority to

---

[/media/files/corporate/publications/2016/12/law360_the_presidents_long_forgotten_power_to_raise_tariffs.pdf.](/media/files/corporate/publications/2016/12/law360_the_presidents_long_forgotten_power_to_raise_tariffs.pdf.)

26

**App.234**

protect the national security with respect to this transaction,"[25] CFIUS did not fulfill this responsibility.

44.    In fact, CFIUS fully considered only *one* of at least five other laws available to the President to protect domestic production by imposing import tariffs. And its consideration of the one law it did fully examine (Section 232) was convoluted, contradictory, and flawed. Indeed, it is noteworthy that President Biden used both Section 232 and Section 301 to protect domestic steel production for national security reasons *during the pendency of the Nippon Steel / U. S. Steel transaction before CFIUS.*

### a.    CFIUS Consideration of Section 232 Was Contradictory and Flawed

45.    CFIUS argued that U. S. Steel participation in AD/CVD cases is essential to protecting the domestic steel industry and, thus, national security. It said that "AD/CVD is… an indispensable authority in protecting the steel industry and specific steel products…."[26] It later attempted to explain at length why the risk that U. S. Steel might participate in fewer AD/CVD cases impairs the President's ability to

---

[25] AR_000093

[26] AR_000067.

27

protect domestic steel production, saying, "[T]here are concerns that Nippon Steel would not instigate AD/CVD proceedings even if there were unfairly traded imports that were injuring the U.S. industry, which would limit the ability of the administration to impose AD/CVD tariffs."[27]

46.    When considering whether Section 232 could protect national security in the same way as AD/CVD laws, CFIUS says in its December letter that Section 232 is inadequate because it is a law "limited to adjusting imports."[28]  However, *the AD/CVD laws are similarly limited*. Indeed, CFIUS itself acknowledges this in the same December letter: "the AD/CVD laws only allow import relief (in the case of AD/CVD in the form of tariffs)."[29] The reasoning is contradictory: CFIUS argues that the transaction threatens national security because it risks impairing the government's ability to impose AD/CVD import tariffs while claiming Section 232 is inadequate to protect national security because it – *like the AD/CVD laws* – is limited to imposing import tariffs.

---

[27] AR_000095.

[28] AR_000093.

[29] AR_000096.

47.    CFIUS then implies that the real problem with Section 232 is that it will not prevent a post-transaction reduction in domestic steel production, even though the last two presidents have used Section 232 *precisely for this purpose.* In its December letter, CFIUS says that "Section 232 could be used to limit imports with the goal of maintaining or increasing domestic production" but worries that "if domestic facilities have been shuttered and domestic human and capital capabilities have been lost, replacing domestic production might be uneconomical…."[30] Yet, as CFIUS itself pointed out in an August 31, 2024 letter to the parties, the "President has noted that Section 232 national security measures on steel will help the U.S. domestic steel industry to revive idle facilities, open closed mills, and maintain or increase production lines."[31]

48.    President Biden never disputed that Section 232 tariffs could protect domestic production and never questioned their utility in protecting national security. Indeed, on July 10, 2024, President Biden issued a proclamation under Section 232 to adjust steel tariffs on Mexico, imposing a melt and pour requirement for imports of steel articles that

---

[30] AR_000094.

[31] AR_000067.

are products of Mexico and increasing the Section 232 duty rate for imports of steel articles and derivative steel articles that are products of Mexico that are melted and poured in a country other than Mexico, Canada, or the United States. National security was expressly cited as the reason, with the President noting, "These measures will provide an effective, long-term alternative means to address any contribution by Mexican steel articles imports to the threatened impairment of the national security by restraining steel articles imports to the United States from Mexico, limiting transshipment, and discouraging excess steel capacity and production."[32]

49.    Either import tariffs on steel are necessary to protect national security or they are not. CFIUS tries to have it both ways: it raises the specter that fewer AD/CVD petitions will irreparably damage an "indispensable authority in protecting the steel industry" by adjusting imports, but then dismisses the utility of Section 232 to mitigate risk because, *like the AD/CVD laws*, it is "limited to adjusting imports."

---

[32] Proclamation 10783, Adjusting Imports of Steel Into the United States, 89 Fed. Reg. 57347 (July 10, 2024).

### b.  Section 301 Was Invoked In May 2024 To Raise Steel Tariffs for National Security Reasons

50.  CFIUS did not even consider two other available trade remedy laws that have both been recently used by Presidents to protect domestic steel production and national and economic security. Notably, President Biden used Section 301 of the Trade Act of 1974 *just seven months before denying this transaction* to raise tariffs on steel from China (among other products), arguing his action was "supporting investments and creating good jobs in key sectors that are vital for America's economic future and national security."[33] Tariff rates on certain steel products from China were raised to 25%. As part of the same action, tariffs on other items deemed essential for national security, such as semiconductors, electric vehicles, batteries, and solar cells were doubled, tripled, or even quadrupled, in one case to a rate of 100%. As President Biden's action showed, Section 301 gives the President broad authority to impose import tariffs in sectors deemed vital to national security, including the steel

---

[33] *Fact Sheet: President Biden Takes Action to Protect American Workers and Businesses from China's Unfair Trade Practices*, U.S. DEPARTMENT OF COMMERCE (May 14, 2024), https://www.commerce.gov/news/fact-sheets/2024/05/fact-sheet-president-biden-takes-action-protect-american-workers-and.

31

**App.239**

sector. It has recently been used for this express purpose. Yet, CFIUS ignored it entirely.

### c. Section 201 Was Used In 2002-2003 To Raise Steel Tariffs and Impose Quotas and Provides Broad Authority to Protect Steel Production

51.    Other trade law provisions, ignored by CFIUS in its analysis, give the President multiple ways to impose tariffs or quotas. During my service in the Bush Administration, I consulted with the domestic industry during a steel "safeguard" measure imposed under Section 201 of the Trade Act of 1974. From March 2002 until December 2003, the President imposed measures to protect domestic steel capacity through tariffs ranging from 8 to 30 percent on ten categories of steel products and a tariff-rate quota on one product. The President imposed these measures "to help give America's steel industry and its workers the chance to adapt to the large influx of foreign steel."[34]

52.    Although the 2002-2003 steel safeguard action involved the imposition of tariffs and one tariff-rate quota, Section 201 gives the

---

[34] *President Announces Temporary Safeguards for Steel Industry*, THE WHITE HOUSE (Mar. 5, 2002), https://georgewbush-whitehouse.archives.gov/news/releases/2002/03/20020305-6.html.

President expansive authority to take many other measures. These include the power to:

- proclaim a tariff, tariff increase, tariff-rate quota, or quota on imports;

- implement adjustment measures for U.S. firms and workers;

- negotiate and implement agreements limiting exports with other countries;

- proclaim procedures for the auction of import licenses;

- initiate international negotiations;

- submit legislative proposals to Congress;

- take any other actions under the President's legal authority; or

- use any combination of these actions.[35]

53.   "The President may grant import relief for an initial period of up to four years and extend it one or more times, up to a maximum of eight years."[36] Section 201 was most recently used in January 2018 to

---

[35] 19 U.S.C. § 2253(a)(3).

[36] Liana Wong, Cong. Rsch. Serv., IFI0786, Safeguards: Section 201 of the Trade Act of 1974 (2021), https://crsreports.congress.gov/product/-pdf/IF/IF10786.

impose tariff rate quotas on imports of residential washing machines and parts.[37]

54.     In my own government experience, Section 201 was a valuable resource for the President. While it does require a finding of serious injury by the USITC, it does *not* require a finding of an unfair trade practice (as is required by the AD/CVD laws). The broad menu of remedies under Section 201 makes it an attractive option to protect critical domestic industries vital for economic and national security. Yet, CFIUS failed even to consider it in this case.

### d. Self-initiated AD/CVD Cases Have Been Used To Impose Tariffs on Steel and Other Products

55.     The Commerce Department has self-initiated antidumping and countervailing duty cases with increasing frequency in recent years under Sections 702(a) and 732(a)(1) of the Tariff Act of 1930, as amended. Under those provisions of law, cases "shall be initiated whenever the administering authority determines, from information available to it, that a formal investigation is warranted into the question of whether the

---

[37] *QB 23-505 Large Residential Washers and Covered Parts Expiration 2023*, U.S. CUSTOMS AND BORDER PROTECTION (Feb. 02, 2023), https://-www.cbp.gov/trade/quota/bulletins/qb-23-505.

34

**App.242**

elements necessary for the imposition of a duty under [section 701 (CVD) or 731 (AD)] exist."[38]

56.    Indeed, in May 2020, the Commerce Department highlighted the fact that it was using self-initiation of AD/CVD cases as a new trade enforcement tool when it announced the self-initiation of an inquiry into the circumvention of antidumping duty (AD) and countervailing duty (CVD) orders on stainless steel sheets and strips from China. The possible circumvention involved stainless steel flat-rolled products from China that are completed in Vietnam and then exported to the United States. At the time, the Department noted, "This is the seventh circumvention inquiry self-initiated by Commerce based on its own monitoring of trade patterns – a new trade enforcement tool created by the Trump administration."[39]

57.    The Biden Administration also announced the self-initiation of new inquiries into possible circumvention of the antidumping duty

---

[38] 19 U.S.C. § 1671a; 19 U.S.C. § 1673a.

[39] *U.S. Department of Commerce Self-Initiates Circumvention Inquiry Involving Exports of Stainless Steel Sheet and Strip Completed in Vietnam*, INTERNATIONAL TRADE ADMINISTRATION (May 12, 2020), https://www.trade.gov/press-release/us-department-commerce-self-initiates-circumvention-inquiry-involving-exports.

35

**App.243**

(AD) and countervailing duty (CVD) orders on quartz surface products from China in February 2022.[40]

58. CFIUS dismisses self-initiation as an adequate and appropriate authority to address national security risk in its December 18, 2024, Risk Based Analysis. But once again, its reasoning is shoddy and wrong on the facts and the law. First, it claims Commerce has only used self-initiation sparingly. This is a logical fallacy: The fact that Commerce *has not* used self-initiation does not prove that Commerce *cannot* use self-initiation to protect national security. Once again, CFIUS and Commerce show they prefer privately initiated AD/CVD cases as a tool of convenience, not necessity.

59. Compounding its flawed reasoning, Commerce justifies its claim that self-initiated AD/CVD cases are inadequate to protect national security by claiming that USITC might be unable to reach injury determinations in self-initiated AD/CVD cases because the industry might refuse to participate or, in the case of U.S. Steel, be directed by

---

[40] *Department of Commerce Self-Initiates Scope and Circumvention Inquiries into Possible Circumvention of AD/CVD Orders on Quartz Surface Products from China*, INTERNATIONAL TRADE ADMINISTRATION (Feb. 2, 2022), https://www.trade.gov/press-release/department-commerce-self-initiates-scope-and-circumvention-inquiries-possible.

36

**App.244**

Nippon Steel not to participate. In its December Risk Based Analysis, Commerce argues, "Pursuing an injury determination in the USITC requires data (for example on price effects) that is provided by participating domestic firms…. The lack of cooperation of a major producer in the USITC's investigation could pose an obstacle to self-initiation."[41] This is simply wrong on the facts and the law. It entirely ignores the broad power of USITC to *compel industry to provide it with information*, under subpoena if necessary.[42] Voluntary industry participation in AD/CVD cases is not a necessity for the government to gather the information needed to investigate dumping or subsidization. And it is certainly not a prerequisite for the President to impose import tariffs for national security reasons.

---

[41] AR_004586.

[42] *See, e.g.*, 19 CFR § 207.8 ("Any questionnaire issued by the Commission in connection with any investigation under title VII of the Act may be issued as a subpoena and subscribed by a Commissioner, after which it shall have the force and effect of a subpoena authorized by the Commission."). *See also* 19 U.S.C. § 1333 (giving USITC broad power to compel production of "any document, paper, or record, pertinent to the subject matter under investigation, in the possession of any person, firm, copartnership, corporation, or association engaged in the production, importation, or distribution of any article under investigation").

37

### e.    CFIUS Ignored Other Provisions of Law

60.    Section 338 of the Tariff Act of 1930 provides broad authority to the President to raise tariffs on or even block imports entirely from a country found to have discriminated against U.S. commerce. While Section 338 has fallen into disuse since the late 1940s, it contains relatively few procedural hurdles and remains a viable option for the President to take action to protect national security and domestic production. Indeed, in a Memorandum issued on January 20, 2025, President Trump ordered a sweeping review of U.S. trade policies and practices with a heavy emphasis on national security and specifically cited Section 338, among many other laws available to the President. Far from claiming that private petitions under the AD/CVD laws are the only viable way to protect national security, the President ordered Cabinet officials to "undertake a review of, and identify, any unfair trade practices by other countries and recommend appropriate actions to remedy such practices under applicable authorities, including, but not limited to, the Constitution of the United States; sections 71 through 75 of title 15, United States Code; sections 1337, 1338, 2252, 2253, and 2411 of title 19,

**App.246**

United States Code; section 1701 of title 50, United States Code; and trade agreement implementing acts."[43]

61.    It is noteworthy and telling that less than one month after CFIUS concluded the President would be powerless to impose needed tariffs absent AD/CVD petitions from U.S. Steel, a new President has identified no fewer than eight provisions of trade law that might be used to impose sweeping new tariffs not only on steel but potentially every commodity imported into the United States.

62.    During my own government service, it was often the case that policymakers *preferred* to self-initiate trade action under the trade remedy laws rather than relying on private petitioners to take action (for example, the Section 201 steel safeguard was self-initiated in 2002 by the Bush Administration). Self-initiation gives Executive Branch officials more control over the timing and scope of trade action and, in some cases, avoids the need for lengthy and fact-intensive investigations or findings of injury by the independent USITC. It also has the political benefit that the Administration, rather than private parties, undertakes the

---

[43] *See America First Trade Policy, supra* note 5.

39

**App.247**

initiative to protect national economic security and respond to unfair trade practices.

63.    As the discussion in this section illustrates, the Executive Branch has ample authority to address the trade risks that CFIUS purported to be concerned about. Still, CFIUS failed to consider them, even though it was required to do so under the statute.

## F.    CFIUS COULD HAVE MITIGATED THE TRADE "RISK" THROUGH A NATIONAL SECURITY AGREEMENT

64.    Even if CFIUS had fulfilled its obligation to conduct a more fulsome analysis of other laws and concluded they were insufficient to mitigate the purported trade "risk," CFIUS *still* could have addressed the risk through a mitigation agreement, a remedy envisioned by FINSA and FIRRMA and outlined in Treasury Department regulations. It steadfastly refused to do so.

### a.    CFIUS Historically Prefers Mitigation Agreements To Denying Transactions

65.    During my government service, mitigation agreements (usually called National Security Agreements) were used quite frequently, so much so that Treasury regulations and guidance outlined a process by which Lead Agencies should work with parties to negotiate such agreements. Indeed, one of the changes to CFIUS procedure

40

following FINSA was that agencies were required to consult with CFIUS as a committee and with Treasury as the chair before they could begin such negotiations. Previously, agencies would sometimes "freelance" by approaching parties with proposed mitigation terms that CFIUS had not reviewed or approved.

66.    In my experience as a government official and at IBM, CFIUS often took the first step to propose mitigation, either by creating its own draft "term sheet" or by proactively suggesting to the parties that they draft one for CFIUS to consider. While not every term sheet led to a successful mitigation agreement, the Committee almost always preferred to negotiate with the parties so that it would not be forced to recommend a straight denial of the transaction to the President. Multiple administrations have recognized that without mitigation agreements, many more transactions would be denied, putting the President in an uncomfortable position (sometimes, as in this case, with a close treaty ally) and discouraging foreign investment in the United States.

41

### b. CFIUS Refused in This Case to Engage, Despite Extraordinary Commitments Proffered by the Parties That Would Have Mitigated the Alleged Trade "Risk"

67.    In this matter, however, CFIUS flatly refused to engage in negotiations with the Parties, despite their proffering of multiple drafts of a National Security Agreement with terms that were increasingly generous to the government. With specific regard to the trade "risk" identified by CFIUS, the Parties began by explaining the economic logic that a Nippon Steel-owned U. S. Steel would have every commercial incentive to continue participating in AD/CVD actions to protect the sizable investment Nippon Steel would be making in U. S. Steel.

68.    When that did not work, Nippon Steel offered, through a draft NSA in September 2024,[44] to (1) memorialize Nippon Steel's commitment not to interfere with U. S. Steel's decisions on trade matters; and (2) include monitoring protocols to ensure this commitment is verifiable and enforceable. Specifically, Nippon Steel and U. S. Steel were prepared to commit that U. S. Steel will maintain a trade committee led by one or more senior management officers and composed of U. S. Steel employees

---

[44] AR_009222.

who are U.S. citizens and to require approval by the majority of independent U.S. citizen directors of U. S. Steel's board of directors for decisions on material trade matters to ensure that such decisions are made without interference by Nippon Steel.

69.   The powers that the Parties were prepared to grant to the government over the staffing and operations of this trade committee  and the appointment of independent U.S. citizen directors were extraordinary. The CFIUS monitoring agencies under the NSA would have had the power to disapprove appointments of trade committee members, the independent U.S. citizen directors, and, indeed, even insist upon the removal of the chairperson of the committee and the independent directors.[45]

70.   It is worth considering what an astonishing grant of authority over private party actions this would have been. It would have given the government the power to oversee and effectively influence the private business decisions of parties to file or not file AD/CVD actions. I am unaware of any such grant of power over private business decisions to the government in any other area of trade law or practice.

---

[45] AR_010681.

43

**App.251**

71.    Yet even this offer did not move CFIUS to engage. Instead, it continued to raise the concern that the transaction would cripple the government's ability to impose import tariffs. By steadfastly refusing to negotiate an NSA, CFIUS denied the Parties any opportunity to mitigate the trade "risk" the government put forward.

## G.    **CONCLUSION**

72.    As this Declaration has pointed out, the trade "risk" identified by CFIUS appears to have been based on speculation, denial of economic logic, and highly prejudicial assumptions about the independent actions of private parties, government agencies, and the courts. Nonetheless, the "risk" could have been readily mitigated by numerous other provisions of law, most of which CFIUS did not even bother to consider. Finally, the "risk" could have been eliminated had the government accepted the extraordinary mitigation commitments offered by the Parties. Nothing worked, and CFIUS instead fell back on trade-related arguments that contained grave errors of law and reasoning.

73.    The most logical explanation for this shoddy analysis by CFIUS is that the Committee was desperately grasping for a rationale to justify  a  decision  the  President  had  already  made  and  publicly

44

announced. When the President stated on March 14, 2024 that U. S. Steel should "remain domestically owned and operated", and reiterated this position on multiple occasions throughout the CFIUS review process, it must have prejudiced the CFIUS conclusion in this case, because it would have to be interpreted by CFIUS to mean there could be no ultimate foreign ownership or control of U. S. Steel. I am unaware of any other case where this happened. It put the CFIUS principals, deputies, and staff members in the unenviable position of knowing that if they, based on the evidence, found that the transaction presented no national security risk, or that the risk could be addressed by other laws or by a mitigation agreement, they would be acting contrary to not just the stated wishes of the President, but to the outcome the President had publicly promised would happen.

74.    Therefore, I conclude that in its trade-related analysis of this matter, CFIUS ignored evidence and logic, relied on contorted reasoning to fit a pre-determined outcome, and did not comply with the requirements outlined by Congress to justify the denial of foreign investment in the United States.

45

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this day February 2nd, 2025.

_____

Christopher Padilla

# Appendix A

<u>Curriculum Vitae</u>

**Christopher A. Padilla**

**Apr 2009 – Jun 2024**          **Vice President, Government & Regulatory Affairs**
                                 **IBM Corporation**

- Led the company's global government and regulatory affairs and team, with more than 100 professionals in 36 countries.
- Represented IBM on policy matters before governments worldwide on defense, national security export controls, foreign investment, international trade, taxation, copyright and intellectual property rights, privacy and cybersecurity policy, workforce policy, and government procurement.
- Managed global compliance team responsible for trade regulations, national security export controls, sanctions policy, and supply chain security matters.
- Represented the company in meetings with global leaders, ministers, parliamentarians, Cabinet officials, Members of Congress, media outlets, and civic organizations.

**Dec 2008 – Apr 2009**          **Managing Director, C&M International**

- Member of international trade consulting practice at a respected global law firm, Crowell & Moring LLC.
- Assisted U.S. multinational clients in consumer products and chemical industries to resolve market access problems in China, Europe, and the United States.

**Nov 2007 - Dec 2008**          **Under Secretary of Commerce**
                                 **for International Trade**

- Appointed by the President and confirmed by the Senate to lead the International Trade Administration, a 2,000-person agency responsible for helping to develop U.S. trade policy, promoting and reviewing foreign direct investment in the United States, supporting U.S. exports, ensuring compliance with trade agreements, and administering U.S. trade remedy laws.
- Spearheaded work on U.S. trade initiatives including free trade agreements with Colombia, Peru, and Panama, and nations of the Pacific Rim.
- Served as senior sub-Cabinet official for Commerce on the Committee on Foreign Investment in the United States (CFIUS), reviewing cases and establishing regulations for national security investment reviews.
- Represented the United States in sub-Cabinet negotiations with China through the U.S.-China Joint Commission on Commerce and Trade (JCCT).
- Appointed by the President to serve on the Congressional-Executive Commission on the People's Republic of China.

1

**App.256**

**Oct 2006 – Nov 2007**          **Assistant Secretary of Commerce for Export Administration**

- Appointed by the President and confirmed by the Senate to oversee and administer U.S. regulations governing the export of items controlled for national security and foreign policy reasons, and for monitoring the U.S. defense industrial base.
- Initiated and led rule-making proceedings and regulatory compliance programs, including reviews and revisions of U.S. export controls on China and U.S. export sanctions policy in the Middle East.
- Responsible for industry treaty compliance with the Chemical Weapons Convention and represented the United States at meetings of the Organization for the Prohibition of Chemical Weapons (OPCW).

**Aug 2005 – Oct 2006**          **Chief of Staff and Senior Advisor to the Deputy Secretary of State**

- Chief of Staff and Senior Advisor to Deputy Secretary of State Robert B. Zoellick, focusing on U.S.-China relations, Latin America, Sudan, North Korea, and international economic matters.
- Planned and helped launch the Senior Strategic Dialogue with China and participated on the U.S. negotiating team for international agreements with Sudan (Darfur and South Sudan).

**Oct 2002 – Aug 2005**          **Assistant U.S. Trade Representative, Intergovernmental Affairs and Public Liaison**

- Built business, agricultural, and congressional support for trade agreements.
- Assisted in developing and executing USTR strategy to negotiate and pass new U.S. free trade agreements with Australia, Singapore, Chile, Central America and the Dominican Republic, Morocco, and Bahrain.
- Secured support for U.S. trade policy from leading U.S. agricultural, industrial, and services organizations.

**May 1997 – Oct 2002**          **Director, International Trade Relations, Eastman Kodak Company**

- Chief international trade official for Eastman Kodak, representing the company with governments in the U.S., Europe, Asia, and Latin America.
- Served as communications leader for the Business Coalition for U.S.-China Trade, which helped pass Permanent Normal Trade Relations with China in 1999-2000.

**App.257**

**Jun 1987 – May 1997**          **AT&T Network Systems, later Lucent Technologies**

- Held series of posts in international business.  International marketing planner, then business development manager (1987-1989), international sales manager (1989-1990), and director, federal government affairs (1990-97).

**EDUCATION:**

**Johns Hopkins University**

1987                              Master of Arts in International Studies
                                  Concentration: International Economics and
                                  U.S. Foreign Policy

1986                              Bachelor of Arts in International Studies
                                  Member of Phi Beta Kappa Honor Society

3

**App.258**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, et al., | |
| *Petitioners*, | No. 25-1004 |
| v. | |
| THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES, et al., | |
| *Respondents*. | |

## <u>DECLARATION OF KEVIN LEWIS</u>

I, Kevin Lewis, under penalty of perjury, hereby declare as follows:

1.    I am the Vice President of Finance & Strategy at United States Steel Corporation ("U. S. Steel"), where I primarily have been employed since 2008.  My responsibilities include overseeing investor relations, financial planning and analysis, enterprise transformation, and corporate strategy.

2.    As part of my role, I was involved in the strategic alternatives review process undertaken by the Board of Directors of U. S. Steel, which commenced in August 2023 and concluded in December 2023 with the

announced merger agreement providing for a merger through which Nippon Steel Corporation's ("NSC") subsidiary Nippon Steel North America, Inc. ("NSNA" and, together with NSC, "Nippon Steel") would wholly own U. S. Steel (the "Parties").

3.    I have also been directly involved in the review process of the merger conducted by the Committee on Foreign Investment in the United States ("CFIUS"), participating in each meeting attended by U. S. Steel. This included delivering multiple presentations to the CFIUS agencies, participating in each meeting in which the Parties proposed mitigation terms in the forms of the National Security Agreement ("NSA") drafts that are part of the CFIUS record, and contributing to the parties' diligent responses to questions from CFIUS.

4.    The purposes of this declaration are to explain the circumstances of the merger between U. S. Steel and Nippon Steel, and my experience of the CFIUS review that followed.

5.    This declaration is based upon my personal knowledge and belief and upon my review of relevant business records and discussions with employees of U. S. Steel.

**App.260**

## A. **Background on U. S. Steel**

6.    Founded in 1901, U. S. Steel has a long and successful history in the United States.    It is a publicly traded company and is headquartered in Pittsburgh, Pennsylvania.

7.    According to the World Steel Association's (known as "worldsteel") latest published statistics, U. S. Steel is the third-largest steel producer in the United States—behind Nucor Corporation and Cleveland-Cliffs Inc. ("Cleveland-Cliffs")—and the 24th-largest steel producer in the world.[1]  For its fiscal year ending on December 31, 2023, U. S. Steel had net earnings of $895 million and had almost 22,000 employees, including approximately 13,995 employees in the United States and 7,832 employees in its additional production operations in Slovakia.

8.    U. S. Steel principally manufactures steel sheet and tube products.  It supplies these products to customers throughout the world (but mainly focused on the United States and Europe), primarily in the automotive, construction, consumer (packaging and appliance),

---

[1] World Steel Association, *Top 50 Steel Producing Companies 2023*, WORLDSTEEL (2024), https://worldsteel.org/data/world-steel-in-figures-2024/#top-50-steel-producing-companies-2023.

electrical, industrial equipment, service center/distribution, and structural tubing and energy (oil country tubular goods and line pipe) segments.  U. S. Steel also produces iron ore that is consumed in the steelmaking process.  U. S. Steel does not supply products to the U.S. military, and its manufacturing technologies and processes are not designed to produce steel for military applications.

**B. <u>Merger Between U. S. Steel and Nippon Steel</u>**

9.    Throughout the 2010s, U. S. Steel struggled with high steelmaking costs and low steel prices.  Starting around 2019, U. S. Steel began making significant investments to acquire or develop newer technologies and higher-value products, which contributed to improved returns in 2021 and 2022.  We had also embarked on a business strategy in which we reduced our older blast furnace steelmaking footprint and shifted production to and expanded our newer electric arc furnace steelmaking facilities in Arkansas.  The resulting returns, however, were not immediately reflected in U. S. Steel's stock price, which made U. S. Steel an attractive acquisition target.

10.    Between March 2023 and July 2023, U.S. Steel received several unsolicited bids to acquire all or parts of the company.  On July

4

28, 2023, U. S. Steel received a proposal from Cleveland-Cliffs, its primary competitor in key markets and customer segments, to acquire all of the outstanding shares of U. S. Steel common stock.  On August 5, 2023, Cleveland-Cliffs sent U. S. Steel a letter from the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "United Steelworkers" or "USW") in support of its bid.

11.     On August 7, 2023, U. S. Steel requested that Cleveland-Cliffs enter into a confidentiality agreement to enable the Board of Directors to fully and adequately evaluate the bid.  On Friday August 11, 2023, Lourenco Goncalves, the Chief Executive Officer of Cleveland-Cliffs, sent U. S. Steel a letter refusing to sign the confidentiality agreement, offering a revised merger proposal, and demanding a response to the revised proposal just two days later, by Sunday August 13, 2023.

12.     Upon receipt of this letter, U. S. Steel held a special meeting of its Board of Directors, which, after considering the information provided by senior management and discussions with financial and legal advisors, determined that it could not satisfactorily assess Cleveland-Cliffs' proposal.  The Board decided to reject the proposal due to several

factors, including a lack of detailed information necessary for proper evaluation, Cleveland-Cliffs' unwillingness to enter into a confidentiality agreement, and the fact that U. S. Steel had received indications of interest from other bidders.

13.    On August 13, 2023, U. S. Steel announced that the Board of Directors had decided to undertake a strategic alternatives review process. The strategic alternatives review process was robust. Between August and October 2023, U. S. Steel's financial advisors contacted or were contacted by 54 potential counterparties.

14.    On August 17, 2023, Thomas Conway, the then-president of the USW, sent U. S. Steel a letter stating that the USW had transferred and assigned to Cleveland-Cliffs the rights granted to the USW pursuant to the "right to bid" provisions under the USW's basic labor agreement with U. S. Steel.

15.    On October 9, 2023, U. S. Steel sent a letter to five potential counterparties, including Cleveland-Cliffs and Nippon Steel, inviting them to participate in the next phase of U. S. Steel's strategic alternatives review process. After a series of bids, Nippon Steel and Cleveland-Cliffs were the final remaining bidders and each submitted

6

final offers.

16.    Cleveland-Cliffs' final proposal, dated December 15, 2023, included a non-binding offer to acquire all of the outstanding shares of U. S. Steel common stock for $27.00 per share in cash and 1.444 shares of Cleveland-Cliffs stock per share of U. S. Steel common stock, representing a value of $54.00 per share of U. S. Steel common stock based on the closing price of Cleveland-Cliffs common stock on December 15, 2023.

17.    During the process of making its proposals, Cleveland-Cliffs and their advisors sought to assuage our Board of Directors' concerns about potential antitrust obstacles to a merger with U. S. Steel by stating that Cleveland-Cliffs had the support of David McCall, the new President of the USW, which would effectively result in President Biden's administration assuring that the Antitrust Division of the Department of Justice would not object to the transaction.

18.    Nippon Steel's final proposal offered to acquire U. S. Steel for $55.00 per share in cash.

19.    The Board of Directors ultimately concluded that Nippon Steel's proposal was superior to the other proposals U. S. Steel received,

after considering, among other things, factors such as price, form of consideration, certainty of payment, conditions precedent to closing, and regulatory and competitive factors, including the fact that CFIUS had never previously blocked a deal with a Japanese investor. In particular, the Board of Directors determined that the value represented by the stock component (which was based on a fixed exchange ratio) of Cleveland-Cliffs' proposal would fluctuate over time based on changes in Cleveland-Cliffs' stock price. In addition, the future value of Cleveland-Cliff's stock could be negatively impacted by required divestitures. Comparatively, the Nippon Steel proposal contemplated an all-cash transaction for the entirety of the company, representing a higher value per share of U. S. Steel common stock in upfront consideration, and thus providing more certainty of the value being offered to U. S. Steel stockholders. The Board of Directors also considered the potential consequences from a combination with Cleveland-Cliffs, which could result in layoffs, and the potential value loss to U. S. Steel's stockholders resulting from possible divestitures as a result of antitrust review. In contrast, the Nippon Steel bid would keep the company intact and provided synergies and capabilities that would be additive to U. S. Steel's

8

**App.266**

facilities in the United States.

20.  On December 18, 2023, U. S. Steel announced its plans to merge with Nippon Steel.

21.  On April 12, 2024, U. S. Steel held a special meeting of its stockholders, with 71% of the outstanding shares voting in favor of the merger transaction, resulting in an overwhelming vote of approval of approximately 99% of the shares represented at that meeting.  At the time, U. S. Steel expected the transaction to close in the third or fourth quarter of 2024, subject to CFIUS approval and other customary closing conditions.  The merger agreement provides for an "End Date" of June 18, 2025, to complete the merger.

## C. The CFIUS Review Process

22.  Following the signing of the merger agreement, the Parties pursued necessary regulatory approvals, which included preparing a detailed draft Joint Voluntary Notice ("Notice") and exhibits package that the Parties filed in draft form with CFIUS on January 29, 2024.

23.  On February 21, following CFIUS's review of the draft submission, representatives from U. S. Steel and Nippon Steel met with CFIUS to provide a briefing on the transaction, including an explanation

of Nippon Steel's rationale for entering into the transaction and how the transaction would benefit U. S. Steel and its customers. All nine permanent member agencies of CFIUS were represented at the meeting. On March 11, 2024, U. S. Steel and Nippon Steel formally submitted the Notice, which CFIUS formally accepted on March 26.

24.     Between March and December 2024, the Parties pursued the CFIUS approval through three cycles of review and investigation.

25.     Throughout this process Mr. Goncalves, Mr. McCall, the USW President, and others at Cleveland-Cliffs made public comments indicating that they had been in direct contact with CFIUS or the White House regarding the review and had received assurances that the transaction would be blocked.  We also continued to hear from investors and other third parties that Mr. Goncalves and other Cleveland-Cliffs officials were even more explicit in telling them that the CFIUS process was just political cover for a decision that had already been made, and that the deal would be blocked consistent with the President's and presidential candidates' statements.

26.     For example, during a February 2, 2024, call for investors organized and transcribed by the investment bank Raymond James,

10

Celso Goncalves, the Chief Financial Officer of Cleveland-Cliffs and son of CEO Lourenco Goncalves, stated, "The President can take the recommendation [of CFIUS] or he can throw the recommendation in the trash and just do whatever he wants. So, you know, between us, I don't think I don't think CFIUS is really the main concern…. [Even if CFIUS doesn't] find any evidence of a supply chain problem or a national security problem [and therefore its recommendation is that the deal does not need to be blocked] Joe Biden can take the look at that and say, 'Okay, that's great. But my buddy, Dave McCall[, t]he … international president of the USW doesn't want the deal. So, I'm going to side with him. And I'm gonna block. I'm not gonna allow the deal to go through.'"

27.    That same day, Mr. McCall stated: "Today we received personal assurances that President Joe Biden has our backs. He's always been a friend to the American worker and our union, and we're grateful he's taking an interest in this matter."[2]

28.    On approximately February 12, 2024, Lourenco Goncalves

---

[2] Press Release, United Steelworkers, *Biden Supports Steelworkers as USW Continues Opposition to Proposed USS-Nippon Deal* (Feb. 2, 2024), https://m.usw.org/news/media-center/releases/2024/biden-supports-steelworkers-as-usw-continues-opposition-to-proposed-uss-nippon-deal.

called one of Nippon Steel's financial advisors to attempt to cut a deal with Nippon Steel to purchase U. S. Steel's blast furnace facilities. According to the financial advisor's notes of the call, which were provided to U. S. Steel,

> "He [Goncalves] started out by saying he was '100% sure NSC already knew this' but wanted to make sure his message was passed on in any case. His first message was 'the US Government will block this deal as it is', 'I know you don't like to hear that but that is the fact'. He specifically said it would be blocked on national security grounds. He then went on to describe a number of conversations he is having/has had with US Government officials. He said he has been talking directly with US Secretary of Commerce, Gina Raimondo, who 'has been keeping me in the loop as to what is going to happen'. He said she has also communicated her views directly to the Minister of Industry in Japan. Separately, she has told him that Jake Sullivan, National Security Advisor of the US, has communicated with the Japanese Foreign Minister (although he didn't know his or her name). He was also 'informed' that the US Ambassador to Japan, Rahm Emanuel, was 'tasked' with communicating directly with NSC. He didn't offer specifically what was communicated but the implication that the message was the deal would be blocked."

We subsequently learned from the administrative record in this case that Mr. Goncalves and Secretary Raimondo had spoken about the transaction on at least three separate occasions in January 2024, twice at Mr. Goncalves's request and once at Secretary Raimondo's request, to discuss Mr. Goncalves's "deep concerns regarding Nippon Steel of Japan

12

**App.270**

and its intent to acquire United States Steel Corporation."[3]

29.    On March 18, 2024, a U. S. Steel investor sent an email to U. S. Steel summarizing statements made by Mr. Goncalves during an investor conference call hosted by J.P. Morgan, which took place on March 13, 2024.  On that call, Mr. Goncalves reportedly told investors that Nippon Steel executives will commit *seppuku*, a Japanese form of ritual suicide, when the transaction fails.  Further into the presentation, Mr. Goncalves stated "no one else has the union, and there is zero chance anyone [else] will have the union . . . I have already fixed the situation in a way so that it cannot go against me."  He continued, "I can't force U. S. Steel to sell to me, but I can work my magic to make a deal that I don't agree with not to close.  That's what I said, it's not closing, and Biden hasn't spoken yet.  He will."

30.    On March 14, 2024, Mr. Goncalves told Bloomberg, "We have been in total contact with the administration, so I know what's going on."  Goncalves said, "[t]he contact is about making it abundantly clear between me and Dave McCall that the only buyer the union accepts for

---

[3] AR_000126-000141.

the union-represented assets is Cleveland-Cliffs."[4]

31.   The following day, according to a transcript provided to U. S. Steel by one of our investors that I have reviewed and that we later provided to CFIUS, Goncalves made the following statement during a call with the investor:

> "[T]here's no process.  This is not going to be a process. CFIUS is just cover for a President to kill a deal. CFIUS is a bunch of bureaucrats, second and third level, inside the cabinet, treasury, DOE, Department of State, National Economic Council, National Security Council and they write the report, it lands on the desk of the President of the United States and he can do three things with the report: adopt, reject or modify. It means the President can do whatever he wants.  That's why Trump said 'I would block the deal'.  So, he knows what he's talking about, and he knows how things works."

32.   Despite all of the information we provided to the Committee between February and June 2024, as the conclusion of the initial statutory review period approached, we had not received any indication from CFIUS that it was prepared to clear the transaction, but we had also not received any formal communication from the Committee regarding national security risks identified as associated with the

---

[4] Joe Deaux, *Cliffs CEO Weighs Lowball Bid for US Steel With Union Backing*, BLOOMBERG (Mar. 14, 2024), https://www.bloomberg.com/news/articles/2024-03-14/cliffs-ceo-weighs-lowball-bid-for-us-steel-with-union-backing.

transaction.

33.    In that context, on June 14, 2024, the Parties submitted a request to withdraw and refile the Notice of the transaction to provide the Committee additional time and information to reach a considered conclusion.  CFIUS accepted the request on June 24, which officially started a new review period.

34.    On August 19, 2024, having still not received any formal communication from CFIUS on how its review was progressing, I presented to the Committee in person on, among other things, how the transaction would benefit U. S. Steel's union-represented blast furnace facilities and customers, and thus domestic supply.  I explained to the CFIUS staff the consequences for U. S. Steel should the transaction fail, including that U. S. Steel would have to idle blast furnace #14 at Gary Works and would not be able to invest in upgrading or replacing the hot strip mill at Mon Valley Works, as Nippon Steel was prepared to do.  I explained that, if the deal with Nippon Steel failed, U. S. Steel would return to its pre-transaction strategy of shifting production from its integrated blast furnace facilities to its electric arc furnace-based mini mill facilities in Arkansas.  The full scope of the investment commitments

15

at Gary and Mon Valley were not and are not part of U. S. Steel's pre-transaction strategy.  At no point in the meeting did the Committee raise any national security concerns regarding the transaction, nor did it provide an opportunity to discuss potential mitigation measures. CFIUS's questions focused instead on Nippon Steel's bid process and U. S. Steel's negotiations with the USW.

35.    On August 31, 2024, the Saturday of Labor Day weekend, CFIUS sent a 17-page letter to the Parties identifying for the first time purported national security concerns related to "potential decisions" by Nippon Steel in the future that could lead to a reduction in domestic steel production capacity.   The letter did not mention possible mitigation measures, nor did it include a draft NSA.  In the letter, CFIUS demanded a response by the morning of Wednesday, September 4, just one business day later.

36.    On September 3, we submitted a 100-page response.  The response addressed the many factual inaccuracies in CFIUS's August 31, 2024 letter; reiterated the Parties' commitment to enhancing U. S. Steel's domestic production; and expressed the Parties' willingness to formalize these commitments in an NSA.  The response letter also attached a term

16

sheet proposing a national security mitigation solution.

37.   On September 6, we again met with CFIUS to discuss the mitigation term sheet submitted as part of our response to the August 31 letter.  During this meeting we raised the Parties' interest in drafting an NSA to address the purported national security risks that CFIUS identified in its August 31 letter.  The Committee staff responded that they did not "have scope to request that," and that they had not received "any direction or guidance on it."   On September 9, seeking to be proactive, we nevertheless submitted to CFIUS a proposed NSA that expanded on the mitigation term sheet.

38.   On September 11, the Parties, including U. S. Steel's Chairman and CEO and Nippon Steel's Vice Chairman and Executive Vice President, met with the Deputy Secretaries and other leaders of certain of the CFIUS member agencies—including Wally Adeyemo, Deputy Secretary of the Treasury; Don Graves, Deputy Secretary of Commerce; Lisa Monaco, Deputy Attorney General; David Turk, Deputy Secretary of Energy; Robert Silvers, Under Secretary of Homeland Security; and Stephen Welby, Deputy Director for National Security of the White House Office of Science and Technology Policy—to further

17

emphasize the benefits of the transaction and the need for a withdraw and refile, which would provide additional time to work with the Committee on the NSA and to reach an agreement with the USW.

39.    At the start of the meeting, Deputy Secretary Adeyemo stated, "We are in receipt of your latest correspondence, and this case as you know has been on our record since March 26.  So, we thought this would be a good opportunity to hear from you specifically on two matters related to mitigation [(i) regarding what level of control NSC has over NSNA and (ii) whether the Parties had analyzed the impact of the NSA on the economics of the transaction] and what you would do with additional time if we granted it. We will have some questions and we want to have ongoing dialogue, but we won't have additional information to provide to you."

40.    Consistent with Deputy Secretary Adeyemo's message, the Deputy Secretaries asked questions about the two matters identified above, including about how granting a withdraw and refile would affect the dynamics with the USW, and sought to clarify whether the commitment in the NSA to maintaining production capacity was indefinite.  The Deputy Secretaries did not ask any other questions.  The

18

**App.276**

Deputy Secretaries also did not indicate that the terms of the NSA were insufficient to resolve any concerns identified by the Committee or how the terms needed to be changed to sufficiently address those concerns, if at all. Deputy Secretary Adeyemo was clear in the meeting that they did not have additional information to provide to the Parties at that time.

41.    On September 17, CFIUS granted the Parties' August 23 request to withdraw and refile.

42.    On October 16, 2024, again in an effort to engage the Committee on mitigation, and following multiple requests from the Parties, we met with CFIUS staff to discuss the proposed NSA. At the beginning of the meeting, the CFIUS staff indicated that they wished to (i) discuss the Parties' response to the Committee's August 31 letter and (ii) understand how we envisioned that the proposed NSA would work in practice. The staff explained that—at their level (i.e., the professional, non-partisan staff)—they wished to engage with the Parties "to move forward," but they did not have the authorization to commit to anything.

43.    During the meeting, the CFIUS staff asked questions about how we envisioned key provisions of the proposed NSA would work in practice, including how they would ensure that U. S. Steel maintained

production capacity at its mills to meet the demand for steel in the United States and that Nippon Steel would not interfere with U. S. Steel's decisions regarding trade matters.  The staff, however, did not discuss the national security concerns identified in the August 31 letter, nor did they indicate that they thought the NSA was insufficient to resolve those concerns. The staff did not propose revisions to the proposed NSA or indicate that additional measures would be required to address their concerns.

44.    In addition to the discussion regarding the NSA, the CFIUS staff also asked about the status of discussions with the USW following the resolution of arbitration between the Parties and the USW in the Parties' favor, and the risks to U. S. Steel's facilities should the transaction fail.

45.    On October 29, 2024, the Parties submitted a revised draft of the NSA in a good faith effort to solicit CFIUS's engagement since the staff indicated that they were not authorized to provide any written feedback to our prior draft NSA.  In particular, the Parties revised the NSA to enhance the protections against Nippon Steel's interference in U. S. Steel's decisions on trade matters, which had been a focus of the

20

CFIUS staff's questioning during the October 16 meeting.

46.    The Parties also offered to include additional provisions to enhance CFIUS's ability to monitor U. S. Steel's decisions to indefinitely or temporarily idle production locations.  Again, the CFIUS staff had not asked for these terms to be enhanced or indicated that they saw the previous draft of the NSA as deficient, but the Parties were trying to address the concerns stated in the August 31 letter as best they could while the CFIUS staff still were not authorized to negotiate or provide any written feedback.

47.    After the November 5, 2024 election, an investor contacted U. S. Steel to report that it had heard that, following the election, President Biden spoke with Mr. McCall, and Mr. McCall told the President that he still wanted the deal to be blocked.  U. S. Steel's stock price fell approximately 2.5% between November 7 and 8 as a result. Investors also advised U. S. Steel that they were receiving information— which was not provided to the Parties—that the White House was instructing the CFIUS agencies to allow the current investigation period to end without a consensus or recommendation, and to refer the transaction to the President for a decision on that basis.

48.    Around this same time, still in November, Cleveland-Cliffs also became active in contacting investors to tell them that the President had made up his mind and the deal would be blocked.  Five investors contacted U. S. Steel on November 14, reporting concerns over Lourenco Goncalves's persistent claims. One quoted him as saying: "It's just a matter of time before Biden blocks the deal from the CFIUS perspective. He's just crossing the T's and dotting the I's.'" That investor commented, "to hear him say it as consistently as he has been saying that has been discouraging."  U. S. Steel's stock closed down nearly 6%.

49.    On November 19, Farallon Capital, one of U. S. Steel's stockholders, relayed to U. S. Steel that Lourenco Goncalves had told the investment banking firm Jefferies that Mr. McCall had spoken with President Biden prior to the election and asked whether the transaction would be blocked before Nippon Steel's lead negotiator's upcoming visit. According to Goncalves, officials in the White House confirmed that the merger with Nippon Steel would be blocked "in November."  Very soon after that, U. S. Steel's stock fell 5.5%.

50.    On November 25, 2024, U. S. Steel's stock sank another 2% as investors reported to U. S. Steel intensified doubts stemming from

22

further updates provided by Cleveland-Cliffs. According to these reports:

- Mr. McCall expressed heightened confidence the deal would be blocked after the prior week's meetings;

- Mr. McCall spent time with President Biden, his chief of staff Jeffrey Zients, and U.S. Trade Representative Katherine Tai—a voting member of CFIUS—at a union leader cocktail event; and

- The Administration was sharply focused on ensuring proper CFIUS procedures to avoid foot faults that could expose it to litigation.

51.    Also on November 25, 2024, the Parties met again with the CFIUS staff, at the Parties' request, in another attempt to discuss the NSA. During the meeting, the Parties presented information on projected U.S. and global steel demand. Committee staff also asked further questions about how the provisions of the draft NSA would work in practice. Our counsel stated to the Committee staff, "If there are specific points you have, let us know, and either we can draft them, or you can draft them. A lot of these questions we feel like we have addressed, so if there is a concern, let us know what's behind it." However, the

23

Committee staff continued to ask questions only on how our proposal would work, rather than identify any issues they perceived with the draft NSA or ways in which the NSA could be changed to address their concerns. When asked whether the Committee would be able to provide redlines indicating any changes they would like to see in the draft NSA, the Deputy Assistant Secretary of the Treasury for Investment Security stated "I don't know. We're trying to put ourselves in a position to be able to do that." The staff also indicated that they had comments—including specific mark-ups of the Parties' draft NSA—that they would like to have shared with the Parties, but implied they were not permitted to do so.

52.    In addition to asking about the NSA, the CFIUS staff also asked again about the current status of Nippon Steel's engagement with the USW. I also reiterated the points made in the August meeting about the consequences of the transaction failing, to include idling blast furnace #14 at Gary Works, not investing in upgrading or replacing the hot strip mill at Mon Valley Works, and shifting production from U. S. Steel's integrated blast furnace facilities to its electric arc furnace-based mini mill facilities in Arkansas. We also explained that, despite these consequences, and the generally positive response to the deal from our

24

customers, employees, local USW leadership at our facilities, and elected officials in the communities in which we operate, we continued to hear concerns from investors regarding the deal being blocked based on statements made by Mr. McCall, Mr. Goncalves, and others, as noted above.

53.    On December 2, the Parties submitted a further revised draft of the NSA, again in the hope that by enhancing the terms of the NSA, the Parties could provide a path for CFIUS to approve the transaction by further addressing the purported national security concerns.  CFIUS had not asked the Parties to provide an updated draft of the NSA or to revise specific terms, nor had they identified any concerns with the terms the Parties proposed previously.  However, the Parties sought to revise the NSA for a third time in an effort to persuade CFIUS and the President to approve the transaction.  The Parties thus updated the NSA to:

- List specific areas for oversight by the Independent U.S. Directors;

- Provide for the appointment of a board observer to U. S. Steel's board of directors who would report to CFIUS on compliance in the event any of the Parties violated the NSA;

25

- Provide for enhanced monitoring by CFIUS of Nippon Steel's investments in Mon Valley Works and Gary Works;

- Define what it would mean for the Parties not to transfer any production of U. S. Steel outside the United States;

- Provide for enhanced monitoring by CFIUS of U. S. Steel's decisions to temporarily or indefinitely idle production facilities;

- Provide CFIUS with a right to object to the appointment of the chair of U. S. Steel's Trade Committee; and

- Provide that compensation of members of the Trade Committee shall be based on the performance of U. S. Steel, and not of the broader Nippon Steel group.

54.    On December 9, 2024, we met again with CFIUS, at the Parties' request. We reiterated the consequences of the deal not going through, as well as the impact that the protracted CFIUS process and public speculation around the outcome had already had on the Parties. We described the statements made by Mr. McCall, in particular, about his engagement with CFIUS on the transaction—including, for example, stating in a March 1, 2024, letter sent to all U.S. senators

26

**App.284**

that "we are actively engaged with the Committee on Foreign Investment in the United States (CFIUS) to raise our concerns about the ramifications [of] this proposed deal."[5]  We also described public reporting regarding the strategic significance of the United States' alliance with Japan, reactions from within the national security community and the media to the extended CFIUS process and anticipated outcome in the context of that alliance, and the Chinese view that the anticipated blocking of the deal would undermine U.S. representations of itself as a defender of free trade and sow doubt about the strength of the relationship between the U.S. and Japan.

55.    At the conclusion of the meeting, the Parties asked if there were any questions. The Acting Assistant Secretary of the Treasury for Investment Security, who was leading the meeting for CFIUS, responded: "I don't have any questions.  Unfortunately, as we said last week, we were instructed just to be in listening mode."  The CFIUS staff present also had no questions or other comments for the Parties.

---

[5]David McCall, President, United Steelworkers, *Re: United Steelworkers Urges Your Opposition to the Proposed Merger of United States Steel and Nippon Steel Corporation*, USW (Mar. 2024), https://usw.org/workplaces/metals/uss-sale/USW_USSteel.pdf.

**App.285**

56.    At no point did CFIUS provide feedback regarding whether the mitigation terms proposed by the Parties were sufficient to address the purported national security concerns identified by the Committee, nor did the Committee provide edits to the Parties' third proposed NSA or indicate that other terms were required.

57.    On December 14, 2024, CFIUS sent a letter to the Parties responding to the Parties' September 3 letter and setting forth the national security risks CFIUS had purportedly identified with the transaction "relate[d] to potential decisions and actions by Nippon Steel that could lead to a reduction in domestic steel production capacity."

58.    The Parties responded to the Committee's letter on December 17, 2024.    In our response, we corrected the many inaccuracies and omissions in the Committee's December 14 letter, and we refuted the Committee's analysis of the transaction, which we viewed as illogical and ignoring important facts that we had submitted to the Committee.    In particular, as set forth in our December 17 response, the December 14 letter did not account for (i) the fact that we had confirmed to CFIUS that we would continue reducing blast

furnace production capacity in the absence of the transaction; (ii) the fact that we had confirmed to CFIUS that Nippon Steel was the only bidder in a position to keep U. S. Steel together and invest the capital required to maintain and upgrade U. S. Steel's blast furnace production capacity; and (iii) the Parties were willing to commit in a legally binding and enforceable NSA to invest in and upgrade U. S. Steel's blast furnace production capacity, maintain production capacity across U. S. Steel's U.S. footprint, and that Nippon Steel would not interfere with U. S. Steel's pursuit of trade remedies.

59.     On December 20, 2024, the Parties met telephonically with Deputy Secretary of the Treasury Wally Adeyemo, Deputy Secretary of Commerce Don Graves, Deputy Secretary of Energy David Turk, and other politically-appointed members of the CFIUS agencies who were not identified. During the call, the Parties—recognizing that the transaction was likely to be blocked soon—made what we believed to be our final arguments to CFIUS in favor of the transaction.  The attendees from CFIUS did not ask any questions, discuss their concerns regarding the transaction, or explain why the Parties' proposed NSA was insufficient to address those concerns. The

operator managing the call on behalf of the government did not permit the representatives of the Parties to speak in the order previously provided to the CFIUS staff, nor were we allowed to unmute ourselves to engage in a substantive discussion with the CFIUS attendees. Multiple participants, including the CEO of U. S. Steel, senior Nippon Steel executives, and local steelworkers, were muted by the operator.

60.  On December 30, 2024, after CFIUS referred the transaction to the President, the Parties tried again to address the risks identified by the Committee by submitting a fourth draft of the NSA that provided CFIUS with a veto right over any reductions in production capacity by U. S. Steel for 10 years at all production locations but one (which already was largely idled and which U. S. Steel already explained to CFIUS would have closed but for the pendency of the transaction).  The Parties also added a provision to ensure that U. S. Steel would have sufficient resources to pursue trade actions as determined to be necessary or advisable by the Trade Committee.  The draft submitted was signed by both Nippon Steel and U. S. Steel.

61.  Three days later, the President issued an order prohibiting the transaction.

30

62.  In the more than nine months that CFIUS and, ultimately, the President reviewed the transaction, they consistently refused to engage with us in substantive negotiations on terms to mitigate the purported national security risks CFIUS had identified.  Even when we took it upon ourselves to propose mitigation terms, CFIUS never told us whether it believed those terms could address the identified risks, nor did CFIUS explain why the mitigation terms were insufficient, if that was the case.  CFIUS also never indicated that revisions to our proposed NSA or additional terms would be required to address its concerns.  CFIUS simply asked us how the proposed NSA would work in practice and asked about the status of our discussions with the USW, until finally CFIUS stopped asking questions entirely.

31

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of February, 2025.

_____
Kevin Lewis

**App.290**

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

/s/ Andrew J. Pincus
Andrew J. Pincus