ORAL ARGUMENT NOT YET SCHEDULED

No. 25-1004

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES STEEL CORPORATION; NIPPON STEEL NORTH AMERICA, INC.; and NIPPON STEEL CORPORATION,

*Petitioners*,

v.

THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES; ET AL.,

*Respondents*.

On Petition for Review of Actions of President Biden and of the Committee on Foreign Investment in the United States

**APPENDIX TO BRIEF OF PETITIONERS**
**VOLUME II OF II (Pages 291-607)**

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600
Douglas.Hallward-Driemeier@ropesgray.com

*Counsel for Petitioners Nippon Steel North America, Inc. and Nippon Steel Corporation*

Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
APincus@mayerbrown.com

*Counsel for Petitioner United States Steel Corporation*

*(Additional counsel listed on inside cover)*

David B. Hennes
Alexander B. Simkin
Andrew S. Todres
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
David.Hennes@ropesgray.com
Alexander.Simkin@ropesgray.com
Andrew.Todres@ropesgray.com

Nicole A. Saharsky
Charles A. Rothfeld
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, Northwest
Washington, DC 20006
(202) 263-3000
NSaharsky@mayerbrown.com
CRothfeld@mayerbrown.com
WMallat@mayerbrown.com

Stefan P. Schropp
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600
Stefan.Schropp@ropesgray.com

*Counsel for Petitioners Nippon Steel North America, Inc. and Nippon Steel Corporation*

Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
BBright@mayerbrown.com

*Counsel for Petitioner United States Steel Corporation*

Dated: February 3, 2025

## TABLE OF CONTENTS

**Page**

### VOLUME I

Declaration of Andrew J. Pincus .................... App.1

Ex. A: Statement from President Biden on US Steel (Mar. 14, 2024) .................... App.6

Ex. B: Remarks by President Biden on New Actions to Protect U. S. Steel and Shipbuilding Industry from Unfair Practices (Apr. 17, 2024) .................... App.8

Ex. C: Remarks by President Biden and Vice President Harris at a Campaign Event (Sept. 2, 2024) .................... App.21

Ex. D: Alexandra Alper, et al., *Biden Still Opposes Nippon Steel Deal's Bid for U.S. Steel*, Reuters (Sept. 27, 2024) .................... App.40

Ex. E: Press Briefing by Press Secretary Karine Jean-Pierre and NSC Coordinator for Strategic Communications John Kirby (Jan. 31, 2024) .................... App.43

Ex. F: United Steelworkers, *Biden Supports Steelworkers as USW Continues Opposition to Proposed USS-Nippon Deal* (Feb. 2, 2024) .................... App.80

Ex. G: Transcript of Raymond James Investor Webinar (Feb. 2, 2024) .................... App.84

Ex. H: Joe Deaux, *Cliffs Weighs Lowball Bid for US Steel With Union Backing*, Bloomberg (Mar. 14, 2024) .................... App.97

Ex. I: United Steelworkers, *USW Endorses Joe Biden for Reelection as President* (Mar. 20, 2024) .................... App.102

Ex. J: Gavin Bade, *Biden's US Steel decision highlights 'deference' given to Rust Belt senators, steelworkers*, Politico (Mar. 22, 2024) .................... App.107

Ex. K: Alan Rappeport, *Furor Over U.S. Steel Bid Puts Secretive Government Panel In Spotlight*, N.Y. Times (May 3, 2024) .......... App.115

Ex. L: Letter from U. S. Steel Corporation and Nippon Steel Corporation to Jonathan Kanter, Assistant Attorney General, U.S. Department of Justice, Antitrust Division (July 12, 2024) .......... App.121

Ex. M: Ricky Sayer, *Pittsburgh union members throw support behind Harris as she opposes sale of U.S. Steel*, CBS News (Sept. 3, 2024) .......... App.132

Ex. N: Press Release, USTR Announces New Members to Serve on Advisory Committee for Trade Policy and Negotiations (Oct. 31, 2024) .......... App.136

Ex. O: Evan Robinson-Johnson, *Threatened by foreign investment, Cleveland-Cliffs teamed up with its union to unravel U.S. Steel deal*, Pittsburgh Post-Gazette (Dec. 22, 2024) .......... App.141

Ex. P: Statement from President Joe Biden (Jan. 3, 2025) ..... App.147

Ex. Q: Order Regarding the Proposed Acquisition of United States Steel Corporation by Nippon Steel Corporation (Jan. 3, 2025) .......... App.150

Declaration of Richard Sofield .......... App.153

Appx. A: Curriculum Vitae .......... App.204

Declaration of Christopher Padilla .......... App.209

Appx. A: Curriculum Vitae .......... App.255

Declaration of Kevin Lewis .......... App.259

**VOLUME II**

Submission to CFIUS regarding USW's claim of engagement (Mar. 5, 2024) .......... App.291

Email from Parties to CFIUS on Goncalves statements (Apr. 2, 2024) .................................. App.305

Email from Parties to CFIUS (Jul. 30, 2024) .................................................................. App.313

Letter from CFIUS to Parties (Aug. 31, 2024) .................................................................. App.315

Letter from Parties to CFIUS (Sept. 3, 2024) .................................................................. App.332

Letter from Nippon Steel to Secretaries Raimondo and Yellen (Sept. 4, 2024) ...................................... App.432

Letter from U. S. Steel to Secretaries Raimondo and Yellen (Sept. 4, 2024) ...................................... App.434

Revised Draft National Security Agreement (Dec. 2, 2024)........................................................ App.436

White Paper Submission to CFIUS (Dec. 11, 2024)................................................................. App.473

Supplemental Submission to CFIUS (Dec. 13, 2024)................................................................. App.486

Letter from CFIUS to Parties (Dec. 14, 2024)................................................................. App.487

Letter from Burritt to Secretaries Raimondo and Yellen (Dec. 16, 2024)...................................... App.516

Letter from Parties to CFIUS (Dec. 17, 2024)................................................................. App.517

Statement from Allegheny Conference (Dec. 17, 2024)................................................................. App.600

Letter from Mayors of Gary, Birmingham, and Southwestern Pennsylvania to Biden (Dec. 17, 2024).................................... App.602

Letter from CFIUS to Parties regarding Referral (Dec. 23, 2024) ........ App.605

DRAFT//DELIBERATIVE//PRE-DECISIONAL
UNCLASSIFIED//FOR OFFICIAL USE ONLY

**From:** Plotkin, Mark <mplotkin@cov.com>
**Sent:** Tuesday, March 5, 2024 11:14 PM
**To:** Fair, Andrew <Andrew.Fair@treasury.gov>; Tsang, Winnie <Winnie.Tsang@treasury.gov>
**Cc:** Adams, Ama <Ama.Adams@ropesgray.com>; Fagan, David <dfagan@cov.com>; Wakely, Jonathan <jwakely@cov.com>; Karson, Sam <SKarson@cov.com>; Danescu, Irina <IDanescu@cov.com>; Cook, Corinne <CCook@cov.com>; Hanifin, Brendan C. <Brendan.Hanifin@ropesgray.com>; Siegle, Emerson <Emerson.Siegle@ropesgray.com>; Fowler, Kurt <Kurt.Fowler@ropesgray.com>; Lee, Junsuk <Junsuk.Lee@ropesgray.com>
**Subject:** United Steelworkers Claim of Engagement with CFIUS on U. S. Steel/Nippon Steel Transaction

** **Caution:** External email from: **[mplotkin@cov.com]** Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

**Business Confidential - Pursuant to 50 U.S.C. Section 4565; Protected from Disclosure Under 5 U.S.C. Section 552**

Dear Andrew and Winnie,

We are writing on behalf of United States Steel Corporation ("U. S. Steel") to bring to your attention the attached letter dated March 1, 2024 from David McCall, International President of the United Steelworkers ("USW"), to Members of the United States Senate, relating to the proposed acquisition of U. S. Steel by Nippon Steel Corporation.

As you will see from the letter, Mr. McCall asserts that *"... we are actively engaged with the Committee on Foreign Investment in the United States (CFIUS) to raise our concerns about the ramifications this proposed deal will have on our national security, critical infrastructure, and supply chain ..."*

We know the Committee and its practices very well. We have little doubt that Committee staff are abiding by their obligations of confidentiality. That said, given that the USW is making the foregoing claim to Congress, U. S. Steel respectfully requests that we reconfirm with you that the Committee is aware of, and is complying strictly with, the confidentiality requirements set out in 50 U.S.C. § 4565(c)(1). As we have discussed previously, this is a situation in which competitors, detractors and their allies will undertake seemingly innocuous contacts with Committee staff and officials and then mischaracterize those contacts as dialogue with the Committee. This in turn risks distorting public perceptions of the integrity of the CFIUS process and its potential susceptibility to inappropriate influence.

Thank you for your attention to these concerns. Thank you also for the professional and productive engagement we have had to date in connection with the proposed transaction. Please let the Ropes and Covington teams know if you have any questions regarding the foregoing or any other aspect of the transaction.

Best regards,

This CFIUS document is exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b). Public disclosure is further prohibited by § 721(c) of the Defense Production Act, as amended.

DRAFT//DELIBERATIVE//PRE-DECISIONAL
UNCLASSIFIED//FOR OFFICIAL USE ONLY

Mark

**Mark E. Plotkin**
Pronouns: He/Him/His

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5656 | mplotkin@cov.com
https://hyperlink.services.treasury.gov/agency.do?origin=www.cov.com

COVINGTON

This CFIUS document is exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b).
Public disclosure is further prohibited by § 721(c) of the Defense Production Act, as amended.



UNITED STEELWORKERS
USW
UNITY AND STRENGTH FOR WORKERS

David McCall
International President

March 1, 2024

**Via Email**
U.S. Senate
Washington, D.C. 20510

**RE: United Steelworkers urges your opposition to the proposed merger of United States Steel and Nippon Steel Corporation.**

Dear Senator:

On behalf of the United Steelworkers union (USW), I write to urge you to join many of your colleagues in opposing the proposed merger of United States Steel (USS) and Nippon Steel Corporation, as well as to encourage continued Congressional scrutiny of the deal's long-term implications for workers, their communities, and our national security.

A strong domestic steel industry is vital to our nation's defense and economic wellbeing. However, Nippon's proposed acquisition of USS imperils this security in a number of ways. First, it threatens tens of thousands of direct jobs, including those of 12,000 USW members in six states, as well as the more than 1.9 million jobs throughout the country that the domestic steel industry indirectly supports.[1]

Our labor agreement with USS includes strong protections for workers and retirees that we negotiated to apply in this very circumstance. However, USS has a long history of broken promises, and it is clear that both USS and Nippon are choosing to ignore the portions of our contracts they find inconvenient. This includes Nippon's attempt to push off our labor agreements and pension and benefit plans onto parties with questionable willingness and ability to support these obligations, jeopardizing workers' futures. While USW is currently pursuing these complaints through our contract, neither company shows any urgency in addressing these fundamental problems.

The proposed merger also stands to undermine the communities in which our members live and work. Our facilities require consistent investment and improvement so they can stay on the cutting edge of the industry – which is why we negotiate capital investments into our contracts. USS's board of directors had several viable options for the future direction of the company, but chose to act upon what can only be described as short-sighted greed. If this merger occurs, shareholders will get their

[1] American Iron and Steel Institute, "The Economic Impact of the American Iron and Steel Industry", May 23, 2018.

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION
60 Boulevard of the Allies, Pittsburgh, PA 15222 • 412-562-2400 • 412-562-2598 • dmccall@usw.org

payout, executives will get their bonuses – but hard-working USW members, and their communities, will bear the burden of USS's decision long after the corporate interests evaporate.

Finally, we are actively engaged with the Committee on Foreign Investment in the United States (CFIUS) to raise our concerns about the ramifications this proposed deal will have on our national security, critical infrastructure, and supply chain, which includes Nippon's current export practices and its financial interests in the People's Republic of China. This merger poses meaningful risks, and included with this letter are materials explaining why CFIUS must block Nippon's proposed acquisition of USS.

Of the materials included with this letter, one document regards the union's concerns under CFIUS and another regards the union's rights under the Collective Bargaining Agreement. Please use these materials. American jobs are at stake, and failure to protect one of our core domestic industries presents opportunities for foreign competitors and countries, like China, to undermine our economic and national security.

Do not hesitate to reach out with questions about the union's position on this, or any issue. Our Legislative Department is more than willing to meet with your office to discuss any concerns that may be raised in the attached papers. Meeting requests should go to Roy Houseman, USW Legislative Director, at rhouseman@usw.org, and Carolyn Keys, USW Executive Assistant, at ckeys@usw.org.

Sincerely,

David McCall

David McCall
International President

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION

60 Boulevard of the Allies, Pittsburgh, PA 15222 • 412-562-2400 • 412-562-2598 • dmccall@usw.org



# UNDERSTANDING WORKER PROTECTIONS IMPLICATED BY THE UNITED STATES STEEL/ NIPPON STEEL MERGER AND UNITED STEELWORKERS' ACTIONS TO ENFORCE THE NEGOTIATED PROTECTIONS

The United Steelworkers (USW) union has an 87-year collective bargaining history with United States Steel (USS). In addition to providing industry leading wages, benefits, pensions, and workplace safety rights, the Basic Labor Agreement (BLA) with USS also includes strong protections for hourly workers when management decides to pursue a transaction that would otherwise threaten rights and benefits negotiated over decades.

**SUCCESSORSHIP CLAUSE:** USS is a publicly traded company. Having a labor agreement is an important matter because it with allows us to bargain with the party that actually controls the business. To protect workers' interests over the long term, our BLA with USS includes a "successorship clause" language that requires USS to guarantee that the ultimate parent company of the new corporate owner will itself assume the labor, benefits, and pension agreements rather than assigning the obligations to a subsidiary that has limited control of its business or finances. Ensuring that the successorship clause is properly implemented is paramount when faced with a transaction like the one USS and Nippon are proposing.

Nippon's hollow promises to adhere to our successorship clause are not adequate. At first, USS and Nippon decided that a U.S. holding company that does not report its financials publicly and that has limited holdings in the United States would assume our agreements. Then, USS and Nippon changed course, and said that Nippon Steel, a Japanese corporation that does not do business in the United States, would assume the contract. We say this is a hollow promise because, should Nippon take the position, as many foreign corporations have done, that it is beyond the jurisdiction of our courts, we will be left with little recourse to enforce our BLA.

**KEY PROTECTIONS:** Our contract with USS includes a number of other significant protections that the proposed merger threatens. For example, we negotiated profit sharing benefits that are a meaningful part of our members' earnings. The key to the profit-sharing program is complete transparency about company earnings, but these calculations will not be possible if USS becomes a subsidiary of a holding company and no longer reports its profits and losses. Steelmaking is a capital-intensive business, and the BLA restricts the company from taking money out of the business to pay shareholders and investors. These restrictions are at risk with the Nippon merger. The BLA also protects our members' work by requiring the company to operate our plants at full capacity and restricts its ability to replace production with imported product. This core protection, too, will be undermined if USS becomes a subsidiary of a global steelmaker.

**RIGHT TO BID:** The BLA with USS also includes a "Right to Bid" clause that requires USS to provide the USW with information about any proposed sale or merger and obligates USS's Board of Directors to fully consider an alternative bid supported by the union. Here, despite its contractual obligations, USS kept the USW in the dark throughout its four-month long sale process. The USW and USS are dealing with the Right to Bid violations, in addition to the successorship disputes.

**GRIEVANCE PROCEDURE:** One of the fundamental elements to collective bargaining is the grievance procedure, an internal dispute resolution process through which workers may address employer violations of a collective bargaining agreement. The USW has filed grievances protesting the way in which USS and Nippon proposed to proceed with their merger, and these grievances are currently being processed.

**OUTSTANDING CONCERNS:** In addition to the uncertainty that the USS merger with Nippon poses to rights under our BLA, the merger also poses risk to the public, particularly in relation to pensions. USS sponsors a single employer defined benefit pension plan which applies to workers hired before 2003 and provides benefits to 27,000 retirees and surviving spouses. USS also participates in a multi-employer pension plan, the Steelworkers Pension Trust (SPT), and which covers 8,450 employees hired after 2003.

Nippon Steel will become part of the controlled group for both pension plans. But, sitting outside the jurisdiction of U.S. courts, the ability of the Pension Benefit Guaranty Corporation to protect public interests in the event that USS fails, and the ability of SPT trustees to collect withdrawal liabilities if USS withdraws from the plan, will be at risk. In short, the risks inhering in this merger are not only a problem for 12,000 workers and more than 35,000, but for the U.S. government as well.

# CRITICAL ISSUES TO OPPOSE THE NIPPON ACQUISITION OF US STEEL

FEBRUARY 23, 2024

UNITED STEELWORKERS
USW
UNITY AND STRENGTH FOR WORKERS

Policymakers should block Nippon Steel's (NSC) proposed acquisition of US Steel (USS) as it would create unacceptable national security risks to the U.S. strategic iron ore supply and the diversity and resilience of domestic steel production capacity. Nippon Steel could divert a substantial percentage of the U.S. iron ore supply to its operations abroad; it could also fail to adequately invest in USS's production capacity or close USS furnaces and facilities, crucially weakening the nation's ability to maintain critical infrastructure and meet infrastructure goals.

## NIPPON LIKELY IS MORE INTERESTED IN SELECT ASSETS OF USS, CALLING INTO QUESTION ITS LONG-TERM COMMITMENT TO USW-INTEGRATED ASSETS [8]

- First responses often speak volumes. On September 20, 2023, Nippon submitted a $9.2 billion bid to acquire USS's Mini-Mill business, which is the Big River operation in Arkansas, and the Keetac iron ore mine in Minnesota, whose production could support the Mini-Mill operations.
- On September 27, 2023, NSC repeated its initial bid for the Mini Mill business and the Keetac mine, while adding that a separate offer to buy all outstanding USS stock "would be for an enterprise value of $9.5 billion."
- On October 5, 2023, Nippon again submitted a proposal to purchase the Mini Mill segment and Keetac mine for $9.2 billion, while increasing its offer for all outstanding shares of USS to $41.40 per share. Based on the amount of USS outstanding shares implied by enterprise value of the final deal between the companies, the October 5 proposal for all USS operations was valued at $10.6 billion.
- USS eventually persuaded NSC to present a bid for the entire company. However, it cannot be ignored that NSC originally valued the USS integrated facilities at a value of only $300 million to $1 billion.
- Considering how little value NSC has placed on the USW-represented assets of USS, its stated commitment to maintaining these assets should be subject to question. Steelmaking is capital intensive, and the capital needs of the integrated steelmaking operations are ongoing. The blast furnaces at the USS Granite City, IL works (capacity 2.8 million tons) are both overdue for major relines, which could cost $100-$300 million for each furnace. Even in considering the $1 billion of capital expenditures required by the current labor agreement, $1billion of spending could represent a doubling or tripling of NSC's valuation of the assets (depending on which bid is used to value the assets). Given NSC's initial lack of interest in USS's integrated steelmaking operations, the level of capital investment required and its failure to address ongoing capital investment, NSC's commitment to USS's integrated steelmaking is in doubt.

[8] https://investors.ussteel.com/sec-filings /all-sec-filings/content/0001104659-24-006070/0001104659-24-006070.pdf. Pages 39 & 40.

## NIPPON'S RECENT CLOSURES OF INTEGRATED MILLS IN JAPAN SUGGEST CONCERNS FOR INTEGRATED STEELMAKING IN THE U.S.

- Nippon's actions in Japan show that it likely will look to reduce integrated steelmaking capacity in a mature, slower-growing market like the U.S.
- Over the last four years, Nippon Steel has undergone a major restructuring. **The Company shut down four blast furnaces or 8.6 million net tons of steelmaking capacity and related downstream operations, displacing over 6,000 workers.**
- A fifth blast furnace (No. 3) at its East Nippon Works Kashima Area (capacity 5.4 million net tons) is scheduled to be shut down by the end of 2024.

## NIPPON'S PLEDGES THAT THERE WILL BE NO LAYOFFS ARE UNDERCUT BY ITS ENDORSEMENT OF US STEEL STRATEGY

- Despite assurances in public statements and talking points being used in meetings with members of Congress that this acquisition will not result in immediate layoffs, Nippon has already endorsed curtailment of USW-represented facilities.
- In the weeks preceding the announcement of the proposed acquisition by Nippon, U.S. Steel indefinitely idled its blast furnace at its Granite City, Ill. facility at the end of November 2023 and permanently shut down its UPI finishing mill in Pittsburg, Calif. in December 2023. Nippon Steel has not proposed to change these decisions.
- On a December 18, 2023 analyst call with USS discussing the proposed merger, Takahiro Mori, EVP, Head of Global Business Development for Nippon Steel Corporation, was asked if Nippon would continue US Steel's plan for Big River 2 (expansion of its EAF mill in Arkansas), which has been accompanied by reducing production elsewhere. [9]
    - Specifically, he was asked, "[t]he concept with U.S. Steel was to offset Big River Steel 2 production with closures elsewhere. Would that still be the plan under your ownership?"
    - Without hesitation, Mr. Mori answered: "We are supportive of U.S. Steel's plan for production in the future. So we're just following the current U.S. Steel production plan. And I think, I believe that the (sic) U.S. Steel is planning to shift some quantity from the other mills to Big River Steel 2. So I'm thinking our plan is to follow that plan."

[9] https://d1io3yog0oux5.cloudfront.net/_7afb3a881b64ad5b12b6254fb8726d04/ussteel/db/3195/30218/file/TRANSCRIPT+-+Nippon-+%26+U.+S.+Steel+Investor+Call+-+20231218.pdf. Page 7.

## A NIPPON ACQUISITION OF US STEEL WOULD TRANSFER CRITICAL U.S. STRATEGIC RESOURCES OUT OF DOMESTIC CONTROL

- USS owns and controls iron ore mines and pellet plants which produced 44% of the iron ore produced in the United States in 2023, including the country's largest – the Minntac mine in Virginia, Minnesota – as well as the Keetac mine in Keewatin, Minnesota and a minority interest in the iron ore mining assets of Hibbing Taconite Company. These facilities produced 22.1 million net tons of iron ore pellets in 2023, representing 44 percent of the approximately 50 million net tons of iron ore produced in the U.S.
  - Beyond production, the mines themselves are an important strategic asset. Mines owned and controlled by USS contain proven and probable reserves of 449 million net tons of iron ore.
  - If this proposed transaction were to proceed, Nippon Steel would control this iron ore and could easily divert it abroad, depriving the United States of a foundational and strategic resource.
    - Nippon Steel consumed approximately **55 million dry net tons** of iron ore and **28 million wet net tons** of coking coal in FY 2022. The Company owns minority shares of iron ore and coking coal mines in Australia and Brazil. However, approximately 80% of Nippon Steel's raw material requirements are purchased from third parties (i.e. **44 million dry net tons** of iron ore and **22 million wet net tons** of coking coal).
    - U.S. Steel Minntac and Keetac and its share of Hibbing Joint Venture have combined production capacity of **23 million net tons** of iron ore pellets. The Company's Flat Rolled Steel Products segment produced 8.8 million net tons of raw steel in 2022, utilizing approximately **14 million net tons** of pellets. U.S. Steel reports that it has agreements to supply iron ore pellets to third-party customers over the next several years. Thus, USS currently has approximately **10 million net tons** of excess iron ore pellet capacity -- which would increase if Nippon Steel shut down additional blast furnaces. It could divert this iron ore to its other affiliates at attractive prices.
    - In the December 18, 2023 call with analysts and US Steel announcing the proposed acquisition, Takahiro Mori, EVP, Head of Global Business Development for Nippon Steel Corporation, was asked about shipping pig iron to Japan, an intermediate good produced by smelting iron ore in a blast furnace. [10]
      - The questioner asked, "[s]o there is no plan to, let's say, ship pig iron from the U.S. to Japan?"
      - Mr. Mori responded, "[n]o, no. We don't have such plan *at this moment.*" [emphasis added]

[10] https://d1io3yog0oux5.cloudfront.net/_7afb3a881b64ad5b12b6254fb8726d04/ussteel/db/3195/30218/file/TRANSCRIPT+-+Nippon+%26+U.+S.+Steel+Investor+Call+-+20231218.pdf. Page 7.

## THE LOSS OF US STEEL INTEGRATED STEEL MILLS POSES A THREAT TO U.S. CRITICAL INFRASTRUCTURE

- The U.S. Department of Homeland Security has defined 16 sectors or categories of infrastructure that are considered critical to the nation[11]. The incapacitation or destruction of any of these sectors would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof.

  - Iron and Steel Mills and Ferro Alloy Manufacturing are the "core" of the Critical Manufacturing Sector, and are crucial to the proper functioning to other industries within the Critical Manufacturing Sector – and indeed many of the other 15 sectors of critical infrastructure. These include the Energy Sector, the Transportation Sector, Water and Wastewater Sector, the Defense Industrial Base, and others.

- The Department of Commerce has on multiple occasions – once in 2001, and again in 2018 – reaffirmed the centrality of domestic steel production capacity to U.S. national security, in particular critical industries. Most recently, the Department of Commerce's **2018 Section 232 Investigation** report determined that domestic steel production was crucial for all 16 sectors of critical infrastructure[12].

  - "Increased quantities of steel will be needed for various critical infrastructure applications in the coming years. The American Society of Civil Engineers estimates that the United States needs to invest $4.5 trillion in infrastructure by 2025, and a substantial portion of these projects require steel content."

  - The 2018 Section 232 Investigation also found that in the prior ten years, the demand for steel in critical industries increased by 63 percent.

- The impact of rebuilding infrastructure requires a significant amount of steel – which should be sourced domestically. According to the American Iron and Steel Institute, "Funding roads and bridges, ports and waterways, water infrastructure, the electric grid and investing in electric vehicle systems, all will require a lot of steel . . . [passage of the Infrastructure Investment and Jobs Act] provides a tremendous boost to our industry, as demand for American steel could increase by as much as **five million tons for every $100 billion in new investment.**" [emphasis added][13]

- Policymakers have also emphasized supply chain security. The President, in Executive Order 14017 on February 24, 2021, underscored this point, noting that "[t]he United States needs resilient, diverse, and secure supply chains to ensure our economic prosperity and national security. Pandemics and other biological threats, cyber-attacks, climate shocks and extreme weather events, terrorist attacks, geopolitical and economic competition, and other conditions can reduce critical manufacturing capacity and the availability and integrity of critical goods, products, and services." [14]

[11] https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/resilience-services/infrastructure-dependency-primer/learn/critical-infrastructure-systems.

[12] https://www.commerce.gov/sites/default/files/the_effect_of_imports_of_steel_on_the_national_security_-_with_redactions_-_20180111.pdf

[13] https://www.steel.org/2021/11/aisi-applauds-house-passage-of-bipartisan-infrastructure-bill/

[14] https://www.govinfo.gov/content/pkg/FR-2021-03-01/pdf/2021-04280.pdf

- Steel is no different. The U.S. must maintain domestic control over strategic resources like the iron ore mines and integrated steel mills owned by US Steel. The secure maintenance of American critical infrastructure, as well as the viability of infrastructure development via the Bipartisan Infrastructure Law and the IRA, are dependent on USS's blast furnaces and cannot alone be met by recycled steel produced in electric arc furnaces (EAF).
- If Nippon diverts iron ore to its operations abroad, USS and other American steel producers will be even more reliant on scrap, which remains in short supply. Although a number of observers have projected a global increase in available scrap the increase will not meet the demand for scrap and the growth will be in obsolete scrap centered in East Asia or China, not NAFTA or Europe. In short, the U.S. will be reliant on China for steel production. What's more, industry observers project a global shortage of the clean, low-residual steel scrap or DRI, necessary to support higher value-added products, such as sheet, SBQ and advanced grades (including automotive exposed sheet and AHSS steels). The domestic supply of clean scrap is in short supply and continues to shrink as U.S. manufacturing generally shrinks.
- This raises the specter of the United States, yet again, becoming dependent on a geopolitical rival for strategic supplies.
- **The United States cannot afford to lose yet another strategic industry to China and this transaction creates an environment where this is at risk.**

## THE LIKELIHOOD OF SHUTDOWNS OR UNDERINVESTMENT BY NIPPON IN USS FACILITIESWOULD COST THE UNITED STATES CRITICAL SKILL AND KNOWLEDGE

- Congress made clear in 2018 that CFIUS should view as a national security threat the loss of knowledge or skill critical to producing items necessary for defense or federal procurement. Similarly, National Security Strategies of Republican and Democratic Administrations have emphasized the importance of maintaining a skilled workforce. Steel mills are highly complex operations that depend on skilled employees with decades of on-the-job experience. This professional knowledge can only be developed and maintained through stable employment. If Nippon were to close production facilities, the United States would lose technical expertise critical to maintaining steel production.
- The 2018 Foreign Investment Risk Review Modernization Act ("FIRRMA") states that, when evaluating national security risks, CFIUS may consider the control of U.S. "industries and commercial activity by foreign persons as it affects the capability and capacity of the United States to meet the requirements of national security, *including the availability of human resources*." [15]

[15] Pub. L. 115-232, Section 1702(c)(4), emphasis added.

- Congress explained that the availability of human resources includes "*potential losses of such availability resulting from reductions in the employment of United States persons whose knowledge or skills are critical to national security,* including the continued production in the United States of items that are likely to be acquired by the Department of Defense or other Federal department or agencies for the advancement of the national security of the United States." [16]
- Similarly, the Biden Administration's 2022 National Security Strategy emphasized that U.S. national security depends on making "strategic public investments in America's workforce, and in strategic sectors and supply chains, especially critical and emerging technologies." [17] This principle aligns with the Trump Administration's 2017 National Security Strategy, which noted that a "healthy defense industrial base is a critical element of U.S. power. . . the ability of the military to surge in response to an emergency depends on our Nation's ability to produce needed parts and systems, healthy and secure supply chains, and a *skilled U.S. workforce.*" [18]
- Steelworkers with this type of critical knowledge and skills are the result of years of training, experience, and stable employment. Steel mills are highly complex operations that depend on employees with decades of experience – knowledge that can only be gained through on-the-job training and apprenticeships in demanding work environments surrounded by molten metal, coke dust, acid mist and high temperatures. To properly function, a large integrated steel mill requires approximately 600 skilled operators and 1,000 multi-craft maintenance technicians. Skilled control room operators are responsible for managing multimillion-dollar furnaces, rolling mills and galvanizing lines. These skilled workers control hot metal chemistry and flow, understand computer systems and programming, and direct support crews to maximize production, productivity, and quality. Maintenance Technicians include both highly skilled multi-crafts (combining the skills of positions of Millwright, Rigger, Welder, Pipefitter and Mobile Equipment Operator) and electrical multi-crafts (combining the skills of the positions of Motor Inspectors, Electricians, Electronics, and Instrument Repair).
- Nippon has indicated that it is likely to shut down, or not adequately invest in, USS's integrated blast furnace operations. Not only will this reduce physical plant capacity for steel production, but it will also put thousands of skilled workers out of jobs and thereby reduce the human resources – the knowledge and skills – necessary to produce steel. Ultimately, this will lead to a displacement of a skilled and trained workforce over the long term and undermine the ability of the United States to produce steel products vital to maintaining U.S. critical infrastructure.

[16] *Id.*

[17] White House, National Security Strategy (Oct. 2022), https://www.whitehouse.gov/wp-content/uploads/2022/11/8-November-Combined-PDF-for-Upload.pdf.

[18] White House, National Security Strategy of the United States of America (Dec. 2017), https://trumpwhitehouse.archives.gov/wp-content/uploads/2017/12/NSS-Final-12-18-2017-0905.pdf.



UNITED STEELWORKERS
USW
UNITY AND STRENGTH FOR WORKERS

AR_010377

App.304

DRAFT//DELIBERATIVE//PRE-DECISIONAL
UNCLASSIFIED//FOR OFFICIAL USE ONLY

**From:** Fagan, David <dfagan@cov.com>
**Sent:** Tuesday, April 2, 2024 3:25 PM
**To:** Rosen, Paul <Paul.Rosen@treasury.gov>; Grant.Harris@trade.gov; Matthew.Olsen@usdoj.gov; andrew.light@hq.doe.gov; laura.d.taylor-kate.civ@mail.mil; tolouir@state.gov; kenneth_schagrin@ustr.eop.gov; stephen.p.welby@ostp.eop.gov; christa.brzozowski@hq.dhs.gov
**Cc:** Fair, Andrew <Andrew.Fair@treasury.gov>; Tsang, Winnie <Winnie.Tsang@treasury.gov>; Considine, Michael <michael.considine@hq.doe.gov>; Telleen, Paul <paul.telleen@hq.doe.gov>; 'DeBacker, Devin (NSD)' <Devin.DeBacker@usdoj.gov>; Beattie, Brien <brien.beattie@hq.dhs.gov>; Vaccaro, Adam <adam.vaccaro@trade.gov>; Michael K. Tracton (tractonmk@state.gov) <tractonmk@state.gov>; halimah.a.najieb-locke.civ (halimah.a.najieb-locke.civ@mail.mil) <halimah.a.najieb-locke.civ@mail.mil>; Nicoletta S. Giordani (nicoletta.s.giordani.civ@mail.mil) <nicoletta.s.giordani.civ@mail.mil>; White, Brandon G. <Brandon.G.Whitehill@ustr.eop.gov>; Johnson, Eric <Eric.S.Johnson@usdoj.gov>; Hanifin, Brendan C. <Brendan.Hanifin@ropesgray.com>; Wakely, Jonathan <jwakely@cov.com>; Karson, Sam <SKarson@cov.com>; Fowler, Kurt <Kurt.Fowler@ropesgray.com>; Adams, Ama <Ama.Adams@ropesgray.com>; Siegle, Emerson <Emerson.Siegle@ropesgray.com>; Lee, Junsuk <Junsuk.Lee@ropesgray.com>; Plotkin, Mark <mplotkin@cov.com>; Cook, Corinne <CCook@cov.com>
**Subject:** CFIUS Case 24-038 — Supplemental Submission to CFIUS

** **Caution:** External email from: [**dfagan@cov.com**] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

Dear Assistant Secretaries of CFIUS,

We are writing to bring to your attention comments that Lourenco Goncalves, Chief Executive Officer of Cleveland-Cliffs, Inc. ("Cleveland-Cliffs"), a competitor of United States Steel Corporation ("U. S. Steel"), has made to U. S. Steel investors regarding President Biden, the Administration, and the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee").

We believe that it is important that the full Committee — including its principals — be aware of these comments, which were made to investors as part of Cleveland-Cliffs' and its advisors' ongoing efforts to disrupt and interfere with the pending acquisition of U. S. Steel by Nippon Steel Corporation ("Nippon Steel"), which is the subject of CFIUS Case 24-038 (the "Transaction"). We respectfully request that the comments be introduced formally into CFIUS's administrative record for this Transaction.

As we describe below, and as shown in the attached transcript, Mr. Goncalves asserts that CFIUS is nothing more than a feckless bureaucracy; that the Cabinet officials responsible for CFIUS are disempowered; that the CFIUS outcome was preordained prior to commencement of the Committee's review; and that Mr. Goncalves is the puppet master controlling the President of the United States and the Executive Branch's decision on the Transaction.

This CFIUS document is exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b). Public disclosure is further prohibited by § 721(c) of the Defense Production Act, as amended.

AR_010393

**App.305**

DRAFT//DELIBERATIVE//PRE-DECISIONAL
UNCLASSIFIED//FOR OFFICIAL USE ONLY

As you are aware, Mr. Goncalves is waging a vigorous public campaign to cause the Transaction to fail by any means possible. His efforts are a transparent attempt to preserve Cleveland-Cliffs' dominant position in certain markets and either to break off pieces of U. S. Steel so that Cleveland-Cliffs can then acquire them at a lower price or acquire the whole company, having previously submitted an inferior offer during the auction process. Mr. Goncalves has informed the media that the Transaction already is dead given President Biden's public statement that "it is vital for [U. S. Steel] to remain an American steel company that is domestically owned and operated." *See* Joe Deaux, *Cliffs CEO Weighs Lowball Bid for US Steel with Union Backing*, BNN BLOOMBERG (Mar. 14, 2024), https://hyperlink.services.treasury.gov/agency.do?origin=https://www.bnnbloomberg.ca/cliffs-ceo-weighs-lowball-bid-for-us-steel-with-union-backing-1.2047017; Trevor Hunnicutt & Alexandra Alper, *Biden Says U.S. Steel Must Stay Domestically Owned, a Major Blow to Nippon Steel*, REUTERS (Mar. 16, 2024), https://hyperlink.services.treasury.gov/agency.do?origin=https://www.reuters.com/markets/us/biden-say-us-steel-must-remain-domestically-owned-operated-2024-03-14/.

In conversations with U. S. Steel investors and other market participants over the last several months, Mr. Goncalves has gone even further, claiming that senior Cabinet officials (including Secretary of Commerce Gina Raimondo and National Security Advisor Jake Sullivan) are keeping him apprised of the government's deliberations, and that he has received assurances from these Cabinet officials — and, indirectly, from senior White House officials — that CFIUS will prohibit the Transaction. He also has asserted that he has the support of former President Trump, implying in the conversations that he can provoke Mr. Trump to leverage the Transaction politically against President Biden. When making these comments, Mr. Goncalves presents them as support for his scheme to acquire U. S. Steel at a bargain price or to break up U. S. Steel, to give Cleveland-Cliffs its choice of acquiring the U. S. Steel facilities that it covets, and to leave to Nippon Steel the remaining pieces of U. S. Steel, including its non-unionized facilities.

As the U. S. Steel stockholder vote on the Transaction rapidly approaches, Mr. Goncalves has escalated his rhetoric, making even more stunning assertions to U. S. Steel investors. In a call with Pentwater Capital ("Pentwater"), U. S. Steel's third largest investor, on March 15, 2024 — the day after President Biden issued a statement that U. S. Steel should be "domestically owned" — Mr. Goncalves implied that he actually controlled President Biden's announcement, and that CFIUS was nothing more than a prop in Mr. Goncalves' campaign to cause the Transaction to fail. The full transcript of that call is attached for the record. A few highlights include:

- Regarding CFIUS, Mr. Goncalves made clear that it is the upcoming election, not the law, that matters: "Well, we have an election [in] November. Trump has been in contact with me frequently and Biden, at the cabinet level, has been in contact with me frequently, so this deal can be killed very quickly. You note that the conversation stepped up a few notches this week and I was behind all that. And it might [be] stepped up again."

- In response to Pentwater asking whether Mr. Goncalves was saying that he was behind President Biden's March 14 statement, Mr. Goncalves said: "Oh, yeah, 100%, 100%, yes sir, yes, yes, the answer is yes. I have been postponing that statement for a while, because I was under the impression that Nippon Steel would listen to me and come to me and negotiate a deal. But they didn't come. So, this was just a demonstration that [it] can get worse."

This CFIUS document is exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552(b).
Public disclosure is further prohibited by § 721(c) of the Defense Production Act, as amended.

AR_010394

App.306

DRAFT//DELIBERATIVE//PRE-DECISIONAL
UNCLASSIFIED//FOR OFFICIAL USE ONLY

- When Pentwater representatives responded that they believed that there would be a legal process involving CFIUS, Mr. Goncalves said: "No, there's no process. This is not going to be a process. CFIUS is just cover for a President to kill a deal. CFIUS is a bunch of bureaucrats, second and third level, inside the cabinet, Treasury, DOE, Department of State, National Economic Council, National Security Council and they write the report, it lands on the desk of the President of the United States and he can do three things with the report: adopt, reject or modify. It means the President can do whatever he wants."

Five days later, on March 20, 2024, Jefferies, the financial advisor to Mr. Goncalves, organized a "broker call" on the Transaction. Investors reported that Mr. Goncalves informed attendees that he and David McCall, the president of the United Steelworkers union ("USW"), had arranged, in effect, a *quid pro quo* with the President of the United States to block Nippon Steel's acquisition of U. S. Steel. Specifically, Mr. Goncalves said that Mr. McCall had been in touch with the White House, and that President Biden had requested the USW endorsement "now" and provided personal assurances that CFIUS would block the Nippon Steel acquisition of U. S. Steel — and that this action would be timed to maximize the President's political benefit.

As if these comments were not sufficiently lawless and repugnant, Mr. Goncalves has repeatedly made bigoted comments regarding the Japanese nationality of Nippon Steel's management team. It has been publicly reported — and confirmed by first-hand accounts — that Mr. Goncalves mimicked a Japanese "accent" when discussing Nippon Steel in investor calls. Additionally, U. S. Steel and Nippon Steel have received first-hand reports that at a J.P. Morgan conference in March, Mr. Goncalves told investors that Nippon Steel executives will commit *seppuku* — a Japanese form of ritual suicide by self-disembowelment — when the Transaction fails. He reportedly pantomimed cutting his abdomen with a knife to ensure those present understood his crude and bigoted comments.

We have practiced before CFIUS for decades, with colleagues who have served ably and responsibly on the Committee, and we know well that these comments do not reflect the professionalism and integrity of you and your colleagues on the Committee. We accordingly bring them to your attention so that you and the senior CFIUS officials at each of your agencies are fully apprised of how the Committee and the President of the United States are being characterized — and caricatured — and so that you are aware of this assault on CFIUS as an institution and on the United States as a beacon of the rule of law, including due process, and a model of openness to foreign investment. Indeed, these comments are the most brazen suggestions of politicization and lawlessness regarding CFIUS that we have ever heard. At all other times, we would dismiss them as being blatantly false, and we sincerely hope that they are here, but we cannot do so given the circumstances in which we find ourselves.

Nippon Steel and U. S. Steel are committed to continuing to work with CFIUS responsibly; to being fully transparent with and responsive to the Committee; and to adhering to a fact-based process that conforms to the law and applies an appropriate risk-based analysis to arrive at a determination that safeguards national security — not one pre-determined by a competitor boasting of its power to manipulate the federal government in an election year for its own benefit.

Please let us know if you have any questions. We would be glad to discuss this matter further.

Best regards,

This CFIUS document is exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b). Public disclosure is further prohibited by § 721(c) of the Defense Production Act, as amended.

AR_010395

**App.307**

DRAFT//DELIBERATIVE//PRE-DECISIONAL
UNCLASSIFIED//FOR OFFICIAL USE ONLY

Mark E. Plotkin
David N. Fagan
Jonathan R. Wakely
Covington & Burling LLP
850 Tenth Street, NW
Washington, D.C. 20001

*Counsel to United States Steel Corporation*

Ama A. Adams
Brendan C. Hanifin
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006

*Counsel to Nippon Steel Corporation*

Enclosure

This CFIUS document is exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552(b). Public disclosure is further prohibited by § 721(c) of the Defense Production Act, as amended.

# Enclosure

BUSINESS CONFIDENTIAL
Pursuant to 50 U.S.C. § 4565
Protected from Disclosure under 5 U.S.C. § 552

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

PW: How can we help you?

Lourenco Goncalves: I believe that we can both help each other because I hear that you are now the largest shareholder of US Steel, right?

PW: There are two other shareholders that are index holders that don't engage with management who are slightly larger. We are the third largest shareholder and we own eight percent of the shares

Lourenco Goncalves: Ok I was told you were the largest so I was directionally correct. So, that's why I picked up the phone and called cold turkey. So, first and foremost thanks for picking up the call. So, here's the thing. I still believe there's a possibility we can save the $55 per share deal, but it will take Mr. Mori and Mr. Hashimoto, at least one of the two. If Mr. Mori comes alone I will receive him, but it will take Mr. Mori to come to Cleveland and cut a deal with me in which they will keep Big River, they will keep Kosice, and I, all the rest comes to Cliffs, that's the only way the $55 deal will go through. There's no other way. You may think there's a deal with the Union. I promise you there's no deal with the Union. That's not gonna happen.

PW: It's not that I don't believe you, but it's just unusual, normally there's a process.

Lourenco Goncalves: Its unusual because, nobody, nobody has a relationship with the union as I have. But that's now known, well known. But its also difficult in this country to have support from JD Vance, and [unclear] Sherrod Brown, Ro Khanna, and you go from the left to the right, Bob Casey, John Fetterman, Joe Manchin, everywhere, so we are consensus from the right, the left and the center and that's very unusual too, as you know.

PW: Yes, that is unusual, but what is more normal is a president can't just kill a transaction. Typically, there's a CFIUS process that can take many months and can involve a pull and refile and there likely wouldn't be an answer for at least six and could last as long as nine months. So, isn't it going to take at least that long to have the deal die, if it does die?

Lourenco Goncalves: Well, we have an election [in] November. Trump has been in contact with me frequently and Biden, at the cabinet level, has been in contact with me frequently, so this deal can be killed very quickly. You note that the conversation stepped up a few notches this week and I was behind all that. And it might [be] stepped up again.

PW: I'm sorry, you were behind the President Biden statement that he made?

Lourenco Goncalves: Oh, yeah, 100%, 100%, yes sir, yes, yes, the answer is yes. I have been postponing that statement for a while, because I was under the impression that Nippon Steel would listen to me and come to me and negotiate a deal. But they didn't come. So, this was just a demonstration that can get worse.

PW: So there's been talk from some investment banks that the United Steel Workers Union Is holding off on endorsing President Biden until the deal is officially killed. Is that accurate?

Lourenco Goncalves: Yes

PW: So, is it like a deal that they have between the United Steel Workers US steel workers and President Biden and he kills the deal and gets the endorsement?

Lourenco Goncalves: Yeah its... yeah its not... that's not how things work in politics. There's no black and white, but it's implied in the 'I have your back' and 'you are the best president since George Washington' as far as union support yada yada yada. But you know what, if Biden kills the deal, Dave McCall will endorse Biden, if that's your question.

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

PW: Because, naively, I thought this was going to be a process

Lourenco Goncalves: No, there's no process. This is not going to be a process. CFIIUS is just cover for a President to kill a deal. CFIUS is a bunch of bureaucrats, second and third level, inside the cabinet, treasury, DOE, Department of State, National Economic Council, National Security Council and they write the report, it lands on the desk of the President of the United States and he can do three things with the report: adopt, reject or modify. It means the President can do whatever he wants. That's why Trump said 'I would block the deal'. So, he knows what he's talking about, and he knows how things works. But Biden is being a lot more careful. Also, because the Prime Minister of Japan is coming to visit on April 10 and Biden, being a polite guy, doesn't want to treat him like Trump did to Zelensky two years ago. So, he's going to try and do all the Kumbaya with Japan the right way, no pun intended. So, there is a lot going on in the political background. Look, Nippon Steel is in a very bad situation because they started from the premise that the union had no say in the process and that's where the problems started. And the union has a say and I think everyone now knows that the union has a say.

PW: So, how long until Biden kills the deal. Does he kill it before the Japanese Prime Minster comes or after?

Lourenco Goncalves: I don't know, that I don't know, because it depends on what Dave McCall will do between now and then. But you know what, Nippon Steel is on the clock.

PW: And I just assume the union will just refuse to negotiation with him at all, period; 100%; because they have the backing of the President.

Lourenco Goncalves: No, no, no. I didn't say that. I don't think they will do that because the unions are very good at negotiating. So, the union will continue to negotiate, but they will continue to negotiate for the next three years if necessary. You know, there will be no conclusion. Because in order for there to be a closing there needs to be a signed and countersigned contract with the union. It's not 'I assume the contract'. That's not the way it works, and the union is not going to countersign a contract. They will negotiate, because they are not going to allow a lawyer to say they are not in compliance because they aren't negotiating. They will negotiate and they will negotiate for a long long time.

PW: Ok, well I can get US Steel on the phone because I'm a large and significant shareholder. Nippon, we are in contact with them, but its not as if I can get them on the phone in an hour. What message do you want me to deliver to Nippon?

Lourenco Goncalves: Mori needs to come to 200 public square in Cleveland and talk to me, cut a deal, they will take Big River, if they want Kosice, they can keep Kosice, if they don't want Kosice, I will take Kosice, the Union assets are OFF LIMITS for the Japanese. If they don't want this, they will get zip, they will get nothing and Mori will be promoted to President of Nippon Steel janitorial services. That is the message I would like you to convey to them.

PW: I think I will leave out the janitorial servicers part of the message

Lourenco Goncalves: Up to you sir, because they know I know how the Japanese companies work. Because if you say that then they will really know that you spoke with me.

PW: Well, I doubt they would return my phone call again if I told them that. But, one of the problems here is in the proxy, they discussed the price you were willing to pay, and it was a fair price because it was close to the $55 that was offered and accepted by Nippon and in fact where your stock is today its in excess of $55, but now you are out there saying you won't pay more than $30.

Lourenco Goncalves: For now, for now, next week it will be in the twenties

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

PW: Next week what?

Lourenco Goncalves: Next week, for now, next week it will be in the twenties

PW: Well, I'm never going to vote for a deal to sell at that low of a price.

Lourenco Goncalves: Ok, up to you. You say that you own 5%, I will own 95%, everybody but you.

PW: well we own 8%, we own 8%, so maybe you will get 92

Lourenco Goncalves: I know, I know, but you get what I'm saying. What I'm saying is: for the $55 that's good for you and good for Nippon Steel, they need to come here.

PW: And how would the deal work?

Lourenco Goncalves: I'm not [unclear], I sent this message to Citi bank and they played deaf. I sent this message to Davis Polk to Ropes and Gray, they did not bite. Now I'm trying through a shareholder. Simple as that.

PW: And how would the deal work? Nippon would acquire the whole company and then flip the assets to you after they acquired the whole company? Is that how it would work?

Lourenco Goncalves: Yes its called an 'on sale'. So, the only thing, the only thing I need from them to cut a deal, and we cut a fair deal, don't worry, that goes without saying. We cut a fair deal, we write the 'on sale', the Nippon deal stays put, stays in place, US Steel doesn't have to do anything other than allow Davis Polk, my attorneys, Ropes and Gray, Nippon Steel attorneys, to have access to legal documents... no due diligence, nothing, legal documents to be able to split the companies. So, its called an 'on sale' you are probably very familiar with that. We write an 'on sale' deal that goes 10 seconds before the main deal close and we are good to go.

PW: And what about the tax leakage associated with that, and the antitrust risk associated with that?

Lourenco Goncalves: The antitrust risk is gone. Think what I am doing. I'm letting Nippon Steel have Big River. So, electrical steels, that's one of the biggest things, electrical steel for automotive industry, gone. Uh, as far as the rest, you know it doesn't matter. Nucor produces automotive steels, Steel Dynamics produces automotive steels, Nippon Steel themselves produces a lot of steel. Their biggest client is Toyota, my biggest client is Toyota. So, there is no antitrust problem. The biggest problem is electric steels in antitrust. But, uh, we will do it and we will also sign with hell or high water, so that should not be a problem for Nippon Steel. That's a problem for me to resolve, because antitrust risk is on my side. I don't believe we are going to have ANY problem with antitrust. This is just Dave Burritt bull shit because that guy is beyond stupid.

PW: Ok, thank you for the phone call, its uh, we've never spoken before and its nice to meet you

Lourenco Goncalves: Very nice to meet you as well

**From:** Siegle, Emerson
**To:** Martin, Connor; Nelson, Leyton; Harvey, Jennifer; Himel, Samuel; Behles, Caitlin; Kolker, Anne; Vaccaro, Adam
**Cc:** Adams, Ama; Hanifin, Brendan C.; Fowler, Kurt; Lee, Junsuk; Fagan, David; Plotkin, Mark; Karson, Sam; Cook, Corinne
**Subject:** CFIUS Case 24-088: Communication on Behalf of Nippon Steel and U. S. Steel
**Date:** Tuesday, July 30, 2024 8:42:54 PM

** **Caution:** External email from: **[prvs=935cc6ef4=Emerson.Siegle@ropesgray.com]** Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

**BUSINESS CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**PROTECTED FROM DISCLOSURE UNDER 5 U.S.C. § 552(b)**

Dear Treasury and Commerce colleagues:

We are writing on behalf of Nippon Steel Corporation ("Nippon Steel") and United States Steel Corporation ("U. S. Steel") (collectively the "Parties") with respect to CFIUS Case 24-088 regarding the proposed indirect acquisition of U. S. Steel by Nippon Steel (the "Transaction"), which is currently pending with CFIUS. As you are aware, the Transaction was withdrawn and refiled by the Parties, with the review period set to conclude no later than August 8, 2024.

We appreciated the opportunity to meet on July 22. As we conveyed in that meeting, while the Parties believe that the Transaction will strengthen the U.S. domestic industrial base and supply chain security and will not pose any risk to U.S. national security, the Parties nonetheless appreciate and respect that the CFIUS agencies must conduct thorough diligence, weigh the equities of various stakeholders, and undertake a risk-based analysis of the Transaction. In that regard, as CFIUS is aware, Nippon Steel has already committed, through public statements, in its March 27 letter to the United Steelworkers ("USW") (which has been publicly available), and in responses to questions from CFIUS, to:

- Maintain U. S. Steel's headquarters in Pittsburgh;
- Cause U. S. Steel to invest $1.4 billion in USW-represented facilities above and beyond what is required under the Basic Labor Agreement between the USW and U. S. Steel (the "BLA");
- Not transfer any of U. S. Steel's production or jobs overseas;
- Not conduct any layoffs or plant closures or idling of U. S. Steel facilities as a result of the Transaction, subject to customary exceptions as set forth in the March 27 letter to the USW;
- Maintain continued supply to U. S. Steel's customers in the United States;
- Not interfere with U. S. Steel's decisions on trade matters and its determination to pursue trade measures under U.S. law such as antidumping duty/countervailing duty orders or safeguard measures, including with respect to unfairly traded imports from countries in which Nippon Steel has operations; and
- Transfer Nippon Steel's enhanced manufacturing and technology capabilities

to U. S. Steel, including as it relates to reducing carbon emissions from steelmaking, where such transfers are economically and technically feasible.

Furthermore, we note that Nippon Steel intends to own U. S. Steel through its domestic subsidiary, Nippon Steel North America, a New York corporation that has operated in the United States for over 50 years and indirectly owns multiple U.S. facilities that employ over 2,500 employees, including approximately 620 employees represented by the USW (employed by companies such as Standard Steel in Burnham, PA and Wheeling Nippon Steel in Follansbee, WV).

The Parties are writing now to underscore these commitments. The Parties note, moreover, that they are prepared to engage with CFIUS to discuss the potential implementation of these commitments and others as part of an agreement with the U.S. government to protect U.S. national security interests while enabling the strategic rationale of the Transaction to proceed. To the extent that CFIUS felt it necessary to include governance and additional verification measures in relation to any such commitments, the parties would be prepared to engage with CFIUS on those issues.

We would welcome the opportunity to further discuss these issues and the path forward for the Transaction with the co-lead agencies as promptly as possible.

Best regards,

The Ropes and Covington teams, on behalf of Nippon Steel and U. S. Steel

**Emerson A. Siegle**
**ROPES & GRAY LLP**
T +1 202 508 4744 | M +1 540 818 0541
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006-6807
Emerson.Siegle@ropesgray.com
https://hyperlink.services.treasury.gov/agency.do?origin=www.ropesgray.com
pronouns: he/him/his

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

August 31, 2024

Ama Adams
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006

Mark Plotkin
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001

Re: CFIUS Case 24-088: Nippon Steel Corporation (Japan)/United States Steel Corporation

Dear Ms. Adams and Mr. Plotkin:

I am writing on behalf of the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee") regarding CFIUS Case 24-088, involving the proposed indirect acquisition by Nippon Steel Corporation ("Nippon Steel"), a public Japanese corporation with its principal place of business in Tokyo, Japan, of 100 percent of United States Steel Corporation ("U.S. Steel"), a public Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania (the "Transaction").

The Committee has identified risks to the national security of the United States arising as a result of the Transaction. To the extent that they can be summarized at an unclassified level, such risks relate to potential decisions by Nippon Steel that could lead to a reduction in domestic steel production capacity. In reaching this conclusion, the Committee relied upon the U.S. Department of Commerce ("Commerce") analysis that considered that a robust commercial steel market is essential for national security, as the market-oriented U.S. steel industry requires steady revenue from sustained commercial production to meet critical industry steel requirements.[1]

In conducting its analysis of whether a transaction poses national security risks, CFIUS assesses whether a foreign person has the intent and capability to take action to impair the national security of the United States (the "threat"), whether the nature of the U.S. business makes it susceptible to exploitation that could result in such impairment (the "vulnerability"), and the potential effects on national security that could reasonably result from the exploitation of the vulnerabilities by the threat actor (the "consequence"). Risk to U.S. national security is thus a function of the interaction among threat, vulnerability, and consequence.

In reaching its determination, CFIUS relied upon both classified and unclassified information, including the assessments of subject matter experts from Commerce. Sources of unclassified information include the Parties' joint voluntary notice, including all documentary materials

[1] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018.

submitted therewith, submitted on March 13, 2024; parties' presentations to CFIUS on February 21, 2024 and August 19, 2024; and information provided by the Parties in response to nineteen (19) rounds of questions (collectively, the "Notice"). In addition, CFIUS considered certain unclassified information obtained from websites, press reports, and other information available in the public domain (please see the Annex attached to this letter). CFIUS also relied on unclassified information submitted to the Committee by an individual Party to the Transaction with a request that it be treated as confidential (referred to hereafter as "information submitted confidentially by [name of Party]"). In each instance where this letter refers to such information submitted by a single Party, CFIUS has summarized the information at a high level for purposes of preserving the confidentiality requested by the submitting Party, while still identifying CFIUS's reliance on that information in reaching its determination.

In reviewing this Transaction, the Committee considered all factors of Section 721(f) of the Defense Production Act (DPA) (Section 721), as well as Executive Order (EO) 14083, which elaborated and expanded on these factors. In particular, the Committee considered "the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security;" (Section 721(f)(3)) "the potential national security-related effects on United States critical infrastructure;" (Section 721(f)(6)); "the long-term projection of United States requirements for...critical resources and material;" (Section 721(f)(10)); and "such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation" (Section 721(f)(11)).

EO 14083 directs CFIUS to "assess the effect of foreign investment on domestic capacity to meet national security requirements, including those requirements that fall outside of the defense industrial base."[2] The EO affirms that the "resilience of certain critical United States supply chains may have national security implications."[3] These factors overlap significantly with factors considered under the authorities described in "The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended." EO 14083 also states that, while "the United States recognizes the importance of cooperating with its allies and partners to secure supply chains...certain foreign investment may undermine supply chain resilience efforts and therefore national security..."[4]

In assessing whether the foreign person in this Transaction has the intent and capability to take action to impair U.S. national security, CFIUS considered several factors.

Japan is a critical ally of the United States and the importance of our alliance to both countries' national security. For example, Japan is a vital trade and investment partner.[5] Nippon Steel is

---

[2] EO 14083, *Executive Order on Ensuring Robust Consideration of Evolving National Security Risks by the Committee on Foreign Investment in the United States*, section 2(a)(i), September 15 2022.
[3] Ibid.
[4] Ibid.
[5] On February 7, 2022, Secretary Raimondo and U.S. Trade Representative Tai announced a new 232 tariff agreement with Japan. The agreement was based on a similar agreement between the U.S. and the EU. The new policy took effect on April 1, 2022. *See also* U.S. Japan Joint Statement, February 7, 2022, https://www.commerce.gov/sites/default/files/2022-02/US-Japan-Joint-Statement.pdf.

the largest steelmaker in Japan and the fourth-largest globally by quantity of steel produced, as of 2022. Nippon Steel employs approximately 106,000 people worldwide, including 4,000 in the United States, and its 2022 annual revenue was approximately $53.9 billion. Nippon Steel has operations in 16 countries and a steel production capacity of approximately 72.5 million tons, of which 72 percent (52 million tons) is produced in Japan. Nippon Steel primarily manufactures steel products, including steel plates; steel sheets; bar and rod materials; railway, automotive, and machinery parts; structural steel; and stainless steel. Nippon Steel serves customers in a variety of sectors, including the automotive, energy, infrastructure, design metals, and consumer electronics sectors. Nippon Steel also has operations in raw materials procurement, chemicals and materials, steel slag recycling, and secondary processing for higher value-added products.

Nippon Steel operates eleven additional blast furnaces outside of the United States, some of which are considerably younger than U.S. Steel's, such as two blast furnaces under construction in India.[6] India is one of the largest production markets for Nippon Steel outside of China. Nippon Steel continues to expand its India presence and manufacturing base. According to public reports, Nippon Steel plans to double its production capacity in India by 2030.[7] A review of the overall cost of steel production in facilities in the United States and India shows that costs in the United States are significantly higher than that in India. According to Transition Zero and Global Efficiency Intelligence (2022) – Global Steel Production Costs, the average total cost of blast furnace operation in the United States is $578.26/ton and that in India is $458.30/ton, and the average labor cost of blast furnace operation in the United States is $66/ton and that in India is $9/ton.[8] In addition, relative to all major steel producing countries, India has the lowest cost of blast furnace production.[9] (Brazil and Mexico, where Nippon Steel also has operations, have similar cost considerations relative to the United States. Specifically, the total cost of blast furnace operation in Mexico is $548.07/ton and $512.23/ton in Brazil with total labor cost of blast furnace operation in Mexico is $17/ton and $25/ton in Brazil.)[10]

India is a strong exporter of steel mill goods. In 2023, Indian producers exported 9.2 million metric tons of steel to the world, a 26.6 percent increase in volume over 2015.[11] For pipe and

---

[6] Yuji Ohira, "Nippon Steel pivots away from China to zero in on U.S., India," Nikkei Asia, August 9, 2024, see https://asia.nikkei.com/Business/Materials/Nippon-Steel-pivots-away-from-China-to-zero-in-on-U.S.-India#:~:text=TOKYO%20%2D%2D%20Nippon%20Steel's%20global,U.S.%2C%20India%20and%20Southeast%20Asia.

[7] Arata Shingeno, "India economic boom lures investment from Nippon Steel venture," Nikkei Asia, February 6, 2024, see asia.nikkei.com/Business/Materials/India-economic-boom-lures-investment-from-Nippon Steel-Steel-ventures#:~:text=India%20economic%20boom%20lures%20investment%20from%20Nippon%20Steel%20venture,-Country%20aims%20to&text=TOKYO%20%2D%2D%India's%20growing%20economy,300%20million%20tonnes%20by%202030.

[8] *Global Steel Production Costs Global Steel Cost Tracker—TransitionZero. Accessed July 30, 2024. https://www.transitionzero.org/products/global-steel-cost-tracker.*

[9] Ibid.

[10] Ibid.

[11] Ibid.

tube products and stainless steel products, the United States was among the top three export destinations.[12]

As of March 31, 2023, Nippon Steel has 54 affiliates involved in steelmaking and steel fabrication, of which 31 are majority or wholly owned subsidiaries.[13] Nippon Steel's steel operations span Japan, Thailand, the United States, Mexico, Sweden, China, the UAE, Brazil, India, and Luxembourg. Nippon Steel has numerous subsidiaries and affiliates in China. China accounts for approximately five percent of Nippon Steel's total production capacity. Nippon Steel does sometimes contest harmful Chinese practices, such as when it filed a lawsuit in 2021 against Baoshan Iron & Steel Co., Ltd., a subsidiary of Baowu Steel Group, alleging infringement of Nippon Steel's patents relating to electrical steel; however, it rarely does so using U.S. trade measures.

In considering Section 721(f) factors, Commerce considered the global environment surrounding steel supply and resultant weak market conditions in connection with this Transaction. China has the capability to produce as much steel as the rest of the world combined.[14] In 1978, when the People's Republic of China (PRC) began to open its economy, the United States produced four times more steel than the PRC. Now, the PRC produces 12 times more steel than United States does.[15] Chinese steel production surpassed that of the United States in 1993, and in 1996, PRC overtook Japan to be the top global producer.[16] Through its persistent use of market-distorting government interventions and other non-market polices, the PRC has unfairly gained dominance in the global steel market allowing it to have an outsized impact, as it exports extensive surplus steel that artificially lowers international prices. In 2022, the PRC produced approximately 54 percent of total global crude steel and was the largest exporter, exporting 68.1 million tons. Chinese excess capacity, estimated at more than 300 million metric tons, dwarfs total U.S. production capacity. Global supply has a significant impact on prices within the international steel market, and the depressed business conditions and market volatility caused by excess capacity and the artificially low prices it creates is a key factor in domestic mill closures.

Markets globally are adversely affected by chronic global excess production led by the PRC, and global supply is outpacing global demand. The United States is the world's largest steel importer and imports a significant percentage of steel used in the domestic market.[17] Currently, much of

---

[12] Ibid.

[13] *Principal Subsidiaries and Affiliates (As of March 31, 2024)*, accessed August 29, 2024. Nipponsteel.com

[14] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018, p. 52. For example, in 2017, the PRC produced 831 metric tons of crude steel, Japan produced 104.7 tons, and the United States produced 116 tons. *See* Seth, Shobhit. *"How China Impacts the Global Steel Industry."* 31 JAN 2022. Investopedia. https://www.investopedia.com/articles/investing/021716/how-china-impacts-global-steel-industry.asp.

[15] Leveling the Playing Field: How to Counter the CCP's Economic Aggression: Hearing before the U.S. House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party, 118th Cong. (2023).

[16] Niccolo Conte, "*Visualizing 50 Years of Global Steel Production.*" Visual Capitalist. 02 June 2021. https://www.visualcapitalist.com/visualizing-50-years-of-global-steel-production/.

[17] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018.

PRC's excess production is lower grade, low value steel not suitable for use in advanced manufacturing, particularly in the automotive sector. However, as PRC increasingly shifts to higher purity and more finished products, other steel-producing countries such as Japan and the United States will need to find ways to lower costs across their own production supply chains to remain competitive against Chinese imports.[18] China has already demonstrated its willingness to flood the market with its surplus steel, which undermines domestic manufacturers, threatens critical industries, and creates increasing dependence on PRC producers.[19]

Nippon Steel continues to focus on cost control, carbon reduction, and improving production of higher margin products amidst this sluggish market created by Chinese overproduction. Nippon Steel stated it has no intentions of idling, permanently closing, reducing staff, or otherwise modifying any of U.S. Steel's blast facilities through 2026, but has acknowledged that the continued state of operations of U.S. Steel's facilities would depend on myriad factors, including projected medium- and long-term demand, availability and cost of raw materials, health of the facility, and other overall cost considerations.

Nippon Steel's relatively limited use of trade remedies in other jurisdictions was also considered. Beyond Japan, Nippon Steel presently has operations in Australia, Brazil, China, the European Union (EU), India, Indonesia, Thailand, and the UAE. Each of these jurisdictions have trade remedy laws that allow either parties, a regulator, or both to initiate an antidumping (AD) or subsidy (countervailing duty "CVD") proceeding. Based on publicly available data, of the 180 active foreign trade remedy proceedings involving steel products in these jurisdictions (excluding Japan), Nippon Steel or an affiliate has participated as a petitioner in seven of them, or approximately four percent.[20] Neither Nippon Steel nor any of its affiliates has filed a petition related to any active cases in Australia, China, the EU, India, or Indonesia, even though each of these countries has active trade measure proceedings related to steel products.[21] Nippon Steel does not favor reliance on AD/CVD protections generally. While U.S. Steel frequently petitions for AD/CVD relief, Nippon Steel features prominently as a foreign respondent resisting trade relief for the U.S. domestic steel industry. Nippon Steel currently appears as a respondent or interested party in 19 AD or CVD cases involving Japan, China, Mexico, South Korea, and

---

[18] Shida, Tomio, "China's surging steel exports risk new round of trade frictions." Asia Nikkei. 20 Dec 2023. https://asia.nikkei.com/Spotlight/Comment/China-s-surging-steel-exports-risk-new-round-of-trade-frictions. Accessed May 23 2024.

[19] Testimony of John Ferriola Chairman, CEO & President of Nucor Corporation found in *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018.

[20] Japan has only two active trade measure proceedings, and Nippon Steel participates in both of them. Given the sample size these cases offer little guidance regarding Nippon Steel's disposition towards or against relying on national trade measure laws.

[21] Based on information available to Commerce staff drawn from publicly available data. For EU cases, the petitioner is often an alliance that does not disclose its public membership, so it is unknown whether Nippon Steel's steel-producing affiliate located in Sweden is a petitioner.

Taiwan.[22] Several of the orders that imposed duties on imports from Nippon Steel in these cases were obtained by U.S. Steel.[23]

Nippon Steel has stated that it "intends to participate in trade remedy proceedings under consideration by governments in Southeast Asia" in which it operates, "assuming that the proposed trade remedy actions reflects [sic] the interest of Nippon Steel." However, this does not constitute a guarantee that Nippon Steel will change its historically limited practices with respect to trade remedies proceedings.

Nippon Steel's statements to the Committee further reflect to Nippon Steel's relatively less aggressive use of trade measure proceedings. For example, Nippon Steel claimed the most important factor for determining whether trade actions are warranted is if imports are fairly priced compared to their own products. However, Nippon Steel's provided statements on participation in AD/CVD cases provide a less robust active participation than U.S. Steel. Nippon Steel acknowledged that "U.S. Steel has been a proactive user of the U.S. trade remedy regime," and has stated that it "will not interfere with U.S. Steel's ability to maintain its historical approach to and participation in" AD/CVD proceedings. Nippon Steel has indicated that "decisions regarding participation" in AD/CVD "will be made by U.S. Steel's management in consultation with Nippon Steel," including decisions about whether imports are harmful. Nippon Steel pointed specifically to its "interest in ensuring the competitiveness of U.S. Steel, including through allowing U.S. Steel to participate fully in antidumping and countervailing duty measures against imports that harm U.S. Steel's competitiveness in the U.S. market," and suggested that it did not anticipate that the interests of U.S. Steel and Nippon Steel would diverge, in part because U.S. Steel and Nippon Steel would have an interest in structuring their operations "in a manner in which Nippon Steel's exports to the United States" would not "directly compete with or harm U.S. Steel's market position domestically."[24]

While these statements suggest that Nippon Steel does not, in the near term, intend to curtail U.S. Steel's participation in AD/CVD proceedings, post-acquisition, U.S. Steel's decisions on AD/CVD cases will be influenced by Nippon Steel, and may take into account Nippon Steel's commercial interests and competitive position in the global steel market, which are broader than U.S. Steel's domestic interests.

In assessing whether the nature of U.S. Steel makes it susceptible to exploitation that could impair national security, CFIUS considered several factors.

U.S. Steel had a production capacity of 22.4 million tons in 2023. U.S. Steel makes steel primarily for automotive, construction, consumer, electrical, industrial equipment, and energy

---

22 ITA, [https://access.trade.gov/ADCVD_Search.aspx] Accessed on July 15, 2024. For example, in 2021, Commerce applied a 199.43 percent tariff in a final review of corrosion resistant steel to Nippon Steel's Chinese operations, causing Nippon Steel to cease shipments of those products to the United States altogether. 86 FR 16185; Corrosion-Resistant Steel Products from China, A-570-026. Nippon Steel has been subject to 77.7 percent AD duties on nickel plated flat steel and 71.35 percent duties on cold rolled steel from Japan.

23 U.S. Steel was a petitioner in the 12 AD/CVD cases. ITA, [https://access.trade.gov/ADCVD_Search.aspx] Accessed on July 15, 2024.

24 This risk is partially mitigated by the fact that Nippon Steel and U.S. Steel's opposition to a petition may be disregarded by Commerce under certain circumstances.

customers. U.S. Steel is the world's 27th largest steel manufacturer, and the third largest steel maker in the United States.[25] U.S. Steel has four business segments: North American flat rolled steel plates and slabs; Mini Mill, which produces steel using an electric arc furnace and is more energy efficient; tubular products, which are prominently used in the oil and natural gas industries; and U.S. Steel Europe, which makes steel in Slovakia, according to the filing.

Maintaining a competitive U.S. domestic steel market, with enough capacity and capital to meet increasing domestic steel demands, is crucial to the downstream consumers of steel products, many of which are national security critical industries that must remain competitive domestically and globally. Steel is used in the transportation sector in bridges, tunnels, the national highway system, railcars and tracks, ports, and in over 19,000 airport runways and facilities. The United States has over 600,000 bridges made up, in part or in whole, of steel.[26] As such critical infrastructure ages, replacement parts, principally made of steel, will be increasingly important to maintaining vital national security infrastructure. Reduced domestic steel availability, especially of high purity steel produced in blast furnaces, may cause injurious delays to critical repairs that could lead to further degradation of these vital infrastructure assets. Further, steel is used in the energy sector in electric power generation, refineries, and nuclear facilities; there are over 6,000 power plants in the United States that require ongoing steel production for maintenance and repair.[27] U.S. Steel is also a supplier of steel for the agricultural market, and its overall market share in this industry is increasing. In 2022, U.S. Steel supplied over 190,000 tons of steel to the U.S. agricultural supply chain (a critical infrastructure market), which increased to over 200,000 tons in 2023. About a quarter of this steel was supplied through its basic oxygen furnaces (BOFs) or blast furnaces.

The U.S. domestic steel market, in its current composition, is already unable to meet domestic critical infrastructure and commercial demand, requiring a reliance on imports.[28]

The history of U.S. Government actions to support the continued viability of the U.S. steel industry demonstrates that, across decades and administrations, the United States has consistently assessed that domestic steel production is essential for national security applications. Prior significant actions to address steel imports using quotas and/or tariffs were taken under various statutory authorities by President George W. Bush, President William J. Clinton (three times), President George H.W. Bush, President Ronald W. Reagan (three times), President James E. Carter (twice), and President Richard M. Nixon. Most recently, the 2018 Commerce investigation under Section 232 of the Trade Expansion Act found that robust industrial oriented steel manufacturing is essential for national security, as the free market system in the United States requires commercially viable steel producers to meet critical infrastructure steel

---

[25] World Steel Association | URL: www.worldsteel.org/data/world-steel-infigures-2023 | World Steel in Figures 2023 | 29 March 2024 |

[26] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

[26] Ibid.

[27] Ibid.

[28] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

requirements. In order to provide sufficient supply for national security needs, the domestic steel industry requires several factors to exist: steady production, efficiency, and revenue volume. It is the commercial and industrial customer sales–which are U.S. Steel's primary customer base–that allow for the relatively steady production needed for manufacturing efficiency as well as revenue volume to sustain the business. Per the parties, the board of directors of U.S. Steel were not looking to sell U.S. Steel in 2023, but unsolicited approaches from several buyers forced the board of directors to consider strategic alternatives to its standalone strategy. Also, according to the parties, the board of directors undertook an exhaustive strategic alternative review process that canvassed more than 50 potential buyers, which resulted in 10 non-binding bids, five second round bids and ultimately resulted in the board of directors agreeing to Nippon Steel's bid. Per the parties, the alternative final bid was Cleveland-Cliffs Inc.; however, Nippon Steel was selected because Nippon provided the highest value and certainty while presenting less regulatory risk than Cleveland-Cliffs.

Among other potential national security implications, Commerce affirms the continued validity of the 2018 Section 232 Report conclusion that a healthy and competitive domestic steel industry is in the national security interest. The 2018 Section 232 report found that an 80 percent capacity utilization rate is an important factor in the ability of the domestic steel industry to meet national security needs.[29]

Overall domestic steel production capacity has been steadily declining in the United States for the last several decades. Utilization rates, including U.S. Steel's, have been steadily declining from an average of 87 percent in 1998, to 81.4 in 2008, and finally to 69.4 percent in 2016.[30] As of 2023, U.S. Steel accounted for 17.81 percent of the U.S. steel supply, with the other major U.S. companies including Nucor Corp. (Nucor), (25.93 percent), Cleveland-Cliffs (16.90 percent), and Steel Dynamics (11.70 percent).

U.S. Steel's average utilization across its North American flat rolled segment, its largest business line, for 2023 was 71 percent. U.S. Steel's tubular segment, solely supplied by its Fairfield Works operation that went online in October 2020 only averages 63 percent utilization, well below the targets anticipated to be required for maintaining readiness.

The number of blast furnaces operating in the United States decreased from 38 to less than 15 between 1975 and 2016, during which time the number of Electric Arc Furnaces (EAFs) decreased from 127 to 98.[31] This decline affects domestic steel producers' current ability to meet national security production requirements for critical infrastructure. This capacity falls further short of the capacity needed to meet demands during an emergency, and further still if there are fewer U.S. operating blast furnaces, which are currently the only source for high purity steel used in the transportation industry, a critical infrastructure sector. While the steel industry is developing the technology to make such steel in EAFs, the research and development is ongoing,

---

[29] *See* Exhibit F in *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.
[30] Utilization rates display the percentage of total steel capacity that is currently in use to produce steel.
[31] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

without an estimated timeline of when blast furnaces are no longer necessary to achieve the required purity standards. No domestic alternative currently exists to replace the lost production capacity and variety of steel products produced at scale in the near-term.

Production costs for zero-carbon steel are expected to double current crude steel production costs. In 2021, U.S. Steel announced a goal of achieving net-zero carbon emissions by 2050. Nippon Steel has begun working to reduce its total CO2 emissions by 30 percent from 2013 levels by 2030 to meet targets set by the government of Japan. In May 2023, Nippon Steel started a full-scale study of the transition from the blast furnace steelmaking process to the EAF steelmaking process. Additionally, Nippon Steel has developed hydrogen injection technology that would be used to reduce carbon emissions from blast furnaces.

Some competitors are seeking to produce critical material for the transport and automotive sectors that are traditionally made in blast furnaces, such as automotive sheet, tin mill, and flat rolled products, in EAFs. EAFs cannot produce the same volume as blast furnaces, even while they attempt to diversify their production.[32]

U.S. Steel recently added non-oriented electrical steel (NOES) production capabilities and is one of only two domestic producers of electrical steel in the United States. NOES is used in the cores of motors for electric vehicles (EVs), industrial processes such as pumping and fanning, and for consumer products, including appliances and small generators. NOES-dependent EVs are critical to national security as transportation, specifically mass-transit systems, are part of the critical infrastructure. With the focus on a transition in reducing the carbon impact, cities are increasingly focused on electric buses which use NOES in the core of the motor.

Despite some projected increases in capacity, domestic capacity will fall below domestic demand by over 61,000 tons of electrical steel by 2026, which is predicted to rise as high as 927,000 tons by 2030.[33] S&P Global estimates that the EV industry is facing significant challenges to meeting projected increased demand. Currently, limited domestic suppliers and production forces the U.S. EV industry to import electrical steel from countries such as China, Japan, and South Korea.[34] Scarcity of electrical steel has made it a strategic commodity integral to national security industries, which is already threatened due to a limited global supply base concentrated in a few countries, one of which is China, another is Japan.

Nippon Steel will also have to consider the cost of restarting mills that have been idled. Per U.S. Steel, the cost to restart a temporarily idled blast furnace is between $2 and $10 million, depending on how long it has been idled, and up to $25 million for indefinitely idled furnaces to become operational again.

---

[32] Parth Kumar (2024, May 30). *Electric arc furnace-based steel production is witnessing a global rise.* Down to Earth. https://www.downtoearth.org.in/energy/electric-arc-furnace-based-steel-production-is-witnessing-a-global-rise.

[33] Vittori, C., Evans, G., & Fini, M. (2021, December 14). *Electrical steel – Another temporary supply chain shortage or a threat to OEMs' electrification plans?* S&P Global Mobility. Accessed May 24, 2024, from https://www.spglobal.com/mobility/en/research-analysis/electrical-steel-another-temporary-supply-chain-shortage.html.

[34] Ibid.

The costs to restart indefinitely or permanently idled mills are even less predictable and "vary on a case-by-case basis," per U.S. Steel. Due to this slow startup period, the aggressive vehicle electrification targets set by the 2021 Infrastructure Investment and Jobs Act, and the time required to ramp up production to full capacity or to restart idled furnaces, U.S. manufacturers in the automotive and transportation sectors will likely face supply chain disruptions as they confront limited local supply options, driving up motor costs in the short term and hurting their international competitiveness. In some trade agreements, including the United States – Canada Mexico Agreement, imported steel is not always a viable option. If current production of electrical steel is not maintained (or increased), the United States could become entirely dependent on foreign producers to supply these critical materials and products such as transformers and generators.[35] While U.S. Steel has closed or idled four mills since 2015, resulting in a loss of approximately 12.6 million tons of productivity in 2023 and 12.7 million tons per year of lost productivity over a five-year average due to challenging market conditions, historically and potentially as a result of its limited global footprint, U.S. Steel has maintained its commitment to the U.S. market and provided critical domestic production capacity.[36] A review of the company's business plan indicates that the company plans to maintain operations in the United States, despite these challenging market conditions.

U.S. Steel has a history of attempts to improve its competitiveness with frequently changing operational priorities. Previous operational priorities include the Carnegie Way in 2013, an asset-revitalization program in 2017 and Best of Both in 2019 before leading to the current Best for All program in 2021. All four programs have resulted in U.S. Steel spending an estimated $10.4 billion. The current Best for All program seeks to add an additional mini-mill similar to its Big River mini-mill and to convert its Granite City A and B into pig iron sources for its EAFs. However, the performance of the Big River Steel mini-mill has deteriorated over the past six quarters due to a mixture of declining steel prices and higher spot-market exposure leading to significant declines in profitability.

Nippon Steel and U.S. Steel have signed an agreement for technical assistance by Nippon for U.S. Steel in the operation and maintenance of U.S. Steel's blast furnaces; it is a standard consulting agreement. Per information provided by the parties during an August 19, 2024 meeting with the Committee, the agreement's purpose is to allow Nippon to evaluate U.S. Steel's blast furnaces to formulate a recommendation for future plans. Per the parties, this technical analysis has been focused on blast furnace #14 (BF14) at the Gary Works facility. U.S. Steel's current business plan includes idling BF14 in 2026 upon the completion of a new EAF facility; however, U.S. Steel's business plans have changed at various points in the past.

Under the technical agreement, U.S. Steel provided Nippon Steel with four possible investment scenarios with costs ranging from $20-$292 million (in addition to the already committed $1.4 billion) and adding between 9 months and 20 years of useful life to the aging furnace. The Nippon Steel board of directors approved this planned investment scenario on August 28, 2024.

---

[35] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

Per the parties, this decision is dependent on numerous factors related to market conditions.[37] Nippon Steel will also need to consider if an investment into BF14 fits in the overarching company strategy, especially in light of its current array of operational blast furnaces.

In addition to the possible investment in BF14, the parties also provided information about an additional investment proposal, approved by the Nippon Steel board of directors on August 28, 2024, into the Mon Valley Works facility, an aged integrated facility. Specifically, the planned investment would replace the current hot strip mill (HSM), which was installed in 1938. Per U.S. Steel, the mill's technical limitations due to the outdated HSM may pose a threat to the facility's long-term operations; however, the Mon Valley Works is U.S. Steel's lowest cost integrated mill operation and a key component of its overall business. Mon Valley Works is U.S. Steel's second largest U.S. flat-rolled facility by production capacity and consistently operates with a utilization rate of at least 75 percent, making it one of, if not the, most efficient of U.S. Steel's facilities. U.S. Steel has proposed replacing the HSM to revitalize and upgrade the facility, which would require an investment of at least $1 billion (on top of its $1.4-1.7 billion capital commitment) and likely four years to complete.

Per the parties, an investment of this scope and magnitude requires significant planning (in addition to high-level approval) so there is currently no timeline for execution or additional agreements in place. Nippon Steel requires approval by its board of directors and considerable technical and feasibility studies before it can seriously consider such an investment. Additionally, any commitment to substantial capital investments require extensive engineering analysis. As the possible investment remains contingent on the engineering analysis, Nippon Steel has not begun making any preparations for a technical assessment or discussed the investment in its negotiations with the steel union.

Additionally, maintaining a competitive U.S. domestic steel market depends upon vigorous enforcement of U.S. trade laws. Leading domestic industry participants have asserted that "the most important trade remedy toolkit is the U.S. antidumping and countervailing duty laws," which are even more important drivers than other trade relief tools, such as section 232 of the Trade Expansion Act of 1962.

Foreign government subsidies and other market-distorting policies in the steel sector have resulted in massive global non-market excess capacity in steel—estimated by the OECD at more than 700 million metric tons, over seven times U.S. raw steel production.[38] This overcapacity, combined with sluggish world demand and import barriers in other markets, has resulted in significant levels of steel imports entering the U.S. market, capturing a historically high

---

[37] Per the parties, the following factors will impact Nippon Steel's considerations on actions to take concerning the Gary Blast furnace: timing of the investment with remaining hearth life; capital costs and capital allocation; market supply/demand balance; long term facility outlook; optimization of investment dollars; consideration of Best for All strategy; broader U.S. Steel enterprise level loading plan; enterprise strategic markets and facility product mix; and customer satisfaction, amongst others.

[38] OECD. March 25-26, 2024. [Recent Developments in the North American Steel Industry] Accessed on June 14, 2024.

percentage of U.S. market share and resulting in thousands of U.S. job losses and numerous plant closures throughout the steelmaking supply chain.[39]

In the past decade, approximately 30 percent of all initiations of AD/CVD petitions covered steel-related commodities, and orders on steel products account for approximately 45 percent of all duty orders issued by Commerce—a total of 307 orders spanning 44 countries.[40] Steel likewise comprises a significant component of Commerce's circumvention reviews. Trade measures cases are of paramount importance to maintaining sufficient domestic steel supply relative to U.S. demand.[41]

U.S. Steel has historically acted as a principal player in steel-related trade measure cases. U.S. Steel is a petitioner in 61 investigations that resulted in AD/CVD orders since 2011, and employees in U.S. Steel plants have separately supported an additional ten petitions through the United Steelworkers Union. As a petitioner, U.S. Steel (either as sole petitioner or joined by other interested parties) has obtained orders imposing duties on imports of a wide range of products, from carbon and alloy pipe, cut to length plate, hot-rolled carbon steel, cold-rolled steel, corrosion-resistant steel, oil country tubular goods, and more.[42] Notably, U.S. Steel has been a petitioner in at least 13 steel cases in which Nippon Steel is a respondent, including cases in which U.S. Steel is the only petitioner.[43]

Existing orders require ongoing participation by U.S. Steel and other petitioners.[44] Orders are subject to annual administrative reviews and every-five-year sunset reviews, where the agencies

---

[39] Burns, S. (2024, June 5). *AISI Releases Annual Statistical Report for 2023.* American Iron and Steel Institute. https://www.steel.org/2024/06/aisi-releases-annual-statistical-report-for-2023/

[40] According to data maintained by Commerce, Commerce has initiated on 167 steel-related petitions out of a total of 563 and Commerce maintains 303 orders on steel-related products out of a total of 676, as of May 15, 2024, from domestic industry and publicly available on ACCESS, *See* ITA, [https://access.trade.gov/ADCVD_Search.aspx] Accessed on July 15, 2024.

[41] Testimony from major steel industry groups, members of Congress, and other stakeholders reveals the extent to which American steel producers have relied upon the trade laws to "restore ... fairness to the market place." *See, e.g.*, Statement of Terrence L. Hartford, SSINA, May 24, 2017; *id.* (noting that any relief afforded under section 232 "cannot undermine the antidumping and countervailing duty orders that have been effective in restraining import surges"); Statement of Lourenco Goncalves, CEO of Cleveland-Cliffs (Sep. 15, 2022), available at https://kaptur.house.gov/media-center/press-releases/kaptur-testifies-international-trade-commission-support-trade ("The continuation of these orders is critical to ensuring that the United States maintains a technologically advanced and carbon efficient steel industry [and] will support market conditions that enable further transformational investments by our company."); Statement of Joe Manchin in Testimony before the USITC (Jan. 4, 2024), available at https://www.manchin.senate.gov/newsroom/press-releases/manchin-testifies-before-the-international-trade-commission-in-support-of-cleveland-cliffs-domestic-steel-industry

[42] *E.g.*, A-588-850, Carbon and Alloy Seamless Standard, Line and Pressure Pipe from Japan; A-533-817, Certain CTL Carbon-Quality Steel Plate from India. *See* ITA, [https://access.trade.gov/ADCVD_Search.aspx] Accessed on July 15, 2024.

[43] Ibid.

[44] U.S. Steel was a petitioner in the 13 AD/CVD cases. *See* ITA, [https://access.trade.gov/ADCVD_Search.aspx] Accessed on July 15, 2024.

will consider varying or revoking import duties.[45] AD/CVD cases require considerable outlays, and often "[s]maller steel manufacturers are financially unable to afford these type of cases."[46]

AD/CVD is therefore an indispensable authority in protecting the steel industry and specific steel products, as steel industry leaders have repeatedly emphasized. Other trade measures protect U.S. national security and help the U.S. domestic steel industry to revive idled facilities, open closed mills, and maintain or increase of production lines, while promoting job creation and expansion of production lines for critical materials.[47]

More broadly, domestic-owned firms tend to bring more petitions than foreign-owned firms. Since 2011, four domestic steel firms—Nucor, U.S. Steel, Cleveland-Cliffs, and Steel Dynamics—have filed approximately 190 steel-related AD/CVD petitions. In the same time period, eight foreign-owned steel firms with significant U.S. presence have participated in 127 (none of which were filed by Nippon Steel). In most of these cases, the petition activity was led by a domestic firm. The four largest U.S. steel producers average 47.5 petitions per firm since 2011 compared to fewer than 18 per foreign firm, with nearly all foreign-owned AD/CVD activity driven by a single outlier company, ArcelorMittal. Some domestic producers attributed the U.S. International Trade Commission's (USITC) negative decision in a recent AD/CVD case to U.S. Steel's decision not to participate in the Commerce and USITC proceedings.

In assessing the consequences to national security, CFIUS considered the potential effects on national security that could reasonably result from the exploitation of the vulnerabilities and concluded that such effects could impair the national security of the United States. The consequences to national security that have been identified relate to possible supply chain disruptions to sectors critical to national security under Section 721(f)(6), particularly transportation, infrastructure, construction, and agriculture. A continued loss of viable commercial production capabilities and related skilled workforce will jeopardize the U.S. steel industry's ability to meet the full spectrum of national security requirements.[48]

The Committee appreciates the engagement of the Parties since March, including the presentations, voluminous submissions, and extensive responses to questions described above.

---

[45] 19 CFR 351.218.

[46] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

[47] The President has noted that Section 232 national security measures on steel will help the U.S. domestic steel industry to revive idle facilities, open closed mills, and maintain or increase of production lines. Adjusting Imports of Steel into the United States, 83 FR 11625. *See also* Senator Brown. January 4, 2024. [https://www.brown.senate.gov/newsroom/press/release/Sherrod-brown-testifies-international-trade-commission-ohio-steelworkers-industry] Accessed on July 3, 2024.

[48] *See* Appendix H in *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

Please provide any new or relevant information for the Committee's consideration no later than the opening of business on Wednesday, September 4, 2024.

Sincerely,

Andrew Fair
Deputy Assistant Secretary for
Investment Security Operations
Department of the Treasury

**ANNEX**

The Committee also considered the following unclassified sources as part of its review:

- https://courtlistener.com/docket/60401183/Nippon Steel-steel-corporation-v-united-states/, accessed on August 12, 2024.
- Bloomberg. February 5, 2024. US Steel Equity Research 9. Past Programs Failed to Move Needle. Accessed on June 28, 2024.
- GAO, December 12, 2022 [https://www.gao.gov/products/gao-23-105794] Accessed on July 1, 2024.;
- World Steel Association. World Steel in Figures 2023. [www.worldsteel.org/data/world-steel-in-figures-2023] Accessed 29 March 2024.
- Nippon Steel. Manufacturing Bases - Nippon Steel. [www.nipponsteel.com/en/company/bases] Accessed 28 March 2024.
- GIC. Report on the Management of the Government's Portfolio for the Year 2019/2020. [https://www.gic.com.sg/our-portfolio/gic-reports/] Accessed 8 February 2023
- Tokyo Bungei Shunju (Japanese). July 17, 2012. Japan: Prime Minister Noda Said to Name Chikao Kawai Next Vice Foreign Minister. Accessed 22 December 2023.

**Appendix: Critical Industry Appendix I from Section 232 Report**[49]

**Figure I. DHS Critical Infrastructure Sectors - Use of Steel**[50]

| | *Sectors* | *Steel End-Uses* |
|---|---|---|
| 1. | Chemical Production | Centrifuges, Conduit, Fire Suppression, Flange Heaters, Incubators, Piping, Stainless Steel Heaters, Storage Tanks, Safety Showers |
| 2. | Commercial Facilities | Structural Beams, Electrical Conduit, Kitchen Equipment, Elevators, Escalators, Waste Pipes, Metal Framing and Studs, Machinery, Valves, Manufacturing Plants, Chemical Processing Plants |
| 3. | Communications | Antennas, Radio/TV Antenna Masts, and Transmissions Towers, Tower Cables |
| 4. | Critical Manufacturing | Blast Furnaces, Rolling Mills, Extrusion, Casting, Forging Production Plants; Fabrication Facilities (i.e. Bend, Cut, Mold, and Stamp steel materials). Specialty Metals Production (i.e. Stainless Steel, Alloy Steel, Magnetic/Electronic, High Strength Alloy Steel, Carbon Steel), Plates, Hot Rolled Round Bar, Cold Finished Steel Bars, Steel Wire, Rebar |
| 5. | Dams | Reinforced Dams and Reservoirs (Rebar, Piping, Structural Supports, Flood Gates, Water Release Gates and Valves, Turbine Supports) |
| 6. | Defense Industrial Base | Armored Personnel Carriers, Heavy Weapons (i.e. Cannon, Machine Guns, Missiles), Humvees, Jet Aircraft, Submarines, Munitions, Aircraft Engines, Fighting Vehicles, Tanks, Ship Propulsion Systems |
| 7. | Emergency Services | Ambulances, Fire Trucks, Helicopters, Portable/Temporary Shelters |
| 8. | Energy | Petroleum Refineries (i.e. Specialty Pipe, Valves, Fittings), Oil and Gas Pipelines (i.e. Steel Plate, Heavy Gauges), Storage Tanks, Electricity Power Generating Plants, Electric Power Transmission Towers, Power Distribution Grids and Stations, Transformers, Utility Distribution Poles, Transformer Cores, Wind Turbines |

[49] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.
[50] Department of Homeland Security, "Critical Infrastructure Sectors," https://www.dhs.gov/critical-infrastructure sectors (accessed May 2024)

| | | |
|---|---|---|
| 9. | Financial Services | Steel Safes, Bank Vaults, Lockers, Armored Trucks, Building Doors and Barriers |
| 10. | Food and Agriculture | Canned Goods, Harvesters, Mechanical Planters, Balers, Tractors, Storage Silos, Partitions, Gates, Watering Systems, Fencing Systems (i.e. Gates, Barb Wire, Posts) |
| 11. | Government Facilities | Structural Steel, Elevators/Escalators, Furniture, Piping, Vehicle, Barriers, Vault Doors, Barracks, Storage Buildings, Shelving, Records Storage, Fences |
| 12. | Health Care/Public Health | Elevators/Escalators, Hospital Framing, Structural Supports, Roofing, Operating Tables, Furniture, Wheel Chairs, Bed Frames, Waste Pipes and Fire Suppression Pipe, Medical Devices (i.e. Drug Delivery Needles, Surgical Pins and Screws) |
| 13. | Information Technology | Data Center Cooling Systems, Data Center Structural Supports, Electronic System Racks, Electrical Conduit, System Cabinets, |
| 14. | Nuclear Reactors, Materials, and Waste Sector | Structural Steel, Pressurizers, Reactor Pressure Vessels, Safety Water Tanks, Containment Vessels, Primary Pumps and Steam Water Lines, Steam Generator Components, Cooling Towers, Overhead Cranes for Reactor Maintenance. |
| 15. | Transportation Systems | Airports, Aircraft, Bridges, Highways, Railroads, Mass Transit Systems, Seaports, Navigation Systems, Shipbuilding, Trucks, Trailers, Boats, Ships |
| 16. | Water and Waste Water Systems | Water Distribution Pipes, Storage Tanks and Towers, Valves, Storm Water Distribution (i.e. Culverts, Flood Control Gates), Waste Water and Sewage Treatment Facilities |

Note: Presidential Policy Directive (PPD-21) on Critical Infrastructure Security and Resilience, issued in February 2013, identified 16 industrial sectors. *See*: https://www.dhs.gov/critical-infrastructure-sectors.
Source: Bureau of Industry and Security, multiple industrial references.

***Business Confidential Pursuant to 50 U.S.C. § 4565***
***Protected from Disclosure Under 5 U.S.C. § 552***

**BY ELECTRONIC MAIL**

Andrew Fair
Deputy Assistant Secretary for Investment Security Operations
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW, Room 5221
Washington, D.C. 20220

Re: **CFIUS Case 24-088: Response to Risk Letter of August 31, 2024**

Dear Mr. Fair:

We are writing on behalf of United States Steel Corporation ("U. S. Steel") and Nippon Steel Corporation ("Nippon Steel") (collectively "the Parties") in response to your letter dated August 31, 2024, in connection with CFIUS Case 24-088 (the "Risk Letter"). The Risk Letter states that the Committee on Foreign Investment in the United States ("CFIUS" or "the Committee") has "identified risks to the national security of the United States arising as a result of" the proposed acquisition of U. S. Steel by Nippon Steel (the "Transaction"). The Risk Letter asserts that the unclassified basis of the alleged "risks" relates to "potential decisions by Nippon Steel that could lead to a reduction in domestic steel production capacity." The Risk Letter claims that, in reaching its determination, the Committee considered "all factors of Section 721(f) of the Defense Production Act" (the "Act") (50 U.S.C. § 4565(f)) as well as Executive Order ("EO") 14083 (Sept. 15, 2022).

As set forth below, we have concerns that the Risk Letter ignores the very clear record of the extent to which the Transaction will advance U.S. national security, the Parties' commitments to secure the national security benefits through an enforceable National Security Agreement with CFIUS, and equally Nippon Steel's commitment to ensuring a strong future for U. S. Steel, including its union-represented facilities. We also are concerned that the Risk Letter reflects, to a remarkable degree, a fundamental mischaracterization or misunderstanding of key facts that have been presented to CFIUS and that relate more broadly to the U.S. steel industry. We note, further, that the Parties have received no response to their repeated efforts to engage with the Committee on mitigation. We also note that the Parties were afforded one business day to provide this response—after having received it with no notice over a holiday weekend—and when we contacted CFIUS to ask why there was such a deadline and whether the Parties could have any dispensation, we were told that CFIUS staff had been instructed only to "listen" and not provide any response.

In these circumstances, we are compelled to express our concern that CFIUS is acting in this matter not on the basis of the facts, the law, or the United States' national security interests, but on the basis of politics and the cynical exploitation thereof by third parties. This is of grave concern for the future of U. S. Steel, its workers, and its U.S. customers, as a rejection of this

Transaction will lead to the idling of U. S. Steel's blast furnace facilities; cost U. S. Steel employees, including all of its unionized workers, approximately $50 million in lost value of their 401(k)s; likely cost thousands of jobs; and ultimately weaken the quality and resiliency of steel supply to U.S. industries.

In that context, we write:

(1) to affirm in the strongest possible terms the commitments of the Parties to *enhance* the domestic production of U. S. Steel and to ensure that U. S. Steel continues to be an active participant in unfair trade cases, including through a binding National Security Agreement with CFIUS, as reflected in the term sheet attached at Appendix A, which also provides significant assurances about the mitigation and governance measures that Nippon Steel is prepared to implement in order to satisfy any national security concerns that the Committee or U.S. Government may have;

(2) to affirm in the strongest possible terms Nippon Steel's intent to reach an agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") through a legally enforceable agreement that will address concerns that the USW has asserted about this Transaction and extend the life of U. S. Steel facilities for years to come, consistent with the term sheet that Nippon Steel has presented to the USW, which is attached at Appendix B; and

(3) to correct the critical inaccuracies and omissions in the Committee's Risk Letter, including through the attachments at Appendices C and D.

Finally, as also set further below, we implore the Committee to uphold due process and the institutional integrity of CFIUS by granting our request to withdraw and refile the joint voluntary notice for the Transaction, consistent with our letter dated August 23, 2024, and the response to Question Set 3, submitted on August 29, 2024, to enable further time for key factual development and to engage with the Committee on mitigation terms.

The Parties remain committed to consummating this Transaction and will take all steps to provide the Committee with the information and assurances necessary to clear this Transaction and to ensure that this Transaction receives a fair and apolitical review that comports with due process.

## I.    Parties' Commitment to Enhance National Security, including through a National Security Agreement

Throughout this CFIUS process, the Parties have repeatedly emphasized the Parties' willingness and commitment to address the U.S. national security interests, and the strong, fact-based reasons why the Transaction will indeed advance U.S. national security.

- During their February 21, 2024, in-person presentation to the Committee, the Parties emphasized that Nippon Steel and U. S. Steel were committed to being good partners of CFIUS and all other U.S. stakeholders, and to ensuring all national security interests are addressed.

- In our May 23, 2024, meeting, the Parties' counsel noted that CFIUS's traditional mitigation tools could be used to address any perceived concerns related to the Transaction, and emphasized that (1) Nippon Steel and U. S. Steel had taken numerous

opportunities in question sets (such as Question Sets 6, 7, and 9 in Case 22-038) to underscore their commitment to domestic production; and (2) the Parties recognized that CFIUS has well-calibrated tools to address any perceived concerns related to supply assurance.

- In a July 22, 2024, teleconference, and our follow-on July 30, 2024, e-mail submission, the Parties' counsel emphasized that Nippon Steel had made certain commitments—through public statements, correspondence with the USW, and CFIUS question sets—including to "[m]aintain continued supply to U. S. Steel's customers in the United States."

- In our July 30, 2024, e-mail submission, we emphasized that the Parties were "prepared to engage with CFIUS to discuss the potential implementation of these commitments and others as part of an agreement with the U.S. government to protect U.S. national security interests while enabling the strategic rationale of the Transaction to proceed."

- In our August 1, 2024, teleconference, representatives from the U.S. Department of the Treasury and the U.S. Department of Commerce stated that there were potential concerns around supply of steel in the United States. During that call, we requested additional detail regarding the Committee's concerns, and noted that the Committee has mitigation tools that could address any perceived concerns.

- We underscored these points in the Parties meeting on August 19, 2024 with CFIUS.

It remains the Parties' desire and intent to work fully and cooperatively with CFIUS to codify the commitments that the Parties' have previously presented. Indeed, to that end, the Parties have prepared the attached term sheet for a National Security Agreement that would codify commitments related to, *inter alia*, (1) continued ownership of U. S. Steel in the United States, and subject to U.S. law; (2) governance of U. S. Steel, including limiting key positions to U.S. citizens; (3) enhancing U. S. Steel's domestic production capabilities and supply; (4) ensuring that U. S. Steel and its management continues to act free from interference by Nippon Steel with respect to pursuing trade measures under U.S. law; and (5) appropriate monitoring and verification measures with respect to the foregoing. We continue to welcome CFIUS's engagement on these terms, which we believe will fully address, in an enforceable manner, any concerns identified in the Risk Letter. To the extent that the Committee believes further measures may be warranted, we welcome the opportunity to begin the negotiations in good faith.

Without diminishing the Parties' firm intent and commitment to work cooperatively with CFIUS, we also feel that we must address certain points from the Risk Letter. We specifically address in Section III below factual inaccuracies in the Risk Letter, but we also want to address certain premises of the Risk Letter, which, as a factual matter, underscore the national security *benefits* associated with the Transaction.

*1. Production and Supply in the United States and Consistency with the Act*

The Act states unambiguously that the Committee "shall review the covered transaction **to determine the effects of the transaction** on the national security of the United States." (See 50 U.S.C. § 4565(b)(1)(A)(i)) (emphasis added). Yet here the Committee has expressly stated that the national security risk it has identified predates the Transaction that is the subject of the Risk Letter. The Transaction itself does not precipitate or exacerbate the underutilization of domestic capacity or a dependence on imports. On the contrary, as the Parties have detailed at

length, the acquisition by Nippon Steel will enhance the capabilities of U. S. Steel in the United States and advance the U.S. steel industry's supply of products to customers in the United States.

There is a raft of evidence:

- Nippon Steel has already committed, through public statements, in its March 27 letter to the USW (which has been publicly available), and in responses to questions from CFIUS, to:
  - Maintain U. S. Steel's headquarters in Pittsburgh;
  - Cause U. S. Steel to invest $1.4 billion in USW-represented facilities above and beyond what is required under the basic labor agreement between the USW and U. S. Steel (collectively, the "BLA");
  - Not transfer any of U. S. Steel's production or jobs overseas;
  - Not conduct any layoffs or plant closures or idling of U. S. Steel facilities as a result of the Transaction;
  - Maintain continued supply to U. S. Steel's customers in the United States;
  - Not interfere with U. S. Steel's decisions on trade matters and its determination to pursue trade measures under U.S. law such as antidumping duty/countervailing duty orders or safeguard measures, including with respect to unfairly traded imports from countries in which Nippon Steel has operations; and
  - Transfer Nippon Steel's enhanced manufacturing and technology capabilities to U. S. Steel, including as it relates to reducing carbon emissions from steelmaking, where such transfers are economically and technically feasible.
- As detailed below, Nippon Steel has further committed to additional investments that will bolster U. S. Steel facilities and protect union jobs:
  - At least $1 billion to enhance the competitiveness of the Mon Valley Works, including improving yield, increasing energy efficiency, improving product quality, and enhancing overall operating effectiveness, and upgrading or replacing Mon Valley Works' circa 1938 hot strip mill; and
  - Approximately $300 million to revamp Blast Furnace #14 at Gary Works, adding 20 years of life to an asset that directly and indirectly employs almost 450 union workers.
- The Parties have submitted additional materials to the Committee, in addition to their joint voluntary notice and responses to 19 question sets with over 120 questions, describing the benefits of the Transaction to U.S. national security and the harm to U.S. national security should the Transaction fail, including:

- A slide deck shared with the Committee on February 21, 2024, providing an overview of the Parties, the Transaction, and its benefits to the United States;

- A white paper submitted to the Committee on March 26, 2024, describing the differences between traditional "integrated" steel mills that use blast furnaces and basic oxygen furnaces and "mini mills" that use electric arc furnaces ("EAFs"), as well as some of the most promising pathways for reducing greenhouse gas emissions from steelmaking, which include technologies innovated by Nippon Steel that can be transferred to U. S. Steel;

- A white paper submitted to the Committee on July 29, 2024, assessing the positive impact of the Transaction on U. S. Steel's efforts to reduce the carbon intensity of its operations leveraging Nippon Steel's carbon reduction technologies;

- A second white paper submitted to the Committee on July 29, 2024, describing how the Transaction fits within the broader context of the United States' efforts to assemble a coalition of countries to address the impacts of China's trade-distorting practices on the global economy; and

- A slide deck shared with the Committee on August 19, 2024, describing how the Nippon Steel's commitments to invest in, and share its technology with, U. S. Steel will improve and extend the life of U. S. Steel's existing blast furnace facilities, compared with the alternative scenario in which the Transaction is blocked, resulting in the inevitable idling of U. S. Steel's blast furnace facilities and the loss of union jobs.

As described below in greater detail, the Transaction will inject substantial amounts of capital into U. S. Steel (capital investment that U. S. Steel would not be able to make on a standalone basis), provide enhanced manufacturing and technology capabilities in the United States, and create a stronger global competitor to China grounded in the close relationship between U.S. and Japan. In that regard—in a development that somehow the Risk Letter ignores and that was conveyed to CFIUS in submissions by the Parties on August 28 and August 29—on August 28, the board of directors of Nippon Steel approved the expenditures of (1) at least $1 billion to revitalize U. S. Steel's Mon Valley Works, upon closing of the Transaction, to include upgrading or replacing the hot strip mill to ensure that Mon Valley Works continues to process U.S.-melted and poured steel into U.S.-origin steel products for the U.S. marketplace[1]; and (2) approximately $300 million to revamp Blast Furnace #14—an action that U. S. Steel assesses could extend the useful life of Blast Furnace #14 by up to twenty years. Nippon Steel has also committed to transfer advanced steelmaking technologies to U. S. Steel that will make its steel production more efficient, allowing it to compete more effectively.

Furthermore, as set out in the attached term sheet for a National Security Agreement, Nippon Steel will prioritize production at U. S. Steel to meet the demand in the U.S. steel market. Thus, Nippon Steel is willing to commit that U. S. Steel will maintain U. S. Steel's production

---

[1] Nippon Steel has no intention to import Japanese-made slabs to process at the new hot strip mill in Mon Valley, which would not be economically feasible.

capacity to meet market demand in the United States on commercially reasonable terms, and U. S. Steel may reduce the production capacity if and only if it is approved by a majority of the independent U.S. citizen directors of the U. S. Steel board of directors, taking into account the possible impact of such reduction on supply chain resilience in industries related to national security in the United States, subject to prior notice and consultation with the CFIUS Monitoring Agencies.

Nippon Steel's offer to acquire U. S. Steel represents a critical lifeline to U. S. Steel's blast furnace facilities, and the Transaction will help to ameliorate the extant risk in the U.S. steel industry identified by CFIUS. Simply stated, Nippon Steel will invest billions of dollars—that would not be available to U. S. Steel absent the Transaction—to maintain and enhance facilities that otherwise would have been idled. The Transaction indisputably will maintain and potentially increase domestic steelmaking capacity in the United States while at the same time reducing reliance on foreign imports.

The Parties have heard from many union representatives, including represented workers at U. S. Steel plants as well as members of other unions, that they are excited about the Transaction and the substantial investment that Nippon Steel has committed to. They believe that these investments will be transformative to the communities in Pennsylvania's Mon Valley and in Gary, Indiana, as well as the other communities where U. S. Steel operates.

These commitments will sustain the production and jobs at the foregoing facilities for many years to come. As U. S. Steel has explained to the Committee, there is no other path that provides such assurances for these facilities in the absence of the Transaction. These commitments are possible because of Nippon Steel's advanced technologies and will be supported by Nippon Steel's stronger balance sheet and access to capital. By transferring its advanced technologies to U. S. Steel, Nippon Steel will contribute to the more efficient operation of U. S. Steel's blast furnace facilities with lower variable costs and reduced emissions. These investments can be realized only through the combination of U. S. Steel and Nippon Steel.

Without the Transaction, the status quo—including the extant risk to U. S. Steel's blast furnace facilities—would continue unabated. U. S. Steel has been fully transparent with CFIUS that, without the Transaction and the substantial commitments offered by Nippon Steel, U. S. Steel would be unable to modernize the Mon Valley Works hot strip mill, with idling of the facility and the loss of 2700 union jobs being the inevitable alternative. Similarly, under its standalone strategy, U. S. Steel has been preparing to idle Blast Furnace #14 at Gary Works, as U. S. Steel lacks the necessary capital to overhaul that facility. As the Committee is aware, Gary Works is U. S. Steel's largest manufacturing plant, and the idling of Blast Furnace #14 would result in 450 union workers losing their jobs.[2] These communities will face significantly grimmer prospects if U. S. Steel is forced to proceed without this Transaction and pursue a standalone strategy that cannot support the continued long-term blast furnace operations. However, this extant risk need not materialize: the Parties are prepared to enter into a National Security Agreement with CFIUS that will lock in the benefits of this Transaction for U.S. domestic production and supply to U.S. customers, as well as the preservation of thousands of union jobs in the United States.

---

[2] Gary Works also is the single largest employer of United Steelworkers members in the United States.

*2. Trade Issues and Sufficiency of Other Laws to Address National Security*

The Risk Letter suggests that because Nippon Steel has not been an active user of U.S. trade remedies—and, instead, has been subject to trade action in the United States—Nippon Steel is likely to interfere with U. S. Steel's longstanding practice of actively participating in trade remedy actions.

To start with an obvious point, the Act provides at 50 U.S.C. § 4565(d)(4) that the President may act to suspend or prohibit a transaction that threatens to impair the national security "only if the President finds that . . . ***provisions of law***, other than this section and the International Emergency Economic Powers Act, ***do not***, in the judgment of the President, ***provide adequate and appropriate authority for the President to protect the national security in the matter*** before the President" [emphasis added]. The Committee's recitation of the availability of antidumping and countervailing duty ("AD/CVD") proceedings and its apparent belief in their effectiveness—as indicated by the Committee's expressed concern that Nippon Steel might be less willing to utilize them—demonstrates that there is in fact an entire other legal regime that has been established to mitigate instances of unfair trade competition in the steel industry. Similarly, Section 232 of the Trade Expansion Act of 1962 provides the President with authority to adjust the imports of goods or materials from other countries, including through tariffs, if such imports are deemed to threaten national security. Indeed, following the Commerce Department's 2018 report—which identified risks to U.S. domestic production stemming from global steel overcapacity and recommended the use of the President's tariff authority (not CFIUS) to address those risks—the U.S. government put in place significant trade protections for the U.S. steel industry, which resulted in domestic steelmakers adding significant production capacity, which continues to increase to this day.[3]

Second, even leaving aside the requirements of the Act, the assertion in the Risk Letter mischaracterizes Nippon Steel's positions and reflects a disquieting misunderstanding of the legal and commercial considerations involved in trade remedy proceedings.

While the Committee is correct that Nippon Steel has rarely used U.S. trade remedies to contest harmful trade actions, **as a foreign producer, Nippon Steel could not use these trade measures to contest such actions, which may be done only by U.S. producers of a particular product.** Nippon Steel's U.S. affiliates produce a limited range of steel products that do not give them U.S. producer status in most ongoing steel-related AD/CVD proceedings. Nippon Steel recognizes and agrees with the importance of AD/CVD actions in the United States, and its ownership of U. S. Steel will give it the means and incentive to support U. S. Steel's utilization of U.S. trade measures. Moreover, post-acquisition Nippon will have every incentive to support and initiate any relevant trade measures/proceedings in order to maximize their U.S. domestic profits. It would be completely illogical for Nippon Steel to increase its imports into the United States.

The Risk Letter's claim that Nippon Steel "does not favor reliance on AD/CVD protections generally" is also inaccurate. As CFIUS acknowledges, Nippon Steel is actively involved in the two trade remedy proceedings conducted by the Japanese government against Chinese imports. In addition, Nippon Steel has expressed its intention to participate in and support investigations

[3] U.S. steel production capacity has increased every year since 2019. Organisation for Economic Co-operation and Development, *Latest developments in steelmaking capacity and outlook until 2026*, June 12, 2024.

brought by Southeast Asian governments. The number of cases that Nippon Steel and its affiliates have brought, especially compared to U.S. domestic producers, is not a reliable indicator of Nippon Steel's support for trade remedy action. The United States maintains the most active and robust trade remedy regime in the world. Even accepting CFIUS's calculation of 180 steel cases in the eight separate regions identified in the Risk Letter (including the EU, which comprises 27 individual countries), this number is dwarfed by the more than 300 active AD/CVD orders on steel products in the United States alone. Leaving aside that Nippon Steel likely was not eligible to participate in many (if not most) of the 180 proceedings unless it produced the specific goods at issue, the level of trade relief that producers can expect in foreign jurisdictions is often much lower than the level of relief provided under U.S. trade law, making trade remedy measures a less attractive option overseas.

Nippon Steel's participation in U.S. AD proceedings as a foreign respondent is also irrelevant to its position on trade remedy action. Nippon Steel's cooperation with U.S. AD proceedings as a foreign respondent (as required under U.S. trade law) is in no way a signal that it will resist trade relief for the U.S. steel industry following the Transaction. On the contrary, Nippon Steel will have every incentive to support U. S. Steel's efforts to protect and advance its commercial interests by targeting competitive imports with AD/CVD measures. Further, Nippon Steel's U.S. subsidiaries do participate in such AD proceedings. As an example, later this week U. S. Steel and Wheeling-Nippon (a subsidiary of Nippon Steel and Nippon Steel North America), will announce that they are joining Nucor Corporation ("Nucor") and Steel Dynamics, Inc., as well as the USW, in filing AD/CVD petitions on imports of corrosion-resistant steel from Australia, Brazil, Canada,[4] Mexico, the Netherlands, South Africa, Taiwan, Turkey, the United Arab Emirates, and Vietnam. Moreover, to the extent Nippon Steel's commercial interests are implicated by an AD/CVD proceeding (e.g., by targeting a product that Nippon Steel sells to the United States), U.S. law already includes safeguards to ensure that Nippon Steel could not block the proceedings through its ownership of U. S. Steel, as CFIUS acknowledges in the Risk Letter.

Notwithstanding the above, Nippon Steel's position on trade remedy action will not affect U. S. Steel's current practices. As subsection IV of Appendix A describes in detail, Nippon Steel and U. S. Steel are prepared to commit to mitigation actions that (1) memorialize Nippon Steel's commitment not to interfere with U. S. Steel's decisions on trade matters; and (2) include monitoring protocols to ensure this commitment is verifiable and enforceable. Specifically, as set out in the attached term sheet for a National Security Agreement, Nippon Steel and U. S. Steel are prepared to commit that U. S. Steel will maintain an internal officer-level "trade committee" comprised of U.S. citizens and to require approval by the majority of independent U.S. citizen directors of U. S. Steel's board of directors for decisions on trade matters to ensure that such decisions are made without interference by Nippon Steel. As Nippon Steel would have an interest in ensuring that U. S. Steel's position in the U.S. market is protected through trade remedy action, this mitigation measure aligns with the common interests of U. S. Steel and Nippon Steel.[5]

---

[4] U. S. Steel, the USW, and Wheeling-Nippon take no position on Canada.

[5] Finally, it is worth noting that AD/CVD proceedings need not be initiated only by private parties. AD/CVD investigations may be self-initiated by the U.S. Department of Commerce. It is specious to suggest that trade remedy proceedings are inadequate to protect the domestic steel industry if U. S. Steel is acquired by Nippon Steel if the Commerce Department can self-initiate such actions. If the problem is that the Commerce Department is failing to initiate an adequate number of AD/CVD proceedings, or other remedies, such as safeguard measures or (continued…)

## II.    Commitment to Reach Agreement with the USW

As the Committee is well aware, Nippon Steel has retained former House Majority Leader Dick Gephardt—a widely respected honest broker—to assist in engagement with USW leadership; he also served previously as the union's designated representative to the U. S. Steel Board of Directors. Leader Gephardt has recently had initial communications with the USW. He strongly believes this transaction could be very beneficial to both Parties, and for national security, if the Parties are given the benefit of time to seek a resolution with the USW leadership in the context of the Transaction.

That said, Leader Gephardt notably has encountered two temporary but noteworthy hurdles to progressing discussions further with the USW. First, USW leadership indicated that they wish to hold off on substantive discussions until a decision is reached in the current arbitration with U. S. Steel relating to a grievance filed by the USW earlier this year. A decision is expected in that arbitration in late September, although that date could be delayed somewhat. Second, USW leadership told Leader Gephardt that they also wished to see how CFIUS acts with respect to this Transaction. Mr. McCall also has confirmed publicly that he has been in contact with the Administration on this matter,[6] and as we have previously reported to CFIUS, the USW has issued written statements that it is actively engaged with the Committee. The Parties understand the prohibition on disclosure and confidentiality provisions of 50 U.S.C. § 4565(c) to include an absolute bar on the sharing of any information whatsoever regarding CFIUS Case 24-088, by any U.S. government employee or official, with—*inter alia*—employees of the USW. Given Mr. McCall's recent public statements and the USW's prior statements about its communications with CFIUS, we must again state our concerns regarding the Committee's adherence to the confidentiality obligations of the statute. These concerns also were exacerbated by the fact that, upon receipt of the letter of August 31, we sought a call with the co-lead agencies on September 1, and asked two very simple questions: Why were the Parties given only one business day to respond, and could there be any dispensation on that? We were told in response that the Committee staff had been "instructed" to listen and not respond. We have asked for answers to both questions and still await a response as of this submission. For the sake of completeness, we note that parties to a review or investigation shall have three business days to respond to requests for information from the CFIUS staff.[7]

Notwithstanding the foregoing, the Parties continue to believe that, with adequate engagement, the USW will recognize the robust benefits of the Transaction for its membership, and the grave risks without the Transaction. The Parties accordingly intend to continue their outreach to the USW through Leader Gephardt, with the expectation that once the arbitration is finished and CFIUS has granted the withdrawal and refiling request, they will be able to progress matters swiftly with the union.

As noted above, there have been important hurdles to overcome in the Parties' efforts to engage with the USW. It took many months to obtain an initial meeting with the USW to discuss the Transaction. The USW also appears to have felt incentivized, given the competing interest

---

Section 232 measures, the appropriate remedy under the Act is for Commerce to be more assertive.

[6] WPXI, Our Region's Business, Interview with David McCall (Sept. 1, 2024).

[7] Here, by contrast, we were provided with one business day. *See* 31 C.F.R. § 800.504(a)(4).

shown in U. S. Steel by Cleveland-Cliffs Inc. ("Cleveland-Cliffs") and the agreement between the USW and Cleveland-Cliffs in their basic labor agreement to seek to expand the latter's steelmaking capacity in North America through acquisition,[8] to hold out to see whether a transaction with Cleveland-Cliffs might materialize. At this point, the Parties believe that it likely is becoming clearer—albeit belatedly—to the USW that Cleveland-Cliffs lacks the financial and management resources necessary to complete an acquisition of U. S. Steel, and indeed the terms of Cleveland-Cliffs' merger agreement with Stelco Holdings Inc., which Cleveland-Cliffs has agreed to acquire, prevent Cleveland-Cliffs from acquiring U. S. Steel. As that possibility continues to recede into the background, the Parties anticipate that the USW will be more forward-leaning in its conversations with Nippon Steel and U. S. Steel and their intermediaries.

We are attaching the most recent offer that Nippon Steel has provided to the USW. This offer belies any suggestion that Nippon Steel has not engaged, or sought to engage, with the USW on its investments. As noted, there have been meaningful challenges in getting the union to respond or engage; however, the USW was informed in writing about the Nippon Steel board approval of the investments through Leader Gephardt.

## III.    Additional Factual Inaccuracies

As noted above, without diminishing the Parties' firm intent and commitment to work cooperatively with CFIUS, we also must fully address certain points from the Risk Letter that are factually inaccurate, rely on faulty reasoning, or lack logic altogether. We have addressed these issues in the chart attached as Appendix C, which includes one column with the relevant text from the Risk Letter and one column with the Parties' responses. We have also attached as Appendix D a white paper describing the economic incentives for Nippon Steel to maintain and grow U. S. Steel's domestic production capacity and its supply of steel to customers in the United States, which are the reason Nippon Steel entered in the Transaction in the first place. We highlight just a few of the key issues below.

In describing the risk purportedly presented by the Transaction, CFIUS seems to hint that Nippon Steel might decide to shut down steel production in the United States in favor of its operations in India, where production costs are lower, and potentially import steel from India or elsewhere into the United States to replace production by U. S. Steel. The suggestion that Nippon Steel might take any of these actions is emphatically incorrect and has no basis in fact or logic. As described more fully in Appendix C, Nippon Steel's general policy has been to export products that are difficult for domestic producers to supply in each region in response to customer needs, and Nippon Steel has no economic incentive to, and will not, import Indian-origin or other non-U.S.-origin steel into the United States to compete with or undermine U. S. Steel, which would directly contradict the basis for Nippon Steel's multi-billion dollar investment. Indeed, Nippon Steel's strategy for its Indian business has been to capture growing domestic demand and does not have any intention to expand exports to the United States.

As it relates to U. S. Steel, the Risk letter seems to claim that U. S. Steel supplies to certain critical infrastructure sectors (transportation, energy, and agriculture), certain types of steel that

---

[8] According to the basic labor agreement between the USW and Cleveland-Cliffs, Cleveland-Cliffs "agrees to aggressively pursue opportunities [to acquire steelmaking capacity], subject to the reasonable and timely approval of the Union." Agreement between Cleveland-Cliffs and the USW, Art. XI, Sec. E, Sept. 1, 2022, *available at*
https://uswlocals.org/system/files/2022_bla_-_clevelandcliffs_steel_llc.pdf.

can be produced only using a blast furnace, specifically high purity steel and electrical steel. As the Parties have described in response to CFIUS's question sets, including Question Set 11, and in meetings with the Committee, the types of high purity steel that historically could be produced only using a blast furnace were exposed automotive steel and tin mill products.[9] These types of high purity steel, however, are not required for (i) the construction of bridges, tunnels, the national highway system, railcars and tracks, ports, or airport runways and facilities; (ii) nuclear facilities, refineries, or power generation; or (iii) the agriculture sector. Moreover, contrary to the Committee's claims in the Risk Letter, electrical steel, including non-grain oriented steel, can be—and is—produced using an EAF, including at U. S. Steel's Big River Steel facility. Please see Appendix C for a more detailed discussion of the inaccuracies in the Risk Letter.

These inaccuracies are concerning and, as discussed below, reflect the importance of providing more time for the Parties to engage with CFIUS. Regardless, notwithstanding these inaccuracies, Nippon Steel is committed to maintaining and improving U. S. Steel's blast furnace production through transformative investments and sharing technology and expertise, and continuing to supply U. S. Steel's customers in the United States. For additional support for the benefits of the Transaction to the United States, please see Appendix E, which contains a compendium third-party statements, including from former U.S. government national security officials, regarding the Transaction.

## IV. Importance of More Time

As the Committee is well aware, the Parties have worked hard to maintain complete transparency with the Committee from the outset of the review process. In that same spirit, the Parties likewise have been careful not to pressure the government to act hastily on the Transaction, recognizing the importance of first reaching an agreement with the USW that would resolve the union's concerns. The Parties remain committed to this sequenced course of action.

At the same time, the Parties hope and expect that the Committee in turn will afford them the time necessary (i) to progress their engagement with the USW to a successful conclusion, (ii) to correct the Committee's understanding—given the inaccuracies set out in the Risk Letter—of certain key facts surrounding the Transaction, and (iii) to engage with the Committee on the Parties' proposed terms to mitigate and fully resolve any and all risks to U.S. national security that CFIUS has identified. The Committee can afford the Parties the necessary time and process to accomplish the foregoing by concurring on the Parties' pending request to withdraw and refile their joint voluntary notice prior to taking any action on the Transaction.

In that last regard, the Parties note that there is no basis whatsoever for the Committee to take any action at this time. The Transaction has not closed, nor will it close without CFIUS and antitrust approval—the latter of which will come in late fall at the earliest. There accordingly is no imminent threat to US national security and no need for precipitous or premature Committee action.

---

[9] Nucor has started to produce high purity steel for exposed automotive using EAFs, and has indicated that its new Apple Grove, West Virginia, mill with three million tons of capacity slated to turn on in 2026 will also make it. Certain producers, including ArcelorMittal Dofasco, also are expected to begin producing tin mill products using steel produced using an EAF within the next few years.

Given this, the Parties' repeat their request to withdraw and refile—as previously stated in our letter dated August 23, 2024, and the response to Question Set 3, submitted on August 29, 2024—to enable further time for key factual development and to engage with the Committee on mitigation terms. We note that the regulations governing CFIUS expressly state that such requests "will ordinarily be granted," 31 C.F.R. § 800.509(a), and consistent with this regulation, CFIUS has a multi-decade record of routinely granting requests to withdraw and refile, especially where, as is evident here, the record stands to benefit from the opportunity to provide and review material information (and correct material misunderstandings), as this correspondence indicates. Indeed, in the nearly four-decade history of CFIUS as a regulatory body, we are aware of no circumstance such as this one – where a transaction has not closed; there is no risk of it closing prior to CFIUS completing action; and there is no other imminent threat to national security – in which CFIUS has not granted a request to withdraw and refile. Thus, the Parties respectfully submit that there is no basis in law, policy, or precedent not to grant the pending request to withdraw and refile in connection with the Transaction.

* * *

This letter contains commercial information regarding the business of the Parties that is confidential and that, therefore, is exempt from the public access provisions of the Freedom of Information Act, 5 U.S.C. § 552, pursuant to 50 U.S.C. § 4565 and 31 C.F.R. § 800.802. Such information, if disclosed, could adversely affect the Parties' financial and competitive positions and the normal conduct of business operations. Accordingly, the Parties request that this letter be withheld in the event of a demand for disclosure, and understand that in the event of such a demand CFIUS will give the Parties prompt notice and opportunity to be heard before taking any action to disclose.

Sincerely,

David N. Fagan
Mark E. Plotkin
Covington & Burling LLP
850 Tenth Street, NW
Washington, D.C. 20001

*Counsel to United States Steel Corporation*

Ama A. Adams
Brendan C. Hanifin
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006

*Counsel to Nippon Steel Corporation*

Appendix A – CFIUS Mitigation Term Sheet
Appendix B – Term Sheet Provided to the USW
Appendix C – Chart Addressing Statements in the Risk Letter
Appendix D – Nippon Steel Incentives to Maintain U.S. Domestic Production
Appendix E – Third-Party Statements Regarding the Transaction

*Business Confidential Pursuant to 50 U.S.C. § 4565; Protected from Disclosure Under 5 U.S.C. § 552*

# APPENDIX A

## U. S. Steel – Nippon Steel National Security Agreement Term Sheet

United States Steel Corporation ("U. S. Steel" or the "Company") and Nippon Steel Corporation ("Nippon Steel" and, together with U. S. Steel, the "Parties") hereby submit this term sheet for a National Security Agreement ("NSA") to be entered into with the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee") to mitigate any national security concern related to Nippon Steel's acquisition of U. S. Steel (the "Transaction"). Specifically, this term sheet addresses (1) continued ownership of U. S. Steel in the United States, and subject to U.S. law; (2) enhancing U. S. Steel's domestic production capabilities and supply; (3) ensuring that U. S. Steel and its management continues to act free from interference by Nippon Steel with respect to pursuing trade measures under U.S. law; and (4) appropriate monitoring and verification measures with respect to the foregoing.

The Parties continue to believe that the facts in this matter support a determination that the Transaction will enhance U.S. national security by strengthening U. S. Steel and its domestic production capabilities, bringing important technology into the United States, and ultimately creating a stronger and more resilient U. S. Steel—and steel industry—that is capable, in combination with Nippon Steel, of competing against future pressures from state-supported Chinese competitors.

Nevertheless, to ensure that these objectives are met, the Parties previously have indicated that they are prepared to enter into mitigation commitments that will make the Parties' commitments on these key areas binding and provide the U.S. government with important verification and enforcement mechanisms.

The Committee, however, has not yet taken the opportunity to engage in such discussions, though on August 31, the Parties received a letter noting that CFIUS has identified national security concerns. For the record, the Parties are prepared to engage with the Committee on the terms below, which clearly address the issues identified in the August 31 letter—and, indeed, go beyond them in several respects. These terms also would secure the future of U. S. Steel's production in the United States—including the blast furnace facilities that have been the subject of CFIUS's attention—for generations.

The Parties remain ready to discuss this term sheet and any other potential mitigation with CFIUS, and to codify these commitments in an enforceable National Security Agreement.

The Parties are committed to addressing the Committee's concerns and reaching a resolution.

### I. Definitions

1. "*Commercially Reasonable Terms*" means terms consistent with prevailing market and industry standards or practices in the United States for like or similar products from a company of similar size and scope, taking into account quality

(including materials and workmanship), quantity, input and production costs, market prices, performance, capacity constraints, timing of delivery, environmental considerations, and safety.

2. *"Production Locations"* means U. S. Steel's existing facilities in the United States involved in the production, including support for production, of steel products as of the Effective Date. Such facilities are identified in Annex 1.

3. "*Production Capacity*" means the ability of U. S. Steel to produce and supply steel and steel-related products from the Production Locations as of the Effective Date.

## II. Structure, Domestic Ownership and Headquarters

1. U. S. Steel to remain a U.S. company owned by Nippon Steel through Nippon Steel North America, Inc. ("NSNA"), a New York corporation that has operated in the United States for over 50 years and indirectly owns multiple U.S. facilities that employ over 2,500 employees, including approximately 620 employees represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW") (employed by NSNA's subsidiaries, Standard Steel, LLC in Burnham, PA and Wheeling-Nippon Steel, Inc. in Follansbee, WV).

2. U. S. Steel, under NSNA, will remain headquartered in Pittsburgh, Pennsylvania with the following governance structure:

   a. The majority of the Board of Directors of U. S. Steel shall be non-dual U.S. citizens.

   b. The Board of Directors of U. S. Steel shall include three independent directors who are non-dual U.S. citizens approved by CFIUS with responsibility to oversee compliance with the NSA, including commitments hereunder related to domestic production as set out in Section III below and those related to trade as set out in Section IV below ("Independent U.S. Directors").

   c. Core senior management members of U. S. Steel shall be U.S. citizens.

   d. U. S. Steel shall designate a Security Officer as set out in Section V. 2. below.

3. As reflected in the Parties' submission of July 30, 2024, the Parties also are prepared to engage with CFIUS on potential additional governance measures, as necessary.

4. All terms of the NSA to apply to U. S. Steel's operations in the United States.

*Business Confidential Pursuant to 50 U.S.C. § 4565;*
*Protected from Disclosure Under 5 U.S.C. § 552*

## III. U.S. Domestic Production Commitments

1. The Parties commit to the following items (a) and (b) to maintain U. S. Steel's domestic production capabilities:

   a. Nippon Steel will prioritize production at U. S. Steel to meet the demand in the U.S. steel market. U. S. Steel will maintain Production Capacity to meet market demand in the United States on Commercially Reasonable Terms, provided that U. S Steel may reduce Production Capacity if and only if it is approved by a majority of the Independent U.S. Directors taking into account possible impact of such reduction on supply chain resilience in industries related to national security in the United States, subject to prior notice and consultation with the CFIUS Monitoring Agencies ("CMAs").

   b. U. S. Steel to provide Production Capacity briefings every six months to the CMAs, to ensure full transparency into capacity plans and production decisions.

2. The Parties commit to the following items (a) to (d) to enhance U. S. Steel's domestic production capabilities:

   a. Codification of Nippon Steel's commitments to make substantial investments in the Production Locations:

      i. At least $1.4 billion investment in USW-represented facilities, above and beyond what is required under the basic labor agreement between the USW and U. S. Steel (collectively, the "BLA");

      ii. At least $1 billion to enhance the competitiveness of the Mon Valley Works, including improving yield, increasing energy efficiency, improving product quality, and enhancing overall operating effectiveness. The commitment will include replacing and/or upgrading the hot strip mill and other facilities at Mon Valley Works.

      iii. Revamping blast furnace #14 at Gary Works, which is anticipated to require an approximately $300 million investment.

   b. No transfer of any of U. S. Steel's Production Capacity or jobs outside the United States.

   c. No layoffs or plant closures or idling of U. S. Steel facilities as a result of the Transaction (subject to certain exceptions in the BLA or otherwise agreed upon with USW).

   d. Transfer of Nippon Steel's enhanced manufacturing and technology capabilities to U. S. Steel on arm's length terms, including as it relates to

*Business Confidential Pursuant to 50 U.S.C. § 4565;*
*Protected from Disclosure Under 5 U.S.C. § 552*

reducing carbon emissions from blast furnace steelmaking, where such transfers are economically and technically feasible.

## IV. Trade

1. No interference by Nippon Steel/NSNA with U. S. Steel's decisions on trade matters and its determination to pursue trade measures under U.S. law against unfair trade such as antidumping/countervailing duty orders or safeguard measures, including with respect to countries in which Nippon Steel has operations.

2. U. S. Steel to maintain an internal officer-level "trade committee" comprised of U.S. citizens and to require approval by the majority of Independent U.S. Directors for decisions as set out in subsection IV.1 above to ensure that such decisions are made without interference by Nippon Steel, and to document the decision-making process for U. S. Steel.

## V. Compliance, Verification, and Monitoring

1. *Compliance Policy* – U. S. Steel to develop and maintain a compliance policy with responsibility under the Security Officer to govern and operationalize compliance with the NSA.

2. *Security Officer* – U. S. Steel to designate a senior employee who shall be a non-dual national U.S. citizen to be responsible for day-to-day compliance activities arising from the NSA and act as a liaison with the CMAs.

3. *Recordkeeping* – The Parties to maintain records to demonstrate compliance with the NSA.

4. *Annual Report* – U. S. Steel and Nippon Steel each to submit an annual report on the Parties' NSA compliance activities, accompanied by a signed certification of compliance from senior officers of U. S. Steel, NSNA, and Nippon Steel.

5. *Incident Reporting* – The Parties, through the Security Officer, to provide timely reports to the CMAs of any violation of the NSA's terms.

6. *Inspection Rights* – Customary CMA access and inspection rights, including access within 72 hours to U. S. Steel, Nippon Steel, and NSNA facilities, personnel, and records for the purpose of verifying compliance with the NSA.

7. *Third Party Audits* – Annual audits conducted by a third party provider nominated and retained by the Parties, with the auditor and audit plan subject to CMA approval and with the third party providing the audit report to the CMAs.

*Business Confidential Pursuant to 50 U.S.C. § 4565;*
*Protected from Disclosure Under 5 U.S.C. § 552*

## ANNEX 1
## PRODUCTION LOCATIONS

- Automotive Center (Troy, Michigan)[1]
- Big River Steel
- Big River 2
- Fairfield Tubular Operations
- Fairfield Works
- Gary Works
- Granite City Works
- Great Lakes Works
- Midwest Plant
- Minnesota Ore Operations (including Keetac and Minntac)
- Mon Valley Works (including Clairton Plant, Edgar Thomson Plant, Fairless Plant, and Irvin Plant)
- Research and Technology Center (Munhall, Pennsylvania)[2]
- U. S. Steel Tubular Products Innovation and Offshore Operations (Houston, Texas)[3]
- Wheeling Machine Products (Pine Bluff, Arkansas)[4]

---

[1] The Automotive Center does not produce steel. It is an R&D center focused on steel for the automotive industry. It can be included in the National Security Agreement depending on feedback from CFIUS.

[2] The Research and Technology Center does not produce steel. It is U. S. Steel's R&D center for steelmaking. It can be included in the National Security Agreement depending on feedback from CFIUS.

[3] U. S. Steel Tubular Products Innovation and Offshore Operations does not produce steel. It provides threading and repair for steel pipe and accessory parts. It also includes certain related R&D activities. It can be included in the National Security Agreement depending on feedback from CFIUS.

[4] Wheeling Machine Products does not produce steel. It makes couplings for oil country tubular goods products. It can be included in the National Security Agreement depending on feedback from CFIUS.

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

**APPENDIX B**

**DRAFT: FOR DISCUSSION PURPOSES ONLY**

The following sets forth topics for discussion and proposed terms of agreement regarding the issues that we understand to be the key areas of importance to the USW. We look forward to discussing, negotiating and finalizing the terms below with you at your earliest convenience. Of course, if there are additional topics that the USW wishes to discuss, we are happy to address them too.

1. **Capital Expenditures at BLA-Covered Facilities**.
   - No less than $1.4 billion in capital expenditures in the aggregate in respect of calendar years 2024, 2025, and 2026 for USS facilities covered by the BLA.
   - Additional capital expenditures of no less than $1 billion to replace and/or upgrade the existing hot strip mill and other facilities at Mon Valley Works.
   - Additional commitment to revamp blast furnace No. 14 at Gary Works, which is expected to cost approximately $300 million.

2. **No Layoffs or Plant Idling or Permanent Closures**.
   - No layoffs of any employees and no idling or permanent closure of any of USS's "Plants" (as defined in the BLA) as a result of the Transaction and during the current term of the existing BLA, except in extraordinary and unforeseen circumstances to be mutually agreed.

3. **No Transfers Overseas**.
   - No transferring of any jobs or USS production to any overseas facilities of NSC, NSNA, or any of their affiliates.

4. **Profit Sharing Audit Protection**.
   - Annual independent outside audit of the USS financial statements will be conducted and furnished to the USW.
   - The USW will be able to appropriately share the results of the audits with its members.
   - USS will provide the USW with the same information relative to quarterly profit-sharing calculations that it receives now.

5. **Pension Protections**
   - By virtue of assumption of the BLA, NSC and NSNA will be treated as a "single employer" with USS under Section 414(b) of the Internal Revenue Code of 1986, as amended, and will be part of USS's "controlled group" for purposes of ERISA.

6. **Technology**.
   - NSC will share its leading-edge technology with USS.

7. **Upstreaming**.

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

**DRAFT: FOR DISCUSSION PURPOSES ONLY**

- By virtue of assumption of the BLA, continued full compliance with the terms of Article Eleven, Section B (Upstreaming) of the BLA (such as the requirements set forth in Article Eleven, Section B, Subsection 2 in connection with any transaction between USS, on the one hand, and all or any of NSC, NSNA, or their respective Affiliates (as defined in the BLA), on the other hand).
- An independent outside auditor will monitor compliance with the terms of Article Eleven, Section B, Subsection 2 of the BLA and make periodic reports to the USW.

**8.** **Trade**.

- NSC and NSNA will protect the best interests of USS in respect of foreign trade matters for the benefit of USS facilities, and workers in accordance with applicable trade remedy laws.[1]
- NSC and NSNA will not interfere with USS's decisions on trade matters and its determination to pursue trade measures under U.S. law such as antidumping duty (AD)/countervailing duty (CVD) and/or safeguard (SG) measures, including with respect to unfairly traded imports from countries in which NSC has operations.

**9.** **Successorship; NSC and NSNA Guarantees**

- Sections 1-4 of the May 17 Letter Agreement remains in full force and effect.

**10.** **Mutual Cooperation**

- NSC, NSNA, USS and the USW will cooperate with each other with mutual trust towards the closing of the Transaction and thereafter.

These above terms are intended to facilitate discussion and are subject to negotiation of legally binding documentation, which shall include customary terms to be discussed and mutually agreed upon by the parties.

[1] As an example, later this week USS, the USW, and Wheeling-Nippon Steel (a subsidiary of NSC and NSNA), will announce that they are joining Nucor, and Steel Dynamics in filing antidumping and countervailing duty (AD/CVD) petitions on imports of corrosion-resistant steel (CORE) from Australia, Brazil, Canada, Mexico, Netherlands, South Africa, Taiwan, Turkey, United Arab Emirates, and Vietnam. USS, the USW, and Wheeling-Nippon Steel take no position on Canada.

*Business Confidential Pursuant to 50 U.S.C. § 4565;*
*Protected from Disclosure Under 5 U.S.C. § 552*

**APPENDIX C**

| Text of CFIUS Risk Letter | Response by the Parties |
|---|---|
| "Japan is a critical ally of the United States and CFIUS considered the importance of our alliance to both countries' national security. For example, Japan is a vital trade and investment partner." (p. 2) | **Response to CFIUS:** The fact that Japan is a "critical ally" is essentially paid lip service. CFIUS does not seriously engage with that fact or explain how it impacts their analysis of the risks. For example, CFIUS does not take into account that the United States and Japan are parties to a reciprocal defense procurement agreement, or that the United States and Japan have entered into a Section 232 agreement, which explicitly recognizes that Japanese steel does not present risk to the U.S. market. The Committee also has never blocked an acquisition by a Japanese company before. |
| "Nippon Steel is the largest steelmaker in Japan and the fourth-largest globally by quantity of steel produced, as of 2022. Nippon Steel employs approximately 106,000 people worldwide, including 4,000 in the United States, and its 2022 annual revenue was approximately $53.9 billion. Nippon Steel has operations in 16 countries and a steel production capacity of approximately 72.5 million tons, of which 72 percent (52 million tons) is produced in Japan. Nippon Steel primarily manufactures steel products, including steel plates; steel sheets; bar and rod materials; railway, automotive, and machinery parts; structural steel; and stainless steel. Nippon Steel serves customers in a variety of sectors, including the automotive, energy, infrastructure, design metals, and consumer electronics sectors. Nippon Steel also has operations in raw materials procurement, chemicals and materials, steel slag recycling, and secondary processing for higher value-added products." (p. 3) | **Response to CFIUS**: As extensively set forth by U. S. Steel, its automotive customers in the United States are eager for the Transaction to close because Nippon Steel will contribute its steel offerings and technology—including electrical steel expertise—to U. S. Steel and, thereby, the U.S. automotive industry. |
| "Nippon Steel operates eleven additional blast furnaces outside of the United States, some of which are considerably younger than U.S. Steel's, such as two blast furnaces under construction in India. India is one of the largest production markets for Nippon Steel outside of China. Nippon Steel continues to expand its India presence and manufacturing base. According to public reports, Nippon Steel plans to double its production capacity in India by 2030. A review of the overall cost of steel production in facilities in the United States and India shows that costs in the United States are significantly higher than that in India. According to Transition Zero and Global Efficiency Intelligence (2022)- Global Steel Production Costs, the average total cost of blast furnace operation in the United States is $578.26/ton and that in India is $458.30/ton, and the average labor cost of blast furnace operation in the United States is $66/ton and that in India is $9/ton. In addition, relative to all major steel producing countries, India has the lowest cost of blast furnace production. (Brazil and Mexico, where Nippon Steel also has operations, have similar cost considerations relative to the United States. Specifically, the total cost of blast furnace operation in Mexico is $548.07/ton and $512.23/ton in Brazil with total labor cost of blast furnace operation in Mexico is $17/ton and $25/ton in Brazil." (p. 3) | **Response to CFIUS:** China ranks behind Japan, India, the Association of Southeast Asian Nations ("ASEAN"), South America, and North and Central America for Nippon Steel, in terms of overall steel production capacity by region. Nippon Steel also does not have any crude steel production capacity in China. Any suggestion that China is one of Nippon Steel's largest markets outside of the United States, or outside of Japan, is false (and disingenuous). The Parties, and Nippon Steel in particular, educated CFIUS on that fact before we even submitted our initial filing, during the Parties' presentation to the Committee on February 21, 2024. Nippon Steel also notes that neither it nor its subsidiaries or affiliates has blast furnace operations in Mexico.<br><br>India is a growth market for Nippon Steel, but that growth will not come at the expense of Nippon Steel's commitment to the U.S. market. Simply put, Nippon Steel intends to invest in the United States and grow U. S. Steel to serve the U.S. market; Nippon Steel is investing in India to develop India-produced steel to serve the Indian market, consistent with India's similar focus on the development of its domestic steel industry.<br><br>Consistent with Nippon Steel's commercial incentives in support of the U.S. steel market, the Parties have prepared a draft term sheet that commits to maintaining U. S. Steel's domestic production capabilities, which the Parties posit will mitigate any possible concern that Nippon Steel plans to reduce production in the United States in favor of other markets, including India (which it does not).<br><br>Nippon Steel's strategic rationale for this Transaction is to expand into the United States, where demand growth is promising and Nippon Steel's technologies and products are highly sought after. Indeed, third party analysts and investment banks have recognized that as Nippon Steel's logic for this investment in U. S. Steel. The Transaction is the best long-term growth opportunity for Nippon Steel to sell to U.S. customers, expand U. S. Steel's industry position, and ensure that U. S. Steel can further grow and better support U.S. customers and supply-chain resilience. Any effort to undermine U. S. Steel would contradict the basis for this Transaction, which is valued well in excess of the $14 billion deal price (and now includes the significant investments recently approved for Mon Valley Works and Gary Works). |

"India is a strong exporter of steel mill goods. In 2023, Indian producers exported 9.2 million metric tons of steel to the world, a 26.6 percent increase in volume over 2015. For pipe and tube products and stainless steel products, the United States was among the top three export destinations." (pp. 3-4)

**Response to CFIUS:** Nippon Steel does not intend to, and will not, export Japanese- or Indian-origin steel to the United States to compete with U. S. Steel, which would directly contradict the basis for its investment. Nippon Steel's policy has been to export products only when it is difficult for domestic producers to supply in each region in response to customer needs.

The insinuation that Nippon Steel would flood the U.S. market with India-produced steel is illogical and unsupported. There would be no benefit to Nippon Steel to introduce competition from one affiliate, U. S. Steel, from another, AM/NS India. First, Nippon Steel's operations in India are intended to supply steel products to meet domestic demand in India. Second, this type of scheme would be belied by economic realities and industry trends. For example, the India Steel Exports Report, issued by the International Trade Organization and available here, notes that India exports 9.2 million tons of steel to other countries, of which exports to the United States account for only 3.08%. Please see below:

The share of Indian steel in U.S. imports is small. According to statistics from U.S. Customs and Border Protection, Indian steel has represented less than 3% of the steel that has been imported into the United States between 2020 and 2023, as set forth below:

| (thousand ton) | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| India | 136 | 338 | 599 | 294 |
| Total | 19,554 | 28,973 | 27,454 | 25,096 |
| % | 0.7% | 1.2% | 2.2% | 1.2% |

Third, for the avoidance of doubt, CFIUS has referenced a higher percentage of imports for specific sectors, including pipe and tube and stainless steel. U. S. Steel does not produce stainless steel products, so this comparison is inapposite.

"As of March 31, 2023, Nippon Steel has 54 affiliates involved in steelmaking and steel fabrication, of which 31 are majority or wholly owned subsidiaries. Nippon Steel's steel operations span Japan, Thailand, the United States, Mexico, Sweden, China, the UAE, Brazil, India, and Luxembourg. Nippon Steel has numerous subsidiaries and affiliates in China. China accounts for approximately five percent of Nippon Steel's total production capacity. Nippon Steel does sometimes contest harmful Chinese practices, such as when it filed a lawsuit in 2021 against Baoshan Iron & Steel Co., Ltd., a subsidiary of Baowu Steel Group, alleging infringement of Nippon Steel's patents relating to electrical steel; however, it rarely does so using U.S. trade measures." (p. 4)

**Response to CFIUS:** These assertions are just inaccurate.

China is not a key market for Nippon Steel, and any suggestion to the contrary is incorrect. Nippon Steel's operations in China are limited, consisting only of downstream facilities. It is misleading to state that Nippon Steel has "numerous subsidiaries and affiliates in China," in reference to steelmaking and steel fabrication, as CFIUS's statements are focused on upstream operations, the most vital to the steelmaking process. China represented only 3.6 percent of Nippon Steel's total revenue in FY2022. Nippon Steel has long recorded more revenue in the United States than in China. As the Committee is aware, Nippon Steel is in the process

| | |
|---|---|
| | of ending its participation in the joint venture Baosteel-NSC Automotive Steel Sheets Co., Ltd. ("BNA"). Once participation in BNA ends, the percentage of Nippon Steel's total production capacity that is based in China—which, again, is limited to <u>downstream</u> capacity—will drop further to less than 5 percent. As a result, Nippon Steel's production capacity in China will be reduced by 70 percent.<br><br>Nippon Steel has participated in more actions targeting China than the referenced lawsuit in 2021 against Baoshan Iron & Steel Co., Ltd. Nippon Steel is now actively lobbying the Japanese government to impose an anti-dumping tariff on Chinese steel exports to protect the Japanese domestic industry. Nippon Steel has also been at the forefront of challenging China's mis-use of its own trade remedy measures. For example, Nippon Steel worked with the Japanese government to file two complaints at the World Trade Organization against China's erroneous use of AD laws in its investigations related to stainless steel products and prevailed in both actions (DS454/DS601). Contesting China's harmful trade practices is a continuing priority for Nippon Steel.<br><br>Naturally, Nippon Steel has rarely used U.S. trade measures to combat China, as only domestic producers that manufacture the product at issue can lawfully bring trade cases. The Department of Commerce should be aware that Nippon Steel has not been eligible to use trade measures in many cases, because it does not produce all types of steel in the United States, and for steel that it does produce, typically does not account for the percentage of total production necessary to meet the requirements to bring a trade case. Post-closing, Nippon Steel will have increasing legal ability and commercial incentives to utilize U.S. trade measures as its presence in the United States grows. To that end, the mitigation term sheet at Appendix A from the Parties provides that Nippon Steel will not interfere with U. S. Steel's use of trade remedy measures, which CFIUS confirms in the Risk Letter is robust.<br><br>Furthermore, the number of affiliates cited by CFIUS as involved in steelmaking (54) is not correct. Nippon Steel does not have any steelmaking facilities in Luxembourg—the Luxembourg entity we presume CFIUS is referring to is a holding company for AM/NS India. |
| "Markets globally are adversely affected by chronic global excess production led by the PRC, and global supply is outpacing global demand. The United States is the world's largest steel importer and imports a significant percentage of steel used in the domestic market. Currently, much of the PRC's excess production is lower grade, low value steel not suitable for use in advanced manufacturing, particularly in the automotive sector. However, as the PRC increasingly shifts to higher purity and more finished products, other steel-producing countries such as Japan and the United States will need to find ways to lower costs across their own production supply chains to remain competitive against Chinese imports. China has already demonstrated its willingness to flood the market with its surplus steel, which undermines domestic manufacturers, threatens critical industries, and creates increasing dependence on PRC producers." (pp. 4-5) | **Response to CFIUS:** CFIUS mischaracterizes the article cited in its letter. The article does not focus on the export of steel from China to the United States. Rather, the article focuses on activities in Asia. Again, as the Department of Commerce knows, China accounted for less than 1% of the U.S. steel imports in the first two months of 2024 (see here). The comparatively low percentage of Chinese steel imports in the United States likely is due to the United States' use of trade remedies to combat the export of certain Chinese steel products to the United States.<br><br>In fact, the article cited in the Risk Letter states, "[a]s China ramps up its steel exports, it is shifting to high-value-added products, putting pressure on steelmakers in such advanced countries as Japan." Rather than suggesting that Nippon Steel represents a threat to U. S. Steel, the article underscores that China's unfair practices threaten Japan and supports the Parties' position that the Transaction represents a compelling opportunity for major steel producers from Japan and the United States, to align in contesting Chinese practices that are threatening the global industry. |
| "Nippon Steel continues to focus on cost control, carbon reduction, and improving production of higher margin products amidst this sluggish market created by Chinese overproduction. Nippon Steel has stated it has no intentions of idling, permanently closing, reducing staff, or otherwise modifying any of U. S. Steel's blast facilities through 2026, but has acknowledged that the continued state of operations of U. S. Steel's facilities would depend on myriad factors, including projected medium- and long-term demand, availability and cost of raw materials, health of the facility, and other overall cost considerations." (p. 5) | **Response to CFIUS:** These assertions are inaccurate and (inexplicably) fail to consider numerous submissions made by the Parties (and acknowledged by the Committee), which suggests that CFIUS failed to consider this information. For example, on August 28, the Parties notified CFIUS in writing that the board of Nippon Steel had formally approved a commitment of investments in Mon Valley Works and Gary Works. Surprisingly, CFIUS's August 31 letter refers to these transformative investments as hypothetical and subject to significant further assessment, whereas detailed study and effort went into the planning and |

| | |
|---|---|
| | approval of the commitment. These investments are not hypothetical, as the Nippon Steel board of directors called a special meeting to approve the investments and made a public announcement that was shared with CFIUS in advance of its August 31 letter. It is true that Nippon Steel cannot lawfully commence certain planning activities until the acquisition is complete, but Nippon Steel has continued its extensive technical analysis and the commitment to the new investments has been approved.<br><br>To reiterate, Nippon Steel has approved a commitment to invest no less than $1 billion to enhance the competitiveness of the Mon Valley Works, by either replacing or upgrading the existing hot strip mill and other facilities. Nippon Steel also has approved a commitment to revamp Blast Furnace #14 at Gary Works that is anticipated to require capital expenditures of approximately $300 million. These investments are anticipated to transform Mon Valley Works and extend the operational life of Blast Furnace #14 by up to 20 years.<br><br>As reflected in the term sheet, the Parties are prepared to enter into commitments regarding ongoing support to key facilities and guarantees against layoffs, shutdowns, and idlings. |
| "Nippon Steel's relatively limited use of trade remedies in other jurisdictions was also considered. Beyond Japan, Nippon Steel presently has operations in Australia, Brazil, China, the European Union (EU), India, Indonesia, Thailand, and the UAE. Each of these jurisdictions have trade remedy laws that allow either parties, a regulator, or both to initiate an antidumping (AD) or subsidy (countervailing duty "CVD") proceeding. Based on publicly available data, of the 180 active foreign trade remedy proceedings involving steel products in these jurisdictions (excluding Japan), Nippon Steel or an affiliate has participated as a petitioner in seven of them, or approximately four percent. Neither Nippon Steel nor any of its affiliates has filed a petition related to any active cases in Australia, China, the EU, India, or Indonesia, even though each of these countries has active trade measure proceedings related to steel products. Nippon Steel does not favor reliance on AD/CVD protections generally. While U.S. Steel frequently petitions for AD/CVD relief, Nippon Steel features prominently as a foreign respondent resisting trade relief for the U.S. domestic steel industry. Nippon Steel currently appears as a respondent or interested party in 19 AD or CVD cases involving Japan, China, Mexico, South Korea, and Taiwan. Several of the orders that imposed duties on imports from Nippon Steel in these cases were obtained by U.S. Steel." (pp. 5-6) | **Response to CFIUS:** Under global trade remedy laws, only domestic producers that manufacture the product at issue can bring trade cases. Nippon Steel does not produce all types of steel in all of its facilities around the world. It is unclear how CFIUS determined that there were 180 active foreign trade remedy proceedings (or how it determined Nippon Steel's role in these cases). As CFIUS (confusingly) acknowledges, it cannot know whether Nippon Steel participated in the EU cases because this information is not disclosed. To the extent that Nippon Steel has any involvement in the decision-making process for its affiliates (for example, it is not even an option where it only has a minority investment), Nippon Steel and its affiliates have not had the option of participating as a petitioner in many of these actions. For example, neither Australia nor the United Arab Emirates are relevant countries, because Nippon Steel does not have steelmaking subsidiaries in either jurisdiction. (As CFIUS may know from its diligence, Nippon Steel only invests in raw materials companies in Australia). Further, it is not clear how CFIUS determined that Nippon Steel appears as a respondent or interested party in 19 AD or CVD cases, especially because there has not been a single CVD case filed against Japan.<br><br>It is simply not true that Nippon Steel has made "limited use of trade remedies in other jurisdictions." As CFIUS acknowledges, Nippon Steel has participated in both of the two active trade measure proceedings in Japan, and it has recently called for the Japanese government to follow the lead of the United States and impose an anti-dumping tariff on Chinese steel exports to protect Japanese domestic industry. Nippon Steel has also disclosed its intent to participate in trade remedy proceedings under consideration by the governments in Southeast Asia. In India, Nippon Steel's affiliate, AM/NS India, has participated as a petitioner in the sunset review of hot-rolled and cold-rolled products, and in Indonesia, Nippon Steel's subsidiary, Pelat Timah Nusantara, was a petitioner in the AD investigation on tinplate from China, Taiwan, and Korea – which resulted in duties that have remained in effect since 2014. As many countries in Southeast Asia do not recognize China as a non-market economy, Nippon Steel believes that there is some reluctance among steel producers to file anti-dumping petitions against China for fear of an adverse result. As in the United States, even in countries in which Nippon Steel does have production facilities, it can only participate in proceedings that involve the specific product that is subject to the trade action.<br><br>Further, bringing a petition is an extremely costly and time-intensive undertaking, and whether to bring a trade case is a commercial decision that is based on the specific business interests of a company. Any domestic producer, including U. S. Steel, must consider several factors in determining whether to bring or support a petition, including the importance of the particular product to the business, likelihood of success, the potential financial benefit of a successful petition, and the incremental benefit of any particular |

company's participation as a petitioner. For example, Wheeling-Nippon Steel, Inc. (a subsidiary of Nippon Steel and NSNA), will—along with U. S. Steel—announce that they are joining Nucor Corporation ("Nucor") and Steel Dynamics, Inc., as well as the USW, in filing AD/CVD petitions on imports of corrosion-resistant steel from Australia, Brazil, Canada,[1] Mexico, the Netherlands, South Africa, Taiwan, Turkey, the United Arab Emirates, and Vietnam. Cleveland-Cliffs Inc. ("Cleveland-Cliffs"), on the other hand, has decided not to join this filing. Presumably CFIUS has not judged Cleveland-Cliffs to pose a threat to U.S. national security because of its decision.

Not all jurisdictions have the same level of trade enforcement as the United States (as an example, both the EU and India enforce a "lesser duty rule" that can act as a cap to the amount of duties imposed, which is not applied in U.S. trade remedy law, and many countries do not recognize China as a "non-market economy," further restricting the high dumping margins achieved in the U.S. for cases involving China), and the cost-benefit assessment might also vary depending on the implementing country at issue. Considering the much-lower number of trade actions in other jurisdictions (in part because other jurisdictions do not have similar robust and comprehensive trade remedy enforcement mechanisms as the United States), Nippon Steel has been an active participant in bringing and supporting trade enforcement actions.

Nippon Steel's participation in U.S. AD proceedings as a foreign respondent is not a signal that it resists trade relief for the U.S. steel industry. Foreign producers do not generally "choose" whether to participate as a foreign respondent. When an AD/CVD case is brought against imports, the Department of Commerce selects respondents to examine based on import data. Similarly, the International Trade Commission solicits and requires submission of information from foreign producers.

Nippon Steel's current involvement in U.S. AD proceedings is limited to administrative reviews and related litigation. In the U.S. retrospective system of assessing and collecting AD duties, the sole purpose of an administrative review of an AD order is to calculate the accurate final dumping margin on merchandise that was imported into the United States during the previous year. By participating in these reviews, Nippon Steel is only asking the Commerce Department to calculate an accurate final dumping margin for the imports that Nippon Steel sold in the United States during the previous year; Nippon Steel is not resisting trade relief for the U.S. steel industry.

**Other Authorities and Mitigation**

Even if CFIUS is not persuaded that Nippon Steel's commercial interests will align with those of U. S. Steel, there are several reasons why Nippon Steel's acquisition of U. S. Steel would not affect the U.S. steel industry's ability to robustly pursue AD/CVD relief or the U.S. Government's ability to protect U.S. national security, regardless of Nippon Steel's intentions.

**First**, as CFIUS acknowledges, the Commerce Department may disregard the position of a domestic producer if it is affiliated with a foreign producer of the same product when determining if there is sufficient domestic industry support for an AD/CVD petition. Likewise, the U.S. International Trade Commission ("USITC") may exclude a domestic producer related to a foreign exporter from the domestic industry for purpose of its injury analysis.

**Second**, the threshold for domestic industry support to initiate an AD/CVD investigation may be met not only by the domestic producers, but also by the workers who produce the products. USW frequently

[1] U. S. Steel, the USW, and Wheeling-Nippon take no position on Canada.

| | |
|---|---|
| | participates as a petitioner for this reason, and petitions can and have met the domestic industry threshold by virtue of the workers even if the company does not express a view.<br><br>**Third**, AD/CVD investigations can be "self-initiated" by the Commerce Department even without a petition from the domestic producers at all. In such cases Nippon Steel and U. S. Steel would be compelled to respond to questionnaires issued by the Commerce Department and USITC.<br><br>**Finally**, Section 232 of the Trade Expansion Act of 1962 remains available as a tool for the U.S. Government to use to address steel imports that may impair national security.<br><br>The reality is that Nippon Steel's economic incentives will align with supporting U. S. Steel's trade positions. Nippon Steel is spending well over $15 billion to invest in the U.S. steel industry, and it has repeatedly committed (in public and in submission to CFIUS) to maintain U. S. Steel's U.S. headquarters and U.S. production capacity. As such, Nippon Steel's economic incentives will align with supporting U.S. trade positions. But if CFIUS does not view Nippon Steel's commercial interests and the legal protections against interference provided under U.S. law as dispositive or sufficient, Nippon Steel is prepared to make that commitment in an NSA—for example, U. S. Steel would maintain an internal officer-level "trade committee" to ensure that decisions to pursue trade cases are made without interference by Nippon Steel, and to document the decisionmaking process for U. S. Steel. |
| Nippon Steel has stated that it "intends to participate in trade remedy proceedings under consideration by governments in Southeast Asia" in which it operates, "assuming that the proposed trade remedy actions reflects [sic] the interest of Nippon Steel." However, this does not constitute a guarantee that Nippon Steel will change its historically limited practices with respect to trade remedies proceedings." (p. 6) | **Response to CFIUS**: As explained above, Nippon Steel has actively participated in trade remedy actions as a petitioner, and in support of petitions. It will also have a commercial interest in ensuring that U. S. Steel has the ability to utilize U.S. trade actions to protect its well over $15 billion investment. To the extent that CFIUS considers that Nippon Steel's involvement in trade remedies proceedings to be "limited" or that Nippon Steel will not actively protect its investment, this will not affect U. S. Steel's practices and involvement in trade remedy proceedings both because of the legal mechanisms described above and the mitigation commitments that Nippon Steel is willing to make in a binding NSA to separate itself from U. S. Steel's decisionmaking process with respect to trade actions. |
| "Nippon Steel's statements to the Committee further reflect to Nippon Steel's relatively less aggressive use of trade measure proceedings. For example, Nippon Steel claimed the most important factor for determining whether trade actions are warranted is if imports are fairly priced compared to their own products. However, Nippon Steel's provided statements on participation in AD/CVD cases provide a less robust active participation than U.S. Steel. Nippon Steel acknowledged that "U.S. Steel has been a proactive user of the U.S. trade remedy regime," and has stated that it "will not interfere with U.S. Steel's ability to maintain its historical approach to and participation in" AD/CVD proceedings. Nippon Steel has indicated that "decisions regarding participation" in AD/CVD "will be made by U.S. Steel's management in consultation with Nippon Steel," including decisions about whether imports are harmful. Nippon Steel pointed specifically to its "interest in ensuring the competitiveness of U.S. Steel, including through allowing U.S. Steel to participate fully in antidumping and countervailing duty measures against imports that harm U.S. Steel's competitiveness in the U.S. market," and suggested that it did not anticipate that the interests of U.S. Steel and Nippon Steel would diverge, in part because U.S. Steel and Nippon Steel would have an interest in structuring their operations "in a manner in which Nippon Steel's exports to the United States" would not "directly compete with or harm U.S. Steel's market position domestically."" (p. 6)<br><br>"While these statements suggest that Nippon Steel does not, in the near term, intend to curtail U. S. Steel's participation in AD/CVD proceedings, post-acquisition, U. S. Steel's decisions on AD/CVD cases will be influenced by Nippon Steel, and may take into account Nippon Steel's commercial interests and competitive position in the global steel market, which are broader than U. S. Steel's domestic interests." (p. 6) | **Response to CFIUS:** As CFIUS acknowledges, the risk of Nippon Steel adversely influencing U.S. trade actions "is partially mitigated by the fact that Nippon Steel and U. S. Steel's opposition to a petition may be disregarded by Commerce under certain circumstances." Moreover, Commerce can bring AD/CVD cases on its own or based on a petition filed by labor unions.<br><br>It would be contrary to Nippon Steel's own economic interest to damage U. S. Steel's economic viability, given the material investment Nippon Steel is making in the United States. However, even if this principle is not sufficiently persuasive to the Committee, Nippon Steel is prepared to enter into a binding NSA that includes (1) commitments to refrain from interfering with U. S. Steel's trade decisions; and (2) monitoring mechanisms to permit CFIUS to verify compliance with such commitments. |

| | |
|---|---|
| U.S. Steel had a production capacity of 22.4 million tons in 2023. U.S. Steel makes steel primarily for automotive, construction, consumer, electrical, industrial equipment, and energy customers. U.S. Steel is the world's 27th largest steel manufacturer, and the third largest steel maker in the United States. U.S. Steel has four business segments: North American flat rolled steel plates and slabs; Mini Mill, which produces steel using an electric arc furnace and is more energy efficient; tubular products, which are prominently used in the oil and natural gas industries; and U.S. Steel Europe, which makes steel in Slovakia, according to the filing. | **Response to CFIUS:** We note that U. S. Steel's North American Flat Rolled ("NAFR") segment produces steel sheet and coil, not "plate" as that term is commonly understood. As explained in the Parties' joint voluntary notice, "strip mill plate," which NAFR does produce, is a type of semi-finished product that is rolled into a hot rolled coil (commonly referred to as "sheet"). Strip mill plate uses the term "plate" because it is 0.1875 inches or greater in thickness. Strip mill plate does not share a production process with products more generally known as "steel plate," which are cross rolled on a plate mill. U. S. Steel does not have the capability to produce plate products.<br><br>We note further that although they are less carbon intensive (because they use scrap steel), electric arc furnaces ("EAFs") are not energy efficient (or necessarily more energy efficient than blast furnaces, which can reduce energy consumption by reusing gases that they generate). |
| "Maintaining a competitive U.S. domestic steel market, with enough capacity and capital to meet increasing domestic steel demands, is crucial to the downstream consumers of steel products, many of which are national security critical industries that must remain competitive domestically and globally." (p. 7) | **Response to CFIUS:** Nippon Steel's investment, and the sharing of its world-leading technology that outpaces the technology that U. S. Steel currently has available, will be a significant benefit to all of U. S. Steel's customers. As noted in our August 19, 2024 presentation, U. S. Steel customers across industries—including automotive, oil/gas/petrochemical, renewable energy, appliances, consumer packaging, heavy machinery, and electrical—strongly support this Transaction because they understand that the Transaction will supplement the quality and reliability of U. S. Steel offerings. In its arguments, the Committee is substituting its economic judgement for the views of the U.S. companies that will be materially negatively impacted if this Transaction does not close.<br><br>For the sake of clarity, the Parties are prepared to include formal supply commitments in an NSA with CFIUS. |
| "Steel is used in the transportation sector in bridges, tunnels, the national highway system, railcars and tracks, ports, and in over 19,000 airport runways and facilities. The United States has over 600,000 bridges made up, in part or in whole, of steel. The United States has over 600,000 bridges made up, in part or in whole, of steel. As such critical infrastructure ages, replacement parts, principally made of steel, will be increasingly important to maintaining vital national security infrastructure. Reduced domestic steel availability, especially of high purity steel produced in blast furnaces, may cause injurious delays to critical repairs that could lead to further degradation of these vital infrastructure assets." (p. 7) | **Response to CFIUS:** This is a generic statement. It does not assert that *U. S. Steel* supplies steel for bridges, tunnels, the national highway system, railcars and tracks, ports, or airport runways and facilities. The paragraph also claims that reduced domestic availability "especially of high purity steel produced in blast furnaces" will harm critical infrastructure. As the Parties have described in response to CFIUS's question sets, including Question Set 11, and in meetings with the Committee, the types of high purity steel that historically could be produced only using a blast furnace were exposed automotive steel and tin mill products. These types of high purity steel, however, are not required for the construction of bridges, tunnels, the national highway system, railcars and tracks, ports, or airport runways and facilities. In fact, U. S. Steel does not produce the steel integral to these types of infrastructure—steel plate, structural shapes, rebar, and forgings, etc.—which are produced in large quantities by EAF-based mini mills and blast furnaces alike, such as those operated by Cleveland-Cliffs, Nucor, Arcelor-Mittal-Calvert, Steel Dynamics, BlueScope-Delta, and others in North America. In any case, Nippon Steel is committed to maintaining and improving U. S. Steel's blast furnace production through transformative investments and sharing technology and expertise, and continuing to supply U. S. Steel's customers in the United States. |
| "Further, steel is used in the energy sector in electric power generation, refineries, and nuclear facilities; there are over 6,000 power plants in the United States that require ongoing steel production for maintenance and repair." (p. 7) | **Response to CFIUS:** This also is a generic statement. It does not assert that U. S. Steel supplies steel for electric power generation, refineries, or nuclear facilities. While U. S. Steel supplies certain steel to the energy sector, including oil country tubular goods and line pipe, this steel is not high purity steel that can be produced only using a blast furnace. U. S. Steel does not sell any steel for nuclear facilities, which U. S. Steel believes is largely plate steel produced using EAFs. Similarly, U. S. Steel believes that most steel supplied for refineries would be plate used in storage tanks, which U. S. Steel does not have the capability to produce, and which can be produced via EAFs. As it relates to power generation, U. S. Steel does not have the capability to produce grain oriented electrical steel ("GOES"), which is critical for the manufacture of transformers. Cleveland-Cliffs is the only domestic producer of GOES. In any case, Nippon Steel is committed to maintaining and improving U. S. Steel's blast furnace production through transformative investments and |

<table>
<tr><td></td><td>sharing technology and expertise, and continuing to supply U. S. Steel's customers in the United States. Again, the Parties are prepared to include formal commitments in an NSA with CFIUS.</td></tr>
<tr><td>"U.S. Steel is also a supplier of steel for the agricultural market, and its overall market share in this industry is increasing. In 2022, U.S. Steel supplied over 190,000 tons of steel to the U.S. agricultural supply chain (a critical infrastructure market), which increased to over 200,000 tons in 2023. About a quarter of this steel was supplied through its basic oxygen furnaces (BOFs) or blast furnaces." (p. 7)</td><td>Response to CFIUS: Steel that U. S. Steel supplies to the agricultural sector is not required to be produced using a blast furnace. As CFIUS notes in the Risk Letter, only a quarter of the steel U. S. Steel supplied to the agriculture sector is produced using a blast furnace—the rest is produced at U. S. Steel's EAF facilities. There indeed was no reason that the steel U. S. Steel supplied to the agricultural sector from its blast furnace facilities needed to be produced using blast furnaces—it equally could have been produced at U. S. Steel's EAF facilities. In any case, Nippon Steel is committed to maintaining and improving U. S. Steel's blast furnace production through transformative investments and sharing technology and expertise, and continuing to supply U. S. Steel's customers in the United States.</td></tr>
<tr><td>"The U.S. domestic steel market, in its current composition, is already unable to meet domestic critical infrastructure and commercial demand, requiring a reliance on imports." (p. 7)</td><td>Response to CFIUS: Nippon Steel agrees with this statement, which is why it is making an investment into the U.S. steel industry. The Transaction represents a rare opportunity for the U.S. domestic steel market to be strengthened, representing a major investment by the fourth largest steelmaker in the world that is the global leader in innovative steelmaking technology, and one of the only major steel producers from a U.S. allied country (i.e., one aligned with U.S. goals and working collectively to combat China's dominance in the global market).</td></tr>
<tr><td>"Most recently, the 2018 Commerce investigation under Section 232 of the Trade Expansion Act found that robust industrial oriented steel manufacturing is essential for national security, as the free market system in the United States requires commercially viable steel producers to meet critical infrastructure steel requirements. In order to provide sufficient supply for national security needs, the domestic steel industry requires several factors to exist: steady production, efficiency, and revenue volume. It is the commercial and industrial customer sales-which are U.S. Steel's primary customer base that allow for the relatively steady production needed for manufacturing efficiency as well as revenue volume to sustain the business. Per the parties, the board of directors of U.S. Steel were not looking to sell U.S. Steel in 2023, but unsolicited approaches from several buyers forced the board of directors to consider strategic alternatives to its standalone strategy. Also, according to the parties, the board of directors undertook an exhaustive strategic alternative review process that canvassed more than 50 potential buyers, which resulted in 10 non-binding bids, five second round bids and ultimately resulted in the board of directors agreeing to Nippon Steel's bid. Per the parties, the alternative final bid was Cleveland-Cliffs Inc.; however, Nippon Steel was selected because Nippon provided the highest value and certainty while presenting less regulatory risk than Cleveland-Cliffs." (p. 7-8)</td><td>Response to CFIUS: The Transaction will, and is intended to, strengthen the U.S. supply chain in each of these factors, in particular:<br><br>• Efficiency: American steel production has fallen behind global producers in terms of innovation and efficiency. Nippon Steel is the global leader in steelmaking innovation, and it has committed to sharing its groundbreaking technological innovations with U.S. Steel.<br>• Revenue volume: The Transaction will result in more investment, more innovation, expanded product offerings, and greater efficiency, which in turn will increase revenue.<br><br>In fact, the Transaction will address the very risks identified in Commerce's 2018 report. The Transaction, will inject substantial amounts of capital into U. S. Steel (capital investment that U. S. Steel would not be able to make on a standalone basis), provide enhanced manufacturing and technology capabilities in the United States, and create a stronger global competitor to China grounded in the close relationship between the United States and Japan. In that regard—in a development that somehow the Risk Letter ignores—on August 28, the board of directors of Nippon Steel approved (as conveyed to CFIUS in submissions by the parties on August 28 and August 29) commitments to (i) expend at least $1 billion to revitalize U. S. Steel's Mon Valley Works, upon closing of the Transaction, to include upgrading or replacing the hot strip mill and other facilities to ensure that Mon Valley Works continues to process U.S.-melted and poured steel into U.S.-origin steel products for the U.S. marketplace[2]; and (ii) revamp Blast Furnace #14 through capital expenditures anticipated to be approximately $300 million—an action that U. S. Steel assesses could extend the useful life of Blast Furnace #14 by up to twenty years. Nippon Steel has also committed to transfer advanced steelmaking technologies to U. S. Steel that will make its steel production more efficient, allowing it to compete more effectively. This brings Nippon Steel's total commitment to the Transaction and U. S. Steel to well over $15 billion.<br><br>As detailed in response to Question Set 2, and in our meeting with CFIUS on August 19, the Transaction was by far the best alternative—including as compared with remaining a standalone public company—for U. S. Steel and its stakeholders, including its blast furnace facilities and its workers. Every single other bid would have resulted in U. S. Steel being broken up or the blast furnace facilities deprioritized—either because</td></tr>
</table>

[2] Nippon Steel will <u>not</u> import Japanese-made slabs to process at the new hot strip mill in Mon Valley, which would not be economically feasible (including due to transportation costs and Section 232 tariffs).

| | |
|---|---|
| | bidders were not interested in the blast furnace facilities, or because antitrust concerns would have forced (at a minimum) the divestiture of several of the blast furnaces and other USW-represented facilities (*e.g.*, the Keetac and/or Minntac mine). |
| "Among other potential national security implications, Commerce affirms the continued validity of the 2018 Section 232 Report conclusion that a healthy and competitive domestic steel industry is in the national security interest. The 2018 Section 232 report found that an 80 percent capacity utilization rate is an important factor in the ability of the domestic steel industry to meet national security needs.<br><br>Overall domestic steel production capacity has been steadily declining in the United States for the last several decades. Utilization rates, including U.S. Steel's, have been steadily declining from an average of 87 percent in 1998, to 81.4 in 2008, and finally to 69.4 percent in 2016. As of 2023, U.S. Steel accounted for 17.81 percent of the U.S. steel supply, with the other major U.S. companies including Nucor Corp. (Nucor), (25.93 percent), Cleveland-Cliffs (16.90 percent), and Steel Dynamics (11.70 percent).<br><br>U.S. Steel's average utilization across its North American flat rolled segment, its largest business line, for 2023 was 71 percent. U.S. Steel's tubular segment, solely supplied by its Fairfield Works operation that went online in October 2020 only averages 63 percent utilization, well below the targets anticipated to be required for maintaining readiness." (p. 8) | **Response to CFIUS:** 50 U.S.C. § 4565(d)(4) provides that the President may act to suspend or prohibit a transaction that threatens to impair the national security "only if the President finds that . . . provisions of law, other than this section and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President." Commerce's 2018 report recommended the use of the President's tariff authority—not CFIUS—to address the risks that steel imports posed to national security. Accordingly, following the Commerce Department's 2018 report, the U.S. government put in place significant trade protections for the U.S. steel industry, which resulted in domestic steelmakers adding significant production capacity, which continues to increase to this day. (Organisation for Economic Co-operation and Development, *Latest developments in steelmaking capacity and outlook until 2026*, June 12, 2024.) Commerce's 2018 report therefore does not provide a legitimate basis for CFIUS to recommend prohibiting this Transaction.<br><br>The risks identified in Commerce's 2018 report, and the level of utilization of U. S. Steel's production facilities, also do not arise from the Transaction, but are extant risks that predate the Transaction. If anything, for the reasons described throughout this document, the Transaction will help maintain and benefit U. S. Steel's production capacity.<br><br>Finally, we note that, when U. S. Steel calculated the 71 percent utilization figure cited by the Committee, it included Granite City Works in the denominator, though that facility was idled in 2023. Without the inclusion of Granite City Works in the denominator, the 2023 utilization rate for NAFR was approximately 80 percent. Further, the relatively low utilization rate of Tubular is due to the smaller capacity of its rolling facility (for seamless pipe) compared to its steelmaking capacity. The Risk Letter also does not cite the utilization rates for U. S. Steel's Mini Mill segment. As described in the joint voluntary notice, "During 2023, BRS had an annual raw steel production capability of 3.3 million tons and produced 3.0 million tons of steel (approximately 90% of production capability)." |
| "The number of blast furnaces operating in the United States decreased from 38 to less than 15 between 1975 and 2016, during which time the number of Electric Arc Furnaces (EAFs) decreased from 127 to 98. This decline affects domestic steel producers' current ability to meet national security production requirements for critical infrastructure. This capacity falls further short of the capacity needed to meet demands during an emergency, and further still if there are fewer U.S. operating blast furnaces, which are currently the only source for high purity steel used in the transportation industry, a critical infrastructure sector. While the steel industry is developing the technology to make such steel in EAFs, the research and development is ongoing, without an estimated timeline of when blast furnaces are no longer necessary to achieve the required purity standards. No domestic alternative currently exists to replace the lost production capacity and variety of steel products produced at scale in the near-term." (pp. 8-9) | **Response to CFIUS:** High purity steel, whether or not produced using blast furnaces, is not required for the transportation category of critical infrastructure (Airports, Aircraft, Bridges, Highways, Railroads, Mass Transit Systems, Seaports, Navigation Systems, Shipbuilding, Trucks, Trailers, Boats, Ships). In any case, even if the *number* of blast furnaces and EAFs decreases, the overall *production volume* of steel does not necessarily decrease, in particular as older, less efficient facilities are phased out and newer, more efficient facilities are brought on line. It also is incorrect to state that blast furnaces are the "only source" of high purity steel, since EAFs are also utilized for production of automotive flat steel through a combination of using direct reduced iron and hot briquetted iron. Nucor has started to produce high purity steel for exposed automotive using EAFs, and has indicated that its new Apple Grove, West Virginia mill, with three million tons of capacity and slated to turn on in 2026, will also make it. Certain producers, including ArcelorMittal Dofasco, also are expected to begin producing tin mill products, which requires high purity steel, using steel produced using an EAF within the next few years. |
| "Production costs for zero-carbon steel are expected to double current crude steel production costs. In 2021, U.S. Steel announced a goal of achieving net-zero carbon emissions by 2050. Nippon Steel has begun working to reduce its total CO2 emissions by 30 percent from 2013 levels by 2030 to meet targets set by the government of Japan. In May 2023, Nippon Steel started a full-scale study of the transition from the blast | **Response to CFIUS:** It is not clear how these statements are relevant to the purported risk posed by the Transaction. If the Committee's position is that Nippon Steel may cause U. S. Steel to turn away from blast furnaces and towards EAFs in order to meet carbon emissions goals, that simply will not be the case, particularly given Nippon Steel's world-leading decarbonization technologies for blast furnaces. And, in any event, Nippon Steel is prepared to make commitments related to U. S. Steel's blast furnace production |

| | |
|---|---|
| furnace steelmaking process to the EAF steelmaking process. Additionally, Nippon Steel has developed hydrogen injection technology that would be used to reduce carbon emissions from blast furnaces." (p. 9) | capacity through a National Security Agreement. As it relates to production costs, we note that costs of achieving carbon emissions goals will vary depending on the necessary investment and the price of energy and ingredients. |
| "Some competitors are seeking to produce critical material for the transport and automotive sectors that are traditionally made in blast furnaces, such as automotive sheet, tin mill, and flat rolled products, in EAFs. EAFs cannot produce the same volume as blast furnaces, even while they attempt to diversify their production." | **Response to CFIUS:** As mentioned, Nucor has started to produce high purity steel for exposed automotive using EAFs, and has indicated that its new Apple Grove, West Virginia mill, with three million tons of capacity slated to turn on in 2026, will also make it. ArcelorMittal-Calvert is expected to do the same using its EAF that is expected to come online in 2025. Certain producers, including ArcelorMittal Dofasco, also are expected to begin producing tin mill products, which requires high purity steel, using steel produced using an EAF within the next few years. |
| "U.S. Steel recently added non-oriented electrical steel (NOES) production capabilities and is one of only two domestic producers of electrical steel in the United States. NOES is used in the cores of motors for electric vehicles (EVs), industrial processes such as pumping and fanning, and for consumer products, including appliances and small generators. NOES-dependent EVs are critical to national security as transportation, specifically mass-transit systems, are part of the critical infrastructure. With the focus on a transition in reducing the carbon impact, cities are increasingly focused on electric buses which use NOES in the core of the motor.<br><br>Despite some projected increases in capacity, domestic capacity will fall below domestic demand by over 61,000 tons of electrical steel by 2026, which is predicted to rise as high as 927,000 tons by 2030. S&P Global estimates that the EV industry is facing significant challenges to meeting projected increased demand. Currently, limited domestic suppliers and production forces the U.S. EV industry to import electrical steel from countries such as China, Japan, and South Korea. Scarcity of electrical steel has made it a strategic commodity integral to national security industries, which is already threatened due to a limited global supply base concentrated in a few countries, one of which is China, another is Japan.<br><br>Nippon Steel will also have to consider the cost of restarting mills that have been idled. Per U.S. Steel, the cost to restart a temporarily idled blast furnace is between $2 and $10 million, depending on how long it has been idled, and up to $25 million for indefinitely idled furnaces to become operational again.<br><br>The costs to restart indefinitely or permanently idled mills are even less predictable and "vary on a case-by-case basis," per U.S. Steel. Due to this slow startup period, the aggressive vehicle electrification targets set by the 2021 Infrastructure Investment and Jobs Act, and the time required to ramp up production to full capacity or to restart idled furnaces, U.S. manufacturers in the automotive and transportation sectors will likely face supply chain disruptions as they confront limited local supply options, driving up motor costs in the short term and hurting their international competitiveness. In some trade agreements, including the United States - Canada Mexico Agreement, imported steel is not always a viable option. If current production of electrical steel is not maintained (or increased), the United States could become entirely dependent on foreign producers to supply these critical materials and products such as transformers and generators.<br><br>While U.S. Steel has closed or idled four mills since 2015, resulting in a loss of approximately 12.6 million tons of productivity in 2023 and 12.7 million tons per year of lost productivity over a five-year average due to challenging market conditions, historically and potentially as a result of its limited global footprint, U.S. Steel has maintained its commitment to the U.S. market and provided critical domestic production capacity. A review of the company's business plan indicates that the company plans to maintain operations in the United States, despite these challenging market conditions. | **Response to CFIUS:** As an initial matter, U. S. Steel's production/supply capability should be evaluated on the basis of its current status, which is that its non-grain oriented electrical steel ("NOES") line at Big River Steel is still working on getting qualified to supply NOES to automakers. Nippon Steel, which has decades of experience producing high grade NOES, will *help* with this process. Indeed, Nippon Steel intends to bring its world-leading technologies related to electrical steel to the United States and U. S. Steel, to the benefit of (among others) the U.S. automotive industry. Furthermore, the Parties are prepared to address technology transfer in an NSA, to formalize Nippon Steel's commitments to technology sharing. The Transaction demonstrates that the strong alliance between the United States and Japan cited by CFIUS (p. 2) is valuable, as it shows that Japan—through this Transaction—is willing to help address a critical scarcity that existed in the United States before Nippon Steel ever considered acquiring U. S. Steel.<br><br>In any case, CFIUS seems to suggest that NOES is critical for national security because it is used in motor cores for electric buses, which constitute "mass-transit systems," a part of the transportation sector, which in turn constitutes critical infrastructure (*i.e.*, electric buses are critical infrastructure and critical to national security). CFIUS then seems to suggest that because there is not sufficient domestic production of NOES to meet demand (relying on a report from 2021), and because blast furnace capacity *generally* decreased in the United States between 1978 and 2016, Nippon Steel will need to consider restarting U. S. Steel's blast furnaces that have been idled in the past, in part because electrical steel cannot be imported under certain trade agreements, including the United States-Mexico-Canada Agreement (the "USMCA"). CFIUS seems to be implying, although it is not stated explicitly, that Nippon Steel will be unlikely to restart these idled blast furnaces in order to meet the demand for NOES in the United States, and therefore "the United States could become entirely dependent on foreign producers to supply these critical materials and products such as transformers and generators." CFIUS also seems to imply that, while U. S. Steel has stated to CFIUS that it will continue idling blast furnaces if the Transaction fails, there is somehow better odds of U. S. Steel restarting these blast furnaces absent the Transaction because it has "a history of attempts to improve its competitiveness with frequently changing operational priorities," and because Big River Steel's performance has declined over the past six quarters.<br><br>None of the statements or implications contained in the Risk Letter and summarized in the foregoing paragraph are accurate, except that NOES would be used in motor cores for electric buses. First, blast furnaces are not required to produce NOES (or any other type of electrical steel); indeed, U. S. Steel produces NOES at its EAF-based Big River Steel facility (which has been hurt by the *slowdown* in demand for electrical vehicles and, in turn, electrical steel). U. S. Steel does not produce electrical steel at any of its blast furnace facilities, and none of its idled blast furnace facilities have the capability to produce electrical steel, so restarting them would not have any effect on the domestic supply of electrical steel. What *will* increase the domestic supply of electrical steel is Nippon Steel transferring its technology and expertise for manufacturing NOES to U. S. Steel, which only just began producing NOES in 2023 and is still learning the manufacturing process, whereas Nippon Steel has decades of experience producing high-grade NOES. |

| | |
|---|---|
| U.S. Steel has a history of attempts to improve its competitiveness with frequently changing operational priorities. Previous operational priorities include the Carnegie Way in 2013, an asset-revitalization program in 2017 and Best of Both in 2019 before leading to the current Best for All program in 2021. All four programs have resulted in U.S. Steel spending an estimated $10.4 billion. The current Best for All program seeks to add an additional mini-mill similar to its Big River mini-mill and to convert its Granite City A and B into pig iron sources for its EAFs. However, the performance of the Big River Steel mini-mill has deteriorated over the past six quarters due to a mixture of declining steel prices and higher spot-market exposure leading to significant declines in profitability." (pp. 9-10) | Prohibiting the Transaction will have the *opposite* effect – *i.e.*, delaying U. S. Steel's ability to supply the U.S. market with NOES because U. S. Steel will emerge weaker if the Transaction fails. Moreover, U. S. Steel has explained to the Committee repeatedly that it has no plans to restart idled blast furnace facilities or expand its blast furnace footprint absent the Transaction, which is consistent with its Best for All and Best for Both initiatives cited in the Risk Letter. The *only* means to maintain and improve U. S. Steel's blast furnace facilities is through the Transaction, and Nippon Steel's transformative investments, including in Mon Valley Works and Gary Works. Also, there are no restrictions on imports of electrical steel under trade agreements, including the USMCA. There are domestic/regional content preferences under certain such agreements, but those would only *incentivize* Nippon Steel to maintain and enhance domestic steel production in the United States. Finally, we note that NOES is not used to produce transformers; rather, GOES, which U. S. Steel does not have the capability to produce, is used to manufacture transformers.<br><br>We note further that the Department of Energy ("DOE"), in its 2023 Critical Minerals Report,[3] rated electrical steel overall (NOES and GOES) as "near critical," though:<br><br>• The main reason "Electrical Steel" receives a 3 rating is the identified supply/demand mismatch based on third party market forecast reports, but DOE acknowledges significant methodological problems with these demand projections (p. 107).<br>• Within the "Electrical Steel" category, DOE actually appears to be more concerned about GOES, citing that NOES capacity expansion may crowd out GOES capacity (p. 154).<br>• Aside from supply/demand mismatch, the scorecard for Electrical Steel mostly shows 1s and 2s. For example, DOE found that there is no co-dependence on other markets ("both steel and Si [silicon] are abundant and do not cause a major disruption" (p. 155)) and there is no concentration risk for imports ("the HHI index based on global electrical steel export is 1413, showing a diverse market" (p. 155)).<br><br>In addition, we note that the current Administration seems to be comfortable giving significant grants/tax breaks to foreign-owned companies to expand the U.S. NOES supply, with ArcelorMittal being one of the first recipients of major DOE grants/tax breaks to build out its facility in Alabama: U.S. Department of Energy announces financial support for ArcelorMittal's anticipated World-Class Electrical Steel facility in Alabama \| ArcelorMittal.<br><br>Finally, the contribution of Nippon Steel's know-how and technology will support the U.S. long-term ability to remain competitive with China. As the Parties presented to CFIUS on February 21, 2024, there are 28 other NOES facilities planned globally through 2030; 15 of them are Chinese. Nippon Steel's ability to contribute its technologies and capabilities to grow U. S. Steel's electrical steel capabilities in the United States is a significant national security benefit of this transaction. |
| "Nippon Steel and U.S. Steel have signed an agreement for technical assistance by Nippon for U.S. Steel in the operation and maintenance of U.S. Steel's blast furnaces; it is a standard consulting agreement. Per information provided by the parties during an August 19, 2024 meeting with the Committee, the agreement's purpose is to allow Nippon to evaluate U.S. Steel's blast furnaces to formulate a recommendation for future plans. Per the parties, this technical analysis has been focused on blast furnace #14 (BF14) at the Gary Works facility. U.S. Steel's current business plan includes idling BF14 in 2026 upon | **Response to CFIUS:** Please refer to the Parties' response to Question Set 2, in particular their responses to questions 1.h and 1.i. As explained, since signing the Transaction, a key focus of technical discussions between the Parties has been Blast Furnace #14 at Gary Works. Certain components on Blast Furnace #14 are nearing their end of life, and, in turn, the facility requires a decision soon either to invest significant capital to revitalize the furnace or cease operations. In the absence of this Transaction (including the backing of Nippon Steel's investment grade balance sheet and the transfer of its blast furnace-related technology and expertise to U. S. Steel), U. S. Steel inevitably would return to its prior strategy—i.e., focusing |

[3] 2023 DOE Critical Materials report, *available at* https://www.energy.gov/sites/default/files/2023-07/doe-critical-material-assessment_07312023.pdf.

| | |
|---|---|
| the completion of a new EAF facility; however, U.S. Steel's business plans have changed at various points in the past." (p. 10) | on expanding its mini mill footprint and reducing its blast furnace footprint, including idling Blast Furnace #14.<br><br>Following the signing of the Transaction, in Q2 2024, as technical site visits began, Nippon Steel expressed high interest in Blast Furnace #14 and its long-term viability. Detailed discussions began, addressing the existing strategy of current management, with the intention of providing Nippon Steel with an understanding of the current landscape and challenges U. S. Steel faced. In April 2024, the first of many visits by Nippon Steel to Gary Works occurred. The visit included tours of the operations and discussions on the capabilities and limitations of the assets. In May, during another site visit, the U. S. Steel and Nippon Steel teams engaged in a detailed discussion of the Gary Works assets with a deep dive into Blast Furnace #14.<br><br>While these discussions were ongoing, U. S. Steel was assessing short-term requirements for its blast furnace footprint that could lead to extending the campaign of Blast Furnace #14. U. S. Steel determined that it would be helpful to obtain outside advisory services for blast furnace technical assistance. In parallel, notwithstanding the foregoing discussion, Nippon Steel still was limited in its ability to evaluate future investment in Blast Furnace #14 because of the gun-jumping guardrails. As a result, U. S. Steel decided to issue a request for proposal, to various engineering firms (including Nippon Steel Engineering Co., Ltd.) for consulting work. Nippon Steel submitted a proposal, as part of the RFP process along with three other highly reputable engineering firms. Based on various criteria, including technical proposal components, requirements of the contract, price, and execution timeline. Nippon Steel was informed that they were chosen on August 13, 2024, as the preferred engineering firm. The Parties executed a consulting agreement on August 23, 2024. Subsequently, as noted above, Nippon Steel's board of directors approved a commitment to revamp Blast Furnace #14 that is anticipated to require capital expenditure of approximately $300 million, and that will occur if the Transaction proceeds.<br><br>CFIUS appears to be discounting the foregoing, along with the rest of the Parties' submissions regarding Blast Furnace #14,which the Parties will certify is true under penalty of perjury—including that, absent the Transaction, U. S. Steel will idle Blast Furnace #14. Nippon Steel also intends to enter into a binding, legally enforceable agreement with the USW regarding its commitment to revamp Blast Furnace #14, and is prepared to enter into a National Security Agreement with CFIUS regarding the same.<br><br>In sum, U.S. Steel is planning to close Blast Furnace #14 in 2026, but for the acquisition by Nippon Steel. Only as a result of the Transaction will that facility remain open and operating. |
| "Under the technical agreement, U.S. Steel provided Nippon Steel with four possible investment scenarios with costs ranging from $20-$292 million (in addition to the already committed $1.4 billion) and adding between 9 months and 20 years of useful life to the aging furnace. Per the parties, this decision is dependent on numerous factors related to market conditions. The Nippon Steel board of directors approved this planned investment scenario on August 28, 2024. Nippon Steel will also need to consider if an investment into BF14 fits in the overarching company strategy, especially in light of its current array of operational blast furnaces." (p. 11) | **Response to CFIUS:** The Nippon Steel board formally approved a commitment to revamp BF#14 that is anticipated to require capital expenditure of approximately $300 million, and that will occur if the Transaction proceeds. The Parties are prepared to formally commit to this in an NSA. Furthermore, the production capacity at Gary Works cannot be replaced by production capacity in India, nor would that make economic sense—even if it were feasible—following Nippon Steel's pledged investment. |
| "In addition to the possible investment in BF14, the parties also provided information about an additional investment proposal, approved by the Nippon Steel board of directors on August 28, 2024, into the Mon Valley Works facility, an aged integrated facility. Specifically, the planned investment would replace the current hot strip mill (HSM), which was installed in 1938. Per U.S. Steel, the mill's technical limitations due to the outdated HSM may pose a threat to the facility's long-term operations; however, the Mon Valley Works is U.S. Steel's lowest cost integrated mill operation and a key component of its overall business. Mon | **Response to CFIUS:** These statements are inaccurate and—the Parties hope—are merely reflective of the Committee's failure to update a letter that was drafted prior to the Parties' August 28 submission.<br><br>As the Committee is aware, the Nippon Steel board formally approved a commitment to make capital expenditures of at least $1 billion to replace or upgrade the hot strip mill and other facilities at Mon Valley |

| | |
|---|---|
| Valley Works is U.S. Steel's second largest U.S. flat-rolled facility by production capacity and consistently operates with a utilization rate of at least 75 percent, making it one of, if not the, most efficient of U.S. Steel's facilities. U.S. Steel has proposed replacing the HSM to revitalize and upgrade the facility, which would require an investment of at least $1 billion (on top of its $1.4-1.7 billion capital commitment) and likely four years to complete.<br><br>Per the parties, an investment of this scope and magnitude requires significant planning (in addition to high-level approval) so there is currently no timeline for execution or additional agreements in place. Nippon Steel requires approval by its board of directors and considerable technical and feasibility studies before it can seriously consider [the Mon Valley] investment. Additionally, any commitment to substantial capital investments requires extensive engineering analysis. As the possible investment remains contingent on the engineering analysis, Nippon Steel has not begun making any preparations for a technical assessment or discussed the investment with the steel union." (p. 11) | Works, and that will occur if the Transaction proceeds. The Parties are prepared to memorialize this investment commitment in an NSA.<br><br>The following statement also is inaccurate: "Nippon Steel has not begun making any preparations for a technical assessment or discussed the investment with the steel union." Nippon Steel has begun the technical assessment and, prior to CFIUS's August 31 letter, the Parties had proceeded, in good faith, on the basis that the Committee staff has been reviewing the information the Parties have submitted to the Committee staff, and building that into the assessment. For example, in the Round 2 Q&A responses submitted to CFIUS on August 23, the Parties noted that Nippon Steel has "sent teams of technical experts on multiple visits to U. S. Steel's Mon Valley Works facilities," and emphasized that "Nippon Steel is eager to conclude . . . negotiations [with the USW] quickly—and is committed to doing so[.]"<br><br>Nippon Steel has sought to discuss this and other commitments with the USW. To date, the USW has indicated it will not discuss these issues with Nippon Steel until a final arbitration decision (which is expected to come after the current CFIUS statutory review period ends, as the Committee knows). The Parties also note that it is unclear where CFIUS would have the basis to conclude otherwise, absent *ex parte* communications with the USW, since the Parties have repeatedly emphasized Nippon Steel's good faith efforts to engage in discussions with the USW.<br><br>If CFIUS is suggesting that U. S. Steel might not actually shut down Mon Valley Works without replacing or upgrading the hot strip mill (*i.e.*, absent the Transaction), the Committee would be incorrect. Eventually, having to shut down a hot strip mill built in 1938 might not be a choice but a necessity, as spares are getting harder and harder to find, and the mill itself has limitations on product quality that will ultimately lead top customers to buy their steel elsewhere. Without this Transaction, U. S. Steel simply does not have $1 billion to make the necessary investments. |
| Discussion of AD/CVD orders at pp. 11-13 of the Risk Letter | **Response to CFIUS:** Please refer to the Parties' statements above and in their response letter for a rebuttal of CFIUS's analysis regarding U. S. Steel's use of U.S. trade remedies laws, including AD/CVD orders, under Nippon Steel's ownership. As noted, Nippon Steel is prepared to formally commit in an NSA to refrain from interfering with U. S. Steel's use of trade remedies. In addition, Nippon Steel will bring significant investment and technology to U. S. Steel, strengthening U. S. Steel affirmatively while U. S. Steel continues to use defensive trade remedies to protect itself from unfair practices, including those initiated by China. Any suggestion by the Committee otherwise, despite the Parties' repeated submissions on this issue, fails to consider the significant commitments and assurances the Parties have extensively provided.<br><br>With respect to the sentence stating "The four largest U.S. steel producers average 47.5 petitions per firm since 2011 compared to fewer than 18 per foreign firm, with nearly all foreign-owned AD/CVD activity driven by a single outlier company, ArcelorMittal," it is natural that the average number of petitions brought by the four U.S steel producers is higher than that of other producers since they are major players in the U.S. Furthermore, there are cases where the foreign-owned companies do not have integrated mills in the United States, making them ineligible to participate in AD/CVD petitions involving substrates. (There are many AD/CVD cases that involve hot rolled coil and cold rolled coil.)<br><br>Finally, the statement that "[s]ome domestic producers attributed the U.S. International Trade Commission's (USITC) negative decision in a recent AD/CVD case to U.S. Steel's decision not to participate in the Commerce and USITC proceedings," is a baseless and false accusation. U. S. Steel made the decision not to participate in that case before it even began its strategic alternative review process. The "domestic producers" CFIUS references in the quoted language is a group with exactly one member: Cleveland-Cliffs, a |

| | |
|---|---|
| | vocal, public opponent of the Transaction. Please refer to the Parties' submission to CFIUS on April 2, 2024, regarding Cleveland-Cliffs and its CEO, Lourenco Goncalves. |

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

## APPENDIX D

### CFIUS Case No. 24-088
### Nippon Steel Incentives to Maintain U.S. Domestic Production

This paper provides further evidence to address any questions or concerns the Committee may have regarding whether United States Steel Corporation ("U. S. Steel") will maintain its domestic production capacity for the manufacture and supply of products to U. S. customers following the transaction with Nippon Steel Corporation ("Nippon Steel"). As described below, the United States is an attractive market for steel production and sales given its strong and growing manufacturing base, government-supported investment in infrastructure, and a healthy long-term economic growth outlook. These market realities—supported by significant steel import measures—will incentivize the continued production of steel by U. S. Steel in the United States. These conditions explain why the United States will remain an attractive market for domestically produced steel in the long term, and support Nippon Steel's decision to invest more than $14 billion in U. S. Steel, as well as $2.7 billion in capital commitments post closing.

The Outlook for Steel Demand in the U.S. is Strong

Growing investment in manufacturing and infrastructure in the United States has created strong demand for steel domestically. Several factors are driving this, including growth in unconventional oil and gas (which fuels local demand for pipes and other steel products used for exploration and drilling); geopolitical de-risking and major industrial policy legislation such as the CHIPS Act, the Bipartisan Infrastructure Law, and the Inflation Reduction Act ("IRA"), which have increased U.S. manufacturing construction (which also has boosted demand for high-quality steel—see Figure 1); and additional government investment in transportation and infrastructure projects.[1]

**Figure 1: Annual private fixed investment in US manufacturing**
**Monthly investment in USD billions**

Source: Federal Reserve Bank of St. Louis

[1] Unpacking the Boom in US Construction of Manufacturing Facilities. June 27, 2023. US Department of the Treasury. https://home.treasury.gov/news/featured-stories/unpacking-the-boom-in-us-construction-of-manufacturing-facilities.

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

US demand for steel products is projected to grow by an annual average of 2.7% between 2023 and 2025, the highest marginal growth after India and Germany and a stark contrast to stagnating or even declining demand in other major markets like China or South Korea (Table 1). In addition to current steel market strength, the United States also has a stronger medium- to long-term economic growth outlook than other high-income democracies, making it a uniquely attractive investment destination for global steel producers that seek markets with solid growth outlook and low political risk.[2]

**Table 1: Demand for finished steel products, top ten countries, 2023-2025**

| | Million tonnes | | | Year-on-year growth, percent | | |
|---|---|---|---|---|---|---|
| | **2023** | **2024 (f)** | **2025 (f)** | **2023** | **2024 (f)** | **2025 (f)** |
| **China** | 895.7 | 895.7 | 886.7 | -3.3 | 0.0 | -1.0 |
| **India** | 133.4 | 144.3 | 156.0 | 14.8 | 8.2 | 8.2 |
| **United States** | 90.5 | 92.2 | 94.0 | 4.2 | 1.8 | 2.0 |
| **South Korea** | 54.7 | 54.3 | 54.4 | 6.7 | -0.8 | 0.2 |
| **Japan** | 53.3 | 53.3 | 53.9 | -3.0 | -0.1 | 1.1 |
| **Russia** | 44.6 | 46.4 | 46.4 | 7.0 | 4.0 | 0.0 |
| **Türkiye** | 38.1 | 41.5 | 39.4 | 17.2 | 9.0 | -5.0 |
| **Mexico** | 28.5 | 28.8 | 29.3 | 14.0 | 1.2 | 1.6 |
| **Germany** | 28.0 | 28.9 | 31.8 | -13.7 | 3.2 | 10.0 |
| **Brazil** | 23.9 | 24.1 | 24.5 | 1.5 | 1.0 | 1.6 |

Source: World Steel SRO April 2024

Trade Measures and Government Policies Provide Further Incentive to Invest in and Maintain U.S. Domestic Production

Not only does the outlook for the U.S. market benefit domestic steel producers, a combination of additional industrial policy tools—subsidies, tariffs, import quotas, and domestic content provisions—provide further incentives to maintain U.S. domestic production. These measures have been in place in different variants since the 1970s, but the use of such instruments has broadened and accelerated in the past decade (Figure 2).[3]

[2] World Bank report says US economy is powering better global outlook. June 11, 2024. The Washington Post. https://www.washingtonpost.com/business/2024/06/11/world-bank-us-economy.

[3] For a historical view, see: Gary Hufbauer and Eujin Jung. 2021. Scoring 50 Years of US Industrial Policy, 1970-2020. Peterson Institute of International Economics. PIIE Briefing 21-5.

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

**Figure 2: Count of U.S. Trade and Industrial Policy Measures Supporting Domestic Production in Steel**

Source: Global Trade Alert. Steel products include category codes 411 and 412.

For over 50 years, the U.S. government has used anti-dumping and countervailing duty ("AD/CVD") orders to protect domestic producers from dumped and subsidized imports. As of August 2024, the United States had 310 AD/CVD orders in place on steel-related imports, representing almost half of total orders, including 69 orders that directly cover U. S. Steel products.[4] The United States has also levied tariffs on steel products on national security grounds. For example, in 2018, the U.S. government placed a 25% import tariff on steel imports under Section 232 and tariffs on imports of steel and other products from China under Section 301.[5] Some allied market economies have since negotiated tariff exemptions, but they often still face quotas. In February 2022, the Commerce Department removed the Section 232 duties on Japanese steel products in lieu of a tariff rate quota, limiting Japanese steel exports that can enter the United States without 25% duties to 1.25 million metric tons, or a little more than one percent (1%) of the apparent U.S. steel demand in the past five years.

The U. S. government also influences the domestic market through domestic content requirements. These content requirements are attached to U.S. government procurement for projects within the government budget, such as under the IRA and the Infrastructure Investment and Jobs Act of 2021 ("IIJA"). For example, one component of the IIJA was the Build America, Buy America Act, which requires projects receiving federal funding for infrastructure to use only American-manufactured steel.[6]

These policy tools have ensured that the supply of steel in the United States remains dominated by local producers – and exactly why it makes more financial sense for foreign producers to make significant investments locally and boost domestic U.S. production rather than continuing to

[4] ADCVD Proceedings. US International Trade Administration. https://www.trade.gov/data-visualization/adcvd-proceedings.
[5] Special Topic: Section 232 and 301 Trade Actions in 2018. US International Trade Commission. https://www.usitc.gov/research_and_analysis/trade_shifts_2018/special_topic.htm.
[6] Build America Buy America. US Department of Commerce. https://www.commerce.gov/oam/build-america-buy-america.

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

export steel produced overseas to the United States. Over the past two decades, imports accounted for an average of only 28% of apparent consumption, with the remainder being supplied by domestic mills. The share of U.S. production being exported is even lower, averaging 11% over the same period (Figure 3). Not surprisingly, steel imports and exports are dominated by economies that are in close geographic proximity and enjoy preferential market access through trade agreements, namely Canada and Mexico.

The effectiveness of U.S. trade policies is a key motivating factor in Nippon Steel's decision to invest in U. S. Steel, because they contribute to the strength of demand for domestically-produced steel in the U.S. marketplace and thus support domestic producers of steel. Nippon Steel plans to strengthen and grow domestic U.S. production and supply to U.S. customers, consistent with its strategic goal of pursuing expansion in markets that have both robust demand and strong market conditions. As it has done in other countries where it has a presence, Nippon Steel is committed to strengthening the domestic production and competitiveness of the United States, consistent with this strategic objective. There is no question that the market for high-end steel is best served by domestic production capability, and Nippon Steel has built strong customer relationships in markets around the world. The reaction from U. S. Steel's customers to the acquisition of U. S. Steel and the investment commitments for U. S. Steel's facilities that Nippon Steel has announced demonstrates that American manufacturers and consumers stand to realize great benefit, not detriment, as a result of this transaction.

**Figure 3: US steel demand and trade penetration**
**Million metric tons (left axis), percent of total (right axis)**

Source: US Geological Survey

<u>Nippon Steel Will Be Incentivized to Maintain and Invest in U. S. Steel Production in the United States</u>

Against this backdrop, the opportunity to acquire U. S. Steel—and maintain U. S. Steel's domestic production capacity and supply to U.S. customers—is commercially attractive and makes perfect economic sense for Nippon Steel. As set forth in the Parties' presentation to CFIUS on February 21, 2024, Nippon Steel is a highly competitive global steel company with advanced technology

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

looking for opportunities abroad—particularly in the United States—in which to grow as its home market slows. Acquiring U. S. Steel and injecting additional capital, technology, and expertise to accelerate growth in the U.S. market is a textbook example of a multi-national firm from one of the United States' closest allies leveraging the opportunities for foreign direct investment in the United States to contribute to the U.S. economy and strengthen its own economic footing.[7]

Upon completion of the transaction, Nippon Steel will have strong economic incentives to maintain and further expand its investment in U.S. manufacturing. For one, most of U. S. Steel's asset base consists of manufacturing plants and equipment that are relatively immobile and need to be utilized in coming decades. U. S. Steel's financials show historical investments of $24 billion in physical steel production assets with a life span of up to 30 years. As of 2023, these manufacturing assets were still valued at $10.4 billion after depreciation and depletion, representing 51% of the firm's total assets and 77% of its long-term assets (Figure 4). Non-monetary assets without physical substance (intangibles) are valued at $436 million. Most of these are customer relationships, with patents worth only $4 million (or 0.03% of total long-term assets). With almost the entire balance sheet consisting of non-moveable U.S. assets, any concerns that Nippon Steel could shut down local operations and transfer intellectual property and other intangibles out of the United States are totally unfounded.

**Figure 4: Breakdown of U.S. Steel's long-term assets, 2023**
**USD million, percent of total long-term assets***

Source: U. S. Steel SEC filings; *excludes cash, receivables, and other current assets

Not only does Nippon Steel have an incentive for U. S. Steel to continue operating its physical plants for the remaining years, but commercial logic calls for additional investment in local manufacturing including to allow U. S. Steel to leverage Nippon Steel's advanced technology and operational know-how. Indeed, since the transaction was signed, Nippon Steel has sent teams of technical experts to U. S. Steel's facilities to evaluate U. S. Steel's capabilities and the potential for future investment, evaluations and assessments that remain ongoing. As announced on August 28, 2024, Nippon Steel has committed to invest post-closing: (i) to revamp Blast Furnace #14, which would cost approximately $300 million and U. S. Steel estimates would extend its campaign life for up to 20 years; and (ii) at least $1 billion to enhance the competitiveness of the Mon Valley Works, including improving yield, increasing energy efficiency, improving product quality, and enhancing overall operating effectiveness, which would include replacing and/or

[7] Dunning, J.H., and S.M. Lundan. 2008. *Multinational enterprises and the global economy.* 2nd ed. Cheltenham: Edward Elgar.

upgrading the hot strip mill and other facilities at U. S. Steel's Mon Valley Works, which U. S. Steel estimates would require approximately 10 years to achieve a positive return on investment. Further, as described in the Parties' August 23, 2024, submission to CFIUS, Nippon Steel and U. S. Steel have entered into a consulting agreement pursuant to which Nippon Steel will provide an evaluation report outlining the recommended approach for the operation and maintenance of U. S. Steel's blast furnace footprint, focused on Blast Furnace #14 at U. S. Steel's Gary Works.

Market fundamentals also mean that there would be no reason for U. S. Steel, under Nippon Steel's ownership, to alter its trade patterns. Sourcing steel products from Japan for the U.S. market does not make economic sense. The cost of producing steel in the United States is generally lower than in Japan because U.S. producers have access to local ore and energy at lower prices. In addition, sourcing steel products from Japan can involve significant transportation costs. Furthermore, cash conscious steel consumers favor the certainty of shorter domestic lead times than the risk of longer lead times associated with imported steel.

Even if these market fundamentals should change, existing trade restrictions limit the possibility of sourcing steel or steel inputs from abroad. For one, local content requirements make it virtually impossible for Nippon Steel to serve domestic demand in specific sectors through overseas production. Second, the United States has product specific tariff rate quotas in place for Japanese steel exports to the U.S., which limit duty-free imports to a total of 1.25 million metric tons per year. [8] There also remain a number of antidumping duty orders in place that are applicable to steel imports from Japan. Further, imports are subject to geopolitical uncertainties that do not exist for domestically produced goods.

Market realities and trade protection also make it unlikely that U. S. Steel could increase exports of "Made in the U.S." steel to markets outside North America rather than selling domestically. As in the United States, overseas markets for high-quality steel are dominated by local producers and heavily protected from import competition. U.S. steel production costs are lower than in Japan and several other high-income OECD economies such as Germany, but the cost advantages are not big enough to make up for the transportation costs and existing tariffs, not to mention "Buy American" requirements for steel in many government-funded projects.

Conclusion

The structure and economics of the U.S. steel market mean that Nippon Steel will be highly incentivized to maintain U. S. Steel's domestic production for consumption in the United States, and indeed, given Nippon Steel's advanced R&D investment, technology advantages, and operational knowhow, it will be incentivized to contribute to the growth of U. S. Steel's domestic production capabilities. The market forces providing these incentives are enduring.[9] In sum, Nippon Steel's rationale for the transaction and its post-transaction plans—i.e., to strengthen and grow U. S. Steel's domestic production capacity in order to supply U.S. customers—are entirely consistent with, and in fact are driven by, the economics of the U.S. steel market. Objectively,

[8] Announcement of Actions on Japanese Imports of Steels Under Section 232. February 7, 2022. US Department of Commerce. https://www.commerce.gov/sites/default/files/2022-02/US-Statement-on-Japan-232.pdf.

[9] For a discussion of the global resurgence of illiberal trade and investment policies, see: Fragmentation: The Economic Risks from a Fractured World Economy. 2023. IMF Centre for Economic Policy Research. https://cepr.org/system/files/publication-files/190366-geoeconomic_fragmentation_the_economic_risks_from_a_fractured_world_economy.pdf.

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

therefore, Nippon Steel has every reason to continue supplying the U.S. steel market from its U.S. operations.

7

AR_009159

App.371

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

Page **1** of **60**

**APPENDIX E**
**Third-Party Statements Regarding the Transaction**

## Contents

Bruce Thompson .......... 9
  6 August 2024 .......... 9
Mike Pompeo .......... 9
  4 August 2024 .......... 9
Bob Carey .......... 9
  2 August 2024 .......... 9
Peter Roff .......... 10
  26 July 2024 .......... 10
Rand Paul .......... 11
  24 July 2024 .......... 11
Lee Steinhauer .......... 11
  24 July 2024 .......... 11
Charlie Kolean .......... 12
  24 July 2024 .......... 12
Alex Little .......... 12
  11 July 2024 .......... 12
Tom Hebert .......... 12
  19 July 2024 .......... 12
William Chou and Paul Sracic .......... 13
  3 July 2024 .......... 13
Derek Hunter .......... 13
  13 June 2024 .......... 13
Jennifer Safavian .......... 13
  13 June 2024 .......... 14
  Real Clear Defense .......... 14
    8 June 2024 .......... 14
Gerard Scimenca .......... 14
  31 May 2024 .......... 14
Evan Rosenberg and Jennifer Beahm .......... 15

AR_009160

App.372

**Business Confidential Pursuant to 50 U.S.C. § 4565**
**Protected from Disclosure Under 5 U.S.C. § 552**

Page **2** of **60**

31 May 2024 .......... 15
Pittsburgh Post Gazette Editorial Board .......... 15
26 May 2024 .......... 15
Mario Lopez .......... 16
25 May 2024 .......... 16
Peter Roff .......... 16
21 May 2024 .......... 16
Doug Branch .......... 17
15 May 2024 .......... 17
Brian Garst .......... 17
14 May 2024 .......... 17
Allysia Finley .......... 17
12 May 2024 .......... 18
Leif Larson .......... 18
8 May 2024 .......... 18
Greg Young .......... 18
7 May 2024 .......... 18
Dean Karayanis .......... 19
20 April 2024 .......... 19
Brad Glosserman .......... 19
27 April 2024 .......... 19
Paul Sracic .......... 19
29 April 2024 .......... 20
Ethan Brown .......... 20
26 April 2024 .......... 20
Steven Bucci .......... 20
25 April 2024 .......... 21
Richard Tucker .......... 21
*Former professor - George Washington University* .......... 21
Peter Mihalick .......... 21
24 April 2024 .......... 21
Josie Gallagher .......... 22

AR_009161

**App.373**

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

Page **3** of **60**

22 April 2024 .... 22
Joel Griffith .... 22
19 April 2024 .... 22
T.J. Rooney .... 22
15 April 2024 .... 22
Thomas P. Feddo .... 23
15 April 2024 .... 23
Clark Packard .... 23
12 April 2024 .... 23
Phil Kerpen .... 24
11 April 2024 .... 24
Michael R. Strain .... 24
10 April 2024 .... 24
George Landrith .... 24
8 April 2024 .... 24
Becky Corbin .... 25
3 April 2024 .... 25
Jared Whitley .... 25
2 April 2024 .... 25
Jeffrey Mazzella .... 26
25 March 2024 .... 26
The Washington Post Editorial Board .... 26
22 March 2024 .... 26
Veronique de Rugy .... 26
21 March 2024 .... 27
Pittsburgh Post-Gazette Editorial Board .... 27
21 March 2024 .... 27
Greg Ip .... 28
21 March 2024 .... 28
Roger Lowenstein .... 28
21 March 2024 .... 28
Heino Klinck .... 29

AR_009162

App.374

20 March 2024 .... 29
Nikkei Asia .... 29
20 March 2024 .... 29
Bill Saporito .... 29
20 March 2024 .... 29
The Blade Editorial Board .... 30
19 March 2024 .... 30
The Financial Times Editorial Board .... 30
19 March 2024 .... 30
William Alan Reinsch .... 30
18 March 2024 .... 30
Michael Strain .... 31
18 March 2024 .... 31
Andrew Langer .... 31
18 March 2024 .... 31
Matthew Yglesias .... 32
17 March 2024 .... 32
Derek Hunter .... 32
17 March 2024 .... 32
The Wall Street Journal Editorial Board .... 33
17 March 2024 .... 33
Scott Lincicome and Alfredo Carrillo Obregon .... 33
15 March 2024 .... 33
Danielle Zanzalari .... 34
15 March 2024 .... 34
James M. Lindsay .... 34
15 March 2024 .... 34
Shihoko Goto .... 34
15 March 2024 .... 34
David Zirin .... 35
15 March 2024 .... 35
The Wall Street Journal Editorial Board .... 35

14 March 2024 .......... 35
Peter Roff .......... 35
14 March 2024 .......... 35
David Faber .......... 36
14 March 2024 .......... 36
Mike Gallagher .......... 36
14 March 2024 .......... 36
Kenneth Weinstein .......... 36
14 March 2024 .......... 36
John Murphy .......... 37
14 March 2024 .......... 37
Nancy McLernon .......... 37
14 March 2024 .......... 37
Al Root .......... 38
14 March 2024 .......... 38
Matthew Goodman .......... 38
14 March 2024 .......... 38
Benjamin Dierker .......... 38
14 March 2024 .......... 38
Dan Price .......... 39
13 March 2024 .......... 39
Coalition of free-market, conservative, and individual liberty organizations .......... 39
13 March 2024 .......... 39
William Greenwalt .......... 39
5 March 2024 .......... 39
Hal Singer .......... 39
25 February 2024 .......... 40
Ivan Sascha Sheehan .......... 40
23 February 2024 .......... 40
Anne O. Krueger .......... 40
16 February 2024 .......... 40
Derek Hunter .......... 41

15 February 2024 ........ 41
Brian Darling ........ 41
15 February 2024 ........ 41
John G. Murphy ........ 41
14 February 2024 ........ 41
Tom Herbert ........ 42
14 February 2024 ........ 42
Robert A. Manning ........ 42
13 February 2024 ........ 42
Brad Glosserman ........ 43
9 February 2024 ........ 43
Mark Holman ........ 43
8 February 2024 ........ 43
Nao Matsukata ........ 43
7 February 2024 ........ 43
Scott Gureck ........ 44
6 February 2024 ........ 44
Rikako Watai ........ 44
6 February 2024 ........ 44
Tim Berra ........ 44
3 February 2024 ........ 44
Wayne Winegarden ........ 44
29 January 2024 ........ 45
Nancy McLernon ........ 45
24 January 2024 ........ 45
Clark Packard ........ 45
23 January 2024 ........ 45
Larry Summers ........ 46
19 January 2024 ........ 46
Eric Boehm ........ 46
19 January 2024 ........ 46
Steve Forbes ........ 46

9 January 2024 ..... 46

The Bloomberg Editorial Board ..... 47

5 January 2024 ..... 47

Carlos Roa ..... 48

4 January 2024 ..... 48

Jeffrey Kupfer ..... 48

2 January 2024 ..... 49

Wilbur Ross ..... 49

1 January 2024 ..... 49

Marc L. Busch ..... 50

30 December 2024 ..... 50

Matthew J. Slaughter ..... 50

28 December 2023 ..... 50

Ike Brannon ..... 51

27 December 2023 ..... 51

The Japan Times Editorial Board ..... 52

22 December 2023 ..... 52

The Washington Post Editorial Board ..... 52

22 December 2023 ..... 52

William Chou ..... 53

22 December 2023 ..... 53

Mises Institute ..... 53

21 December 2023 ..... 53

Leo Lewis ..... 54

20 December 2024 ..... 54

Chris Hamilton ..... 54

21 December 2023 ..... 54

The Blade Editorial Board ..... 55

21 December 2023 ..... 55

Pat Toomey ..... 55

21 December 2023 ..... 55

Rahm Emanual ..... 56

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552
Page **8** of **60**

20 December 2023 ........ 56
Phillip Bell and Sarah Bauerle Danzman ........ 56
20 December 2023 ........ 56
Pittsburgh Post-Gazette Editorial Board ........ 56
20 December 2023 ........ 56
20 December 2023 ........ 57
Camera Bartolotta ........ 57
19 December 2023 ........ 57
The Wall Street Journal Editorial Board ........ 57
19 December 2023 ........ 57
Spencer Igo ........ 58
19 December 2023 ........ 58
Eric Holcomb ........ 58
19 December 2023 ........ 58
Ryan Costello ........ 58
19 December 2023 ........ 59

AR_009167

**App.379**

**Bruce Thompson**
***Former U.S. Senate aide, assistant secretary of Treasury for legislative affairs, and the director of government relations for Merrill Lynch for 22 years***
**Real Clear Markets**
Nippon Steel - U.S. Steel Merger Would Be Big Win For U.S.
**6 August 2024**

- "A new study by Stephen Moore and Philip Kerpen of the Committee to Unleash Prosperity has found that the Nippon Steel-U.S. Steel combination would be an enormous win for American workers and the U.S. manufacturing industry. According to the study, the acquisition would be "enormously beneficial to American workers" and would "save America's steel industry.""

- "One major benefit of the deal would be the technological advancements Nippon Steel would bring to U.S. Steel and the entire U.S. steel industry. Nippon Steel's massive investments in new technology would increase domestic production of high quality steel, benefiting U.S. Steel and other manufacturing sectors and leading to better products for U.S. consumers."

- "The deal would also make the U.S. steel industry more competitive with Chinese steel. China currently dominates the global steel industry, which is the real threat to our national security. This Nippon investment in America would help U.S. Steel modernize, grow, and expand production and be better able to compete against China."

**Mike Pompeo**
***Former secretary of state, 2018-21. He is a Nippon Steel strategic adviser***
**The Wall Street Journal**
Nippon Steel Deal Is Good for America
**4 August 2024**

- "It is essential that we invest in American manufacturing to bolster our domestic industrial base and reinvigorate our economy after years of high inflation and economic stagnation. Nippon Steel's pending acquisition of U.S. Steel is a major step toward this effort, putting domestic steelworkers, their families and American manufacturing first."

- "This deal puts American workers and their families first, all while empowering domestic manufacturing. Our leaders shouldn't squander a unique opportunity to strengthen the U.S. steel industry for years to come."

**Bob Carey**
***Former national security advisor to two U.S. Senators, Senior Policy Advisor to the Secretary of Energy, and Senior Executive in the Department of Defense.***
**The American Spectator**
Steel Deal With Japanese Company is in America's Best Interest
**2 August 2024**

- "In other areas of national security, like American shipyards, the Biden administration sees no national security threat to Asian allies acquiring U.S. industries. Hanwha, a South Korean company, recently agreed to purchase the Aker Philadelphia Shipyard, already owned by a Norwegian company. Hanwha specifically sought out this opportunity after being encouraged by Navy Secretary Carlos Del Toro who said 'Hanwha's acquisition of Philly Shipyard is a game-changing milestone in our new Maritime Statecraft.'"

- "More importantly for U.S. national security, the U.S. Steel–Nippon Steel deal is a unique opportunity to form a strategic counterbalance to China's dominance of the steel industry. Currently, six of the world's 10 largest steel producers are Chinese — including the world's largest, state-owned China Baowu Group. Nippon Steel is the fourth largest steel company in the world, but its acquisition of U.S. Steel would catapult it to the second largest. The creation of a close, free-world competitor to the China Baowu Group would be a positive development for competing with China in a critical industry with reach into many sectors of the economy."

**Matthew Halbower**
***Founder, CEO, CIO, and Portfolio Manager of Pentwater Capital Management.***
**CNBC,** Squawk on the Street
**1 August 2024**

- "If the transaction doesn't close, US Steel does not spend the 1.4 billion that Nippon has committed to spend upgrading facilities in Pennsylvania and in Gary Indiana. Instead, those facilities don't get that needed CapEx, and employment in those facilities that would result from all that additional CapEx spend doesn't happen. That's bad for Pennsylvania, that's bad for the Union, that's bad for the USA."

- "There's no state of the world where there is a national security concern that a Japanese company, one of our best allies in the entire world, is a national security threat in purchasing U.S. Steel... If you listen to Janet Yellen who has commented on this deal several times, she has said specifically "The President has talked about this transaction and has never said that this is a national security issue, and that she will do her job to make sure that CFIUS will do their job" and that job will come to the conclusion the purchasing of US Steel is not a national security threat."

**Peter Roff**
***Columnist & Commentator; a former senior political writer for United Press International and former U.S. News & World Report contributing editor***
**The Daily Times**
Peter Roff: US Steel deal is good for America
**26 July 2024**

- "Along with free and fair trade, cross-border global investment adds wealth and value to companies. That's good for workers and shareholders..."

- "It [the transaction] would boost America's industrial manufacturing base by creating a combined company able to go head-to-head with China's steel making oligopoly. People should cheer the idea."

- "A new report from the non-partisan Committee to Unleash Prosperity echoes the arguments for letting the deal between Nippon Steel and U.S. Steel be consummated. Economist Stephen Moore, a committee co-founder and Trump advisor, called the proposed acquisition 'a massive vote of confidence in the American economy.'"

**Rand Paul**
***U. S. Senator – Kentucky***
**The Lexington Herald Leader**
Sen. Rand Paul: Blocking sale of U.S. Steel hurts us and one of our closest allies | Opinion
**24 July 2024**

- "Foreign direct investment -- especially by a private company from Japan, one of our most important allies -- should be welcome. It is key to promoting American competitiveness and economic growth."

- "For decades, Japanese investment in Kentucky facilities has created thousands of jobs, boosting our economy and uplifting communities. There are almost 200 Japanese-owned facilities in Kentucky, generating nearly 46,000 jobs... Depriving other states of this kind of investment and the opportunity to create jobs is irresponsible and a grave mistake."

- "Japan has been a close ally of the U.S. for decades. In fact, in 2023 the House Select Committee on the Chinese Communist Party argued that exempting Japanese companies from reviews by the Committee on Foreign Investment in the United States was an important step in fortifying our national security."

**Lee Steinhauer**
***Strategic policy and political consultant***
**Newsmax**
Mergers Could Make Steel Great Again
**24 July 2024**

- "Going forward, America must use its substantial leverage to drive hard bargains that ensure foreign investment, especially in critical industries, and advance U.S. national interests and, importantly, the prosperity of American workers, who for too long were sacrificed upon the free trade altar. Nippon's merger with U.S. Steel can potentially serve as a model in this regard."

- "Simply put, Nippon wants in on the action of rebuilding America and is pledging to invest at least $1.4 billion in U.S. Steel facilities over the next three years and infuse them with advanced technology. Nippon's CEO has also "committed to no layoffs, no plant closures, no shift of jobs or production outside the United States."

- "The Nippon-U.S. Steel merger would create the world's second-largest steelmaker and one able to effectively compete and win globally against these Chinese steel behemoths."

**Charlie Kolean**
***Chief Political Strategist - RED PAC***
**Newsmax**
US Steel and Nippon Steel: A Strategic Alliance Against China
**24 July 2024**

- "While Chinese companies freely set up automotive manufacturing plants across the United States, resistance to Japanese investment in our steel industry is not only economically foolish but also jeopardizes our national security. We must embrace global investment from our allies and support the U.S. Steel and Nippon Steel deal to safeguard our economic future and national interests."

- "The merger between U.S. Steel and Nippon Steel represents an opportunity to inject much-needed capital, technology, and expertise into the American steel industry. Nippon Steel, a global leader in steel production, brings advanced technologies and innovative practices that can significantly enhance U.S. Steel's operational efficiency and product quality."

- "By integrating Nippon Steel's advanced technologies and management practices, U.S. Steel can modernize its operations, reduce costs, and improve product quality. This will not only preserve existing jobs but also create new opportunities in a revitalized industry.

- · "This collaboration will position American steel as a formidable competitor on the global stage, securing jobs and stimulating economic growth domestically."

**Alex Little**
***M.S. graduate of Georgia Tech who specializes in Russian and Central Asian affairs. He is also a writer with Young Voices***
**The Diplomat**
Nippon Steel's Acquisition of U.S. Steel Would Serve U.S. Interests
**11 July 2024**

- ""In the past, there have been concerns that both the United States and Europe could become dependent on China for stainless steel, given China's dominant share of global production. Therefore, strengthened friend-shoring with Japan, a country with a history of efficiency in the steel industry, can help its partners hedge their bets against China."

- "Propping up U.S. Steel through artificial protectionist means is bound to fail. Instead, Americans should appreciate how the Japanese acquisition stands to benefit the U.S. in the long term.""

**Tom Hebert**
***Director of Competition and Regultory Policy - Americans for Tax Reform***
**The Washington Examiner**
The bad economics behind Biden's Nippon Steel opposition
**19 July 2024**

- "Nippon is not buying U.S. Steel to strip it for parts — the company already operates eight steel mills in the United States. Rather, the company plans to reinvigorate U.S. Steel with new technology that will ramp up domestic steel manufacturing."

- "By opposing the Nippon deal, Biden and his Big Labor paymasters can campaign on protecting union jobs from the whims of a greedy multinational corporation. They are lying through their teeth: Nippon has repeatedly promised to honor all of U.S. Steel's existing commitments to their workers, including collective bargaining agreements negotiated with USW. In a further sign of commitment to U.S. Steel's workers, Nippon will move its American headquarters to Pittsburgh."

**William Chou and Paul Sracic**
***Japan Chair Fellow; Professor - Hudson Institute***
**Pittsburgh Post-Gazette**
Nippon Steel is the best deal for union steelworkers
**3 July 2024**

- "The USW wants U.S. Steel to go to Cleveland-Cliffs, surrendering its rights to approve any U.S. Steel sale to the Ohio company. Its rejection of Nippon Steel in favor of a single alternative will endanger their objectives in the long run. Engaging with Nippon Steel at the negotiation table is the best way to ensure a long-term legacy of union steelmaking in Pittsburgh."

- "The union's bigger concern, however, should be about the future. Union workers' blast furnace steel plants need new technological investment. Cleveland-Cliffs cannot make those investments, as it lacks Nippon Steel's capital resources, and prefers to spend $600 million on stock buybacks in the first quarter of 2024 and has announced a further $1.5 billion in stock buybacks. These buybacks will force it to take on more debt, rather than making any investments. In contrast, a Nippon Steel merger would permit technology transfers that will make U.S. Steel's blast furnace plants more competitive and viable in the long-term. In addition to the $1.4 billion capital investment already mentioned, Nippon Steel has pledged $500 million a year in R&D to U.S. Steel, a sharp uptick from the $40 million that U.S. Steel previously spent."

**Derek Hunter**
***Washington, DC based writer, radio host and political strategist. He has previously worked for several prominent conservative non-profits as an analyst in health, education, technology and judicial policies, as well as a press secretary in the US Senate***
**Townhall**
Nothing Threatens Jobs Like Politicians in an Election Year
**13 June 2024**

- "What's the alternative, really? Bankruptcy is a real one. Or another company, a US company, offers significantly less money for the company and lays off some, most or all the steelworkers and strips the company bare by selling it for parts. What could go wrong?"

**Jennifer Safavian**
***President and CEO - Autos Drive America***

**Autos Drive America**
Letter to Lael Brainard
**13 June 2024**

- "Such investment by our closest allies and partners is a driver of economic growth and job creation in the United States and has a positive impact on the communities where those investments are made."

- "Nippon Steel has been operating in the U.S. for nearly 40 years with eight production bases in seven different states. Our understanding is that this investment will modernize and expand U.S. Steel's facilities and, if the sale to Nippon Steel were to be approved, will enhance productivity, drive innovation, and support the overall competitiveness of the U.S. steel industry on the global stage."

- "Japan has been a steadfast ally of the United States for decades. Our strong diplomatic, economic, and security relationships have continually contributed to the stability and prosperity of both nations. Fostering FDI from a trusted ally like Japan grows our economic partnership, helps to diversify supply chains, and creates new opportunities for economic growth. It also has the potential to bring with it cutting-edge technology and products that are not currently produced in the United States."

**Heino Klinck**
***Former Deputy Assistant Secretary of Defense for East Asia, 2019–21, with responsibility for bilateral defense relations with Japan***
**Real Clear Defense**
No Better Friend Than Japan Despite Political Distractions
**8 June 2024**

- "It is important for Washington to strike the proper balance of international relations and domestic politicking. While much has been accomplished with Japan, we cannot take the relationship for granted at a time when we need more help than ever to counter China. Distractions like the President's rhetorical gaffes or politicizing commercial deals only serve our adversaries' objectives."

- "As Secretary Austin just said at the Shangri-La conclave, America's "greatest global strategic advantage" is our alliances. We should not put that at risk for domestic political gain."

**Gerard Scimenca**
***Co-founder and Chairman - Consumer Action for a Strong Economy***
**TribLive**
Gerard Scimeca: Administration's approach to U.S. Steel undermines law, national security, innovation
**31 May 2024**

- "It's a sad situation when the EU's famously difficult regulators swiftly recognize the enormous benefits of the proposed steel merger while the U.S. bottles up billions of dollars in critical investment to boost innovation in domestic steel production in a regulatory neverland."
- "An acquisition by a Japanese company would typically be an easy approval for CFIUS considering our countries' close economic and military ties. But President Biden has politicized the process by issuing White House statements declaring that U.S. Steel should remain American owned, even if it comes at the expense of enhanced job security for American workers and an influx of investment and know-how for American steelmaking."
- "...it's disturbing precedent for a sitting president to violate the spirit of the law by intervening in a deal between two companies seeking to unite and compete against Chinese domination of the global steel market. The prioritization of union-boss politics over the nation's security is both short-sighted and politically cynical."
- "The Biden administration should stop slighting our most important ally in our competition with China. A good place to start would be to allow CFIUS to do its job as congressionally authorized and let the EU reclaim the lead in regulatory self-defeat."

**Evan Rosenberg and Jennifer Beahm**
***Publisher & Editor in Chief, respectively, Pittsburgh Business Times***
**Pittsburgh Business Times**
Editorial: Nippon's acquisition of U.S. Steel is best choice for all
**31 May 2024**

- "Nippon Steel's deep pockets and commitment to more environmentally friendly manufacturing makes it a very logical suitor. The fact that the company is committed to expanding in Pittsburgh is just icing on the cake."
- "Cries of national security concerns are laughable. Japan is our strongest ally and trading partner in Asia..."
- "This overreaction politically from both sides of the aisle has been nothing short of embarrassing, and the response from the United Steelworkers union has been disappointing. Both appear shortsighted, and it all reeks of xenophobia."

**Pittsburgh Post Gazette Editorial Board**
Editorial: Legacy of steel: Nippon's visit to Pittsburgh reassures about acquisition
**26 May 2024**

- "Opposition to the deal has proven time and again to be political, parochial and short-sighted, more about grandstanding than weighing what's best for Western Pennsylvania and the country as a whole."

- "The company is motivated and incentivized to enhance supply chain security and production capacity within the United States, because this is precisely the customer market it desires to access. And as a Japanese company it similarly views China as a rival, not a partner."

- "Only Nippon has the will and the resources to extend Pittsburgh's steel legacy, and the jobs that go with it, into the future."

- "The United Steelworkers has served its image but not its members by attempting to obstruct the deal. The union's preferred suitor, Cleveland-Cliffs, would pay far less and result in several redundancies and anti-trust vulnerabilities. USW bosses might be more comfortable with Cleveland-Cliffs, but that match would result in thousands of lost jobs, especially in Pittsburgh."

**Mario Lopez**
***President - Hispanic Leadership Fund***
**Townhall**
Opposition to U.S. Steel Deal is Misguided and Counterproductive
**25 May 2024**

- "Nippon Steel's offer handily beat other competitors, offering $5 billion above U.S. Steel's market capitalization—an all-cash bid with more than 100 percent premium paid. A major upside is accessing a market that has, ironically, been stifled by decades of protectionist policy. Even American manufacturers that use steel—that is, current and potential customers for U.S. Steel—welcomed the news."

- "Weakening America's ability to attract foreign investment is counterproductive, especially when the domestic benefits are a major source of strength and an advantage over countries like China."

- "The goal is to grow the company into a strong steelmaker what will reinforce domestic production of American-made steel products. So, yes, the jobs will stay in the United States. Even U.S. Steel's historic name will go unchanged."

- "Japanese corporations and individuals have invested more than any other nation in the U.S. economy—to Americans' benefit. The Bureau of Economic Analysis reported that Japan accounted for $712 billion in investment in the U.S. economy in 2022. This number has been consistent over the years."

**Peter Roff**
***Columnist & Commentator; a former senior political writer for United Press International and former U.S. News & World Report contributing editor***
**Red Bluff Daily News**
Why is President Biden trying to kill the steel deal?
**21 May 2024**

- "A proposed alliance with Nippon Steel promises job preservation and considerable growth, a prospect that should be of great interest to policymakers."

- "The deal would preserve every existing job and honor the union contracts now in force."
- "A consummated deal would deepen relations between our two countries, strengthening the counterweight to China. There's no legitimate basis for blocking the deal on the grounds that it endangers U.S. national security."

**Doug Branch**
***Principal, Phronesis Insights, LLC; previously served 25 years in Congress, including as a senior adviser and deputy staff director of the Joint Economic Committee, and senior adviser at the Senate Committee on Homeland Security and Governmental Affairs***
**Phronesis Insights, LLC**
**Washington Examiner**
US should be encouraging more foreign investment, not stifling it
**15 May 2024**

- "This investment would expand on the $721 billion Japanese companies have injected into the U.S. economy since 2021 and the nearly 1 million Americans they have employed."
- "...America would win from this deal in many ways: the American workforce would suffer no harm (and would ultimately benefit); American infrastructure would be revitalized and better utilized; the American economy would grow both now and in the long term with the cash flow from this investment..."

**Brian Garst**
***Vice President - Center for Freedom and Prosperity***
**DC Journal**
Blocking Nippon Steel deal will hurt US economy
**14 May 2024**

- "It raises no true national security concerns and instead likely will lead to an expansion of domestic steel production."
- "Trade between the U.S. and Japan benefits both nations. Corporations and individuals in Japan have become a major source of foreign direct investment (FDI) in American business, boosting domestic GDP."
- "Such investments benefit American workers and the economy when 'international companies in the United States build new factories, fund U.S.-based research and development (R&D), and grow their well-established U.S. operations.' According to the GBA, these international firms employ almost 8 million Americans in good jobs."

**Allysia Finley**
***Member of WSJ Editorial Board***
**The Wall Street Journal**

The George Costanza Presidency: With each expedient act, from climate policy to the Mideast, Joe Biden digs a deeper hole for himself.
**12 May 2024**

- "While the United Steelworkers union cheered, the president's intervention will discourage foreign investment that creates good-paying U.S. jobs. It's also another snub to Japan, whose help the U.S. needs to contain a bellicose China."

**Leif Larson**
***Political Media Consultant and Strategist***
**American Thinker**
No downside to Nippon Steel/U.S. Steel deal
**8 May 2024**

- "The merger between U.S. Steel and Nippon Steel is a necessary and promising move for the American steel industry. The board of U.S. Steel has stated that this merger is crucial for preserving the rich history of the steel brand and ensuring its future success. By integrating Nippon Steel's advanced technologies into U.S. Steel's facilities, the company will be able to manufacture high-grade steel products, such as electrical steel and automotive flat steel, for customers in the United States and North America."

- "Japan is a close U.S. defense treaty ally, and its investment in the American steel industry will secure critical supply chains for U.S. steel customers and suppliers. This will enhance the resilience of these supply chains and support vital American industries, including automotive manufacturers. The equitable partnership with a Japanese company strengthens the bond between the two nations, ensuring a reliable supply of steel for defense and infrastructure needs."

- "This merger between U.S. Steel and Nippon Steel is a crucial step toward revitalizing the American steel industry. By introducing advanced technologies, supporting national security, and strengthening supply chains, this merger has the potential to make U.S. Steel a leader in the industry. It also ensures the production of high-quality American-made steel, contributing to the country's economic growth and stability."

- "The merger presents a unique opportunity to preserve the history and legacy of the American steel brand while embracing a cleaner and more sustainable future."

**Greg Young**
***Host, "Chosen Generation Radio Show," served as a Russian Linguist during the Cold War in the United States Air Force***
**BizPac Review**
US must strengthen alliances with Japan to protect against China
**7 May 2024**

- "China will be the threat of the 21st century. America needs strong partnerships to resist that threat. We should welcome the support of the Japanese and Nippon's investment in our domestic steel industry."

**Dean Karayanis**
***Content producer for "The Clay Travis & Buck Sexton Show," a former Rush Limbaugh staffer, and the host of "History Author Show" on iHeartRadio***
**Washington Times**
Report stokes xenophobia to oppose Japanese purchase of U.S. Steel
**20 April 2024**

- "Japan is an island nation with sparse natural resources. To succeed, its industries must invest in foreign markets. Far from starving China of iron ore, canceling the U.S. Steel purchase may only encourage Nippon Steel to invest more in Baowu Group"

- "Nippon's track record of modernizing and operating several other American steel facilities promises that this key industry will be stronger, not weaker, if a future conflict manifests. They promise to "bring additional resources and expertise to support investment in American steel while also accelerating innovation, decarbonization, and digitization at U.S. Steel."

**Brad Glosserman**
*Deputy director of and visiting professor at the Center for Rule-Making Strategies at Tama University as well as senior adviser (nonresident) at Pacific Forum. He is the author of Peak Japan: The End of Great Ambitions*

**Pacific Forum**
Politics over strategy? Another own goal by the US
**27 April 2024**

- "Rejection of the deal – even equivocation – is a mistake. Nippon Steel's purchase would contribute to US Steel's modernization and allow its continued operation. It would help US Steel become more competitive, putting a crucial industry on a more sustainable footing."

- "It would set an example for other countries as they struggle to balance the protection of domestic industries from predation and encouraging foreign investment. "

- "Rather, Biden should make a straightforward case to US voters – and US partners – that he understands the national interest and that this sale best protects it and offers the best chance to preserve steel jobs."

**Paul Sracic**
***Professor of politics and international relations at Youngstown State University and an adjunct fellow at the Hudson Institute***
**The Wall Street Journal**
Protectionism Won't Save U.S. Steel's Jobs

**29 April 2024**

- "Over the next decade, 70% of traditional blast furnaces will reach the end of their useful lives. This, alongside the global shift to cleaner steel production, means that only mills with access to sufficient investment capital will survive. Nippon Steel, as the fourth-largest steelmaker in the world, has the resources to expand U.S. Steel. It is offering a premium price to gain better access to the U.S. market. It would make little economic sense for the company to fail to provide the type of investment necessary for success."

- "Even if the U.S. adopts tariffs and other countermeasures to raise the price of foreign steel, the older plants that formed the core of the old U.S. Steel will face increased competition from greener domestic rivals. A lack of investment and innovation destroyed steel jobs in the 1970s and '80s. Politicians and others who oppose Nippon Steel's purchase of U.S. Steel risk taking us down this road once again. Ironically, they are doing so in the name of the very working-class voters who will feel the brunt of the economic pain should these mills close."

**Ethan Brown**
***Writer and Commentator for Young Voices, Creator and Host of "The Sweaty Penguin," an award-winning comedy climate program***
**RealClearEnergy**
A U.S. Steel/Nippon Deal Would Make Pittsburgh a Sustainable Steel Leader
**26 April 2024**

- "A U.S. Steel (USS) and Nippon Steel (NSC) merger isn't just an economic boost and counter to Chinese steel dominance. It's also a climate solution."

- "By merging with NSC, USS can adopt NSC's cleaner technologies, enjoy deeper pockets for innovation, and revitalize Pittsburgh's steel industry — this time, as the sustainable steel capital of the world."

- "A USS/NSC merger wouldn't just accelerate steel's decarbonization; it would ripple across all of clean energy."

- "If USS/NSC can produce electric steel sustainably, they would receive immediate interest from American electric vehicle makers with their own environmental goals. That market competition with Cleveland-Cliffs would reduce steel prices, and consequently, EV prices — allowing more Americans to purchase EVs and turbocharging clean transportation."

- "This merger will improve the climate, create jobs, and allow Pittsburgh to do what it does best: make steel, innovate new technologies, and beat Cleveland."

**Steven Bucci**
***Visiting Fellow, Phillip N. Truluck Center for Leadership Development at The Heritage Foundation***
**The Daily Signal**
Biden Again Puts Politics Ahead of National Security and Good Sense

**25 April 2024**

- "Biden's statement set off warning signals to those interested in preserving the sanctity of CFIUS's vital and impartial role in defending America's national security. The statement was also an avoidable blunder that undermines U.S.-Japan relations."
- "Japan is our most important ally in confronting our most challenging threat, the Chinese Communist Party. It's a sad state of our politics that the president would prioritize union demands over this essential foreign relationship, especially considering the deal would strengthen competition against Chinese steelmaking dominance."
- "This is a hugely important issue with real national security impact. To cavalierly push it aside to gain a few votes is both dangerous and simply wrong."

**Richard Tucker**
***Former professor - George Washington University***
**Real Clear Markets**
Let Markets, Not Political Posturing, Decide the Fate of U.S. Steel
**25 April 2024**

- "This is a case where a private company is trying to acquire another private company. Presidential approval shouldn't be necessary."
- "However, there is no reason, in a free-market economy like ours, for government leaders to block this deal."
- "Both President Biden and former and would be President Trump want to come down on the side of American workers. That means they should stand down and allow Nippon to close this deal at a fair price, one that's set by the market. Choice is important. Voters and companies alike should be able to make their own economic decisions."

**Peter Mihalick**
***Former legislative director and counsel to former Reps. Barbara Comstock, Virginia Republican, and Rodney Blum, Iowa Republican***
Foreign investment in Pennsylvania company is good
**24 April 2024**

- "The potential Nippon Steel investment in U.S. Steel is a culmination of the bipartisan desire for strategic reshoring of critical industries such as steel."
- "By introducing Nippon Steel's cutting-edge technologies to existing steel producing infrastructure, the new U.S. Steel will be better positioned to manufacture American-made high-grade steel products like electrical steel and automotive flat steel for customers in the United States and North America."

**Business Confidential Pursuant to 50 U.S.C. § 4565**
**Protected from Disclosure Under 5 U.S.C. § 552**

- "This transaction will forge U.S. Steel into a stronger, more stable, and cleaner company able to manufacture a broader array of American-made steel products in the United States."

- "With an already existing footprint and no interference from either the government of Japan, or any other foreign country, investments by Nippon Steel in U.S. steelmaking makes financial sense for both companies, the future of U.S. workers, and U.S. national security."

**Josie Gallagher**
***Director Government Affairs - Family Business Coalition***
**Delaware Valley Journal**
Main Street Depends on Steel Jobs
**22 April 2024**

- "With a commitment to preserving US Steel's identity and honoring agreements with workers, Nippon is making a serious effort to assuage job loss concerns by committing to keeping jobs in Pennsylvania and prioritizing the well-being of local communities."

- "It is not only the steel industry workers who benefit from keeping jobs in the state, family businesses of all shapes and sizes depend on steel workers as a customer base and benefit tremendously from the steel industry's economic footprint."

**Joel Griffith**
***Research Fellow, Thomas A. Roe Institute for Economic Policy Studies at The Heritage Foundation***
**American Institute for Economic Research**
Nippon Acquisition of US Steel
**19 April 2024**

- "Blocking this acquisition will result in losses to shareholders, workers, and our economy."

- "Their goal of this acquisition is to ramp up steel production here in the United States. In fact, Nippon plans on spending $1.4 billion in capital investments at US Steel plants — roughly $140,000 of investment per each of the current US Steel's workforce."

- "Simply put: Nippon's acquisition of US Steel deal does not present a national security threat."

**T.J. Rooney**
***Former Chair of the Pennsylvania Democratic Party and former member of the Pennsylvania House of Representatives from Bethlehem***
**The Morning Call**
**Misguided protectionism will hurt Pa. steel industry**
**15 April 2024**

Rooney 4.15.pdf

- "Those opposing this deal may think they are protecting union jobs, for example, but it may very well be doing the opposite. U.S. Steel has lost nearly 90% of its workforce in the region over the last 40 years and may very well continue to shed more of it without a major injection of capital."

- "Steel-NSC merger should be considered a major accomplishment for efforts to revitalize American manufacturing. The combined company would become the second largest steelmaker in the world and would finally provide American-made steel an opportunity to compete against China's dominance in the global market."

**Thomas P. Feddo**
***Assistant Treasury Secretary for Investment Security, 2019-21, Founder of The Rubicon Advisors LLC.***
**The Wall Street Journal**
Biden, Cfius and the U.S. Steel Acquisition
**15 April 2024**

- "Nothing in this steel-making transaction risks compromising cutting-edge technology, critical infrastructure, sensitive data or the defense industrial base's supply chain."

- "Nippon Steel's investment in U.S. Steel promises to enhance American production capacity and strengthen geopolitical ties between the U.S. and Japan in the face of Chinese aggression. Japan is of indispensable strategic importance, not least because of its supporting U.S.-led export controls and collaborating on regional defense matters. Last month the U.S. Navy secretary urged Japanese industrial companies to invest in America's shipyards."

- "American allies would have another reason to worry about how special their relations with the U.S. really are. And the legitimacy of a vital national-security tool would be compromised."

**Clark Packard**
***Research fellow in the Herbert A. Stiefel Center for Trade Policy Studies at the Cato Institute***
**Cato Institute**
On Japan, Washington's Economic Policies Belie Rhetoric
**12 April 2024**

- "Indeed, the president recently stated that it was "vital" for US Steel "to remain an American steel company that is domestically owned and operated." As our Cato colleague Scott Lincicome recently explained, Biden's statement belies the fact that US Steel is a shell of its former self, and both industry experts and US steel-consuming manufacturers believe that the acquisition would benefit US Steel, the American workforce, and the broader manufacturing sector."

- "In recent years, policymakers have increasingly talked about the concept of "friendshoring"—strengthening trade and investment ties with close allies—as a new paradigm to guide US international economic relations in light of intensifying competition with China and legitimate concerns over Beijing's troublesome practices. Yet in a recent test case for its commitment to this new framework—Japanese-based Nippon Steel's proposed acquisition of US Steel—Washington failed miserably. Indeed, the Biden administration's opposition to the Nippon deal is not an outlier—it is the latest in a long line of international economic policy affronts to Japan."

**Phil Kerpen**
***President of American Commitment and the author of Democracy Denied***
**The Daily Times**
Biden wrong to oppose Nippon steel deal
**11 April 2024**

- "Nippon Steel's commitment is clear: to grow U.S. Steel's operations, protect American jobs, and counter the issues stemming from China's state-subsidized exports. This acquisition is a strategic move to create a more competitive steel producer capable of meeting demand in the U.S. market and competing globally."

- "The benefits of this deal extend far beyond the balance sheets. For U.S. Steel, it means leveraging Nippon Steel's advanced technologies to enhance production processes and maintain aging facilities, including blast furnaces. It's an opportunity to produce high-grade steel products like electrical steel and automotive flat steel."

- "For the workers, this deal is a lifeline. It guarantees job security, with no layoffs or facility closures, and ensures that plants remain rooted in Pennsylvania. The iconic U.S. Steel name and Pittsburgh headquarters remain. The local communities see growth in the supplier base, contributing to a thriving regional economy. An enormous capital infusion is a win for domestic manufacturing."

**Michael R. Strain**
***Economist - American Enterprise Institute***
**The New York Times - Dealbook**
The Politics of a Steel Deal Hangs Over Biden's Japan Summit
**10 April 2024**

- "For the United States to say that a Japanese company investing in an American manufacturing firm constitutes a threat to American national security is strange and troubling."

**George Landrith**
***President of Frontiers of Freedom Institute - Frontiers of Freedom Institute***
**Newsmax**
Biden Doesn't Understand Global Business, and It Shows
**8 April 2024**

- "In the end, Congress passed only the narrower, tech transfer-focused expansion. Under those rules, CFIUS must prove that an acquisition threatens the nation's "critical infrastructure" in a way that could seriously destabilize America's national security."

- "That description does not credibly describe Nippon's proposed acquisition — so, from a legal point of view, CFIUS should greenlight the deal."

- "But, hypothetically, even if one took a more expansive interpretation of CFIUS powers into consideration, permitting the acquisition will likely strengthen — not undermine — U.S. national security."

- "U.S. Steel and Nippon together would rise to become the globe's second-largest steel producer, allowing the U.S. and Japan to compete with the world leader: China's Baowu Group."

- "Cooperation with allies, especially in sectors where the U.S. has largely lost its comparative advantage, shouldn't be understood as anything other than a positive development."

**Becky Corbin**
***Former member of the Pennsylvania House of Representatives***
**D.C. Journal**
Swampy Steel Politics Is a Bad Election Year Play
**3 April 2024**

- "This twist of political fate has provided Trump the opportunity to rethink his support of a policy position that could hamper America's ability to innovate and compete globally and that The Wall Street Journal has cautioned could lead to "the swampiest example of corporate-insider political favoritism in many a year."

- "A closer and more nuanced examination of the proposed deal reveals that it benefits the broader U.S. economy and environment."

- "This should be seen as a boon for Pennsylvanians, as well as the more than 11,000 jobs and $3.6 billion in economic activity supported by U.S. Steel in the state."

- "Conversely, should the deal fall through, it would mean giving way to a concerted lobbying campaign by jilted suitor Cleveland-Cliffs...it could also harm consumers by resulting in a domestic steel-making monopoly that would control as much as 80 percent of the steel sold to the American auto industry."

**Jared Whitley**
***Political Columnist, has worked for newspapers, Sen. Orrin Hatch, and the White House Communications Office under President Bush***
**Townhall**
In Letting Corporate America Manipulate Him Over PA Deal, Biden Doesn't Exactly Have Nerves Of Steel
**2 April 2024**

- "But more important is the fact that if Cleveland-Cliffs were to acquire US Steel, it would control as much of 90 percent of steel used in domestically constructed vehicles – at least that's what the Alliance for Automotive Innovation told Reuters recently. So that's called a monopoly, and monopolies are usually bad for workers."

**Jeffrey Mazzella**
***President - Center for Individual Freedom***
**The Daily Caller**
OPINION: Blocking The US Steel Deal On 'National Security Grounds' Undermines National Security
**25 March 2024**

- CFIUS must prove that acquisitions of American companies by a foreign entity threaten our "critical infrastructure," which the law defines as "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems or assets would have a debilitating impact on national security. By any stretch, Nippon's acquisition certainly does not meet that criteria or pose even the most remote national security threat. Accordingly, from a strictly legal point of view according to the underlying law, CFIUS should permit the deal."

- "Permitting the deal will likely enhance U.S. national security — not threaten it. Combined, U.S. Steel and Nippon would become the second-largest global steel producer, allowing the U.S. and Japan to better compete jointly with China's Baowu Group, the world leader."

- "The U.S.-Japan relationship central to the proposed deal should serve as the model for intelligent competition with China, and we should not only permit, but actively encourage commercial ties that better allow us to keep pace with "the world's factory."

- "The sudden effort to overstep CFIUS authority thus risks chilling useful foreign investment in favor of capture by domestic special interests. Far from undermining U.S. security interests, the Nippon-U.S. Steel agreement will bolster our geopolitical security, and we cannot allow those who seek to abuse CFIUS authority to jeopardize it."

**The Washington Post Editorial Board**
In U.S. Steel merger, Biden gets in the way of Bidenomics
**22 March 2024**

- "But Mr. Biden's apparent preference for a Cleveland-Cliffs takeover contradicts the policy goals he claims to have."

- "The Alliance for Automotive Innovation, a lobby group for U.S. auto manufacturers, warned members of Congress that the combined company would control all of the nation's blast furnace production and between 65 and 90 percent of the steel that goes into cars and light trucks. "In a combined company, 100 percent of the domestic e-steel needed for electrical motors and EV production will be concentrated in a single company," it noted. Perhaps the Federal Trade Commission can advise the White House on what this near-monopoly power would do to its effort to drastically increase the share of EVs on the road."

**Veronique de Rugy**
***George Gibbs Chair in political economy, Senior Research Fellow at George Mason University, djunct scholar at the Cato Institute and a senior research fellow at the Mercatus Center***
**The New York Sun**

Nippon Steel's Purchase of U.S. Steel Would Boost American Prosperity, Yet Politicians Stand in the Way
**21 March 2024**

- "This deal makes sense to economists. It will encourage other foreign companies to invest in America, creating wealth and new job opportunities, and further shoring up the American economy, particularly amid inflation worries. More importantly, this deal makes sense to the owners of U.S. Steel"

- "Assertions of dangers to "national security" are being used to scare Americans into thinking that a good deal for investors, employees and the economy will somehow make America less militarily secure. This is nonsense."

- "Nippon Steel has the potential, and the incentive, to restore U.S. Steel into a strong and leading steelmaker once again, unless the federal government and the hordes of economic nationalists get in the way."

**Pittsburgh Post-Gazette Editorial Board**
Stop pandering to Pittsburgh: Politicians should drop opposition to Nippon Steel
**21 March 2024**

- "Nippon Steel's bid to purchase U.S. Steel is the best available option to ensure the long-term stability of the American steel industry, and to keep quality jobs — both white- and blue-collar — in Western Pennsylvania."

- "The deal will ensure not only that U.S. Steel's headquarters will remain in Pittsburgh but, after Tuesday's announcement, that Nippon's American HQ, currently in Houston, will move here. It is also the option most likely to result in further investment, including environmental upgrades, in the Mon Valley Works, which is still one of the most extensive integrated steel operations in the world."

- "Promises to dash the deal, whether from Mr. Fetterman or Mr. Vance or Mr. Trump, are promises to hurt Western Pennsylvania's economy and workers. As the Post-Gazette Editorial Board explained just days after the acquisition was announced: There is no better suitor for U.S. Steel than Nippon, and no better nation to which to entrust American industry than Japan."

- "...the deal (Cleveland-Cliffs transaction) would have resulted in multiple redundancies — a Cleveland corporate HQ and other integrated steel operations — that would likely have ended with Pittsburgh losing thousands of both office and mill jobs."

- "Further, the acquisition would have had worse national economic security (and anti-trust) implications than Nippon's bid: It would have brought nearly all U.S. iron ore deposits under one corporate umbrella."

- "Nippon, on the other hand, brings deep pockets, a more diverse industrial portfolio and a better-than-most environmental record. While it may be optimistic to expect immediate

investment in the Mon Valley Works — especially if political grandstanding delays the deal — it is simply a fact that Nippon is more likely to maintain and expand Pittsburgh operations than U.S. Steel or Cleveland-Cliffs."

**Greg Ip**
***Chief Economics Commentator - The Wall Street Journal***
**The Wall Street Journal**
America is Sliding Toward Chinese-Style Capitalism
**21 March 2024**

- "Nippon's deep pockets, close relationship with Japanese automakers and expertise making the specialized thin steel for electric-vehicle motors would make U.S. Steel stronger. A Japanese American counterweight to Chinese behemoths would embody Biden's vision of cooperation among market democracies."

- "Biden's opposition makes it more likely U.S. Steel will be bought on the cheap by Ohio-based steelmaker Cleveland-Cliffs, which was outbid last year by Nippon Steel. That would undermine another Biden priority, preventing corporation concentration, since the combined entity would dominate some markets."

**Roger Lowenstein**
***Journalist and the author of "Ways and Means: Lincoln and His Cabinet and the Financing of the Civil War"***
**The New York Times**
It Hurts to See Biden Imitating Trump on Trade
**21 March 2024**

- "But blocking the purchase would be destructive to American interests overseas and at home."

- "Moreover, Nippon Steel's nonhostile $14.1 billion deal is clearly in America's interest as well as in the workers' interest. The Japanese company, which already produces steel in the United States as well as in Latin America and across Asia, won the sale in the boardroom by offering roughly twice as much as a domestic competitor, Cleveland-Cliffs. Nippon has promised to inject needed capital and technology to make the century-old former icon more competitive. It also promises that U.S. Steel will keep making its steel in the United States and keep its headquarters in Pittsburgh."

- "The notion that foreign ownership of an American steel plant poses a national security risk is ludicrous — steel is not in short supply, and Japan is friend, not foe."

- "A negative decision would chill future investment in the United States and wound America's partner in the Pacific, a vital relationship as tensions with China rise. Among the Japanese, it would revive memories of bygone racism. (According to The Wall Street Journal, Lourenco Goncalves, the chief executive of Cleveland-Cliffs, was heard on a private call with investors appearing to mock the accents of Nippon executives.) Not a way to treat an ally."

**Heino Klinck**
***Former Deputy Assistant Secretary of Defense for East Asia, 2019–21, with responsibility for bilateral defense relations with Japan***
**National Interest**
Joe Biden's Handling of U.S. Steel Sale Harms U.S.-Japan Ties
**20 March 2024**

- "More than ever, the world needs a display of leadership and commitment to global cooperation from the United States. From the conflict between Israel and Hamas, the ongoing war in Ukraine, and intensifying global competition with Russia and China, we must continue to step up to the challenge—both at home and abroad. Doubting our closest ally's offer to invest in our economy will only disappoint our friends and satisfy our adversaries around the world. To reject the U.S. Steel-Nippon deal will undercut one of America's greatest strengths—its alliances with like-minded partners such as Japan—and strikes a stark contrast to the president's own words in 2022: "The alliance between our two countries is stronger than it's ever been and it's as important as it has ever been.""

**Nikkei Asia**
Politics should not thwart Nippon Steel's plan to buy U.S. Steel
**20 March 2024**

- "Trying to block this merger not only imperils a relationship with a crucial ally but also provides an increasingly belligerent China with another means of leverage."

- "Nippon Steel hails from Japan, a close U.S. ally. Deepening U.S.-Japan industrial collaboration in the materials sector -- following that in semiconductors -- benefits the economic security of both countries. Introducing advanced steel technology, one of Nippon Steel's strengths, to U.S. Steel's plants would likely strengthen the U.S. supply network."

**Bill Saporito**
**Editor at large at Inc. Magazine. He began his career at the New York Daily News and has since worked as an assistant managing editor at Time magazine and as a senior editor at Fortune.**
**The Washington Post**
We have nothing to fear from Nippon Steel
**20 March 2024**

- "The unstated concern here is more election threat than national security threat. President Biden needs to hang on to blue-collar voters in Pennsylvania, Ohio and Michigan who traditionally vote Democratic but whose loyalty is far from certain."

- "Foreign ownership isn't foreign to steel, either. As big steel melted down a generation ago, overseas investment was welcomed — South Korea's Pohang Iron and Steel was a partner with U.S. Steel in a plant in Pittsburg, Calif. Luxembourg's ArcelorMittal employs about 12,000 people in steelmaking and mining in the United States, Canada and Mexico. AK Steel, which ran the plant in Middletown, Ohio., where Vance's grandfather worked, was owned by Armco and

Japan's Kawasaki Steel for a time, too. And, oh yeah, Nippon Steel bought Wheeling-Pittsburgh Steel out of bankruptcy in 2008; some of that company's assets had previously been owned by Russians."

- "As long as the plant and the jobs there are protected, as Nippon Steel has promised, who owns it doesn't really matter — unless you're a politician."

**The Blade Editorial Board**
Bidenomic blunders
**19 March 2024**

- "CFIUS has a serious purpose. It should not be used to facilitate a deal paying shareholders half the market value available from a willing buyer with close U.S. ties. Moreover, U.S. automakers are strongly supportive of Nippon Steel to block consolidation in the steel industry giving Cleveland-Cliffs major pricing power."
- "Treating Japan as an adversary when they pay the highest price for assets owned by shareholders, while giving China an open door to U.S subsidies in a strategic industry, practically invites industrial decline."

**The Financial Times Editorial Board**
**The** Contrasting tales of TikTok and Nippon Steel
**19 March 2024**

- "Japanese ownership of US Steel, by contrast, does not pose a national security threat by any stretch. Japan is a long-standing ally, with whom the US has a shared interest in curbing Chinese influence. Steel has none of the sensitivities of high-tech social media; US Steel is not a direct supplier to the military."
- "The Japanese steelmaker has said it will pump investment into US Steel and update its technology. Though cross-border acquirers do not always keep their word, Nippon has pledged not to shift production or US jobs overseas, and to honour bargaining agreements with the United Steelworkers union."

**William Alan Reinsch**
***Scholl Chair and Senior Adviser - Center for Strategic and International Studies (CSIS)***
**Center for Strategic & International Studies**
The Danger of Hasty Action
**18 March 2024**

- "More important, his statement that U.S. Steel should be owned and managed by Americans may well kill off negotiations with Nippon Steel. As with TikTok, that would prevent a win-win outcome in which the United Steelworkers union might be able to obtain better commitments from Nippon Steel then they have from current management. It is entirely possible that wouldn't happen, but to kill off the possibility before the outcome is becoming clear leaves the

union with either the status quo, or the possibility of an inferior offer from Cleveland Cliffs which would almost certainly trigger an antitrust investigation."

**Michael Strain**
***Director of Economic Policy Studies - American Enterprise Insitute***
**Financial Times**
Protectionism is running amok in the US
**18 March 2024**

- "Nippon's acquisition of US Steel would benefit the economy broadly and the working class specifically. The company intends to inject much-needed technology and capital into US Steel. This would raise the productivity of its workers, putting upward pressure on their wages and incomes, and potentially increasing employment opportunities and steel output."

- "Second, this might have a chilling effect on the willingness of other foreign companies to invest in the US. But foreign investment is a sign of the strength of the American economy, and Biden should be doing all he can to welcome more of it. The more than $5tn in foreign direct investment in the US is increasing the productivity of American workers and building up the country's industrial base and services economy."

- "Third, Japan is an increasingly important Pacific ally as the US's relationship with China becomes more adversarial. Biden should be using economic policy to strengthen this partnership, not to weaken it by treating a Japanese company as a security threat. "

- "Finally, the president's unusual intervention in a single deal is itself a threat to economic liberty. In a free society, the government should not attempt to blow up voluntary transaction between private parties. America's long-term prosperity rests on the responsible use of government power, including the president's bully pulpit. Because this deal clearly does not threaten national security, blocking it on those grounds would also weaken the rule of law."

- "But even more iconic than U. S. Steel are the commitments that Biden would be undermining if he blocked the deal - to sound economic policy that supports the long-term prosperity, the value of foreign investment, and support for America's allies, the rule of law and economic freedom."

**Andrew Langer**
***Director - CPAC Foundation Center for Regulatory Freedom***
**Townhall**
Preserve Economic Growth and National Security by Unraveling the Politics From the U.S. Steel Deal
**18 March 2024**

- "Foreign direct investment in the U.S, totaling $5.25 trillion in 2022, is a testament to the critical role played by international partners. Politicizing the CFIUS process raises risks for multinational companies, leading to potential reductions in foreign investments, American jobs, and overall prosperity. It is imperative to let CFIUS operate as intended, ensuring that its decisions are

based on expertise and unbiased evaluations rather than political posturing."

- "The bid by Nippon Steel to acquire U.S. Steel should be met with applause, not skepticism. U.S. Steel, facing economic challenges and an unsolicited lowball offer from Cleveland-Cliffs, sought a strategic partner for its survival. Nippon Steel's $14.9 billion bid promises significant benefits for consumers, workers, and American businesses."

- "Contrary to knee-jerk opposition based on outdated sentiments, Nippon's investment will modernize U.S. Steel's technological capabilities, foster innovation, increase productivity, and improve cost efficiency. This infusion of capital will result in higher-quality steel, more efficient operations, and lower prices – a trifecta of advantages for American consumers. The deal preserves competition in the domestic steel market, preventing a monopoly that could lead to higher prices for essential goods like automotive steel and food cans."

**Matthew Yglesias**
***Opinion Columnist***
**Bloomberg**
Biden's Industrial Policy Is Just Politics by Another Name
**17 March 2024**

- "Of course, to make subs you need steel, which is why there are good reasons to maintain a domestic steel industry. But Japanese ownership of US steel facilities is not a security risk. Not only is Japan a US ally, it is the key US ally against the key adversary, China. Nippon Steel has committed to maintaining production in the US, which is the relevant national security issue. Precisely because this is a sensitive security topic, the US should be thrilled that it wants to buy the company."

**Derek Hunter**
***Washington, DC based writer, radio host and political strategist. He has previously worked for several prominent conservative non-profits as an analyst in health, education, technology and judicial policies, as well as a press secretary in the US Senate***
**Town Hall**
Joe Biden Does Not Understand America
**17 March 2024**

- "I've never seen a union come out against securing jobs long term, nor have I known a President to endorse the concept of an ally nation keeping a major employer in a swing state in business as a bad thing. This election is shaping up to be a weird one."

- "The US Steel situation is just the latest example of the Biden administration doing things that leave you scratching your head. The only rational explanation is that, no matter how many times he reads line about who we are as a country off a teleprompter, the President of the United States does not understand the concept of America. Either that or he doesn't care. Neither option is particularly good."

**The Wall Street Journal Editorial Board**
Steel-Making in the Swamp
**17 March 2024**

- "Nippon Steel offered roughly double Cleveland-Cliffs's bid and promised to inject U.S. Steel with $1.4 billion in capital to upgrade factories. Nippon has also pledged to honor collective-bargaining agreements. Its takeover would make U.S. Steel more efficient and globally competitive. Mr. Goncalves and the United Steelworkers don't share those goals. They want to create a U.S. steel-making monopoly that is protected by tariffs from foreign competition. A Cleveland-Cliffs-U.S. Steel merger would control 100% of blast furnace production in the U.S. and 65% to 90% of domestic steel used in vehicles."

  "Cleveland-Cliffs could then raise prices, and the union could negotiate richer wages and benefits, without worrying about competition. U.S. manufacturers and consumers would be harmed, but who cares about them? Not Mr. Biden or the Members of Congress opposing the Nippon deal, including Republican Sens. J.D. Vance, Josh Hawley and Marco Rubio. The Biden antitrust cops also seem to have taken a powder on this one."

**Scott Lincicome and Alfredo Carrillo Obregon**
***Vice President, General Economics and Stiefel Trade Policy Center at Cato Institute and Research Associate at Cato Institute, respectively***
**Cato Institute**
On the Nippon Steel-US Steel Deal, Politics (Again) Tops Policy
**15 March 2024**

- "Such a result would hardly be uncommon. Foreign investments—including by Japanese companies, which had invested $712 billion in the United States by end-2022 and employ 963,000 Americans—have often benefited the US companies being acquired and their surrounding communities. The investments can result in increased spending in R&D and capital equipment and internal changes in management or business practices—precisely what both Nippon Steel and US Steel have told their shareholders about the current acquisition."

- "As Lincicome also explained, Japan has been one of the United States' closest allies for 60 years, hosts US military personnel and Department of Defense (DOD) civilians and their families and acquires more than 90 percent of its defense imports from the US. Similarly, Japanese investors haven't been a concern for the Committee on Foreign Investment in the United States (CFIUS), which is reviewing the Nippon deal, since the 1980s. The House Select Committee on the Chinese Communist Party has even gone so far as to recently recommend that Congress put Japan on the CFIUS "whitelist" of close allies. Nippon Steel is also far removed from the days in which it was closely connected to the Japanese government, and almost a quarter of it is owned by foreign (i.e., non-Japanese) entities. And if a war or other national emergency arose that did necessitate the federal government nationalizing some of company's US output, Nippon's ownership would be immaterial."

- "The Defense Department doesn't currently buy from US Steel, and DOD needs just 3 percent of domestic steel production to meet its procurement obligations. As former deputy

undersecretary of defense for industrial policy William C. Greenwalt recently explained, in fact, the current steel industry—save a couple mills (not owned by US Steel) that produce defense-grade metals—'has not only been mostly worthless to national security—it has arguably become detrimental to it.'"

- "Given these realities, most independent observers understand President Biden's decision as motivated by politics, not economics or national security."

**Danielle Zanzalari**
***Assistant Professor of Economics - Seton Hall University***
**Real Clear Markets**
With U.S. Steel's Acquisition, Don't Let Politics Triumph Over Economics
**15 March 2024**

- "This transformative merger will strengthen American jobs, U.S. steel competition, and lead to lower steel prices" (On Cliffs) Despite clearly presenting a financially worse outcome for stakeholders, it would also lead to redundant geographic headquarters, which would diminish hiring competition, thus lowering wages for steel workers—the exact opposite union leaders want for their members. Nippon Steel, on the other hand is committed to maintaining existing jobs post-acquisition and honoring all collective bargaining agreements already in place.... It is imperative that we prioritize sound economic reasoning over misguided political concerns to pave the way for a prosperous future in the steel industry."

**James M. Lindsay**
***Senior Vice President, Director of Studies, and Maurice R. Greenberg Chair - Council on Foreign Relations***
**Council of Foreign Relations**
Campaign Roundup: Joe Biden Opposes the Sale of U.S. Steel to Nippon Steel – Excerpt
**15 March 2024**

- "...and now by opposing the sale of U.S. Steel, the message that Biden administration has been sending, whether unintentional or not, is that Washington is interested in what it can get and not in what it can give. That indifference to the interests of others may come back to haunt the administration."

**Shihoko Goto**
***Director - Asia Program of the Wilson Center in Washington, D.C.***
**Bloomberg**
Nippon Steel Defends US Deal After Biden Comes Out Against Bid
**15 March 2024**

- "US domestic politics is defining what should be up to two private companies to decide," said Shihoko Goto, director of the Asia Program at the Wilson Center in Washington DC. "The US Steel/Nippon Steel debate is also driving a harmful wedge between otherwise solid partner nations," she wrote in a post on X, the social media site formerly known as Twitter.

**David Zirin**
***CEO - Pentwater Capital Management***
**Nikkei Asia**
**Major U.S. Steel shareholder Pentwater supports Nippon Steel deal**
**15 March 2024**

- "It has been widely reported that Cleveland Cliffs is very upset that its inferior bid to purchase U.S. Steel was rejected. It is Pentwater's belief that Nippon Steel is a much better partner for U.S. Steel and as a result Pentwater would vote its shares against any offer made by Cleveland Cliffs to purchase U.S. Steel."

**The Wall Street Journal Editorial Board**
Biden's Nippon Steel Fiasco
**14 March 2024**

- "The American political consensus used to be that foreign investment is a sign of U.S. economic strength and a source of good-paying jobs. Protectionists focused on blocking imported goods that compete with American products. But now they're targeting even investment in U.S. manufacturing from friendly countries."

- "If you really care about workers, Nippon Steel's bid is better. The firm has promised to honor the United Steelworkers collective-bargaining agreement and says it won't move current U.S. production or jobs overseas. A more competitive U.S. Steel is less likely to have to lay off workers in the future."

**Peter Roff**
***Columnist & Commentator; a former senior political writer for United Press International and former U.S. News & World Report contributing editor***
**The Washington Times**
Let the world invest in America: Nippon-U.S. Steel merger should be approved
**14 March 2024**

- "Letting one company buy the other would be a step closer to the kind of monopoly-making mergers that the Justice Department and the FTC should prevent. Apparently, that's OK in Mr. Biden's world if the labor bosses say so.

- "The rest of us, including the unions in the industries downstream like the United Autoworkers, should pay closer attention. They must actively support the proposed Nippon-U.S. Steel deal because it's in their best interest. They should pressure their friends in Congress and the Biden administration to look out for their interests, not just those of the United Steelworkers."

- "Reigniting the American manufacturing lamp requires preserving what remains. That means the U.S. government should approve a Japanese company's proposed $18 billion investment in U.S. Steel. The proposed merger brings an influx of cash and a reconstitution of the corporate

culture that will breathe new life into a venerable name that has survived while many of its competitors have been dying."

**David Faber**
**Co-anchor, " - Squawk on the Street"**
CNBC,
Squawk on the Street
**14 March 2024**

- "There is virtually nobody who would argue that Japan represents a national security risk. In fact the technology transfer in this case is going from Japan to the US where there would be significant potential upgrades of it."

- "Having not already received the assent of unions very different from Cleveland cliffs the archrival that has been working nonstop to try to dislodge this deal - but it doesn't mean they can't get them on board at some point in the near future and maybe they will do that."

- 'Cleveland cliffs steel in contrast raised significant antitrust questions particularly in terms of domestic production for steel for the automobile industry. by the way there's also a question of UAW unions opposing that potential deal were that to somehow come back so will continue to monitor this."

**Mike Gallagher**
***Former U.S. State Representative – Wisconsin 8th Congressional District***
**Nikkei Asia**
Biden says U.S. Steel should remain American-owned
**14 March 2024**

- "Rep. Mike Gallagher, a Republican from Wisconsin and the chairman of the House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party, told Nikkei Asia that he supports the Nippon Steel deal, and that the U.S. should be strengthening ties with allies as it competes with China."

- "Given everything that the Nippon Steel executives have said about what they plan to do, honoring labor agreements, I don't think there's a national security concern at all," he said.

- "I've also made the argument that Japan should be on the CFIUS whitelist," he added, referring to the interagency Committee on Foreign Investment in the United States.

**Kenneth Weinstein**
***Japan Chair - Hudson Institute***
**Nikkei Asia**
Biden says U.S. Steel should remain American-owned
**14 March 2024**

- "Kenneth Weinstein, the Japan chair at the conservative Washington think tank Hudson Institute, called the statement "profoundly disappointing."
- "This isn't about acquiring a prized U.S. asset. It's about investing in an American company, creating jobs in Pennsylvania, and training workers in cutting-edge technologies," he said, adding that it could damage the relationship between Washington and Tokyo."
- "It's being done in the most low-key manner possible by a presidential statement rather than an actual podium statement, and it's an attempt to bury this thing before the prime minister arrives, to get it off the table," Weinstein told Nikkei."

**John Murphy**
***U.S. Chamber Senior Vice President and Head of International - U.S. Chamber of Commerce***
**Press Release**
U.S. Chamber Warns Against Politicizing NSC Acquisition of U.S. Steel
**14 March 2024**

- "Attempts to politicize the objective Committee on Foreign Investment in the United States (CFIUS) review of NSC's acquisition of U.S. Steel are both inappropriate and counterproductive. That review will surely support the transaction given Japan's status as one of America's most important and reliable allies. Japanese investment in the U.S. supports nearly one million American jobs, and officials must be careful not to send a chilling signal to international companies that U.S. politics may put their job-creating investments in the U.S. at risk. For these reasons, it's imperative that the CFIUS review proceed; and if, as expected, it reveals no national security concerns, the sale should proceed."

**Nancy McLernon**
***CEO - Global Business Alliance***
**Press Release**
McLernon: Japan is a Strategic Ally, CFIUS Exists for a Reason
**14 March 2024**

- "The CFIUS process was designed by Congress to thoroughly review cross-border deals for their potential impact on national security and, importantly, to remain apolitical. Only once all of the facts are uncovered through this process can a determination be made. To stay globally competitive for foreign direct investment, which now employs nearly eight million American workers, the Administration should adhere to this standard."
- "Japan is a strategic partner that contributes heavily to America's prosperity, providing countless good-paying American jobs."
- "A non-national-security decision would be contradictory to the Biden-Harris Administration's Open Investment Policy and out of line with broad political support."
- "The Open Investment Policy of the United States is a pledge to treat all investors fairly and equitably under the law... I want to reiterate my administration's commitment to ensuring that

the United States remains the most attractive place in the world for businesses to invest and grow, thus creating jobs here at home, strengthening supply chains across the country, and deepening our relationships with allies and partners."

**Al Root**
***Reporter – Barron's***
**Barron's**
The U.S. Steel Story Just Got Stupider. The Losers Are Stockholders and Workers.
**14 March 2024**

- "American steel workers would continue to operate U.S. Steel's mills even if Nippon Steel buys the company. The White House didn't immediately respond to a request for comment about the fact that U.S. workers would remain in the mills, or what new capital and technology from a leading steel company could do for U.S. Steel."

**Matthew Goodman**
***Trade and economics expert - Washington's Council on Foreign Relations***
**Reuters**
Biden to raise concern over Nippon Steel's deal for U.S. Steel, source says
**14 March 2024**

- "Goodman said he thought the case of the acquisition being a risk to U.S. national security was "dubious" and questioning investments from a supposedly trusted security partner could be very damaging to the relationship."

- "It's much more to do with politics in an election year when both nominees are appealing to support from steel workers and unions," he said of Biden and Trump.

**Benjamin Dierker**
***Executive Director of the Alliance for Innovation and Infrastructure (Aii), specializing in economic, administrative, and legal aspects of American energy, transportation, infrastructure, and innovation***
**DC Journal**
Fighting Steel Deal Makes Perfect the Enemy of the Good
**14 March 2024**

- "Whether they are aware of it or not, Americans rely on steel to be cost-effective, high-quality and dependably available. But these conditions should not be taken for granted. The future is not certain, and welcoming investment opportunities, like U.S. Steel's agreement to be acquired by global leader Nippon Steel, may be essential to the long-term viability of America's steel industry."

- "So, how do we ensure reliable, high-quality, low-cost steel? We limit disruptions of voluntary transactions by private companies and friendly allied nations, like U.S. Steel's agreement to be acquired by Nippon Steel, a Japanese company."

- "For America's steel industry to succeed, leaders must be able to recognize and welcome beneficial investments that encourage innovation and the preservation of American facilities and jobs. The U.S. Steel deal has the potential to do precisely that."

**Dan Price**
***Managing Director - Rock Creek Global Advisors; Top White House official on international trade and investment during the George W. Bush administration***
**The Washington Post**
Biden set to voice concern over proposed Japanese purchase of U.S. Steel
**13 March 2024**

- "I am unaware of any president preemptively signaling he may oppose an acquisition that is undergoing national security review, much less an acquisition by a company from a treaty partner that we are obligated to defend with U.S. troops."

**Coalition of free-market, conservative, and individual liberty organizations**
Letter to Janet Yellen, Secretary Department of the Treasury
**13 March 2024**

- "Additionally, if Nippon Steel purchases U. S. Steel it will maintain all plants and workers in the United States, a big improvement over a status quo where the American steel industry lost workers nearly every year since World War II. If U.S. Steel is acquired by a competitor other than Nippon Steel, there is no doubt these job slides will continue."

- "The combination of Nippon Steel and U.S. Steel will create one of the world's largest and most globally competitive steel companies. Finally, the United States–along with our longtime allies in Japan–will be able to challenge the socialist, government-subsidized Chinese steel industry anywhere in the world. A free market steel industry that comes from democratic republics will give emerging countries a better choice against China than they have today. There is no understating both the soft and hard power advantages to this for the United States."

**William Greenwalt**
***Nonresident senior fellow at the American Enterprise Institute and a former deputy undersecretary of defense for industrial policy***
**Breaking Defense**
The mythical national security argument for protecting the steel industry
**5 March 2024**

- "There is no national security reason for CFIUS to reject the US Steel-Nippon Steel deal, but if the Treasury Department does go down this path, the CFIUS process will be forever tainted and politicized. That is not good for national security or anything else. Our credibility is on the line and allies and investors will be looking closely at any decision."

**Hal Singer**
***An expert in antitrust, consumer protection, and regulation. He has researched, published, and testified on competition-related issues in a wide variety of industries, including media,***

***pharmaceuticals, sports, and finance. Courts have certified twelve classes in reliance on Dr. Singer's economic models. As a Managing Director at Econ One, he has extensive experience providing expert economic and policy advice to regulatory agencies in the United States and Canada, as well as before congressional committees***
**The Sling**
In Finding a Buyer for U.S. Steel, Security Concerns Can't Trump Harms to Competition
**25 February 2024**

- "Whatever security concerns might flow from ceding control of a large steel operation to a Japanese company must be assessed against the likely antitrust injury that would be inflicted on domestic workers and steel buyers by combining two direct horizontal competitors in the same geographic market. This basic economic point has been lost in the kerfuffle."

**Ivan Sascha Sheehan**
***Ivan Sascha Sheehan is the associate dean of the College of Public Affairs at The University of Baltimore. A frequent speaker on U.S. foreign policy, Sheehan has addressed diverse audiences from academic forums in Eastern and Western Europe, Asia, the Middle East, and North America to policymakers in the U.S. Congress and the National Press Club***
**International Business Times**
China's Rise Justifies Sale Of US Steel
**23 February 2024**

- "Simply put, the United States needs allies like Japan to help manufacture steel. If Nippon Steel and U.S. Steel can join forces to become more productive in their collective operations and scale a competitive steel industry, it will benefit the national security of both nations."

**Anne O. Krueger**
***Former World Bank chief economist and former first deputy managing director of the International Monetary Fund, is Senior Research Professor of International Economics at the Johns Hopkins University School of Advanced International Studies and Senior Fellow at the Center for International Development at Stanford University***
**Project Syndicate**
America's steel madness
**16 February 2024**

- "Not many big corporate deals advance all three of Biden's biggest economic-policy objectives. All Americans – including steel workers – should be hailing this one, which represents a real opportunity to reverse US Steel's fortunes and improve the American steel industry's prospects. The alternative is bleak: if the acquisition is not approved, the US steel industry will keep depending on protective tariffs, and other US industries will continue to lose competitiveness as they are forced to pay higher prices for steel."

- "Meanwhile, foreign actors will be discouraged from pursuing productive investments in the US. If a Japanese company cannot own manufacturing facilities in America – while introducing modern technology and retaining workers and plant capacity – without jeopardizing America's national and economic security, can any foreign-owned company produce anything on US soil?"

**Derek Hunter**
***Washington, DC based writer, radio host and political strategist. He has previously worked for several prominent conservative non-profits as an analyst in health, education, technology and judicial policies, as well as a press secretary in the US Senate***
**Townhall**
Honestly, Who Cares Who Owns US Steel as Long as the Jobs Stay?
**15 February 2024**

- "I don't really care who buys it, I'd just prefer US Steel not collapse and lose all the jobs it currently has. The more the union makes a fuss, or politicians pander to that union, the more likely that negative scenario seems. But I am a firm believer in putting America first, which in this case is putting American workers first. If, at the end of this mess, they still have their jobs, it'll be a win. And it doesn't matter if the parent company paying those workers has a US address or one in Japan."

**Brian Darling**
**Real Clear Markets**
Opinion: Nippon's Acquisition of U.S. Steel Makes Economic Sense
**15 February 2024**

- "This transaction makes economic sense because it will forward the goal of strengthening domestically produced steel and will keep jobs here. As a national security issue, supply chain issues will be removed, and automobile manufacturers will be able to cut down on the cost of transporting steel to plants."

- "Free markets, free trade and inviting foreign investment are three qualities of a healthy economy. Politicians, and self-interested union officials, may oppose this deal for selfish reasons, yet they have no economic theory to stand on. This deal should be allowed to go to completion and will end up helping to expand an American economy in dire need of some good news."

**John G. Murphy**
***Senior Vice President, Head of International, U.S. Chamber of Commerce***
**U.S. Chamber of Commerce**
Three Risks to International Investment (and the Golden Eggs It Lays)
**14 February 2024**

- "First, America benefits hugely from its openness to international investment. Breaking from this policy would be costly."

- "Sending a signal to the world — and to Japanese companies — that the U.S. is overturning its open-door policy would undeniably have a chilling effect. The U.S. may no longer be seen as a welcoming place to invest, build, and hire."

- "The U.S.-Japan alliance is regularly called the "cornerstone" of the free world's security arrangements in the Asia-Pacific region."

- "In sum, America benefits hugely from our openness to international investment. We can't afford to slam the door on these benefits."

**Tom Herbert**
***Director of Competition and Regulatory Policy at Americans for Tax Reform and executive director of the Open Competition Center***
**Americans for Tax Reform**
Nippon Steel Deal Would Benefit American Workers and Global Competitiveness
**14 February 2024**

- "Regulators should focus on the merits of the deal itself instead of the noise surrounding the deal. Biden aides recently signaled that Big Labor bosses could hold sway over the regulatory review process. USW put out a nonsensical statement opposing the Nippon deal shortly after it was announced despite Nippon's aforementioned commitment to keep USW-represented workers employed."

- "Ultimately, Nippon Steel's proposed acquisition of U.S. Steel would protect American jobs, increase domestic steel production, and strengthen our global competitiveness with countries like China. Instead of allowing unfounded objections to derail the deal, CFIUS should approve the transaction."

**Robert A. Manning**
***A distinguished fellow at the Stimson Center. He previously served as senior counselor to the undersecretary of State for global affairs, as a member of the U.S. secretary of state's policy planning staff and on the National Intelligence Council Strategic Futures Group.***
**The Hill**
US Steel xenophobia is precisely how not to compete with China
**13 February 2024**

- "As for national security, the U.S. military requires only 3 percent of the steel produced by U.S. manufacturers, none of which is supplied by U.S. Steel. Regarding the U.S. industrial base, Nippon Steel has reassured United Steelworkers it would fully honor existing labor agreements and retain the name U.S. Steel. It already owns two steel plants in the U.S. and is a leader in steel technology. Thus, U.S. Steel, a laggard in tech modernization, would likely become more competitive."

- "Rejecting the deal would also raise some troubling questions. Japan is the largest investor in the U.S., with more than $700 billion employing more than half a million U.S. workers. If more trusted and resilient supply chains are a goal of U.S. industrial policy, then what message is sent to allies and partners by rejecting investment from a publicly owned firm from a key U.S. ally?"

**Business Confidential Pursuant to 50 U.S.C. § 4565**
**Protected from Disclosure Under 5 U.S.C. § 552**

**Brad Glosserman**
***Deputy director of and visiting professor at the Center for Rule-Making Strategies at Tama University as well as senior adviser (nonresident) at Pacific Forum. He is the author of "Peak Japan: The End of Great Ambitions" (Georgetown University Press, 2019).***
**Pacific Forum**
Steel deal tests US commitment to real economic security
**9 February 2024**

- "To call Nippon Steel a foreign company is misleading. It's already operating in the US, with stakes in eight companies with 4,000 employees. The purchase is intended to increase production to serve US consumers (and offset declining demand in Japan) and improve efficiency in US operations, both of which should be welcome by politicians and the public."

- "US Steel's moment may have passed, but Nippon Steel's purchase is a sign of American resurgence and strength, not weakness."

- "Today, Japan is the United States' closest ally in the Indo-Pacific. It has worked ever more closely with the US to promote security not only in this region but around the world; their bilateral efforts in economic security in particular are pacing projects with other countries. If the US truly wants to work with like-minded nations to build resilience, ensure stable and secure supply chains, and forge a coalition to backstop its preferred vision of international order, then this deal should go through."

**Mark Holman**
***Longtime chief of staff to former Pennsylvania Gov. Tom Ridge and deputy assistant to the president for Homeland Security in the George W. Bush White House, is a partner at Ridge Policy Group in Washington, D.C.***
**Pittsburgh Tribune Review**
We are — and always will be — the Steel City
**8 February 2024**

- "In the post-9/11 White House, serving then Homeland Security adviser Ridge, I was immersed in national security issues. One of our lessons learned was that we need our allies more, not less. In today's world, our nation's relationship with Japan is a critical counterbalance to China in Southeast Asia and globally."

- "In the '70s and '80s, the future of domestic steel production looked bleak. Today, we have allies willing to invest billions in our domestic steel-making capability."

**Nao Matsukata**
***Former senior trade official in the Office of the U.S. Trade Representative in the administration of George W. Bush.***
**The Washington Post**
Letters To The Editor: The troubling views of the proposed U.S. Steel sale
**7 February 2024**

- "The effort to cast Nippon Steel's acquisition of U.S. Steel as harmful to the United States is a play for the White House at the expense of our national security. Blocking the deal would be folly, especially when economic integration with Japan, our most important ally for counterbalancing China, is paramount."

**Scott Gureck**
***Retired U.S. Navy captain, served as an Executive Vice President at the U.S. Naval Institute in Annapolis, Md and president, Naval Academy Class of 1986.***
**RealClearDefense**
U.S. – Japan Steel Alliance Helps National Security of Both
**6 February 2024**

- "China now dominates steel global production, controlling 27 steel producers out of the top 50 and 6 of the top 10. If the U.S. and our allies don't work together, Beijing will soon run the table on the steel market... Japan is one of the strongest U.S. allies, both in military might and economic clout. I witnessed the unmatched professionalism of their Self-Defense Forces first-hand during my two U.S. Navy tours of duty in Japan. I also saw it later as the senior spokesman for the United States Pacific Fleet."

**Rikako Watai**
***Professor of administrative law at Keio University Law School in Tokyo. Her research focuses on foreign direct investment regulation and economic security issues.***
**Nikkei Asia**
To affirm U.S. openness, Washington should approve U.S. Steel sale
**6 February 2024**

- "As a U.S. ally sharing many of the same values, Japan does not present a threat to U.S. national security and legally speaking, Nippon Steel's buyout should not raise any national security concerns."

**Tim Berra**
***CEO - Heidtman Steel***
**Bloomberg**
American Steel Buyers Hail Nippon Deal That Scares Washington
**3 February 2024**

- "This isn't the first time that a foreign company has owned a lot of capacity in the US."
- "For Nippon to come in and purchase the mills doesn't scare us...If Cliffs would have won the deal and you relied on someone with blast furnace material, you would have been a little concerned about that because they would have owned all the blast furnaces in the US"

**Wayne Winegarden**
***Senior Fellow in Business and Economics at the Pacific Research Institute and Director of the Center for Medical Economics and Innovation***
**Forbes**

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

Nippon Steel's Purchase Of U.S. Steel Will Improve The Economy
**29 January 2024**

- "Put differently, the combination of Nippon Steel and U.S. Steel would transform a smaller less productive U.S. steel manufacturer into a global leader than could produce better steel, more efficiently, and with fewer greenhouse gas emissions. A good deal, indeed."

- "Rather than creating "high paying" jobs and increasing economic activity, preventing this purchase will weaken the U.S. manufacturing sector, eliminate potential new high-paying jobs, and thwart efficiency gains in domestic steel manufacturing."

- "Rather than an economic drag or a national security threat, Nippon Steel's purchase of U.S. Steel is an opportunity to help revitalize an iconic U.S. company, improve steel manufacturing in the U.S., and grow the economy. It would be a huge loss if unfounded objections, bipartisan or not, were to scuttle this opportunity."

**Nancy McLernon**
***President of the Global Business Alliance***
**Barron's**
Multinationals Urge Fair Review Of US Steel Takeover Deal
**24 January 2024**

- "I urge you to remain steadfast in applying the time-tested principles of CFIUS — focusing only on actual facts to identify and mitigate potential national security risks," said GBA president Nancy McLernon in the letter dated Tuesday.

- "Unfortunately, some elected officials are now advocating to ignore that standard and jeopardize the legitimacy of the Committee," she wrote.

- "Efforts to delay or derail CFIUS reviews could have far-ranging consequences, damaging America's investment climate," she added.

**Clark Packard**
***Research fellow at the Cato Institute***
**Nikkei Asia**
Nippon Steel sends delegation to Washington to gauge U.S. Steel deal
**23 January 2024**

- "CFIUS and all the stakeholders will slow roll it into the election and once the election is over, it's likely to be approved," he told Nikkei Asia.

- "It is pretty clear that Japan does not pose any national security risk to the United States," he said. "It's not like Nippon Steel is a state-owned steel company in China. It's a privately owned company in Japan and the U.S. should welcome all kinds of investment from Japan."

**Larry Summers**
***Former U.S. Secretary of the Treasury***
**Bloomberg**
Summers Warns Biden Team Against 'Pandering' on US Steel Deal - UPDATED
**19 January 2024**

- "Former Treasury Secretary Lawrence Summers said there's no national-security justification for questioning the proposed takeover of United States Steel Corp. by Japan's Nippon Steel Corp., amid a Biden administration review of the deal."
- "There is no remotely plausible national-security rationale for questioning the Nippon-US Steel transaction," Summers said on Bloomberg Television's "Wall Street Week" with David Westin. "Japan is a staunch ally."
- "Scrutiny of the $14.1 billion agreement by US officials is unlikely to end until late this year and may even extend into 2025, Bloomberg reported last week. President Joe Biden's top economic adviser, Lael Brainard, said in late December that a review should be conducted because 'it's important to make sure there is serious scrutiny of these kinds of transactions from the perspective of national security and supply chain resilience.'"
- "This is a test for the Biden administration," said Summers, a Harvard University professor and paid contributor to Bloomberg TV. The question is whether its industrial policy is truly based on seeking resilience, or serves as "a cloak for protectionist pandering to traditional industries — with no genuine national security rationale."

**Eric Boehm**
***Reporter***
**Reason Magazine**
Over 300,000 Ohioans Are Employed by Foreign Companies. Why Isn't J.D. Vance Outraged?
**19 January 2024**

- "Surely, Vance knows that foreign investment in the United States isn't something to be feared or blocked but welcomed. As I pointed out last month, Vance's best-selling memoir Hillbilly Elegy literally contains a story about how investments by a Japan-based company, Kawasaki, benefitted Vance's hometown of Middletown, Ohio."

**Steve Forbes**
***Chairman and Editor-in-Chief of Forbes Media***
**The Washington Examiner**
US Steel and Nippon Steel will make good partners
**9 January 2024**

- "Champions of free markets should applaud the recent announcement of a deal in which Nippon Steel, a Japan-based company, will buy U.S. Steel. Instead of focusing on government-imposed tariffs that allegedly protect steelmakers (these taxes raised steel prices to American

manufacturers and manifestly failed in saving jobs), the market has found a positive way forward that will strengthen this vital industry and benefit its thousands of workers."

- "Moreover, this transaction will be a blessing for our national security. It begins to deepen a critical partnership with a crucial ally at a time of increasing belligerence by Beijing. China's headlong military expansion threatens free world access to vital international waterways such as the South China Sea."

- "The capital, market access, and industry expertise Nippon Steel brings to the table will be a bonus for U.S. Steel. The unions should not object to this plan (although we shouldn't be surprised if they do) because Nippon Steel has pledged to honor existing labor agreements and pension obligations. It has also committed to making steel as cleanly as possible, a must if the industry is going to succeed in this era of climate change obsession. Nippon Steel has the financial resources to invest in existing Pennsylvania U.S. steel facilities that need environmental improvements, a plus for both the company and the environment."

- After decades of seeing America's heavy manufacturing base eroded by foreign competition, the Nippon Steel/U.S. Steel alliance is an encouraging example of foreign investment creating U.S. jobs and boosting domestic output instead of moving them offshore. As competing with China becomes ever more difficult, this will bolster an industry that is critical to other manufacturing businesses while providing high-paying jobs for American workers."

**The Bloomberg Editorial Board**
Biden Shouldn't Block the Nippon Steel Deal
**5 January 2024**

- "The acquisition would lend US Steel the backing of a financially stronger patron and create a steel giant able to hold its own against China's behemoth producers. It's highly unlikely that the Pentagon's needs, which currently account for about 3% of total US steel shipments, would be in any way compromised. Even if Nippon Steel, a private company, were somehow beholden to the Japanese government, there's little reason that Japan would want to weaken the US military at a time when it faces growing threats from China and North Korea."

- "Meanwhile, Nippon Steel's advanced technology and expertise in energy efficiency should boost US Steel's productivity. The tie-up will also speed both companies' efforts to decarbonize by 2050 and help increase production of specialized steel needed for electric vehicles, which the White House is trying to boost."

- "So long as CFIUS clears this promising commercial transaction, the administration shouldn't let political pressure derail it. Biden should reaffirm that closer economic ties to allies are a force multiplier for the US and a critical bulwark against China. Administration officials should also quietly encourage dialogue between Nippon Steel and union leaders, and urge Democratic allies in Congress to stop fanning protectionist flames."

- "Biden likes to claim his administration's policies are aimed at deepening ties with allies and strengthening the ability of US companies to compete. He shouldn't stand in the way of a deal that would accomplish both."

**Carlos Roa**
***Visiting Fellow at the Danube Institute***
**Newsweek**
Believe It or Not, the Sale of U.S. Steel Is Good for American Industry | Opinion*
**4 January 2024**

- "For one, Nippon Steel isn't subject to Tokyo's whims any more than U.S. Steel is to Washington's. For another, there is an unstated fear that the Japanese company will destroy jobs and move steel production abroad. This is absurd; it is American companies, not Japanese ones, that are too shareholder-oriented and inconsiderate of the fate of ordinary workers."

- "In contrast, Nippon paid a significant markup for U.S. Steel, meaning it has a vested interest in ensuring a successful turnaround. One of the company's strategic goals is to reach 100 million tons of global steelmaking capacity, meaning it can't afford to close plants. Moreover, Nippon has already declared it will honor all of U.S. Steel's union contracts. If anything, if the company is successful in modernizing U.S. Steel and integrating it into Nippon Steel's wider value chain, the number of jobs available to American workers would actually increase."

- "If U.S. Steel had accepted the offer made by Cleveland-Cliff, for example, the resulting company would have had a monopoly on U.S. blast furnace steel production and a commanding share in the market of steel used by the U.S. auto industry. Given FTC chair Lina Khan's ongoing anti-monopoly crusade and objections from the auto industry, the merger probably wouldn't have gone through."

- "More importantly, the Nippon Steel acquisition dovetails with key U.S. strategic interests, particularly in the context of the AUKUS alliance and Washington's increasing focus on the Indo-Pacific theater. The United States, in its pivot towards addressing the challenges posed by China, requires a robust and technologically advanced industrial base. Steel is a critical component in shipbuilding and other defense-related manufacturing. Japan, as a key U.S. ally in the region, shares these strategic concerns and makes for a natural partner in this endeavor."

- "Nippon Steel's acquisition of U.S. Steel thus isn't just a business transaction; it's a strategic alignment of interests. With Japan's technological prowess and commitment to quality, the United States can expect a significant boost in its manufacturing capabilities, essential for maintaining a competitive edge in the international environment."

**Jeffrey Kupfer**
***Adjunct faculty member at Carnegie Mellon University and former acting deputy secretary for the U.S. Energy Department***
**Pittsburgh Post-Gazette**
Jeffrey Kupfer: Being bought was good for U.S. Steel and for Pittsburgh

**2 January 2024**

- "First, the Nippon Steel bid, valued at almost $15 billion, is close to double what Cleveland-Cliffs was offering. Under the terms of the deal, U.S. Steel will continue to operate under its name, but at the same time, will become part of a new combined company that would be among the top three steel manufacturers in the world that will have the scale to compete against state-owned Chinese manufacturers."

- "As for the current workforce, Nippon Steel has publicly committed to honoring all existing union contracts. This would include last year's four year labor agreement, which the United Steelworkers heralded at the time, saying that it "won major economic and contract language improvements that will improve the standard of living of USW members and their families."

- "Customers should also appreciate this deal. It preserves competition in the U.S. steel market, which is dominated by only four companies – two of which are U.S. Steel and Cleveland-Cliffs. A Cliffs' acquisition would have put 100 percent of blast furnace production under the newly combined company, along with 65 to 90 percent of vehicle-grade steel."

- "Prior to the Nippon announcement, U.S. Steel stared at an uncertain future. Now, employees, customers, and communities can be encouraged that a reinvigorated company is here to stay and compete in the modern economy. I recently saw a tee shirt in a Steeler merchandise store that read "Santa Skips Cleveland." During this holiday season, we should be pleased that U.S. Steel appears to be following Santa's lead."

**Wilbur Ross**
**Former U.S. Secretary of Commerce**
**The Wall Street Journal**
Opinion: Xenophobia Drives Foes of Nippon Steel's Deal
**1 January 2024**

- "There is no real cause for concern other than xenophobia and the damage it could do to Cleveland-Cliffs's position as the sole U.S. producer of electrical steel for transformers and electric vehicles. The rest is imported."

- "Nippon's steelmaking is at least as advanced as U.S. Steel's, so technology export control isn't an issue. National security could be a concern if American mills were shutting down due to unfairly subsidized Japanese exports to the U.S. But Nippon never used gimmicks to avoid the Trump tariffs on steel imports. And its $14.1 billion investment in U.S. Steel is a powerful incentive against any dumping by Japan. There's nothing in the deal from which the U.S. needs defending. Attacks by Washington pols only create unnecessary geopolitical tensions, and those, not the acquisition itself, could endanger American national security."

- "Japan is a major ally, recently agreeing to replenish the U.S. supply of Patriot missiles with ones made by Mitsubishi Heavy Industries under license from Lockheed Martin and RTX, formerly Raytheon Technologies. Japan ranks first in foreign direct investment in the U.S., with more than $700 billion in 2022. U.S. firms are the largest foreign investors in Japan."

- "Nippon has a history of good labor relations and has pledged to honor U.S. Steel's union contract, which runs through 2026. The union complained that U.S. Steel blindsided it by giving no advance notice of the deal. Perhaps management can right that misstep by apologizing publicly. The American steel industry is operating at about 75.4% of capacity and idle capacity exceeds U.S. Steel's total output, so there is no danger of monopolistic behavior by the merged firm. U.S. Steel bonds are in the junk category, but the major rating agencies said upgrades are possible if the Nippon deal goes through. U.S. Steel's importance in terms of economics and national security can be enhanced only by stronger finances."

**Marc L. Busch**
***Karl F. Landegger Professor of International Business Diplomacy at the Walsh School of Foreign Service, Georgetown University, and a global fellow at the Wilson Center's Wahba Institute for Strategic Competition***
**The Hill**
Let the watchdogs decide if a foreign U.S. Steel sale works for America
**30 December 2024**

- "Which brings us back to Nippon Steel. The company vows to keep U.S. Steel in Pittsburgh, honor the company's existing labor contract and help it reduce its carbon footprint by making more use of mini mills. How does any of this pose, or otherwise enable Japan to make, a threat to national security?"

- "Moreover, the executive order lauds "open investment" as a means of improving the "competitiveness" of American companies, thereby contributing to "supply chain resilience." How does Nippon Steel's acquisition of U.S. Steel not check these two boxes?"

**Matthew J. Slaughter**
***Dean of Tuck School of Business at Dartmouth***
**The Wall Street Journal**
Opinion: The Nippon Steel Deal Is Good for America
**28 December 2023**

- "Democrats and Republicans alike are assailing Nippon Steel's prospective purchase of U.S. Steel as a threat to national security. The complaints are misplaced. Essential to national security is economic competitiveness, which is strengthened by global connections such as inward foreign direct investment."

- "A more competitive economy is better able to fund the military and ameliorate the inevitable guns-for-butter trade-offs. Consider the Cold War. Fast labor-productivity growth after World War II expanded."

- "Inward foreign direct investment by companies like Nippon Steel boosts America's economic competitiveness. Although U.S. affiliates of foreign multinational enterprises comprise less than 1% of U.S. companies, in 2021 these affiliates in America accounted for 13% of business

spending on research and development, 17.3% of investment in plant and equipment, and 23.6% of total goods exports."

- "The world is becoming more dangerous, and America's fiscal position is increasingly shaky. Although the U.S. has experienced full employment during much of 2023, the federal deficit hit $2 trillion and debt as a share of gross domestic product is forecast to grind higher. Interest outlays in the current fiscal year will be nearly as large as the total defense budget. Meanwhile, U.S. labor productivity is growing slowly."

- "Given this bleak outlook, leaders in Washington concerned about national security should be building bridges between America and other countries in the global economy. Instead, the U.S. is clumsily building more walls. America's post-World War II decades of liberalizing trade and investment—all of which benefited American competitiveness—have largely stalled."

- "Global commerce needs checks to protect essential defense technologies and products. But beyond these, America can't be fully secure without a globally competitive, high-productivity economy. International investment and trade strengthen America. That's how the world can help bolster our national security."

**Ike Brannon**
***Economist and Fellow at the Cato Institute***
**Barron's**
U.S. Steel Merger Objections Rooted In A 1970s-Era Perspective*
**27 December 2023**

- "For starters, Japan is a close military ally of the United States and the mutual interdependence between the two countries have served both to enhance our defense and our economies. Any direct military threat that Japan might face would invariably result in the U.S. being intimately involved as well. The notion that Japan could take actions that would jeopardize our military readiness in some way is clearly nonsensical."

- "Its furnaces will remain in the U.S. and will largely service the same customers, although somewhat more efficiently if the merger accomplishes what it's intended to do. In the unlikely event that relations between Japan and the U.S. worsen, and Japan threatens to restrict the ability of U.S. corporations to purchase output from the current U.S. Steel furnaces, the U.S. government could simply move to temporarily nationalize those furnaces to ensure uninterrupted deliveries. Many countries did such a thing with PPE equipment early in the 2020 pandemic, for instance."

- "The objection that Nippon Steel's acquisition of U.S. Steel will significantly reduce U.S. employment is similarly specious. Nippon Steel will take over the union contract covering current union workers that won't expire until 2026, and it will keep the current headquarters to run its U.S. operations."

- "Liberal labor economists, striving for a valid reason to impose minimum wages or other wage floors, love to cite the existence of monopsonistic labor markets as a reason for government

intervention in markets without providing any evidence or example of any monopsony. Given the fear engendered by such pronouncements it is hard to see the Biden administration countenancing a merger of U.S. Steel with Cleveland Cliffs that would clearly create the bogeyman so many of its economists have warned us about."

- "The steel industry has drastically changed over the last few decades: the prominence of mini-mills and the increased globalization of the market have diminished the importance of the large steel furnaces that once came to define the prowess of U.S. manufacturing. A merger between U.S. Steel and Nippon Steel would result in a more efficient steel industry, reducing prices and enhancing the competitiveness of the U.S. industries that depend on steel."

**The Japan Times Editorial Board**
A steel deal that's good for Japan and the U.S.
**22 December 2023**

- "The U.S. should be encouraging such investment, not fending it off. Japan is the largest foreign investor in the U.S., with a cumulative stock of $721 billion in 2021, 14% of the total. Those funds provide a substantial boost to U.S. economic activity. Japanese companies underwrite 860,000 jobs in the U.S. and their subsidiaries and affiliates exported over $75 billion in goods in 2020, about one and a half times that of Germany, the number two investor."

- "Those investments are signals of trust and faith in the future of the U.S. They are proof of the solidarity and vision for the future that Japan and its ally share. Deeper integration not only provides an economic boost but it enhances security and deterrence as well."

- "The more tightly coupled our economies, the greater the certainty that the U.S. will act in defense of its ally and partner. Steel remains critical to both economies and their defense industrial bases. This deal makes economic and national security sense. It should proceed."

**The Washington Post Editorial Board**
Why there's no reason to worry about the Japanese takeover of U.S. Steel
**22 December 2023**

- "The proposed transaction should easily pass muster. Large-scale capital investment by a Japanese company poses no danger to U.S. national or economic security, as the relevant agency — the Committee on Foreign Investment in the United States (CFIUS), chaired by Treasury Secretary Janet L. Yellen — has every reason to conclude."

- "Under the deal, U.S. Steel would retain its brand and Pittsburgh headquarters, as part of a new combined, company that would be the world's second-largest steel manufacturer — and a free-world rival to China's state-owned Baowu Group. Consolidation is necessary to compete with China, which manufactures more than half the globe's steel."

- "The United Steelworkers, which represents about 11,000 U.S. Steel employees, called the company's board "greedy" for accepting the best offer. The union wanted the board to sell to Ohio-based Cleveland-Cliffs, even though that company made an initial offer of $7.3 billion,

about half what Nippon countered with. But there's no reason the acquisition should harm the workforce, since the Japanese firm promises to honor all existing union contracts."

- "The irony of ironies: Much criticism of Nippon Steel's bid emanates from those who support the industrial policies that made U.S. Steel an attractive takeover target in the first place. President Donald Trump imposed a 25 percent tariff on steel imports that President Biden largely kept in place. Mr. Biden's signature legislative achievements — a bipartisan infrastructure bill, the Chips Act and the Inflation Reduction Act — included inducements, such as tax credits for wind farms built with domestic steel, that incentivized the Japanese company to buy an American steelmaker."

**William Chou**
***Deputy Director of Hudson Institute's Japan Chair***
**The Wall Street Journal – Opinion**
Biden's Foolish Snub of Nippon Steel
**22 December 2023**

- "U.S. politicians' unjustified criticisms of the deal could strain relations between the U.S. and Japan and weaken their collaboration on trade and economic security. The White House should work with allies on economic and military cooperation, not criticize them."

- "The sale protects American consumers. Had U.S. Steel merged with Cleveland-Cliffs, the new company would have dominated steel supplies for the auto industry and provided all the steel needed for electric-vehicle motors. The lack of competition would likely mean higher EV costs for consumers."

- "Claims that the deal is a threat to national security aren't convincing either. Opponents on Capitol Hill are urging Treasury Secretary Janet Yellen to use the Committee on Foreign Investment in the United States, or Cfius, to block the sale. This doesn't make sense. Japan, unlike China, is an important American ally. Earlier this month, the bipartisan House Select Committee on the Chinese Communist Party recommended that Congress put Japan on the Cfius "whitelist" of close allies. Countries already on the list include Australia, Canada, New Zealand and the U.K. Being on this list exempts qualifying investors from Cfius jurisdiction over noncontrolling transactions, real-estate transactions, and mandatory filing requirements."

- "Nippon Steel plans to maintain U.S.-based production, which will provide Americans with greater economic security. Chinese steel producers dominate the global market, accounting for nine of the top 13 companies. The deal will create the third-largest steelmaker in the world, and its U.S. presence will insulate American consumers from market distortions as Chinese producers dump their excess steel overseas."

**Mises Institute**
Let them Merge: Foreign Acquisition of US Steel*
**21 December 2023**

- "First, Nippon is a private company. Fetterman is essentially trying to make it seem like an adversary is buying US Steel, but this is contrary to reality. Japan and the US have a strong relationship, and to think that a Japanese company would threaten that is nothing but wild and unrealistic speculation."

- "The joint productive capacities of the two companies would be roughly equivalent to 58.56 million metric tons, which would be a step toward challenging China's present dominance in the global steel industry, a goal that one would think the economic nationalist, specifically the Chinese hawks, would favor."

- "As for the concerns over its impact on the American worker, Nippon has already committed to maintaining US Steel headquarters in Pittsburgh, and given the recent news of the United Auto Workers signing contracts with Ford, General Motors, and Stellantis, steel production would likely be kept in the US to make transportation of steel to these auto plants less costly. There are also plenty of nontransportable assets, such as workers, factories, supply chains, and local contracts, making it costly to outsource production. Steel is likely not going anywhere."

- "There is an additional economic reason to support this deal: increased foreign investment. Washington will gladly send foreign aid across the globe with the goal of helping the disadvantaged and downtrodden, but they oppose a foreign company investing in the US on the grounds that it would be harmful to Americans. So, which is it? Is foreign investment beneficial or harmful?"

- "The nationalist justifications for opposing this merger are empty, and any opposition should be flatly rejected as economic nonsense. Every defender of the free market should be in favor of freedom of acquiring and merging companies. When exceptions are made for vague national security concerns, the integrity of the free-market system is threatened."

**Leo Lewis**
***Tokyo Bureau Chief – Financial Times***
**Financial Times**
The US backlash against Nippon Steel is wholly misguided
**20 December 2024**

- "If Nippon Steel's deal is approved, it will draw a mid-ranked American company under the umbrella of one of the world's top three steelmakers, none of which is American. Specifically, it will make that company more competitive with Chinese rivals (that are genuinely state-owned) in an era where that battle is the greater threat."

**Chris Hamilton**
***President of West Virginia Coal Association***
**WCHS**
Reactions: $14 billion sale of U.S. Steel to Japan gathers mixed feedback
**21 December 2023**

- "West Virginia Coal Association president Chris Hamilton called the sale 'a positive move.'"

- "Nippon Steel currently consumes a couple, 3 million of tons of West Virginia coal on an annual basis to supply the coke and coal to steel production lines," Hamilton said. "We think that's going to continue to be a good thing. Hopefully, it will provide a little needed cash to retool some of their domestic steel making facilities."

**The Blade Editorial Board**
Editorial: Steel deal sealed
**21 December 2023**

- "Moreover, since when is a trusted ally like Japan a national security threat?"

- "These politicians are acting as if U.S. Steel was acquired by the Chinese Communist Party."

- "Our politicians are failing us economically and geopolitically with emotional attacks against commonsense business."

- "If foreign ownership of deeply rooted U.S. companies is a national disaster, how can Toledo live with Amsterdam-based Stellantis in control of Jeep?"

**Pat Toomey**
***Former US Senator (PA)***
CNBC, Squawk Box
**21 December 2023**

- "The skepticism behind this deal is some combination of protectionism, nativism and xenophobia gone wild, together with ding the bidding of organized labors. I think the labor union calculates that its more likely to get a renewal of its contract with an independent U.S. Steel than on owned by Nippon Steel."
- "The shareholders of US Steel are being offered something like twice the next highest biggest offer, and let's remember that shareholders consist of Americans of all stripes; teachers, fireman, truck drivers with 401ks and pension plans invested in companies including US Steel. What is the basis of denying them the full value of their asset?"
- "U.S. Steel is here. What do they think, Nippon is gonna dismantle the plants and put them on a barge to Tokyo? They're spending $14B, if this goes through, in order to develop and grow to develop a company that has been struggling for decades for a variety of reasons. Steel is not going anywhere, it's here. It's extremely improbable that our steel would be diverted in a time where we need it, and military consumption of American steel is around the order of 3%."
- "Nippon Steel is obligated to follow all labor laws that anyone else would, including the obligations over new contracts which is highly regulated by the federal government. Union workers should be glad a larger parent company with greater resources is gonna be there to increase the likelihood that they stay viable. They've struggled for a long time and it's a mistake for the union to conclude that somehow they're worse off."

**Rahm Emanual**
***US Ambassador to Japan***
**Reuters**
**Japan-US ties stronger than ever, minister says amid US Steel scrutiny**
**20 December 2023**

- "U.S. Ambassador to Japan Rahm Emanuel had welcomed the deal shortly after its announcement on Monday, saying in an X social media post the two companies were "defining the future of the key steel industry and forging a strong bond as they face a more competitive environment." He added that the deal would "deepen the bonds" between the U.S. and Japan."

**Phillip Bell and Sarah Bauerle Danzman**
***President of Steel Manufacturers Association and Political Scientist and Associate Professor at Indiana University, respectively***
**Reuters**
Nippon's US Steel buy needs scrutiny, says Biden campaign adviser Deese - Updated
**20 December 2023**

- "Philip Bell, the president of the Steel Manufacturers Association, said Japan is a trusted U.S. ally and the deal does not appear to consolidate control of iron ore mining or automotive steel production under a single company, as Cliffs' proposed purchase earlier this year of U.S. Steel would have done."

- "There will likely be a (CFIUS) review, but they will probably not block it," said Sarah Bauerle Danzman, who teaches international studies at Indiana University. She said CFIUS could only block the deal if it found "a clear national security threat."

- "She said transactions involving a Japanese investor happen frequently, with some 60 Japanese transactions reviewed between 2020 and 2022, according to the recent CFIUS annual report."

**Pittsburgh Post-Gazette Editorial Board**
Editorial: Loss of U.S. Steel stings, but Nippon may be just the right suitor
**20 December 2023**

- "Consider the alternative: a $7.3 billion pairing with Cleveland-Cliffs that U.S. Steel smartly rebuffed, then leveraged into a much more lucrative deal with Nippon. In a Cleveland-Cliffs marriage, nearly all American iron ore would have been held by a single corporation, which is neither economically nor strategically sound. Further, Cleveland-Cliffs and U.S. Steel share a specialty in integrated steel manufacturing — from iron ore to finished steel — that would have resulted in consolidation of operations and jobs."

- "In this match, the iconic U.S. Steel brand would have been retired, and the company's headquarters sent to Ohio."

- "The Nippon deal avoids these bad outcomes. Nippon has few operations in the U.S., so there are no serious antitrust concerns. For southwest Pennsylvania, it's unlikely Nippon just dropped

$14 billion — a huge 40% premium on the market value — just to shut down the Mon Valley Works. It is more likely that Nippon values owning an American integrated steel operation, maybe even more than U.S. Steel did."

- "Nippon has also committed to making steel as cleanly as possible. While it's far too early to know, it's reasonable to hope Nippon may be open to making the expensive environmental improvements to the Mon Valley Works that U.S. Steel balked at two years ago. To this end, local organizations dedicated to clean air and water should seek to develop a positive relationship with the new firm, based in economic and environmental realism."

**The Daily Mail**
What does the US Steel takeover mean for American jobs? Despite outcry from lawmakers and unions, experts say purchase by Japan's Nippon Steel may not impact steelworkers
**20 December 2023**

- "'I think he's 100 percent wrong,' Prusa told NPR in response to Fetterman's remarks. 'There are challenges for US Steel workers, and those challenges are going to be there at US Steel with or without Nippon Steel's ownership.'"
- "'What's most important for US steel workers, and particularly the ones at US Steel, is that they have companies that will invest and continue to invest in state-of-the-art technology to allow them to be competitive.'"

**Camera Bartolotta**
***State Sen., R- Carroll Township***
**Mon Valley Independent**
U.S. Steel sold to Japan's Nippon Steel for $14.9B
**19 December 2023**

- "I'm optimistic and pleased that the collective bargaining agreement is being honored and that they're keeping the headquarters and the iconic name of U.S. Steel in Pittsburgh," Bartolotta said. "That's huge."
- "This is a highly, highly capitalized global player, and they are poised to invest hundreds of millions of dollars to modernize steelmaking in Pittsburgh," she said.
- "So I'm fingers crossed that this is something that will come to fruition because they will keep steelmaking alive in the U.S. We were a number one player for generations. And to ignore the opportunity that's right here before us, I think, would be foolhardy."

**The Wall Street Journal Editorial Board**
U.S. Steel's Sale Is Industrial Policy Boomerang
**19 December 2023**

- "The deal could even provide an American-Japanese counterweight to China's steel powerhouse. Yet the same politicians who support higher tariffs and industrial policy to counter China now are raising abouts about the deal for purported national security reasons."

- "U.S. steel making has been declining for decades owing to the higher labor costs of unionized production. American human and financial capital have been put to better work elsewhere such as advanced manufacturing. There are nearly one million more U.S. manufacturing jobs than a decade ago, and there probably would be more if not for Mr. Trump's tariffs."

- "Some politicians, including presidential front-runners from both parties, want to take the U.S. back to the days of 1930s protectionism and industrial policy. But if the Japanese want to invest in the U.S., shouldn't Washington welcome them with open arms?"

**Spencer Igo**
***U.S. State Rep. (MI)***
**Duluth News Tribune**
'People on the Range are nervous' as Japanese company announces deal to buy US Steel
**19 December 2023**

- "State Rep. Spencer Igo, R-Wabana Township, whose district includes Keetac, said the sale 'opens the door for new possibilities on the Iron Range as Nippon's acquisition of U.S. Steel will better position our region to play an important role in helping meet increased, global demand for steel.'"

- "There are many questions that will be answered in the weeks and months ahead, but I am encouraged that Nippon has made clear that they are committed to honoring all of U.S. Steel's collective bargaining agreements that have been negotiated over the years," Igo said. "Moving forward, I expect operations at Keetac and Minntac to continue uninterrupted and am hopeful that new technologies will expand opportunities in Minnesota."

**Eric Holcomb**
***Governor of Indiana***
**WFYI**
Holcomb: You can't be 'isolationist' about U.S. Steel acquisition by Japanese company
**19 December 2023**

- Gov. Eric Holcomb said the sale of U.S. Steel to a Japanese company reflects the need to remain competitive in a global marketplace.

- Holcomb said the sale is a reminder that an "isolationist" perspective doesn't work.

- "You have to be able to compete on a global stage if you want to stay in business and grow," Holcomb said.

**Ryan Costello**
***Former U.S. Representative (PA)***

**Pittsburgh Tribune Review**
Ryan Costello: U.S. Steel-NSC Merger a good deal for workers, consumers and Pa.
**19 December 2023**

- "This is good news on two fronts for workers. First, NSC is promising at the outset to be a good-faith partner to the United Steelworkers by honoring the agreement they have in place with U.S. Steel and making it clear that the company intends to maintain its unionized workforce in the United States."

- "Second, the United Steelworkers will have membership in a combined U.S. Steel-NSC and with other American steelmakers. We saw the success the United Autoworkers had in their recent contract negotiations in part because they could play competing automakers off each other. The United Steelworkers' bargaining position in future negotiations with the entire industry has increased with this deal."

- "In addition to the industrywide benefit for workers, Pennsylvania is well served by this merger. U.S. Steel's iconic brand will remain unchanged and the company's Pittsburgh headquarters will stay right where it is. Any situation in which U.S. Steel's headquarters left Pennsylvania would have been a huge hit for the commonwealth to take."

- "If another domestic steel producer had acquired U.S. Steel, that would put American iron ore deposits and steel into the hands of one combined American steel maker. A lack of competition would drive up prices on everything from cars to infrastructure construction to military defense procurement."

- "The United Steelworkers will have their contract honored and a good-faith bargaining partner in the combined U.S. Steel-NSC. Pittsburgh and Pennsylvania get to keep the U.S. Steel jobs that already were here, and our state will maintain its primacy in the American steel industry. Finally, up and down the steel supply chain, buyers will have a competitive marketplace that is not dominated by any one firm. As inflation continues to be a problem, a merger that will help keep prices down is good for consumers."

- "The nationalist justifications for opposing this merger are empty, and any opposition should be flatly rejected as economic nonsense. Every defender of the free market should be in favor of freedom of acquiring and merging companies. When exceptions are made for vague national security concerns, the integrity of the free-market system is threatened."

Business Confidential Pursuant to 50 U.S.C. § 4565
Protected from Disclosure Under 5 U.S.C. § 552

Page 60 of 60

AR_009219

App.431



September 4, 2024

Dear Secretary Raimondo and Secretary Yellen,

I am writing in response to Deputy Assistant Secretary Fair's letter dated August 31, 2024, in which on behalf of the Committee on Foreign Investment in the United Sates (CFIUS), he identifies a series of national security concerns related to Nippon Steel's pending acquisition of U. S. Steel.

I must admit that I am disappointed to see that despite so many areas where we seem to be fully aligned, we have reached very different conclusions on the impact that this transaction will have on the domestic steel industry. We specifically identified U. S. Steel as an acquisition target given the attractiveness of the market, a deep respect for the rule of law so present across the American economy, and our strong conviction that Nippon Steel's expertise and resources can drive growth within the entire American steel industry – ultimately benefitting national security.

I want to provide you and the rest of the Committee with my personal assurances that through this transaction, Nippon Steel is committed to strengthening U.S. national security and addressing any potential issues that may arise. We have a shared desire to curb the influence of the Chinese steel industry on global markets while promoting innovation, knowledge sharing and healthy competition in friendly economies.

Nippon Steel prides itself in being responsible and constructive partners in the jurisdictions where we operate. This has been the case over the past four decades we have operated in the United States, and it will remain the case in our approach to operating U. S. Steel. We are committed to following all applicable laws and regulations, including trade laws, to bolster the entire American manufacturing industry.

We will also ensure that the United Steelworkers (USW) remain central to U. S. Steel's future. As you have seen, we have made several commitments focused on protecting and growing USW jobs while investing in the long-term competitiveness of USW facilities – all of which we intend to make legally binding with the USW itself. Over the last nine months, we have sought to be responsive to each of the concerns that the USW leadership has raised, with last week's announcement of major planned investments in the Mon Valley, Pennsylvania and Gary, Indiana as just the latest example.



To conclude, Nippon Steel remains deeply committed to the transaction with U. S. Steel and investing the resources it needs to write a successful new chapter. In order to better understand the Committee's concerns and outline our approach to addressing them, I am requesting that we meet in person at your earliest possible convenience. I hope that this can be the start of a productive long-term partnership.

Sincerely,

*Takahiro Mori*

*Representative Director and Vice Chairman*



United States Steel Corporation
600 Grant Street, Suite 6100
Pittsburgh, PA 15219-2800
(412) 433 - 1130

**David B. Burritt**
President & Chief Executive Officer

September 4, 2024

Secretary Raimondo and Secretary Yellen:

We are writing on behalf of United States Steel Corporation ("U. S. Steel") to request a meeting with you promptly to discuss the review by the Committee on Foreign Investment in the United States ("CFIUS") of the pending acquisition (the "Transaction") of U. S. Steel by Nippon Steel Corporation ("Nippon Steel," and together with U. S. Steel, the "Parties").

We are requesting this meeting because we wish to underscore the importance of the recent commitments that Nippon Steel has made to the future of U. S. Steel and its USW-represented facilities; the benefits that will accrue to those facilities and USW members as a result of the Transaction; the broader benefits to U. S. Steel and our customers that also will accrue from this Transaction, and the risks that will materialize if the Transaction is not consummated.

In requesting this meeting, our hope is to focus on the many positive benefits that will result from the Transaction. At the same time, we are advised of the letter dated August 31, 2024, from CFIUS to the Parties. On behalf of the board of directors of U. S. Steel (the "Board of Directors"), we are concerned that, notwithstanding the Parties' full transparency and submissions of thousands of pages of materials over the course of the CFIUS process, the August 31 letter reflects serious factual errors and inaccuracies regarding the Parties, the Transaction, and the steel industry – and is a sign of a disconcerting politicization of a legal process.

The Transaction results from an exhaustive strategic review undertaken by U. S. Steel at the direction of the Board of Directors in 2023. This review included the evaluation of U. S. Steel as a standalone company as well as potential alternatives, including contacts with 54 potential counterparties to a transaction, resulting in 10 non-binding bids, five second round bids, and ultimately resulting in the Board of Directors agreeing to Nippon Steel's bid.

The Transaction was by far the best alternative for U. S. Steel and its stakeholders, including its blast furnace ("BF") facilities and its workers and the communities they serve and reside in. Every single other bid would have resulted in U. S. Steel being broken up or the BF facilities deprioritized—either because bidders were not interested in the BF facilities, or because antitrust concerns would have forced (at a minimum) the divestiture of several of the BF and other USW-represented facilities. The Board of Directors ultimately determined that Nippon Steel's all-cash proposal of $55 per share for U. S. Steel provided the highest value and certainty of value of any of the bids, and presented lower regulatory risk than Cleveland-Cliffs Inc.'s bid, which was the alternative final bid.

The Board of Directors also noted that Nippon Steel is a publicly traded company from one of the United States' closest allies with a long history of operating in the United States, and with resources, R&D capabilities, and technology that would be *contributed* to the United States and enhance U. S. Steel's capabilities. It was – and remains – the assessment of the Board of Directors and U. S. Steel management, after thorough study, that the Transaction will strengthen U. S. Steel's production capabilities and ability to serve its commercial



United States Steel Corporation
600 Grant Street, Suite 6100
Pittsburgh, PA 15219-2800
(412) 433 - 1130

**David B. Burritt**
President & Chief Executive Officer

customers – an assessment that has been confirmed by the strongly positive customer reaction to the Transaction.

The certainty provided by U.S. laws and regulations – and their insulation against political manipulation and distortion – is a bedrock of the U.S. economy and national security, and it is vitally important to the standing of the United States in the world and to the prospects of U.S. companies to compete globally. It also is vitally important that boards of directors of U.S. public companies have the ability to plan with full confidence in the legal system and clarity in how regulators will act within that system.

As the stewards of the two executive branch agencies with the greatest responsibility for protecting and promoting the U.S. economy, we trust that you share our interest in safeguarding the integrity of our institutions of government and the rule of law.

For these reasons, we encourage you to meet with us to discuss the path forward on this Transaction.

*David Burritt*
*President & CEO*

*David Sutherland*
*Board Chair*

*Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure under 5 U.S.C. § 552*
Draft of December 2, 2024

# NATIONAL SECURITY AGREEMENT

This NATIONAL SECURITY AGREEMENT ("NSA" or "Agreement") is entered into as of [December __,] 2024 (the "Effective Date"), by and among: (i) Nippon Steel Corporation ("Nippon Steel"), a publicly traded company incorporated in Japan; (ii) Nippon Steel North America, Inc. ("NSNA"), a New York corporation; (iii) United States Steel Corporation ("U. S. Steel"), a publicly traded company incorporated in Delaware (U. S. Steel, together with Nippon Steel and NSNA, the "Transaction Parties," and each individually, a "Transaction Party"); and (iv) the U.S. Government ("USG"), represented by the U.S. Department of the Treasury and the U.S. Department of Commerce as the CFIUS Monitoring Agencies (the "CMAs"), with each of the Transaction Parties and the CMAs referred to herein individually as, a "Party" and collectively as, the "Parties."

## RECITALS

WHEREAS, the Committee on Foreign Investment in the United States ("CFIUS") has received written notification, dated March 13, 2024 (together with all additional information and documentary materials subsequently submitted to CFIUS by the Transaction Parties in connection therewith, the "Notice"), pursuant to Section 721 of the Defense Production Act of 1950, as amended, codified at 50 U.S.C. 4565 ("50 U.S.C. 4565"), of a transaction that is the subject of CFIUS Case 24-038, which was subsequently refiled on June 24, 2024 as CFIUS Case 24-088, and on September 24, 2024 as CFIUS Case 24-154;

WHEREAS, the transaction involves the indirect acquisition by Nippon Steel of all the issued and outstanding shares of U. S. Steel U. S. Steel, pursuant to the Agreement and Plan of Merger dated as of December 18, 2023 (the "Transaction").

WHEREAS, CFIUS has determined that the Transaction constitutes a "covered transaction" for purposes of 50 U.S.C. § 4565;

WHEREAS, CFIUS has undertaken a review and investigation of the effects of the Transaction on the national security interests of the United States, including a risk-based analysis, as required by 50 U.S.C. § 4565, and determined that there are risks to the national security of the United States that arise as a result of the Transaction;

WHEREAS, CFIUS has determined that it is necessary to enter into this NSA with the Transaction Parties for the purposes of mitigating the risks to the national security of the United States that arise as a result of the Transaction and to allow CFIUS to conclude action under 50 U.S.C. §4565 with respect to the Transaction;

WHEREAS, the Transaction Parties understand that 50 U.S.C. 4565(l)(3)(A) authorizes the CMAs, acting on behalf of CFIUS, to enter into an agreement with any party to a covered transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction and that this NSA constitutes an agreement pursuant to 50 U.S.C. § 4565(l) to mitigate such national security risk; and

WHEREAS, each of the Transaction Parties has determined to enter into this NSA based on its belief that the business purpose of the Transaction can be achieved consistent with the terms of

this NSA, with the understanding that there is no presumption that a waiver or exception will be granted to any provision of this NSA, and with the understanding that failure to abide by this NSA is subject to all remedies available to the USG.

NOW, THEREFORE, by the authority vested in CFIUS by 50 U.S.C. 4565 and associated regulations, and Executive Order 11858 of May 7, 1975, as amended by Executive Order 13456, 73 Fed. Reg. 4677 (January 23, 2008), the CMAs, acting on behalf of CFIUS, hereby enter into this NSA with the Transaction Parties to address CFIUS's national security concerns on the following terms:

## ARTICLE I: DEFINITION OF TERMS

As used in this NSA, capitalized terms shall be defined as set forth below; *provided,* that capitalized terms used in this NSA and not defined in this Article I shall have the meanings assigned to them elsewhere in the NSA:

A. "Access" means to, or the right or ability to:

1. enter a physical space ("Physical Access"); or

2. obtain, read, copy, edit, divert, hear, release, affect, search, alter the state of, or otherwise view data or systems in any form and through any means, whether remotely or electronically, including through Information Technology (IT) Systems, cloud computing platforms, networks, data, security systems, software, and hardware ("Logical Access").

B. "Affiliate" means with respect to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with the Person specified; *provided,* that for purposes of this NSA, U. S. Steel and each of its subsidiaries shall be deemed not to be an Affiliate of Nippon Steel or NSNA.

C. "BLA" means the basic labor agreement in effect between U. S. Steel and the USW as of the Effective Date.

D. "Capacity Utilization" means the actual production volume of a Production Location divided by the name plate capacity of such Production Location.

E. "Closing Date" means the date upon which the Transaction is consummated.

F. "Commercially Reasonable Terms" means terms consistent with prevailing market and industry standards or practices in the United States for like or similar products from a company of similar size and scope, and other industry participants, taking into account quality (including materials and workmanship), quantity, input and production costs, market prices, performance, capacity constraints, timing of delivery, environmental considerations, and safety.

G. "Control" (including the terms "Controlled by" and "under common Control with") means the power, direct or indirect, whether or not exercised, to determine, direct, or decide important matters affecting an entity.

H. "Force Majeure Event" means acts of God, natural disaster or the elements, explosion, insurrection, riot, strikes, lockouts, boycotts, picketing, labor disturbances, acts of public enemy, war (declared or undeclared), acts of terrorism, epidemics or pandemics, partial loss or shortage of raw materials (including third-party products used to maintain Production Capacity), but in each case only to the extent that such act or event prevents, impedes, or reduces Production Capacity.

I. "Headquarters" means the primary location where an entity's management directs, controls, or coordinates the entity's activities.

J. "Indefinite Idling" means the idling of a Production Location occurs in response to reduced demand for which the timeline is uncertain, *provided* that the relevant Production Location is maintained in a condition such that production and supply of steel or steel-related products therefrom can be resumed in the future, typically within three to six months and within no more than 12 months.

K. "Key Management Personnel" means the Security Officer and any individual holding the position or exercising the authority of a president and chief executive officer, chief financial officer, general counsel, chief ethics & compliance officer, or senior vice presidents with responsibility for production, manufacturing, and raw materials supply.

L. "Permanent Idling" means the closure of a Production Location such that actions are taken that render production and supply of steel or steel-related products therefrom impractical to restart without significant capital expenditures and an extended timeline (e.g., dismantling and scrapping of the equipment used for producing steel or steel-related products, or otherwise rendering such equipment permanently unusable).

M. "Person" means any individual or entity.

N. "Personal Verification Information" means:

1. full name (last, first, middle name);

2. all other names and aliases used;

3. name of current and/or last employer;

4. business address;

5. country and city of residence;

6. residential address;

7. date of birth, in the format MM/DD/YYYY;

8. place of birth;

9. U.S. Social Security number (where applicable);

10. all current and/or past citizenships;

11. national citizenship;

12. national identity number, including nationality, date and place of issuance, and expiration date (where applicable);

13. U.S. or foreign passport number (if more than one, all must be fully disclosed), nationality, date and place of issuance, and expiration date and, if a U.S. visa holder, the visa type and number, date and place of issuance, and expiration date;

14. dates and nature of foreign government and foreign military service (where applicable), other than military service at a rank below the top two non-commissioned ranks of the relevant foreign country;

15. relevant contact information, including office and cell phone numbers, email, and emergency contact information; and

16. a *curriculum vitae* or similar professional synopsis.

O. "Personnel" means any employee, director, officer, manager, agent, contractor, temporary staff, or other representative, and includes the respective successors or assigns of the foregoing.

P. "Production Capacity" means the name plate capacity to produce and supply steel and steel-related products from the Production Locations as of the Effective Date, specifically set forth in Annex 1, as may be updated from time to time in accordance with the terms of this Agreement.

Q. "Production Locations" means U. S. Steel's existing facilities (identified in Annex 1) in the United States involved in the production, including support for production, of steel products as of the Effective Date, as may be updated from time to time in accordance with the terms of this Agreement.

R. "Temporary Idling" means the idling of a Production Location or that occurs in response to reduced demand for which the timeline is reasonably foreseeable, *provided* that the relevant Production Location or is maintained in a condition such that production and supply of steel or steel-related products therefrom can be restarted within a reasonable period of time, typically within six weeks and within no longer than 12 weeks.

S. "United States" or "U.S." means the United States of America, the States of the United States, the District of Columbia, and any commonwealth, territory, dependency, or possession of the United States, or any subdivision of the foregoing.

T. "USW" shall mean the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.

**ARTICLE II: STRUCTURE, DOMESTIC OWNERSHIP AND HEADQUARTERS**

A. Place of Incorporation and Headquarters of U. S. Steel.

1. U. S. Steel shall be incorporated under the laws of the state of Delaware or another state, district, or territory of the United States.

2. U. S. Steel shall have its Headquarters in Pittsburgh, Pennsylvania.

B. Place of Incorporation and Headquarters of NSNA.

1. NSNA shall be incorporated under the laws of the state of New York or another state, district, or territory of the United States.

2. Within no more than one (1) year following the Closing Date, NSNA shall have its Headquarters in Pittsburgh, Pennsylvania.

C. Ownership of U. S. Steel. Following the Closing Date, all the issued and outstanding shares of U. S. Steel shall be owned directly or indirectly by NSNA.

D. Ownership of NSNA. Following the Closing Date, all the issued and outstanding shares of NSNA shall be owned directly or indirectly by Nippon Steel.

E. U. S. Steel Board. Following the Closing Date, the board of directors of U. S. Steel (the "U. S. Steel Board") shall be composed of a maximum of nine (9) members, a majority of whom are U.S. citizens who are not dual citizens, and three of such U.S. citizens shall be independent directors (the "Independent U.S. Directors"), appointed pursuant to Section II.G below.

F. Qualification of Independent U.S. Directors. The Independent U.S. Directors shall:

1. be U.S. citizens who are not dual citizens;

2. have no prior relationship with the Transaction Parties unless otherwise approved by the CMAs;

3. be chosen specifically for their expertise in national security, trade matters, manufacturing, and/or labor; and

4. be approved by the CMAs, pursuant to Section II.G.

G. Appointment, Removal, and Vacancy of Independent U.S. Directors.

1. Nomination of Independent U.S. Directors.

a. Within at least [15] days after the Closing Date, the Transaction Parties shall nominate, for approval of the CMAs, the candidates to serve as the initial Independent U.S. Directors.

b. Contemporaneously with each nomination of an Independent U.S. Director, the Transaction Parties shall provide the CMAs with complete Personal Verification Information and any other information requested for the nominee, in the format requested by the CMAs, to assess whether the nominee can effectively perform the functions set forth in this NSA. The Transaction Parties shall ensure that each nominee is available for an interview at the request of the CMAs.

c. If the CMAs do not object in writing within [15] days following receipt of all information required under this paragraph and all information requested about the nominated Independent U.S. Director, as determined by the CMAs in their sole discretion, the lack of action shall constitute a non-objection.

d. If the CMAs object to the nominated Independent U.S. Director, the Transaction Parties shall nominate a different candidate within [15] days of receipt of any such objection, subject to the same procedures as the initial nomination.

e. The Transaction Parties shall formally appoint an Independent U.S. Director within [5] days following the non-objection of the CMAs.

2. Removal of Independent U.S. Directors.

a. An Independent U.S. Director may be removed without prior written approval of the CMA only for acts of fraud, gross negligence or willful misconduct or breach of his or her duties as a director under this Agreement or applicable law, provided that in the case of such a removal of an Independent U.S. Director, the removal shall not become effective until (i) such Independent U.S. Director as well as the CMAs have received written notification of such removal and (ii) no objection was raised by the CMAs within ten (10) days upon the receipt of the notification on the grounds that such Independent U.S. Director did not commit acts of fraud, gross negligence or willful misconduct or breach his or her duties as a director under this Agreement or applicable law. The failure to object in a timely manner shall be deemed an approval.

b. Requiring or advocating for compliance with this Agreement shall not in any circumstance be considered to be an act of fraud, gross negligence or willful misconduct. In exigent circumstances, the U. S. Steel Board may by a two-thirds (2/3) vote of the remaining members of the U. S. Steel Board, suspend an Independent U.S. Director's authority pending the CMAs' non-objection to his or her removal.

c. The Transaction Parties may remove an Independent U.S. Director for any reason upon the prior written consent of the CMAs.

d. The CMAs, acting in their sole discretion, shall have the right to require the removal and replacement of any Independent U.S. Director who violates the requirements applicable to that Independent U.S. Director under this Agreement.

3. Vacancy in Independent U.S. Director Position. In the event of a vacancy in the position of an Independent U.S. Director (including as a result of death, disability, or resignation), the Transaction Parties shall nominate a replacement within (15) days, subject to the non-objection of the CMAs under Section II.G.1.

H. Compliance Committee. The Independent U.S. Directors shall establish a Compliance Committee of the U. S. Steel Board to oversee U. S. Steel's compliance with this Agreement (the "Compliance Committee"). The Compliance Committee shall be comprised only of the Independent U.S. Directors.

1. The Compliance Committee shall supervise and report to the full U. S. Steel Board on all matters related to implementation of and compliance with this Agreement, including, *but not limited to*:

a. investments and capital commitments approved by the U. S. Steel Board to ensure that capital is allocated appropriately to maintain Production Capacity;

b. on a periodic basis, Capacity Utilization and demand, including customer order information, to ensure that U. S. Steel does not transfer orders or potential orders to non-U. S. Steel or overseas entities in a manner that would adversely affect Capacity Utilization;

c. the Transaction Parties' compliance with the commitments in Article III, and any changes that could affect such compliance;

d. planned idling actions by U. S. Steel to ensure that they do not reduce Production Capacity except pursuant to Article IV;

e. on a periodic basis, the operating status of the Production Locations, including (i) the anticipated need to idle, restart, or change the idling designation of any Production Location or part thereof, and (ii) the maintenance conditions of any Production Locations or parts thereof that are then subject to a Temporary Idling or Indefinitely Idling;

f. plans for undertaking any Capacity Reduction;

g. any interference by Nippon Steel or NSNA in determinations made by the Trade Committee regarding U. S. Steel's Trade Actions in breach of Article V;

h. instances of noncompliance with the NSA; and

i. any other topics related to compliance with the NSA as requested by the CMAs.

2. Within 120 days of the Closing Date, the Compliance Committee shall implement a policy setting forth procedures to carry out its responsibilities, including for:

a. monitoring compliance with this Agreement as set forth in Section II.H.1;

b. reporting to the U. S. Steel Board on such matters;

c. making recommendations to the U. S. Steel Board on actions necessary to maintain compliance with this Agreement;

d. reporting to the CMAs instances of non-compliance.

3. To perform its function, the Compliance Committee shall, among other things, receive reports from the Security Officer on the Transaction Parties' compliance with this Agreement.

4. Additionally, the Compliance Committee shall:

a. Serve, along with the Security Officer, as primary points of contact for the CMAs;

b. Hold periodic meetings with the CMAs (or otherwise meet as requested) to discuss any questions of interest or other concerns raised by the CMAs relating to compliance with this Agreement; and

c. Certify U. S. Steel's compliance with this Agreement annually to the CMAs.

5. The Transaction Parties shall provide the Compliance Committee with the resources necessary to perform its duties under this Agreement, which shall include authority to engage outside counsel and third-party consultants.

I. <u>NSA Board Observer</u>.

1. In the event that the CMAs determine that any of the Transaction Parties has violated this Agreement, and, in the sole discretion of the CMAs, such violation has not been cured within 60 days of written notice thereof by the CMAs, the CMAs shall have the right, for a period of two years following such violation, to

require the Transaction Parties to appoint one (1) non-voting observer to the U. S. Steel Board (the "NSA Board Observer").

2. Qualification of the NSA Board Observer. The NSA Board Observer shall:

a. be a U.S. citizen who is not a dual citizen;

b. have no prior relationship with the Transaction Parties;

c. be chosen specifically for his or her expertise in national security, trade matters, manufacturing, and/or labor; and

d. be approved by the CMAs, pursuant to Section II.I.

3. Nomination of NSA Board Observer.

a. Within at least [30] days after the CMAs inform the Transaction Parties in writing of the requirement to appoint an NSA Board Observer, the Transaction Parties shall nominate, for approval of the CMAs, a candidate to serve as the NSA Board Observer.

b. Contemporaneously with each nomination of an NSA Board Observer, the Transaction Parties shall provide the CMAs with complete Personal Verification Information and any other information requested for the nominee, in the format requested by the CMAs, to assess whether the nominee can effectively perform the functions set forth in this NSA. The Transaction Parties shall ensure that each nominee is available for an interview at the request of the CMAs.

c. If the CMAs do not object in writing within [15] days following receipt of all information required under this paragraph and all information requested about the nominated NSA Board Observer, as determined by the CMAs in their sole discretion, the lack of action shall constitute a non-objection.

d. If the CMAs object to the nominated NSA Board Observer, the Transaction Parties shall nominate a different candidate within [15] days of receipt of any such objection, subject to the same procedures as the initial nomination.

e. The Transaction Parties shall formally appoint an NSA Board Observer within [5] days following the non-objection of the CMAs.

4. Responsibilities of the NSA Board Observer.

a. The U. S. Steel Board shall permit the NSA Board Observer to attend all meetings of the U. S. Steel Board and of any committee thereof in a non-voting observer capacity, in each case, to the extent permissible under

applicable law, and will give the NSA Board Observer notice of such meetings at the same time and in the same manner as notice is provided to the members of the U. S. Steel Board. Notwithstanding the foregoing sentence, the Board may meet without the presence of the NSA Board Observer, provided that (i) the Transaction Parties provide written notice three (3) days in advance of such meeting to the CMAs and an explanation of the rationale for such a request and the CMAs do not object within three (3) days of receipt of such request; and (ii) the Security Officer attends the meeting.

b. The Transaction Parties shall ensure that the NSA Board Observer participates in the Compliance Committee and, through such participation, (i) has the necessary authority to oversee the Transaction Parties' adherence to the terms of this NSA on and in relation to Board meetings; (ii) participates in the Compliance Committee in any meetings and reports to the CMAs; (iii) is charged with reporting any actual or suspected violation of this NSA relating to the Board to the CMAs, within forty-eight (48) hours of learning of any actual or suspected violation; (iv) participates in investigating any suspected violation of this NSA relating to the Board to determine whether it is an actual violation; and (v) maintains availability, upon notice from the CMAs, for discussions with the CMAs on matters relating to compliance with this NSA.

c. The NSA Board Observer shall be entitled to concurrent receipt of any materials provided to the U. S. Steel Board or any committee thereof; provided, however, that (i) the NSA Board Observer shall agree to hold in confidence and trust all information so provided pursuant to a confidentiality agreement entered into between such NSA Board Observer and U. S. Steel in a form reasonably acceptable to U. S. Steel and (ii) U. S. Steel reserves the right to remove information that, upon advice of counsel, is deemed to be subject to attorney-client privilege or protected under the attorney work product doctrine.

d. The Transaction Parties shall instruct the NSA Board Observer to perform his or her duties in a manner that the NSA Board Observer reasonably believes to be, in descending order: (a) first, in the national security interest of the United States as determined by the CMAs; and (b) second, where not inconsistent with the national security interest of the United States, in the best interests of the Transaction Parties, in each case subject to this NSA.

5. <u>Removal of the NSA Board Observer</u>.

a. The Transaction Parties shall not remove or replace the NSA Board Observer, except for cause, without the prior written consent of the CMAs. The Transaction Parties shall notify the CMAs at least fifteen (15) days before any removal of the NSA Board Observer without cause, and any

removal of the NSA Board Observer without cause shall only be proposed in conjunction with the nomination of a replacement NSA Board Observer, to prevent a vacancy from taking place. Removal for cause must be based on gross negligence, reckless disregard, violation of applicable law, violation of company policy, misconduct, or failure of the individual to perform his or her duties. For the avoidance of doubt, the Transaction Parties shall not remove the NSA Board Observer for any reason related to the NSA Board Observer's reasonable attempts to comply with or ensure the Transaction Parties' compliance with this NSA.

b. The Transaction Parties shall notify the CMAs within forty-eight (48) hours of the U. S. Steel Board learning of: (i) an actual or planned resignation of the NSA Board Observer; (ii) the incapacity of the NSA Board Observer; (iii) the death of the NSA Board Observer; or (iv) the termination of the NSA Board Observer for cause. Should the CMAs, in their sole discretion, lose confidence in the abilities of the NSA Board Observer to perform his or her duties related to this NSA or determine that he or she has contributed to a breach of, or undermined compliance with, this Agreement, the CMAs may direct the Transaction Parties to remove the NSA Board Observer from the NSA Board Observer role, and the Transaction Parties shall promptly remove the NSA Board Observer from the NSA Board Observer role. Should any vacancy in the NSA Board Observer position occur, the Transaction Parties shall nominate a replacement NSA Board Observer within thirty (30) days, subject to the same procedures as the initial nomination in Section II.I.3. The Transaction Parties shall appoint the NSA Board Observer within [5] days following the non-objection of the CMAs.

6. Costs. The Transaction Parties shall be responsible for all costs associated with the NSA Board Observer.

J. U. S. Steel Corporate Organizational and Governance Documents. Following the Closing Date, U. S. Steel's corporate organizational and governance documents shall be amended to reflect the board structure as set forth in this Agreement, and U. S. Steel will not be permitted to further modify such board structure without the approval of the CMAs.

K. U.S. Management of U. S. Steel. U. S. Steel's Key Management Personnel shall be U.S. citizens, with the permanent residence in the United States, and be responsible for the day-to-day operations and management of U. S. Steel.

## ARTICLE III: DOMESTIC PRODUCTION AND SUPPLY ASSURANCE AND ENHANCEMENT

A. Following the Closing Date and subject to the notice, consultation, and other terms of Articles IV and V, U. S. Steel shall maintain Production Capacity to meet market demand in the United States on Commercially Reasonable Terms, and shall not cease or reduce Production Capacity except in accordance with this Agreement.

1. Nippon Steel shall ensure that Production Locations and U. S. Steel's other locations in the United States to be newly constructed or acquired after the Effective Date are prioritized for production of steel to meet demand by the U.S. market.

B. Notwithstanding the foregoing, U. S. Steel's inability to maintain Production Capacity as the result of a Force Majeure Event shall not constitute a breach of this Agreement, *provided* that the Transaction Parties provide notice to the CMAs in accordance with this Section III.C, and *provided, further,* that the Transaction Parties shall use commercially reasonable efforts to comply with their obligations to maintain Production Capacity. If the Transaction Parties become aware that a Force Majeure Event will or is likely to result in the inability to maintain Production Capacity, U. S. Steel shall notify the CMAs within seven (7) days after becoming aware and shall detail the cause of the disruption and the anticipated schedule to restore Production Capacity. Upon receiving such a notification, the CMAs may initiate consultations with the Transaction Parties to address any issues related to such notification or disruption. The Transaction Parties shall engage in such consultations for so long as the CMAs seek their continuation.

C. Following the Closing Date and subject to the provisions of Article IV, the Transaction Parties shall not make any change to the operations of U. S. Steel that would reasonably be expected to have a material adverse effect on its ability to maintain Production Capacity.

D. Following the Closing Date, the Transaction Parties shall, during the years of 2024, 2025 and 2026, invest at least $1.4 billion in Production Locations covered by the BLA.

E. The Transaction Parties shall invest at least $1 billion to enhance the competitiveness of the Mon Valley Works, including improving yield, increasing energy efficiency, improving product quality, and enhancing overall operating effectiveness, which shall include replacing and/or upgrading the hot strip mill and other facilities at Mon Valley Works.

1. Within 90 days after the Closing Date, the Transaction Parties shall submit to the CMAs a plan of action ("MV PoA") for the development of the project and investment in Mon Valley Works. The MV PoA shall include actions and steps related to project engineering, permitting, equipment ordering, site activities, and commissioning and startup work, as applicable.

2. The Transaction Parties shall provide the CMAs with a quarterly update on their progress under the MV PoA and any adjustments to the MV PoA.

F. The Transaction Parties shall revamp, including to reline, blast furnace #14 at Gary Works, at a cost of at least approximately $300 million.

1. Within 90 days after the Closing Date, the Transaction Parties shall submit to the CMAs a plan of action ("Gary PoA") for the development of the project and investment in blast furnace #14 at Gary Works. The Gary PoA shall include

actions and steps related to project engineering, permitting, equipment ordering, site activities, and commissioning and startup work, as applicable.

2. The Transaction Parties shall provide the CMAs with a quarterly update on their progress under the Gary PoA and any adjustments to the Gary PoA.

G. Following the Closing Date, Nippon Steel shall transfer to U. S. Steel, on arm's length terms, Nippon Steel's technology and know-how, including as they relate to steel products, blast furnace steel manufacturing processes, and the reduction of carbon emissions from blast furnace steelmaking.

H. Following the Closing Date, the Transaction Parties shall not transfer any production or jobs of U. S. Steel outside the United States.

1. This commitment not to transfer production shall mean that U. S. Steel shall not transfer orders or potential orders to non-U. S. Steel or overseas entities in a manner that would adversely affect Capacity Utilization, taking into consideration actual demand for products, of any Production Location.

I. Following the Closing Date, the Transaction Parties shall not conduct any layoffs of Employees (as defined in the BLA) or plant closures or idling of the Plants (as defined in the BLA), in each case, during the term of the BLA, except as permitted under the BLA [or otherwise agreed upon with the USW, which agreement shall be documented in writing and provided to the CMAs / or as provided in the letter from Nippon Steel to the USW, dated March 27, 2024 and attached as Exhibit [X]].

J. Following the Closing Date, the Transaction Parties shall not import into the United States steel slab produced outside the United States to reduce Production Capacity without prior approval from the CMAs.

**ARTICLE IV: FORMAL NOTICE**

A. Following the Closing Date, the Transaction Parties shall not reduce Production Capacity, except subject to the terms and procedures set forth below.

1. If the senior management officers of U. S. Steel responsible for maintaining Production Capacity determine that Production Capacity should be reduced, taking into consideration, among other factors, market forecasts, rigorous sales and operation planning processes, and the availability of relevant Trade Actions, they shall notify the Compliance Committee of the proposed reduction (each, a "Capacity Reduction") and submit information explaining the rationale for the Capacity Reduction and its anticipated effects on U. S. Steel's supply to customers, as well as any additional information requested by the Compliance Committee.

2. The Compliance Committee shall review and consider the information submitted by such senior management officers, including to assess the possible impact of the Capacity Reduction on supply chain resilience in industries in the United States

relevant to U.S. national security. After considering the information submitted by such senior management officers, the Compliance Committee shall vote to approve or not to approve the Capacity Reduction, with the affirmative vote of a majority of the Independent U.S. Directors required for approval. The senior management officers shall not proceed with a Capacity Reduction unless approved by the Compliance Committee.

3. If the Compliance Committee approves a Capacity Reduction, the Independent U.S. Directors shall provide written notice (a "Formal Notice") to the CMAs, including a detailed, written explanation of the rationale for approving the Capacity Reduction and the Compliance Committee's assessment of its possible impact on supply chain resilience in industries in the United States relevant to U.S. national security. All information provided to the Compliance Committee by the senior management officers also shall be provided to the CMAs with the Formal Notice.

4. The Transaction Parties shall not undertake any measures to implement a Capacity Reduction until at least 120 days after Formal Notice thereof has been provided to the CMAs (a "Consultation Period").

5. For the avoidance of doubt, a Temporary Idling or Indefinite Idling shall not be considered a Capacity Reduction under the Agreement; a Permanent Idling shall constitute a Capacity Reduction subject to the approval and notice requirements of Article IV.

B. In the event of a Temporary Idling or Indefinite Idling initiated following the Closing Date:

1. U. S. Steel shall notify the CMAs at least [30] days in advance of any Temporary Idling or Indefinite Idling, *provided* that in exigent circumstances U. S. Steel shall notify the CMAs as soon as reasonably possible in advance of or following such Temporary Idling or Indefinite Idling. The notification to the CMAs shall include a summary of the information and data considered, including the market and customer demand, order book status, and footprint loading scenarios, as well as a summary of the action plan for the idling and potential restart.

2. If U. S. Steel determines that any Temporary Idling or Indefinite Idling will last longer than six (6) months (as measured starting after the Closing Date), U. S. Steel shall submit a report to the CMAs (an "Initial Idling Report") regarding the status of the idling, including:

   a. the market and customer demand, order book status, and footprint loading scenarios;

   b. the action plan for the idling; and

   c. potential timelines for restart or change to a different idling status.

3. For any Temporary Idling or Indefinite Idling that has persisted longer than six (6) months, U. S. Steel shall submit an update to the Initial Idling Report to the CMAs every six (6) months that any such Temporary Idling or Indefinite remains ongoing following the Initial Idling Report.

**ARTICLE V: TRADE ACTIONS**

A. Following the Closing Date, neither Nippon Steel nor NSNA shall prevent, prohibit, or otherwise interfere with U. S. Steel's decisions or ability to pursue trade measures under U.S. law such as antidumping/countervailing duty orders, safeguard measures, Section 232 national security actions, or any other legal action, including filing a petition or otherwise initiating a case, or policy advocacy related to U.S. trade or imports (hereafter "Trade Actions"), as it relates to any country in the world, including, for the avoidance of doubt, any country in which Nippon Steel has operations.

B. U. S. Steel shall maintain a trade committee led by one or more senior management officers and comprised of U. S. Steel employees who are U.S. citizens (the "Trade Committee" and each member thereof a "Trade Committee Member"). The Trade Committee shall be responsible for coordinating all of U. S. Steel's Trade Actions.

1. <u>Appointment of Trade Committee Members</u>.

a. Within [15] days after the Closing Date, U. S. Steel shall appoint the Trade Committee Members and notify the CMAs of the appointed Trade Committee Members and shall provide the CMAs with complete Personal Verification Information of the appointed Trade Committee Members. The Chair of the Trade Committee shall be subject to non-objection by the CMAs, subject to Section V.B.3 below. Without limiting the foregoing, if the CMAs develop concerns as to any Trade Committee Member's capability to perform the functions set forth in this NSA, within [15] days of written notice thereof by the CMAs, U. S. Steel shall discuss with the CMAs in good faith to address such questions and/or concerns raised by the CMAs.

b. U. S. Steel shall also notify the CMAs no later than [5] days after the appointment of an additional Trade Committee Member and shall provide the CMAs with complete Personal Verification Information of the new Trade Committee Member.

2. Removal and Replacement of Trade Committee Members.

a. U. S. Steel shall have the ability to remove and replace a Trade Committee Member, other than the Chair, for any reason, provided that in the case of such a removal of a Trade Committee Member, the removal shall not become effective until such Trade Committee Member as well as the CMAs have received written notification of such removal with an explanation of the reasons for the removal.

b. The CMAs, acting in their sole discretion, shall have the right to require the removal and replacement of any Trade Committee Member who violates the requirements applicable to that Trade Committee Member under this Agreement.

3. Appointment and Removal of Trade Committee Chairperson.

a. Upon the nomination of the original Trade Committee Members, as specified above, U. S. Steel shall nominate, in writing to the CMAs, one such member to be the Trade Committee Chairperson. The appointment of the Trade Committee Chairperson shall be subject to the prior non-objection of the CMAs. If the CMAs do not object within thirty (30) days following receipt of all necessary information about a nominee, as determined by the CMAs in their sole discretion, the lack of action shall be deemed to be a non-objection. If the CMAs object to the nominated Trade Committee Chairperson, then U. S. Steel shall nominate a different candidate within ten (10) days of receipt of any such objection, subject to the same procedures as the initial nomination. U. S. Steel shall appoint the Trade Committee Chairperson within five (5) days following the non-objection of the CMAs.

b. U. S. Steel shall not remove or replace the Trade Committee Chairperson, except for cause, without the prior non-objection of the CMAs. U. S. Steel shall notify the CMAs at least fifteen days (15) days before the removal of the Trade Committee Chairperson, unless removed for cause. If the CMAs do not object within fifteen (15) days following receipt of the notice of proposed removal, the lack of action shall be deemed to be a non-objection. Any removal of the Trade Committee Chairperson shall only be proposed in conjunction with the nomination of a replacement Trade Committee Chairperson to prevent a vacancy from taking place, subject to the same procedures as the initial nomination.

c. U. S. Steel shall notify the CMAs within forty-eight (48) hours of learning of: (i) the actual or planned resignation of the Trade Committee Chairperson; (ii) the incapacitation of the Trade Committee Chairperson; (iii) the death of the Trade Committee Chairperson; (iv) any other leave that may interfere with the Trade Committee Chairperson fulfilling his or her responsibilities as Chairperson; or (v) the termination of the Trade Committee Chairperson for cause, and, in that case, nominate a new candidate to serve as Trade Committee Chairperson within seven (7) days of any such notification, subject to the same procedures as the initial nomination.

d. Removal for cause must be based on fraud, gross negligence, intentional misconduct, violation of applicable law, violation of company policy, or failure of the individual to perform his or her job duties. For the avoidance of doubt, U. S. Steel shall not remove the Trade Committee

Chairperson for any reason related to the Trade Committee Chairperson's attempts to comply with, or ensure the Transaction Parties' compliance with, the NSA.

e. In the event of a vacancy in the Trade Committee Chairperson position (including as a result of death, disability, or resignation), a qualified Trade Committee Member shall temporarily serve as the Trade Committee Chairperson until such time as the CMAs have approved a replacement Trade Committee Chairperson.

f. Should the CMAs, in their sole discretion, lose confidence in the ability of the Trade Committee Chairperson to perform his or her duties as chair of the Trade Committee or determine that he or she has intentionally or through gross negligence failed to meet his or her obligations or has otherwise undermined the effectiveness of the NSA, the CMAs may direct the Transaction Parties to remove the Trade Committee Chairperson and U. S. Steel shall: (i) immediately remove the Trade Committee Chairperson; and (ii) nominate a replacement Trade Committee Chairperson within seven (7) days of such notice, subject to the same procedures as the initial nomination.

C. The Trade Committee shall meet monthly, or more frequently as needed, with the Security Officer in attendance, to consider and decide U. S. Steel's Trade Actions, and to consider and recommend U. S. Steel's Trade Actions as identified in Section V.D. Minutes and records of all Trade Committee meetings and decisions shall be maintained by the Security Officer, and minutes shall be signed by the Chair of the Trade Committee and the Security Officer. The minutes shall be provided to the Compliance Committee and made available to the CMAs upon their request.

D. Approval by the Compliance Committee, with the affirmative vote of a majority of the Independent U. S. Directors, shall be required for any decision by the Trade Committee for U. S. Steel

1. to undertake any Trade Action that the Trade Committee assesses could cost over $1 million; or

2. not to join the USW or another U.S. party in a Trade Action concerning products manufactured by U. S. Steel, or to withdraw from such a Trade Action.

E. If the Compliance Committee approves a decision under Section V.D.2, the Independent U.S. Directors shall make a record of such approval, including a detailed, written explanation of the rationale for the approval and the Compliance Committee's assessment of its possible impact on supply chain resilience in industries in the United States relevant to U.S. national security. The record of approval and all information provided to the Compliance Committee by the Trade Committee in connection with such approval shall be preserved and made available to the CMAs upon request.

F. Compensation of members of the Trade Committee shall be based on the performance of U. S. Steel, and not of the broader Nippon Steel group.

**ARTICLE VI: CONSULTATIONS AND INFORMATION MEETINGS**

A. During any Consultation Period, the CMAs may, in their sole discretion, initiate consultations with the Transaction Parties to address any issues identified by the CMAs in connection with such Formal Notice. In any Consultation Period, the Transaction Parties shall engage in such consultations as directed by the CMAs for so long as the CMAs seek their continuation within such Consultation Period. In connection with such consultations, the Transaction Parties shall promptly provide all information requested by the CMAs.

B. On a quarterly basis, U. S. Steel shall meet with the CMAs at a mutually agreed upon time and location (or by telephone if requested, at the sole discretion of the CMAs) (each such meeting, an "Information Meeting").

C. At each Information Meeting, U. S. Steel shall provide all information requested by the CMAs on matters relating to compliance with this NSA and the forecast for Capacity Utilization. At the Information Meetings, the CMAs may discuss compliance with the NSA including:

1. all ongoing business operations affecting Production Capacity;
2. demand for steel and U. S. Steel's ability to supply products to meet such demand;
3. Capacity Utilization of all Production Locations;
4. any planned action by the Transaction Parties that may reduce Production Capacity or the ability to meet U.S. market demand;
5. instances of noncompliance with the NSA;
6. the continued need for the NSA;
7. whether any facilities need to be removed from the definition of Production Locations;
8. foreseeable changes affecting the Transaction Parties' ability to meet their obligations under Article III;
9. plans for undertaking any Capacity Reduction;
10. determinations made by the Trade Committee regarding U. S. Steel's Trade Actions;

11. the operating status of the Production Locations, including (i) the anticipated need to idle, restart, or change the idling designation of any Production Location or part thereof, and (ii) the maintenance conditions of any Production Locations or parts thereof that are then subject to a Temporary Idling or Indefinitely Idling; and

12. any other topics related to compliance with the NSA as requested by the CMAs.

D. Within fifteen (15) days after each Information Meeting, U. S. Steel shall provide to the CMAs a written summary of the information discussed with the CMAs.

E. U. S. Steel shall ensure that the Security Officer and other appropriate senior management officers attend each Information Meeting.

F. The Transaction Parties shall maintain reasonable availability for discussions with the CMAs on matters relating to compliance with this NSA, and the Transaction Parties shall provide written responses within ten (10) days to written inquiries from the CMAs.

**ARTICLE VII: SECURITY OFFICER**

A. Nomination Procedures. Within fifteen (15) days following the Closing Date, U. S. Steel shall nominate, in writing to the CMAs, an employee of U. S. Steel as the Security Officer (the "Security Officer") who will be responsible for ensuring the Transaction Parties' day-to-day compliance with the NSA and serve as the primary point of contact for the CMAs regarding such compliance. The appointment of the Security Officer shall be subject to the prior non-objection of the CMAs. If the CMAs do not object within thirty (30) days following receipt of all necessary information about a nominee, as determined by the CMAs in their sole discretion, the lack of action shall be deemed to be a non-objection. If the CMAs object to the nominated Security Officer, then U. S. Steel shall nominate a different candidate within ten (10) days of receipt of any such objection, subject to the same procedures as the initial nomination. U. S. Steel shall appoint the Security Officer within five (5) days following the non-objection of the CMAs.

B. Nomination Submission. Contemporaneously with each nomination of a Security Officer, U. S. Steel shall provide to the CMAs the Personal Verification Information for such nominee and any other information requested by the CMAs, in their sole discretion, to ensure that the nominee can effectively perform the functions of the position.

C. Eligibility Requirements. U. S. Steel shall ensure that the Security Officer:

1. is a U.S. citizen, not a dual citizen, who has been subject to background checks appropriate to the level of seniority and sensitivity of the position, and physically resides in the United States for the duration of his or her responsibilities;

2. has the appropriate senior-level authority and necessary skills and resources to fulfill the responsibilities of his or her position and to ensure implementation of and compliance with the NSA on a daily operational basis; and

3. has Access to all Personnel, records, information, networks, and resources necessary to instruct, ensure, monitor, document, and report on compliance with the NSA.

D. Responsibilities. The Transaction Parties shall ensure that the Security Officer:

1. instructs all relevant Personnel of the Transaction Parties as to the requirements of the NSA, and provides training as necessary to ensure compliance with the NSA and facilitate prompt reporting of violations discovered by Personnel of the Transaction Parties;

2. continuously monitors and ensures the day-to-day and overall compliance with the NSA;

3. serves as the primary point of contact for the CMAs regarding the Transaction Parties' compliance with the NSA;

4. provides written responses to the CMAs within five (5) days after receiving any inquiries from the CMAs and is available upon reasonable notice for discussions with the CMAs on matters relating to the enforcement of and compliance with the NSA or any other matter with respect to the NSA;

5. ensures that the Annual Compliance Reports and any information requested by the CMAs to enforce and monitor compliance with the NSA are submitted to the CMAs in accordance with the NSA;

6. reports any actual or suspected violations of the NSA to the CMAs as soon as practicable, but in any event within forty-eight (48) hours of learning of the actual or suspected violation, including submitting all reports made by any Personnel to the Security Officer regarding an actual or suspected violation of the NSA to the CMAs;

7. thoroughly investigates any actual or suspected violation of the NSA immediately upon learning thereof and promptly takes all reasonable steps to rectify any actual violation of the NSA;

8. implements policies that prohibit the Transaction Parties from retaliating against its Personnel for reporting any actual or suspected violations of the NSA to the Security Officer;

9. maintains oversight over information concerning matters relating to the enforcement of and compliance with the NSA; and

10. creates and maintains records adequate to permit confirmation and audit of the Transaction Parties' compliance with the NSA.

E. Additional Responsibilities. The Transaction Parties shall ensure that if the Security Officer holds other titles and responsibilities within U. S. Steel beyond serving as the Security Officer for the purposes of the NSA, such other responsibilities do not prevent such Security Officer from fully performing his or her duties as the Security Officer.

F. Replacement, Removal, Vacancy. The Transaction Parties shall not remove or replace the Security Officer, except for cause, without the prior non-objection of the CMAs.

1. The Transaction Parties shall notify the CMAs at least fifteen days (15) days before the removal of the Security Officer, unless removed for cause. If the CMAs do not object within fifteen (15) days following receipt of the notice of proposed removal, the lack of action shall be deemed to be a non-objection. Any removal of the Security Officer shall only be proposed in conjunction with the nomination of a replacement Security Officer to prevent a vacancy from taking place, subject to the same procedures as the initial nomination.

2. The Transaction Parties shall notify the CMAs within forty-eight (48) hours of learning of: (i) the actual or planned resignation of the Security Officer; (ii) the incapacitation of the Security Officer; (iii) the death of the Security Officer; (iv) any other leave that may interfere with the Security Officer fulfilling his or her responsibilities under the NSA; or (v) the termination of the Security Officer for cause, and, if such notification relates to the Security Officer position, shall nominate a new candidate for the Security Officer position within seven (7) days of any such notification, subject to the same procedures as the initial nomination.

3. Removal for cause must be based on fraud, gross negligence, intentional misconduct, violation of applicable law, violation of company policy, or failure of the individual to perform his or her job duties. For the avoidance of doubt, the Transaction Parties shall not remove the Security Officer for any reason related to the Security Officer's attempts to comply with, or ensure the Transaction Parties' compliance with, the NSA.

4. In the event of a vacancy in the Security Officer position (including as a result of death, disability, or resignation), a qualified employee of U. S. Steel comporting with the eligibility requirements of this NSA shall temporarily serve as the Security Officer under this NSA until such time as the CMAs have approved a replacement Security Officer, subject to the nomination procedures in this Article VII.

G. CMAs' Direction to Remove. Should the CMAs, in their sole discretion, lose confidence in the ability of the Security Officer to perform his or her duties in connection with the NSA or determine that he or she has intentionally or through gross negligence failed to meet his or her obligations or has otherwise undermined the effectiveness of the NSA, the CMAs may direct the Transaction Parties to remove the Security Officer and U. S. Steel shall: (i) immediately remove the Security Officer; and (ii) nominate a replacement Security Officer within seven (7) days of such notice, subject to the same procedures as the initial nomination.

H. Costs. The Transaction Parties shall be entirely responsible for all costs and expenses in connection with the Security Officer.

## ARTICLE VIII: COMPLIANCE POLICY

A. Compliance Policy. No later than one hundred twenty (120) days after the Closing Date, U. S. Steel shall submit to the CMAs a Compliance Policy (the "Compliance Policy") to govern the implementation of and compliance with the NSA. U. S. Steel shall adopt the Compliance Policy in accordance with this NSA. The Security Officer shall be responsible for day-to-day compliance with the Compliance Policy. U. S. Steel shall ensure that the Compliance Policy includes at a minimum:

1. appropriate mechanisms for informing and routinely training relevant Personnel, including Key Management Personnel, with respect to the terms of the NSA;

2. a notification and reporting policy to govern the reporting of any violation of the NSA to the CMAs, including a requirement for all Personnel, including Key Management Personnel to report any violation, attempted violation, or suspected violation of the NSA to the Security Officer;

3. guidance on the duties and roles of relevant Personnel to ensure the Transaction Parties' compliance with the NSA;

4. procedures for the Security Officer to delegate duties assigned under the NSA in circumstances where a Security Officer is unavailable;

5. an express prohibition on any form of retaliation or discrimination against any Personnel who report any known, attempted, or suspected violation of the NSA;

6. contact information of the Security Officer; and

7. adequate record-keeping policies and practices to permit independent confirmation and audit of the Transaction Parties' compliance with the NSA.

B. CMA Review. The adoption of the Compliance Policy shall be subject to the prior non-objection of the CMAs. Upon the CMAs' review of the Compliance Policy, U. S. Steel shall work in good faith with the CMAs to address the CMAs' comments, if any, and resubmit the revised Compliance Policy within fifteen (15) days following receipt of comments from the CMAs, unless the CMAs consent in writing to an extension of the response time in their sole discretion.

1. If the CMAs do not object within thirty (30) days following receipt of the initial Compliance Policy, or any subsequent Compliance Policy, the lack of action shall be deemed to be a non-objection;

2. U. S. Steel shall adopt the Compliance Policy within fifteen (15) days of non-objection by the CMAs. U. S. Steel shall fully implement and maintain the Compliance Policy, as non-objected to by the CMAs; and

3. Any amendment to, or waiver of, the Compliance Policy shall be subject to the same procedures as the initial review by the CMAs, except that CMA approval shall not be required for immaterial amendments or supplements to (i) cure any ambiguity, defect, or inconsistency; or (ii) reflect ordinary course changes in personnel, titles, organizational structure, or internal policies that have no effect on the Transaction Parties' compliance with the Compliance Policy or the NSA.

C. Compliance. At all times, U. S. Steel shall comply with, and ensure that its Affiliates, in each case including their respective Personnel, comply with, the Compliance Policy as applicable to them. A failure to ensure compliance with the material provisions of the Compliance Policy may be deemed to constitute a violation of a material provision of the NSA.

D. Non-Interference. Each Transaction Party shall not interfere with, prevent, or otherwise impair, and shall ensure that its Affiliates and Personnel do not interfere with, prevent, or otherwise impair, (i) compliance with the Compliance Policy and (ii) the Security Officer, Third Party Auditor, Compliance Committee, Trade Committee, NSA Board Observer or any other position required under this Agreement in the performance of his or her duties and responsibilities under this NSA.

## ARTICLE IX: THIRD-PARTY AUDITS

A. Upon request by the CMAs in their sole discretion, the Transaction Parties shall engage a third-party auditor (the "Third-Party Auditor") to conduct an audit of the Transaction Parties' compliance with this NSA (the "Audit"). The Transaction Parties shall be entirely responsible for all costs associated with the Audit.

B. The Third-Party Auditor and the scope and terms of the Audit (the "Audit Plan") shall each be subject to the prior non-objection of the CMAs.

C. Within thirty (30) days after the CMA request, the Transaction Parties shall nominate an auditor to be the Third-Party Auditor and provide sufficient information for the CMAs to assess the nominee, as determined by the CMAs' sole discretion. If the CMAs object to the proposed nominee, the Transaction Parties shall submit a nomination for a different candidate to the CMAs within five (5) days of receipt of any such objection, subject to the same procedures as the initial nomination. If the CMAs do not object within seven (7) days following receipt of the nomination and all additional information required by the CMAs, as determined in their sole discretion, the lack of action shall be deemed to be a non-objection. The Transaction Parties shall engage the Third-Party Auditor within three (3) days following the non-objection of the CMAs to the Audit Plan pursuant to the procedures detailed in Section X.E.

D. The Transaction Parties shall ensure that the Third-Party Auditor has no current or prior contractual, fiduciary, or financial relationship with any of the Transaction Parties or Affiliates thereof, other than serving as a prior third-party auditor for one or more of the Transaction Parties. The Transaction Parties shall ensure that each auditor nominated has the qualifications appropriate for completing the Audit in accordance with the Audit Plan.

E. The Transaction Parties shall submit a draft of the Audit Plan to the CMAs within fifteen (15) days following the non-objection of the CMAs to the Third-Party Auditor. If the CMAs object to the draft Audit Plan, the Transaction Parties shall resolve all concerns raised by the CMAs to the CMAs' satisfaction and submit a revised draft of the Audit Plan to the CMAs within ten (10) days following receipt of the CMAs' comments. If the CMAs do not object within seven (7) days following receipt of a draft of the Audit Plan, the lack of action shall be deemed to be a non-objection.

F. The Transaction Parties shall fully cooperate with the Third-Party Auditor, including providing the Third-Party Auditor with unrestricted access upon reasonable request to relevant Personnel, data and/or documents, and provide all information requested by the Third-Party Auditor to conduct the Audit.

G. The Transaction Parties shall include terms in the Audit Plan that require:

1. the Third-Party Auditor to complete the Audit consistent with the Audit Plan within sixty (60) days of the non-objection of the CMAs to the Audit Plan unless the CMAs grant an extension in writing;

2. that a full Audit report (the "Audit Report") be provided to the CMAs directly by the Third-Party Auditor within three (3) days following the completion of the Audit;

3. that the Third-Party Auditor be prohibited from providing the Audit Report to any Person, including any of the Transaction Parties and their respective Affiliates, except the CMAs until the CMAs have approved its release;

4. that the Third-Party Auditor takes all necessary and appropriate steps to address promptly and in writing any questions or concerns of the CMAs with the substance of the Audit Report, including completing supplemental reports if the Audit Report is not complete or consistent with the CMAs' expectations; and

5. that the Third-Party Auditor promptly make itself available to meet and confer with the CMAs independently of the Transaction Parties.

H. At the request of the CMAs and following receipt of the Audit Report and consultation with the CMAs, the Transaction Parties shall promptly implement any recommendations identified in the Audit Report. The Transaction Parties shall update the CMAs on the implementation of any such recommendations until such time as those recommendations are fully implemented.

I. After the initial Audit, the CMAs may require subsequent Audits no more than once every twelve (12) months, in their sole discretion, to be completed consistent with the process in this Article IX.

## ARTICLE X: REPORTING OBLIGATIONS

A. Annual Compliance Report.

1. No later than seven (7) days following each anniversary of the Closing Date, in coordination with the Security Officer, each of U. S. Steel, on the one hand, and Nippon Steel and NSNA, on the other hand, shall submit an annual report to the CMAs concerning the implementation of and compliance with this NSA ("Annual Compliance Report").

2. Each Annual Compliance Report must include, at a minimum:

   a. a detailed description of the manner in which the Transaction Parties are effectuating their obligations under this NSA, including all substantive actions taken;

   b. a detailed description of determinations made by the Trade Committee regarding U. S. Steel's Trade Actions;

   c. a detailed description of any instances of known or suspected noncompliance with this NSA, whether inadvertent or intentional, and the steps taken to prevent such noncompliance and violations from recurring;

   d. the operating status of the Production Locations, including (i) the anticipated need to idle, restart, or change the idling designation of any Production Location or part thereof, and (ii) the maintenance conditions of any Production Locations or parts thereof that are then subject to a Temporary Idling or Indefinitely Idling; and

   e. a certification by, as applicable, a duly authorized designee of each of Nippon Steel, NSNA, and U. S. Steel that: (i) the Annual Compliance Report is accurate and complete in all material respects; and (ii) all actual and suspected instances of non-compliance have been disclosed and described in the Annual Compliance Report.

3. In consultation with the CMAs, the Transaction Parties shall address any concerns raised by the CMAs regarding the information provided in an Annual Compliance Report to the CMAs' satisfaction. For the avoidance of doubt, the failure of the CMAs to raise an issue with an Annual Compliance Report shall not constitute approval by the CMAs or preclude the CMAs' ability to take enforcement action, in the CMAs' sole discretion.

B. <u>Reporting of Violations</u>. The Transaction Parties shall report any actual or suspected violations of this NSA to the CMAs as soon as practicable, but in any event within seventy-two (72) hours of learning of the actual or suspected violation, which reporting may be undertaken by the Security Officer.

## ARTICLE XI: RECORDKEEPING

The Transaction Parties shall maintain such records as necessary to demonstrate compliance with the terms of this NSA.

## ARTICLE XII: ACCESS AND INSPECTION

A. Upon seventy-two (72) hours' notice, the Transaction Parties shall allow and afford the CMAs access to meet with Personnel of the Transaction Parties or U. S. Steel's Affiliates and to inspect the books and records, equipment, servers, and facilities and premises owned, leased, managed, or operated by the Transaction Parties or U. S. Steel's Affiliates for the purposes of monitoring compliance with or enforcing the NSA; *provided* that in exigent circumstances, no advance notice shall be required.

B. The foregoing right to access and inspect extends to the Personnel, books and records, equipment, servers, facilities, and premises of any third-party contractor or agent working on behalf of the Transaction Parties or U. S. Steel's Affiliates. If the Transaction Party does not possess the authority or capability to afford such access, the Transaction Party shall use its best efforts to obtain whatever is required from the third-party contractor or agent for such access to be afforded.

C. Each of the Transaction Parties shall cooperate with the CMAs and promptly provide the CMAs with information as may be requested by the CMAs in their sole discretion to enforce and monitor compliance with this NSA.

## ARTICLE XIII: GENERAL PROVISIONS

A. Effectiveness. Except as otherwise specifically provided in this NSA, the obligations imposed by this NSA shall take effect immediately upon the Effective Date and shall remain in effect until this NSA is terminated in accordance with the terms hereof.

B. Choice of Law. This NSA shall be governed by and interpreted according to the federal laws of the United States.

C. Forum Selection. A civil action brought by any Party for judicial relief with respect to any dispute or matter whatsoever arising under, in connection with, or incident to, this NSA shall be brought, if at all, in accordance with 50 U.S.C. § 4565(e)(2) to the extent applicable. If 50 U.S.C. § 4565(e)(2) is not applicable, such civil action shall be brought in the U.S. District Court for the District of Columbia.

D. Other Laws. Nothing in this NSA is intended to limit, alter, or constitute a waiver of:

1. any obligation imposed on the Transaction Parties by any U.S. federal, state, territory, or local law;
2. any enforcement authority available under any U.S. federal, state, territory, or local law;
3. the sovereign immunity of the United States; or
4. any authority or jurisdiction the USG may possess over the activities of the Transaction Parties or their agents located within or outside the United States.

E. Computing Time. All references to "days" in this NSA mean calendar days unless otherwise expressly provided. In computing any time period pursuant to this NSA:

1. the day of the event that triggers the period is excluded; and

2. the last day of the period is included, but if the last day is a Saturday, Sunday, or federal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or federal holiday.

F. Tolling of Deadlines. Any non-objection, consent, or approval provision applicable to the CMAs pursuant to this NSA shall be tolled during a shutdown in federal government operations due to a lapse in appropriations.

G. Notice Regarding Legal Representation. The Transaction Parties shall provide notice to the CMAs, including contact information, of any legal representation in connection with obligations under this NSA, whether outside legal counsel or internal counsel, within five (5) days following the Effective Date and thereafter within five (5) days following any change to such legal representation.

H. Change in Circumstances.

1. If after this NSA takes effect, the CMAs or the Transaction Parties believe that changed circumstances warrant a modification or termination of this NSA (including if the CMAs determine that the terms of this NSA are inadequate or no longer necessary to address national security concerns or if Nippon Steel ceases to Control U. S. Steel), then the Transaction Parties shall negotiate in good faith with the CMAs to modify or terminate this NSA.

2. Rejection of a proposed modification alone does not necessarily constitute evidence of a failure to negotiate in good faith.

3. Nothing in this NSA shall limit the authorities of CFIUS or the CMAs under 50 U.S.C. § 4565, including 50 U.S.C. § 4565(l)(6)(D).

I. Successors and Assigns.

1. This NSA is binding upon, and inures to the benefit of, the Transaction Parties and their respective successors and assigns; for purposes of this NSA, successors and assigns under this Section includes any corporate name changes.

2. No Transaction Party may assign any obligation under this NSA without the prior written consent of the CMAs. The Transaction Parties shall remain liable for all the obligations under this NSA that are assigned to any other Person.

3. In the event that any Transaction Party effects the transfer, separation, or sale of a material portion of its business operations or assets that are subject to requirements under this NSA, including by way of a sale of assets, spin-off, split-

off, reorganization, or similar transaction, such Transaction Party shall immediately notify the CMAs in writing and, after consultation with the CMAs, the transferee, successor, or acquirer, as applicable, may, without any further action required of the Transaction Parties, execute a joinder agreement under which such transferee, successor, or acquirer, as applicable, takes on the relevant obligations under this NSA and becomes a party hereto.

4. In the event that any Transaction Party effects the transfer, separation, or sale of a material portion of its business operations or assets that are subject to requirements under this NSA to an Affiliate, such Transaction Party shall, at the time of such transaction, cause the relevant Affiliate to execute a joinder agreement under which the Affiliate takes on the relevant obligations under this NSA and becomes a party hereto.

J. Name Changes. Each of the Transaction Parties shall provide written notice to the CMAs within five (5) days of effectuating any change to its name in any jurisdiction, including any non-English language name. The Transaction Party shall include each of the following in a written notice under this Section: the name and address of the relevant entity; the date the name change became effective; and a revised organizational chart that includes U. S. Steel and reflects the new name of the relevant entity.

K. Bankruptcy. The Transaction Parties shall provide notice to the CMAs within thirty (30) days following the initiation of any bankruptcy, reorganization, refinancing, insolvency, liquidation, or other proceeding under any bankruptcy law or any law for the relief of debtors instituted by or against U. S. Steel or its subsidiaries.

L. Termination.

1. After this NSA takes effect, it shall terminate only upon written notice by the CMAs to the Transaction Parties.

2. Termination of this NSA shall not relieve a Transaction Party from liability for any breach of this NSA occurring while the NSA was in effect or for fraud.

3. Article I (Definition of Terms) and Article XIII (General Provisions) shall survive a termination of this NSA.

M. Interpretation.

1. The section headings and numbering in this NSA are inserted for convenience only and shall not affect the meaning or interpretation of the terms of this NSA.

2. All references herein to Articles and Sections shall be deemed references to Articles and Sections of this NSA unless the context otherwise requires.

3. The words "hereof," "herein," and "hereunder" and words of like import used in this NSA refer to this NSA as a whole and not to any particular provision of this

NSA. Whenever the words "include," "includes," or "including" are used in this NSA, they shall be deemed to be followed by the words "without limitation."

4. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

5. Whenever any provision in this NSA refers to action to be taken by any Person, or which any Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including by such Person's Personnel.

6. The definitions given for terms in this NSA shall apply equally to both the singular and plural forms of the terms defined.

7. Unless otherwise specified, all references to a CMA action or decision, a determination, non-objection, approval, or consent of or by the CMAs, the "discretion of the CMAs," "CMAs' discretion", or any words of like import used in this NSA, shall be deemed to mean, in each case, the sole discretion of the CMAs, without any limitation.

N. Notices. All notices and other communications given or made relating to this NSA shall be in writing and shall be deemed to have been duly given or made as of the date of receipt and shall be sent by electronic mail addressed to the Parties' designated representatives at the addresses shown below, or to such other representatives at such other addresses as the applicable Party may designate in accordance with this Section:

*If to the CMAs:*

U.S. Department of the Treasury
[Contact Information]

U.S. Department of Commerce
[Contact Information]

*If to the Transaction Parties:*

Nippon Steel Corporation
Attn: Shigekazu Iwamoto
2-6-1 Marunouchi, Chiyoda-ku
Tokyo 100-8071, Japan
iwamoto.m32.shigekazu@jp.nipponsteel.com

With copy to:

Ama Adams
Ropes & Gray LLP

2099 Pennsylvania Avenue, NW
Washington, DC 20006
Ama.Adams@ropesgray.com

Ariel J. Deckelbaum
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Ariel.Deckelbaum@ropesgray.com

Nippon Steel North America, Inc.
Attn: Hiroshi Ono
920 Memorial City Way, Suite 700
Houston, Texas 77024
ohno.fk9.hiroshi@us.nipponsteel.com

With copy to:

Ama Adams
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Ama.Adams@ropesgray.com

Ariel J. Deckelbaum
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Ariel.Deckelbaum@ropesgray.com

United States Steel Corporation
Attn: Scotland Duncan
600 Grant Street
Pittsburgh, PA 15219-2800
smduncan@uss.com

With copy to:

David Fagan
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
dfagan@cov.com

O. Severability. The provisions of this NSA shall be severable and if any provision hereof or the application of such provision under any circumstances is held invalid by a court of competent jurisdiction, it shall not affect the validity or enforceability of any other provision of this NSA or the application of such other provision, which shall remain in full force and effect.

P. Remedies; Preservation of Rights. Each of the Transaction Parties acknowledges that if it fails to comply with any of the terms of this NSA, the CMAs or any other appropriate USG authority may seek any and all remedies available under applicable law, including injunctive or other judicial relief, and remedies under 50 U.S.C. § 4565 and 31 C.F.R. Part 800. Each of the Transaction Parties acknowledges that, pursuant to 50 U.S.C. § 4565 and 31 C.F.R. Part 800, any Person who violates a material provision of this NSA may be liable to the United States for a civil penalty not to exceed $250,000 per violation or the value of the Transaction, whichever is greater, with the amount of the penalty imposed being based on the nature of the violation and as determined by CFIUS. Nothing in this NSA is intended to create rights to damages enforceable at law by the Transaction Parties against the USG, or to limit any rights the USG may have under law or regulation or this NSA.

Q. Waivers. The taking of any action by the CMAs or other appropriate USG authority in the exercise of any remedy shall not be considered as a waiver by the CMAs or such other USG authority of any other rights or remedies. The failure of the CMAs to insist on strict performance of any of the provisions of this NSA, or to exercise any right granted herein, shall not be construed as a relinquishment or future waiver; rather, the provision or right shall continue in full force. No waiver by the CMAs of any provision of or right under this NSA shall be valid unless it is in writing and expressly provides for the waiver of a specified requirement under a particular provision of this NSA. The CMAs shall have the authority to grant or revoke any waiver, exception, consent, or approval in their sole discretion.

R. Amendment. This NSA may be amended only by written agreement signed by all of the Parties.

S. Entire Agreement. This NSA, together with any Annexes and Exhibits hereto, constitutes the entire understanding of the Parties and supersedes all prior agreements or understandings with respect to the subject matter hereto.

T. Counterparts. This NSA may be executed in one or more counterparts, including pdf or other electronic counterparts, each of which shall be deemed an original, but all of which together shall be deemed to constitute one and the same agreement.

[*Signature pages follow.*]

[*Remainder of this page intentionally left blank.*]

*Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure under 5 U.S.C. § 552*
Draft of December 2, 2024

Agreed to on the date first above written:

**Nippon Steel Corporation**

By: ______________________
Name:
Title:

AR_009433

**App.467**

*Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure under 5 U.S.C. § 552*
Draft of December 2, 2024

Agreed to on the date first above written:

**Nippon Steel North America, Inc.**

By: ____________________________
Name:
Title:

AR_009434

**App.468**

*Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure under 5 U.S.C. § 552*
Draft of December 2, 2024

Agreed to on the date first written above:

**United States Steel Corporation**

By: __________________________
Name:
Title:

AR_009435

**App.469**

*Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure under 5 U.S.C. § 552*
Draft of December 2, 2024

Agreed to on the date first written above:

**For the U.S. Department of the Treasury**

By: __________________________
Name:
Title:

AR_009436

**App.470**

*Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure under 5 U.S.C. § 552*
Draft of December 2, 2024

Agreed to on the date first written above:

**For the U.S. Department of Commerce**

By:_ ______________________
Name:
Title

AR_009437

**App.471**

*Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure under 5 U.S.C. § 552*
Draft of December 2, 2024

**ANNEX 1**
**PRODUCTION LOCATIONS**

- Automotive Center (Troy, Michigan)[1]
- Big River Steel
- Big River 2
- Fairfield Tubular Operations
- Fairfield Works
- Gary Works
- Granite City Works
- Great Lakes Works
- Midwest Plant
- Minnesota Ore Operations (including Keetac and Minntac)
- Mon Valley Works (including Clairton Plant, Edgar Thomson Plant, Fairless Plant, and Irvin Plant)
- Research and Technology Center (Munhall, Pennsylvania)[2]
- U. S. Steel Tubular Products Innovation and Offshore Operations (Houston, Texas)[3]
- Wheeling Machine Products (Pine Bluff, Arkansas)[4]

---

[1] The Automotive Center does not produce steel. It is an R&D center focused on steel for the automotive industry. It can be included in the National Security Agreement depending on feedback from CFIUS.

[2] The Research and Technology Center does not produce steel. It is U. S. Steel's R&D center for steelmaking. It can be included in the National Security Agreement depending on feedback from CFIUS.

[3] U. S. Steel Tubular Products Innovation and Offshore Operations does not produce steel. It provides threading and repair for steel pipe and accessory parts. It also includes certain related R&D activities. It can be included in the National Security Agreement depending on feedback from CFIUS.

[4] Wheeling Machine Products does not produce steel. It makes couplings for oil country tubular goods products. It can be included in the National Security Agreement depending on feedback from CFIUS.

Business Confidential Pursuant to 50 U.S.C. § 4565; Protected from Disclosure Under 5 U.S.C. § 552

# Excessive Costs Make Importing Slab from Japan Economically Impractical

## Executive Summary

- This paper examines the economic feasibility of exporting steel slab from Japan to feed U.S. steel processing mills as an alternative to relying on available domestically produced slab. This analysis calculates the costs of delivering slab to a U.S. processing facility and compares two alternative sourcing options: (i) producing slab in Japan and then exporting the slab to the United States and (ii) producing slab in a U.S. integrated mill and transporting the slab to a processing facility. This analysis finds that supplying Japanese produced slab to a U.S. steel processing facility is 50% more expensive than supplying via U.S. slab production.

- There are multiple reasons why U.S. slab production has such a significant cost advantage relative to Japanese slab production. To begin with, high raw material costs cause Japanese produced slab to cost almost $70 per metric ton more than U.S. produced slab. Ocean transportation costs along with tariffs further drive up the delivered cost of Japanese produced slab. Finally, once it has arrived at a U.S. port, Japanese slab also incurs higher ground transportation costs. All things taken together, **the delivered cost of Japanese produced slab is $259 per metric ton more expensive than comparable U.S. produced slab**.

- The cost advantage of U.S. produced steel slab is not a recent phenomenon. Looking over the last five years this analysis finds that Japanese slab is consistently more expensive than U.S. slab. **Importing slab is not, and has never been, an economically viable option for U.S. processing facilities**.

- Trade statistics confirm the implications of the cost analysis. Japan has exported miniscule amounts of slab to the United States. Over the last five years, Japan accounts for less than one percent of U.S. slab imports.

# Introduction

Many of the country's most critical steel products rely on slab as a key input. Flat-rolled sheet products (e.g., hot-rolled, cold-rolled, corrosion-resistant and coated sheet, tin), plate, and welded steel pipe are all the result of processing steel slab. Often steel slab is produced in a different geographical location than where the subsequent processing (or "rolling") occurs.[1] Given that slab is generally being delivered to a separate processing facility, the question arises regarding the most cost-effective way to supply slab. An integrated producer like U.S. Steel can supply its rolling mills with slab produced at any of its domestic hot-end/casting facilities. Alternatively, U.S. Steel can purchase slab from another domestic producer, or perhaps even a foreign producer, and then ship the purchased slab to a rolling mill.

The slab sourcing issue is particularly relevant in light of the announced merger between Nippon Steel and U.S. Steel (USS). This paper evaluates the economics of the alternative approaches a merged Nippon-USS company might consider when deciding how to supply its domestic rolling mills in the future. This paper compares two alternatives. The first option is for Nippon Steel-USS to continue to operate its slab hot-end/casting facilities and then further process the domestically produced slab at a USS rolling mill. The other option considered is for Nippon Steel-USS to instead produce slab at one of Nippon Steel's Japanese hot-end/casting facilities and export slab to the United States. This option would involve shipping the slab across the Pacific Ocean and then transporting the slab from the port to the USS rolling mill. Critically, the cost of producing slab in Japan versus the United States is only

[1] This paper only discusses slab produced by integrated steel producers generally using a basic oxygen furnace. "Thin slab" produced using an electric arc furnace is not relevant for the issue analyzed as thin slab is immediately further processed into flat-steel and is not shipped to separate rolling mills.

one part of the overall costs of delivering slab to the rolling mill. The most relevant cost must be based on a comparison of the delivered cost to the rolling mill.

This paper finds that domestically produced slab has a massive cost advantage relative to importing Japanese produced slab. The cost advantage is observed at all stages of supply and the cumulative cost advantage for domestically produced slab is overwhelming. The cost advantage begins at the initial slab production stage where high raw material costs make Japanese produced slab $68 per metric ton more expensive than comparable U.S. produced slab. In other words, at the factory door Japanese slab is already 14% more expensive than U.S. produced slab. But of course, the factory door is not the end of the story. The slab needs to be delivered to the processing mill. Ocean and ground freight costs further bolster the U.S. cost advantage. Tariffs on imported steel create yet another cost advantage for U.S. production. All told, the delivered cost of Japanese produced slab is $259/MT more than U.S. produced slab. Given that the delivered cost of U.S. produced slab is just $509/MT, the cost differential is immense: 51%. It makes no economic sense for Nippon Steel-USS to import slab rather than operate its domestic facilities.

This paper also compares Japanese and U.S. slab costs over the last five years. In every year the delivered cost of Japanese slab is at least 30% higher than U.S. produced slab. At no time has there been any economic basis for Nippon Steel-USS to displace domestic slab production with slab imported from Japan.

This cost analysis is deliberately conservative – that is, the analysis understates the true extent of the U.S. cost advantage. For instance, while it is well known that ocean transport costs soared to record levels for much of the post-COVID era, these higher costs are not included in the analysis. The analysis, therefore, gives the Japanese produced slab supply option its best chance to compete. Nevertheless, this paper finds that Japanese produced slab simply cannot compete against U.S. produced slab.

U.S. produced slab has other advantages which are not incorporated into the calculations. The most obvious is the strong historical linkages and well-developed relationships between the various production units of U.S. Steel. The USS facilities that produce slab have deep knowledge of the specifications the USS downstream rolling mills require. In addition, domestically produced slab can be cast and delivered much more quickly than imported slab.[2] This shorter lead time provides flexibility and cost savings. Evaluating the monetary value of these additional factors would only further increase the U.S. produced slab facilities' massive cost advantage.

# Comparing the Cost of Slab

### Cost Comparison Based on 2023 Data

The key comparison that Nippon Steel-USS must consider is the cost of slab delivered to the rolling mill's factory gate. The delivered cost includes two components: the cost of production and the cost of delivery.

As shown in **Table 1** Japan's long-standing challenge of sourcing raw materials results in Japanese produced slab costing $549/MT as compared with domestically produced slab cost of $481/MT, a $68/MT (14%) difference.

**Table 1 – Cost of Producing Slab (December 2023), (World Steel Dynamics)**

| $/MT | US Integrated | Japan |
|---|---|---|
| Pig Iron Cost | $320 | $419 |
| Liquid Steel Cost | $128 | $101 |
| Slab Processing | $33 | $29 |
| **Total** | **$481** | **$549** |

[2] USITC reports the lead time for domestic sourced steel about 1/3 that of imported steel. USITC Publication 3479, p. FLAT-56.

**Table 1** reflects the costs when the slab leaves the casting facility. The slab still needs to be delivered to a USS rolling mill. For example, USS has a rolling facility in Mon Valley (West Mifflin, PA) and produces slab at the Gary Works facility (Gary, IN). This means slab would be shipped 444 miles (if produced in Gary Works and shipped to Mon Valley).

Obviously, the total shipping distance is much more substantial if the slab were produced in Japan. Using information reported in the official U.S. import statistics, the estimated average ocean transportation costs for slab exported to the U.S. are 6%.[3] As mentioned earlier, this estimate is conservative, as it does not capture the surge in global shipping costs in recent years.

Once the Japanese produced slab reaches a U.S. port it would have to be transported to a USS processing mill, e.g., Mon Valley. The closest port to Mon Valley is Philadelphia which would entail inland travel of 322 miles. To be consistent, this analysis assumes both domestically produced slab and slab imported from Japan face the same U.S. inland transportation costs (5%).[4] Again, this assumption is conservative as the USITC's reports on the U.S. steel industry generally finds ground transportation costs are higher for imported steel, largely due to the longer distance from most U.S. ports to the destination.

Finally, Section 232 National Security tariffs of 25% are levied on imported slab from Japan for any import volume exceeding 63,185 metric tons in a calendar year.[5] Given that the annual steel-making capacity of just one of USS's steelmaking facilities (Gary Works) is approximately 100 times larger than Japan's in-quota

[3] This estimate is consistent, albeit a bit smaller, than ocean transportation costs reported by the USITC for flat-rolled steel (generally in the 8-10% range). See USITC Publication 4638, page V-3 and USITC Publication 3479, page FLAT-61. The lower estimate likely is related to the fact that the extremely low quantities of slab are imported from Japan.
[4] Id.
[5] It should also be noted that the category covering imports of slab also includes non-slab steel semi-finished products, such as blooms and billets. See https://www.bis.doc.gov/index.php/documents/section-232-investigations/2944-steel-annual-trq-category-levels-for-japan-03312022/file; https://www.commerce.gov/sites/default/files/2022-02/US-Statement-on-Japan-232.pdf

amount, any economically meaningful slab volume from Japan will be subject to the Section 232 tariff.[6]

**Table 2** summarizes the full cost of supplying slab to a USS rolling mill for both slab supply alternatives (i.e., inclusive of additional delivery costs and tariffs). As seen, U.S. produced slab costs $505/MT, making it $259/MT less than Japanese produced slab, which costs $764/MT. Even for the small amount of in-quota slab volume, U.S. produced slab costs $113/MT less than Japanese produced slab – a 22% cost gap.

**Table 2 – Cost Comparison of Supplying Slab to U.S. Rolling Mill (December 2023), $/MT**

| | | |
|---|---|---|
| **Japanese Slab Supply Cost (delivered)** | | |
| • **Inclusive of the Section 232 Tariff** | **$764** | |
| • **Not Including the Section 232 Tariff** | **$618** | |
| *Japanese Slab Production Costs (WSD)* | | *$549* |
| *Ocean Transport Costs (CIF)* | | *$33* |
| *Tariff (25%)* | | *$146* |
| *Ground Transport Cost (USITC)* | | *$36* |
| **U.S. Produced Slab Supply Cost (delivered)** | **$505** | |
| *U.S. Integrated Producer Slab Prod'n Cost (WSD)* | | *$481* |
| *Ground Transport Cost (USITC)* | | *$24* |
| **U.S. Produced Slab Cost Advantage** | | |
| • Inclusive of the Section 232 Tariff | $259 | (51%) |
| • Not Including the Section 232 Tariff | $113 | (22%) |

**Figure 1** depicts the results in graphical format. The difference is quite stark. Even before it even leaves the Japanese mill slab produced in Japan is more expensive than U.S. produced slab delivered to the rolling mill. The cost difference

[6] U.S. Steel Gary Works annual raw steelmaking capacity is estimated to be 7.5 million short tons (which is equivalent to 6.8 million metric tons). See https://www.in.gov/idem/resources/lake-michigan-sites-of-interest/u.s.-steel-gary-works/ .

becomes increasingly larger as the slab produced in Japan proceeds through the various stages of exporting to the United States: ocean transport (+$33/MT), Section 232 tariffs (+$146/MT), and ground transportation in the United States (+$36). The gap in the cost of domestically produced slab and slab produced in Japan is astonishingly large.

**Figure 1 – Cost Comparison of Supplying Slab (December 2023)**

The above cost comparison thoroughly rebukes any suggestion that a merged Nippon Steel-USS would replace domestically produced slab with slab imported from Japan by importing slab in any larger volumes than the small amount currently being exported to the United States.

Even if one ignores the fact that the production cost in Japan exceeds the production cost in the United States ($549/MT versus $481/MT), it is impossible to overlook the huge additional costs associated with importing (ocean transportation and tariffs), which add another $179/MT to the delivered cost. Even if one limits the Japanese exports of slab to the in-quota quantity, Japanese slab is 22% more

expensive than U.S. produced slab.[7] In either case, there is no economic basis to argue that a merger of Nippon Steel and USS would result in Japanese produced slab replacing slab produced in USS's domestic facilities.

**Cost Comparison Based on Longer Run Data**

**Table 3** extends the cost comparison presented in **Table 2** to the five year period, 2019-2023.[8] As seen, the extended analysis reveals that the 2023 cost comparison result (**Table 2**) is no anomaly. In every year slab produced in Japan and exported to the United States cost at least 30% more than simply producing slab in a USS facility.[9] Moreover, in each of the last three years (2021, 2022, and 2023) the cost disparity has grown and exceeds $250/MT in each year. In other words, the cost gap between the supply sources has increased in recent years compared to the already prohibitive levels of 2019 and 2020.

The longer run perspective confirms that slab produced in Japan and exported to the United States is more than 50% more expensive than domestically produced slab. The results again decisively reject any suggestion that Nippon Steel would seek to replace USS's domestically produced slab with Japanese produced slab. Such a statement is unambiguously rejected by this factual review of actual cost data.

---

[7] Japan's in-quota volume is tiny, both relative to overall U.S. imports of slab but even more so relative to U.S. slab production. As a result, the U.S. industry's 22% cost advantage for even this small volume is noteworthy.

[8] Full calculations are given in Exhibit A.

[9] USITC Publication 3479, Table FLAT-4 (p. FLAT-8) and Table FLAT-12 (p. FLAT-16).

**Table 3 – Cost Comparison of Supplying Slab to U.S. Rolling Mill (historical perspective), $/MT**

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Japanese Slab Supply Cost* | $607 | $597 | $799 | $744 | $764 |
| U.S. Produced Slab Supply Cost | $450 | $461 | $528 | $477 | $505 |
| U.S. Produced Slab Cost Advantage | $157 | $136 | $271 | $267 | $259 |
| | 35% | 30% | 51% | 56% | 51% |

* inclusive of the Section 232 25% tariff

# Trade Data Confirms Japanese Produced Slab is Too Expensive for U.S. Buyers

The above discussion unambiguously demonstrates that it is not economically viable for Japanese slab to displace U.S. slab production. U.S. import statistics confirm the conclusion of the cost analysis. Over the five-year period, 2019-2023, Japan accounted for approximately 0.5% of import market for slab.[10] Given that domestically produced slab accounts for the vast majority of the overall slab consumed in the United States, it is reasonable to conclude that Japanese produced slab accounts for less than 1/10th of one percent of the overall U.S. market for slab. The extremely high cost of Japanese slab (inclusive of costs of delivery and tariffs) makes it impossible for Japan to sell any more than a minuscule amount of slab to the United States.

For perspective on how small Japan's slab volume is, consider 2023. Japan's slab export volume to the United States was the largest of any year in the 2019-2023 period. In 2023 Japan exported 54,588 metric tons of slab to the United States. This is just 1.1% of total slab import volume in 2023, which given the size of U.S. slab production makes it clear that Japan has much, much less than one percent share of the overall U.S. slab market (imports plus domestic production).

[10] Import statistics for each year are given in Exhibit B.

**Table 4 – Import Market Share, Slab (2019-2023)[11]**

| | Share |
|---|---|
| Brazil | 56% |
| Mexico | 26% |
| Russia | 10% |
| Canada | 6% |
| India | 1.4% |
| Australia | 0.8% |
| Japan | 0.5% |
| All Others | 0.2% |

# Conclusion

This paper has compared the cost to a U.S. processing mill to obtain slab from either a U.S. or Japanese integrated facility. No matter how the data was analyzed the same conclusion emerged. Japanese produced slab cannot be exported to serve U.S. processing facilities in any cost competitive manner. As shown in **Figure 2** Japanese costs tower above comparable costs for slab produced in a U.S. integrated steel mill. It is simply not reasonable to think a merged Nippon Steel-USS steel company would willingly choose to pay 51% more to import slab from Japan.

Moreover, the assumptions underlying these calculations were repeatedly done in order to make the Japanese produced slab alternative more cost competitive. For example, the analysis did not include inland transportation costs within Japan. Also, the analysis discounted soaring ocean transport costs; further, the analysis has not imputed the value of the proximity value of the existing U.S. facilities. All these considerations further diminish Japanese produced slab's competitiveness in

[11] Import quantities downloaded from USITC dataweb. HTS codes for slab are 7207200045, 7207200025, 7207120050, 7224900055, and 7207120010.

Business Confidential Pursuant to 50 U.S.C. § 4565; Protected from Disclosure Under 5 U.S.C. § 552

the U.S. market. Nevertheless, even ignoring these factors it is quite clear that Japanese produced slab simply cannot compete against U.S. produced slab.

**Figure 2 – Japanese Slab is Uncompetitive in U.S. Market (2023)**

$764/MT
Delivered Cost to rolling mill:
Japanese slab is 51% more expensive
$505/MT

10

AR_010542

App.483



## Exhibit A

### "All In" Cost Comparison of Supplying Slab to U.S. Rolling Mill

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| **Japanese Slab Supply Cost** | | | | | |
| • **Inclusive of the Section 232 Tariff** | **$607** | **$597** | **$799** | **$744** | **$764** |
| • **Not Including the Section 232 Tariff** | **$491** | **$484** | **$646** | **$603** | **$618** |
| *Japanese Slab Prod'n Costs (WSD)* | *$436* | *$429* | *$574* | *$535* | *$549* |
| *Ocean Transport Costs (CIF)* | *$26* | *$26* | *$34* | *$32* | *$33* |
| *Tariff (25%)* | *$116* | *$114* | *$152* | *$142* | *$146* |
| *Ground Transport Cost (USITC)* | *$29* | *$28* | *$38* | *$35* | *$36* |
| **U.S. Produced Slab Supply Cost** | **$450** | **$461** | **$528** | **$477** | **$505** |
| *U.S. Slab Production Cost (WSD)* | *$429* | *$439* | *$502* | *$455* | *$481* |
| *Ground Transport Cost (USITC)* | *$21* | *$22* | *$25* | *$23* | *$24* |
| **U.S. Steel Slab Cost Advantage** | | | | | |
| • **Inclusive of the Section 232 Tariff** | **$157** | **$136** | **$271** | **$267** | **$259** |
| | 35% | 30% | 51% | 56% | 51% |
| • **Not Including the Section 232 Tariff** | **$41** | **$22** | **$119** | **$125** | **$113** |
| | 9% | 5% | 23% | 26% | 22% |

**Exhibit B**

**Foreign Sources of Slab to the U.S. Market, 2019-2023[12]**

| Metric Tons | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Brazil | 3,217,438 | 3,203,796 | 3,552,248 | 1,838,862 | 2,974,584 |
| Mexico | 1,300,992 | 1,095,382 | 1,635,341 | 1,423,683 | 1,340,834 |
| Canada | 215,764 | 98,848 | 372,745 | 355,439 | 473,690 |
| Australia | 1,314 | 45,333 | 0 | 72,272 | 79,652 |
| India | 30,858 | 57,546 | 120,901 | 101,918 | 55,675 |
| Japan | 0 | 32,726 | 23,479 | 34,323 | 54,588 |
| China | 967 | 180 | 12 | 67 | 50,190 |
| South Korea | 0 | 0 | 0 | 0 | 509 |
| United Kingdom | 57 | 138 | 0 | 12 | 70 |
| Czechia | 0 | 0 | 0 | 0 | 62 |
| Germany | 23 | 0 | 68 | 259 | 17 |
| Netherlands | 0 | 10 | 0 | 9 | 3 |
| Austria | 0 | 0 | 0 | 0 | 3 |
| Spain | 0 | 0 | 39 | 0 | 1 |
| Taiwan | 0 | 4 | 0 | 0 | 0 |
| Russia | 684,535 | 313,642 | 1,291,338 | 264,202 | 0 |
| Italy | 869 | 195 | 85 | 6,005 | 0 |
| France | 0 | 11 | 0 | 0 | 0 |
| Finland | 0 | 469 | 0 | 0 | 0 |
| Total | 5,452,815 | 4,848,280 | 6,996,258 | 4,097,049 | 5,029,877 |
| | | | | | |
| **Share of Import Slab Market - Japan** | **0.0%** | **0.7%** | **0.3%** | **0.8%** | **1.1%** |

[12] Import quantities downloaded from USITC dataweb. HTS codes for slab are 7207200045, 7207200025, 7207120050, 7224900055, and 7207120010.

*Business Confidential – Pursuant to 50 U.S.C. Section 4565*
*Protected from Disclosure Under 5 U.S.C. Section 552*

**CFIUS Case No. 24-154: Update on Communications from Cliffs to Investors**

Earlier today, while the leadership of U. S. Steel and Nippon Steel were preparing for a meeting with Secretary Yellen and Secretary Raimondo, U. S. Steel received reports from multiple investors that Cleveland-Cliffs again was telling U. S. Steel's investors and others that CFIUS would refer the Transaction to the President to be blocked imminently.

- According to investor Readystate Asset Management, "[Cliffs] is calling around the street telling people that the block is coming today or early next week. (I don't know why they're so vocal). If they know that's the case, its wretchedly corrupt."
- Regarding the Transaction being blocked, U. S. Steel's investor Citadel said, "confirmed today or tomorrow from Cliffs." Citadel later stated that the rumors from Cliffs were being sent through sell-side trading desks that they have in the past (likely Jefferies, Raymond James, and Cowen).
- According to Farallon Capital Management: "We've heard from a political consultant-type based in PA that Shapiro is not optimistic about CFIUS approving and heard through the investor grapevine a rumor that CFIUS might decide on the deal today."



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

December 14, 2024

Ama Adams
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006

Mark Plotkin
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001

Re: CFIUS Case 24-154: Nippon Steel Corporation (Japan)/United States Steel Corporation

Dear Ms. Adams and Mr. Plotkin:

I am writing on behalf of the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee") regarding CFIUS Case 24-154, involving the proposed indirect acquisition by Nippon Steel Corporation ("Nippon Steel"), a public Japanese corporation with its principal place of business in Tokyo, Japan, of 100 percent of United States Steel Corporation ("U.S. Steel" and together with Nippon Steel the "Parties"), a public Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania (the "Transaction").

As CFIUS representatives conveyed to you in a letter dated August 31, 2024 (the "August 31 Letter"), CFIUS identified risks to the national security of the United States arising from the Transaction. Such risks, to the extent they can be summarized at an unclassified level, relate to potential decisions and actions by Nippon Steel that could lead to a reduction in domestic steel production capacity. The August 31 Letter informed you that, in reaching this conclusion, the Committee relied upon analysis that assessed both classified and unclassified information, including U.S. Department of Commerce ("Commerce") analysis that considered that a robust commercial steel market is essential for national security, as the market-oriented U.S. steel industry requires steady revenue from sustained commercial production to meet critical industry steel requirements.[1] The letter further requested that you provide any new or relevant information for the Committee's consideration no later than the opening of business on Wednesday, September 4, 2024. You emphasized in your response to the August 31 Letter the importance of having additional time to engage on the Transaction with the Committee, and as noted below, the Committee subsequently granted the Parties' request to withdraw and refile the notice.

## A. Procedural History

Following the August 31 Letter, you sent CFIUS a response dated September 3, 2024 (the "September 3 Letter"), challenging the assessments in the August 31 Letter, and reiterating the

[1] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018.

Parties' request to withdraw and refile their notice, which request was first made in writing to the Committee on August 23, 2024. Additionally, in the September 3 Letter, the Parties proposed mitigation terms to address the national security risks identified in the August 31 Letter.

On September 6, 2024, these mitigation terms were discussed during a subsequent meeting between the Parties and representatives from Commerce and the Department of the Treasury ("Treasury" and together with Commerce, the "Co-Lead Agencies").

On September 9, 2024, you shared a proposed draft National Security Agreement ("Parties' September 9 NSA"). On September 17, 2024, CFIUS informed you that the Parties' request to withdraw and refile their notice was granted effective September 23, and that a new review period for the Transaction would commence on September 24, 2024.

In an October 11, 2024 phone call, representatives from the Co-Lead Agencies discussed with you the possibility of an in-person meeting to discuss the September 3 Letter and the Parties' September 9 NSA. On October 16, 2024, representatives from CFIUS met with the Parties and discussed some of the claims made in the September 3 Letter, updates to the Transaction and additional commitments made by Nippon Steel to U.S. Steel, and some of the mitigation terms from the Parties' September 9 NSA.

On October 29, 2024, the Parties shared a revised draft National Security Agreement proposal. On November 21, representatives from CFIUS held a phone call with Parties to discuss an upcoming meeting, including discussion of an agenda for the meeting.

On November 25, representatives from CFIUS and the Parties had an in-person meeting (the "November 25 Meeting"). At the November 25 Meeting, the Parties responded to questions about progress that has been made towards achieving Nippon Steel's commitments, U.S. Steel's plans if the Transaction does not receive CFIUS approval, the steel market outlook, and questions about the updated mitigation proposal.

Following the November 25 Meeting, on November 27, the Parties provided written submissions memorializing the statements made in the meeting. Additionally, on December 2, 2024, the Parties provided a third, further revised draft National Security Agreement (the "Parties' December 2 NSA").

On December 9, 2024, representatives from CFIUS met with the Parties in person. The Parties presented additional information about the current operating state of U.S. Steel and Nippon Steel's plans to uphold its commitments.

On December 13, 2024, executives from the Parties spoke by telephone with the Secretaries of Treasury and Commerce.

**B. Updated analysis in response to Parties' assertions**

As summarized below, the Committee has considered the additional information provided by the Parties. The Committee informs you of the following findings with respect to this Transaction.

The Committee relied upon classified and unclassified information in its analysis. Additional unclassified information that the Committee has considered is provided as **Annex 1**.

As stated in the August 31 Letter, in assessing whether the foreign person in this Transaction has the intent and capability to take action to impair U.S. national security, CFIUS has considered several factors.

The August 31 Letter informed the Parties that one of the risks the Committee has identified as arising from this Transaction is that Nippon Steel may make decisions that reduce U.S. domestic steel production capacity. In the September 3 Letter, and in other communications to the Committee, Nippon Steel has stated that it has no intentions of idling, permanently closing, reducing staff, or otherwise modifying any of U.S. Steel's blast facilities through 2026. In addition, Nippon Steel has made a commitment to not idle or permanently close Gary Works BF 14 and Mon Valley Works through 2026, and Nippon Steel has stated it would invest $1.3 billion to modernize these facilities. However, the Committee continues to assess a risk to national security arising from the Transaction despite the commitment for these two facilities, as these represent 26 percent of U.S. Steel's steelmaking production capacity. Nippon Steel has acknowledged several contingencies that could reduce the continued state of operations of U.S. Steel's facilities and that those operations depend on myriad factors, including projected medium- and long-term demand, availability and cost of raw materials, health of the facility, and other overall cost considerations, notwithstanding the Parties' objections to the inclusion of this fact in the August 31 Letter.[2]

Additionally, although the Parties also stated in the September 3 Letter that "the overall production volume of steel does not necessarily decrease, in particular as older, less-efficient facilities are phased out and new, more efficient facilities are brought online," the Committee assesses that building new facilities for production and maintaining capacity require significant investment and capital that may be contrary to Nippon Steel's future business plans and incentives. The Committee notes that, as of October 2024, U.S. Steel maintains $5.2 billion in liquidity available to continue investing in its furnaces and production lines. Business plans and incentives may change; for example, U.S. Steel committed $1.5 billion in 2019 to expanding production at Mon Valley, and even spent $170 million towards this end, before cancelling such investment due to issues with obtaining required environmental permits to begin construction. U.S. Steel instead focused its investments towards Big River Steel 2, which will become operational in the fourth quarter of 2024 at a cost of $3.4 billion.

The Committee has considered the fact that Nippon Steel has continually restated its commitment to this planned investment. The Gary Works BF 14 is a significant element of U.S. Steel's portfolio that Nippon Steel likely would maintain as part of the significant production increase. U.S. Steel has claimed that Gary Works BF 14 will close absent this Transaction, and Nippon Steel could make a similar commercial decision to either idle the mill as planned or in the future, further reducing production in the United States, even if this decision is unlikely in the short term. The Parties' December 2 NSA includes a provision that would commit Nippon Steel to an investment in the mill. Concerning the Mon Valley investment, Nippon Steel, U.S. Steel, and Hatch (a third-party engineering firm) are meeting weekly to provide technical studies,

[2] CFIUS Case 24-038 Question Set 6, Question 4.

engineering reports, and budgeting related to three modernization investments being evaluated.[3]

The Parties' December 2 NSA includes a provision that would commit Nippon Steel to an investment in this mill. Nippon Steel likely will encounter construction-execution risks similar to those that U.S. Steel experienced in trying to expand production lines at Mon Valley. Parties have conveyed that the change in state administration increases the likelihood that permitting is received and this is reinforced by a recent executive order by Pennsylvania Governor Shapiro on permitting timelines. However, U.S. Steel has not elaborated on the reason that the environmental permits were not issued for Mon Valley, precluding CFIUS from determining if the issue was solely based upon Pennsylvania's lack of timeliness as described by the parties.[4] The Parties' December 2 NSA also includes a commitment to not reduce Production Capacity unless certain procedural and notice requirements are met. Additionally, concerning the Gary Works investment, U.S. Steel's history of corporate direction changes, as noted above, calls into question the longevity of the Parties' current plan and stated decisions, given these actions are scheduled to take effect years into the future.

With respect to Nippon Steel's global reach and decision-making calculus, in the September 3 Letter, the Parties corrected the factual record regarding Nippon Steel's affiliates and subsidiaries, and the Committee has included this correction in its assessment. Nippon Steel's website notes that as of March 31, 2024, Nippon Steel has 467 affiliates involved in steelmaking and steel fabrication, of which 34 are principal subsidiaries and 20 principal affiliates.[5] Nippon Steel's steel operations span Japan, Thailand, South Africa, Nigeria, Italy, France, Finland, Saudi Arabia, the Philippines, Indonesia, Malaysia, the United States, Mexico, Sweden, China, the UAE, Vietnam, Brazil, and India.[6]

The Committee has taken note of the statements in the September 3 Letter regarding the People's Republic of China ("PRC" or "China"). Among other things, the Parties state that the PRC is "not a key market for Nippon Steel." Currently, China accounts for less than five percent of Nippon Steel's total production and is limited to downstream capacity.[7] The September 3 Letter also notes that Nippon Steel is ending its participation in one of its Chinese joint ventures, which will reduce its production capacity in China by 70 percent.[8] While the Parties characterize China as "not a key market for Nippon," the Committee assesses that Nippon Steel's continued operations in China are relevant considerations in the context of risk analysis for this Transaction, due to the impacts China's non-market policies could have on domestic steel production capacity.[9] Furthermore, while the Committee acknowledges that markets' being

[3] CFIUS Case No. 24-154: Progress on the Gary Works and Mon Valley Commitments.
[4] CFIUS Case 24-154 Question Set 1, Question 16. See also https://dced.pa.gov/newsroom/governor-shapiro-signs-executive-order-creating-the-pa-permit-fast-track-program-to-speed-up-government-drive-economic-growth-and-make-pennsylvania-more-competitive/. Accessed on December 13, 2024.
[5] https://www.nipponsteel.com/en/company/about/pdf/subsidiaries_and_affiliates.pdf. Accessed on September 10, 2024.
[6] Bloomberg L.P. Accessed on September 10, 2024.
[7] Per the parties, Nippon does not have any crude steel production capacity in China and "ranks behind Japan, India, the Associations of Southeast Asian Nations (ASEAN), South America, and North and Central America for Nippon Steel, in terms of overall steel production capacity by region." See Response to Risk Letter of August 31, 2024, Appendix C; CFIUS Case 24-038, Question Set 2, Question 3.
[8] CFIUS Case 24-088: Response to Risk Letter of August 31, 2024, Appendix C.
[9] *Ibid.*

affected by PRC exports precedes the Transaction, it is important background information that adds necessary context to the risk consideration.

As expressed in the August 31 Letter, the Committee also considered the willingness or ability of U.S. Steel to continue to engage as vigorously in trade matters were it to be owned by Nippon Steel. The Committee continues to evaluate that there is a risk that a Nippon Steel-owned U.S. Steel could reduce its participation in U.S. trade remedy investigations and reviews, with a possible adverse impact on the commercial viability of the domestic steel industry to the extent that U.S. Steel's non-participation impairs Commerce's ability to order remedies pursuant to such investigations and reviews. In the September 3 Letter, the Parties pointed out that Nippon Steel has participated in two trade remedy proceedings in Japan and argued that Nippon Steel's participation as a respondent "is not a signal that it resists trade relief for the U.S. steel industry" because Nippon Steel does not "choose" to participate as a respondent. However, Nippon Steel's selection or appearance as a respondent reflects its position as a global market leader that produces steel in numerous foreign jurisdictions and has been found to have dumped steel into the United States.[10] Commerce has imposed cash deposit rates on Nippon Steel or its affiliates ranging up to 256 percent.[11] This points to Nippon Steel's potentially divergent incentives on trade remedies enforcement from the balance of the U.S. steel industry. In other words, the Committee does not assess that Nippon Steel's cooperation or lack thereof signals the possibility of resistance to U.S. Steel pursuing trade relief, but rather Nippon Steel's potentially divergent longer-term commercial and legal incentives with respect to trade relief for U.S. industry could affect these choices with respect to U.S. Steel, especially as Nippon Steel notably has been found to have dumped steel in the U.S. market in investigations and reviews initiated by both the U.S. steel industry at large and U.S. Steel specifically.[12]

Further, U.S. Steel has petitioned for import duty relief from nearly every country in which Nippon Steel has steel manufacturing operations.[13] Import duties sought by U.S. Steel pertain to many of Nippon Steel's largest commodity types, including pipes, flat products, hot and cold rolled products, stainless steel, and tin. The bulk of Nippon Steel's operations will continue to be outside of the United States post-acquisition, the number of which is expected to grow as Nippon Steel expands its production capabilities in India and Southeast Asia. Regardless of whether Nippon Steel chooses to participate as a respondent in trade remedy reviews and investigations, it has in the past had potentially divergent commercial and legal incentives with respect to U.S. trade relief from the U.S. steel industry at large (and U.S. Steel specifically). If Nippon Steel were able to direct U.S. Steel's approach to trade actions, some of these incentives could be applied to decisions of U.S. Steel, depending on the overall trajectory and profitability of Nippon Steel's U.S. and global operations.

---

[10] Cash deposits are estimated anti-dumping/countervailing ("AD/CVD") duties paid at time of entry. Final duties are assessed after Commerce conducts an administrative review.

[11] ITA, [https://access.trade.gov/ADCVD_Search.aspx] Accessed on July 15, 2024. For example, in 2021, Commerce applied a 199.43 percent tariff in a final review of corrosion resistant steel to Nippon Steel's Chinese operations, causing Nippon Steel to cease shipments of those products to the United States altogether. 86 FR 16185; Corrosion-Resistant Steel Products from China, A-570-026. Nippon Steel has been subject to 77.7 percent AD duties on nickel plated flat steel, which has been reaffirmed in several subsequent administrative reviews, 71.35 percent duties on cold rolled steel from Japan, and over 100 percent cash deposit rates on carbon and alloy pipe.

[12] 86 FR 16185; Corrosion-Resistant Steel Products from China, A-570-026.

[13] Commerce SME Assessment of CFIUS Case 24-088: Response to Risk Letter of August 3 I, 2024, Appendix C.

The Parties argue in the September 3 Letter that the "number of cases that Nippon Steel and its affiliates have brought" is "not a reliable indicator of Nippon Steel's support for trade remedy action." In particular, Nippon Steel asserts that it could not or would not have participated in certain foreign actions due to, among other things, limitations on the products manufactured by the relevant affiliates, and/or the reduced efficacy of foreign trade remedy regimes. Nippon Steel also claims to have participated in proceedings in Japan, among other countries, and has stated that it "intends to participate in trade remedy proceedings under consideration by governments in Southeast Asia" in countries in which it operates, "assuming that the proposed trade remedy actions reflect the interest of Nippon Steel."[14]

The Committee has already recognized and considered the factors identified by the Parties and counted the sample cases identified by Nippon Steel in the September 3 Letter. The Committee assesses that, based upon publicly available information, Nippon Steel participates in a lower percentage of steel-related trade remedies proceedings in the jurisdictions in which it conducts operations than global competitors such as ArcelorMittal and U.S. firms such as Nucor.[15] This is true even when taking into consideration that there are more U.S. trade remedies cases than in many other countries; that firms cannot necessarily participate in each proceeding depending on the steel production in question; and that such proceedings may be less impactful in certain jurisdictions than in the United States.

The Committee recognizes that firms have a variety of commercial and business motivations for pursuing trade relief in any particular case or jurisdiction. These considerations include the relevant subject merchandise, the financial benefit of a successful petition, and the remedies available in the jurisdiction. The Committee has taken all of these factors into account in assessing the risks that would arise from a reduction in a Nippon Steel-owned U.S. Steel's engagement in AD/CVD proceedings and other trade tools. The Committee has already included the sample cases identified by Nippon Steel in reaching its assessment that, based upon publicly available information, Nippon Steel participates in a lower percentage of steel-related trade remedies proceedings in the jurisdictions in which it conducts operations than would be expected of a firm of its size and production levels. This remains true even taking into account that the United States tends to have more trade remedies proceedings than some other countries, and that a given firm cannot necessarily participate in each proceeding.[16] Concerning Nippon Steel's history regarding its use of trade measures, while these activities precede the Transaction, they are important background information that adds necessary context to the risk consideration.

Finally, the Committee recognizes that even in the absence of the participation of U.S. Steel in trade remedy measures, other domestic steel companies and labor unions such as the United

[14] 24-038, Question Set 16, Question 3a response. Of the seven cases identified by Commerce in which a Nippon-affiliate was involved in a foreign trade remedies petition, several involved joint ventures, not wholly owned subsidiaries, suggesting that Nippon's singular involvement in trade remedies proceedings globally is perhaps even lower.

[15] CFIUS recognizes again that certain countries limit the availability of data concerning their trade remedies proceedings. These figures are based on the data Commerce was able to collect.

[16] In many foreign cases that Nippon does not appear to have joined, the steel product at issue in the foreign trade remedies proceeding is one produced by Nippon Steel and its affiliates (*e.g.*, cold-rolled steel, stainless steel plate, corrosion resistant steel, and grain-oriented electrical steel).

Steelworkers Union (USW) would still be able to initiate trade actions, and advocate for trade relief on products produced by those companies and/or unions. However, the Committee continues to assess that, given *inter alia* the significant investment required to initiate or support trade actions and the relatively limited number of relevant industry participants, a significant reduction in the participation of one of the most important firms in this market (U.S. Steel) could lead to a reduction in the efficacy of U.S. trade relief for the domestic steel industry overall.

The United States has a long history of implementing trade measures.[17] As the Parties stated in the September 3 Letter, "[i]t makes more financial sense for foreign producers to make significant investments locally and boost domestic U.S. production rather than continuing to export steel produced overseas to the United States." This is why the risk of decreased participation in trade measures is a crucial risk, as it would not only impact U.S. Steel, but the entire industry. A reduction in this national advantage would likely diminish the incentive to continue to focus on the U.S. market, considering the Parties stated in the September 3 Letter that the "effectiveness of U.S. trade policies is a key motivating factor in Nippon Steel's decision to invest in U.S. Steel." Capital is a limited resource, and Nippon Steel will make investment decisions based on the best use of its capital while considering such factors as the costs of production, costs of participating in trade policies, effectiveness of trade policies, and revenue generated from its U.S. subsidiaries, and comparing the same elements for all its domestic and foreign subsidiaries.

As stated in the August 31 Letter, in assessing whether the nature of the U.S. business makes it susceptible to exploitation that could impair national security, CFIUS has considered several factors.

In the September 3 Letter and other communications to the Committee, Parties asserted that the risks identified in the August 31 Letter predate the Transaction. The Committee acknowledges that some of the factors considered as context in the risk analysis do predate the Transaction. There is overcapacity in the steel industry globally, and operational costs in the United States are higher than in other regions, both of which have contributed to the erosion of the U.S. domestic steel industry. Further idling or closures of steel factories in the U.S. could significantly deepen the domestic supply deficit of domestically produced steel and erode the country's critical manufacturing base in primary metal and other critical manufacturing sectors to the detriment of national security.[18] This Transaction could degrade the domestic supply of multiple types of steel and further imperil primary metal manufacturing and electric motor manufacturing, critical manufacturing industries as identified by the National Infrastructure Protection Plan (NIPP) of 2013.[19]

Reduced output by U.S. Steel would represent reduced capacity for primary metals manufacturing, which could also negatively affect other critical manufacturing industries as identified by the NIPP as necessary to strengthen critical infrastructure security and resilience

---

[17] CFIUS Case 24-088: Response to Risk Letter of August 31, 2024.
[18] Critical Manufacturing Sector, Cybersecurity and Infrastructure Agency CISA.
https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/critical-manufacturing-sector. Accessed December 13, 2024.
[19] *Ibid.*

such as the electrical equipment, appliance, and component manufacturing sector, including the electric motor manufacturing industry, and the transportation equipment manufacturing sector, including the vehicle manufacturing industry. Critical manufacturing industries are crucial to the economic prosperity of the United States and disruption of certain elements of manufacturing, such as steel manufacturing, could disrupt essential functions critical to national security across multiple critical infrastructure sectors.[20]

In the September 3 Letter, Nippon Steel asserts that the capital investments agreed to by its Board in August 2024 represents a long-term commitment to providing capital and advanced technology to U.S. Steel. These proposed investments account for only two of U.S. Steel's facilities, and further investments remain subject to various factors, including economic conditions, Nippon Steel's global strategy, and market performance, as discussed above. This uncertainty and Nippon Steel's obligations to sustain production at the two facilities in the Parties' December 2 NSA could require U.S. Steel to divert capital for the investment, or capital needed to undertake core activities away from its other facilities, resulting in long-term decline in manufacturing profitability or commercial viability overall.[21]

Further, the proposed operational timeframes of those investments (ten to twenty years) would not by themselves address current insufficient production and capacity utilization to satisfy the factors highlighted by Section 721(f)(6), nor the current demand and increases in medium-term demand by domestic steel consumers, and would be exacerbated if Nippon Steel determines its global strategy includes reducing U.S. Steel capacity and production. As discussed above, the specific incentives for investing in the United States could, in some cases, be transitory, particularly if other countries referenced above such as India have sustained increases in steel demand.

The Parties note in the September 3 Letter that market fundamentals and various trade remedies such as AD/CVD proceedings currently incentivize Nippon Steel's investment in the United States. However, as explained below, many of these market incentives and legislative decisions could be transitory, with the associated possibility of a long-term reduction in investment into U.S. Steel if alternative markets become more profitable investments, such as in India or Brazil, or if market incentives, including grants and subsidies under recent legislation, disappear due to changing political or market environments. Nippon Steel's recent commitments to improve U.S. Steel may be limited by changes in both the global steel market and domestic market conditions that alter Nippon Steel's decisions. As described below, the Parties have proposed mitigation terms that they assert could address this concern.[22] If the market situation in the United States deteriorates, through a reduction in demand, decrease in investment incentives, or other reasons, Nippon Steel could decide to use the capital currently earmarked for improvement of U.S. Steel's aging assets for an alternative investment. Similarly, Nippon Steel could continue with the planned investments but, after using U.S. Steel's current and improved manufacturing assets for the remainder of the assets' viable lives, decline to provide any further capital infusions and

---

[20] Ibid.

[21] CFIUS Case 24-038 Question Set 3, Question 7. As noted below, even with Nippon board approval of additional investments, these efforts are also subject to engineering and other technical analysis as well as other factors that could alter investment plans.

[22] 24-154 - Draft NSA (12.2.24) (the "Parties' December 2 NSA").

effectively let U.S. Steel's production diminish, focusing new investments on more profitable strategies while Nippon Steel expands its operations outside the United States.

Concerning the steel demand outlook, the short-term outlook for steel demand in the United States shows stable growth compared to many other nations. This growth is spurred on by unconventional oil and gas industries, geopolitical de-risking from China, and significant legislative expenditures authorizing monetary and tax relief incentives to companies investing in manufacturing and production assets in the United States. However, some or even many of these factors, which Nippon Steel specifically stated as motivations for investing in the U.S. market in the September 3 Letter, could ultimately prove to be transitory. The domestic growth in the unconventional oil and gas industries may decline as the United States continues to shift towards renewable energy. Recent U.S. legislative actions authorizing large expenditures were also departures from typical spending levels during a period of increased federal spending. Future governmental decisions could impact spending levels and domestic demand. Alternative markets, such as India, are also seeing significant stable growth. The high growth in alternative markets along with a potential shift in geopolitical dynamics and reduction in government incentives creates uncertainty in Nippon Steel's commitment to the United States particularly if, in the long term, alternative markets become more appealing for Nippon Steel's investment. Investments to maintain U.S. Steel's competitive edge in the United States could shift towards alternative markets such as India where there are many factors supporting long-term growth.

### C. Mitigation proposal

The Committee has taken note of the Parties' December 2 NSA proposal in its analysis. The Parties' December 2 NSA focuses on governance, supply assurance, and maintaining U.S. Steel's independence regarding certain decision making, including decision making related to U.S. Steel's participation in AD and CVD reviews and investigations as well as other trade remedy proceedings. The Committee has considered the following key provisions provided by the Parties:

U.S. Steel would remain a U.S. company and would retain its current headquarters in Pittsburgh, Pennsylvania.[23] Key management positions involved in the day-to-day operations of U.S. Steel would be filled by U.S. citizens.[24] U.S. Steel's Board of Directors would have nine members, a majority of whom would be non-dual U.S. citizens, with three U.S. directors who would be independent and approved by CFIUS Monitoring Agencies (CMAs).[25] The independent U.S. directors would establish and serve as the three members of a Compliance Committee of the U.S. Steel Board to oversee U.S. Steel's compliance with the NSA.[26]

The Parties' December 2 NSA would also require the Parties to maintain production capacity necessary "to meet market demand" needs; however, Nippon Steel could still close U.S facilities after meeting certain process requirements (*e.g.*, involvement of Compliance Committee) and notifying the CMAs. The Parties' December 2 NSA specifies that U.S. Steel's production would

---

[23] 24-154 - Draft NSA (12.2.24), Article II A.
[24] 24-154 - Draft NSA (12.2.24), Article II, K.
[25] 24-154 - Draft NSA (12.2.24), Article II, E-G.
[26] 24-154 - Draft NSA (12.2.24), Article II, H.

be prioritized for the U.S. market.[27] The Parties' December 2 NSA would commit the Parties to invest at least $1.4 billion in U.S. Steel's existing facilities covered by the basic labor agreement (BLA), a commitment which Parties raised to $1.6 billion in written submission to the Committee on December 12, 2024. The December 2 NSA would also commit the parties to invest at least $1 billion for Mon Valley Works, and at least $300 million in Gary Works. The Parties would provide quarterly progress updates to the CMAs.[28] The Parties' December 2 NSA also reaffirms the Parties' commitments in the BLA with the USW, which lasts until 2026 and includes no layoffs or plant closures or idling, except as permitted under the BLA or otherwise agreed upon with the USW.[29] The Parties' December 2 NSA reaffirms Nippon Steel's commitment to transfer technology and know-how from Nippon Steel to U.S. Steel, on arm's length terms.[30] Under the Parties' December 2 NSA, the Parties would be required to formally notify the CMAs 120 days in advance if Nippon Steel determines there is a need to reduce U.S. Steel's capacity or production.[31]

In the Parties' December 2 NSA, Nippon Steel would commit to not influence U.S. Steel's decisions or actions related to AD/CVD orders, Section 232 activity, or any other trade-related measures.[32] Further, and as discussed above, U.S. Steel would establish a trade committee led by one or more senior management officers from U.S. Steel and comprised of U.S. Steel employees who are U.S. citizens to handle U.S. Steel's trade actions.[33] Approval by the compliance committee, with the affirmative vote of a majority of the independent U.S. directors, would be required for any decision by the trade committee to undertake any trade action that could cost over $1 million or to decline to join the USW or another U.S. party in a trade action concerning products manufactured by U.S. Steel.[34]

Other provisions of the Parties' December 2 NSA include the potential appointment of a non-voting observer to the U.S. Steel Board; regular meetings with CMAs; creation of a Security Officer; creation of an NSA Compliance Policy; potential third-party audits; reporting obligations, including annual compliance reports and a requirement to report violations or suspected violations within 72 hours of discovery; and standard recordkeeping requirements as well as access and inspection provisions.[35]

In the mitigation proposals shared by the Parties, the Parties have proposed the creation of a trade committee to supervise and oversee U.S. Steel's decisions with respect to AD/CVD, Section 232, and other trade matters. Per the parties, this trade committee would have independence from Nippon Steel's foreign-based management. Whether such a committee could fully address the national security concerns raised would depend on numerous factors, including the enforcement mechanisms.

---

[27] 24-154 - Draft NSA (12.2.24), Article III, A.
[28] 24-154 - Draft NSA (12.2.24), Article III, F, 2.
[29] 24-154 - Draft NSA (12.2.24), Article III, I.
[30] 24-154 - Draft NSA (12.2.24), Article III, G.
[31] 24-154 - Draft NSA (12.2.24), Article IV, A (4).
[32] 24-154 - Draft NSA (12.2.24), Article V, A.
[33] 24-154 - Draft NSA (12.2.24), Article V, B.
[34] 24-154 - Draft NSA (12.2.24), Article V, D (1-2).
[35] 24-154 - Draft NSA (12.2.24), Articles II, I; VI; VII; VIII, A; IX; X; XI; and XII, A-C.

 Notwithstanding these potential commitments, it is possible Nippon Steel might in the future make decisions that could lead to a reduction in domestic steel production capacity due to considerations stemming from its global operations. As a global company with widespread operations in many jurisdictions, Nippon Steel faces a different set of commercial incentives than does U.S. Steel today.

By statute, a National Security Agreement may not be entered into with respect to a covered transaction unless the Committee determines that it "resolves the national security concerns posed by the transaction." The Committee has not yet reached consensus on whether the mitigation measures proposed by the Parties would be effective, allow for compliance in an appropriately verifiable way, and enable effective monitoring and enforcement, or whether they would resolve the risk to U.S. national security arising from the Transaction.

The President may ultimately make a decision about the identified risks and how to resolve them appropriately. As Section 721(d) of the DPA provides, the President may take such action for such time as the President considers appropriate to suspend or prohibit a covered transaction that threatens to impair the national security. The President must announce a decision on whether or not to take action no later than 15 days after the earlier of the date on which the investigation is completed or the date on which the Committee otherwise refers the transaction to the President.

CFIUS appreciates the Parties' continued cooperation, and representatives of CFIUS are available to discuss this matter further, should Parties seek to do so. If you have any questions regarding this letter or wish to update CFIUS regarding the matters discussed herein, please contact the case officer.

Sincerely,

Andrew Fair
Acting Assistant Secretary for
Investment Security
Department of the Treasury

**Annex 1: Additional Unclassified Information Considered by the Committee**

Along with the narrative response provided above, the Committee is providing a list of additional unclassified information upon which it relied in making its assessment, below.

The Committee considered that:

- This transaction implicates the following factors under Section 721 of the Defense Production Act (DPA) (Section 721): "the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security" (Section 721(f)(3)); "the potential national security-related effects on United States critical infrastructure" (Section 721(f)(6)); "the long-term projections of United States requirements for... critical resources and materials" (Section 721(f)(10)); and "such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation" (Section 721(f)(11)).

- Section 7(a) of Executive Order 11858 provides that CFIUS may seek to mitigate "any national security risk posed by a transaction that is not adequately addressed by other provisions of law."

- The President may take action to suspend or prohibit a covered transaction only if the President finds that "provisions of law, other than this section and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President."[36]

- CFIUS therefore considered whether other laws provide adequate and appropriate authority to protect the national security with respect to this transaction.

- In particular, Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. 1862), U.S. Antidumping and Countervailing Duty Laws, and Defense Priorities and Allocations Program authorities were considered.

- Section 232 allows the President to take action to adjust imports of an article and its derivatives following a finding from the Secretary of Commerce that the article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security. Section 232 authority is limited to adjusting imports.

- Thus, for example, if Nippon Steel were to decide to shutter U.S. Steel production capacity or decrease or eliminate U.S. production of certain steel products, Section 232 does not provide the President with authority to prohibit Nippon Steel from shuttering U.S. production facilities or to require Nippon Steel to maintain existing domestic

[36] 50 U.S.C. 4565(d)(4)(B).

production.

- While Section 232 could be used to limit imports with the goal of maintaining or increasing domestic production, if domestic facilities have been shuttered and domestic human and capital capabilities have been lost, replacing domestic production might be uneconomical (particularly given the extremely high capital costs of developing new steel production) and could take decades, during which time the United States would not have the domestic steel production capacity necessary for national security. Commerce does not assess any need to take additional action under Section 232 at this time, as the remedies and actions from the 2018 investigation are still in force and valid, primarily because domestic mills have not met the 80 percent capacity utilization rate defined by the 2018 investigation as being necessary to maintain a healthy domestic steel industry.

- The Defense Production Act (DPA), through Title I, is a powerful tool to influence domestic production and industrial mobilization but is limited in its ability address the concerns outlined in the U.S. Steel/Nippon Steel case.

- First, as practical matter, the U.S. Government cannot compel a private business to produce something that it says it cannot produce. Second, DOD already has the buying power to get the majority of goods needed through their regular acquisition practices, such as using DPA priority rated contracts for end items containing steel. Those rated orders will flow down to raw materials, including steel. This is daily practice for DOD and, as a consolidated purchaser of the items needed for defense needs, DOD's ability to obtain steel for its requirements will not be negatively impacted. Third, the majority of critical infrastructure in the United States is owned by private sector organizations. These organizations would have to petition the President or Department of Commerce to use the priority contracting function on a case-by-case basis. This cannot be effectively authorized to all critical infrastructure without weakening the power of the authority, because if all becomes a priority then there is no legitimate prioritization—effectively recreating the situation that currently exists.[37] It also could create additional bias in the system if only some critical infrastructure owner/operators received prioritization when others did not, thereby selecting who profits and who does not. This is a level of tactical operations that is not advisable for the U.S. Government.

- Lastly, although the President is authorized to allocate materials, services, and facilities, the powers granted for critical and strategic materials shall not be used to control the general distribution of any material in the civilian market unless the President finds (1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship. This is an extreme measure that would require a level of knowledge to ascertain the economic feasibility to control the entire domestic steel industry, not just the company referenced in this case. The due diligence required to obtain data and understand the entirety of the

[37] Commerce SME assessment.

domestic steel industry and then manipulate it to allocate those resources is not an easy undertaking, nor could be executed in a timely manner.

- The Committee also considered whether U.S. AD/CVD laws, which Commerce administers, would resolve the risks arising from the transaction.[38]

- Commerce processes petitions from firms that allege they have been harmed by unfair competition from imports (or, infrequently, self-initiates investigations), makes preliminary and final determinations about whether such imports were dumped or benefitted from government subsidiaries, and conducts (upon request) annual administrative review of AD/CVD orders.[39]

- Merchandise found to be subsidized or dumped is subject to duties as needed to offset the advantage conferred by the unfair practice. The AD law addresses the unfair trade practices of price discrimination among national markets or selling below cost.

- It provides for the imposition of antidumping duties when Commerce finds that the subject merchandise is being, or is likely to be, sold in the United States at less than normal value (below the price charged for the like product in the producer's home market or below the cost of production).

- Before AD duties may be imposed, the U.S. International Trade Commission (ITC) must determine that an industry in the United States is materially injured or threatened with material injury, or that establishment of an industry is materially retarded, by reason of imports of the dumped goods.[40]

- The CVD law provides for the imposition of countervailing duties on goods exported to the United States which Commerce determines have benefited from a financial contribution provided by a foreign government to a specific industry or group of industries.

- For WTO members, or countries that have assumed substantially equivalent obligations (most of our trading partners), the ITC must determine that the imports are causing or threatening to cause material injury to the U.S. industry, or are materially retarding the establishment of an industry, before countervailing duties may be assessed.

- While the AD/CVD law allows for the imposition of duties in response to injurious, unfairly traded imports, as is discussed elsewhere, there are concerns that Nippon Steel would not instigate AD/CVD proceedings even if there were unfairly traded imports that were injuring the U.S. industry, which would limit the ability of the administration to impose AD/CVD tariffs.

[38] 19 USC§ 2171 note (Reorganization Plan No. 3).
[39] Dept. Organizational Order 40-1 § 7.
[40] 19 USC§ 1673 *et seq.*

- More significantly, as was the case for Section 232 remedies, the AD/CVD laws only allow import relief (in the case of AD/CVD in the form of tariffs) and, as was the case for Section 232, do not provide authority to respond to a decision to decrease or eliminate U.S. production of certain steel products.

- For these reasons, AD/CVD authorities would not be adequate to address the national security threat posed by Nippon Steel acquiring U.S. Steel.

In addition, the Committee considered that:

- Through its persistent use of market-distorting government interventions and other non-market polices, China has unfairly gained dominance in the global steel market allowing it to have an outsized impact, as it exports extensive surplus steel that artificially lowers international prices.[41]

- These conditions impact steel markets around the world, incentivizing global steel producers to pursue low-cost production.

- In 1978, when the PRC began to open its economy, the United States produced four times more steel than the PRC. Now, the PRC produces 12 times more steel than the United States does.[42]

- Nippon Steel does sometimes contest harmful PRC practices, such as when it filed a lawsuit in 2021 against Baoshan Iron & Steel Co., Ltd. (Baoshan), a subsidiary of Baowu Steel Group, alleging infringement of Nippon Steel's patents relating to electrical steel; however, it rarely does so using U.S. trade measures.[43]

- These considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production and/or accelerate the closure of blast furnaces in the United States rather than seek other remedies to support its continued operations.

- Nippon Steel may also decline to support U.S. Steel's use of trade remedy tools, creating vulnerabilities in the efficacy of trade relief measures.

- Japan is the top foreign investor in the United States with a nearly $800 billion portfolio of foreign direct investment, while Japanese companies employ nearly 1 million Americans across all 50 states.[44]

---

[41] Global Forum on Steel Excess Capacity, Steel exports, trade remedy actions and sources of excess capacity, May 2024, paras. 9-11 [https://steelforum.org/gfsec-impacts-of-global-excess-capacity.pdf]. Section 721(f)(3);(6);(11). Accessed September 13, 2024.

[42] Leveling the Playing Field: How to Counter the CCP's Economic Aggression: Hearing before the U.S. House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party, 118th Cong. (2023).

[43] CFIUS Case 24-038 Question Set 3, Question 2.

[44] See Kishida, Fumio Address to Joint Meeting of the U.S. Congress, "For the Future: Our Global Partnership." Delivered April 11, 2024. Page 7.

- Japan also joined the United States in imposing strict export controls on advanced semiconductors to the People's Republic of China (PRC) and to curtail Russian energy exports.[45]

- Nippon Steel is minority owned by The Master Trust Bank of Japan, Ltd. (Master Trust) (approximately 14 percent) and Custody Bank of Japan, Ltd. (approximately 5 percent), with no other shareholders having interests of greater than five percent.[46]

- The Government Pension Investment Fund of Japan holds an indirect 8.29 percent interest in Nippon Steel through its trust account at Master Trust.[47]

- CFIUS has conducted its risk-based analysis under the premise that an individual foreign investor in a specific transaction may raise national security concerns due to the unique facts and circumstances of that transaction even though the investor's country of origin is a vital ally and trade partner.

- As described below, these considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production in the United States rather than seek other remedies to support its continued operations.

- Currently, China accounts for approximately five percent of Nippon Steel's total production.[48]

The Committee further considered that:

- Nippon Steel, as a multinational company, would have an inherently different decision-making process than an independent U.S. Steel.

- The Committee assesses that the proposed new Nippon Steel-owned U.S. Steel will be vulnerable to Nippon Steel's different motivations and potentially divergent priorities as a foreign-owned entity with over 80 percent of its steel petitions, investigations, and orders outside the United States.[49]

- While U.S. Steel has restarted production at such facilities several times in the last ten years, Nippon Steel may not elect to do so in the future for the commercial considerations

[45] For semiconductors, see: https://www.cnn.com/2023/03/31/tech/japan-china-chip-export-curbs-intl-hnk/index.html. Accessed December 13, 2024. For energy, see: https://www.spglobal.com/commodity-insights/en/news-research/latest-news/crude-oil/040822-japan-to-phase-out-russian-coal-imports-with-eye-to-suspend-it-on-g7-pledge-minister. Accessed December 13, 2024.
[46] CFIUS Case 24-038 JVN.
[47] CFIUS Case 24-038 JVN.
[48] Per the parties, Nippon does not have any crude steel production capacity in China and "ranks behind Japan, India, the Associations of Southeast Asian Nations (ASEAN), South America, and Noth and Central America for Nippon Steel, in terms of overall steel production capacity by region." See Response to Risk Letter of August 31, 2024, Appendix C.
[49] Analysis conducted by Commerce SMEs comparing Nippon's U.S.- and foreign-based trade remedy activities.

reviewed above.

- Nippon Steel could decide for business reasons, including cost, to shift production from U.S. Steel's aging blast furnaces to its other operations. Specifically, in the long term, overall cost and market considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production in the United States in favor of production in lower cost jurisdictions where Nippon Steel already has significant operations.

- U.S. Steel may view the costs for restarting a temporarily idled facility as "generally immaterial" now, but future considerations by Nippon Steel may differ, especially if these costs were to rise in the future.[50]

- Such decisions are made similar to any other business decision and are based on factors such as cost/benefit analysis, company priorities, and resourcing.

- This uncertainty introduces risks to national security under Section 721(t)(3).

- Nippon Steel asserts that the capital investments agreed to in August 2024, represent a long-term commitment to providing capital and advanced technology to U.S. Steel.[51]

- As described above, Nippon Steel would have other considerations influencing its decision-making, aside from the purchase price and infusion of capital into U.S. Steel, such as considering the resourcing needs of its other subsidiaries, its global capital commitments, the relative size of its market presence in the United States compared to other regions, and other such factors that U.S. Steel would not need to consider due to Nippon Steel's status as a global company.

- Nippon Steel is also likely to significantly grow its production capacity in other foreign markets where it has existing operations.

- The Committee assesses that Nippon Steel could decide to not invest any additional capital into BF14 and continue with U.S. Steel's plan to idle the furnace in 2026, even with current Nippon Steel board approval.[52]

- The Committee assesses that, given Nippon Steel's other existing blast furnaces, an additional five to ten years of profit earning (useful life) ten years from now may be an incentive to put that $300 million into something more immediately profitable or with a longer lifespan, or alter the planned investment after initial work has started based on changing demand or other business conditions.

- These considerations could reasonably lead to Nippon Steel making a commercial

[50] CFIUS Case 24-038, Question Set I, Question 4.
[51] CFIUS Case 24-088: Response to Risk Letter of August 31, 2024, Appendix C.
[52] The parties have proposed mitigation measures they assert will mitigated the expressed risks. See 24-154 Draft NSA (12.2.24).

decision to idle the mill as planned, further reducing production in the United States.

- While the parties have yet to discuss the logistics of the deal, it is reasonable to conclude that Nippon Steel must consider the same factors—cost, overall strategy, demand, amongst other considerations with this investment as with the Gary Works proposal and that the final implementation of the investment, along with next steps and future operation decisions, would be subject to Nippon Steel's different decision-making calculus.

- Were the transaction to take place, it is simply unknown the extent to which Nippon Steel would increase or decrease U.S. Steel's production.

- Nippon Steel's efforts on reducing costs and its carbon output likely could impact U.S. Steel's business plans, post-transaction.

- Although U.S. Steel announced in 2021 a goal of achieving net-zero carbon emissions by 2050, its acquisition by Nippon Steel would accelerate this process significantly to meet Nippon Steel's own environmental commitments.[53]

- The reduction of carbon output could accelerate U.S. Steel's current plans to expand its EAF production sites while closing down blast furnaces.

- Depending on the length of the development and refining process, Nippon Steel may not be able to use this method to achieve its environmental goals, increasing the likelihood that idling or modifying production at U.S. blasts furnaces may be required.

In addition, the Committee considered that:

- Nippon Steel has historically resisted AD/CVD relief under U.S. trade laws.

- Nippon Steel's relatively limited trade measure activity in other jurisdictions so sheds some light on how a U.S.-based subsidiary may approach AD/CVD cases under U.S. law.[54]

- This comparison is even starker, considering that Nippon Steel's global crude steel production capacity is approximately 72.5 million tons and its 2022 revenue was $53.9 billion, while U.S. Steel's production capacity is 22.4 million tons and its revenue was approximately $18.1 billion.

- Nippon Steel does not have a history of relying much on trade measure actions in any of the jurisdictions in which it operates. To the contrary, globally, Nippon Steel is far more likely to be found dumping or benefiting from countervailable subsidies than to seek

[53] Commerce SME assessment.

[54] Certain countries approach trade measures very differently depending on their institutional, political, economy, and legal structures. A reduced number of trade measure investigations in a given country may reflect that country's particular approach to trade measures, not just the activity level of firms.

relief from those practices.[55]

- Additionally, in any new cases filed by domestic steel producers naming Nippon Steel as a respondent, Nippon Steel would have to determine whether to have its U.S. affiliate support a petition that would likely result in additional costs for its other foreign affiliates or support its new U.S. production.

- The Committee further assesses that following Nippon Steel's acquisition of U.S. Steel, it could reduce its AD/CVD petitioning activity or take other actions that limit the efficacy of Commerce's AD/CVD authorities.

- Nippon Steel's choices concerning the support of AD/CVD tools to address PRC and other countries dumping and unfairly subsidizing of steel products on the U.S. domestic market could deviate significantly from U.S. Steel's choices.

- In particular, Nippon Steel may still have economic incentives to invest and increase production in lower-cost, high-margin markets such as Brazil, India, or Mexico and to weaken AD/CVD protections accordingly.[56]

- As a result, post-acquisition, unless Nippon Steel restructures all of U.S. Steel's operations and product lines to avoid competition with Nippon Steel's foreign businesses (which risks substantially reducing U.S. Steel's domestic production capacity), an apparent conflict could arise between the position of U.S. Steel in AD/CVD proceedings with the position of its prospective new parent, Nippon Steel, as a respondent in those same proceedings.

- As a global firm, Nippon Steel could direct U.S. Steel not to file petitions against foreign imports; not to make AD/CVD decisions that increase costs for Nippon Steel's affiliates in other countries; or decide to push back on AD/CVD protections vis-a-vis other markets in which Nippon Steel operates, which would erode the United States' ability to rely on current trade protections to ensure a competitive market for domestic steel.

- It is possible that Nippon Steel's longer-term commercial and strategic interests in its foreign businesses (the vast majority of its steel production post-acquisition) will eventually predominate over its stated interest in maintaining U.S. trade measures.[57]

- The Committee understands that the parties have proposed the creation of a trade committee to supervise and oversee U.S. Steel's decisions with respect to AD/CVD, Section 232, and other trade tools.

---

[55] Nippon Steel Corporation v. United States, 1:21-cv-00533, (United States Court of International Trade), Court listener, https://courtlistener.com/docket/60401183/nippon-steel-corporation-v-united-states/], accessed on August 12, 2024.

[56] Commerce SME assessment.

[57] Commerce SME assessment and analysis of unclassified information; see also Bloomberg, May 12, 2024. Nippon Steel Equity Research 1. Nippon Steel Equity Outlook. Accessed on October 8, 2024.

- Per the parties, this Trade Committee would have independence from Nippon Steel's foreign-based management.

- The efficacy of such a committee would depend on numerous factors, including the enforcement mechanisms.

- Self-initiation by Commerce of AD/CVD investigations is not an adequate or appropriate authority to address the specific national security risk implicated by a major U.S. steel producer—and prior frequent participant—declining to participate in, or actively undermining, trade measure proceedings. Since 2016, Commerce has self-initiated only two investigations, compared to 561 initiated by petition.

- The question is not, as Nippon Steel implies, merely a failure of the U.S. Government to self-initiate more proceedings. The statutory necessity of obtaining an affirmative U.S. International Trade Commission (USITC) determination of injury to domestic industry and the indispensable role private industry plays in such determinations has limited the ability of Commerce to self-initiate.[58] Pursuing an injury determination in the USITC requires data (for example, on price effects) that is provided by participating domestic firms. Industry participants have observed that the failure of a major firm to participate in USITC proceedings and provide its data has had potentially adverse effects on the success of that case. The lack of cooperation of a major producer in the USITC's investigation could pose an obstacle to self-initiation. Private petitioners are therefore best positioned to identify the threat of injury to their own companies before such injury results in irreversible consequences. Commerce lacks the same degree of real-time information about competitive harm suffered by a domestic firm.

- This data is particularly critical in the highly competitive U.S. steel industry. Compared to domestic petitioners, Commerce is more likely to become aware of the conditions that cause injury only after the economic effects of unfair trade practices a reflected in the marketplace—for example, when steel companies start idling mills, by which time any relief may be inadequate.[59]

- Furthermore, domestic industry support is a statutory prerequisite to initiate an investigation based on a petition.[60]

- If a firm that accounts for a significant volume of U.S. production and/or workforce fails to support a petition, that could make a finding of industry support more difficult if the petition encountered other opposition from domestic (*i.e.*, non-foreign owned) firms.

- While the risk that opposition from a Nippon Steel-owned U.S. Steel could jeopardize the threshold for industry support could be mitigated by the fact that as a foreign-owned company, U.S. Steel's position opposing the petition might be disregarded, its lack of

58 19 U.S. Code § 1677 (5).
59 19 U.S. Code § 1677 (5).
60 19 U.S. Code § 1677 (5).

support could increase the threshold for the industry support calculation and/or delay initiation.[61]

Furthermore, the Committee additionally considered:

- While this transaction may bring benefits to U.S. Steel in the near-term through access to certain superior technology and a planned capital infusion, risks remain.

- In 2023, U.S. Steel had a steel production capacity of 22.4 million tons and shipped 15.5 million tons of steel to customers globally, including 10.7 million tons to U.S. customers. In 2023, U.S. Steel had revenues of approximately $18.1 billion and had approximately 22,000 employees, approximately 14,000 of which were in the United States.[62]

- As of 2022, U.S. Steel's shares of the markets in which it operated were, by category: hot- rolled sheets and coils (14 percent); cold-rolled sheets and coils (17 percent); hot-dipped galvanized sheet (17 percent); tin mill products (29 percent); and seamless pipe and tube (11 percent).

- Currently, U.S. Steel does not supply products directly to the U.S. Government but may indirectly supply steel to U.S. Government agencies.

- In the last five years, pursuant to priority-rated orders, U.S. Steel provided commercial steel and flat-rolled substrate that U.S. Steel understands were indirectly supplied to the U.S. Government for use in bomb casings and Department of Defense (DOD) ships.

- Separately, U.S. Steel has had ten unclassified contracts with the U.S. Government in the last three years, of which eight are still active. Of the ten, nine are or were with the Department of Energy and one is with the Naval Surface Warfare Center.

- Pursuant to these contracts, U.S. Steel participates in research projects that primarily aim to reduce energy consumption and increase efficiency in its steel production. U.S. Steel does not supply products through these contracts.[63]

- Electrical steel is also an essential product for national security applications, including the nation's electrical grid and critical transportation infrastructure.

- The Committee notes that this transaction may bring benefits to U.S. Steel in the near-term through superior technology and a planned capital infusion.

---

[61] *See* Section 702(4)(8) of the Act ("In determining industry support under subparagraph (A), the administering authority shall disregard the position of domestic producers who oppose the petition, if such producers are related to foreign producers, as defined in section 771(4XB)(ii), *unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of a countervailing duty order.").*" Emphasis added); Domestic industry opposition or a requirement to poll the industry can also delay the initiation of investigations and, as a result, the ultimate trade relief. *See e.g.,* 19 U.S. C. 1613 a(c)(l)(B).

[62] CFIUS Case 24-038 JVN.

[63] CFIUS Case 24-038 JVN.

- The Committee assesses that historically, U.S. Steel has remained profitable enough to sustain operations, although its profitability has fluctuated over time due to variations in business strategies and markets.

- U.S. Steel has a history of inadequate attempts to improve its competitiveness with frequently changing operational priorities that limits analysis of how U.S. Steel will proceed in the absence of this transaction.

- Considering its track record of programs failing to deliver, U.S. Steel likely will continue to alter its business decisions but remain profitable enough to cover its operations and debt in the absence of this transaction.

- Based on previous steel requirements during prior national emergencies, current domestic steel production and capacity utilization, the Committee assesses, would likely be insufficient to satisfy national security needs under Section 721(f)(6), as producers would need to increase production by nearly 150 percent, an unattainable figure that takes into account U.S. Steel's current production levels.[64]

- Without U.S. Steel, or if U.S. Steel were operating under decreased capacity, this number could climb even higher and further out of the domestic steel market's reach. Further idling or closures would significantly deepen the domestic supply deficit of domestically produced steel to the detriment of national security. The introduction of further weaknesses in the domestic steel industry could result in even greater levels of dependency on imports.

- As background, the Committee emphasizes that the domestic industry (of which U.S. Steel is a principal player) drives essentially all remedial activity in the AD/CVD space, and that ongoing participation of firms with substantial market share is vital for Commerce to identify and redress injury to critical, sensitive domestic industries.[65]

- A relatively small number of petitioners—U.S. Steel, Nucor, Cleveland-Cliffs, Steel Dynamics, and a handful of others—drive a majority of trade measure cases in the sector. U.S. Steel has participated in hundreds of AD/CVD petitions. Placing aside the commercial and strategic dynamics that could arise from this transaction, U.S. Steel would likely be in a position to file further petitions naming Nippon Steel as a respondent on additional steel-related products in the future.

- Domestic industry ordinarily participates in these reviews, as necessary, to maintain duties and keep protections for businesses and workers in place. If a petitioner fails to advocate for maintaining duties as part of the review process, Commerce does not benefit from the additional evidence and arguments that could justify ongoing relief.

---

[64] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.
[65] 19 U.S.C. §§ 1671, 1673.

- Large firms such as U.S. Steel play an especially valuable role, since this advocacy requires the retention of expert counsel and can be costly and time-consuming to undertake.

- U.S. Steel is not the only active firm in the trade measure space; however, it is a consequential party to following AD/CVD cases through to completion. Even if U.S. Steel only trims or relaxes its trade measure activity, that change could have broader adverse implications for the rest of the industry.[66]

- This reduction in the effectiveness of U.S. trade measures to protect the U.S. steel industry could adversely affect U.S. national security due to steel's essential role in critical infrastructure and other national security applications, presenting the type of national security concern that CFIUS and the President are directed to consider.[67]

The Committee additionally considered:

- Nippon Steel acknowledged that the continued state of operations of U.S. Steel's facilities beyond 2026 would depend on a myriad of factors, including projected medium- and long-term demand, availability and cost of raw materials, health of the facility, and other overall cost considerations.[68]

- Although Nippon Steel appears committed to providing capital and advanced technology to U.S. Steel, none of these commitments go beyond 2026, which creates a potential consequence where U.S. Steel might not have the capital needed when required to undertake core activities to maintain profitability in the long-term.

- The return-on-investment period is over ten years, which could be seen as evidence of a long-term commitment to this particular facility; however, this is not a definitive nor a binding commitment. In contrast, this risk scenario envisioned by the Committee extends significantly through 2026.

- In addition, the benefits to the domestic steel industry, including capital injections or efficiency improvements, alone would not be sufficient to reverse the industry's decline and create a competitive environment with firms from non-market economies under current market conditions described above and considered under Section 721(f).

---

[66] GAO, December 12, 2022 (https://www.gao.gov/products/gao-23-105794). Accessed on July 1, 2024; In the view of Commerce SMEs, in the circumstance in which Nippon chose to reduce U.S. Steel's ADICVD footprint, the fact that other large firms would continue to petition does not fully mitigate the risk of weakened protections for the domestic steel market. As noted, petitions are costly and depend on a wealth of data and industry expertise; each additional petitioner brings incremental value and increases the likelihood of relief. Conversely, opposition by U.S. Steel could undermine a case brought by other firms. In an industry where 3-4 firms dominate AD/CVD activity, the potential reduction to 2-3 firms could have materially adverse effects on trade measures and protections in this space.

[67] Section 721(f)(1)-(3).

[68] CFIUS Case 24-038 Question Set 6, Question 4.

- Given the numerous contingencies, the Committee assesses that a potential Nippon Steel investment in the Mon Valley Works does not provide assurance that this facility will continue to operate after this transaction and, in any event, would not fully address the risks discussed elsewhere in this document.[69]

- Nippon Steel's decision to reduce the operation of U.S. Steel's facilities would pose a risk to the domestic steel supply chain.[70] The variability in restarting production lines depends on numerous factors.[71]

Additionally, the Committee considered the following:

- In considering Section 721(f)(3) of the Defense Production Act (DPA) (Section 721), the Committee assesses that, in the long-term, Nippon Steel could make commercial decisions that result in further weakening of the domestic steel market through loss of production capabilities and a reduction of the efficacy of trade remedy tools such as anti-dumping and countervailing duties (AD/CVD) to protect the U.S. steel industry that in turn could negatively affect U.S. national security.

- For instance, this could affect the capability and capacity of the United States to meet the requirements of national security as determined in Commerce's report under Section 232 of the Trade Expansion Act of 1962, which found that domestic steel production to meet national security needs depends on a healthy and competitive U.S. industry.

- In considering Section 721(f)(6), the Committee assesses any significant reduction in domestic steel capacity would likely jeopardize the U.S. steel industry's ability to maintain commercial production and meet the full spectrum of national security requirements to include critical infrastructure sectors such as transportation, infrastructure, construction, and agriculture, amongst others.

- The consequence of this risk is possible supply chain disruptions to sectors critical to national security under Section 721(f)(6), particularly transportation, infrastructure, construction, and agriculture. These critical infrastructure sectors would be impacted by a reduction of domestic steel capacity.

- If Nippon Steel were to reduce U.S. Steel's production and/or idle or shutter its mills, including its blast furnaces, there would be an overall reduction in the total capacity of the U.S. steel industry, reducing the steel capacity that critical infrastructure, such as critical manufacturing, energy, transportation, and communications (all vital to national security) relies on for maintenance and repairs.

- Potential critical infrastructure failures could lead to a variety of negative consequences

---

[69] The parties have proposed mitigation measures they assert will mitigated the expressed risks. *See* 24-154 Draft NSA (12.2.24).

[70] The parties have proposed mitigation measures they assert will mitigated the expressed risks. *See* 24-088 - Draft NSA (9.9.24).

[71] CFIUS Case 23-038, Question Set 1, Question 4.

for U.S. national security caused by delays in repairs to aging infrastructure.

- However, EO 14083 states that, while "the United States recognizes the importance of cooperating with its allies and partners to secure supply chains... certain foreign investment may undermine supply chain resilience efforts and therefore national security."[72]

- This transaction creates a national security risk by giving the foreign acquirer control over the third-largest domestic steel producer, allowing Nippon Steel to control and direct U.S. Steel's future business decisions and production, thereby potentially resulting in a further weakened U.S. domestic steel market.

- Specifically, under Section 721(f)(3) and (10), the Committee assesses that, in the long-term, Nippon Steel could make commercial decisions that result in further weakening of the domestic steel market through loss of production capabilities and a reduction of the efficacy of trade remedy tools such as anti-dumping and countervailing (AD/CVD) duties.

- In turn, this could affect the capability and capacity of the United States to meet the requirements of national security as determined in Commerce's report under Section 232 of the Trade Expansion Act of 1962, which found that domestic steel production to meet national security needs depends on a healthy and competitive U.S. industry.

- The Committee assesses that the long-term potential negative impacts on the domestic market and subsequent national security impacts outweigh any short-term benefits resulting from this transaction.

- The Committee assesses that the maintained operations will continue to provide the necessary capacity for the national security needs of the United States.

- As stated above, Nippon Steel's ownership of U.S. Steel could jeopardize the re-starting of idled facilities, result in the closing of more facilities, or a reduced future production output.

- If Nippon Steel were to idle or shutter some of U.S. Steel's production, which could include blast furnaces, there would be an overall reduction in capacity in the U.S. steel industry from which national security users of steel could draw.

- This scenario would pose a risk to U.S. national security by reducing capacity which hinders the overall U.S. steel industry's ability to meet increased demand during a national emergency or other time of increased demand.

---

[72] EO 14083, *Executive Order on Ensuring Robust Consideration of Evolving National Security Risks by the Committee on Foreign Investment in the United* States, section 2(a)(i), September 15, 2022.

- Reducing available capacity and eliminating domestic sources of numerous grades and types of steel could result in supply gaps that would leave manufacturers and suppliers of parts and components for critical infrastructure sectors without the steel needed to complete customer orders. This, in turn, could impact the resiliency, effectiveness, and integrity of critical infrastructure during a national crisis.

- This conflict of interest may create a vulnerability that a Nippon Steel-owned U.S. Steel could reduce its AD/CVD petitioning activity, oppose AD/CVD petitions brought by other domestic firms, and/or stop advocating to maintain duties in ongoing reviews for particular products and situations, taking into account case-specific supply chain concerns.[73]

- If Nippon Steel's global commercial interests diverged from the domestic industry, U.S. Steel, once controlled by Nippon Steel, could file to have orders revoked or take actions that could lead Commerce to revoke the order.[74]

- While this risk could be mitigated in cases where other domestic producer petitioners remained party to the proceedings, this may not be the case with all AD/CVD actions.

- The Committee assesses that potential reduced output by U.S. Steel from Nippon Steel could lead to supply shortages of critical components and production delays that could reverberate throughout industries critical to national security under Section 721(f)(6).

- These industries include the infrastructure, transportation, communication, and energy sectors, by reducing U.S. production capacity, rendering the domestic steel industry incapable of meeting demand and creating additional supply chain vulnerabilities.[75]

- Without available steel, critical infrastructure sectors may be forced to delay critical repairs or upgrades, or substitute inferior materials-including foreign-produced steel or materials of lessor strength and suitability-when repairs or maintenance cannot be delayed.[76]

- Such supply chain disruptions could exacerbate situations such as electrical grid or transformer outages or bridge or tunnel collapses, by delaying critical repairs due to a lack of available necessary parts that rely on domestic steel production.

- If Nippon Steel were to idle or shutter some of U.S. Steel's production, there would be an

---

[73] This risk is partially mitigated by the fact that Nippon Steel and U.S. Steel's opposition to a petition may be disregarded by Commerce under certain circumstances. Nippon Steel has stated to the Committee that it "will not interfere" in U.S. Steel's ability to participate in AD/CVD proceedings.
[74] 19 CFR § 351.216; 19 CFR § 351.218.
[75] For complete list, *see* Appendix H to *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018; *See also* This presents potential national security concerns of the type that the President and CFIUS are directed to consider. *See, e.g.,* Section 721(f)(6).
[76] Commerce SME Assessment.

overall reduction in capacity in the U.S. steel industry from which national security users of steel could draw.

- This scenario would pose a risk to U.S. national security by reducing capacity which hinders the overall U.S. steel industry's ability to meet increased demand during a national emergency or other time of increased demand (see below for additional information).

- Without U.S. Steel, or if U.S. Steel were operating under decreased capacity, this number could climb even higher and further out of the domestic steel market's reach. A continued loss of viable commercial production capabilities and related skilled workforce will jeopardize the U.S. steel industry's ability to meet the full spectrum of national security requirements.[77]

- Further, the lengthy process to restart operations would likely exacerbate any supply shortages created by other steel producers' pivot to steel for national security needs.[100] In this case, U.S. Steel's commercial steel production capabilities would be a crucial backstop for steel used for commercial and industrial industries that support critical infrastructure needs under Section 721(f)(6).

- For instance, U.S. Steel is a major supplier of the transportation sector, one of DHS's sixteen critical infrastructure sectors, including components for trains, trucks and buses.

- Any further reduction in production in the long-run, or decrease in utilization, would have negative impacts across multiple critical infrastructure supply chains.

- In times of increased steel requirements, critical industries would have increased difficulty acquiring enough domestically produced steel to meet demand if capacity were reduced due to idling or closures of U.S. Steel's facilities.[78]

- In turn, this could cause critical industries to reduce or delay production of critical components due to a lack of available steel or rely on imported steel thus increasing their use of lower-quality Chinese steel, which could lead to a variety of negative consequences, including critical infrastructure failures caused by delayed repairs to aging infrastructure.

- Being forced to rely on foreign owned facilities introduces significant risk and potential delay for the development of new steel technologies and production of needed steel products, particularly in times of national emergency.[79]

---

[77] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

[78] Commerce SME Assessment.

[79] 24-038 Question Set 5, Question 2; *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

- Without a second fully integrated blast furnace manufacturer, automotive and other commercial steel production used for machinery, in construction, and for other industrial purposes would drop precipitously if Cleveland-Cliffs and other producers had to shift its production capacities to national security-related steel products, harming national security.[80]

- The Committee assesses that, without backup capacity, increases in national security-related steel production would come at the expense of the production of commercial and industrial steel products.

- Further, commercial and industrial industries that support national security industries would face increasing domestic supply chain shortages that would ultimately harm national security through potential upstream disruptions in the supply chains for critical national security products.

- Lack of access to high purity steel, produced in blast furnaces, could cause bottlenecks and disruptions to supply chains for industries crucial to national security. Two sectors that would be particularly affected by a disruption in the domestic steel supply are transportation (including the automotive industry) and energy.

- The Committee assesses it would be expensive and labor intensive to restart or ramp up production during a reduction in U.S. Steel's overall capacity, harming national security.

- Shortfalls in supply could slow down or stop the production of certain automotive and other transport components, which would result in supply chain disruptions and delays throughout the industry.

- The loss of domestic production is a critical national security concern given the ubiquitous nature of steel throughout multiple critical industries.

- A reduced U.S.-produced supply would force manufacturers to turn to imports, where possible, to meet their needs, further weakening the vulnerable U.S. steel market.

- Without an assured domestic supply of these products, the Committee assesses that the United States cannot be certain that it could effectively respond to large power disruptions affecting civilian populations, critical infrastructure, and U.S. industrial production facilities and installations in a timely manner.

- These risks affect the potential production and markets for NOES (electrical steel), which must be produced at adequate volumes to support an expansion of EV production.

- A decline in the rate or effectiveness of trade tools for steel-related products could conversely lead to additional risk to the overall production capacity and supply of the U.S. steel industry.

---

[80] Commerce SME Assessment.

- The Committee assesses that lack of support would hinder the U.S. Government's ability to provide adequate trade protection measures and leave the U.S. economy more exposed to dumping and unfair subsidization of steel, leading to a weakened U.S. domestic steel production capability.

- A reduction in U.S. Steel's support for trade measures on steel imports could weaken the protections available to the domestic steel industry and significantly reduce domestic production capacity.[81]

- If U.S. Steel were to substantially reduce its affirmative participation in AD/CVD cases targeting any major steel-producing or circumventing jurisdiction, other domestic steel producers could also experience decreased import duty protection and face a relatively greater volume of dumped or unfairly subsidized imports.

- Per the parties, the alternative final bid for U.S. Steel was from Cleveland-Cliffs; however, Nippon Steel was selected because Nippon Steel provided the highest value and certainty while presenting less regulatory risk than Cleveland-Cliffs.[82]

[81] A national security concern per Section 721(f)(3).
[82] CFIUS Case 24-088 Question Set 2, 1(b).



United States Steel Corporation
600 Grant Street, Suite 6100
Pittsburgh, PA 15219-2800
(412) 433-1130

**David B. Burritt**
President & Chief Executive Officer

December 16, 2024

Dear Secretary Yellen and Secretary Raimondo:

As I expressed to you this past Friday, I have admired and appreciated your leadership for the last four years to enhance American competitiveness. I came away from our conversation heartened by your assurance that CFIUS would adhere to the law and a fair process. I therefore was profoundly disappointed to receive a letter on Saturday from CFIUS, with no notice from you on Friday, that is rife with inaccuracies and distorted from reality – and that appears to chart a path that will affirmatively harm U.S. national and economic security, a path that is clearly being authored by the opponents to the transaction.

Our company's merger with Nippon Steel Corporation ("Nippon Steel") will make U. S. Steel bigger and stronger in the United States, maintain and enhance our U. S. footprint, preserve our iconic name and headquarters in Pittsburgh, enhance competition and better serve U. S. Steel customers, provide a stronger future for U. S. Steel employees and the communities they serve, and, perhaps most importantly, forge a more resilient global player in the steel industry, bonded in the close and enduring relationship of two great allies and democracies, to compete against the long-term threats emerging from China.

My board of directors and I are resolute that we are on the right side of history with this transaction, and we will continue to pursue every avenue to secure its benefits for our shareholders, employees, customers, communities, and the United States. These stakeholders, like us, are keenly aware of the consequences of this transaction for their livelihood, their communities, the future competitiveness of the American steel industry, and the strength of the U.S.-Japan alliance and its ability to stand up to the pending Chinese threat.

I implore you in the strongest possible terms to uphold the rule of law, preserve the integrity of CFIUS, affirm the United States' alliance with Japan and the long-standing policy of the United States to be open to foreign investment, particularly where it enhances U.S. manufacturing capabilities and strengthens national security, and approve the acquisition by Nippon Steel.

I stand ready to work with you to bring the CFIUS process to a successful close.

Best,

David B. Burritt
President & Chief Executive Officer

***Business Confidential Pursuant to 50 U.S.C. § 4565***
***Protected from Disclosure Under 5 U.S.C. § 552***

December 17, 2024

**BY ELECTRONIC MAIL**

Andrew Fair
Acting Assistant Secretary for Investment Security
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW, Room 5221
Washington, D.C. 20220

Re: **CFIUS Case 24-154: Response to Letter of December 14, 2024**

Dear Mr. Fair:

We are writing on behalf of United States Steel Corporation ("U. S. Steel") and Nippon Steel Corporation ("Nippon Steel" and, together with U. S. Steel, the "Parties") in response to your letter dated December 14, 2024, in connection with CFIUS Case 24-154 (the "December 14 Letter"). Enclosed is a detailed response to the points in the December 14 Letter, including its annex (the "Parties' Response").

The December 14 Letter repeatedly dismisses (or ignores) the extraordinary benefits of the transaction that will result from the unprecedented and binding commitments–which will be enforceable by CFIUS—that Nippon Steel has made to invest nearly $3 billion of new capital in U. S. Steel facilities and communities, maintain and enhance domestic production capacity, and maintain U. S. Steel intact as a Pittsburgh-headquartered domestically organized company controlled by a majority U.S. citizen board. In addition, the December 14 Letter fails to adequately account for the fact that Nippon Steel has committed, through verifiable and enforceable mechanisms, to refrain from interfering with U. S. Steel's decisions or ability to pursue trade measures under U.S. law. The reality is that the steelworkers' jobs will be much more secure as a result of the transaction, and the Administration has been given detailed information demonstrating that reality, including the Parties' proposed robust National Security Agreement ("NSA"). Yet, CFIUS has repeatedly refused to engage with the Parties on codifying these commitments.

Instead of such engagement, as set forth in detail in the Parties' Response, CFIUS sent a letter—the December 14 Letter—that is littered with factual inaccuracies and omissions, misleading and incomplete statements, conjecture and hypotheticals that have no basis in fact and are plainly illogical, as well as wholly unsupportable disparagement directed at a critical U.S. ally. CFIUS must assess national security risk that arises as a result of a transaction, and not conjure imaginary risks that have no basis in fact and that do not arise from the transaction. Instead, the December 14 Letter distorts the law and is a clear departure from Committee precedent. We find it implausible that the December 14 Letter reflects the reasoned analysis, let

alone the full "assessment," of CFIUS.[1] Indeed, the fact that it repeats inaccurate and incomplete information that has been raised only by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW")—and not at any point during the last nine months of this CFIUS review—is telling, and suggests that CFIUS is not exercising independent judgment, but instead seems to parrot arguments made by David McCall, the President of the USW.

We are gravely concerned that the December 14 Letter reflects impermissible influence in the CFIUS process from the White House, at the behest of third parties who oppose the transaction and seek to weaken the Parties, namely, Cleveland-Cliffs Inc. ("Cliffs"), led by CEO Lourenco Goncalves, and Mr. McCall.

The December 14 Letter, among other things:

- asserts risks related to reduction of production capacity of U. S. Steel that are in fact *certain to happen without the transaction*, and that the transaction would *directly remedy, including pursuant to the binding commitments summarized above and set forth in detail in the Parties' proposed NSA;*

- falsely claims that Nippon Steel's environmental commitments will cause it to reduce U. S. Steel's blast furnace footprint, even though (1) U. S. Steel's announced strategy, backed up by its actions, prior to the transaction was to move away from such facilities precisely because it does not have the technologies or resources to address the environmental concerns; and (2) Nippon Steel has pledged to contribute its leading technologies to these facilities in the United States, and to maintain U. S. Steel's blast furnace operations for years to come;

- refuses to acknowledge the commercial and economic reasons why Nippon Steel—a publicly traded company accountable to its diverse base of shareholders—would be incentivized, following a nearly $18 billion investment, to support U. S. Steel's trade positions, while also simultaneously ignoring (1) the unprecedented commitments reflected in the Parties' proposed NSA, which would ensure that U. S. Steel trade actions are made by U.S. citizens, with oversight and enforcement by CFIUS and free from interference by Nippon Steel; and (2) the fact that the United States, under the Biden Administration, entered into a cooperation agreement with Japan to coordinate on trade remedies and customs matters (as well as continuing the two countries' broader ongoing regional and military cooperation);

- insinuates that the passive minority ownership in Nippon Steel held by Japanese banks—banks that are merely engaged in custody of securities without having sole voting discretion, and whose ownership in Nippon Steel ***is less than the ownership held by U.S. investors***—presents a national security concern;

- selectively cites to certain authorities of the Defense Production Act (the "DPA") while ignoring more directly relevant provisions of the DPA that have been

---

[1] The timing of the letter—on a Saturday afternoon—also is curious and raises questions of exactly who among the Committee was aware of the December 14 Letter and the full details of its contents, and when they were made aware.

repeatedly invoked to incentivize and reward domestic manufacturing and production; and

- attributes risk to Nippon Steel's *de minimis* presence in China—which is diminishing, legacy, and wholly separate from the business at issue here—and ignores the reality that Japan, a close ally, is under threat from China, and that this transaction will bolster the Japanese and U.S. steel industries' resilience against the long-term threat from China.

These statements confirm that CFIUS has deviated dramatically from its usual procedures and failed to follow the law and apply its usual standards. Indeed, the December 14 Letter says there is "no consensus" among agencies, but we fail to see how there could possibly be "consensus" among agencies—particularly agencies that are charged with protecting and defending U.S. national security, our Constitution, and the economy—when the proffered "assessment" is so disingenuous. Make no mistake: The assertions contained in the December 14 Letter are patently false, and they are dangerous. They directly belie claims—made as recently as Friday by Secretary Yellen and Secretary Raimondo—that CFIUS is focusing on protecting the process and following the law. If these falsehoods carry the day, the result will taint the legacy of CFIUS and all involved in this process, including President Biden. Once the underlying record is laid bare, the world will have no alternative but to conclude that the United States, which has been the leading light on foreign investment for decades, has taken a dark and protectionist turn; that U.S. regulators will abdicate their legal responsibilities and ignore statutory requirements to curry political favor; that the U.S. government is willing to outsource protection of U.S. national security to private sector participants acting in their own self-interest; and that the United States will readily torpedo its allies if politically beneficial.

China's dominance in steel will be further solidified, and China will continue to issue propaganda highlighting the United States' shocking mistreatment of Japan and about the United States' lack of commitment to foreign investment.[2] We also remind the Committee that Mr. Goncalves of Cliffs, an unabashed monopolist, bragged in March—before the CFIUS process even started—that he orchestrated a quid pro quo between the USW and the President to block the transaction, and that CFIUS was nothing more than a feckless bureaucracy with no decisionmaking authority. David McCall has made similar statements.[3] We fear that if CFIUS blocks this transaction, these actors' cynical, persistent efforts to undermine the legitimacy of the CFIUS process will succeed, resulting in irreparable damage to CFIUS's reputation, decreasing foreign investors' confidence in the United States, and further incentivizing external parties, including our adversaries, to devise and pursue plans to manipulate regulatory reviews to serve their interests.

---

[2] *See, e.g.*, *US steels itself to be more protectionist*, CHINA DAILY (Apr. 2, 2024), https://www.chinadaily.com.cn/a/202404/02/WS660bf792a31082fc043c0108.html; Li Yang, *Biden's nixing of steel deal reveals little trust in ally*, CHINA DAILY (Sept. 6, 2024), https://www.chinadaily.com.cn/a/202409/06/WS66da3c67a3103711928a65b5.html; Zhang Zhouxiang, *Tokyo must stop flattering its uncaring master*, CHINA DAILY (Dec. 13, 2024), https://www.chinadaily.com.cn/a/202412/13/WS675b6f82a310f1265a1d29e4.html.

[3] We are reattaching communications we have previously provided to CFIUS highlighting these statements.

That does not need to be the outcome. One year ago, upon announcing the transaction, the Parties embarked on a path committed to transparency and partnership with the regulators who would review the transaction, including resolving all legitimate national security interests, and with a firm belief in the rule of law in the United States and the institutions of the U.S. government. The Parties embarked on this path with the hope that ultimately Nippon Steel would be able to build a strong and trusted relationship with the USW. They were not naïve about pursuing such a merger during an election year, but believed deeply that the U.S. government would follow the course of action that is clearly in the best national security and economic interests of the United States, and grounded in the rule of law.

The Parties remain fully confident in the many benefits that will result from Nippon Steel's acquisition of U. S. Steel. Indeed, those benefits are even more clear one year later, given the unprecedented, legally binding, and enforceable commitments that Nippon Steel has made to support U. S. Steel employees and to invest in U. S. Steel facilities and communities. We are pleased to have received the support of leaders of the Congressional Black Caucus, as well as mayors and county leaders. We are also pleased that the majority of USW members employed by U. S. Steel have acknowledged and supported Nippon Steel's continuing desire to build a productive relationship with the USW, despite the fact that the leadership of the USW International has repeatedly refused to engage seriously with Nippon Steel and instead has orchestrated a well-connected and organized campaign to subvert the legal process.

If CFIUS appropriately concludes action, including by determining that the NSA proposed by the Parties addresses any potential concerns, it will preserve CFIUS's reputation, uphold U.S. national security interests, maintain the United States' rightful place as a leader on foreign investment matters in the world, and protect the U.S. steel industry. We implore the Committee to follow the rule of law and engage promptly to finalize the NSA and approve the transaction.

Sincerely,

David N. Fagan
Covington & Burling LLP
850 Tenth Street, NW
Washington, D.C. 20001

*Counsel to United States Steel Corporation*

Ama A. Adams
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006

*Counsel to Nippon Steel Corporation*

Enclosure 1 – Response to Text of December 14 Letter
Enclosure 2 – Response to Annex of December 14 Letter
Enclosure 3 – Statements by Lourenco Goncalves
Enclosure 4 – Statements by David McCall

*Business Confidential Pursuant to 50 U.S.C. § 4565; Protected from Disclosure Under 5 U.S.C. § 552*

**Enclosure 1 – Response to Text of December 14 Letter**

| Text of the CFIUS Risk Letter | Response by the Parties |
|---|---|
| "The August 31 Letter informed the Parties that one of the risks the Committee has identified as arising from this Transaction is that Nippon Steel may make decisions that reduce U.S. domestic steel production capacity. In the September 3 Letter, and in other communications to the Committee, Nippon Steel has stated that it has no intentions of idling, permanently closing, reducing staff, or otherwise modifying any of U.S. Steel's blast [furnace] facilities through 2026. In addition, Nippon Steel has made a commitment to not idle or permanently close Gary Works BF 14 and Mon Valley Works through 2026, and Nippon Steel has stated it would invest $1.3 billion to modernize these facilities. However, the Committee continues to assess a risk to national security arising from the Transaction despite the commitment for these two facilities, as these represent 26 percent of U.S. Steel's steelmaking production capacity. Nippon Steel has acknowledged several contingencies that could reduce the continued state of operations of U.S. Steel's facilities and that those operations depend on myriad factors, including projected medium- and long-term demand, availability and cost of raw materials, health of the facility, and other overall cost considerations, notwithstanding the Parties' objections to the inclusion of this fact in the August 31 Letter." (p.3) | In the United States and other market economies, the steel industry is a private (non-government-controlled) industry that—like other private industries—is subject to the realities of supply and demand. Today, U. S. Steel's decisionmaking regarding the operations of its facilities depends on the same factors cited by the Committee.<br><br>Post-Transaction, U. S. Steel's decision making related to its facilities would be informed by the considerably greater financial resources of Nippon Steel. Post-Transaction, U. S. Steel would be better able to withstand the market forces identified by the Committee. By contrast, if the Transaction does not proceed, (1) U. S. Steel would be forced to revert to its pre-Transaction strategy of rationalizing existing facilities to maintain a healthy business with limited resources, shifting production from older, USW-represented facilities to more efficient electric arc furnace ("EAF") facilities; and (2) U. S. Steel would remain in a significantly worse financial position than had the company not received an unsolicited acquisition proposal from a competitor, triggering the 2023 strategic alternatives review process.<br><br>In addition, under the Parties' proposed National Security Agreement ("NSA")—which incorporates robust consultation and monitoring mechanisms—the U.S. government would have ***greater*** insight into decisionmaking related to the operation of U. S. Steel's facilities than presently exists. For example, the Parties' proposed NSA would require that Independent U.S. Directors, approved by CFIUS, approve any permanent idling of a U. S. Steel facility in the United States (*i.e.*, a change that would reduce production capacity), and CFIUS would be notified and consulted regarding that determination. None of these approval, notice, or consultation mechanisms currently exist. Today, any U. S. Steel facility could be permanently idled without notice to, or consultation with, the U.S. government.<br><br>The Parties have submitted three draft NSAs to CFIUS (in September, October, and December), over a more than three month period. However, the Committee has refused to engage substantively with the Parties on mitigation terms, nor has CFIUS shared even a single markup of ***any*** of the Parties' proposed NSAs. The Parties have emphasized their willingness to consider other mitigation proposals or markups to their proposed NSAs, including as recently as in the December 13 conversation with Secretary Yellen and Secretary Raimondo. To date, however, CFIUS has refused to engage on the merits. |
| "Additionally, although the Parties also stated in the September 3 Letter that "the overall production volume of | The Parties are surprised by the Committee's reference to the $5.2 billion in liquidity given (a) in the nine months this matter has been pending with CFIUS, the Committee did not raise that issue a |

| Text of the CFIUS Risk Letter | Response by the Parties |
|---|---|
| steel does not necessarily decrease, in particular as older, less-efficient facilities are phased out and new, more efficient facilities are brought online," the Committee assesses that building new facilities for production and maintaining capacity require significant investment and capital that may be contrary to Nippon Steel's future business plans and incentives. The Committee notes that, as of October 2024, U.S. Steel maintains $5.2 billion in liquidity available to continue investing in its furnaces and production lines. Business plans and incentives may change; for example, U.S. Steel committed $1.5 billion in 2019 to expanding production at Mon Valley, and even spent $170 million towards this end, before cancelling such investment due to issues with obtaining required environmental permits to begin construction. U.S. Steel instead focused its investments towards Big River Steel 2, which will become operational in the fourth quarter of 2024 at a cost of $3.4 billion." (p.3) | single time; (b) it is inaccurate; and (c) it is a point that the USW repeatedly raises—which suggests to us that external parties are improperly influencing CFIUS. This is deeply concerning.<br><br>To correct the record, U. S. Steel disclosed on October 31, 2024, total liquidity of $4.1 billion, a reduction of $1.1 billion from CFIUS' inaccurately referenced year end 2023 liquidity of $5.2 billion. As the Committee can see, U. S. Steel's liquidity can change meaningfully from year to year based on the underlying performance of the business and capital expenditures that have already been committed. The Committee's citation of this figure also fails to recognize that U. S. Steel is completing a total investment plan of over $4 billion, which is expected to continue to reduce liquidity moving forward as cash is used to complete the nearly final projects. Had the Committee at any point actually asked U. S. Steel for information about its liquidity, U. S. Steel would have readily provided that information.<br><br>Moreover, a reference to U. S. Steel's overall liquidity as justification for the ability and willingness to make significant, multi-year investments is erroneous, as any economist or financial officer would attest. U. S. Steel's liquidity is comprised of two primary components: (1) cash and cash equivalents; and (2) amounts available under credit facilities and revolving lines of credit. The Committee fails to recognize that the majority of U. S. Steel's liquidity ($2.3 billion of the total $4.1 billion) are the amounts available under credit facilities and revolving lines of credit. Financing sources of this nature are typically used for short-term capital needs (*i.e.*, working capital), not material investment in a company's assets. When a company draws upon a credit facility or a revolving line of credit, the borrowings become part of the interest-bearing debt the company must now service and restricts its access to such funds in the event of market downturns.<br><br>U. S. Steel also notes that based on the company's latest financial projections, U. S. Steel currently projects to end the year with $3.6 billion in liquidity, including $1.4 billion in cash. This cash will be required to support the ongoing capital needs of the business—including the completion of nearly completed investments.<br><br>Finally, as the Committee has been advised previously under penalty of perjury—but somehow failed to include in its letter—in the absence of a transaction, U. S. Steel expects that it will be forced by investors to return any "excess" capital to stockholders via dividends and/or buybacks, further limiting the cash and liquidity available to fund new investments.<br><br>By contrast to the foregoing, Nippon Steel has provided binding legal commitments, which would be enforceable by CFIUS under the Parties' proposed NSA, to provide ***$2.7 billion in new capital*** to |

| **Text of the CFIUS Risk Letter** | **Response by the Parties** |
|---|---|
| | U. S. Steel's integrated facilities, including $1.3 billion to reline Gary's Blast Furnace #14 ($300 million) and upgrade or replace Mon Valley Works' outdated hot strip mill (at least $1 billion). |
| "The Committee has considered the fact that Nippon Steel has continually restated its commitment to this planned investment. The Gary Works BF 14 is a significant element of U.S. Steel's portfolio that Nippon Steel likely would maintain as part of the significant production increase. U.S. Steel has claimed that Gary Works BF 14 will close absent this Transaction, and Nippon Steel could make a similar commercial decision to either idle the mill as planned or in the future, further reducing production in the United States, even if this decision is unlikely in the short term. The Parties' December 2 NSA includes a provision that would commit Nippon Steel to an investment in the mill. Concerning the Mon Valley investment, Nippon Steel, U.S. Steel, and Hatch (a third-party engineering firm) are meeting weekly to provide technical studies, engineering reports, and budgeting related to three modernization investments being evaluated." (p.3-4) | The fact that Nippon Steel's future economic incentives conceivably could be influenced by external developments is neither a risk that arises from the present Transaction nor will it prevent the certain rationalization of U. S. Steel facilities if this Transaction does not proceed.<br><br>This Transaction would enable the Parties to invest in U. S. Steel's integrated steelmaking operations, including $1.4 billion in capital expenditures (beyond repair and maintenance) for U. S. Steel's union-represented facilities (which the Parties now estimate will reach $1.6 billion); approximately $300 million to revamp Gary Works' Blast Furnace #14; and no less than $1 billion to upgrade or replace the vintage 1938 hot strip mill and other facilities at Mon Valley Works. These investments would not occur absent this Transaction. Further, in their proposed NSA, the Parties commit to maintain production capacity at ***all*** facilities in the United States, and the Additional Commitment Letter submitted to CFIUS on December 12 outlines the Parties' plans to operate and/or maintain U. S. Steel's other facilities in the United States. Nippon Steel's investment is intended to strengthen, and allow for the long-term operation of, all U. S. Steel facilities.<br><br>CFIUS's analysis ignores the very real constraints that U. S. Steel operated under before the Transaction was announced, and the information that CFIUS has received about the very real consequences to U. S. Steel if the Transaction does not proceed. These are not just claims; CFIUS has been given direct evidence of U. S. Steel's plans prior to the Transaction, and what U. S. Steel will be compelled to do in the absence of this Transaction. It is noteworthy that CFIUS's letter hypothesizes about all things that Nippon Steel may or (more likely) may not do—including actions that completely contradict rational economic considerations—and yet ignores what it knows U. S. Steel will do. To be crystal clear about this:<br><br>• In Indiana, pre-transaction, U.S. Steel had already planned to idle its largest blast furnace—#14 at Gary Works. If this Transaction falls apart, it will move forward with that idling.<br><br>• In Illinois, but for the pending Transaction, U. S. Steel would have permanently idled Granite City Works. While U. S. Steel remains focused on closing this Transaction, given the threats of a block, it also is having to move forward with preparation to wind down steelmaking at that facility.<br><br>• In Pennsylvania, as U. S. Steel has previously advised the Committee, the prohibition of the Transaction would result in streamlining corporate-level expenditures by reducing |

| Text of the CFIUS Risk Letter | Response by the Parties |
|---|---|
| | headcount. And without the $1 billion upgrade from Nippon Steel, the future of Pittsburgh's Mon Valley Works looks like those of U. S. Steel's other facilities that have closed. Without ongoing steelmaking operations in Pennsylvania, U. S. Steel would eventually move its headquarters elsewhere.<br><br>These are not threats. This is the reality that U. S. Steel will confront if the Transaction is blocked.<br><br>By contrast, the Parties' proposed NSA commits to maintaining Production Capacity for ***all*** of U. S. Steel's facilities in the United States (with any decision to permanently idle a facility requiring (1) approval of CFIUS-approved U.S. Independent Directors; and (2) advance notice to and consultation with CFIUS). The U.S. government would have no such assurances absent this Transaction. Indeed, were the transaction ***not*** to take place, the result would be a ***certain decrease*** in U. S. Steel's production. |
| "The Parties' December 2 NSA includes a provision that would commit Nippon Steel to an investment in this mill. Nippon Steel likely will encounter construction-execution risks similar to those that U.S. Steel experienced in trying to expand production lines at Mon Valley. Parties have conveyed that the change in state administration increases the likelihood that permitting is received and this is reinforced by a recent executive order by Pennsylvania Governor Shapiro on permitting timelines. However, U.S. Steel has not elaborated on the reason that the environmental permits were not issued for Mon Valley, precluding CFIUS from determining if the issue was solely based upon Pennsylvania's lack of timeliness as described by the parties. The Parties' December 2 NSA also includes a commitment to not reduce Production Capacity unless certain procedural and notice requirements are met." (p.4) | As an initial matter, the Committee's purported concern regarding "domestic regulatory red tape risks" is not a national security risk that arises as a result of the present Transaction, ***and, therefore, is not a factor that the Committee can lawfully incorporate into its risk analysis for this Transaction.***<br><br>CFIUS's view that domestic regulatory red tape risks impeding a desperately needed investment in domestic steel production capacity is the type of wholly illogical reasoning that has subverted the Committee's review of this Transaction. If the U.S. federal government is concerned that state authorities may impede an investment that the federal government believes—and the Parties agree—is in the best interest of U.S. national security, the Parties encourage the federal government to execute its responsibilities and engage with their state counterparts.<br><br>Nippon Steel has committed to invest no less than $1 billion to sustain the long-term health of the Mon Valley facility and has committed to doing so in a legally binding NSA. In the absence of this Transaction, that investment will not occur. U. S. Steel has repeatedly acknowledged this fact, and that the inevitable outcome of a decision by President Biden to block the Transaction will be the eventual idling of Mon Valley Works, and, with no steelmaking in Pennsylvania, eventually moving U. S. Steel's headquarters from Pennsylvania.<br><br>In April 2021, U. S. Steel cancelled its plan for a new hot strip mill and co-generation plant at its Mon Valley Works in Pennsylvania after re-evaluating its capital allocation strategy in light of new environmental goals at that time. Significant delays in the environmental permitting process also |

| Text of the CFIUS Risk Letter | Response by the Parties |
|---|---|
| | contributed to the decision. Despite applying for permits necessary to begin construction, which U. S. Steel applied for when it first announced the project 10 months prior to the onset of COVID-19, the permits were never issued by Allegheny County authorities.<br><br>At the time of the company's announcement that it was moving away from the hot strip mill investment at the Mon Valley, President and CEO Dave Burritt explained the decisions by stating, "Today, we're announcing one of those difficult decisions, one of those difficult choices. With a clear vision for our future, we have evaluated how we allocate capital through the lens of sustainability, value creation and lower capital and carbon intensity across the footprint. When facts change, we must change. And as we step forward to meet the needs of a rapidly changing world, we must set aside the Mon Valley endless casting and rolling and co-generation project. This is not a decision we took lightly, but the events of the last year gave us the opportunity to re-evaluate our capital allocation priorities."<br><br>As noted above, referenced events included delays in required permitting. These delays exposed the company to intensifying carbon and capital intensity considerations, forcing U. S. Steel to reallocate capital away from yet another integrated facility.<br><br>This sequence of events exemplifies the risks U. S. Steel faces as a standalone business. With Nippon Steel as a partner—sharing technology and expertise—U. S. Steel will be significantly better positioned to invest in integrated facilities like Mon Valley Works. In the absence of the Transaction, U. S. Steel lacks the capital and expertise to deploy significant capital towards its integrated facilities. Without Nippon Steel, steelmaking in the Mon Valley has an expiration date. |
| "Additionally, concerning the Gary Works investment, U.S. Steel's history of corporate direction changes, as noted above, calls into question the longevity of the Parties' current plan and stated decisions, given these actions are scheduled to take effect years into the future." (p.4) | As an initial matter, the Committee's purported concern regarding "U.S. Steel's history of corporate direction changes" is not a national security risk that arises as a result of the present Transaction – ***and, therefore, is not a factor that the Committee can lawfully incorporate into its risk analysis for this Transaction***.<br><br>Absent this Transaction and the Parties' proposed NSA, the U.S. government would have ***less*** insight into, and influence over, the future operation of U. S. Steel facilities. And, with respect to Mon Valley and Gary Works specifically, the distinction is clear. If the Transaction proceeds, the Parties have committed to investing at least $1.3 billion into these facilities in the near term. As U. S. Steel has repeatedly emphasized, Nippon Steel was the ***only*** bidder that can make such commitments. If the Transaction is blocked, Blast Furnace #14 at Gary Works, U. S. Steel's largest blast furnace, will be permanently idled in the short-term, and Mon Valley Works will not receive vitally needed investment to ensure its long-term viability. Without Nippon Steel's investment, U. S. |

| Text of the CFIUS Risk Letter | Response by the Parties |
|---|---|
| | Steel will inevitably deprioritize its blast furnace facilities, and expand its focus on EAFs, consistent with U. S. Steel's "better, not bigger" strategy.<br><br>Further, as explained in detail in the Additional Commitment Letter submitted to CFIUS on December 12, Nippon Steel plans to continue the current operation of U. S. Steel facilities, including Gary Works and Mon Valley Works, on a long-term basis. Nippon Steel's commitment to invest no less than $2.7 billion in BLA represented facilities is based on such long-term plan. |
| "While the Parties characterize China as "not a key market for Nippon," the Committee assesses that Nippon Steel's continued operations in China are relevant considerations in the context of risk analysis for this Transaction, due to the impacts China's non-market policies could have on domestic steel production capacity." (p.4) | As has been acknowledged by the Committee, China's non-market policies already are distorting the global steel industry, to the detriment of market economies like the United States and Japan. This, too, is not a national security risk that arises as a result of the present Transaction. Indeed, quite the opposite: China's non-market policies are a significant factor motivating this Transaction, and the Parties have demonstrated to CFIUS—and the Committee has not refuted—how completion of this Transaction would strengthen U.S. domestic steel production against the threat posed by China. Without Nippon Steel's superior financial and R&D backing, U. S. Steel, long-term, would be ***more*** susceptible to the market distortions caused by Chinese state-subsidized overproduction. With Nippon Steel's investment, U. S. Steel will better withstand those pressures. Moreover, the combined company will also provide for a stronger and bigger Nippon Steel globally—and such scale is precisely what is necessary to better withstand China's predatory practices in Asia. Indeed, this is precisely why the U.S. government, in so many instances over the last four years, has called on creating greater economic ties and synergies with allies such as Japan. In June of this year, the United States and Japan, along with the other G7 nations, stood shoulder to shoulder to express their "concerns about China's persistent industrial targeting and comprehensive non-market policies and practices that are leading to global spillovers, market distortions and harmful overcapacity in a growing range of sectors, undermining our workers, industries, and economic resilience and security." https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/14/g7-leaders-statement-8/. In announcing the agreement with Japan on Section 232 in 2022, Secretary Raimondo said: "Today's announcement . . . will further help us rebuild relationships with our allies around the world as we work to fight against China's unfair trade practices and create a more competitive global economy for America's families, businesses and workers." The CFIUS letter is an unfortunate pivot and calls into question the sincerity of the U.S. government's focus on and commitment to forging alliances with allies to combat the market distorting practices of China—and presumably is why China has so delighted in the U.S. government's treatment of its ally, Japan, in this matter. *See, e.g.*, *US steels itself to be more protectionist*, CHINA DAILY (Apr. 2, 2024), https://www.chinadaily.com.cn/a/202404/02/WS660bf702a31082fc043c0108.html; Li Yang, *Biden's nixing of steel deal reveals little trust in ally*, CHINA DAILY (Sept. 6, 2024), https://www.chinadaily.com.cn/a/202409/06/WS66da3c67a3103711928a65b5.html; Zhang |

| Text of the CFIUS Risk Letter | Response by the Parties |
|---|---|
| | Zhouxiang, *Tokyo must stop flattering its uncaring master*, China Daily (Dec. 13, 2024), https://www.chinadaily.com.cn/a/202412/13/WS675b6f82a310f1265a1d2e24.html. |
| "The Committee continues to evaluate that there is a risk that a Nippon Steel-owned U.S. Steel could reduce its participation in U.S. trade remedy investigations and reviews, with a possible adverse impact on the commercial viability of the domestic steel industry to the extent that U.S. Steel's non-participation impairs Commerce's ability to order remedies pursuant to such investigations and reviews." (p.5) | As has been repeatedly explained to the Committee, it would defy commercial logic for Nippon Steel to spend tens of billions of dollars to acquire U. S. Steel, only to undermine U. S. Steel's competitive position by thwarting U. S. Steel's ability to use U.S. trade remedies. Nippon Steel seeks to acquire U. S. Steel to protect and grow U. S. Steel for generations to come, ensuring that both the company and the American steel industry can compete and lead on the world stage. Post-closing, Nippon Steel's economic incentives will be fully aligned with those of U. S. Steel. However, even if the Committee (inexplicably) refuses to acknowledge the commercial and economic reasons why Nippon Steel—a publicly traded company accountable to its diverse base of shareholders—would be incentivized to support U. S. Steel's trade positions, the trade provisions of the Parties' proposed NSA guarantee that Nippon Steel will not interfere with U. S. Steel's trade decisions. CFIUS states, "Whether such a committee could fully address the national security concerns raised would depend on numerous factors, including the enforcement mechanisms," acknowledging that the Committee's concern is capable of mitigation, if CFIUS would only engage. |
| "[T]he Committee recognizes that even in the absence of the participation of U.S. Steel in trade remedy measures, other domestic steel companies and labor unions such as the United Steelworkers Union (USW) would still be able to initiate trade actions, and advocate for trade relief on products produced by those companies and/or unions. However, the Committee continues to assess that, given *inter alia* the significant investment required to initiate or support trade actions and the relatively limited number of relevant industry participants, a significant reduction in the participation of one of the most important firms in this market (U.S. Steel) could lead to a reduction in the efficacy of U.S. trade relief for the domestic steel industry overall." (p.6-7) | The Parties reiterate that there is no risk of U. S. Steel reducing its participation in trade actions, because (1) Nippon Steel would have no economic incentive to discourage U. S. Steel's use of trade remedies; and (2) the Parties have committed in their proposed NSA that Nippon Steel would not interfere with U. S. Steel's use of trade remedies. Under the proposed NSA, all decisions regarding trade matters would be determined by the Trade Committee, made up of non-dual U. S. citizens, or the Independent U.S. Directors, and not by the broader Nippon Steel group (a proposal that CFIUS has acknowledged either is or could be, with CFIUS input, sufficient to address any concerns). |
| "In the September 3 Letter and other communications to the Committee, Parties asserted that the risks identified in the August 31 Letter predate the Transaction. The Committee acknowledges that some of the factors considered as context in the risk analysis do predate the Transaction. There is overcapacity in the steel industry globally, and operational | As has been detailed in multiple prior submissions, if this Transaction does not proceed, U. S. Steel will be forced to revert to its pre-Transaction strategy to be "better, not bigger" by adding capacity and capabilities at its EAF facilities in Arkansas while idling its blast furnace facilities. By preventing this Transaction, the U.S. government would ***accelerate*** the domestic supply deficit and erosion of the country's critical manufacturing base about which the Committee professes to be concerned. |

| Text of the CFIUS Risk Letter | Response by the Parties |
|---|---|
| costs in the United States are higher than in other regions, both of which have contributed to the erosion of the U.S. domestic steel industry. Further idling or closures of steel factories in the U.S. could significantly deepen the domestic supply deficit of domestically produced steel and erode the country's critical manufacturing base in primary metal and other critical manufacturing sectors to the detriment of national security. This Transaction could degrade the domestic supply of multiple types of steel and further imperil primary metal manufacturing and electric motor manufacturing, critical manufacturing industries as identified by the National Infrastructure Protection Plan (NIPP) of 2013." (p.7) | For example, Blast Furnace #14 at Gary Works—the largest blast furnace facility that U. S. Steel operates—would be permanently idled in the near-term, and Mon Valley Works likely would be permanently idled in the near to medium term. To reiterate, if Blast Furnace #14 at Gary Works (U. S. Steel's largest facility) and Mon Valley Works (U. S. Steel's historical base of operations) are shuttered, it will be because the U.S. government put politics over national security.<br><br>Without Nippon Steel's investment, U. S. Steel will inevitably deprioritize its blast furnace facilities, and expand its focus on EAFs, consistent with U. S. Steel's "better, not bigger" strategy. All of U. S. Steel's facilities—including its blast furnaces, EAFs, and iron ore mines—will be prioritized through this Transaction, because Nippon Steel views U. S. Steel's strength as the synergy between all of its facilities. Although CFIUS implies that Nippon Steel's environmental goals could lead it to deprioritize U. S. Steel's blast furnaces, the opposite is true: Nippon Steel is the only potential acquirer of U. S. Steel with the balance sheet and technical knowhow to make long-term capital improvements to the blast furnaces ***and*** make technological enhancements that will reduce the carbon emissions of these facilities.<br><br>For example, Nippon Steel's transfer of technology will enhance U. S. Steel's capability to manufacture non-grain oriented electrical steel ("NOES") used for electric motors. U. S. Steel's Big River Steel facility is currently not qualified to supply NOES to automakers. Nippon Steel has decades of experience producing high grade NOES, which will help U. S. Steel become so qualified.<br><br>In their proposed NSA, the Parties commit not only to investments at Mon Valley and Gary Works, but to maintaining production capacity at ***all*** U. S. Steel facilities in the United States (with any decision to permanently idle a facility requiring (1) approval of CFIUS-approved U.S. Independent Directors; and (2) advance notice to and consultation with CFIUS). The U.S. government would have no such assurances absent this Transaction. |
| "In the September 3 Letter, Nippon Steel asserts that the capital investments agreed to by its Board in August 2024 represents a long-term commitment to providing capital and advanced technology to U.S. Steel. These proposed investments account for only two of U.S. Steel's facilities, and further investments remain subject to various factors, including economic conditions, Nippon Steel's global strategy, and market performance, as discussed above. This uncertainty and Nippon Steel's obligations to sustain production at the two facilities in the Parties' December 2 NSA could require U.S. Steel to divert capital for the | The Transaction would enable the Parties to invest in U. S. Steel's integrated steelmaking operations, including $1.4 billion in capital expenditures (beyond repair and maintenance) for U. S. Steel's union-represented facilities (which the Parties now estimate will reach $1.6 billion); approximately $300 million to revamp Gary Works' Blast Furnace #14; and no less than $1 billion to upgrade or replace the vintage 1938 hot strip mill and other facilities at Mon Valley Works. While CFIUS cites (purported) concerns that the Parties' commitment to these transformational investments in Gary Works and Mon Valley Works theoretically could "divert capital" from other facilities, the Committee should understand that, absent this Transaction, these investments will not take place. Blocking the present Transaction would not prevent any of the purported concerns the Committee cites. |

| **Text of the CFIUS Risk Letter** | **Response by the Parties** |
| --- | --- |
| investment, or capital needed to undertake core activities away from its other facilities, resulting in long-term decline in manufacturing profitability or commercial viability overall." (p.8) | Furthermore, and as noted above, the Parties are committing in their draft NSA to maintain production capacity at ***all*** facilities in the United States, not just Mon Valley and Gary Works. As set forth in the Additional Commitment Letter submitted to CFIUS on December 12, Nippon Steel's $1.4 billion in capital expenditures (beyond repair and maintenance) covers facilities other than Gary Works and Mon Valley Works, including Great Lakes, Granite City, Mining, other North American Flat Rolled facilities, and Tubular. Exhibit D of the Additional Commitment Letter sets out Nippon Steel's specific plans to operate and/or maintain: Irvin, besides the hot mill; the coke operations at Clairton; the blast furnaces, basic oxygen furnaces, and casters at Edgar Thompson; the hot mills, cold mills, and tin operations at Gary Works and throughout the Midwest; the other blast furnaces at Gary Works; Granite City and Great Lakes; Fairless Works; Minntac and Keetac; and the tubular business in Alabama. Nippon Steel initially focused on Mon Valley Works and Gary Works as facilities identified by U. S. Steel with the greatest needs, and where Nippon Steel's sizable capital expenditures would have the most immediate impact. However, as explained at length, Nippon Steel's investment will strengthen and provide for the long-term operations of all U. S. Steel facilities.<br><br>As U. S. Steel has repeatedly emphasized, Nippon Steel is the ***only*** bidder that was committed to maintaining U. S. Steel's blast furnaces, and to supporting U. S. Steel's ongoing growth across its enterprise. Nippon Steel's larger balance sheet (with more than three times the assets of U. S. Steel) will allow for long-term investments in U. S. Steel that will allow the company to withstand short-term economic trends, which will benefit Mon Valley Works, Gary Works, ***and*** other U. S. Steel facilities. |
| "Further, the proposed operational timeframes of those investments (ten to twenty years) would not by themselves address current insufficient production and capacity utilization to satisfy the factors highlighted by Section 721(f)(6), nor the current demand and increases in medium-term demand by domestic steel consumers, and would be exacerbated if Nippon Steel determines its global strategy includes reducing U.S. Steel capacity and production. As discussed above, the specific incentives for investing in the United States could, in some cases, be transitory, particularly if other countries referenced above such as India have sustained increases in steel demand." (p.8) | As an initial matter, neither of the concerns identified by CFIUS is a national security risk that arises as a result of the present Transaction. CFIUS's mandate is not to assess whether a transaction can solve a long-standing and industry-wide vulnerability in the United States that is largely a result of the U.S. government's underinvestment in the market, and global factors that are independent of this Transaction. Rather, the Committee's mandate is to assess national security risks that arise as result of specific foreign investments in the United States. If CFIUS determines that the present Transaction should be blocked because it will not resolve the long-term structural weaknesses in the overall U.S. steel industry, the Committee will be vastly exceeding its statutory authority (and the Parties would challenge such an abuse of the Committee's authority in court).<br><br>Second, the Committee's professed concerns relate to hypothetical, future changes in Nippon Steel's global strategy, the premise of which fly in the face of basic economics (much less the realities facing the global steel industry). Even if the Committee insists upon exceeding its statutory mandate (*i.e.*, to review and address national security risks that actually arise from transactions before the Committee), the Parties respectfully request that the Committee refrain from hypothetical |

| Text of the CFIUS Risk Letter | Response by the Parties |
| --- | --- |
| | conjectures concerning Nippon Steel's economic incentives following a nearly $18 billion commitment to the U.S. domestic steel market.<br><br>If the hypothetical risk of a future change in global strategy (no matter how unlikely) is deemed a national security risk incapable of mitigation, then it is difficult to see how ***any*** future foreign investment in the United States could possibly pass CFIUS scrutiny. Such an overreach would belie the Committee's assurances that it values foreign investment (including from an ally such as Japan, the largest source of foreign direct investment in the U.S.).<br><br>Third, the Committee's concerns with respect to Nippon Steel's potential future incentives are not aligned with the historical record of Nippon Steel's investments in the United States (which CFIUS entirely fails to consider). As has been explained to the Committee on numerous occasions, Nippon Steel has made significant financial and technological investments in U.S. subsidiaries like Wheeling-Nippon Steel and Standard Steel, continuing U.S. steel production at facilities that otherwise would have been shuttered without Nippon Steel's investment.<br><br>• Nippon Steel has operated Wheeling-Nippon Steel for more than 35 years, far exceeding the ten-year period that CFIUS identifies as the return-on-investment period. Wheeling-Nippon Steel started its business as a joint venture between Nippon Steel and a domestic company. While the domestic company exited the business during a period of downturn, Nippon Steel has remained invested in Wheeling-Nippon Steel, as its sole shareholder, and continued its domestic production. Nippon Steel has invested in, and provided technical support to, Wheeling-Nippon Steel. Wheeling-Nippon Steel is not only economically successful, but also shares its success with USW members, managers, and the local community. Recently, Wheeling-Nippon Steel participated in the antidumping investigation regarding corrosion-resistant steel sheets to compete against unfair imports from foreign countries.<br><br>• Similarly, Nippon Steel acquired Standard Steel 12 years ago, and its continued operations have benefited the U.S. transportation sector, one of the key sectors identified by CFIUS. Standard Steel was founded in 1795. By the end of the 20th century, although it was managed by U.S. capital, Standard Steel's profits were sluggish. Since its acquisition of Standard Steel, Nippon Steel has made significant investments in and provided technical support to the business. Today, Standard Steel is not only economically successful, but also shares its success with USW union members, managers, and the local community.<br><br>These investments are long-term commitments by Nippon Steel and illustrate that Nippon Steel's commercial incentives will not deviate from those of domestic steel producers. Nippon Steel's track |

| Text of the CFIUS Risk Letter | Response by the Parties |
|---|---|
| | record—even absent an NSA—has been to ensure that the benefits of its investments flow to U.S. communities, employees (including USW-represented employees), and customers.<br><br>Fourth, even setting aside the troubling legal and factual deficiencies in the Committee's reasoning, the Parties are committing to enter into an NSA that would obligate Nippon Steel to prioritize and maintain investment in U. S. Steel and the U.S. market. Nippon Steel is willing to make this long-term commitment in a legally binding NSA because of its confidence in its business plan and commitment to U. S. Steel. |
| "The Parties note in the September 3 Letter that market fundamentals and various trade remedies such as AD/CVD proceedings currently incentivize Nippon Steel's investment in the United States. However, as explained below, many of these market incentives and legislative decisions could be transitory, with the associated possibility of a long-term reduction in investment into U.S. Steel if alternative markets become more profitable investments, such as in India or Brazil, or if market incentives, including grants and subsidies under recent legislation, disappear due to changing political or market environments. Nippon Steel's recent commitments to improve U.S. Steel may be limited by changes in both the global steel market and domestic market conditions that alter Nippon Steel's decisions. As described below, the Parties have proposed mitigation terms that they assert could address this concern. If the market situation in the United States deteriorates, through a reduction in demand, decrease in investment incentives, or other reasons, Nippon Steel could decide to use the capital currently earmarked for improvement of U.S. Steel's aging assets for an alternative investment. Similarly, Nippon Steel could continue with the planned investments but, after using U.S. Steel's current and improved manufacturing assets for the remainder of the assets' viable lives, decline to provide any further capital infusions and effectively let U.S. Steel's production diminish, focusing new investments on more profitable strategies while Nippon Steel expands its operations outside the United States." (p.8) | The Parties again acknowledge that the global steel industry is a competitive industry that is subject to fundamental economic concepts, including supply and demand. However, this observation—like many others in the Committee's December 14 Risk Letter—seems to assume that U. S. Steel currently operates (and, in the absence of this Transaction, would operate in the future) immune to the market developments and legislative decisions that affect all participants in the global steel industry. Instead, every risk that CFIUS identifies relates to the general pressures of the steel market and applies fully to U. S. Steel today.<br><br>If this Transaction does not proceed, U. S. Steel will be left financially battered—and subject to the potential for being broken up—which would not serve the interests of the U.S. domestic steel industry. The fact that Nippon Steel's future economic incentives conceivably could be influenced by external developments is neither a risk that arises from the present Transaction nor will it prevent the certain rationalization of U. S. Steel facilities if this Transaction does not proceed. A decision to block this Transaction based on such rampant speculation would be tantamount to an expression that no foreign investor could ever acquire a U.S. manufacturing firm.<br><br>In addition, the Parties' proposed NSA would obligate Nippon Steel to make long-term commitments that will endure regardless of future economic incentives. U. S. Steel, absent the Transaction, would be subject to no such obligations. |

| **Text of the CFIUS Risk Letter** | **Response by the Parties** |
|---|---|
| "In the mitigation proposals shared by the Parties, the Parties have proposed the creation of a trade committee to supervise and oversee U.S. Steel's decisions with respect to AD/CVD, Section 232, and other trade matters. Per the parties, this trade committee would have independence from Nippon Steel's foreign-based management. Whether such a committee could fully address the national security concerns raised would depend on numerous factors, including the enforcement mechanisms." (p.10) | The Parties' proposed NSA incorporates robust monitoring and enforcement mechanisms, consistent with those included in NSAs negotiated in connection with transactions that actually present meaningful national security risk (unlike the present Transaction). For more than three months, the Parties have repeatedly sought the Committee's substantive feedback and engagement on their proposed NSAs. The Committee's observation—"Whether such a committee could fully address the national security concerns raised would depend on numerous factors, including the enforcement mechanisms"—proves that any trade-related risk ***can*** be mitigated. The Parties believe their current NSA does so; if CFIUS disagrees, it has had months to propose alternative approaches. |
| "Notwithstanding these potential commitments, it is possible Nippon Steel might in the future make decisions that could lead to a reduction in domestic steel production capacity due to considerations stemming from its global operations. As a global company with widespread operations in many jurisdictions, Nippon Steel faces a different set of commercial incentives than does U.S. Steel today." (p.11) | Every prospective non-U.S. investor in a U.S. business may face different commercial incentives than the U.S. business in which it invests. The United States perennially ranks as the top destination for foreign direct investment because the United States has historically understood the benefits of, and has encouraged, foreign direct investment. A decision to block the Transaction based on the theoretical possibility that a foreign parent's incentives could diverge on certain points from a U.S. subsidiary at some future point would be tantamount to an expression that no foreign investor could ever acquire a U.S. manufacturing firm. Such a decision would risk having a dramatic chilling effect on U.S. foreign direct investment, and strengthening the position of authoritarian, non-market governments like China, which will inevitably point to such a decision to demonstrate that the guarantees of the U.S. government of open investment and friendship with allies like Japan ring hollow. Indeed, as the Parties have noticed to CFIUS on the record, China has already begun to propagandize the U.S. government's unprecedented politicization of this process.<br><br>The U.S. government would be responsible for an immediate and definite, and not future or conjectural, reduction in domestic steel production capacity, if it blocks the Transaction. In addition, as the Parties repeatedly have emphasized to the Committee, CFIUS's focus on hypothetical future risk, without legitimate consideration of the significant, legally binding financial investments in U.S. domestic capacity that would occur if the Transaction were completed, is inappropriate. |
| By statute, a National Security Agreement may not be entered into with respect to a covered transaction unless the Committee determines that it "resolves the national security concerns posed by the transaction." The Committee has not yet reached consensus on whether the mitigation measures proposed by the Parties would be effective, allow for compliance in an appropriately verifiable way, and enable effective monitoring and enforcement, or whether they would | CFIUS is obligated to assess what mitigation can address any national security concerns arising from a Transaction. The Parties have proposed three NSAs over the course of the last three-plus months and have repeatedly solicited feedback and requested responsive markups from the Committee, including as recently as in a December 13 teleconference with Secretary Yellen and Secretary Raimondo, to no avail. The Committee's failure to engage—particularly when the asserted concerns are so clearly addressed in the proposed NSA—is a failure to fulfill its statutory mandate, and a gross departure from the Committee's practice in virtually every case. |

| Text of the CFIUS Risk Letter | Response by the Parties |
| --- | --- |
| resolve the risk to U.S. national security arising from the Transaction. (p. 11) | |
| The President may ultimately make a decision about the identified risks and how to resolve them appropriately. As Section 721(d) of the DPA provides, the President may take such action for such time as the President considers appropriate to suspend or prohibit a covered transaction that threatens to impair the national security. The President must announce a decision on whether or not to take action no later than 15 days after the earlier of the date on which the investigation is completed or the date on which the Committee otherwise refers the transaction to the President. (p. 11) | The President has the authority to make a decision whether to clear or block a Transaction if CFIUS opts to refer the decision to the President. By contrast, if CFIUS determines that the Parties' proposed NSA—or, indeed, an NSA that reflects feedback from the Committee—addresses national security concerns, the matter need not be referred to the President. While the out-of-place reference to a referral to the President suggests that CFIUS believes this action is preordained, given the unprecedented political pressure the Committee is under, that need not be the case if the Committee abides by its statutory obligations. |

*Business Confidential Pursuant to 50 U.S.C. § 4565;*
*Protected from Disclosure Under 5 U.S.C. § 552*

**Enclosure 2 – Response to Annex of December 14 Letter**

| Text of the Annex to the CFIUS Risk Letter | Response by the Parties |
|---|---|
| Section 232 allows the President to take action to adjust imports of an article and its derivatives following a finding from the Secretary of Commerce that the article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security. Section 232 authority is limited to adjusting imports. Thus, for example, if Nippon Steel were to decide to shutter U.S. Steel production capacity or decrease or eliminate U.S. production of certain steel products, Section 232 does not provide the President with authority to prohibit Nippon Steel from shuttering U.S. production facilities or to require Nippon Steel to maintain existing domestic production. While Section 232 could be used to limit imports with the goal of maintaining or increasing domestic production, if domestic facilities have been shuttered and domestic human and capital capabilities have been lost, replacing domestic production might be uneconomical (particularly given the extremely high capital costs of developing new steel production) and could take decades, during which time the United States would not have the domestic steel production capacity necessary for national security. Commerce does not assess any need to take additional action under Section 232 at this time, as the remedies and actions from the 2018 investigation are still in force and valid, primarily because domestic mills have not met the 80 percent capacity utilization rate defined by the 2018 investigation as being necessary to maintain a healthy domestic steel industry. | The Parties agree that tariffs alone—whether through Section 232 or AD/CVD proceedings—are not sufficient to reverse the trend of the U.S. domestic steel industry reducing capacity over the last decades. Instead, the domestic steel industry needs ***investment*** into its facilities and technological innovation to compete with the rest of the world.<br><br>The Parties thus fail to see how an investment that will strengthen the U.S. supply chain could possibly threaten national security. In recent decades, U. S. Steel has fallen behind global producers in terms of innovation and efficiency. Nippon Steel is a global leader in steelmaking innovation, and it has committed to sharing its groundbreaking technology with U. S. Steel. The Transaction will result in more investment, more innovation, expanded product offerings, and greater efficiency, which will in turn increase revenue.<br><br>The Committee has not provided any justification for its assessment that Nippon Steel would shutter U. S. Steel production facilities. To be clear, U. S. Steel has shuttered production facilities in recent years because of a ***lack of investment and capital***, not because of foreign ownership. It is undeniable that there is massive demand for American-made steel products, which is one of the fundamental reasons why Nippon Steel wants to invest in American steelmaking. Nippon Steel has committed repeatedly to expanding U. S. Steel's capabilities to meet this demand; it would not make any economic sense for Nippon Steel to make such a massive investment only to shutter the facilities in which it has invested.<br><br>The risk identified by the Committee—that Nippon Steel might "decide to shutter U.S. Steel production capacity or decrease or eliminate U.S. production of certain steel products"—is based on the false premise that Nippon Steel is more likely than U. S. Steel to reduce production capacity at U. S. Steel's facilities. To the contrary, the Parties have stated—under penalty of perjury—that, absent this Transaction, U. S. Steel will pursue its pre-existing plans to permanently idle Granite City and idle Gary Works blast furnace #14, whereas Nippon Steel, as the owner of U. S. Steel, will invest billions of dollars in upgrading and extending the life of U. S. Steel's integrated facilities. Indeed, the Parties have presented commitments to the Committee in the form of a legally binding and enforceable national security agreement ("NSA") under which Nippon Steel would invest $1.4 billion in capital expenditures (beyond repair |

| | |
|---|---|
| | and maintenance) for U. S. Steel's union-represented facilities (which the Parties now estimate will reach $1.6 billion); approximately $300 million to revamp Gary Works' Blast Furnace #14; and no less than $1 billion to upgrade or replace the vintage 1938 hot strip mill and other facilities at Mon Valley Works. These commitments will be legally binding and subject to monitoring and enforcement by CFIUS. The NSA also contains commitments by the Parties that they will not reduce production capacity at U. S. Steel facilities in the United States without 120 days notice to the CFIUS Monitoring Agencies ("CMAs") and approval by CFIUS-approved Independent U.S. Directors. Under the proposed NSA, Nippon Steel will not be able to "shutter U. S. Steel production capacity or decrease or eliminate U.S. production of certain steel products" without approval from the Independent U.S. Directors. The Parties believe that this mechanism would be sufficient and have asked CFIUS for its feedback. However, the Committee has not provided the Parties with ***any*** substantive feedback on the proposed NSA.<br><br>Conversely, absent this Transaction, U. S. Steel will be free to continue closing its facilities without any requirement for consultation with the U.S. government or approval by independent directors approved by the U.S. government. The Committee's failure to approve the Transaction thus would ***harm*** the U.S. government's national security interests as described by CFIUS. |
| The Defense Production Act (DPA), through Title I, is a powerful tool to influence domestic production and industrial mobilization but is limited in its ability address the concerns outlined in the U.S. Steel/Nippon Steel case.<br><br>First, as practical matter, the U.S. Government cannot compel a private business to produce something that it says it cannot produce. Second, DOD already has the buying power to get the majority of goods needed through their regular acquisition practices, such as using DPA priority rated contracts for end items containing steel. Those rated orders will flow down to raw materials, including steel. This is daily practice for DOD and, as a consolidated purchaser of the items needed for defense needs, DOD's ability to obtain steel for its requirements will not be negatively impacted. Third, the majority of critical infrastructure in the United States is owned by private sector organizations. These organizations would have to petition the President or Department of Commerce to use the priority contracting function on a case-by-case basis. This cannot be effectively authorized to all critical infrastructure without weakening the power of the authority, because if all becomes a priority then there is no legitimate prioritization—effectively recreating the situation that currently exists [Commerce SME assessment]. It also could create additional bias in the system | As explained above, the Committee's "concerns outlined in the U.S. Steel/Nippon Steel case" defy logic. By approving this Transaction and the Parties' proposed NSA, the U.S. government will gain additional tools to "influence domestic production and industrial mobilization" as it relates to U. S. Steel. Absent this Transaction, there will be no requirement for U. S. Steel to maintain a certain level of production capacity.<br><br>The Committee's analysis of the Defense Production Act ("DPA") also is flawed. The Committee limits its analysis of whether the DPA could address the purported risks associated with the Transaction to Title I of the DPA, which allows the President to set priorities for the performance of contracts and orders and allocate materials, services, and facilities. The Committee, however, ignores Title III of the DPA ("Expansion of Productive Capacity and Supply"), which, as suggested by the title's name, is more relevant to the purported risks identified here. Indeed, Title III allows the President to incentivize the domestic industrial base to expand the production and supply of critical materials and goods, including through loans, loan guarantees, direct purchases and purchase commitments, and the authority to procure and install equipment in private industrial facilities. The U.S. government has used its authorities under Title III to undertake the following: |

| | |
|---|---|
| if only some critical infrastructure owner/operators received prioritization when others did not, thereby selecting who profits and who does not. This is a level of tactical operations that is not advisable for the U.S. Government.<br><br>Lastly, although the President is authorized to allocate materials, services, and facilities, the powers granted for critical and strategic materials shall not be used to control the general distribution of any material in the civilian market unless the President finds (1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship. This is an extreme measure that would require a level of knowledge to ascertain the economic feasibility to control the entire domestic steel industry, not just the company referenced in this case. The due diligence required to obtain data and understand the entirety of the domestic steel industry and then manipulate it to allocate those resources is not an easy undertaking, nor could be executed in a timely manner. | • A $90 million agreement with Albemarle Corporation "to support the expansion of domestic mining and production of lithium" (September 2023);<br>• A $20.6 million agreement with Talon Nickel, LLC "to increase the domestic production of nickel" (September 2023);<br>• A $37.5 million agreement with Graphite One (Alaska) "to secure a reliable, sustainable supply of graphite materials within the United States to be used in the production of large-capacity batteries" (July 2023);<br>• A $45.5 million agreement with Arconic Corporation "to increase production of High Purity Aluminum (HPA) for use in missile and munition production" (June 2023); and<br>• A $ 15 million agreement with Jervois Mining USA "to conduct feasibility studies to expand cobalt extraction in Idaho."<br><br>The Committee does not explain how Title III of the DPA—which seems designed precisely to address the risks the Committee purports to have identified—would be insufficient to address those risks. Indeed, contrary to the Committee's claims, the U.S. government would not require "a level of knowledge to ascertain the economic feasibility to control the entire domestic steel industry." The U.S. government was perfectly capable of incentivizing production of lithium, nickel, graphite, aluminum, and cobalt by engaging with a discrete company in each industry. Moreover, while the Committee claims that the "due diligence required to obtain data and understand the entirety of the domestic steel industry" would not be "an easy undertaking, nor could be executed in a timely manner," the Committee seems to have no difficulty in assessing the needs of the U.S. economy writ large for domestic steel production capacity and utilization, and substituting its commercial judgment for that of U. S. Steel and Nippon Steel in determining that the Transaction is more likely to adversely impact the U.S. economy than the absence thereof. |
| The Committee also considered whether U.S. AD/CVD laws, which Commerce administers, would resolve the risks arising from the transaction. [19 USC § 2171 note (Reorganization Plan No. 3).] Commerce processes petitions from firms that allege they have been harmed by unfair competition from imports (or, infrequently, self-initiates investigations), makes preliminary and final determinations about whether such imports were dumped or benefitted from government subsidiaries, and conducts (upon request) annual administrative review of AD/CVD orders. [Dept. Organizational Order 40-1 § 7]. | As has been repeatedly explained to the Committee, it would defy commercial logic for Nippon Steel to spend tens of billions of dollars to acquire U. S. Steel, only to undermine U. S. Steel's competitive position by thwarting U. S. Steel's ability to use U.S. trade remedies–which is precisely why Nippon Steel has had no issue providing a legally binding commitment to CFIUS that it will not interfere with U. S. Steel on trade actions. Post-closing, Nippon Steel's economic incentives will be fully aligned with those of U. S. Steel. |

Merchandise found to be subsidized or dumped is subject to duties as needed to offset the advantage conferred by the unfair practice. The AD law addresses the unfair trade practices of price discrimination among national markets or selling below cost. It provides for the imposition of antidumping duties when Commerce finds that the subject merchandise is being, or is likely to be, sold in the United States at less than normal value (below the price charged for the like product in the producer's home market. or below the cost of production). Before AD duties may be imposed, the U.S. International Trade Commission (ITC) must determine that an industry in the United States is materially injured or threatened with material injury, or that establishment of an industry is materially retarded, by reason of imports of the dumped goods. [19 USC § 1673 *et seq.*].

The CVD law provides for the imposition of countervailing duties on goods exported to the United States which Commerce determines have benefited from a financial contribution provided by a foreign government to a specific industry or group of industries. For WTO members, or countries that have assumed substantially equivalent obligations (most of our trading partners), the ITC must determine that the imports are causing or threatening to cause material injury to the U.S. industry, or are materially retarding the establishment of an industry, before countervailing duties may be assessed.

While the AD/CVD law allows for the imposition of duties in response to injurious, unfairly traded imports, as is discussed elsewhere, there are concerns that Nippon Steel would not instigate AD/CVD proceedings even if there were unfairly traded imports that were injuring the U.S. industry, which would limit the ability of the administration to impose AD/CVD tariffs.

More significantly, as was the case for Section 232 remedies, the AD/CVD laws only allow import relief (in the case of AD/CVD in the form of tariffs) and, as was the case for Section 232, do not provide authority to respond to a decision to decrease or eliminate U.S. production of certain steel products. For these reasons, AD/CVD authorities would not be adequate to address the national security threat posed by Nippon Steel acquiring U.S. Steel.

Even after the acquisition, Nippon Steel would remain a foreign (Japanese) producer—it would ***not*** be a domestic producer of steel in the United States under U.S. law, and thus it would not be permitted under U.S. law to initiate AD or CVD proceedings. U. S. Steel would remain a domestic producer with the ability to continue its robust participation in these proceedings consistent with its current practices, and Nippon Steel has made repeated and specific commitments to ensuring that it will not interfere with these decisions. Therefore, there should be no concern that the acquisition would lead to any changes in U. S. Steel's approach to instigating AD/CVD proceedings, or Nippon Steel's ability to influence such decisions.

In fact, should the Committee have any remaining concerns regarding Nippon Steel's approach to AD/CVD actions in countries in which it has investments in production facilities, the actions of Nippon Steel's U.S. subsidiaries show that Nippon Steel will support trade actions that protect its investments in the United States. For example, Wheeling-Nippon Steel Inc. ("Wheeling-Nippon Steel") (a U.S. subsidiary of Nippon Steel and Nippon Steel North America with principal operations in West Virginia) is currently a petitioner in ongoing U.S. AD/CVD investigations into corrosion-resistant steel from Australia, Brazil, Mexico, the Netherlands, South Africa, Taiwan, Turkey, the United Arab Emirates, and Vietnam—one of the most broad-ranging AD/CVD petitions involving steel imports in recent years. Cleveland-Cliffs Inc. ("Cleveland-Cliffs"), another domestic producer of steel, has ***not*** joined these investigations as a petitioner (a decision that the Committee presumably does not view as a threat to national security). We also emphasize the case includes four countries where Nippon produces corrosion-resistant steel ("CORE") (Brazil (USIMINAS), Mexico (Tenigal), Vietnam (China Steel and Nippon Steel Vietnam JSC, "CSVC") and NS BlueScope Vietnam), and UAE (Al Ghurair Iron & Steel LLC)). This clearly demonstrates that Nippon Steel fully supports its U.S. subsidiaries in taking positions in U.S. trade cases that theoretically could be in opposition to Nippon Steel's other global subsidiaries.

Nippon Steel has shown its support of U.S. trade proceedings that benefit its U.S. subsidiaries. There is no basis to conclude that Nippon Steel would change this position after acquiring U. S. Steel—on the contrary, Nippon Steel would have a vested interest in U. S. Steel using every tool at its disposal to protect its investments and increase its competitive advantage in the United States. Moreover, it makes no commercial sense for U. S. Steel to oppose AD/CVD proceedings that address injurious trade measures simply because it has a Japanese parent.

Foreign ownership has not prevented U.S. producers from participating in trade remedy actions. In fact, there have been recent instances where a U.S. producer has brought a trade remedy case against its own foreign affiliates, including its own foreign parent. For example, despite being a wholly owned subsidiary of Indian aluminum producer Hindalco Industries Limited, the U.S. aluminum producer Novelis Corporation was among the petitioners in the AD/CVD petitions on Common Alloy Aluminum Sheet from India filed in March 2020; moreover, Hindalco Industries Limited was selected as a mandatory respondent in both of those AD and CVD investigations. Additionally, Korean-owned Hanwha QCells America is currently a petitioner in the ongoing Solar Cells from Malaysia AD/CVD investigations, and its Malaysian affiliate is the mandatory respondent in both cases.

The Parties further observe that there are ***already*** hundreds of AD/CVD orders on dozens of countries involving steel imports into the United States. After the acquisition, Nippon Steel will have no incentive to oppose these orders, as they protect U. S. Steel from unfair import competition and increase U. S. Steel's competitiveness.

Even if the Committee elects to ignore Nippon Steel's commercial motivations to keep existing AD/CVD orders in place, existing AD/CVD orders will remain in place unless and until the Department of Commerce ("Commerce") determines that dumping/subsidization is not likely to recur without the order, or the U.S. International Trade Commission ("USITC") determines that the U.S. industry is not at risk of injury from imports from a particular country. Under this standard, AD/CVD orders frequently remain in place for decades. Even if a single domestic producer no longer has interest in a particular order remaining in place, that producer has no ability to request termination of an order so long as other domestic producers want the order to remain in place. Nippon Steel's ownership of U. S. Steel thus would have no impact on the hundreds of AD/CVD orders currently in place to protect the domestic steel industry.

The Parties agree that AD/CVD laws, in accordance with U.S. statute, are intended to address injurious dumping and subsidization of imports. The remedy provided under U.S. AD/CVD laws—the imposition of AD/CVD duties—***in itself*** remedies the issues that AD/CVD laws are intended to address, which are injurious dumping and subsidization. This is precisely why AD/CVD measures cannot be the basis upon which this Committee assesses national security risks. The Committee simply cannot rest its assessment on the basis that a law does not address what it is not meant to address.

| | |
|---|---|
| | Further, although AD/CVD law (or Section 232 law) does not provide authority to respond to a decision to decrease or eliminate U.S. production of certain steel products, it provides the environment for U.S. domestic producers to make the decision maintain or increase production should they wish to do so. The over 300 AD/CVD orders and resulting AD/CVD duties on steel imports ensure that the U.S. steel industry is no longer injured by unfairly traded imports. To the extent that U.S. steel companies are still unable to increase production, this means that the issue is not imports (as these would have been addressed through the duties), but other factors, such as lack of investment. Nippon Steel, through its investment into U. S. Steel, seeks to enable the U.S. steel industry to make production decisions that make the most economic sense.<br><br>To the extent that the U.S. government should require authority to "respond to a decision to decrease or eliminate U.S. production of certain steel products," such authority rests elsewhere, for example, through the DPA, which grants the President powers to ensure the nation's defense by expanding and expediting the supply of materials and services from the domestic industrial base.<br><br>U.S. law also provides significant limitations on Nippon Steel's ability to block a new AD/CVD case or thwart a new AD/CVD investigation or sunset review via its ownership of U. S. Steel. U.S. law also provides workers, including the USW, the ability to pursue trade action (including original investigation, administrative reviews, sunset reviews, and appeals) without U. S. Steel, and the USW can cancel out any theoretical opposition from U. S. Steel or Nippon Steel. Specifically:<br><br>• Commerce can exclude opposition by a related party U.S. producer to an AD/CVD petition. 19 USC 1673(c)(4)(B); 19 USC 1671a(c)(4)(B). See the 2024 Initiation of AD/CVD on Large Top Mount Combination Refrigerator-Freezers from Thailand, where Commerce excluded GE Appliances' opposition due to ownership by Haier.<br><br>• Under the statute, Commerce includes workers in AD/CVD petition standing analysis and determination of industry support. 19 USC 1673a(b)(1) and 19 USC 1671a(b)(1) (referencing 1677(9)(D) worker interested parties); and 10 USC 1673a(c)(4)(A) and 1671a(c)(4)(A)). Commerce will cancel out related party opposition if workers at that facility support the petition. For workers and management in direct opposition regarding their position on a petition, consistent with the Statement of Administrative Action accompanying the Uruguay Round Agreements Act and carried into Commerce's regulations, |

<table>
<tr>
<td></td>
<td>their opinions are of equal weight, and the production of that firm would be treated as representing neither support for, nor opposition to, the petition.<br><br>• While neither Commerce nor the USITC considers foreign affiliation, they do consider worker support for initiation and adequacy determinations for sunset reviews. The statute and the agencies' regulations give unions/labor a role in the industry support assessments for five-year (sunset) reviews.<br><br>• Annual administrative reviews are broadly available to domestic interested parties, regardless of foreign ownership/affiliation, though a certified union or group of workers has standing to request administrative reviews.<br><br>• With respect to changed circumstances reviews ("CCR"), U. S. Steel (regardless of whether it is owned by Nippon Steel) would not be able to revoke an AD order via a CCR unless U. S. Steel represented over 85 percent of domestic production for the product in question. Even then, the USW still can cancel out U. S. Steel and oppose revocation and respond to sunset reviews.<br><br>• The USITC can exclude related party U.S. producers from the domestic industry for injury analysis/determinations in original investigations and sunset reviews. 19 USC 1677(4)(B).<br><br>Finally, the Parties note that there are no CVD cases against Nippon Steel.<br><br>Even if the Committee (inexplicably) refuses to acknowledge the commercial and economic reasons why Nippon Steel—a publicly traded company accountable to its diverse base of shareholders, some of the largest of which are U.S. investors—would be incentivized to support U. S. Steel's trade positions, the trade provisions of the Parties' proposed NSA guarantee that Nippon Steel will not interfere with U. S. Steel's trade decisions.</td>
</tr>
<tr>
<td>Through its persistent use of market-distorting government interventions and other nonmarket polices, China has unfairly gained dominance in the global steel market allowing it to have an outsized impact, as it exports extensive surplus steel that artificially lowers international prices. [Global Forum on Steel Excess Capacity, Steel exports, trade remedy actions and sources of excess capacity, May 2024, paras. 9-11 [https://steelforum.org/gfsec-impacts-of-global-excess-capacity.pdf]. Section 721(f)(3);(6);(11). Accessed September 13, 2024.] These conditions impact steel markets around the world, incentivizing global steel producers to pursue low-cost</td>
<td>The Parties agree that China's market-distorting government interventions and other nonmarket policies have permitted China to gain unfair dominance in the global steel market.<br><br>It is absolutely baffling that the U.S. government, in turn, would not embrace the combination of Nippon Steel with U.S. Steel. The U.S. government repeatedly has recognized the importance of cooperation with allies to combat China's market-distorting practices. As Secretary Yellen has said:</td>
</tr>
</table>

| | |
|---|---|
| production. In 1978, when the PRC began to open its economy, the United States produced four times more steel than the PRC. Now, the PRC produces 12 times more steel than the United States does. [Leveling the Playing Field: How to Counter the CCP's Economic Aggression: Hearing before the U.S. House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party, 118th Cong. (2023).] | "As we press China on its unfair economic practices, we will continue to take coordinated actions with our allies and partners in response. A top priority for President Biden is the resilience of our critical supply chains. In certain sectors, China's unfair economic practices have resulted in the over-concentration of the production of critical goods inside China. Under President Biden's leadership, we are not only investing in manufacturing at home. We are also pursuing a strategy called "friendshoring" that is aimed at mitigating vulnerabilities that can lead to supply disruptions. We are creating redundancies in our critical supply chains with the large number of trading partners that we can count on." https://home.treasury.gov/news/press-releases/jy1425.<br><br>As affirmed by the United States in the most recent G7 Foreign Ministers' Meeting Statement:<br><br>"We recognize the importance of China in global trade. We are not trying to harm China or thwart its economic development, indeed a growing China that plays by international rules and norms would be of global interest. However, we express our concerns about China's non-market policies and practices that are leading to harmful overcapacity and market distortions, undermining our workers, industries and economic resilience and security. We are not decoupling or turning inwards. Together with our partners, we are de-risking and diversifying supply chains, where necessary and appropriate to reduce critical dependencies and vulnerabilities and to foster resilience to economic coercion. We further call on China to refrain from adopting export control measures, particularly on critical minerals, that could lead to significant supply chain disruptions." https://www.state.gov/g7-foreign-ministers-meeting-statement/.<br><br>Further, according to the U.S. Department of the Treasury's ("Treasury") readout of Secretary Yellen's meeting with Finance Minister Katsunobu Kato of Japan:<br><br>"Secretary of the Treasury Janet L. Yellen met with Finance Minister of Japan Katsunobu Kato on the margins of the 2024 Annual Meetings of the International Monetary Fund and the World Bank. Secretary Yellen congratulated Minister Kato on his appointment and affirmed the importance of the United States' partnership with Japan on addressing global challenges. She underscored the close relationship between the United States and Japan as one of our strongest allies and largest trading partners. In particular, the Secretary highlighted Treasury's cooperation with Japan on further strengthening the international financial institutions and combating |

> Russia's illegal war against Ukraine." https://home.treasury.gov/news/press-releases/jy2676.

The merger of Nippon Steel with U. S. Steel will enhance resiliency for the United States and its allies in several respects. First, and most directly—and as detailed at length—it will strengthen U. S. Steel's production in the United States.

Second, the combination of Nippon Steel and U. S. Steel would help the United States and Japan—both market economies and strong diplomatic and economic allies—combat Chinese dominance of the global steel market. Nippon Steel is a critical supplier of steel in Japan, including steel for Japanese manufacturers that the U.S. government is seeking to partner with. For example, Nippon Steel makes steel for Japanese shipbuilders—which the U.S. Navy is seeking to partner with. https://www.navy.mil/Press-Office/Press-Releases/display-pressreleases/Article/3693545/secnav-del-toro-engages-japanese-shipbuilding-execs/. By creating the third largest steel company in the world, the Transaction will strengthen Nippon Steel, and make it more resilient in Japan and Asia against the pressures from China. It is truly incredible that the U.S. government would seek to torpedo a transaction that is so clearly beneficial to the United States and Japan—and will create greater resiliency together against China. Indeed, it is for this reason that the China Daily, a propaganda instrument for the Chinese government, has been gloating about the Biden Administration's treatment of Japan on this Transaction. *See, e.g.*, Zhang Zhouxiang, *Tokyo must stop flattering its uncaring master*, China Daily (Dec. 13, 2024), https://www.chinadaily.com.cn/a/202412/13/WS675b6f82a310f1265a1d29e4.html.

Of course, there is an additional clear legal point that the December 14 Letter remarkably ignores: China's predatory practices are not a national security risk that arises as a result of the present Transaction, nor would a decision to prevent the Transaction help alleviate what CFIUS correctly identifies as a long-term threat to the U.S. domestic steel industry.

Finally, U. S. Steel will continue to lead the domestic steel industry in fighting imports of cheap, subsidized Chinese steel, including by continuing to provide advice to the Office of the U.S. Trade Representative and Commerce and at the OECD Steel Committee, Global Forum on Steel Excess Capacity, and Customs and Border Protection educational seminars.

| | |
|---|---|
| | The bottom line is clear: The demise of this Transaction will be celebrated in Beijing. It is unfathomable to the Parties that the U.S. government could not just allow—but indeed create—such a result. |
| Nippon Steel does sometimes contest harmful PRC practices, such as when it filed a lawsuit in 2021 against Baoshan Iron & Steel Co., Ltd. (Baoshan), a subsidiary of Baowu Steel Group, alleging infringement of Nippon Steel's patents relating to electrical steel; however, it rarely does so using U.S. trade measures. [CFIUS Case 24-038 Question Set 3, Question 2.] | As the Committee notes, Nippon Steel contested harmful PRC practices in its 2021 lawsuit against Baoshan Iron & Steel Co., Ltd. And this is not the only example of Nippon Steel contesting harmful PRC practices—as detailed in prior submissions, Nippon Steel is actively lobbying the Japanese government to seriously consider possible measures to address concerns over Chinese steel imports into Japan to protect the Japanese domestic industry.<br><br>Nippon Steel has also been at the forefront of challenging China's misuse of its own trade remedy measures. For example, Nippon Steel worked with the Japanese government to file two complaints at the World Trade Organization ("WTO") against China's erroneous use of AD laws in its investigations related to stainless steel products and prevailed in both actions (DS454/DS601). Contesting China's harmful trade practices is a continuing priority for Nippon Steel.<br><br>CFIUS's observation that Nippon Steel has rarely used U.S. trade measures to contest harmful PRC practice suggests an alarming lack of understanding on the Committee's part of how U.S. trade remedies operate. As has been explained to CFIUS in prior submissions, only domestic producers that manufacture the product at issue can lawfully bring trade cases, and Nippon Steel has had limited eligibility to use U.S. trade measures to date. CFIUS's repetition of this misinformed critique illustrates that the Committee (inexplicably) has failed to update its analysis to reflect the legal and factual corrections contained in the Parties' September 3 submission.<br><br>The Committee also ignores that one of Nippon Steel's U.S. subsidiaries—Wheeling-Nippon Steel—is a petitioner with U. S. Steel, the USW, Nucor, and Steel Dynamics Inc. in the 2024 AD/CVD petitions/cases on CORE from 10 countries, including against four countries where Nippon Steel produces CORE (Brazil (USIMINAS), Mexico (Tenigal), Vietnam (China Steel and Nippon Steel Vietnam JSC) and NS BlueScope Vietnam), and UAE (Al Ghurair Iron & Steel LLC)). By contrast, Nucor did not include Mexico, where it has a joint venture. This clearly demonstrates that Nippon Steel fully supports its U. S. subsidiaries in taking positions in U.S. trade cases that could be in opposition to Nippon Steel's other global subsidiaries. |

| These considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production and/or accelerate the closure of blast furnaces in the United States rather than seek other remedies to support its continued operations. | Nippon Steel is one of the largest and most sophisticated operators of blast furnaces in the world. The suggestion that Nippon Steel "***could***" be more likely than a standalone U. S. Steel to accelerate the closure of blast furnaces in the United States is nonsensical.<br><br>This Transaction would enable the Parties to invest in U. S. Steel's integrated steelmaking operations, including $1.4 billion in capital expenditures (beyond repair and maintenance) for U. S. Steel's union-represented facilities (which the Parties now estimate will reach $1.6 billion); approximately $300 million to revamp Gary Works' Blast Furnace #14; and no less than $1 billion to upgrade or replace the vintage 1938 hot strip mill and other facilities at Mon Valley Works. These investments would not occur absent this Transaction. Further, in their proposed NSA, the Parties commit to maintain production capacity at ***all*** facilities in the United States, and the Additional Commitment Letter submitted to CFIUS on December 12 outlines the Parties' plans to operate and/or maintain U. S. Steel's other facilities. Nippon Steel's commitment to invest no less than $2.7 billion in these facilities is intended to strengthen, and allow for the long-term operation of, all U. S. Steel facilities.<br><br>With its much more robust balance sheet, Nippon Steel has significantly greater resources to make long-term investments that withstand short-term economic trends, which will benefit Mon Valley Works, Gary Works, ***and*** other U. S. Steel facilities. As U. S. Steel has repeatedly emphasized, Nippon Steel is the ***only*** bidder that was committed to maintaining U. S. Steel's blast furnaces, and to supporting U. S. Steel's ongoing growth across its enterprise. The Committee's persistent, incomprehensible failure to acknowledge this point presents far greater national security risk than any of the putative (though largely unintelligible) national security concerns that Committee has attempted to articulate to date. |
|---|---|
| Nippon Steel may also decline to support U.S. Steel's use of trade remedy tools, creating vulnerabilities in the efficacy of trade relief measures. | As has been repeatedly explained to the Committee, it would defy commercial logic for Nippon Steel—a publicly traded commercial entity—to spend tens of billions of dollars to acquire U. S. Steel, only to undermine U. S. Steel's competitive position by thwarting U. S. Steel's ability to use U.S. trade remedies. Post-closing, Nippon Steel's economic incentives will be fully aligned with those of U. S. Steel. However, even if the Committee (inexplicably) refuses to acknowledge the commercial and economic reasons why Nippon Steel—a publicly traded company accountable to its diverse base of shareholders—would be incentivized to support U. S. Steel's trade positions, the trade provisions of the Parties' proposed NSA guarantee that Nippon Steel will not interfere with U. S. Steel's trade decisions, which will be made by a trade committee |

| | |
|---|---|
| | at U. S. Steel (a proposal that CFIUS has acknowledged either is or could be, with CFIUS input, sufficient to address any concerns).<br><br>Moreover, Nippon Steel has actively participated in trade remedy actions as a petitioner in Japan, as has its U.S. subsidiary in the United States, and it has supported petitions for trade relief globally. After the acquisition, Nippon Steel will also have a commercial interest in ensuring that U. S. Steel has the ability to utilize U.S. trade actions to protect its nearly $18 billion investment. Even if the Committee considers Nippon Steel's own involvement in trade remedies proceedings "limited." this does not affect U. S. Steel's practices and involvement in trade remedy proceedings both because of the legal mechanisms in place under U.S. law and the Parties' proposed NSA that would prohibit Nippon Steel from interfering in U. S. Steel's decision-making process with respect to trade actions. |
| Japan is the top foreign investor in the United States with a nearly $800 billion portfolio of foreign direct investment, while Japanese companies employ nearly 1 million Americans across all 50 states. [See Kishida, Fumio Address to Joint Meeting of the U.S. Congress, "For the Future: Our Global Partnership." Delivered April 11, 2024. Page 7.] Japan also joined the United States in imposing strict export controls on advanced semiconductors to the People's Republic of China (PRC) and to curtail Russian energy exports. [For semiconductors, see: https://www.cnn.com/2023/03/31/tech/japan-china-chip-export-curbs-intl-hnk/index.html. Accessed December 13, 2024. For energy, see: https://www.spglobal.com/commodity-insights/en/news-research/latest-news/crude-oil/040822-japan-to-phase-out-russian-coal-imports-with-eye-to-suspend-it-on-g7-pledge-minister. Accessed December 13, 2024.] | Japan is the top foreign investor in the United States, and Nippon Steel has the full support of the Japanese Government in pursuing this Transaction. Nippon Steel understands that (1) the Japanese Government believes that the Transaction will enable Nippon Steel and U. S. Steel to combine advanced technologies and increase competitiveness, and contribute to enhancing steel production capacity and employment in the United States; (2) the Japanese Government is concerned that the failure of this Transaction will send a stark message that investment from Japan is not welcome in the United States; and (3) the Japanese Government has been reaching out to various counterparts in the United States across the various representative agencies to underscore that neither Japan nor this Transaction presents a national security threat to the United States.<br><br>If this Transaction is not approved, it will send a blunt message that Japanese investment is not welcome in the United States, which would be a regrettable message to send to a defense treaty ally and one of the largest contributors to foreign investment in the United States. Equally important, (1) the decision will be exploited and propagandized by countries of concern that are threats to both the United States and Japan; and (2) the credibility of the CFIUS review process will be undermined in a manner that would take decades to restore.<br><br>The Committee also should consider its own members' statements and actions regarding the U.S.-Japanese alliance. See, e.g.:<br><br>• Treasury: https://home.treasury.gov/news/press-releases/jy2676 |

AR_009469

<table>
<tr><td></td><td>

- Commerce: https://www.commerce.gov/news/press-releases/2023/11/joint-statement-japan-us-economic-policy-consultative-committee
- U.S. Trade Representative: https://ustr.gov/about-us/policy-offices/press-office/speeches-and-remarks/2023/april/remarks-ambassador-katherine-tai-foreign-correspondents-club-japan
- Commerce and U.S. Trade Representative: https://www.commerce.gov/news/press-releases/2022/02/raimondo-tai-statements-232-tariff-agreement-japan
- U.S. Department of State: https://www.state.gov/u-s-security-cooperation-with-japan/
- U.S. Department of Defense: https://www.defense.gov/News/Feature-Stories/Story/Article/2306658/us-japan-alliance-increasingly-strengthened-since-end-of-wwii/
- U.S. Department of Justice: https://www.justice.gov/opa/pr/readout-disruptive-technology-protection-network-summit-japan-and-republic-korea
- U.S. Department of Homeland Security: https://www.dhs.gov/news/2024/08/30/dhs-partners-japanese-counterparts-strengthen-maritime-cybersecurity-cooperation
- U.S. Department of Energy: https://www.energy.gov/nnsa/articles/united-states-japan-and-republic-korea-sign-trilateral-framework-encouraging
- White House Office of Science and Technology Policy: https://www.whitehouse.gov/ostp/news-updates/2023/05/16/readout-of-u-s-japan-joint-high-level-committee-meeting/

</td></tr>
<tr><td>Nippon Steel is minority owned by The Master Trust Bank of Japan, Ltd. (Master Trust) (approximately 14 percent) and Custody Bank of Japan, Ltd. (approximately 5 percent), with no other shareholders having interests of greater than five percent. [CFIUS Case 24-038 JVN.] The Government Pension Investment Fund of Japan holds an indirect 8.29 percent interest in Nippon Steel through its trust account at Master Trust. [CFIUS Case 24-038 JVN.]</td><td>We strongly encourage CFIUS to consider what it is implying by selectively citing to these shareholders. It seems to imply that such ownership from Japanese banks and asset managers – when Japan is the largest foreign investor in U.S. treasuries – is justification for a national security risk. At the same time that CFIUS cites to this minority ownership from Japanese banks, it ignores:</td></tr>
</table>

| | |
|---|---|
| | • Nippon Steel is a publicly traded company with a diverse group of shareholders, most of which are not just Japanese but also U.S. and European investors. Indeed, Nippon Steel's stockholder base is comprised of nearly 30 percent U.S. and European investors—larger than the investors cited by CFIUS.<br><br>• Indeed, Nippon Steel has four U.S. investors in its top 10, including Blackrock, Vanguard, JPMorgan Chase, and State Street Capital. The top 10 U.S. investors collectively own approximately 13 percent of Nippon Steel.<br><br>• The Government Pension Fund is a diversified asset manager that is a well respected international investor. The fund specifically states its goal is to secure investment return for the sole benefit of pension recipients. The Government Pension fund has a diverse portfolio with domestic equities only accounting for 24 percent of its portfolio.<br><br>• The Master Trust Bank of Japan likewise is an asset manager that is a well respected international investor with investments in foreign securities in approximately 130 countries.<br><br>Any objective evaluation of Nippon Steel's shareholder base would conclude that Nippon Steel—a publicly traded company of a market economy and defense treaty ally—is fully incentivized to strengthen U. S. Steel, which will represent a material investment of nearly $18 billion. |
| CFIUS has conducted its risk-based analysis under the premise that an individual foreign investor in a specific transaction may raise national security concerns due to the unique facts and circumstances of that transaction even though the investor's country of origin is a vital ally and trade partner. As described below, these considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production in the United States rather than seek other remedies to support its continued operations. | The lip service that CFIUS pays to Japan as a "vital ally and trade partner"—in addition to being insulting to the Parties—will pale in comparison to the damaging message that would be sent by a (nakedly political) decision to block this Transaction. Indeed, China already has begun to propagandize the U.S. government's unprecedented politicization of this process.<br><br>Post-Transaction, Nippon Steel will be fully incentivized to support U. S. Steel. It is Nippon Steel's confidence in its investment thesis that has led it to develop the extensive mitigation measures in the Parties' proposed NSA, which would guarantee transformational investment, long-term growth for U. S. Steel, and maintenance of Production Capacity, as defined in the NSA, for ***all*** of U. S. Steel's facilities in the United States. None of these investments or permanent guarantees would occur absent Nippon Steel's investment. If CFIUS believes that the guarantees in the |

| | |
|---|---|
| | Parties' proposed NSA—the third draft that the Parties have offered to CFIUS—are insufficient, it is inexplicable why the Committee has repeatedly declined, for more than three months, to offer any substantive feedback on the Parties' mitigation proposal. |
| Currently, China accounts for approximately five percent of Nippon Steel's total production. [Per the parties, Nippon does not have any crude steel production capacity in China and "ranks behind Japan, India, the Associations of Southeast Asian Nations (ASEAN), South America, and North and Central America for Nippon Steel, in terms of overall steel production capacity by region." See Response to Risk Letter of August 31, 2024, Appendix C.] | Nippon Steel's operations in China are limited, consisting of only downstream facilities. As the Committee is aware, Nippon Steel has ended its participation in the joint venture Baosteel-NSC Automotive Steel Sheets Co., Ltd., which will further reduce Nippon Steel's total production capacity based in China from approximately five percent to approximately one percent of Nippon Steel's total production.<br><br>Although CFIUS asserts that "Nippon Steel's continued operations in China are relevant considerations in the context of risk analysis for this Transaction, due to the impacts China's non-market policies could have on domestic steel production capacity," there is no credible basis to suggest that a limited—and shrinking—downstream presence in China is in any way related to the practices of the Chinese government. Indeed, Nippon Steel's economic thesis for this Transaction is driven by an effort to expand its operations in, and in support of, the U.S. steel industry, to help both Japan and the United States combat the predatory practices of the Chinese government to which CFIUS repeatedly has referred. |
| Nippon Steel, as a multinational company, would have an inherently different decisionmaking process than an independent U.S. Steel. The Committee assesses that the proposed new Nippon Steel-owned U.S. Steel will be vulnerable to Nippon Steel's different motivations and potentially divergent priorities as a foreign-owned entity with over 80 percent of its steel petitions, investigations, and orders outside the United States. [Analysis conducted by Commerce SMEs comparing Nippon's U.S.- and foreign-based trade remedy activities.] While U.S. Steel has restarted production at such facilities several times in the last ten years, Nippon Steel may not elect to do so in the future for the commercial considerations reviewed above. Nippon Steel could decide for business reasons, including cost, to shift production from U.S. Steel's aging blast furnaces to its other operations. Specifically, in the long term, overall cost and market considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production in the United States in favor of production in lower cost jurisdictions where Nippon Steel already has significant operations. U.S. Steel may view the costs for restarting a temporarily idled facility as "generally immaterial" now, but future considerations by Nippon Steel may differ, especially if these costs were to rise in the future. [CFIUS Case 24-038, Question Set | The Committee's professed concerns relate to hypothetical, future changes in Nippon Steel's global strategy, the premise of which fly in the face of basic economics (much less the realities facing the global steel industry). The Parties respectfully request that the Committee refrain from hypothetical conjectures concerning Nippon Steel's economic incentives following a nearly $18 billion commitment to the U.S. domestic steel market. If the hypothetical risk of a future change in global strategy (no matter how unlikely) is deemed a national security risk incapable of mitigation, then it is difficult to see how any future foreign investment in the United States could possibly pass CFIUS scrutiny. Such an overreach would belie the Committee's assurances that it values foreign investment (including from an ally such as Japan).<br><br>The Committee's concerns with respect to Nippon Steel's potential future incentives are not aligned with the record of Nippon Steel's investments in the United States (which CFIUS entirely fails to consider). As the Committee is aware from prior submissions, Nippon Steel has made significant financial and technological investments in U.S. subsidiaries like Wheeling-Nippon Steel and Standard Steel, |

| | |
|---|---|
| I, Question 4.] Such decisions are made similar to any other business decision and are based on factors such as cost/benefit analysis, company priorities, and resourcing. This uncertainty introduces risks to national security under Section 721(t)(3). | continuing U.S. steel production at facilities that otherwise would have been shuttered without Nippon Steel's investment.<br><br>Nippon Steel has operated Wheeling-Nippon Steel for more than 35 years, far exceeding the ten-year period that CFIUS identifies as the return-on-investment period. Wheeling-Nippon Steel started its business as a joint venture between Nippon Steel and a domestic company. While the domestic company exited the business during a period of downturn, Nippon Steel has remained invested in Wheeling-Nippon Steel, as its sole shareholder, and continued its domestic production. Nippon Steel has invested in, and provided technical support to, Wheeling-Nippon Steel. Wheeling-Nippon Steel is not only economically successful, but also shares its success with USW members, managers, and the local community.<br><br>Similarly, Nippon Steel acquired Standard Steel 12 years ago, and its continued operations have benefited the U.S. transportation sector, one of the key sectors identified by CFIUS. Standard Steel was founded in 1795. By the end of the 20th century, although it was managed by U.S. capital, Standard Steel's profits were sluggish. Since its acquisition of Standard Steel, Nippon Steel has made significant investments in and provided technical support to the business. Today, Standard Steel is not only economically successful, but also shares its success with USW union members, managers, and the local community.<br><br>These investments are long-term commitments by Nippon Steel and illustrate that Nippon Steel's commercial incentives will not deviate from those of domestic steel producers. Nippon Steel's track record—even absent an NSA—has been to ensure that the benefits of its investments flow to U.S. communities, employees (including USW-represented employees like those at Wheeling-Nippon and Standard Steel), and customers.<br><br>Even setting aside the troubling legal and factual deficiencies in the Committee's reasoning—wherein the Committee relies on conjecture and hypotheticals rather than focusing on the evidence and track record of Nippon Steel's investments in the United States—the Parties are committing to enter into an NSA that would obligate Nippon Steel to prioritize and maintain investment in U. S. Steel and the U.S. market. Nippon Steel is willing to make this long-term commitment in a legally binding NSA, because of its confidence in its business plan and commitment to U. S. Steel. |
| Nippon Steel asserts that the capital investments agreed to in August 2024, represent a long-term commitment to providing capital and advanced technology to U.S. Steel. | As an initial matter, CFIUS's analysis ignores the very real constraints that U. S. Steel operated under before the Transaction was announced, and the very real |

| | |
|---|---|
| [CFIUS Case 24-088: Response to Risk Letter of August 31, 2024, Appendix C.] As described above, Nippon Steel would have other considerations influencing its decision-making, aside from the purchase price and infusion of capital into U.S. Steel, such as considering the resourcing needs of its other subsidiaries, its global capital commitments, the relative size of its market presence in the United States compared to other regions, and other such factors that U.S. Steel would not need to consider due to Nippon Steel's status as a global company. Nippon Steel is also likely to significantly grow its production capacity in other foreign markets where it has existing operations. | consequences to U. S. Steel if the Transaction does not proceed. In the latter scenario, U. S. Steel will be left financially battered—and ripe to be broken up—which would not serve the interests of the U.S. domestic steel industry. The fact that Nippon Steel's future economic incentives conceivably could be influenced by external developments is neither a risk that arises from the present Transaction nor will prevent the certain rationalization of U. S. Steel facilities if this Transaction does not proceed. A decision to block this Transaction based on such rampant speculation would be tantamount to an expression that no foreign investor could ever acquire a U.S. manufacturing firm. To be crystal clear about this:<br>• In Indiana, pre-Transaction, U.S. Steel had already planned to idle its largest blast furnace—#14 at Gary Works. If this Transaction falls apart, it will move forward with that idling.<br>• In Illinois, but-for the pending Transaction, U. S. Steel would have permanently idled Granite City Works. While U. S. Steel remains focused on closing this Transaction, given the threats of a block, it also is having to move forward with preparation to wind down steelmaking at that facility.<br>• In Pennsylvania, as U. S. Steel has previously advised the Committee, the prohibition of the Transaction would result in streamlining corporate-level expenditures by reducing headcount. And without the $1 billion upgrade from Nippon Steel, the future of Pittsburgh's Mon Valley Works looks like those of U. S. Steel's other facilities that have closed. Without ongoing steelmaking operations in Pennsylvania, U. S. Steel would eventually move its headquarters elsewhere.<br>These are not threats. This is the reality that U. S. Steel will confront if the Transaction is blocked.<br>By contrast, the Parties' proposed NSA would obligate Nippon Steel to make long-term commitments that will endure. These are binding commitments regardless of future economic incentives. It is completely baffling as to how, in turn, CFIUS could suggest the Transaction threatens, rather than saves, the future of key U. S. Steel facilities. |
| The Committee assesses that Nippon Steel could decide to not invest any additional capital into BF14 and continue with U.S. Steel's plan to idle the furnace in 2026, even with current Nippon Steel board approval. [The parties have proposed mitigation measures they assert will mitigated the expressed risks. See 24-154 Draft NSA | The Parties' proposed NSA commits Nippon Steel to invest approximately $300 million to revamp Gary Works' Blast Furnace #14 and no less than $1 billion to upgrade or replace the vintage 1938 hot strip mill and other facilities at Mon Valley Works. As the Parties have repeatedly emphasized, and as the Committee should |

AR_009474

| | |
|---|---|
| (12.2.24).] The Committee assesses that, given Nippon Steel's other existing blast furnaces, an additional five to ten years of profit earning (useful life) ten years from now may be an incentive to put that $300 million into something more immediately profitable or with a longer lifespan, or alter the planned investment after initial work has started based on changing demand or other business conditions. These considerations could reasonably lead to Nippon Steel making a commercial decision to idle the mill as planned, further reducing production in the United States. While the parties have yet to discuss the logistics of the deal, it is reasonable to conclude that Nippon Steel must consider the same factors—cost, overall strategy, demand, amongst other considerations with this investment as with the Gary Works proposal and that the final implementation of the investment, along with next steps and future operation decisions, would be subject to Nippon Steel's different decision-making calculus. Were the transaction to take place, it is simply unknown the extent to which Nippon Steel would increase or decrease U.S. Steel's production. | understand, absent this Transaction, these investments will not take place. The distinction is clear. If the Transaction proceeds, the Parties have committed to investing at least $1.3 billion into these facilities in the near term. As U. S. Steel has repeatedly emphasized, Nippon Steel was the ***only*** bidder that could make such commitments since it also was the only bidder to propose to keep U.S. Steel intact. If the Transaction is blocked, Blast Furnace #14 at Gary Works, U. S. Steel's largest blast furnace, will be permanently idled in the short-term, and Mon Valley will not receive vitally needed investment to ensure its long-term viability. If Blast Furnace #14 at Gary Works is idled because this Transaction is blocked, the responsibility will rest with the U.S. government. If Mon Valley shuts down, the responsibility will rest with the U.S. government.<br><br>The Parties' proposed NSA commits to maintaining Production Capacity for ***all*** of U. S. Steel's facilities in the United States (with any decision to permanently idle a facility requiring (1) approval of CFIUS-approved U.S. Independent Directors; and (2) advance notice to and consultation with CFIUS). The U.S. government would have no such assurances absent this Transaction. Indeed, were the Transaction ***not*** to take place, the result would be a ***certain decrease*** in U. S. Steel's production at its blast furnace facilities. |
| Nippon Steel's efforts on reducing costs and its carbon output likely could impact U.S. Steel's business plans, post-transaction. Although U.S. Steel announced in 2021 a goal of achieving net-zero carbon emissions by 2050, its acquisition by Nippon Steel would accelerate this process significantly to meet Nippon Steel's own environmental commitments. [Commerce SME assessment.] The reduction of carbon output could accelerate U.S. Steel's current plans to expand its EAF production sites while closing down blast furnaces. Depending on the length of the development and refining process, Nippon Steel may not be able to use this method to achieve its environmental goals, increasing the likelihood that idling or modifying production at U.S. blasts furnaces may be required. | Without Nippon Steel's investment, U. S. Steel will inevitably deprioritize its blast furnace facilities, and expand its focus on electric arc furnaces ("EAF"), consistent with U. S. Steel's "better, not bigger" strategy. With Nippon Steel's investment, all of U. S. Steel's facilities—including its blast furnaces, EAFs, and iron ore mines—will be prioritized, because Nippon Steel views the synergies among U. S. Steel's facilities as a core strength.<br><br>Although CFIUS implies that Nippon Steel's environmental goals could lead it to deprioritize U. S. Steel's blast furnaces, the opposite is true: Nippon Steel is the only potential acquirer of U. S. Steel with the balance sheet and technical knowhow to make long-term capital improvements to the blast furnaces ***and*** make technological enhancements that will reduce the carbon emissions of these facilities. Any insinuation that there is a national security risk stemming from Nippon Steel's desire to explore innovations that can help to reduce carbon emissions is absurd and deeply disingenuous.<br><br>Indeed, as we have discussed with the Committee, Nippon Steel's path to achieving its own decarbonization goals includes investing in blast furnace technologies that reduce carbon emissions, including hydrogen. Given Nippon Steel's research and development and expertise, U. S. Steel's pathway to decarbonization is substantially |

| | |
|---|---|
| | broadened under Nippon Steel's ownership compared to a standalone U. S. Steel. As a standalone business, U. S. Steel's primary and most probable path to achieving 2050 sustainability goals is electrification through the adoption of EAFs. Nippon Steel, however, explicitly states that by implementing COURSE50 (technology developed by Nippon Steel that is designed to replace carbon used in the blast furnace as a reducing agent with hydrogen-rich gases), Nippon Steel can achieve 30 percent or more reduction in total CO2 emissions when compared with 2013 levels. Nippon Steel's technologies such as COURSE50 bring a lifeline to U. S. Steel blast furnace facilities and has demonstrated extraordinary results already. Since May 2022, Nippon Steel has been developing technologies with the modified COURSE50 test furnace. So far, the test in November-December 2023 has already confirmed the world's highest 33 percent reduction in CO2 emission in the blast furnace. Nippon Steel is conducting more demonstration tests to further reduce CO2 emissions by 40 percent or more.<br><br>Nippon Steel is also considering introducing large scale EAFs into their production process. Unlike U. S. Steel, however, Nippon Steel's idea is to install EAFs at existing steelmaking facilities in order to convert existing production. Also, Nippon Steel has established the world's first integrated EAF steelmaking process that enables the production and supply of high-grade electrical sheets. |
| Nippon Steel has historically resisted AD/CVD relief under U.S. trade laws. Nippon Steel's relatively limited trade measure activity in other jurisdictions so sheds some light on how a U.S.-based subsidiary may approach AD/CVD cases under U.S. law. [Certain countries approach trade measures very differently depending on their institutional, political, economy, and legal structures. A reduced number of trade measure investigations in a given country may reflect that country's particular approach to trade measures, not just the activity level of firms.] This comparison is even starker, considering that Nippon Steel's global crude steel production capacity is approximately 72.5 million tons and its 2022 revenue was $53.9 billion, while U.S. Steel's production capacity is 22.4 million tons and its revenue was approximately $18.1 billion. Nippon Steel does not have a history of relying much on trade measure actions in any of the jurisdictions in which it operates. To the contrary, globally, Nippon Steel is far more likely to be found dumping or benefiting from countervailable subsidies than to seek relief from those practices. [Nippon Steel Corporation v. United States, I :2 l-cv-00533, (United States Court of International Trade), Court listener, https://courtlistener.com/docket/60401183/nippon-steel-corporation-v-united-states/], accessed on August 12, 2024.] | Nippon Steel has not historically resisted AD/CVD relief under U.S. trade laws. Because of the importance of the American steel industry and the prevalence of imports in the market, trade actions against steel imports are an inevitability for any foreign producer that sells steel into the U.S. market, no matter the origin. In fact, steel imports from virtually every country have been subject to U.S. trade actions, and virtually all foreign producers of steel that sell to the United States are subject to AD and/or CVD orders.<br><br>It is important to note that AD/CVD actions are not company specific—AD/CVD orders are imposed on imports from an entire country, based upon injury determinations by the USITC for all subject countries involved cumulatively and company-specific duty rates calculated by Commerce for a limited number of individual respondents in each subject country. Thus, an AD order on imports from Japan does not equate to an AD order on imports from Nippon Steel. There are trade actions involving Japanese steel products that Nippon Steel produces. However, Nippon Steel's products are subject to only a handful of AD orders out of the hundreds of AD orders involving steel products alone. Specifically, the United States currently has over 700 active AD and CVD orders in place against foreign imports. Of |

| | |
|---|---|
| | these, about half involve steel products. Of over 300 AD/CVD orders related to steel, Nippon Steel exports to the United States only five products subject to AD orders involving Japan. There are no CVD orders on any imports from Japan.<br><br>Moreover, almost all of the AD orders that affect Nippon Steel's products are more than a decade old, and the most recent order went into effect in 2017. In recent history, there have been ***no*** allegations of unfair trade practices made against Nippon Steel, and any injury findings that the USITC has made that involve steel products from Japan are based on factual findings from years ago.<br><br>Foreign producers do not generally "choose" whether to participate as a foreign respondent in U.S. trade cases. When an AD/CVD case is brought against imports, Commerce selects respondents to examine based on import data, and issue lengthy questionnaires to these respondents that require responses within set timeframes, at the risk of severely punitive treatment if a company fails to respond adequately. Similarly, the USITC solicits and requires submission of information from foreign producers.<br><br>AD orders, once in effect, remain in place for decades, and U.S. law has mandated procedures for administering these orders, which rely upon active foreign producer participation. Nippon Steel has participated in U.S. trade proceedings as encouraged under U.S. law when required by Commerce, requested by petitioners, or when doing so aligns with its business interests. Regular participation in these proceedings ensures that existing duty rates reflect current market conditions. Participation does ***not*** signal resistance to U.S. trade relief—on the contrary, Nippon Steel's participation shows its willingness to follow U.S. trade rules and comply with statutorily mandated procedures for the U.S. government to adjust prices of products subject to AD orders.<br><br>It is simply not true that Nippon Steel has made "limited use of trade remedies in other jurisdictions." As Nippon Steel has emphasized, it has participated in both of the two active trade remedy proceedings in Japan, and it is actively lobbying the Japanese government to follow the lead of the United States and seriously consider possible measures to address concerns over Chinese steel imports into Japan to protect the Japanese domestic industry. Nippon Steel also intends to participate in trade remedy proceedings under consideration by Southeast Asian governments. In addition, Wheeling-Nippon Steel is currently an active participant in a U.S. trade remedy case involving CORE. As mentioned above, the case includes four countries where Nippon produces CORE (Brazil (USIMINAS), Mexico (Tenigal), Vietnam |

<table>
<tr>
<td></td>
<td>(China Steel and Nippon Steel Vietnam JSC, "CSVC") and NS BlueScope Vietnam), and UAE (Al Ghurair Iron & Steel LLC)).<br><br>As the Committee acknowledges, not all jurisdictions have the same level of trade enforcement as the United States. On the contrary, the United States has the most robust and comprehensive trade remedy regime in the world. Considering the much-lower number of trade actions in other jurisdictions and the different standards for petitioners in those jurisdictions, Nippon Steel has, in fact, been an active participant in and supportive of trade enforcement actions in other jurisdictions.<br><br>It is not clear how a comparison of Nippon Steel's and U. S. Steel's capacity suggests a national security threat. Rather, the comparison underscores why Nippon Steel's investment in U. S. Steel comes at a critical time. Nippon Steel has the capital to spend nearly $18 billion investing in the U.S. steel industry, and it has repeatedly committed to expanding U. S. Steel's capacity in the United States and sharing its innovative steelmaking technology with the company.<br><br>Under the WTO agreements, a producer can only bring AD/CVD action in jurisdictions in which it has manufacturing facilities. Nippon Steel has production facilities in Japan and 15 other countries, and exports to more than 90 countries. Nippon Steel's products are subject to AD/CVD duties in 11 of those countries.<br><br>Thus, it is simply a gross mischaracterization to state that "Nippon Steel is far more likely to be found dumping or benefiting from countervailing subsidies than to seek relief from those practices."<br><br>Finally, it is unclear to Nippon Steel the relevance of the Court of International Trade decision provided by the Committee, which addresses certain specific technical issues that were the subject of an appeal of a decision by Commerce.</td>
</tr>
<tr>
<td>Additionally, in any new cases filed by domestic steel producers naming Nippon Steel as a respondent, Nippon Steel would have to determine whether to have its U.S. affiliate support a petition that would likely result in additional costs for its other foreign affiliates or support its new U.S. production. The Committee further assesses that following Nippon Steel's acquisition of U.S. Steel, it could reduce its AD/CVD petitioning activity or take other actions that limit the efficacy of Commerce's AD/CVD authorities. Nippon Steel's choices concerning the support of AD/CVD tools to address PRC and other countries dumping and unfairly subsidizing of steel products on the U.S. domestic market could deviate significantly from U.S. Steel's choices. In particular, Nippon Steel may still have economic incentives to invest and</td>
<td>As an initial matter, domestic steel producers do not name respondents when filing a petition for imposition of AD or CVD measures. Instead, investigations are initiated on a country-wide basis, and Commerce selects respondents based on the largest exporters of that product in a particular country.<br><br>Second, Nippon Steel has made a binding commitment not to intervene in U. S. Steel's decisions about whether to participate in trade remedy proceedings, regardless of whether they involve products produced by Nippon Steel. Accordingly, it is not accurate for the Committee to say that "Nippon Steel would have to determine whether to have its U.S. affiliate support a petition;" instead, Nippon Steel</td>
</tr>
</table>

| | |
|---|---|
| increase production in lower-cost, high-margin markets such as Brazil, India, or Mexico and to weaken AD/CVD protections accordingly. [Commerce SME assessment.] As a result, post-acquisition, unless Nippon Steel restructures all of U.S. Steel's operations and product lines to avoid competition with Nippon Steel's foreign businesses (which risks substantially reducing U.S. Steel's domestic production capacity), an apparent conflict could arise between the position of U.S. Steel in AD/CVD proceedings with the position of its prospective new parent, Nippon Steel, as a respondent in those same proceedings. | has ensured that this decision will rest solely in the hands of U. S. Steel based on U. S. Steel's own business interests.<br><br>Third, almost all of the AD orders that affect Nippon Steel's products are more than a decade old, and the most recent order went into effect in 2017. In recent history, there have been no allegations of unfair trade of steel from Japan. There is thus no indication that, regardless of Nippon Steel's acquisition of U. S. Steel, the domestic industry would file petitions involving products manufactured by Nippon Steel or against Japan.<br><br>The Committee has no basis to assess that U. S. Steel could reduce its AD/CVD petitioning activity following acquisition of U. S. Steel. But even if U. S. Steel did lessen its participation in AD/CVD petitioning activity, there is no evidence that this would affect the ability of the domestic industry to pursue trade relief. As Nippon Steel has repeatedly explained, for any future cases involving products that Nippon Steel produces, U. S. Steel's support or lack thereof of a petition would not affect whether the case will proceed, because U.S. AD/CVD law already includes a mechanism whereby Commerce will disregard the position of any domestic producer owned by a foreign parent that produces the merchandise subject to an investigation. Accordingly, after acquisition, U. S. Steel could not block any investigations that the domestic industry, labor unions, or Commerce itself could initiate involving Nippon Steel products. With regard to petitions involving steel products from other countries, U. S. Steel would have no reason to lessen its participation in such proceedings, and Nippon Steel would have every incentive to support participation in proceedings that benefit U. S. Steel.<br><br>It is not clear what "other actions that limit the efficacy of Commerce's AD/CVD authorities" would be.<br><br>Nippon Steel is making a nearly $18 billion investment into U. S. Steel to increase ***American*** production of steel products to meet ***American*** demand for ***American-made*** steel. Nippon Steel has no incentive to prioritize imports from other countries; on the contrary, Nippon Steel has repeatedly pledged to prioritize production at U. S. Steel's American facilities to meet the demand for steel products in the U.S. market. Following the acquisition, Nippon Steel's business interests will lie in the future of domestic steel production in the United States, not imports.<br><br>For AD orders already in place that affect products produced by Nippon Steel in Japan, U. S. Steel's participation or lack thereof in any subsequent proceedings will have absolutely no impact on the continuation of the orders. AD orders, once in effect, remain in place for decades, unless and until Commerce determines at |

| | |
|---|---|
| | dumping or subsidization is not likely to recur in the absence of the order, or the USITC determines that the targeted imports no longer pose a risk of injuring the domestic industry. Regardless of how U. S. Steel decides to participate in trade proceedings that involve products produced by Nippon Steel, this will not affect the continued enforcement and existence of an order. |
| As a global firm, Nippon Steel could direct U.S. Steel not to file petitions against foreign imports; not to make AD/CVD decisions that increase costs for Nippon Steel's affiliates in other countries; or decide to push back on AD/CVD protections vis-a-vis other markets in which Nippon Steel operates, which would erode the United States' ability to rely on current trade protections to ensure a competitive market for domestic steel. [Commerce SME assessment and analysis of unclassified information; see also Bloomberg. May 12, 2024. Nippon Steel Equity Research 1. Nippon Steel Equity Outlook. Accessed on October 8, 2024.] The Committee understands that the parties have proposed the creation of a trade committee to supervise and oversee U.S. Steel's decisions with respect to AD/CVD, Section 232, and other trade tools. Per the parties, this Trade Committee would have independence from Nippon Steel's foreign-based management. The efficacy of such a committee would depend on numerous factors, including the enforcement mechanisms. | Nippon Steel could not direct U. S. Steel not to file petitions against foreign imports or not to make AD/CVD decisions that would increase duties for Nippon Steel's affiliates in other countries. The Parties reiterate that there is no risk of U. S. Steel reducing its participation in trade actions, because (1) Nippon Steel would have no economic incentive to discourage U. S. Steel's use of trade remedies; and (2) the Parties have committed in their proposed NSA that Nippon Steel would not interfere with U. S. Steel's use of trade remedies. The Committee has recognized that the Parties have created a mechanism that addresses this very concern, yet CFIUS (inexplicably) has refused to engage with the Parties regarding this mitigation proposal.<br><br>Moreover, under the proposed NSA, all decisions regarding trade matters would be determined by the Trade Committee, made up of non-dual U. S. citizens whose compensation would be based on the performance of U. S. Steel alone, and not of the broader Nippon Steel group per Article V. It would be against the interests of the Trade Committee Members, and U. S. Steel itself, to take any of the actions hypothesized by the Committee. The NSA would provide for a governance structure—tried and true in countless CFIUS cases—to insulate U. S. Steel from control or influence by Nippon Steel over decisions on trade matters. All such decisions and the reasons therefore would be documented and made available to the CMAs for purposes of monitoring and enforcement. Indeed, the Parties' proposed NSA incorporates robust monitoring and enforcement mechanisms, consistent with those included in NSAs negotiated in connection with transactions that actually present meaningful national security risk (unlike the present Transaction). For over three months, the Parties have repeatedly sought the Committee's substantive feedback and engagement on their proposed NSAs. The Committee's observation—"[w]hether such a committee could fully address the national security concerns raised would depend on numerous factors, including the enforcement mechanisms"—acknowledges that trade-related risk can be mitigated. The Parties believe their current NSA does so; if CFIUS disagrees, the Committee has had months to propose alternative approaches (but repeatedly has declined to do so). |

Self-initiation by Commerce of AD/CVD investigations is not an adequate or appropriate authority to address the specific national security risk implicated by a major U.S. steel producer—and prior frequent participant—declining to participate in, or actively undermining, trade measure proceedings. Since 2016, Commerce has self-initiated only two investigations, compared to 561 initiated by petition. The question is not, as Nippon Steel implies, merely a failure of the U.S. Government to self-initiate more proceedings. The statutory necessity of obtaining an affirmative U.S. International Trade Commission (USITC) determination of injury to domestic industry and the indispensable role private industry plays in such determinations has limited the ability of Commerce to self-initiate [19 U.S. Code § 1677(5).]. Pursuing an injury determination in the USITC requires data (for example, on price effects) that is provided by participating domestic firms. Industry participants have observed that the failure of a major firm to participate in USITC proceedings and provide its data has had potentially adverse effects on the success of that case. The lack of cooperation of a major producer in the USITC's investigation could pose an obstacle to self-initiation. Private petitioners are therefore best positioned to identify the threat of injury to their own companies before such injury results in irreversible consequences. Commerce lacks the same degree of real-time information about competitive harm suffered by a domestic firm. This data is particularly critical in the highly competitive U.S. steel industry. Compared to domestic petitioners, Commerce is more likely to become aware of the conditions that cause injury only after the economic effects of unfair trade practices a reflected in the marketplace—for example, when steel companies start idling mills, by which time any relief may be inadequate. [19 U.S. Code § 1677(5).]

Out of over 300 AD/CVD orders involving steel products, Nippon Steel exports to the United States merchandise subject to only five: (1) stainless steel sheet and strip in coils (A-588-845, TRQ volume 10,038 MT); (2) tin mill products (A-588-854, TRQ volume 88 MT); (3) non-oriented electrical steel (A-588-872, TRQ volume 11,979MT); (4) cold-rolled steel flat products (A-588-873, TRQ volume 23,923 MT); and (5) hot-rolled steel flat products (A-588-874, TRQ volume 255,512 MT).

As the Parties have explained, to the extent that the Committee believes that Nippon Steel's acquisition of U. S. Steel could prevent the domestic industry from filing petitions that involve products produced by Nippon Steel, there are three different statutory mechanisms that would not allow this to occur:

1. For assessing whether petitions filed by the domestic industry have sufficient industry support to proceed, Commerce will disregard the positions of domestic producers that have a foreign parent that produces the product subject to the investigation. Accordingly, should the domestic industry seek to file a petition that targets products produced by Nippon Steel, U. S. Steel's position on the petition would not be taken into account on whether the investigation proceeds.
2. Labor unions can and often do file AD/CVD petitions. To the extent a labor union wanted to target any products manufactured by Nippon Steel, nothing would prevent it from doing so, regardless of U. S. Steel's ultimate owner.
3. Finally, the U.S. government (Commerce) could self-initiate a petition.

In other words, the Parties have not suggested that self-initiation by Commerce is the only way to address any alleged risks of U. S. Steel declining to participate in trade remedy proceedings. Instead, there are multiple reasons that U. S. Steel's position on cases involving products produced by Nippon Steel—whether existing AD orders or future petitions—would not affect the enforcement of U.S. trade remedy laws.

As for AD/CVD proceedings involving products *not* produced by Nippon Steel, Nippon Steel would have no reason to discourage U. S. Steel from participating in such proceedings, even if it did not have in place a mechanism to ensure that it cannot intervene in such proceedings. Nippon Steel would have every incentive to encourage U. S. Steel to use every tool at its disposal to reduce import competition and benefit its own production, including AD/CVD measures. Nippon Steel has shown through its participation in trade remedy proceedings in other jurisdiction and its affiliates' participation in U.S. trade proceedings that it supports the use of

trade remedy measures to protect its investments, and it will continue to do so following the acquisition.

With regard to CFIUS's (baseless) conjecture that U. S. Steel would decline to participate in USITC proceedings if it is owned by Nippon Steel, the Committee's position ignores that participation is required by law. Even where a domestic producer does not participate as an active petitioner in a case, it is required by law to provide data to support the USITC's investigation. For example, despite Cleveland-Cliffs not participating as a petitioner in the ongoing CORE investigations, it provided its data to the USITC as required by law. Nippon Steel is not aware of a U.S. trade proceeding where a domestic producer has refused to provide data to the USITC, regardless of the producer's ultimate ownership.

As stated above, the Parties' proposed NSA will allow U. S. Steel to make decisions regarding trade actions—including to initiate and participate in trade actions and provide data in connection therewith—free from control or influence by Nippon Steel. To the extent the Committee believes the proposed NSA is inadequate in that regard, it has failed to provide such feedback to the Parties.

As in its August 31 Letter, the Committee seems preoccupied with the tin mill case that Cleveland-Cliffs and the USW lost earlier this year before Commerce and the USITC. As the Parties stated in their September 3 Letter, the statement that "[i]ndustry participants have observed that the failure of a major firm to participate in USITC proceedings and provide its data has had potentially adverse effects on the success of that case"—clearly a reference to the tin mill case—is baseless and false. The "industry participants" CFIUS references in the quoted language is a group with exactly one member: Lourenco Goncalves, the CEO of Cleveland-Cliffs, a vocal, public opponent of the Transaction who, as reported to CFIUS, has told investors that "CFIUS is just cover for a President to kill a deal."

In any case, U. S. Steel made the decision not to participate in the tin mill case before U. S. Steel even began its strategic alternative review process—because it was a bad case. Cleveland-Cliffs refused to conduct proper case assessment and due diligence. That was borne out by the fact that the case lost on four countries at Commerce and the rest at the USITC. Those losses had nothing to do with the fact that U. S. Steel did not join as a petitioner. Indeed, U. S. Steel fully cooperated with the USITC investigation, submitting extensive questionnaire responses (that are in fact required under power of subpoena).

| | |
|---|---|
| Furthermore, domestic industry support is a statutory prerequisite to initiate an investigation based on a petition. [19 U.S. Code § 1677(5).] If a firm that accounts for a significant volume of U.S. production and/or workforce fails to support a petition, that could make a finding of industry support more difficult if the petition encountered other opposition from domestic (*i.e.*, non-foreign owned) firms. While the risk that opposition from a Nippon Steel-owned U.S. Steel could jeopardize the threshold for industry support could be mitigated by the fact that as a foreign-owned company, U.S. Steel's position opposing the petition might be disregarded, its lack of support could increase the threshold for the industry support calculation and/or delay initiation. [See Section 702(4)(8) of the Act ("In determining industry support under subparagraph (A), the administering authority shall disregard the position of domestic producers who oppose the petition, if such producers are related to foreign producers, as defined in section 771(4XB)(ii), unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of a countervailing duty order.")." Emphasis added); Domestic industry opposition or a requirement to poll the industry can also delay the initiation of investigations and, as a result, the ultimate trade relief. See e.g., 19 U.S. C. 1613 a(c)(l)(B).] | U.S. trade remedy law expressly prevents U.S. producers from blocking AD/CVD proceedings that would affect products manufactured by their foreign affiliates. To the extent that a U.S. producer is owned by a foreign producer that manufactures a product subject to an investigation, Commerce will disregard its opposition when calculating industry support. It is correct that a lack of industry support could make a finding of industry support more difficult. However, as the Committee acknowledges, if U. S. Steel, under Nippon Steel's ownership, were opposed to a petition, Commerce would remove U. S. Steel from the denominator for purposes of calculating the industry support percentage, so the hypothetical lack of support for a petition from U. S. Steel would not affect the ability to make a finding of industry support.<br><br>With regard to petitions involving products not produced by Nippon Steel, the Parties fail to see how U. S. Steel's foreign ownership would in any way affect its determination on whether to support a petition. U. S. Steel will continue to determine whether to participate in trade remedy proceedings based on considerations related to its own business interests. In their proposed NSA, the Parties have committed to establishing a mechanism whereby Nippon Steel cannot interfere with such decisions. That said, Nippon Steel supports U. S. Steel's use of any and all tools at its disposal to address import competition.<br><br>The Committee seems to imply that, because Nippon Steel is a foreign producer, it would, as a default position, oppose any trade remedy measures, regardless of the country or product targeted. This is wholly untrue and disregards the legitimate business interests that Nippon Steel would have in reducing import competition and improving U. S. Steel's position in the market. This implication also disregards Nippon Steel's own support of and participation in trade remedy proceedings, and the active participation of other foreign-owned steel companies (including Nippon Steel subsidiaries) in ongoing U.S. trade remedy proceedings.<br><br>With that said, the Parties' proposed NSA contains special protections for U. S. Steel's support of trade actions in which other U.S. steelmakers or the USW participate. Specifically, if the Trade Committee—which is already insulated from control or influence by Nippon Steel—determines not to join, or to withdraw from, a trade action with other U.S. steelmakers or the USW, such a decision must be approved by the Compliance Committee, which is composed of Independent U.S. Directors approved by CFIUS and protected from removal by Nippon Steel. |
| Electrical steel is also an essential product for national security applications, including the nation's electrical grid and critical transportation infrastructure. The | The Transaction will bring benefits to U. S. Steel in both the near-term *and* long-term through superior technology and investment. |

<table>
<tr>
<td>Committee notes that this transaction may bring benefits to U.S. Steel in the near-term through superior technology and a planned capital infusion.</td>
<td>With respect to electrical steel, U. S. Steel's production/supply capability should be evaluated on the basis of its current status, which is that its non-grain oriented electrical steel ("NOES") line at Big River Steel is still working on getting qualified to supply NOES to automakers. Nippon Steel, which has decades of experience producing high grade NOES, will help with this process. Indeed, Nippon Steel transferring its technology and expertise for manufacturing NOES to U. S. Steel, which only just began producing NOES in 2023 and is still learning the manufacturing process, will increase production capacity for electrical steel.<br><br>We note with respect to the "nation's electrical grid" that NOES is not used to produce transformers; rather, grain oriented electrical steel ("GOES"), which U. S. Steel does not have the capability to produce, is used to manufacture transformers. Nippon Steel, on the other hand, has expertise in producing GOES. While there are no specific plans yet for Nippon Steel to produce GOES in the United States, the Transaction will logically present opportunities to this end. Nippon Steel will work with U. S. Steel to identify areas of collaboration and will examine the technical and commercial feasibility of technology contributions in detail. Together, Nippon Steel and U. S. Steel will continue to monitor the demand for GOES in the United States in order to best serve demand with products that are critical to enhance the infrastructure of the United States and the decarbonization goals the country is pursuing.<br><br>We note further that the U.S. Department of Energy ("DOE"), in its 2023 Critical Minerals Report,[1] rated electrical steel overall (NOES and GOES) as "near critical," though:<br><br>• The main reason "Electrical Steel" receives a 3 rating is the identified supply/demand mismatch based on third party market forecast reports, but DOE acknowledges significant methodological problems with these demand projections (p. 107).<br><br>• Within the "Electrical Steel" category, DOE actually appears to be more concerned about GOES, citing that NOES capacity expansion may crowd out GOES capacity (p. 154).<br><br>• Aside from supply/demand mismatch, the scorecard for Electrical Steel mostly shows 1s and 2s. For example, DOE found that there is no co-</td>
</tr>
</table>

[1] 2023 DOE Critical Materials report, *available at* https://www.energy.gov/sites/default/files/2023-07/doe-critical-material-assessment_07312023.pdf.

| | |
|---|---|
| | dependence on other markets ("both steel and Si [silicon] are abundant and do not cause a major disruption" (p. 155)) and there is no concentration risk for imports ("the HHI index based on global electrical steel export is 1413, showing a diverse market" (p. 155)).<br><br>In addition, we note that the current Administration seems to be comfortable giving significant grants/tax breaks to foreign-owned companies to expand the U.S. NOES supply, with ArcelorMittal being one of the first recipients of major DOE grants/tax breaks to build out its facility in Alabama: U.S. Department of Energy announces financial support for ArcelorMittal's anticipated World-Class Electrical Steel facility in Alabama \| ArcelorMittal.<br><br>Finally, the contribution of Nippon Steel's know-how and technology will support the U.S. long-term ability to remain competitive with China. As the Parties presented to CFIUS on February 21, 2024, there are 28 other NOES facilities planned globally through 2030; 15 of them are Chinese. Nippon Steel's ability to contribute its technologies and capabilities to grow U. S. Steel's electrical steel capabilities in the United States is a significant national security benefit of this Transaction. |
| The Committee assesses that historically, U.S. Steel has remained profitable enough to sustain operations, although its profitability has fluctuated over time due to variations in business strategies and markets. U.S. Steel has a history of inadequate attempts to improve its competitiveness with frequently changing operational priorities that limits analysis of how U.S. Steel will proceed in the absence of this transaction. Considering its track record of programs failing to deliver, U.S. Steel likely will continue to alter its business decisions but remain profitable enough to cover its operations and debt in the absence of this transaction. | The notion that the primary consideration for U. S. Steel is how can it be 'sustained' is misguided. The opportunity for U. S. Steel is not simply to survive, but to thrive with Nippon Steel as a partner.<br><br>The fact of the matter is that U. S. Steel has been a profitable company. However, because of the fluctuations in profitability, the company has had to make difficult decisions on how to allocate capital.<br><br>From 2021-2022, U. S. Steel generated nearly $10 billion in EBITDA, an all-time record. Despite record profitability, the company had to decide which investments it would pursue and which investments it would not. As the Committee is aware, U. S. Steel allocated its profits towards its standalone long-term strategy by investing over $4 billion in mini mill production, including the construction of Big River 2.<br><br>Profitability alone is not a guarantee of investment in integrated facilities. U. S. Steel has widely disclosed its standalone strategy—before the pending merger with Nippon Steel—and certainty after it would be forced to pursue a standalone strategy—that the path forward would be to rationalize existing blast furnace facilities and replace them with mini mill production.<br><br>Indeed, the only way U. S. Steel has remained profitable in the last five years is by ***reducing*** production capacity and shifting production capacity from its blast |

| | |
|---|---|
| | furnace footprint to its EAF footprint. U. S. Steel has stated to CFIUS—under penalty of perjury—that it will resume this strategy in the absence of the Transaction. U. S. Steel has been clear throughout the entire CFIUS process about how it will proceed in the absence of this Transaction. U. S. Steel will continue to execute—and accelerate—its "better not bigger" strategy by idling Granite City Works and Gary Works Blast Furnace #14. The assertion made about the effectiveness of U. S. Steel's strategy is inaccurate and ignores the increased profitability, earnings margin, and cash flow the adoption of the mini mill business model has afforded the company.<br><br>Based on company commentary about its standalone strategy, sell-side analysts have consistently noted the change in footprint for U. S. Steel. On January 12, 2024, J.P. Morgan analyst Bill Peterson noted, "We'd also note its blast furnace footprint should meaningfully shrink once [Big River 2] is ramped and older capacity is idled." Other analysts have even 'predicted' the strategic path the company will follow as a standalone business. For example, on September 23, 2023, Phil Gibbs from KeyBanc Capital states, "As we've previously written (and assuming X stays as a standalone enterprise and does not add to net U.S. sheet upstream supply), we believe it remains unclear how X will manage to throttle down Mon Valley Works over that time, as Big River [2] is framed as lower cost replacement tonnage."<br><br>Assuming the assertion that prior attempts to improve competitiveness have been inadequate—not acknowledging the significant and proven opportunities to improve competitiveness with Nippon Steel is a flawed and shortsighted perspective on the long-term best interest of U. S. Steel and its stakeholders. If the Committee doubts the adequacy of U. S. Steel's standalone strategic decisions, the merger with Nippon should present a compelling and transformational opportunity to strengthen domestic steelmaking.<br><br>Indeed, U. S. Steel will be left financially battered if CFIUS refers the Transaction to the President to be blocked. U. S. Steel will face intense pressure from its shareholders to return capital in the form of dividends and buybacks, and U. S. Steel has received feedback that activist investors have built up positions in its stock in anticipation of deal failure. These activist shareholders have no concern for the long-term viability of U. S. Steel and will be glad to see U. S. Steel scrapped for parts, which is the most likely outcome of another sale process, given that Nippon Steel was the only buyer capable of keeping U. S. Steel together. Such an outcome would put in motion the end of steelmaking in Western Pennsylvania.<br><br>The Committee cannot simply ignore this evidence by stating that "U.S. Steel has a history of inadequate attempts to improve its competitiveness with frequently changing operational priorities that limits analysis of how U.S. Steel will proceed in |

| | |
|---|---|
| | the absence of this transaction." The Committee may not substitute its judgment that "U.S. Steel likely will continue to alter its business decisions but remain profitable enough to cover its operations and debt in the absence of this transaction" for that of U. S. Steel itself. |
| Based on previous steel requirements during prior national emergencies, current domestic steel production and capacity utilization, the Committee assesses, would likely be insufficient to satisfy national security needs under Section 721(f)(6), as producers would need to increase production by nearly 150 percent, an unattainable figure that takes into account U.S. Steel's current production levels. [*The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018.] Without U.S. Steel, or if U.S. Steel were operating under decreased capacity, this number could climb even higher and further out of the domestic steel market's reach. Further idling or closures would significantly deepen the domestic supply deficit of domestically produced steel to the detriment of national security. The introduction of further weaknesses in the domestic steel industry could result in even greater levels of dependency on imports. | U. S. Steel will be ***better able*** to meet production requirements, if any, in the event of a national emergency with the financial and operational backing of Nippon Steel. Indeed, as the Parties continue to reiterate, the Transaction guarantees investment in U. S. Steel's integrated facilities to maintain domestic production capacity, whereas the absence of the Transaction guarantees the shuttering of U. S. Steel's integrated facilities and the reduction of production capacity. If CFIUS were genuinely concerned about the U.S. steel industry's ability to meet production requirements in the event of a national emergency, it would approve the Transaction. |
| As background, the Committee emphasizes that the domestic industry (of which U.S. Steel is a principal player) drives essentially all remedial activity in the AD/CVD space, and that ongoing participation of firms with substantial market share is vital for Commerce to identify and redress injury to critical, sensitive domestic industries. [19 U.S.C. §§ 1671, 1673.] A relatively small number of petitioners—U.S. Steel, Nucor, Cleveland-Cliffs, Steel Dynamics, and a handful of others—drive a majority of trade measure cases in the sector. U.S. Steel has participated in hundreds of AD/CVD petitions. Placing aside the commercial and strategic dynamics that could arise from this transaction, U.S. Steel would likely be in a position to file further petitions naming Nippon Steel as a respondent on additional steel-related products in the future. Domestic industry ordinarily participates in these reviews, as necessary, to maintain duties and keep protections for businesses and workers in place. If a petitioner fails to advocate for maintaining duties as part of the review process, Commerce does not benefit from the additional evidence and arguments that could justify ongoing relief. Large firms such as U.S. Steel play an especially valuable role, since this advocacy requires the retention of expert counsel and can be costly and time-consuming to undertake. | As stated above, the Parties' proposed NSA will allow U. S. Steel to make decisions regarding trade actions—including to initiate and participate in trade actions and provide data in connection therewith—free from control or influence by Nippon Steel. Moreover, the Parties' proposed NSA contains special protections for U. S. Steel's support of trade actions in which other U.S. steelmakers or the USW participate. Specifically, if the Trade Committee—which is already insulated from control or interference by Nippon Steel—determines not to join, or to withdraw from, a trade action with other U.S. steelmakers or the USW, such a decision must be approved by the Compliance Committee, which is composed of Independent U.S. Directors approved by CFIUS and protected from removal by Nippon Steel. To the extent the Committee believes the proposed NSA is inadequate in that regard, it has failed to provide such feedback to the Parties. |

| | |
|---|---|
| U.S. Steel is not the only active firm in the trade measure space; however, it is a consequential party to following AD/CVD cases through to completion. Even if U.S. Steel only trims or relaxes its trade measure activity, that change could have broader adverse implications for the rest of the industry. [GAO, December 12, 2022 (https://www.gao.gov/products/gao-23-105794). Accessed on July 1, 2024; In the view of Commerce SMEs, in the circumstance in which Nippon chose to reduce U.S. Steel's ADICVD footprint, the fact that other large firms would continue to petition does not fully mitigate the risk of weakened protections for the domestic steel market. As noted, petitions are costly and depend on a wealth of data and industry expertise; each additional petitioner brings incremental value and increases the likelihood of relief. Conversely, opposition by U.S. Steel could undermine a case brought by other firms. In an industry where 3-4 firms dominate AD/CVD activity, the potential reduction to 2-3 firms could have materially adverse effects on trade measures and protections in this space.] This reduction in the effectiveness of U.S. trade measures to protect the U.S. steel industry could adversely affect U.S. national security due to steel's essential role in critical infrastructure and other national security applications, presenting the type of national security concern that CFIUS and the President are directed to consider. [Section 721(f)(l)-(3).] | The Parties disagree with the Committee's presumption that U. S. Steel would reduce its participation in trade remedy proceedings if acquired by Nippon Steel. First, Nippon Steel has already committed not to interfere with U. S. Steel's decision-making processes regarding participation in these proceedings. Accordingly, following the acquisition, U. S. Steel would continue to make its decisions regarding its participation in trade remedy proceedings based on its own business interests, not considering the interests of Nippon Steel. The Committee has refused to engage with the Parties regarding this mitigation proposal, which squarely addresses the Committee's concerns regarding Nippon Steel's possible influence on U. S. Steel's trade decisions.<br><br>Second, Nippon Steel would have a vested interest in supporting U. S. Steel's use of trade remedies to target unfair trade following the acquisition. The Committee's concerns ignore the commercial realities of the Transaction; specifically, Nippon Steel will support U. S. Steel's use of trade remedy proceedings that target import competition and unfair trade, because these proceedings will ***protect*** Nippon Steel's nearly $18 billion investment. Nippon Steel is investing in American steel production to meet American demand; it has no incentive to discourage U. S. Steel from using the United States' robust trade remedy regime to protect its production.<br><br>Third, even if the Committee disregards the NSA proposed by the Parties and Nippon Steel's obvious commercial interest in supporting U. S. Steel's continued use of trade remedies, U.S. trade laws prevent Nippon Steel or U. S. Steel from interfering in ongoing or future trade remedy proceedings in the manner suggested by the Committee. For the more than 300 AD/CVD orders currently in effect related to steel, or the five AD orders that apply to products currently exported to the United States by Nippon Steel in Japan, the duties would only be removed or lowered if U.S. government agencies (Commerce and the USITC) determine the duties are no longer necessary or that the rates are outdated and need to be adjusted. Foreign producers like Nippon Steel cannot terminate orders, nor can domestic producers without the support of the remainder of the domestic industry.<br><br>With regard to future AD/CVD petitions, the Parties emphasize that neither the U.S. industry nor U.S. labor unions have raised unfair trade allegations against Japan in nearly eight years, and most of the orders in place that affect products produced by Nippon Steel are more than a decade old. That said, to the extent that the domestic industry, labor unions, or Commerce itself seek to bring a petition that affects products manufactured by Nippon Steel in the future, U.S. law prevents Nippon Steel's ownership from affecting the ability of the case to move forward. |

AR_009488

| | |
|---|---|
| Nippon Steel acknowledged that the continued state of operations of U.S. Steel's facilities beyond 2026 would depend on a myriad of factors, including projected medium- and long-term demand, availability and cost of raw materials, health of the facility, and other overall cost considerations. [CFIUS Case 24-038 Question Set 6, Question 4.] Although Nippon Steel appears committed to providing capital and advanced technology to U.S. Steel, none of these commitments go beyond 2026, which creates a potential consequence where U.S. Steel might not have the capital needed when required to undertake core activities to maintain profitability in the long-term. The return-on-investment period is over ten years, which could be seen as evidence of a long-term commitment to this particular facility; however, this is not a definitive nor a binding commitment. In contrast, this risk scenario envisioned by the Committee extends significantly through 2026. | In the United States and other market economies, the steel industry is a private (non-government-controlled) industry that—like other private industries—is subject to the realities of supply and demand. Today, U. S. Steel's decisionmaking regarding the operations of its facilities depends on the same factors cited by the Committee. Under the Parties' proposed NSA—which incorporates robust consultation and monitoring mechanisms—the U.S. government would have greater insight into decisionmaking related to the operation of U. S. Steel's facilities than presently exists. For example, the Parties' proposed NSA would require that Independent U.S. Directors, approved by CFIUS, approve any permanent idling of a U. S. Steel facility in the United States (i.e., a change that would reduce production capacity), and CFIUS would be notified and consulted regarding that determination. None of these approval, notice, or consultation mechanisms currently exists. Today, any U. S. Steel facility could be permanently idled without notice to, or consultation with, the U.S. government.<br><br>In addition, post-Transaction, U. S. Steel's decision making related to its facilities would be informed by the considerably greater financial resources of Nippon Steel. Post-Transaction, U. S. Steel would be better able to withstand the market forces identified by the Committee. By contrast, if the Transaction does not proceed, (1) U. S. Steel would be forced to revert to its pre-Transaction strategy of rationalizing existing facilities to maintain a healthy business with limited resources; and (2) U. S. Steel would be in a significantly worse financial position than had the company not received an unsolicited acquisition proposal from a competitor, triggering the 2023 strategic review process.<br><br>The undeniable fact is that a standalone U. S. Steel has not and will not commit to continuing to operate blast furnace operations to the extent as assured under the Transaction. As communicated to the Committee on multiple occasions, in the absence of the Transaction, U. S. Steel will return to its 'better not bigger' strategy by idling Granite City and Gary blast furnace #14. Without Nippon Steel's commitment to replace or upgrade the Mon Valley hot strip mill, steelmaking in Western Pennsylvania has an expiration date.<br><br>The extraordinary commitments made by Nippon Steel secure a long-term future for facilities that are currently at risk of being idled and shutdown. If the Committee is seriously concerned about a risk scenario significantly beyond 2026, the Committee should be most concerned with the inevitable consequences at production facilities in the absence of this deal. |

AR_009489

| | |
|---|---|
| | To the extent CFIUS still has concerns that Nippon Steel's long-term interests could diverge from those of U. S. Steel, those concerns are addressed by the Parties' proposed NSA. To date, CFIUS has refused to engage on these proposals. |
| In addition, the benefits to the domestic steel industry, including capital injections or efficiency improvements, alone would not be sufficient to reverse the industry's decline and create a competitive environment with firms from non-market economies under current market conditions described above and considered under Section 72l(f). Given the numerous contingencies, the Committee assesses that a potential Nippon Steel investment in the Mon Valley Works does not provide assurance that this facility will continue to operate after this transaction and, in any event, would not fully address the risks discussed elsewhere in this document. [The parties have proposed mitigation measures they assert will mitigated the expressed risks. *See* 24-154 Draft NSA (12.2.24).] Nippon Steel's decision to reduce the operation of U.S. Steel's facilities would pose a risk to the domestic steel supply chain. [The parties have proposed mitigation measures they assert will mitigated the expressed risks. *See* 24-088 - Draft NSA (9.9.24).] The variability in restarting production lines depends on numerous factors. [CFIUS Case 23-038, Question Set 1, Question 4.] | The concerns identified by CFIUS are not national security risks that arise as a result of the present Transaction. CFIUS's mandate is not to assess whether a transaction can solve a long-standing and industry-wide vulnerability in the United States that is largely a result of the U.S. government's underinvestment in the market, and global factors that are independent of this Transaction. Rather, the Committee's mandate is to assess national security risks that arise as result of specific foreign investments in the United States. If CFIUS determines that the present Transaction should be blocked because it will not resolve the long-term structural weaknesses in the overall U.S. steel industry, the Committee will be vastly exceeding its statutory authority (and the Parties would challenge such an abuse of the Committee's authority in court).<br><br>If the Transaction proceeds, the Parties have committed to investing at least $1.3 billion into Mon Valley Works and Gary Works in the near term. If the Transaction is blocked, Blast Furnace #14 at Gary Works, U. S. Steel's largest blast furnace, will be permanently idled in the short-term, and Mon Valley will not receive vitally needed investment to ensure its long-term viability.<br><br>The U.S. government would be responsible for an immediate and definite, and not conjectural or future, reduction in domestic steel production capacity, if it blocks the Transaction. In addition, as the Parties repeatedly have emphasized to the Committee, CFIUS's focus on hypothetical future risk, without legitimate consideration of the significant, legally binding financial investments in U.S. domestic capacity that would occur if the Transaction were completed, is inappropriate. If CFIUS believes that the commitments in the Parties' proposed NSA—with respect to Mon Valley Works, Gary Works, or any of the other facilities for which Nippon Steel is committing to maintain production capacity—are not sufficiently robust, it has had more than three months to provide feedback. |
| In considering Section 721(f)(3) of the Defense Production Act (DPA) (Section 721), the Committee assesses that, in the long-term, Nippon Steel could make commercial decisions that result in further weakening of the domestic steel market through loss of production capabilities and a reduction of the efficacy of trade remedy tools such as anti-dumping and countervailing duties (AD/CVD) to protect the U.S. steel | CFIUS's concerns are speculative, not based on fact, and the risks to the domestic steel market do not arise from the Transaction. In fact, the specific risks that the Committee identifies—reduction of production capacity and idling of mills—have all occurred ***in the absence of the Transaction***, and the nearly $18 billion in investment from the Transaction could reverse this trend. The Transaction is an |

AR_009490

| | |
|---|---|
| industry that in turn could negatively affect U.S. national security. For instance, this could affect the capability and capacity of the United States to meet the requirements of national security as determined in Commerce's report under Section 232 of the Trade Expansion Act of 1962, which found that domestic steel production to meet national security needs depends on a healthy and competitive U.S. industry. In considering Section 721(f)(6), the Committee assesses any significant reduction in domestic steel capacity would likely jeopardize the U.S. steel industry's ability to maintain commercial production and meet the full spectrum of national security requirements to include critical infrastructure sectors such as transportation, infrastructure, construction, and agriculture, amongst others. The consequence of this risk is possible supply chain disruptions to sectors critical to national security under Section 721(f)(6), particularly transportation, infrastructure, construction, and agriculture. These critical infrastructure sectors would be impacted by a reduction of domestic steel capacity. If Nippon Steel were to reduce U.S. Steel's production and/or idle or shutter its mills, including its blast furnaces, there would be an overall reduction in the total capacity of the U.S. steel industry, reducing the steel capacity that critical infrastructure, such as critical manufacturing, energy, transportation, and communications (all vital to national security) relies on for maintenance and repairs. Potential critical infrastructure failures could lead to a variety of negative consequences for U.S. national security caused by delays in repairs to aging infrastructure. However, EO 14083 states that, while "the United States recognizes the importance of cooperating with its allies and partners to secure supply chains... certain foreign investment may undermine supply chain resilience efforts and therefore national security." [EO 14083, *Executive Order on Ensuring Robust Consideration of Evolving National Security Risks by the Committee on Foreign Investment in the United* States, section 2(a)(i), September 15, 2022.] | opportunity to enhance production in the United States—and even though the (putative) national security concerns that the Committee has articulated (albeit unconvincingly) have been conjured like a mythical spell rather than grounded in the record before the Committee, the Parties have offered robust commitments with respect to production capacity and trade remedy measures in their proposed NSA, as well as broad enforcement and monitoring mechanisms that are consistent with those entered into in other mitigation agreements. The Parties have proposed three draft NSAs and pressed the Committee for feedback for more than three months. If CFIUS refuses to provide ***any*** substantive response to the Parties' proposed mitigation, and instead simply recites the same conjectural risks as a basis to block the Transaction, it will demonstrate clearly that the Committee has not been acting in good faith (which can only be attributable to the unprecedented political interference in this process). |
| This transaction creates a national security risk by giving the foreign acquirer control over the third-largest domestic steel producer, allowing Nippon Steel to control and direct U.S. Steel's future business decisions and production, thereby potentially resulting in a further weakened U.S. domestic steel market. Specifically, under Section 721(f)(3) and (10), the Committee assesses that, in the long-term, Nippon Steel could make commercial decisions that result in further weakening of the domestic steel market through loss of production capabilities and a reduction of the efficacy of trade remedy tools such as anti-dumping and countervailing (AD/CVD) duties. In turn, this could affect the capability and capacity of the United States to meet the requirements of national security as determined in Commerce's report under Section 232 of the Trade Expansion Act of 1962, which found that domestic | The investments Nippon Steel has committed to making in U. S. Steel's domestic operations will create the opportunity to build out a stronger and more robust steel industry right here in the United States. This Transaction will not only enable the United States to expand its domestic steelmaking capabilities and tackle challenges caused by foreign economies, including China, but will elevate the competitive standing of the entire American steel ecosystem, reinforce the reliability of American supply chains, and protect American economic and national security.<br><br>As noted, the Parties have proposed to address CFIUS's purported concerns about loss of production capabilities and a reduction of the efficacy of trade remedy tools through their proposed NSA. If CFIUS believes that the Parties' proposed NSA does |

AR_009491

| | |
|---|---|
| steel production to meet national security needs depends on a healthy and competitive U.S. industry. | not mitigate concerns, it has had months to offer feedback. To date, CFIUS has refused to provide ***any*** substantive response to the Parties' proposed mitigation. |
| The Committee assesses that the long-term potential negative impacts on the domestic market and subsequent national security impacts outweigh any short-term benefits resulting from this transaction. The Committee assesses that the maintained operations will continue to provide the necessary capacity for the national security needs of the United States. | The Parties are disturbed to read that CFIUS assesses "that the long-term potential negative impacts on the domestic market and subsequent national security impacts outweigh any short-term benefits resulting from this transaction"—*i.e.*, as a definitive conclusion. The long-term potential negative impacts will arise if the Transaction does NOT happen. The Committee appears to be contorting itself in unnatural ways to justify a political determination rather than follow the facts and the law—and if the Committee continues down that path, it will do a great disservice to the American economy, the American people, and to our ally, Japan. The Parties urge the Committee instead to engage on the NSA that has been pending for months with the Committee.<br><br>Further, CFIUS's statement that "the maintained operations will continue to provide the necessary capacity for the national security needs of the United States" appears to suppose that all of U. S. Steel's existing operations will be maintained, should the Transaction be blocked. As U. S. Steel has repeatedly explained, that is not the case. In the face of deal failure, (1) U. S. Steel would be forced to revert to its pre-Transaction strategy of rationalizing existing facilities to maintain a healthy business with limited resources; and (2) U. S. Steel would be in a significantly worse financial position than had the company not received an unsolicited acquisition proposal from a competitor, triggering the 2023 strategic review process. This will mean that, *inter alia*, the facility at Granite City will be permanently idled; U. S. Steel's largest blast furnace (Blast Furnace #14 at Gary Works) will be shuttered; and U. S. Steel will not have the capital to invest in other key facilities such as Mon Valley Works, which will ultimately be idled as well. An adverse decision by CFIUS will inevitably result in elimination or degradation of certain of U. S. Steel's operations, particularly its blast furnaces. |
| As stated above, Nippon Steel's ownership of U.S. Steel could jeopardize the re-starting of idled facilities, result in the closing of more facilities, or a reduced future production output. If Nippon Steel were to idle or shutter some of U.S. Steel's production, which could include blast furnaces, there would be an overall reduction in capacity in the U.S. steel industry from which national security users of steel could draw. This scenario would pose a risk to U.S. national security by reducing capacity which hinders the overall U.S. steel industry's ability to meet increased demand during a national emergency or other time of increased demand. Reducing available | The Committee's position—that Nippon Steel's ownership would somehow jeopardize the potential for U. S. Steel to restart its idled facilities, or result in the closing of more facilities or a reduction in production output—is deeply misleading and clearly reflects the bad faith with which the Committee appears intent on approaching this Transaction. As explained above, the Parties have stated—under penalty of perjury—that, absent this Transaction, U. S. Steel will continue reducing its production capacity—as it had been prior to the Transaction—whereas Nippon Steel, as the owner of U. S. Steel, will invest billions of dollars in upgrading and |

| | |
|---|---|
| capacity and eliminating domestic sources of numerous grades and types of steel could result in supply gaps that would leave manufacturers and suppliers of parts and components for critical infrastructure sectors without the steel needed to complete customer orders. This, in turn, could impact the resiliency, effectiveness, and integrity of critical infrastructure during a national crisis. | extending the life of U. S. Steel's integrated facilities. Under the NSA, Nippon Steel would invest $1.4 billion in capital expenditures (beyond repair and maintenance) for U. S. Steel's union-represented facilities (which the Parties now estimate will reach $1.6 billion); approximately $300 million to revamp Gary Works' Blast Furnace #14; and no less than $1 billion to upgrade or replace the vintage 1938 hot strip mill and other facilities at Mon Valley Works. These commitments will be legally binding and subject to monitoring and enforcement by CFIUS. The NSA also contains commitments by the Parties that they will not reduce production capacity at U. S. Steel facilities in the United States without 120 days notice to the CFIUS Monitoring Agencies ("CMAs") and approval by CFIUS-approved Independent U.S. Directors.<br><br>Conversely, absent this Transaction, U. S. Steel will be free to continue closing its blast furnaces facilities—which it has stated under penalty of perjury it will do—without any requirement for consultation with the U.S. government or approval by independent directors approved by the U.S. government. The Committee's failure to approve the Transaction thus would ***harm*** the U.S. government's national security interests as described by CFIUS.<br><br>To say that Nippon Steel's ownership of U. S. Steel jeopardizes U. S. Steel's production capacity, or the potential for increasing production capacity in the future, turns logic on its head. |
| This conflict of interest may create a vulnerability that a Nippon Steel-owned U.S. Steel could reduce its AD/CVD petitioning activity, oppose AD/CVD petitions brought by other domestic firms, and/or stop advocating to maintain duties in ongoing reviews for particular products and situations, taking into account case-specific supply chain concerns. [This risk is partially mitigated by the fact that Nippon Steel and U.S. Steel's opposition to a petition may be disregarded by Commerce under certain circumstances. Nippon Steel has stated to the Committee that it "will not interfere" in U.S. Steel's ability to participate in AD/CVD proceedings.] If Nippon Steel's global commercial interests diverged from the domestic industry, U.S. Steel, once controlled by Nippon Steel, could file to have orders revoked or take actions that could lead Commerce to revoke the order. [19 CFR § 351.216; 19 CFR § 351.218.]<br><br>While this risk could be mitigated in cases where other domestic producer petitioners remained party to the proceedings, this may not be the case with all AD/CVD actions. | As has been repeatedly explained to the Committee, it would defy commercial logic for Nippon Steel to spend tens of billions of dollars to acquire U. S. Steel, only to undermine U. S. Steel's competitive position by thwarting U. S. Steel's ability to use U.S. trade remedies. Nippon Steel seeks to acquire U. S. Steel to protect and grow U. S. Steel for generations to come, ensuring that both the company and the American steel industry can compete and lead on the world stage. Post-closing, Nippon Steel's economic incentives will be fully aligned with those of U. S. Steel. However, even if the Committee (inexplicably) refuses to acknowledge the commercial and economic reasons why Nippon Steel—a publicly traded company accountable to its diverse base of shareholders—would be incentivized to support U. S. Steel's trade positions, the trade provisions of the Parties' proposed NSA guarantee that Nippon Steel will not interfere with U. S. Steel's trade decisions. CFIUS states, "[w]hether such a committee could fully address the national security concerns raised would depend on numerous factors, including the enforcement mechanisms," acknowledging that the Committee's concern is capable of mitigation, if CFIUS would only engage. These proposed mitigation measures would be ***cumulative*** with the existing statutory |

AR_009493

| | |
|---|---|
| | provisions that would direct Commerce to disregard opposition of U. S. Steel in any case that involved products manufactured by Nippon Steel and its affiliates—provisions that the Committee already acknowledges mitigates its concerns regarding U. S. Steel's future AD/CVD petitioning activity. |
| The Committee assesses that potential reduced output by U.S. Steel from Nippon Steel could lead to supply shortages of critical components and production delays that could reverberate throughout industries critical to national security under Section 721(f)(6). These industries include the infrastructure, transportation, communication, and energy sectors, by reducing U.S. production capacity, rendering the domestic steel industry incapable of meeting demand and creating additional supply chain vulnerabilities. [For complete list, *see* Appendix H to *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018; *See also* This presents potential national security concerns of the type that the President and CFIUS are directed to consider. *See, e.g.*, Section 721(t)(6).] Without available steel, critical infrastructure sectors may be forced to delay critical repairs or upgrades, or substitute inferior materials-including foreign-produced steel or materials of lessor strength and suitability-when repairs or maintenance cannot be delayed. [Commerce SME Assessment.] Such supply chain disruptions could exacerbate situations such as electrical grid or transformer outages or bridge or tunnel collapses, by delaying critical repairs due to a lack of available necessary parts that rely on domestic steel production. | We note that CFIUS does not identify any specific "critical components" or products that U. S. Steel supplies to the infrastructure, transportation, communication, and energy sectors. With respect to the few specifics the Committee does provide, we note that U. S. Steel does not produce the GOES required for transformers in the electric grid, nor does U. S. Steel produce the steel plate, structural shapes, rebar, and forgings, etc., that are required to keep bridges and tunnels from collapsing. Try as it might, CFIUS still has not shown that U. S. Steel's products have any applications in the "critical infrastructure" sectors that the Committee claims are relevant to national security.<br><br>With that said, for all of the reasons previously stated, the Transaction will ***enhance*** U. S. Steel's production capacity, whereas CFIUS referring the Transaction to the President to be blocked will cause U. S. Steel to ***reduce*** production capacity. |
| If Nippon Steel were to idle or shutter some of U.S. Steel's production, there would be an overall reduction in capacity in the U.S. steel industry from which national security users of steel could draw. This scenario would pose a risk to U.S. national security by reducing capacity which hinders the overall U.S. steel industry's ability to meet increased demand during a national emergency or other time of increased demand (see below for additional information). Without U.S. Steel, or if U.S. Steel were operating under decreased capacity, this number could climb even higher and further out of the domestic steel market's reach. A continued loss of viable commercial production capabilities and related skilled workforce will jeopardize the U.S. steel industry's ability to meet the full spectrum of national security requirements. [*The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018.] Further, the lengthy process to restart operations would likely exacerbate any supply shortages created by | Again, if this Transaction does not proceed, U. S. Steel will be weaker, which will result in rationalization of certain U. S. Steel facilities—an outcome that would not serve the interests of the U.S. domestic steel industry. If the Transaction proceeds, the Parties will invest in U. S. Steel's integrated steelmaking operations, including $1.4 billion in capital expenditures (beyond repair and maintenance) for U. S. Steel's union-represented facilities (which the Parties now estimate will reach $1.6 billion); approximately $300 million to revamp Gary Works' Blast Furnace #14; and no less than $1 billion to upgrade or replace the vintage 1938 hot strip mill and other facilities at Mon Valley Works. The Parties' proposed NSA would obligate Nippon Steel to make long-term commitments that will endure. To the extent that CFIUS is genuinely concerned about the ongoing supply of steel for trains, trucks, and buses, reason dictates that CFIUS approve this Transaction. |

| | |
|---|---|
| other steel producers' pivot to steel for national security needs. [Commerce SME Assessment.] In this case, U.S. Steel's commercial steel production capabilities would be a crucial backstop for steel used for commercial and industrial industries that support critical infrastructure needs under Section 721(f)(6). For instance, U.S. Steel is a major supplier of the transportation sector, one of DHS's sixteen critical infrastructure sectors, including components for trains, trucks and buses. | Moreover, on December 13, 2024, the Alliance for Automotive Innovation, an association representing automobile manufacturers that produce vehicles sold in the United States, wrote a letter to President Biden underscoring its members' strong support for the Transaction. As explained in the letter, "the future growth and strength of the U.S. auto industry is very much reliant on a globally competitive American steel industry. A stronger U.S. Steel will encourage healthy competition among the American steel producers, and the Nippon Steel-U.S. Steel Transaction will bring onshore advanced steel production techniques currently not being utilized in the United States. This will allow U.S. Steel facilities to make higher-quality steel products and allow our industry and other steel-reliant industries to source more steel from the United States." "Any alternative outcome would create significant challenges to U.S. auto manufacturing, affecting our workers, and impacting the U.S. economy broadly."<br><br>Regarding a merger with Cleveland-Cliffs, the Alliance for Automotive Innovation sent a letter to members of Congress on October 31, 2024, urging them to "examine the potential for anti-competitive pricing of materials used by the steel-reliant automotive manufacturers" as a result of such a consolidation of steel production capacity, which would "further increase costs across the [automotive] industry for both materials and finished vehicles, slow EV adoption by driving up costs for customers, and put domestic automakers at a competitive disadvantage relative to manufacturers using steel from other parts of the world." Specifically, the Alliance for Automotive Innovation stated that a transaction resulting in a combination of Cleveland-Cliffs and U. S. Steel would result in combined control of (i) 100 percent of blast furnace production in the U.S., (ii) more than 90 percent of U.S. advance high strength steel used for automotive underbody panels, bodyside reinforcements and impact areas, (iii) 80 percent of body in white steel used to produce a vehicle's structural frame and (iv) 65 percent of U.S. exposed grade steel used for automotive surface panels like doors, hoods and fenders.<br><br>The deal with Nippon Steel strengthens U. S. Steel as a second source for this type of blast furnace automotive steel in the United States. |
| Any further reduction in production in the long-run, or decrease in utilization, would have negative impacts across multiple critical infrastructure supply chains. In times of increased steel requirements, critical industries would have increased difficulty acquiring enough domestically produced steel to meet demand if capacity were reduced due to idling or closures of U.S. Steel's facilities. [Commerce SME Assessment.] In turn, this could cause critical industries to reduce or delay | See the Parties' comments above. The Committee's concerns stated here are so vague that they are impossible to address. |

| | |
|---|---|
| production of critical components due to a lack of available steel or rely on imported steel thus increasing their use of lower-quality Chinese steel, which could lead to a variety of negative consequences, including critical infrastructure failures caused by delayed repairs to aging infrastructure. Being forced to rely on foreign owned facilities introduces significant risk and potential delay for the development of new steel technologies and production of needed steel products, particularly in times of national emergency. [24-038 Question Set 5, Question 2; *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of /962, as amended*, U.S. Department of Commerce, January 11, 2018.] | |
| Without a second fully integrated blast furnace manufacturer, automotive and other commercial steel production used for machinery, in construction, and for other industrial purposes would drop precipitously if Cleveland-Cliffs and other producers had to shift its production capacities to national security-related steel products, harming national security. [Commerce SME Assessment.] The Committee assesses that, without backup capacity, increases in national security-related steel production would come at the expense of the production of commercial and industrial steel products. Further, commercial and industrial industries that support national security industries would face increasing domestic supply chain shortages that would ultimately harm national security through potential upstream disruptions in the supply chains for critical national security products. | For all of the reasons previously stated, the Transaction will ***enhance*** U. S. Steel's production capacity, whereas CFIUS referring the Transaction to the President to be blocked will cause U. S. Steel to ***reduce*** production capacity. We also note that machinery, construction, and industrial applications do not require steel produced using a blast furnace. Such steel can be produced using an EAF. |
| Lack of access to high purity steel, produced in blast furnaces, could cause bottlenecks and disruptions to supply chains for industries crucial to national security. Two sectors that would be particularly affected by a disruption in the domestic steel supply are transportation (including the automotive industry) and energy. The Committee assesses it would be expensive and labor intensive to restart or ramp up production during a reduction in U.S. Steel's overall capacity, harming national security. Shortfalls in supply could slow down or stop the production of certain automotive and other transport components, which would result in supply chain disruptions and delays throughout the industry. The loss of domestic production is a critical national security concern given the ubiquitous nature of steel throughout multiple critical industries. A reduced U.S.-produced supply would force manufacturers to turn to imports, where possible, to meet their needs, further weakening the vulnerable U.S. steel market. Without an assured domestic supply of these products, the Committee assesses that the United States cannot be certain that it could effectively respond to large power disruptions affecting civilian populations, | As explained previously, while U. S. Steel supplies certain steel to the energy sector, including oil country tubular goods and line pipe, this steel is not high purity steel that can be produced only using a blast furnace. U. S. Steel does not sell any steel for nuclear facilities, which U. S. Steel believes is largely plate steel produced using EAFs. Similarly, U. S. Steel believes that most steel supplied for refineries would be plate used in storage tanks, which U. S. Steel does not have the capability to produce, and which can be produced via EAFs. As it relates to the electric grid, U. S. Steel does not have the capability to produce GOES, which is critical for the manufacture of transformers. Cleveland-Cliffs is the only domestic producer of GOES. As the Parties have described in response to CFIUS's question sets, the August 31 Letter, and in meetings with the Committee, the types of high purity steel that historically could be produced only using a blast furnace were exposed automotive steel and tin mill products. Such steel now can be produced via EAF. |

| critical infrastructure, and U.S. industrial production facilities and installations in a timely manner. | As mentioned, the Alliance for Automotive Innovation—which represents the U.S. operations of 13 international automakers and suppliers who operate 31 manufacturing plants, employ over 156,000 Americans, and support an additional 2.1 million American jobs—sent a letter to President Biden on December 13, 2024, noting that the Transaction "is critical to the competitiveness of American automotive manufacturing" and that "[a]ny alternative outcome would create significant challenges to U.S. auto manufacturing, affecting our workers, and impacting the U.S. economy broadly."<br><br>The Transaction with Nippon Steel strengthens U. S. Steel as a second source for this type of blast furnace automotive steel in the United States. |
|---|---|
| These risks affect the potential production and markets for NOES (electrical steel), which must be produced at adequate volumes to support an expansion of EV production. | U. S. Steel's production/supply capability should be evaluated on the basis of its current status, which is that its NOES line at Big River Steel is still working on getting qualified to supply NOES to automakers. Nippon Steel, which has decades of experience producing high grade NOES, will ***help*** with this process. Indeed, Nippon Steel transferring its technology and expertise for manufacturing NOES to U. S. Steel, which only just began producing NOES in 2023 and is still learning the manufacturing process, will ***increase*** production capacity for electrical steel.<br><br>U. S. Steel is the sole new competitor in NOES production in North America. Cleveland-Cliffs currently enjoys the incumbent, monopolist position in the United States.<br><br>As was first mentioned to the Committee in our February presentation, Nippon Steel has been developing cutting-edge products in the field of electrical steel for more than 70 years. One of the many benefits of this Transaction is Nippon Steel's commitment to help enhance product qualities of U. S. Steel by leveraging cutting-edge technologies of electrical steel sheets. |
| A decline in the rate or effectiveness of trade tools for steel-related products could conversely lead to additional risk to the overall production capacity and supply of the U.S. steel industry. The Committee assesses that lack of support would hinder the U.S. Government's ability to provide adequate trade protection measures and leave the U.S. economy more exposed to dumping and unfair subsidization of steel, leading to a weakened U.S. domestic steel production capability. A reduction in U.S. Steel's support for trade measures on steel imports could weaken the protections available to the domestic steel industry and significantly reduce domestic production capacity. [A national security concern per Section 721(f)(3).] If U.S. Steel were to substantially | There is no reason to believe that Nippon Steel's acquisition of U. S. Steel would lead to (1) a decline in the rate or effectiveness of trade tools for steel-related products; (2) a lack of support for trade protection measures; or (3) a reduction of U. S. Steel's participation in AD/CVD cases. Post-Transaction, Nippon Steel would have every incentive to protect its U.S. investment from unfairly traded imports. In addition, Nippon Steel has made binding commitments not to interfere in U. S. Steel's decisions to participate in, or initiate, trade actions. To the contrary, Nippon Steel's |

AR_009497

| | |
|---|---|
| reduce its affirmative participation in AD/CVD cases targeting any major steel-producing or circumventing jurisdiction, other domestic steel producers could also experience decreased import duty protection and face a relatively greater volume of dumped or unfairly subsidized imports. | significant financial backing would provide U. S. Steel with further resources to take action to protect its interests.<br><br>Moreover, as stated above, the Parties' proposed NSA will allow U. S. Steel to make decisions regarding trade actions—including to initiate and participate in trade actions and provide data in connection therewith—free from control or influence by Nippon Steel. Moreover, the Parties' proposed NSA contains special protections for U. S. Steel's support of trade actions in which other U.S. steelmakers or the USW participate. Specifically, if the Trade Committee—which is already insulated from control or influence by Nippon Steel—determines not to join, or to withdraw from, a trade action with other U.S. steelmakers or the USW, such a decision must be approved by the Compliance Committee, which is composed of Independent U.S. Directors approved by CFIUS and protected from removal by Nippon Steel. To the extent the Committee believes the proposed NSA is inadequate in that regard, it has failed to provide such feedback to the Parties. |
| Per the parties, the alternative final bid for U.S. Steel was from Cleveland-Cliffs; however, Nippon Steel was selected because Nippon Steel provided the highest value and certainty while presenting less regulatory risk than Cleveland-Cliffs. [CFIUS Case 24-088 Question Set 2, I(b).] | As U. S. Steel has presented to the Committee on multiple occasions, the merger with Nippon Steel was the ***only*** transaction that kept U. S. Steel together, including its operations, iconic name, and Pittsburgh-based headquarters. U. S. Steel's board of directors (the "Board") assessed—consistent with its fiduciary duties—value, certainty of value, and certainty of closing when evaluating all potential bids for U. S. Steel.<br><br>As noted in more detail in U. S. Steel's public proxy statement (https://www.sec.gov/Archives/edgar/data/1163302/000110465924006070/tm243679-1_prem14a.htm), the bid from Cleveland-Cliffs included substantial execution risk under U.S. antitrust laws (including the potential impact of divestitures that might be required to resolve antitrust concerns). Among other things, a transaction with Cleveland-Cliffs would eliminate the sole new competitor in NOES production in North America as well as eliminate a competitive threat to Cleveland-Cliffs' incumbent position in the United States, and put up to 95 percent of iron ore production in the United States under the control of a single company.<br><br>U. S. Steel would reasonably expect that an acquisition by Cleveland-Cliffs would lead to both divestitures of blast furnace steelmaking, automotive steel production and processing, iron ore mining operations, and electrical steel production, and far fewer long-term commitments to the future of steelmaking at U. S. Steel. Such divestitures would be made to a fragmented and limited pool of potential buyers. It is also worth noting again for the Committee that a potential acquirer of divested U. S. Steel assets by Cleveland-Cliffs—Stelco—has since been acquired by Cleveland-Cliffs, |

AR 009498

eliminating a potential buyer and further strengthening Cleveland-Cliffs' monopoly position in blast furnace steelmaking. It is also reasonable to assume that any owner of divested blast furnace assets (divestitures that would be required to satisfy significant regulatory concerns) would lack the scale, knowhow, and expertise to invest in the long-term success of U. S. Steel's integrated facilities.

Whether it is Cleveland-Cliffs or another fragmented acquiror of U. S. Steel's assets, it is reasonable to assume that those potential parties would lack the financial wherewithal and commitment to U. S. Steel's blast furnace facilities.

As previously communicated to the Committee, Cleveland-Cliffs was asked by an investor during a September 5, 2024, UBS Global Materials Conference about how they would invest in Mon Valley Works, where Nippon Steel has committed at least $1 billion to upgrade the aging hot strip mill. Paul Finan, Senior Vice President of Finance at Cleveland-Cliffs stated that "we have a lot of different options for Mon Valley. Mon Valley is a good coke plant and has a good hot end. Mon Valley needs help on the hot strip mill. But we have excess hot strip mill capacity elsewhere. We would have had to figure out what to do with the union workforce. We've done this in the past. When we shut down Weirton, for example, we could offer jobs [to the union workers] at other places in our footprint. We also have natural attrition in the workforce." Cleveland-Cliffs has acknowledged firsthand that it has no intention to make the same investments that Nippon Steel has committed to making that will secure the long-term future and jobs of the Mon Valley. Instead, when asked about displaced USW workers who would be laid off as a result of Cleveland-Cliffs' intention to idle the Mon Valley hot strip mill, Mr. Finan further explained, "we have excess hot strip mill capacity. But workforce attribution would solve a lot of that. 1,000 people out of our workforce of 26,000 retire every year. When we shut down Weirton, for example, we only relocated 120 out of 1,000 people." Finally, when asked about the USW leadership's response to idling and layoffs, Mr. Finan concluded by stating "people think the union is unreasonable, but they want us to be competitive. They understand that. And they want a company committed to the Midwest and blast furnaces. McCall understood that we needed to shut down Weirton. It was losing $100mm per year." That commitment to the Midwest is an admission that Cleveland-Cliffs and the USW are willing to sacrifice jobs in Western Pennsylvania.

Cleveland-Cliffs has made it clear to investors that it cannot and will not commit to the same capital investments in U. S. Steel's facilities as Nippon Steel has done. If the Committee is concerned with the risk of losing blast furnace production at union

| | |
|---|---|
| | represented facilities, the Transaction with Nippon Steel should provide resounding confidence that U. S. Steel will be protected and grow in a future with Nippon Steel.<br><br>Despite the publicly stated intentions for U. S. Steel's footprint under a hypothetical Cleveland-Cliffs acquisition, David McCall, President of the USW International, has blindly endorsed Cleveland-Cliffs because they "are committed to [making] steel in America and operating blast furnaces." McCall also stated that "Cliffs further committed to much-needed capital investment . . . and to adhere to all our contract provisions, including pensions, health care, and profit sharing." (USW Letter from David McCall and Mike Milsap to members dated November 26, 2024.) This endorsement includes only a fraction of the commitments made by Nippon Steel. Nippon Steel has committed to the future of steelmaking in America in ways that Cleveland-Cliffs, or any other buyer, would not be able to do. |

*Business Confidential – Pursuant to 50 U.S.C. Section 4565*
*Protected from Disclosure Under 5 U.S.C. Section 552*

**CFIUS Case No. 24-154: What happens if the transaction fails?**

On November 21, 2024, counsel to United States Steel Corporation ("U. S. Steel") and Nippon Steel Corporation ("Nippon Steel" and together with U. S. Steel, the "Parties"), respectively, and CFIUS representatives from the Departments of Treasury and Commerce (the "CFIUS Co-Lead Agencies") spoke by phone to discuss questions and the agenda for the Parties' meeting with the CFIUS Co-Lead Agencies on November 25, 2024. During that call, the CFIUS Co-Lead Agencies asked for any update from the Parties on the consequences if Nippon Steel's acquisition of U. S. Steel fails. This submission summarizes the Parties' response to that question, as conveyed in the November 25, 2024, meeting with the Co-Lead Agencies.

Specifically, with respect to U. S. Steel and its facilities, U. S. Steel conveyed the following during the November 25 meeting with the Co-Lead Agencies:

- Everything that U. S. Steel reported previously regarding the consequences to its facilities and its future in Western Pennsylvania and elsewhere holds true – except that the pace would be accelerated.

- There is evidence that activist shareholders may be building positions in U. S. Steel stock in order to take over the company and break it apart if the deal fails. U. S. Steel continues to monitor that risk along with its financial advisors.

- The president of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW"), David McCall, continues to assert that U. S. Steel will be fine on its own, even though McCall initially joined forces with Cleveland-Cliffs, Inc. ("Cleveland-Cliffs") last year in an unsolicited bid for U. S. Steel that resulted in the sales process. In the meeting on November 25, U. S. Steel played out that scenario – one where shareholders do not force U. S. Steel to be broken apart, and relayed the following:

    - First, as CFIUS has heard previously, U. S. Steel will be severely battered following the public announcement of its failed deal and will have no choice other than to revert to its pre-deal strategy: namely, shifting operations from outdated USW-represented blast furnace facilities to more efficient, less carbon-intensive electric arc furnace-based facilities.

    - Second, as CFIUS is aware, U. S. Steel had plans long before the announced transaction with Nippon Steel to idle blast furnace #14 at Gary Works. Without the $300 million investment from Nippon Steel, that blast furnace will be quickly idled and possibly shutdown.

    - Third, there will be no $1 billion investment in Mon Valley Works – an investment that Nippon Steel has committed to make – to replace and/or upgrade the nearly 90-year old hot strip mill and other facilities at Mon

Valley Works. Without that upgrade, Mon Valley Works has no viable path forward — it will suffer the same fate as U. S. Steel's other blast furnace facilities that have disappeared. Finally, with no future for steelmaking in Western Pennsylvania, there will be no reason for U. S. Steel to maintain its headquarters there.

- U. S. Steel executives further noted that U. S. Steel competitor Cleveland-Cliffs and Mr. McCall have pushed the story that these warnings are "blackmail." However, CFIUS is aware from prior meetings – well before there was any public statement regarding such a future – that U. S. Steel is stating the truth. These are unavoidable facts, and they reflect the path that U. S. Steel was on prior to the announced transaction with Nippon Steel. As previously conveyed to CFIUS, U. S. Steel's management and Board of Directors studied these issues extensively between 2019 and 2023 and as part of its strategic alternatives review process that was precipitated by Cleveland-Cliffs' threat to make a hostile bid for the company. U. S. Steel does not want to idle facilities or lay off workers. On the contrary, it is laser focused on taking care of its employees. However, U. S. Steel, like all companies, has to make hard decisions regarding the allocation of capital based on available resources, and the simple reality is that U. S. Steel does not have the resources on its own to invest $1 billion in replacing and/or upgrading a piece of equipment that has existed since 1938 and other facilities at Mon Valley Works. Nippon Steel, on the other hand, has the balance sheet and credit rating to do so. The bottom line is that without this transaction, Mon Valley Works will continue to shrink and eventually shutter.

- U. S. Steel further noted that Cleveland-Cliffs has made it clear that it would not save Mon Valley Works. During an investor conference call on September 5, 2024, Cleveland-Cliffs asserted that Nippon Steel and U. S. Steel were "bad people" who did not have "morals," stating further that Cleveland-Cliffs "knew that CFIUS had decided to block" the transaction, and it was just a matter of announcing the decision." Cleveland-Cliffs executives then discussed their objectives in taking over U. S. Steel's blast furnace facilities. Specifically, Paul Finan, Senior Vice President of Finance at Cleveland-Cliffs said:

  > "We have a lot of different options for Mon Valley. Mon Valley is a good coke plant and a good hot end. Mon Valley needs help on the hot strip mill. But we have excess hot strip mill capacity elsewhere. We would have had to figure out what to do with the union workforce. We've done this in the past. When we shut down Weirton, for example, we could offer jobs [to the union workers] at other places in our footprint." He went on to say: "Workforce attrition would solve a lot of that. 1,000 people out of our workforce of 26,000 retire every year. When we shut down Weirton, for example, we only relocated 120 out of 1,000 people."

- In other words, Cleveland-Cliffs has stated publicly that it will close the plant and manage the resulting workforce reduction through early retirements and job

transfers out of Pennsylvania. U. S. Steel noted that this appears to be what the USW International leadership wants: a deal with a competitor to move jobs out of Pennsylvania. But that's not what USW members want, and that's not what the USW local leadership in Western Pennsylvania wants, and they are increasingly at odds with David McCall. The rank-and-file — the actual steelworkers — want this deal, and they will vote with their feet and make their voices heard if this deal does not happen.

In addition to the foregoing, in the meeting with the CFIUS Co-Lead Agencies on November 25, counsel to U. S. Steel reviewed the legal consequences if the President prohibits the transaction under 50 U.S.C. 4565.

First, as has previously been shared with CFIUS, the Parties would immediately file a petition in the U.S. Court of Appeals for the DC Circuit challenging the decision as a violation of due process and the authority of the President under Section 721 of the Defense Production Act.

Second, counsel also conveyed that there would be other civil litigation that will include extensive discovery.

Counsel shared that there is substantial evidence to support the litigations, including beyond the public statements of Cleveland-Cliffs and David McCall of which the Committee is already aware. Indeed, Lourenco Goncalves, the CEO of Cleveland-Cliffs, and other Cleveland-Cliffs executives have been flagrant in their efforts to interfere with the transaction – both through their public comments and through their separate communications to U. S. Steel investors that, to date, have not been made public. These comments include, among other things, the following:

- During the strategic alternatives review process undertaken by the Board of Directors of U. S. Steel last year, as part of the Cleveland-Cliffs bid, Cleveland-Cliffs asserted that:
  - it and the USW had support from the Biden Administration for their takeover attempt;
  - notwithstanding the substantial antitrust issues (which were acknowledged by their own counsel), the outcome of the antitrust review of Cleveland-Cliff's takeover was preordained because the President would direct the outcome of the antitrust division's analysis as a favor for David McCall (going so far as to say that the Assistant Attorney General of the Antitrust Division, Jonathan Kanter, would do what the White House wanted); and
  - no other bidder would be viable as a result, notwithstanding the substantial antitrust risk.
- After losing its bid to Nippon Steel, Cleveland-Cliffs executives repeatedly asserted that the CFIUS process would be a sham used by the President as cover to kill the

transaction. Lourenco Goncalves repeatedly has asserted that he and David McCall have been assured of this by senior Administration officials with whom they have spoken directly.

- Lourenco Goncalves bragged to investors that President Biden assured McCall that he would block the deal in a quid pro quo for McCall's endorsement of the President in his reelection campaign.

For additional reference, counsel highlighted for the Co-Lead Agencies several of the statements that are included in the Appendix attached to this submission.

Third, counsel shared that since the Presidential election, Cleveland-Cliffs has become even more aggressive targeting investors, which has impacted U. S. Steel's stock price – raising potential securities law violations. U. S. Steel conveyed the following timeline of events and summary of legal implications to the Co-Lead Agencies:

**November 8: Investors Call U. S. Steel**

- Lourenco Goncalves, CEO of Cleveland-Cliffs, stated that USW President David McCall, had contacted the White House following the election and received a callback from President Biden on November 7. During their conversation, President Biden asked McCall if he still wanted the deal blocked. McCall affirmed. While the President stopped short of explicitly promising action, he remarked that he would *"always do what's right for the union workers and for national security."*

  This exchange was relayed to investors by Goncalves, who also asserted that President Biden would block the deal on or around November 25, 2024. U. S. Steel's stock fell approximately 2.5% between November 7 and 8 as a result.

**November 14: Investor Reaction and Stock Movement**

- Five investors contacted U. S. Steel on November 14, reporting concerns over Lourenco Goncalves's persistent claims. One quoted him as saying: *"It's just a matter of time before Biden blocks the deal from the CFIUS perspective. He's just crossing the T's and dotting the I's."*

  U. S. Steel's stock closed down nearly 6% as investor confidence was shaken.

**November 19: Escalating Speculation**

- Farallon Capital relayed that Lourenco Goncalves told sell-side banking firm Jefferies that McCall spoke with President Biden prior to the election. According to McCall, he told the White House Mori-san was coming to the U.S. in the third week of November. McCall pointedly asked whether the transaction would be blocked before the visit and said the White House confirmed it would be blocked "*in November*." McCall also claimed that post-election discussions reaffirmed this timeline.

**November 20-21: Market Impact**

- At 3:01 pm on November 20, Celso Goncalves emailed sell-side brokers, stating: *"FYI, apparently Mori made no progress with Shapiro at their meeting yesterday."*

  U. S. Steel's stock price plummeted 5.5% over the next 40 minutes.

- At 7:41 am on November 21, Celso Goncalves emailed brokers again, claiming McCall had a meeting scheduled with the White House but no plans to meet with Mori-san. Goncalves further stated that the CFIUS panel lacked consensus, leaving the decision squarely in President Biden's hands.

  U. S. Steel's stock opened down another 2.8%.

**November 25: Renewed Investor Concerns**

- U. S. Steel's stock sank another 2% as investors reported intensified doubts stemming from further Cliffs-related updates. According to these reports:
  - McCall expressed heightened confidence the deal would be blocked after the prior week's meetings.
  - McCall spent time with President Biden, his chief of staff, and USTR Katherine Tai—a voting member of CFIUS—at a union leader cocktail event (though no formal Oval Office meeting occurred).
  - The Administration was sharply focused on ensuring proper CFIUS procedures to avoid foot faults that could expose it to litigation.

**Legal Implications**

- U. S. Steel's legal counsel noted the following in the November 25 meeting with the Departments of Treasury and Commerce:
  - The parties had not been formally informed of a decision to block.
  - Arbitration under the Basic Labor Agreement was resolved in the parties' favor, giving the USW no legal path to block the transaction.
  - Shareholders had approved the transaction.
  - The parties were satisfactorily addressing antitrust regulatory interests.
  - The parties had proposed a robust National Security Agreement that effectively resolves any potential or perceived national security concern.
- ***In these circumstances and against the foregoing backdrop of events, if the transaction ultimately is blocked, it will validate all of Cliffs' claims and expose potential impermissible U.S. government communications with McCall and Cliffs, implicating serious potential securities and other federal law violations.***

## Appendix: Examples of Cleveland-Cliffs' Statements Regarding the Transaction

- February 2, 2024, investor call organized by Raymond James with Cleveland-Cliffs – (transcribed by Raymond James):

  - **Celso Goncalves, CFO of Cleveland-Cliffs**: "The President can take the recommendation [of CFIUS] or he can throw the recommendation in the trash and just do whatever he wants. So, you know, between us, I don't think I don't think CFIUS is really the main concern.... [Even if CFIUS doesn't] find any evidence of a supply chain problem or a national security problem [and therefore its recommendation is that the deal does not need to be blocked] Joe Biden can take the look at that and say, 'Okay, that's great. But my buddy, Dave McCall. the President international president of the USW doesn't want the deal. So, I'm going to side with him. And I'm gonna block. I'm not gonna allow the deal to go through.' So, from that standpoint he doesn't even need to wait for the CFIUS conclusion to come to him to get to that conclusion.

    And Dave McCall and the USW have already been clear that they don't want the deal to go through. So, I think the Administration has made it clear that the decision's already been made. They're not gonna allow the deal to go through. The Union doesn't want it, and they're gonna side with the Union and he doesn't have to wait until the conclusion of CFIUS to make that decision.

    [After Raymond James officers hosting the call say, in essence, "But the President has to have a reason,"] Goncalves says: Yeah, I mean, his reason can be that the USW doesn't want it. He doesn't need to have any more reason than that.... It's ultimately the decision of the President and the Union has a lot of influence in terms of what the President does, as it relates to this specific topic."

- Approximately February 12, 2024 Call from Lourenco Goncalves to Citi (financial advisors to Nippon Steel) in which Goncalves specifically asked Citi to take notes and report to Nippon Steel:

  - "He [Goncalves] started out by saying he was '100% sure NSC already knew this' but wanted to make sure his message was passed on in any case. His first message was 'the US Government will block this deal as it is', 'I know you don't like to hear that but that is the fact'. He specifically said it would be blocked on national security grounds. He then went on to describe a number of conversations he is having/has had with US Government officials. He said he has been talking directly with US Secretary of Commerce, Gina Raimondo, who 'has been keeping me in the loop as to what is going to happen'. He said she has also communicated her views directly to the Minister of Industry in Japan. Separately, she has told him that Jake Sullivan, National Security Advisor of the US, has communicated with the Japanese Foreign Minister (although he didn't know his or her name). He was also 'informed' that the US Ambassador to Japan, Rahm Emanuel, was 'tasked' with communicating directly with NSC. He didn't offer specifically what was communicated but the implication that the message was the deal would be blocked.

- He made the point a couple of times that 'time is of the essence'. He suggested he is 'holding off Jake Sullivan' but he is 'running out of time'. He suggested that Lighthizer is 'on fire' and provoking Trump and meanwhile Biden does not want to let Trump take over the messaging on this situation. He said if this goes down the road any farther with CFIUS that there would 'no room for any other alternative'.

- Goncalves then suggested that NSC's only path was to reach a deal with Cliffs to split up U. S. Steel.

- March 13, 2024 Investor Conference call hosted by J.P. Morgan Conference Call – (reported to U. S. Steel by investors)

  Mr. Goncalves told investors that Nippon Steel executives will commit *seppuku* — a Japanese form of ritual suicide by self-disembowelment — when the Transaction fails. He reportedly pantomimed cutting his abdomen with a knife to ensure those present understood his crude and bigoted comments.

  Further into the presentation, CEO Goncalves stated "no one else has the union, and there is zero chance anyone [else] will have the union . . . I have already fixed the situation in a way so that it cannot go against me . . . I can't force US Steel to sell to me, but I can work my magic to make a deal that I don't agree with not to close. That's what I said, it's not closing, and Biden hasn't spoken yet. He will."

- March 14, 2024 (the day that President Biden made this statement) - Lourenco Goncalves spoke to Bloomberg:

  (https://www.bloomberg.com/news/articles/2024-03-14/cliffs-ceo-weighs-lowball-bid-for-us-steel-with-union-backing)

  "We have been in total contact with the administration, so I know what's going on," Goncalves said. "The contact is about making it abundantly clear between me and Dave McCall that the only buyer the union accepts for the union-represented assets is Cleveland-Cliffs."

- March 15, 2024 – Call with Pentwater Capital; transcript previously submitted to CFIUS on April 2, 2024; Lourenco Goncalves says, among other things:

  - "[T]here's no process. This is not going to be a process. CFIUS is just cover for a President to kill a deal. CFIUS is a bunch of bureaucrats, second and third level, inside the cabinet, treasury, DOE, Department of State, National Economic Council, National Security Council and they write the report, it lands on the desk of the President of the United States and he can do three things with the report: adopt, reject or modify. It means the President can do whatever he wants. That's why Trump said 'I would block the deal'. So, he knows what he's talking about, and he knows how things works.

- March 19, 2024 – Lourenco Goncalves interview with David Faber:

  - **Goncalves**: I have full conviction that this deal between Nippon and the union will never happen. We have an agreement with the USW, we have the right to bid on their behalf, we understand the successorship clause – that is something that clearly Nippon Steel has no clue about. We are going to prevail. The President of the United States has already spoken.

  - **Faber**: Have you spoken to President Biden? Has he given you the same assurance?

  - **Goncalves**: I have not, but my partner, Dave McCall is in direct contact with the White House. We have assurance from the Biden administration as well.

- March 20, 2024 - Broker call organized by Jefferies (summary based on notes from brokers who attended the call and reported to U. S. Steel):

  Jefferies, the financial advisor to Mr. Goncalves, organized a "broker call" on the Transaction. Investors reported that Mr. Goncalves informed attendees that he and David McCall had arranged, in effect, a *quid pro quo* with the President of the United States to block Nippon Steel's acquisition of U. S. Steel. Specifically, Mr. Goncalves said that Mr. McCall had been in touch with the White House, and that President Biden had requested the USW endorsement "now" and provided personal assurances that CFIUS would block the Nippon Steel acquisition of U. S. Steel — and that this action would be timed to maximize the President's political benefit.

- May 16, 2024 - Cliffs Annual Special Shareholder Meeting

  - **Lourenco Goncalves**: "[O]ne thing I know for sure, this deal between U.S. Steel and Nippon Steel is not going to close because of the USW. And more recently, another thing is starting to shape up extremely well. President Biden has been even more vocal now, and more clear now, and by the way, has been very vocal and very clear through cabinet members, through direct reports that speak on behalf of him, but now he himself has said what he wants for the outcome of the investigation that's going on. That doesn't taint anything."

  - "Remember, the CFIUS investigation will produce a report, and the President has three possibilities to use the report for. He can apply whatever is in the report, he can reject what's in the report, and he can modify what's in the report. In other words, the President can do whatever the President wants to do, and he already said what he's going to do."

*Business Confidential – Pursuant to 50 U.S.C. Section 4565*
*Protected from Disclosure Under 5 U.S.C. Section 552*

- May 30, 2024 - Investors' site visit to Cleveland-Cliffs' Cleveland Works – (summary by U. S. Steel based on accounts from Pentwater Capital, BlackRock, TIG, and Davidson Kempner)
    - Lourenco Goncalves reiterated McCall doesn't want the deal to proceed – and asked investors if they wanted him to call McCall in the middle of the meeting to confirm. (No call was made).
    - Investors believed Goncalves may have gotten a "slap on the wrist" for the comments he had previously made regarding his political sway.
        - Goncalves confirmed that he had not spoken to Biden before.
        - Lourenco continued to suggest Secretaries Yellen, Raimondo, and Granholm, as well as Lael Brainard, as politicians he had a direct line to on the transactions.

*Business Confidential – Pursuant to 50 U.S.C. Section 4565*
*Protected from Disclosure Under 5 U.S.C. Section 552*

**CFIUS Case No. 24-154: Matters Discussed During December 9, 2024 Meeting**

On December 9, 2024, representatives of Nippon Steel Corporation ("Nippon Steel") and United States Steel Corporation ("U. S. Steel," and with Nippon Steel, the "Parties") met with representatives of the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee")—including representatives from the U.S. Departments of the Treasury, Commerce, Justice, Defense, Homeland Security, and U.S. Trade Representative—to discuss Nippon Steel's proposed acquisition of U. S. Steel (the "Transaction"), as well as the proposed National Security Agreement ("NSA") submitted by the Parties on December 2, 2024.

The Parties requested this meeting with CFIUS in light of reports, now public,[1] that President Biden has determined to prohibit the Transaction, notwithstanding that (i) the Committee has not yet concluded action regarding Case No. 24-154 and (ii) the Committee has failed to substantively engage with the Parties on the NSA, drafts of which the Parties submitted to CFIUS on September 6, October 29, and December 2, 2024. The Parties sought this meeting to update CFIUS regarding: (i) concerns communicated by the Government of Japan to the U.S. Government regarding irregularities in the CFIUS process; (ii) the United Steelworkers union ("USW") International President David McCall's failure to engage in good faith negotiations with Nippon Steel regarding Nippon Steel's commitments to the USW; (iii) the harm suffered by U. S. Steel and its employees during the pendency of CFIUS's review; and (iv) additional implications of referring the Transaction to the President. This document summarizes and expands upon key topics discussed during the December 9 meeting.

## I. The Committee's Unwillingness to Engage on the NSA

As CFIUS is aware, the Parties have now submitted three drafts of the proposed NSA to the Committee—on September 9, October 29, and December 2.

All drafts were robust, and the Parties' most recent proposed NSA (December 2) is particularly robust and responsive to all questions that have been expressed by the Committee in our meetings, as well as those that have been expressed publicly by the White House and USW International President David McCall. Over the past three months, the Parties have proactively sought the Committee's specific feedback on the proposed NSA terms. As we have expressed, it has been disappointing to the Parties that the CFIUS staff have not been authorized by more senior CFIUS officials to provide substantive feedback and/or comments on the NSA. Notwithstanding that fact, the Parties have made every possible effort to address the questions raised by CFIUS to date.

Because Nippon Steel is firmly committed to this Transaction, immediately following the Parties' meeting with CFIUS on November 25, Nippon Steel, including its top management, seriously deliberated and updated the draft NSA that the Parties submitted to the Committee on December 2. Nippon Steel and U. S. Steel are prepared to execute that version of the Agreement promptly. With less than two weeks left in the statutory review period, the Parties remain committed to addressing any feedback from the Committee.

---

[1] US Steel Drops as Biden Plans to Block Sales to Nippon Steel, BLOOMBERG (Dec. 10, 2024), https://www.bloomberg.com/news/articles/2024-12-10/biden-set-to-finally-kill-nippon-steel-s-proposed-takeover-of-us-steel.

## II. Concerns Communicated by the Japanese Government

Nippon Steel has full support from the Japanese Government. As CFIUS may have seen in the media, the Japanese Government has been focused on this Transaction at the highest level. According to the media, Prime Minister Ishiba sent a letter to President Biden.[2]

Nippon Steel understands that (i) the Japanese Government believes that the Transaction will enable Nippon Steel and U. S. Steel to combine advanced technologies and increase competitiveness, and contribute to enhancing steel production capacity and employment in the United States; (ii) the Japanese Government is concerned that the failure of this Transaction will send a stark message that investment from Japan is not welcome in the United States; and (iii) the Japanese Government has been reaching out to various counterparts in the U.S. across the various representative agencies to underscore that neither Japan nor this Transaction presents a national security threat to the United States.

Nippon Steel respectfully submits that, if the Transaction is not approved, it will send a blunt message that Japanese investment is not welcome in the United States, which would be a regrettable message to send to a defense treaty ally and one of the largest contributors to foreign investment in the United States—and the decision will be exploited and propagandized by countries of concern that are threats to both the U.S. and Japan.

## III. USW International President David McCall's Failure to Engage in Good Faith Negotiations with Nippon Steel

As conveyed during the December 9 meeting, Nippon Steel respects the role played by the USW in contributing to U. S. Steel's iconic brand and enduring success.

While agreement with the USW is not a closing condition to this Transaction and should not be treated as such, Nippon Steel has actively sought to engage with USW leadership in good faith since the announcement of this Transaction and to respond to all of their legitimate concerns. From Nippon Steel's perspective, however, the current relationship between USW leadership and U. S. Steel management is marked by significant tension and mistrust (which would only be exacerbated if this Transaction does not close). Nippon Steel has deep experience working productively with labor unions in Japan, and Nippon Steel has long believed that it is important for U. S. Steel to "reset" its relationship with the USW. For that reason, since the announcement of the Transaction, Nippon Steel has strived to work constructively with the USW. Unfortunately, to date, USW International President David McCall has repeatedly and consistently rebuffed Nippon Steel's efforts to engage in meaningful dialogue and has never engaged with Nippon Steel in good faith, notwithstanding that (i) an independent arbitration panel appointed by the USW and U. S. Steel ruled in September that all requirements under the BLA required for the Transaction to proceed have been met and (ii) Nippon Steel already has a USW-represented workforce in Pennsylvania and West Virginia, with whom it has good relations. Mr. McCall instead has sought to forestall any agreement and to mischaracterize Nippon Steel's commitments to his members, based on his apparent understanding that President Biden plans

[2] *See, e.g.*, *Exclusive: Japan PM Ishiba urges Biden to approve Nippon-US Steel deal, sources say*, REUTERS (Nov. 26, 2024, 9:51 AM EST), https://www.reuters.com/markets/deals/japan-pm-ishiba-urges-biden-approve-nippon-us-steel-deal-sources-say-2024-11-26/.

to block the Transaction, and calling on "the Committee on Foreign Investment in the United States (CFIUS) and the president to reject a deal that's bad for workers and bad for America."[3]

To date, Nippon Steel has refrained from providing a detailed and public accounting of its attempts to engage with Mr. McCall, at Mr. McCall's request. However, under the circumstances, Nippon Steel now feels compelled to share the following information with the Committee, to ensure that government stakeholders fully understand the extent of Mr. McCall's efforts to avoid good faith engagement with Nippon Steel, and to subvert the CFIUS process to achieve his objective:

- After the Transaction was announced on December 18, 2023, the USW was one of the first parties that Nippon Steel representatives contacted (on December 18, 2023). At this time, Nippon Steel representatives offered to meet as soon as possible with the USW, irrespective of the impending holidays.

- There was a preliminary meeting with the USW on December 29, 2023, attended by USW representatives and Hiroshi Ono, the President of Nippon Steel North America ("NSNA"), as well as U. S. Steel's representatives. During this initial meeting, NSNA attempted to discuss the USW's views on the Transaction, and to understand any potential concerns. NSNA was also prepared to share a larger confidential presentation with the USW, but the USW was, at the time, unwilling to sign a confidentiality agreement.

- In January and February, the USW submitted a number of detailed requests for information, and Nippon Steel and NSNA, in a series of letters, provided responses and documents. Eventually, the USW signed a Nondisclosure Agreement.

- The first meeting involving both Mr. Takahiro Mori (Representative Director, Vice Chairman and Executive Vice President) and Mr. McCall occurred on March 7, 2024, at USW's headquarters in Pittsburgh, PA, with a large group of participants from both sides. During that meeting, Nippon Steel provided a copy of commitments it was prepared to offer the USW. While the USW had not identified any specific requests, Nippon Steel provided these commitments based on what it understood—from comments and questions made by the USW, public reporting and third-party communications—were the primary areas of concern for the USW. After Mr. McCall reviewed the commitments, he promptly ended the meeting in less than one hour, without providing any substantive response or asking any substantive questions regarding the commitments.

- After the March 7, 2024 meeting, Mr. McCall repeatedly declined subsequent meeting invitations from Nippon Steel, and he continued to disparage the Transaction in the press. Repeated efforts by Nippon Steel's advisors to back-channel with representatives of the USW were unproductive.

- In April, Mr. McCall sent an email to Mr. Mori stating, "The national security concerns are clear to Cfius. We do not see how this transaction could ever receive Cfius approval. We would have expected U.S. Steel and Nippon to recognize the realities and abandon the transaction."

---

[3] Press Release, United Steelworkers, Nippon Says it Wants to Be Just Like USS (Nov. 14, 2024), https://m.usw.org/union/mission/industries/metals/resources/bargaining-with-uss/nippon-says-it-wants-to-be-just-like-uss.

- After several months of rebuffed outreach efforts, Nippon Steel and its advisors began hearing that U. S. Steel employees, including USW-represented employees, were growing frustrated, as they were not hearing about the Transaction from either Nippon Steel or USW leadership. From May to July 2024, Mr. Mori therefore embarked on a multi-site tour to meet and engage with U. S. Steel personnel, including USW-represented employees, and answer any and all questions about Nippon Steel and its plans to strengthen and grow U. S. Steel. During these listening sessions, Nippon Steel discovered that employees across U. S. Steel's footprint—from Minnesota to Alabama to Indiana to Pennsylvania—were aligned around several key themes, including that (i) USW-represented employees cared deeply about their jobs and the continued operation of their facilities; (ii) USW-represented employees were not feeling heard or represented by USW leadership; and (iii) all U.S. Steel employees appreciated Mr. Mori's engagement.

- Mr. McCall became upset that Nippon Steel was speaking directly to USW-represented employees, notwithstanding his repeated refusal to engage directly with Nippon Steel. We also understand that Mr. McCall began to receive substantial pressure from USW local union leaders, who argued that Mr. McCall should be meeting with Nippon Steel.

- Very soon thereafter, to quell complaints from his members, Mr. McCall agreed to another in-person meeting with Mr. Mori on July 12, 2024. As a predicate for this meeting, Mr. McCall insisted that no material issues were to be discussed, and that the meeting could not be made public. At the start of the meeting, Mr. Mori apologized for any misunderstanding stemming from his statements made around the announcement of the Transaction. Mr. Mori also reiterated his commitment that Nippon Steel would be a good long-term partner to the USW and emphasized Nippon Steel's dedication to the Transaction. At the meeting, Mr. McCall focused on a single section of the Basic Labor Agreement ("BLA") on upstreaming profits, and invited Nippon Steel to submit a proposal on that one topic.

- Following this meeting, Nippon Steel engaged Dick Gephardt, Former House Majority Leader and a trusted friend to organized labor, to serve as an honest third-party broker to help facilitate conversations between Nippon Steel and the USW. In July 2024, Leader Gephardt sought to bring Mr. McCall back to the negotiating table, and Mr. McCall responded that he could not discuss the Transaction further until an arbitration related to the successorship provisions of the BLA occurred in August 2024.

- After the arbitration proceeding was held on August 15, 2024, Leader Gephardt again reached out to Mr. McCall and sought to arrange a meeting. Consistent with his strategy to delay substantive engagement, Mr. McCall again moved the goalposts, responding that he would not meet until the arbitration **decision** was reached, *and* until after CFIUS made a final decision on the matter (both of which then were scheduled to occur the following month, in September 2024).

- CFIUS sent the parties a letter on August 31, 2024, and the media widely reported that President Biden intended to imminently block the Transaction.[4] Although the Committee ultimately permitted the Parties to withdraw and refile their notice, and the independent arbitration panel unanimously ruled that the Parties had satisfied their obligations under

---

[4] *See, e.g.*, David J. Lynch and Jeff Stein, *Biden preparing to block Nippon Steel purchase of U. S. Steel*, THE WASHINGTON POST (Sept. 4, 2024), https://www.washingtonpost.com/business/2024/09/04/biden-prepares-reject-us-steel-deal/.

the BLA—meaning no further action was necessary under the BLA for Nippon Steel to acquire U. S. Steel and assume all USW agreements in line with its commitments—Mr. McCall continued to refuse to meet with Nippon Steel.

- In September and October 2024, thousands of members of the USW broke from Mr. McCall's position and expressed support for the Transaction. In many cases, Mr. McCall either attempted to discourage meetings (such as meetings between USW-represented employees of U. S. Steel and USW-represented employees of Wheeling-Nippon Steel, who could attest to Nippon Steel's history and practices as an employer) or otherwise attempted to silence dissent.

- Immediately prior to the U.S. presidential election, on November 5, 2024, Leader Gephardt again contacted Mr. McCall, to suggest a meeting with Nippon Steel after the election. Mr. McCall agreed but indicated that he was attending a shipbuilding conference in Australia and could meet only in mid-to-late November. After the election, Leader Gephardt re-contacted Mr. McCall to attempt to arrange a meeting, and Mr. McCall asserted that he was unhappy that news of his potential meeting with Mr. Mori and Leader Gephardt had leaked; to Nippon Steel's knowledge, no such leak occurred, and the Parties are not aware of any media reports regarding a planned meeting.

- During a trip to the United States in mid-November 2024, Mr. Mori met with Governor Josh Shapiro of Pennsylvania. During the meeting, Governor Shapiro indicated that he would be interested in pursuing whether the Governor's Office could help facilitate talks between Nippon Steel and the USW.

- Ultimately, Governor Shapiro was successful in organizing a meeting, which occurred on November 26, 2024 (the Tuesday before Thanksgiving). In attendance were Governor Shapiro and one of his cabinet secretaries, Mr. Mori and one of his advisors, and Mr. McCall. Nippon Steel at first believed the November 26 meeting—which covered a range of issues, from investment commitments to trade issues—was productive. With that said, during the meeting, Mr. McCall said he "knew" that Nippon Steel was negotiating an NSA with CFIUS, which Nippon Steel found to be an odd remark, given the regulatorily mandated confidentiality around the CFIUS review process.

- Following the meeting, Governor Shapiro asked Nippon Steel to provide additional written specifics to address questions from Mr. McCall, which Governor Shapiro suggested he could provide to Mr. McCall to help facilitate another meeting between Nippon Steel and the USW. However, Mr. McCall is now again refusing to meet, rebuffing Governor Shapiro. Moreover, subsequent to the November 26 meeting, Mr. McCall released a video blatantly and dishonestly mischaracterizing Nippon Steel's positions regarding the Transaction and its commitments to the USW.[5]

Nippon Steel never intended to negotiate with the USW in public and has attempted at every turn to be respectful and supportive of the USW. Unfortunately, Mr. McCall has taken a different approach. From the pattern and practice of discussions over the past year, Nippon Steel can only conclude that Mr. McCall has disengaged from negotiations every time that he believes a government-related deadline is approaching, based on his apparent understanding that President Biden intends to use the CFIUS review process as a pretext to block the Transaction.

[5] United Steelworkers, *McCall on Nippon: USW is Fighting for All Members of USS*, YOUTUBE (Dec. 4, 2024), https://www.youtube.com/watch?v=xxLWlhB-qoo.

## IV. The Harm Suffered by U. S. Steel and Its Employees During the Pendency of the CFIUS Review

As U. S. Steel has explained to CFIUS on multiple occasions, this Transaction is the best path forward for U. S. Steel and its employees—and the only option available to keep the company intact and make meaningful investments in its facilities, ensuring their longevity. U. S. Steel's strategy prior to the Transaction was to be "better, not bigger" by adding capacity and capabilities at its electric arc furnace facilities in Arkansas while idling its blast furnace facilities, including Granite City and portions of Gary Works. As part of U. S. Steel's pre-Transaction plans, these idlings would have impacted jobs, but U. S. Steel had to make hard decisions to maintain a healthy business with limited resources. The Transaction, however, will enable the Parties to invest in U. S. Steel's integrated steelmaking operations, including $1.4 billion in capital expenditures (beyond repair and maintenance) for U. S. Steel's union-represented facilities (which the Parties now expect to reach $1.6 billion); approximately $300 million to revamp Gary Works' Blast Furnace #14; and no less than $1 billion to upgrade or replace the vintage 1938 hot strip mill and other facilities at Mon Valley Works. U. S. Steel has been clear that, absent the Transaction, these investments will not take place. Instead, U. S. Steel will be forced to idle Blast Furnace #14 at Gary Works—the largest blast furnace in U. S. Steel's footprint—and Mon Valley Works eventually will be idled. Without ongoing steelmaking operations in Pennsylvania, U. S. Steel would move its headquarters elsewhere.

U. S. Steel also will be left financially battered if CFIUS refers the Transaction to the President to be blocked. U. S. Steel will face intense pressure from its shareholders to return capital in the form of dividends and buybacks, and U. S. Steel has received feedback that activist investors have built up positions in its stock in anticipation of deal failure. Those activist investors likely will force U. S. Steel to put itself up for sale again in order to make a financial return. These activist shareholders have no concern for the long-term viability of U. S. Steel and will be glad to see U. S. Steel scrapped for parts, which is the most likely outcome of another sale process, given that Nippon Steel was the only buyer capable of keeping U. S. Steel together. Such an outcome would put in motion the end of steelmaking in Western Pennsylvania.

The Transaction has now been under review by CFIUS for nearly nine months. U. S. Steel and its employees have suffered during this prolonged period, while the politicization of CFIUS's review by the President and third parties—including David McCall and Lourenco Goncalves—have introduced tremendous deal uncertainty. These factors, combined with the Committee's unwillingness to engage substantively with the Parties and conclude action on the Transaction's merits—instead taking direction from the White House to stonewall and eventually tee up the Transaction to be blocked—have precluded U. S. Steel from pursuing opportunities for improvement and innovation that it had pursued prior to the Transaction, in effect damaging U. S. Steel's competitiveness, the very thing about which CFIUS purports to be concerned. While transaction parties typically would be able to resume such activities following a CFIUS review in the normal course, many of these opportunities for U. S. Steel will no longer come to fruition given the protracted CFIUS review. Such opportunities Include:

- U. S. Steel had been seeking grants from the Department of Energy and other sources of funding, as well as investment opportunities, primarily related to decarbonization, energy, direct reduced iron, and electrical steels. U. S. Steel has put on pause those grant applications.

- U. S. Steel had been pursuing seed investments in startup companies through Carnegie Foundry focused on bringing cutting-edge technology to the industrial base. U. S. Steel has paused pursuing these investments.
- U. S. Steel had been pursuing innovation partnerships related to developing products for steel homes, steel roofs, solar panels, and steel pallets. U. S. Steel has since been forced to slow roll the development of technologies related to these partnerships.

U. S. Steel has not faced the consequences of prolonged deal uncertainty alone; the company's employees have also suffered and continue to endure its effects. Over the last twelve months, employees have become fatigued and exhausted given the uncertainty about the future of their company; their lives have been used by politicians on both sides of the aisle, as well as by Mr. McCall and Mr. Goncalves, to score points, with no relief from this Committee despite the overwhelming evidence that the Transaction enhances U.S. national security. Evidence of declining morale among U. S. Steel's employees is apparent in the numbers. U. S. Steel's non-union resignation rates increased by over 56 percent from 2023 to 2024. Employees are citing "Company Instability" or "Job Security"—both caused by deal uncertainty—as their reasons for leaving, which represents a greater than 200 percent increase from 2023 to 2024. Further, non-union employees resigning in their fourth year at U. S. Steel increased by over 85 percent. Because U. S. Steel employees become fully vested in 401(k) contributions after three years, retaining them for four years generally ensures longer-term employment. Consequently, deal uncertainty has impacted not only temporary attrition rates, but has also likely led to the depletion of U.S. Steel's future workforce. These attrition rates suggest employees are already experiencing the foreshocks of a failed deal.

## V. Additional Implications of a Referral to the President

As the Parties have discussed previously with CFIUS, President Biden has been clear that he intends to use his authority under 50 U.S.C. Section 4565 to prohibit the Transaction based on his commitment made to Mr. McCall. As the President asserted to the USW, "U.S. Steel has been an iconic American company for more than a century, and it should remain a totally American company. American-owned, American-operated by American union steel workers, the best in the world. And it's – that's going to happen, I promise you."[6] However, the President can prohibit the Transaction only if CFIUS concludes that the Transaction poses an unresolved national security concern. Otherwise, if CFIUS approves the Transaction, it will never reach the President's desk. Here, it is overwhelmingly clear that the Transaction will *enhance* U.S. national security, and any possible concern that CFIUS might have has been addressed through the NSA proposed by the Parties. The only way CFIUS could refer this Transaction to the President would be under the direction of the President, acting on his commitment to Mr. McCall, which the President announced even before the CFIUS process began.[7] We strongly encourage CFIUS to

[6] *Biden promises union workers to keep US Steel 'American-owned, American-operated'*, ABC NEWS (Apr. 17, 2024), https://abcnews.go.com/Politics/biden-promises-union-workers-us-steel-american-owned/story?id=109361397.

[7] Statement from President Biden on US Steel, The White House (Mar. 14, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/14/statement-from-president-biden-on-us-steel/ ("I told our steel workers I have their backs, and I meant it. U.S. Steel has been an iconic American steel company for more than a century, and it is vital for it to remain an American steel company that is domestically owned and operated").

follow the law and not to allow the law and the institution of CFIUS to be subverted in a manner that seems to be the committed objective of Mr. McCall.

Indeed, Mr. McCall has made clear from the beginning his intent to use his relationship with President Biden to subvert the CFIUS process and block the Transaction. For example, before the CFIUS review began, Mr. McCall was clear that he was engaged with the President and CFIUS, and had assurances that the President would support Mr. McCall's desired outcome:

- February 2, 2024: "Today we received personal assurances that President Joe Biden has our backs. He's always been a friend to the American worker and our union, and we're grateful he's taking an interest in this matter."[8]

- March 1, 2024: "Finally, we are actively engaged with the Committee on Foreign Investment in the United States (CFIUS) to raise our concerns about the ramifications this proposed deal will have on our national security, critical infrastructure, and supply chain, which includes Nippon's current export practices and its financial interests in the People's Republic of China. This merger poses meaningful risks, and included with this letter are materials explaining why CFIUS must block Nippon's proposed acquisition of USS."[9]

- March 14, 2024: "The president's statements should end the debate: U.S. Steel must remain 'domestically owned and operated.'

  "President Biden told USW members he has our backs, and there's no question that he meant it. We're grateful for his unfailing support and his ongoing commitment to advancing the interests of working families and their communities."[10]

Once the CFIUS review commenced, Mr. McCall continued to make clear his understanding that the outcome was preordained:

- April 10, 2024: "'We hope that the CFIUS process takes place sooner rather than later,' McCall added, 'so that the president can make a decision on national-security issues. It's important that we maintain blast furnaces in this country. [U.S. Steel has] already shut down three blast furnaces in the past three years.'"[11]

- April 17, 2024: "'I'll talk to [President Biden] about the issue we face with Nippon, maybe talk to him about the shipbuilding petition we put in, and thank him for the infrastructure

[8] Press Release, United Steelworkers, Biden Supports Steelworkers as USW Continues Opposition to Proposed USS-Nippon Deal (Feb. 2, 2024), https://m.usw.org/news/media-center/releases/2024/biden-supports-steelworkers-as-usw-continues-opposition-to-proposed-uss-nippon-deal.

[9] David McCall to U.S. Senators, United Steelworkers urges your opposition to the proposed merger of United States Steel and Nippon Steel Corporation (Mar. 1, 2024), https://usw.org/workplaces/metals/uss-sale/USW_USSteel.pdf.

[10] Press Release, United Steelworkers, USW Welcomes Biden's Call for U.S. Steel to Remain Domestically Owned and Operated (Mar. 14, 2024), https://m.usw.org/news/media-center/releases/2024/usw-welcomes-bidens-call-for-u-s-steel-to-remain-domestically-owned-and-operated.

[11] Robert Kuttner, *The U.S.-Japan Summit and the Nippon Steel Deal*, THE AMERICAN PROSPECT (Apr. 10, 2024), https://prospect.org/economy/2024-04-10-us-japan-summit-nippon-steel-deal/.

bill and IRA, as we're starting to get some of that funding for the companies that need it and some of their future employers,' McCall said in an interview Tuesday."[12]

- April 28, 2024: "'U.S. Steel and Nippon should walk away from [the Transaction]. I think U.S. Steel and Nippon should still give up on it. Based on the president's comments, it's clear to me that when the Committee for Foreign Investments in the United States decision comes out it will be a negative decision. It's national security issues that CFIUS will look at.'"[13]

- September 18, 2024: "'The national security concerns are clear to Cfius. We do not see how this transaction could ever receive Cfius approval,' Steelworkers International President Dave McCall wrote in an April email to Nippon Steel executives recently released with other correspondence. 'We would have expected U.S. Steel and Nippon to recognize the realities and abandon the transaction.'"[14]

- September 21, 2024: "In an interview, David McCall, the USW president, sounded confident of the ultimate outcome. 'At the end of the day,' he said, 'U.S. Steel will remain American-owned and American-operated.'"

  "McCall said he is confident that Biden will 'live up' to his commitment."[15]

- October 25, 2024: "McCall revealed he met Biden last month to discuss his concerns that included the future of US Steel's blast furnace operations, Nippon Steel's commitments and national defense concerns under Japanese ownership. Biden listened and understood, McCall said, calling it a 'good informal dialog between him and me and a couple other people.'"

  "McCall said he was dismayed by the Cfius extension, which came after his meeting with Biden."

[12] Josh Wingrove, et al., *US Steel 'Guaranteed' to Stay US-Owned, Biden Tells Steelworkers*, BLOOMBERG (Apr. 17, 2024), https://www.bloomberg.com/news/articles/2024-04-17/higher-tariffs-on-chinese-steel-aluminum-sought-by-biden-in-2024-election-push.

[13] Joseph Pete, *Cleveland-Cliffs CEO asserts U.S. Steel sale to Nippon is dead, may consider another offer for rival*, NWI TIMES (Apr. 28, 2024), https://www.nwitimes.com/news/local/cleveland-cliffs-ceo-asserts-u-s-steel-sale-to-nippon-is-dead-may-consider-another/article_50d5bc74-03f5-11ef-81f0-0b7cb1d8ecea.html.

[14] Bob Tita, *Nippon Steel Gets More Time for U.S. Steel Deal Review*, THE WALL STREET JOURNAL (Sept. 18, 2024), https://www.wsj.com/business/deals/nippon-steel-gets-more-time-for-u-s-steel-deal-review-2cdca49b.

[15] David Lynch, *Union opposition to U.S. Steel sale reflects years of bad relations*, THE WASHINGTON POST (Sept. 21, 2024), https://www.washingtonpost.com/business/2024/09/21/us-steel-union-opposition-sale-nippon-steelworkers/.

"'I was taken off guard by it and disappointed,' said McCall, who said he thought a decision should have been made at the time. 'I was disappointed in the fact that they let them pull the application and refile and give them another 90 days.'"[16]

After the election, Mr. McCall has further made clear that he expects the political calculus, rather than the law, to carry the day:

- November 12, 2024: "McCall said he has no plans to return Mori's outreach. 'They don't care about our members,' he said about Nippon Steel. 'I don't want them to own this company.'"[17]

- December 5, 2024: "United Steelworkers International (USW) president Dave McCall met with US president-elect Donald Trump at Mar-a-Lago on Monday, seeking intervention in Nippon Steel's proposed acquisition of US Steel, according to two people familiar with the matter.

  Two of the people briefed on the matter said McCall warned Trump that while the Nippon Steel deal might save 3,000 jobs, it could spell financial ruin for Cleveland-Cliffs, a key player in the US steel industry."[18]

If CFIUS refers the Transaction to the President and the President prohibits the Transaction, McCall will come out a winner—although his members will lose. Lourenco Goncalves, the CEO of Cleveland-Cliffs Inc., who seeks to monopolize blast furnace and iron ore production in the United States, also will be a winner—at least temporarily, and subject to the outcome of litigation. The costs, however, are clear and abundant:

First, U. S. Steel, its union-represented and non-represented employees, and the communities where U. S. Steel operates, as described above and in the Parties' previous submissions to CFIUS, will incur the harm inflicted by such a decision. Jobs will be lost, competition will suffer, an American steel manufacturer will be weakened, and the future of steelmaking in Western Pennsylvania will be highly uncertain.

Second, the United States' relationship with Japan also will suffer, as confirmed by the Japanese Government. To reiterate:

- Japanese investors have invested more capital in the United States than investors from any other country, including in manufacturing, and Japanese companies employ nearly one million Americans.

[16] Joe Deaux, *Union Boss Pushes Wavering Members on Harris, US Steel Deal*, BLOOMBERG GOVERNMENT (Oct. 25, 2024), https://news.bgov.com/bloomberg-government-news/steel-union-boss-pushes-wavering-members-on-harris-nippon-deal.

[17] Bob Tita, *The Union Head Opposing a U.S. Steel Takeover—and Some of His Members*, THE WALL STREET JOURNAL (Nov. 12, 2024), https://www.wsj.com/business/dave-mccall-united-steelworkers-us-steel-nippon-deal-fdaacd79.

[18] Article by Diane Alter for CTFN previously shared with Committee staff.

- Japan holds more U.S. federal government debt—over $1 trillion—than any other country.

- Nearly 55,000 U.S. military personnel are stationed in Japan, and Japan pays the United States $2 billion to offset the costs.

- According to U.S. Department of State:

  "For over 60 years the United States-Japan Alliance has served as the cornerstone of peace, stability, and freedom in the Indo-Pacific region. The U.S. commitment to Japan's defense under the U.S.-Japan Security Treaty of 1960 is unwavering. We continue to work with Japan to address shared regional and global objectives by enhancing our security cooperation within the U.S.-Japan Alliance, affirming a rules-based approach to maritime governance, and deepening American, Japanese, and South Korean trilateral cooperation in the face of North Korea's dangerous and unlawful nuclear and ballistic missile programs.

  The depth of the U.S. commitment to the U.S.-Japan Alliance is evidenced by the approximately 55,000 U.S. military personnel stationed in Japan, and the thousands of Department of Defense civilians and family members who live and work alongside them. The United States has also deployed its most capable and advanced military assets to Japan, including the U.S.S. Ronald Reagan carrier strike group and the F-35 Joint Strike Fighter.

  The U.S. has over $20 billion in active government-to-government sales cases with Japan under the Foreign Military Sales (FMS) system. Japan's July 2020 $23.11 billion request to procure up to 105 additional F-35 Joint Strike Fighter aircraft became the second largest single FMS case ever authorized by the Department and notified to Congress. [R]ecent and significant implemented [FMS] sales include: the F-35 Joint Strike Fighter, E-2D Airborne Early Warning Aircraft, the KC-46 Refueling Tanker, the Global Hawk Unmanned Aerial System (UAS), and the MV-22 Osprey Tilt-rotor aircraft, as well as missiles like the AIM 120 Advanced Medium-Range Air-to-Air Missile (AMRAAM), UGM-84 Harpoon, and SM-3 Block IIA Ballistic Missile Defense interceptor missiles.

  Since 2015, the U.S. also authorized the permanent export of over $12.5 billion in defense articles to Japan via the Direct Commercial Sales (DCS) process. The top categories of DCS to Japan include gas turbine engines and associated equipment; aircraft parts; and military electronics."[19]

  The Defense Department has echoed these points:

- U.S.-Japan Alliance Increasingly Strengthened Since End of WWII: https://www.defense.gov/News/Feature-Stories/Story/Article/2306658/us-japan-alliance-increasingly-strengthened-since-end-of-wwii/.

[19] Fact Sheet, U.S. Department of State, U.S. Security Cooperation With Japan (Jan. 20, 2021), https://www.state.gov/u-s-security-cooperation-with-japan/.

- U.S., Japan Military-to-Military Relationship Reaches 'New Heights': https://www.defense.gov/News/News-Stories/Article/Article/3739131/us-japan-military-to-military-relationship-reaches-new-heights/.

If CFIUS refers the Transaction to the President to be blocked, the world will see it for what it is. Scores of national security experts have written or spoken publicly supporting approval of the Transaction, including former cabinet members in both Republican and Democratic administrations from the Departments of the Treasury, Commerce, and State, and former sub-cabinet and career officials from those same agencies as well as the Departments of Defense and Homeland Security, the U.S. Trade Representative, and former White House officials. These experts have rightly observed that blocking the Transaction would undermine the U.S. government's support from allies in advancing its national security interests and would give other countries license to use their own investment screening regimes—many implemented at the U.S. government's behest—to block transactions for political reasons unrelated to national security.

Newspaper editorial boards also have weighed in—at least 23 times—in favor of the Transaction, including:

- The Washington Post – September 11, 2024:

  "What's truly inexplicable, though, is the likely rationale for the ban: national security. Perhaps in the 1980s, Japan could have been considered a strategic economic threat. It was fear of 'Japan Inc.' that prompted Congress to authorize presidents to block prospective mergers on national security grounds, after vetting by the body currently reviewing Nippon Steel's bid: the Committee on Foreign Investment in the United States, or CFIUS. Today, though, Tokyo is one of Washington's closest friends and a critical ally in the United States' confrontation with China. Japan is boosting its defense capabilities, and it has been helping the United States slow China's development of advanced technologies."

- The Wall Street Journal – December 8, 2024:

  "The Committee on Foreign Investment in the United States (Cfius) launched a review of the deal, though it poses no national security risks. Japan is a critical U.S. ally and serves as a bulwark in the Asia-Pacific against China's economic and military ambitions.

  Only last month the Defense Department issued a statement at a trilateral defense ministers meeting with Australia and Japan that touted the 'longevity and enduring commitment of our partnership" that is "grounded in shared values, deep trust, and our unbreakable commitment to strengthening collective deterrence.'

  Blocking the offer would undermine the alliance and the U.S. steel industry."[20]

---

[20] *Not even winning Pennsylvania can justify this bad move on U.S. Steel*, THE WASHINGTON POST (Sept. 11, 2024), https://www.washingtonpost.com/opinions/2024/09/11/japan-us-steel-merger-china-politics-nippon/.

To quote former Treasury Secretary Larry Summers: "There is no remotely plausible national security rationale for questioning the Nippon-US Steel transaction."[21]

At the end of the day, there will be one clear winner if CFIUS refers the Transaction to the President—China. In April, the China Daily observed in an editorial:

> "Yet despite all these gestures that Nippon Steel has made, as well as the fact that it is shelling out around twice what a US bidder is ready to pay, politicians in Washington, from both the Democratic and Republican camps who are embracing an increasingly strident nationalist and protectionist economic vision, have joined with the USW to oppose the proposed merger.
>
> Ironically, they have cited Nippon Steel's exposure to China as reasons for concern, despite the Japanese steelmaker saying its operations in China are very limited — representing less than 5 percent of the company's global production capacity.
>
> The upcoming US presidential election in November has only served to heighten the jingoism and make the proposed deal a flag-bearer for the two parties' self-proclaimed championing of US workers as they vie for votes. A week after President Joe Biden announced on March 14 that 'US Steel has been an iconic American steel company for more than a century, and it is vital for it to remain an American steel company that is domestically owned and operated', he won the endorsement of the USW.
>
> His Republican opponent Donald Trump had already said earlier he would block the merger if he returned to the White House, calling it 'a horrible thing'.
>
> All these serve as unmistakable signs that the US is drifting away from its long-held policy of openness to foreign trade and investment, and minimal government interference in the markets."[22]

The editorial closed by noting that the U.S. government "talks the free market talk, but refuses to walk the walk."

Similarly, in a September op-ed in the South China Morning Post titled "Cooperative Tokyo finds America a demanding, but ungrateful boss; After doing everything to please Washington with its China containment, Japan is not allowed to buy US Steel that has been in decline for decades," the author wrote:

> "One of [Japan's] more popular politicians, Shigeru Ishiba, is running to become the leader of the country's ruling Liberal Democratic Party, and so the next prime minister. He certainly doesn't mince words. 'I find what the United States is saying [about Nippon Steel] to be very unsettling, making such statements or actions that could undermine the trust of its allies,' the 67-year-old former defence minister was reported as saying.

---

[21] Lawrence H. Summers (@LHSummers), X (Jan. 19, 2024), https://x.com/LHSummers/status/1748500005147611467.

[22] *US steels itself to be more protectionist*, CHINA DAILY (Apr. 2, 2024), https://www.chinadaily.com.cn/a/202404/02/WS660bf792a31082fc043c0108.html.

> 'Recently the US is tending to impose deals and threats even on its allies, this is true not only with Nato countries but also now with Japan. I question whether that is really a fair approach. It is extremely important for the Japanese government to discuss these matters sincerely, earnestly, and logically.'
>
> There is a simple reason. Nippon Steel has the misfortune of choosing an election year to make the deal. Pennsylvania is a swing state. It went to Trump in 2016 but to Biden in 2020. US Steel is headquartered in the state and its powerful United Steelworkers union has rejected the US$14 billion deal.
>
> Notice the dollar sign in the extremely generous offer, it's almost double the company's market cap. Actually, it was more than double because US Steel's share prices, long in the doldrums, only shot up after the Japanese offer was made last year.
>
> Incidentally, the latest presidential debate was held in Pennsylvania, so it would have been suicidal for Trump and Harris to have said they supported the deal.
>
> These days, when Washington says 'national security', it just means to friends and foes alike that we do whatever we want and you can shut up.[23]

Finally, a September op-ed in the China Daily titled "Biden's nixing of steel deal reveals little trust in ally" noted that "even though Japan is a close ally of the US, that it has still not won the trust of US policymakers is clear to all."[24]

---

[23] Alex Lo, *Cooperative Tokyo finds America a demanding, but ungrateful boss*, SOUTH CHINA MORNING POST (Sep. 13, 2024), https://www.scmp.com/opinion/article/3278400/cooperative-tokyo-finds-america-demanding-ungrateful-boss.

[24] Li Yang, *Biden's nixing of steel deal reveals little trust in ally*, CHINA DAILY (Sept. 6, 2024), https://www.chinadaily.com.cn/a/202409/06/WS66da3c67a3103711928a65b5.html.

*Business Confidential – Pursuant to 50 U.S.C. Section 4565*
*Protected from Disclosure Under 5 U.S.C. Section 552*

Allegheny Conference
on Community Development

**Nippon Steel Deal – Statement from Allegheny Conference CEO Stefani Pashman on behalf of the Board of Directors**

The Pittsburgh region's history as a global leader in the steel industry is well known. In 1980, there were 90,000 steel jobs. Today there are around 16,000. We have celebrated our recovery from a reliance on the steel industry, but at the same time, recent trends show that we are losing approximately 13,000 jobs a year. We should embrace projects that create high-paying jobs, attract capital investment, and fuel population growth.

The region, while undergoing a transformation, relies on all jobs across all industries, and what remains of our steel legacy are outdated plants that lack the needed investment to compete globally. While we recognize that legacy, we are not resting on it – we are building on what's next in energy and manufacturing and that's why investments like the Nippon Steel proposal are critical and well suited for the future of southwestern Pennsylvania.

Given this, we are hard pressed to understand how elected officials in Washington can abandon this region and threaten the Nippon/U.S. Steel deal. Are they going to replace the jobs lost? No. Are they going to provide the capital necessary to modernize our plants? No. Nippon has made commitments that will retain and expand environmentally sustainable steelmaking in western Pennsylvania – a future-focused investment that we need. Simply put, we are concerned there is no Plan B that proposes similar or greater value to our region.

We appreciate the honest broker role that Gov. Shapiro has played throughout his engagement in this process, yet his work alone isn't enough; we need federal policymakers to get this done.

Pittsburgh, let's raise our voice and not allow politics to decide our fate.

###



Allegheny Conference
on Community Development

# 2024 BOARD OF DIRECTORS

## OFFICERS

**CHAIR** David L. Holmberg
**VICE CHAIR** Timothy M. Knavish
**TREASURER** Eric Boughner
**SECRETARY** Rebekah Byers Kehowski
**IMMEDIATE PAST CHAIR** Laura Shapira Karet
**CHIEF EXECUTIVE OFFICER** Stefani Pashman

## DIRECTORS

Will Allen, Magarac Ventures
Bill Artman, Giant Eagle, Inc.
Leroy M. Ball, Jr., Koppers Inc.
Steve C. Blanco, MSA The Safety Company
Eric Boughner, BNY Mellon
Jeff Broadhurst, Eat'n Park Hospitality Group, Inc.
Quintin B. Bullock, Community College of Allegheny County
Helen Hanna Casey, Howard Hanna Real Estate Services
Leslie C. Davis, UPMC
Chris DeCardy, The Heinz Endowments
Vincent J. Delie, Jr., F.N.B. Corporation
Thomas DeLuca, ATI
Nicholas J. DeIuliis, CNX Resources Corporation
William S. Demchak, The PNC Financial Services Group, Inc.
J. Christopher Donahue, Federated Hermes Inc.
John J. Engel, WESCO International, Inc.
Karen Wolk Feinstein, Jewish Healthcare Foundation
Sylvia V. Fields, Eden Hall Foundation
Daniel K. Fitzpatrick, Citizens Mid-Atlantic Region
Patrick Fragman, Westinghouse Electric Company
Joan T. A. Gabel, University of Pittsburgh
Jennifer Giovannitti, Claude Worthington Benedum Foundation
Kenneth G. Gormley, Duquesne University
Lisa Haley, JP Morgan Chase Bank, N.A.
Charles L. Hammel, III, PITT OHIO
Karen Hanlon, Highmark Health
Samir Hitti, Covestro LLC
Diane P. Holder, UPMC Health Plan
David L. Holmberg, Highmark Health
Michael Huwar, Peoples Natural Gas
Farnam Jahanian, Carnegie Mellon University
John F. Kasel, L. B. Foster Company
Rebekah Byers Kehowski, Jones Day Pittsburgh
Ronald C. Keating, Excelitas Technologies Corp
Mark R. Kempic, Columbia Gas
Timothy M. Knavish, PPG
David J. Malone, Gateway Financial Group, Inc.
James J. McQuade, Dollar Bank, FSB
David Morehouse, Pittsburgh Steelers LLC
Sam Reiman, Richard King Mellon Foundation
David K. Roger, Hillman Family Foundations
Casey S. Ryan, Reed Smith LLP
Bryan Salesky, Stack AV
Rafael Otoni Santana, Wabtec Corporation
Steve R. Schott, Calgon Carbon Corporation
Lisa M. Schroeder, The Pittsburgh Foundation
James R. Segerdahl, K&L Gates LLP
Susan Baker Shipley, The Huntington National Bank
William E. Strickland, Jr., Manchester Bidwell Corporation
Jaime S. Tuite, Buchanan Ingersoll & Rooney PC
Kevin Walker, Duquesne Light Company
Teresa Whalen, CytoAgent, Inc.
Travis E. Williams, Pittsburgh Pirates
Lisa Witte, Thermo Fisher Scientific

## EX OFFICIO VOTING MEMBERS

Laura Shapira Karet, Who Brew LLC
Stefani Pashman, Allegheny Conference on Community Development

## MEMBERS EMERITI

Charles E. Bunch
Richard J. Harshman
James E. Lee
Martin G. McGuinn
Morgan K. O'Brien
Thomas H. O'Brien
C.J. Queenan, Jr.
James E. Rohr
Richard P. Simmons
John P. Surma



CITY OF GARY
OFFICE OF THE MAYOR
EDDIE D. MELTON
401 Broadway, Suite 203
Gary, Indiana 46402
(219) 881-1302 | fax (219) 881-1337
mayorsoffice@gary.gov
www.gary.gov

December 17, 2024

Hon. President Joseph R. Biden
The White House
1600 Pennsylvania Ave
Washington D.C., 20500

Re: Pending Merger of NIPPON and US Steel and its impact on American steel cities

Hon. President Joseph R. Biden:

Today, as federal officials on the Committee on Foreign Investment in the United States (CIFUS) consider the proposed sale of US Steel to Nippon Steel, we are writing to implore you to consider the people who have dedicated their lives to steelmaking, and the negative impact that rejecting this opportunity will have on their local communities.

Japan has successfully manufactured automobiles in the United States for decades and today employs approximately one million workers. Many Japanese-owned US manufacturing facilities are union shops which provide good middle-class wages to thousands of American families. Nippon Steel itself employs approximately 4,000 American workers, of which over 600 are USW members.

The reality is that Japan is a key defense and security partner to the United States. This relationship was reaffirmed this spring, when the White House issued its joint statement with Japanese Prime Minister Fumio KISHIDA declaring that the United States and Japan were Global Partners for the Future.

The communities of North Braddock Borough, Pennsylvania, Birmingham, Alabama, and Gary, Indiana, have suffered from US Steel's history of disinvestment, lack of compliance with environmental regulations, and broken promises. These municipalities have continued to host US Steel's ongoing operations and provide essential city services despite failures of US Steel to be a good corporate partner.

In Birmingham, Alabama, Mayor Randall Woodfin* has expressed his concern for the large number of brownfields that US Steel has left un-remediated in his city. In Gary, Indiana, Mayor Eddie Melton has expressed his concern about the severe divestment in city infrastructure and air quality. In many of these "rust belt" cities, US Steel's lack of support has repeatedly posed barriers to revitalization and redevelopment. Nippon has committed to come into compliance with state and federal environmental regulations and to cooperate with all cities on economic development. If this deal is not approved, we also anticipate that there will be adverse economic impacts in other steelmaking communities in the United States. The signatures of their representative mayors are included in this letter.

US Steel has stated that without the contemplated merger with Nippon Steel, it lacks the capital necessary to modernize or maintain all its current facilities. If this merger fails, US Steel has said it will have no choice but to revert to its strategy of "better, not bigger" which will result in the closure of facilities and will put steelworkers out of work in short order. The closest competitive bid that US Steel received was for half of Nippon's $14.9 billion bid, and that bid did not come with commitments to maintain all current facilities, maintain current union staffing levels or to invest in modernizing and "future-proofing" US Steel's manufacturing facilities.

In our view, the proposed Nippon deal represents an unparalleled opportunity to strengthen the competitiveness of the American steel industry and, in turn, the resiliency and competitiveness of so many critical U.S. manufacturing sectors that depend on the availability of high-quality, competitive domestic steel. These sectors provide critical job and economic security for steelworkers, their families and the surrounding communities.

As mayors, we have met with Vice Chairman Mr. Takahiro Mori from Nippon to discuss the history and future of US Steel in our respective communities. In our discussions, Nippon has agreed in writing to maintain the current union employment levels and honor the collective bargaining agreement with the United Steelworkers union. Additionally, Mr. Mori has laid out Nippon Steel's commitments to invest in US Steel facilities, which include extending the operational lifespan of their critical union-represented facilities. In each of these meetings, we were able to discuss Nippon Steel's proposed investments in our communities and how our citizens could benefit. We strongly believe that Nippon Steel's planned investments will be transformative and help secure a brighter future for our local economies.

Mr. President, before you commit to block the deal, the Biden-Harris Administration should recognize that it is rejecting the only solution on the table that will stabilize US Steel and grow the communities that have labored for generations to build the American steel industry. Nippon understands our history and has met this challenge head on. As president, you have the opportunity to help us turn a new page for our cities. Please approve this deal.

EDDIE D. MELTON · CITY OF GARY · OFFICE OF THE MAYOR
401 Broadway | Suite 203 | Gary, Indiana 46402 | (219) 881-1302 | fax (219) 881-1337
mayorsoffice@gary.gov · www.gary.gov



CITY OF GARY
OFFICE OF THE MAYOR
EDDIE D. MELTON
401 Broadway, Suite 203
Gary, Indiana 46402
(219) 881-1302 | fax (219) 881-1337
mayorsoffice@gary.gov
www.gary.gov

Sincerely,

Eddie D. Melton
Mayor
City of Gary, IN

Delia Lennon-Winstead
Mayor
Braddock, PA

Cletus Lee
Mayor
North Braddock, PA

Mayor Richard Lattanzi
Mayor
Clairton, PA

Chris Kelly
Mayor
West Mifflin Borough, PA

Rob Falce
Mayor
Munhall Borough, PA

Randall Woodfin*
Mayor
Birmingham, AL

*Although we were not able to secure Mayor Randall Woodfin's signature before sending this letter, he has confirmed his firm support of this letter and the Nippon deal.



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

December 23, 2024

Ama Adams
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006

Mark Plotkin
David Fagan
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001

Re: CFIUS Case 24-154: Nippon Steel Corporation (Japan)/United States Steel Corporation

Dear Ms. Adams, Mr. Plotkin, and Mr. Fagan:

I am writing on behalf of the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee") regarding CFIUS Case 24-154, involving the proposed indirect acquisition by Nippon Steel Corporation ("Nippon Steel"), a public Japanese corporation with its principal place of business in Tokyo, Japan, of 100 percent of United States Steel Corporation ("U.S. Steel" and together with Nippon Steel the "Parties"), a public Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania (the "Transaction").

In a letter dated August 31, 2024 (the "August 31 Letter") and again in a letter dated December 14, 2024 (the "December 14 Letter"), CFIUS representatives conveyed information about identified risks to the national security of the United States arising from the Transaction. Such risks, to the extent they can be summarized at an unclassified level, relate to potential decisions and actions by Nippon Steel that could lead to a reduction in domestic steel production capacity. The letters informed you that, in reaching this conclusion, the Committee relied upon analysis that assessed both classified and unclassified information, including U.S. Department of Commerce ("Commerce") analysis that considered that a robust commercial steel market is essential for national security, as the market-oriented U.S. steel industry requires steady revenue from sustained commercial production to meet critical industry steel requirements.[1]

Following the December 14 Letter, the Parties sent CFIUS a response dated December 17, 2024 (the "December 17 Letter"), in which the Parties updated one fact and challenged many of the assessments in the December 14 Letter. The Committee appreciates the Parties' additional submissions and has considered them. Enclosure 1 to the December 17 Letter states that, as a factual matter, the assertion in the December 14 Letter that "as of October 2024, U.S. Steel maintains $5.2 billion in liquidity available to continue investing in its furnaces and production lines" is incorrect, and that the current figure is $4.1 billion, of which $2.3 billion are available

[1] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018.

under credit facilities and revolving lines of credit. The Committee appreciates the Parties' update and has considered the potential ramifications of this reduction in liquidity for the Committee's assessment that U.S. Steel maintains liquidity available to invest in its furnaces and production lines.

With respect to the December 17 Letter's assertions regarding the authorities available under the antidumping (AD) law and the countervailing duty (CVD) law, CFIUS and the Parties agree that trade measures such as the AD/CVD laws are critical to the commercial health of the domestic steel industry, and that existing AD/CVD orders and other protections help to remedy injurious dumping and subsidization and have thus supported the commercial viability of that industry. As the December 17 Letter notes, such trade measures do "not provide authority to respond to a decision to decrease or eliminate U.S. production of certain steel products." The December 14 Letter addressed the Parties' arguments that other firms and labor unions can also initiate or defend trade actions and that Commerce has the statutory authority to self-initiate certain actions.

The December 17 Letter refers to authorities available under Section 232 of the Trade Expansion Act of 1962, and the Defense Production Act (DPA). Those authorities and their limitations were addressed in the December 14 Letter. The December 14 Letter describes the Committee's assessment of why Section 232 would not address the risk it has identified as arising from the Transaction. With respect to the DPA, because the U.S. Government does not directly procure the kind of steel produced by U.S. Steel, the "appropriate actions" listed under 50 U.S.C. 4517(b) would not address the identified risk. Furthermore, steel is not a "critical component" or "critical technology" as those terms are defined in 50 U.S.C. 4552(1) and (3). As the December 17 Letter states, however, potential reduced output by U.S. Steel could lead to supply shortages and delays that could affect industries critical to national security under Section 721(f)(6). As to Title III of the DPA, CFIUS does not believe it would be an adequate and appropriate authority to address the national security risks identified.

The December 17 Letter also reiterated the Parties' request to mitigate the national security risk with a national security agreement ("NSA"), which the Parties have drafted, revised, and submitted to the Committee multiple times, most recently on December 2, 2024 (the "December 2 NSA"). As acknowledged in the December 14 Letter, by statute, an NSA may not be concluded with respect to a covered transaction unless the Committee determines that it "resolves the national security concerns posed by the transaction." The Committee has not reached consensus on such a determination.

In the December 14 Letter you were informed that the Committee had not yet reached consensus on whether the mitigation measures proposed by the Parties would be effective, allow for compliance in an appropriately verifiable way, and enable effective monitoring and enforcement, or whether the measures would resolve the risk to U.S. national security arising from the Transaction. As of today, the Committee remains unable to reach such consensus.

Since the December 14 Letter, the Parties have shared further written submissions and supplemental information with the Committee. Such further submissions include, *inter alia*, (i) the Allegheny Conference on Community Development statement; (ii) the December 13 Congressional Black Caucus letter to President Biden; (iii) the December 15 Regional

Commissioners Letter; (iv) the December 17 Mayors Letter to President Biden; (v) media commentary about the Transaction shared with the Committee on December 18; (vi) the statement from Mayors Lee, Melton, and Kelly regarding the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"); (vii) the Hudson Institute analysis; (viii) the updated commitments Nippon Steel proposed to the USW, shared with the Committee on December 20; and (ix) the transcript of a local radio program.

On December 20, 2024, executives from the Parties met by telephone with CFIUS Deputy Secretaries. On December 22, U.S. Steel's Chief Executive Officer wrote to the Deputy Secretaries of the Committee.

The December 14 Letter also recalled that, by statute, the President may ultimately make a decision about the identified risks and whether or not they require suspension or prohibition of the Transaction. As Section 721(d) of the DPA provides, the President may take such action for such time as the President considers appropriate to suspend or prohibit a covered transaction that threatens to impair the national security. The President must announce a decision on whether or not to take action no later than 15 days after the earlier of the date on which the investigation is completed or the date on which the Committee otherwise refers the transaction to the President.

The Committee's investigation of the Transaction concludes today. Based upon the foregoing, CFIUS is referring this matter to the President for decision.

CFIUS appreciates the Parties' continued cooperation, and representatives of CFIUS are available to discuss this matter further, should Parties seek to do so. If you have any questions regarding this letter or wish to update CFIUS regarding the matters discussed herein, please contact the case officer.

Sincerely,

Andrew Fair

Andrew Fair
Acting Assistant Secretary for
Investment Security
Department of the Treasury

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

/s/ Andrew J. Pincus
Andrew J. Pincus