ORAL ARGUMENT NOT YET SCHEDULED

No. 25-1004

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES STEEL CORPORATION; NIPPON STEEL NORTH
AMERICA, INC.; and NIPPON STEEL CORPORATION,

*Petitioners*,

v.

THE COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES,
ET AL.,

*Respondents*.

---

**BRIEF OF FORMER NATIONAL SECURITY AND LAW ENFORCEMENT
OFFICIALS AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS**

---

LIGHTLINE LAW AND POLICY
Daniel J. Rosenthal, Esq.
10029 Carmelita Drive
Potomac, MD 20854

WILK AUSLANDER LLP
Scott Watnik, Esq.
T. Jackson Brake, Esq.
825 Eighth Avenue, Suite 2900
New York, NY 10019

*Counsel for Amici Curiae*

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

**Page(s)**

INTEREST OF *AMICI CURIAE* ................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................5

ARGUMENT ..............................................................................................7

  I.  THE PRESIDENT'S DECISION VIOLATES THE STATUTORY
     REQUIREMENTS OF CFIUS .......................................................7

      A.  The Record Demonstrates Departure from Required
         National Security Analysis ...............................................10

      B.  The President's Decision Lacks Any Valid National Security
         Justification Required by Statute.......................................16

      C.  The Decision's Departure from Statutory Requirements
         Threatens CFIUS's Core Function .....................................22

  II.  THE PRESIDENT'S DECISION UNDERMINES RATHER
     THAN PROTECTS NATIONAL SECURITY .............................26

      A.  The Decision Damages Critical Strategic Alliances to
         America's Detriment ..........................................................26

      B.  The Decision Encourages Retaliatory Actions by Foreign
         Governments Targeting U.S. Investments Overseas..........27

      C.  The Decision Weakens America's Strategic Position Against
         China....................................................................................28

CONCLUSION ........................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Dep't of Envtl. Conservation v. EPA*,
  540 U.S. 461 (2004) ...........................................................................9

*Ralls Corp. v. CFIUS*,
  758 F.3d 296 (D.C. Cir. 2014) ........................................................12

*United States Steel Corp. v. Comm. on Foreign Inv. in the U.S.*,
  No. 25-1004 (D.C. Cir. Feb. 3, 2025)......................................... passim

**Statutes**

50 U.S.C. § 4565(d)(4)......................................................................10

50 U.S.C. § 4565(l)(4)(A)....................................................................9

50 U.S.C. § 4565(b) ..................................................................... 5, 6, 8

50 U.S.C. § 4565(d) ..........................................................................16

50 U.S.C. § 4565(f)(1-3)......................................................................8

91 C.J.S. United States § 48 (2010)....................................................26

**Rules**

Fed. R. App. P. 29(a) ...........................................................................1

**Regulations**

Executive Order No. 14017 ........................................................... 26, 29

*Publication of a Report on the Effect of Imports of Steel on the National Security*,
  85 Fed. Reg. 40202 (July 6, 2020) ...................................................18

**<u>Other Authorities</u>**

Foreign Investment and National Security Act of 2006, S. 3549, 109th Cong. (2006)....................................................................................................23

Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), Title XVII, P.L. 115-232 ................................................................................8

CFIUS Reform: H.R.5337 .......................................................... 13, 23, 27

# INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* respectfully submit this brief in support of United States Steel Corporation's ("U.S. Steel"), Nippon Steel Corporation's and Nippon Steel North America, Inc's (together with Nippon Steel Corporation, "Nippon Steel") (collectively, "Petitioners") petition to vacate and enjoin President Biden's order blocking the merger between U.S. Steel and Nippon Steel.

*Amici* collectively represent over two hundred years of combined experience in national security, foreign policy, economic policy, and geopolitical affairs, serving in senior positions across the Departments of Defense, Commerce, Homeland Security, and Justice, as well as the intelligence community, the National Security Council, the National Economic Council, and the Council of Economic Advisers. As senior government leaders spanning multiple presidential administrations of both parties, *amici* helped shape U.S. foreign and economic policy and national security and economic strategy at the highest levels, engaging directly with world leaders on complex geopolitical challenges and critical diplomatic negotiations.

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties. Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici* and their counsel have contributed money for this brief.

*Amici* also include individuals who are expert in reviewing foreign investments of U.S. businesses by virtue of their work on hundreds of matters before the Committee on Foreign Investment in the United States (CFIUS). This experience spans senior government service across many of the agencies that comprise CFIUS, as well as subsequent private sector roles advising American businesses and multi-national companies on proposed mergers, acquisitions, and investments.

This unique combination of public and private sector experience provides *amici* as a group with a comprehensive understanding of both the government's national security interests – including the broader geopolitical context in which these issues arise – and the importance to the economy of fostering the investment and innovation associated with foreign direct investment, which depends on the business community's confidence in, and reliance on predictability and fairness in, the CFIUS process.

*Amici* are:

Bruce Andrews, former Deputy Secretary of Commerce.

RJ Arneson, former CFIUS Team Lead, National Security Agency.

Stewart Baker, former Member of the Homeland Security Advisory Council; Former Assistant Secretary for Policy, Department of Homeland Security; former General Counsel, National Security Agency.

Joel Brenner, former head of Counterintelligence Policy, Office of the Director of National Intelligence; former inspector general of the National Security Agency; former senior counsel to that agency.

Jason Furman, former Chairman of the Council of Economic Advisers and Former Principal Deputy Director of the National Economic Council and Assistant to the President.

Admiral and Ambassador Harry Harris, USN, (Ret.), former U.S. Ambassador to South Korea; former Commander, U.S. Indo-Pacific Command; former Commander, U.S. Pacific Fleet.

Admiral Timothy J. Keating, USN (Ret.), former Commander, United States Northern Command; former Commander, North American Aerospace Defense Command; former Commander, United States Pacific Command.

Kenneth Krieg, former Under Secretary of Defense for Acquisition, Technology and Logistics, Director for Program Analysis and Evaluation, Executive Secretary of the Senior Executive Council, Department of Defense.

Brett Lambert, former Deputy Assistant Secretary of Defense for Manufacturing and Industrial Base Policy, Department of Defense.

Ellen Lord, former Under Secretary of Defense for Acquisition and Sustainment.

Rear Admiral Mark Montgomery, USN (Ret.), former Director of Operations (J-3) at U.S. Indo-Pacific Command, and Executive Director of the Cyberspace Solarium Commission.

Benjamin Richardson, former head of CFIUS, Department of Defense; former Director of Critical Technology Protection, Department of Defense; former Portfolio Director, Defense Innovation Unit.

DJ Rosenthal, former Director for Counterterrorism, National Security Council; former Senior Counsel to the Assistant Attorney General, National Security Division, U.S. Department of Justice; former Senior Legal Counsel, Office of the Director of National Intelligence.

Dov Zakheim, former Under Secretary of Defense (Comptroller) and Chief Financial Officer, Department of Defense; former Deputy Under Secretary of Defense (Planning and Resources).

## INTRODUCTION AND SUMMARY OF ARGUMENT

For nearly fifty years, since the establishment of CFIUS in 1975 through Executive Order and its subsequent codification by Congress, the long-standing policy of the United States has supported two broad goals. On the one hand, it seeks to foster international investment in American businesses, recognizing that foreign capital supports American ingenuity, fosters continued American global leadership across all sectors and industries, and serves national geopolitical interests by placing the United States (including American businesses and innovation) at the forefront of the global marketplace and preserving its dominant role on the world stage.

At the same time, there are limited instances in which foreign direct investment in American businesses can create national security harms. This occurs, for example, when such investments result in foreign control or influence of businesses that hold or have access to military or intelligence expertise or secrets, or large volumes of personally identifiable information on American citizens. First through Executive Order and now pursuant to statute, CFIUS is charged with reviewing proposed foreign investments in U.S. businesses to determine if the transaction will likely cause national security harms.[2] Where CFIUS perceives a

---

[2] 50 U.S.C. § 4565(b).

potential national security harm, the statute authorizes CFIUS to explore whether there are ways to mitigate those harms.[3]

Although the statute authorizes the President to prohibit transactions, it prevents him from doing so unless he concludes that the transaction will "threaten to impair the national security," and that no other provisions of law "provide adequate and appropriate authority for the President to protect the national security in the matter before the President."[4]

*Amici* file this brief because they believe that President Biden's recent decision to block the proposed acquisition by Nippon Steel of U.S. Steel violates the law and is inconsistent with the purpose of CFIUS and our national security.

**First**, the factual record shows that President Biden and his Administration violated statutory requirements by departing from the required national security analysis, and ultimately by blocking the transaction without a valid national security basis for doing so. Indeed, during their decades of experience both in government and the private sector, *amici* have never encountered a case in which the President blocked a transaction on such transparently inadequate grounds and – because the outcome had been prejudged – the agencies chiefly responsible for

---

[3] *Id*. at (l).
[4] *Id.*

national security failed to work in good faith with the parties to seek to address purported national security concerns.

**Second,** President Biden's decision undermines, rather than protects, U.S. national security by damaging our alliances, encouraging retaliatory action by Japan, one of our closest allies, and other nations with respect to U.S. investments worldwide, and weakening U.S. geopolitical and economic interests with respect to China.

## ARGUMENT

### I.    THE PRESIDENT'S DECISION VIOLATES THE STATUTORY REQUIREMENTS OF CFIUS

President Gerald Ford, by Executive Order in 1975, established a process for national security reviews of proposed inbound foreign investment to foster international investment consistent with the protection of the national security. Later codified by statute in the Defense Production Act, CFIUS currently comprises national security experts from the Departments of Treasury, Justice, Commerce, Homeland Security, State, Defense, and Energy, as well as the U.S. Trade Representative and the Director of the White House Office of Science and Technology Policy. Other departments and agencies of the Executive Branch,

including the Director of National Intelligence, regularly provide input to or participate in meetings or other proceedings of CFIUS.[5]

CFIUS's mandate is to review certain transactions – commonly those that would confer foreign control of a U.S. business – to "determine the effects of the transaction on the national security of the United States."[6] Among the factors that the statute directs both CFIUS and the President to consider are domestic production capacity for national defense needs, the ability of U.S. industries to meet defense requirements, and how foreign control of domestic industries impacts national security capabilities.[7]

The statute mandates an order of progression to CFIUS reviews, authorizing the President to suspend or prohibit a transaction only *after* CFIUS has completed a national security review. Specifically, the statute contemplates that CFIUS conduct a "risk-based analysis" of the transaction to include "an assessment of the

---

[5] More specifically, in 1988 Congress codified and expanded the Executive Branch's authorities by passing the Exon-Florio amendment to the Defense Production Act, which granted the President carefully circumscribed authority to block transactions that threaten to impair U.S. national security. In 2007, Congress established statutory authority of CFIUS via the Foreign Investment and National Security Act of 2007 (FINSA). In 2018, prompted by concerns about Chinese investments in the United States, Congress passed the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), Title XVII, P.L. 115-232, through which, among other things, Congress expanded CFIUS's powers to review a broader range of transactions.

[6] 50 U.S.C. § 4565(b).

[7] 50 U.S.C. § 4565(f)(1-3).

threat, vulnerabilities, and consequences to national security related to the transaction."[8] The statute authorizes CFIUS to "complete the action of the Committee with respect to the transaction" (to include its "risk-based analysis") "and refer the transaction to the President for action" if the parties cannot or will not mitigate the Committee's national security concerns. The President is then authorized to "suspend or prohibit" the transaction.[9]

In its totality, Section 721 of the Defense Production Act establishes a series of procedural steps that the Executive Branch must follow, as well as substantive findings that the President must make prior to blocking a transaction. In light of the statute's overall structure and its focus on process, *amici* do not believe that the President has the statutory authority to block a transaction without having followed the procedural steps that the statute specifically requires. Concluding otherwise would render the Defense Production Act's detailed procedural requirements mere surplusage, violating the fundamental canon that statutes should be construed to give effect to every provision Congress has enacted,[10] and undercut the carefully

---

[8] 50 U.S.C. § 4565(l)(4)(A).

[9] *Id.* at (d)(1).

[10] *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004) ("It is, moreover, a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant.") (internal quotations omitted).

crafted statutory scheme Congress designed to balance national security concerns with the free flow of commerce.[11]

### A. The Record Demonstrates Departure from Required National Security Analysis

Although courts appropriately grant significant deference to presidential national security determinations, as discussed *supra*, the Defense Production Act establishes specific requirements that must be met before the President can block a covered transaction. The record here shows multiple departures from these statutory requirements.

Based on the public record, *amici* believe, and respectfully urge this court to conclude that President Biden's decision to block the proposed acquisition of U.S. Steel by Nippon Steel departed substantially from these important statutory requirements. As shown above, those statutory requirements limit the President's authority to block transactions to instances in which he makes specific national security-based findings.[12] To give effect to subsections (d)(4) and (5) and the broader statutory scheme that Congress established in Section 721 of the Defense Production Act as a whole, the court should not allow the President's mere conclusory recitation of certain words (*i.e.*, that he has made certain findings)

---

[11] Petition for Review at 22-25, *United States Steel Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 25-1004 (D.C. Cir. Jan. 6, 2025).

[12] 50 U.S.C. § 4565(d)(4).

substitute for the powerful evidence that demonstrates that those findings were in reality just the final step in a pretextual process that bore no resemblance to that which Congress mandated by law.

Specifically, *amici* are troubled by several aspects of the record that suggest a failure to engage with the mandated national security analysis:

First, the timing and sequence of events suggest the President's decision preceded, rather than followed, the mandated CFIUS review. The public record is unequivocally clear that President Biden was determined to block the transaction prior to receiving input from CFIUS, rather than afterwards as required by the statue.[13] On March 14, 2024, long before CFIUS had completed its review, President Biden issued an official statement that U.S. Steel must "remain an American steel company that is domestically owned and operated."[14] In subsequent months and during CFIUS's continued review of the transaction, President Biden made a series of additional statements reaffirming his commitment to this decision.[15]

---

[13] Trevor Hunnicutt & Alexandra Alper, *Biden says U.S. Steel must stay domestically owned, a major blow to Nippon Steel*, Reuters (Mar. 16, 2024), https://www.reuters.com/markets/us/biden-say-us-steel-must-remain-domestically-owned-operated-2024-03-14/.

[14] The White House, Statement from President Biden on US Steel (Mar. 14, 2024), https://www.govinfo.gov/content/pkg/DCPD-202400197/pdf/DCPD-202400197.pdf.

[15] Brief for the Petitioners at 18, *United States Steel Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025).

Second, interactions between the parties and CFIUS strongly suggest that CFIUS' efforts to satisfy the parties' due process rights was an empty formality.[16] This includes suspect timing of CFIUS actions that indicate coordination to accommodate political considerations, (*i.e.*, to align with a political rally),[17] including the apparent instruction for CFIUS to be in "listen-only" mode.[18] Having seemingly met every legitimate issue raised by the Committee, including through repeated offers for mitigation, the parties were then frozen out of meaningful participation in a "process" dictated by the White House.[19] Among other things, this included a refusal by CFIUS to engage in the customary give and take between CFIUS and the parties as they work to address government national security concerns through mitigation.[20]

Third, the Administration appears to have consulted with interested third parties about the transaction for reasons unrelated to the government's assessment

---

[16] Petition for Review at 56, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Jan. 6, 2025) (quoting *Ralls Corp. v. CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014)).

[17] Brief for the Petitioners at 59, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025).

[18] *Id.* at 44.

[19] Petition for Review at 56, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Jan. 6, 2025).

[20] Brief for the Petitioners at 22-24, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025).

of potential national security harms.[21] *Amici* recognize that, as a general matter,
political considerations in the broad sense inform many presidential decisions. But
partisan political concerns are not among the statutory factors that CFIUS may
consider, and in *amici's* experience they have never been part of CFIUS
proceedings. Nor is it consistent with the statutory regime, history of CFIUS
proceedings, or sound public policy to allow "competitors' opportunities to
interfere with transactions for reasons that have nothing to do with national
security."[22]

---

[21] Petition for Review at 3-4, *United States Steel Corp.*, No. 25-1004 (D.C. Cir.
Jan. 6, 2025). *See also,* CFIUS Reform: H.R. 5337, The Reform of National
Security Reviews of Foreign Direct Investment Act: Hearing Before the
Subcommittee on Commerce, Trade, and Consumer Protection of the Committee
on Energy and Commerce, 109 Cong. 13 (2006) (Statement of John Castellani).

The concerns raised by Castellani are prescient, as there appear to be
numerous interactions between senior leaders of both the United Steelworkers
Union and Cleveland-Cliffs, Inc. (both of which have their own objectives apart
from national security and the private interests of the two parties to the transaction
who together desired to effectuate this transaction) with President Biden, other
senior administration officials, and the public in an effort to introduce the very
political and economic considerations that CFIUS is supposed to be insulated from.
*See, e.g.,* Brief for the Petitioners at 24-26, 60-61, *United States Steel Corp.*, No.
25-1004 (D.C. Cir. Feb. 3, 2025); Petitioner's Appendix at 170, *United States Steel
Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025)
(noting that "CFIUS scrupulously seeks to avoid becoming involved in business
disputes between parties").

[22] CFIUS Reform: H.R. 5337, The Reform of National Security Reviews of Foreign
Direct Investment Act: Hearing Before the Subcommittee on Commerce, Trade,
and Consumer Protection of the Committee on Energy and Commerce, 109 Cong.
13 (2006) (Statement of John Castellani).

The introduction of politics into the process, and the public statements by President Biden, undercut any assertion that the statutory framework was followed. CFIUS was specifically structured by Congress to provide an evidence-based assessment of security threats; the record here shows no meaningful engagement with that statutory framework.

These departures from the required national security analysis are particularly significant given that standard CFIUS practice, as established over decades, involves careful evaluation of potential national security threats and consideration of whether any national security concerns can be mitigated.[23] Here, despite Nippon Steel's willingness to make substantial commitments regarding future U.S. operations and management structure,[24] the record reflects that neither CFIUS nor the President identified any national security concern that could not be mitigated. So far as *amici* know and believe, there are none. CFIUS likewise failed to

---

[23] Petitioner's Appendix at 155, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025) (noting that "the conduct of CFIUS's review of Nippon Steel's proposed acquisition of U.S. Steel is so far outside the standards of my experience with the mandatory or customary process that these deviations appear to have been motivated by interests other than national security").

[24] Daniel Bob, *Blocking the Nippon-U.S. Steel deal risked national security*, Pittsburgh Post-Gazette (Jan. 8, 2025), https://www.post-gazette.com/opinion/guest-columns/2025/01/08/nippon-us-steel-deal-biden-trump-national-security/stories/202501080010.

meaningfully, in a good faith effort, seek to mitigate any national security concerns.[25]

These departures from statutory and long-followed process are particularly troubling given the timing and context of the President's actions. President Biden's decision to block the deal was announced during the Presidential election cycle when Pennsylvania was very much in play and the importance of the American steel industry to Pennsylvania voters was well known. Indeed, the record suggests the President's decision was made in close consultation with the President of the United Steelworkers and the Chief Executive Officer of Cleveland-Cliffs Inc.[26]

---

[25] Brief for the Petitioners at 21-24, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025); Petitioner's Appendix at 177-78, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025) (noting the substantial departure from practice for CFIUS to refuse to engage with parties in an effort to determine whether any risk mitigation measures were adequate and appropriate in light of national security concerns).

[26] For instance, Cleveland-Cliffs Inc. initiated lobbying efforts in the fourth quarter of 2023 with the U.S. Senate and House of Representatives regarding its interest in acquiring U.S. Steel. Cleveland-Cliffs Inc Lobbying Report (LD-2) Q4/2023, Clerk of the House of Representatives & Secretary of the Senate. Beginning in the first quarter of 2024 and continuing throughout the remainder of 2024, those lobbying efforts expanded to include direct engagement with the Department of Commerce, National Economic Council, and the White House, and shifted from a focus on Cleveland-Cliffs Inc.'s bid to acquire U.S. Steel to "concerns regarding the trade enforcement, worker protection and national security implications of the proposed acquisition of United States Steel Corporation by Nippon Steel Corporation." Cleveland-Cliffs Inc Lobbying Report (LD-2) Q1/2004 - Q4/2024, Clerk of the House of Representatives & Secretary of the Senate.

This represents an unprecedented and troubling departure from law and consistent historical practice.[27] If President Biden's block of this transaction is allowed to stand, it threatens to transform CFIUS from a rigorous national security review into a discretionary political tool – allowing future Presidents to block any transaction by merely invoking "national security" while bypassing Congress' carefully designed process.

### B. The President's Decision Lacks Any Valid National Security Justification Required by Statute

The President may prohibit a transaction "only if" he concludes that: (A) "there is credible evidence that leads the President to believe that a foreign person that would acquire an interest in a United States business or its assets as a result of the covered transaction might take action that threatens to impair the national security," and (B) other provisions of law "do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President."[28] The step of prohibiting a transaction is extraordinary and in over fifty years, prior to President Biden's block of Nippon Steel's acquisition of U.S. Steel, has been exercised exactly eight times.[29]

---

[27] Petitioner's Appendix at 167-68, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025).

[28] 50 U.S.C. § 4565(d).

[29] To be sure, there are instances when parties withdraw their applications after CFIUS informs them that it is inclined to recommend that the President block the transactions. But in the experience of *amici*, such occasions are not common.

*Amici* have collectively been intimately involved in hundreds of CFIUS matters. Although there is sometimes room for reasonable disagreement as to the relative national security harms in particular transactions, *amici* fail to see any plausible national security rationale to justify President Biden's decision to block this transaction, let alone to have done so prior to a full CFIUS review and recommendation. Nippon Steel is an established multinational steel corporation from Japan, a close U.S. ally. Japanese companies have many investments in the United States across even more sensitive sectors – including critical technology, defense manufacturing, and vital infrastructure. Moreover, *amici* understand that the nature of U.S. Steel's business is unrelated to the production of steel for critical national defense purposes[30] and that, in any event, existing steel production capacity in the United States far exceeds any plausible future military requirements.

The record is devoid of credible evidence that this transaction poses a national security threat. U.S. Steel is not the behemoth it once was. As the third-largest steel producer in the United States (24th largest in the world), it produces 15.75 million tons of steel per year, or approximately 12 percent of the nation's

---

[30] *See* Brief for the Petitioners at 29, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025).

total steel production.[31] Nippon Steel, meanwhile, produces approximately 44 million tons per year, making it the fourth-largest steel producer in the world.[32]

The defense industry's consumption of steel only accounts for approximately three percent of the nation's total output.[33] And even then, U.S. Steel does not maintain any defense contracts, and does not produce the steel or steel products that the Department of Defense has identified as strategic and critical.[34]

Thus, even at the current levels of U.S. steel production, the quantity of available steel is not even a major concern in the abstract, since the United States produces far more steel than the defense industry requires. Additionally, considering that the American steel industry operates at less than 75 percent of

---

[31] William Chou and Paul Sracic, *The Real Deal for US Steel: A Comprehensive Analysis of the Nippon Steel-US Steel Purchase*, Hudson Institute (Dec. 19, 2024), https://www.hudson.org/economics/real-deal-us-steel-comprehensive-analysis-nippon-steel-us-steel-purchase-william-chou-paul-sracic.

[32] Jared Whitney, *Trump's 'Art of the Deal' can still save US Steel merger*, Duluth News Tribune (Jan. 13, 2025), https://www.duluthnewstribune.com/opinion/columns/national-view-trumps-art-of-the-deal-can-still-save-us-steel-merger.

[33] Publication of a Report on the Effect of Imports of Steel on the National Security, 85 Fed. Reg. 40202 (July 6, 2020)

[34] Sharon Squassoni, *We're Stealing From Ourselves if We Block This Japanese Deal*, Newsweek (Nov. 4, 2024), https://www.newsweek.com/were-stealing-ourselves-blocking-this-japanese-deal-opinion-1979963.

production capacity, U.S. steel production can be dramatically, and expeditiously, increased should the need arise to address a national security threat.[35]

In the abstract at least, steel is a strategic resource of crucial importance to the national security of the United States. CFIUS determinations, however, are fact specific, not abstract in nature, and *amici* do not believe that the acquisition of U.S. Steel by Nippon Steel creates any current national security concerns.

Moreover, any theoretical concerns could have been addressed through mitigation. Nippon Steel expressed willingness to make substantial commitments to assuage any concerns related to both national security and the economic future of U.S. Steel.[36] For example, Nippon Steel guaranteed a $2.7 billion dollar investment in modernizing U.S. Steel's aging infrastructure, as well as a 10-year minimum production capacity guarantee.[37] Additionally, Nippon Steel has a research and development budget of $500 million, dwarfing U.S. Steel's current budget of $40 million, which it has committed to leverage to support U.S. Steel.[38]

---

[35] William Chou and Paul Sracic, *The Real Deal for US Steel: A Comprehensive Analysis of the Nippon Steel-US Steel Purchase*, Hudson Institute (Dec. 19, 2024), https://www.hudson.org/economics/real-deal-us-steel-comprehensive-analysis-nippon-steel-us-steel-purchase-william-chou-paul-sracic.

[36] Petitioner's Appendix at 194-99, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025).

[37] *Id.* at 195-96, 200.

[38] Paul Sracic and William Chou, *Nippon Steel is the best deal for union steelworkers*, Pittsburgh Post-Gazette (July 3, 2024), https://www.post-gazette.com/opinion/guest-columns/2024/07/03/nippon-steel-us-steel-cleveland-cliffs-usw-united-steel-workers/stories/202407030026.

Nippon Steel made further guarantees regarding the structure of U.S. Steel's management, specifically to address fears related to national security. For instance, Nippon Steel agreed that top executives, as well as a majority of the board of U.S. Steel, would be American citizens.[39] As *amici* understand the record and engagement between CFIUS and the parties, at no point did CFIUS explain why those or other undertakings were insufficient to address potential national security concerns; instead, CFIUS expressed to the parties that it was not authorized to even engage with the parties with respect to potential mitigation measures.[40]

In *amici*'s experience, even when reviewing transactions involving countries of concern and significant national security vulnerabilities, CFIUS will engage with the parties to explore potential mitigation measures. The absence of meaningful engagement here demonstrates that the "process" was hollow because the outcome was already determined.

And of course, it is hard to understand how the President could have concluded that Japanese ownership of U.S. Steel imperils national security given the reality of U.S.-Japanese relations and the urgent importance of Japan to address national security threats in the Asia-Pacific region. President Biden, in fact,

---

[39] Petitioner's Appendix at 197, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Feb. 3, 2025).

[40] Petition for Review at 6-7, *United States Steel Corp.*, No. 25-1004 (D.C. Cir. Jan. 6, 2025).

recognized this long-term mutual alliance between the two nations. For instance, in welcoming the Japanese Prime Minister in April 2024, President Biden declared that "to maintain and strengthen the competitive edge in the area of advanced technologies and to respond appropriately to issues such as economic coercion, non-market policies and practices, and excess capacities and to overcome the vulnerability of the supply chains and to lead a sustainable and inclusive economic growth, we affirmed that the collaboration of Japan and the United States is indispensable."[41]

The President's actions in blocking this transaction are likewise in tension with other recent actions taken by the United States government. Indeed, CFIUS has in the past routinely approved Japanese business purchases of U.S. businesses in critical national security industries, including Toshiba Corporation's 2006 purchase of Westinghouse's nuclear business.[42] Unequivocally, Japan is deeply invested in the continuing strength and vitality of the United States' defense capabilities, and the President's "credible evidence" that Japanese ownership of

---

[41] Remarks by President Biden and Prime Minister Kishida Fumio of Japan in Joint Press Conference (April 10, 2024), https://bidenwhitehouse.archives.gov/briefing-room/speeches-remarks/2024/04/10/remarks-by-president-biden-and-prime-minister-kishida-fumio-of-japan-in-joint-press-conference/.

[42] Editorial Board, *Stop the politics, get the U.S. Steel deal done*, Pittsburgh Business Times (Dec. 19, 2024), https://www.bizjournals.com/pittsburgh/news/2024/12/19/us-steel-nippon-editorial-get-the-deal-done.html.

U.S. Steel poses a national security risk to the United States; *i.e.*, the statutory pre-requisite for blocking the transaction, is nowhere to be seen.

### C. The Decision's Departure from Statutory Requirements Threatens CFIUS's Core Function

Congress carefully designed CFIUS to balance two critical objectives: maintaining an open investment environment while protecting legitimate national security interests. So foundational is this notion of process integrity and political separation that the statute requires strict confidentiality with respect to CFIUS matters. Confidentiality encourages parties to engage with CFIUS to notify it of a transaction and seek to work productively to address potential national security concerns without fear of any adverse commercial consequences or stigma that may result from public awareness of and engagement with ongoing reviews. The Committee itself will not even publicly confirm or deny that a transaction has been notified to CFIUS, a position maintained by former Treasury Secretary Janet Yellen with respect to the transaction at issue in this litigation.[43]

---

[43] U.S. Department of the Treasury: The Committee on Foreign Investment in the United States (CFIUS), https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius (last visited Jan. 30, 2025); Joe Delano, *Treasury Secretary Yellen discusses sale of U.S. Steel to Japanese company*, CBS News (Feb. 13, 2024), https://www.cbsnews.com/pittsburgh/news/us-steel-sale-japanese-company-treasury-secretary-janet-yellen/.

This focus on process integrity is further demonstrated by Congress' careful consideration of oversight mechanisms. Following two high profile CFIUS matters in 2005 and 2006 – the attempted acquisition by China National Offshore Oil Corporation of Unocal, a U.S. oil company, and the attempted acquisition by Dubai Ports World of Peninsular and Oriental Steam Navigation Company – Congress faced pressure to require real-time reporting to Congress on pending CFIUS deals.[44] Ultimately, however, Congress passed a statutory change that only required reporting after transactions were completed; it did so to avoid the risk that real-time reporting would inevitably inject politics into the CFIUS analysis.[45]

In the experience of *amici*, CFIUS has scrupulously adhered to the protocols mandated by statute for its national security analysis, including critical assessments of the intelligence community. Doing so has enabled CFIUS to become an international model for how a nation-state can protect its national security interests

---

[44] Foreign Investment and National Security Act of 2006, S. 3549, 109th Cong. (2006).

[45] *See, e.g.*, The Need for CFIUS to Address Homeland Security Concerns: Hearing Before the Committee on Homeland Security, 110 Cong. 26 (2006) (Statement of Daniella Markheim); CFIUS Reform: H.R. 5337, The Reform of National Security Reviews of Foreign Direct Investment Act: Hearing Before the Subcommittee on Commerce, Trade, and Consumer Protection of the Committee on Energy and Commerce, 109 Cong. 6 (2006) (Statement of Rep. Holtz-Eakin) (noting the "imperative" of "keeping politics out" of the CFIUS process). The post-deal notification worked to avoid "injecting unnecessary political risk and [] severely chill safe foreign investment." Committee on Foreign Investment in the United States (CFIUS), One Year After Dubai Ports World: Hearing Before the Committee on Financial Services, 110 Cong. 2 (2007) (Statement of Rep. Carolyn Maloney).

while continuing to foster capital investments in its businesses. It has enabled CFIUS to remain appropriately focused on reviewing and investigating proposed transactions for national security risks without morphing into a pretextual process to facilitate the inappropriate imposition on private parties of broader political objectives.[46]

The precedent created by President Biden's decision to block the acquisition of U.S. Steel threatens to upend this careful balance. Specifically, the absence of legitimate documented national security concerns in blocking a transaction from a close ally and partner like Japan – which already has substantial investments in more sensitive sectors including defense manufacturing, telecommunications, and nuclear facilities and infrastructure – creates uncertainty about what standards govern CFIUS reviews. Of course, international trade relies on predictability in government approval processes and more fundamentally that such processes will in fact be meaningfully followed, including those undertaken by CFIUS. With the assistance of private counsel, parties can reasonably predict how CFIUS might

---

[46] *See* John Carlin, Assistant Attorney General, Remarks at the 2nd Annual Global Competition Review Conference (June 13, 2014) (CFIUS reviews facilitate "America's longstanding open investment policy, which has proven so beneficial to economic growth and job creation. By focusing solely on potential national security concerns, we maintain that policy while protecting against risk in transactions under CFIUS's purview. CFIUS conducts thorough and rigorous national security reviews of such transactions; and, if the transaction presents a risk, the statute gives us the tools we need to address it. If it doesn't present such a risk, we not only clear the transaction; we welcome it").

view a particular transaction and work proactively to structure their transaction or offer mitigation terms to address any CFIUS concerns.

By contrast, politicization introduces uncertainty, which can chill investors from exploring investments in the United States, encourage third parties to seek to interfere in the CFIUS process, and dissuade American businesses from pursuing foreign capital to save or turbocharge their business.[47] In the long run, use of national security authorities for partisan purposes will be fatal to those authorities. If the past decade in American politics has shown anything, it is the fragility of support for such authorities in the face of partisan suspicion. Congress was therefore wise to insist on a process that excludes such considerations, and it is paramount that Congress' process is followed.

---

[47] *See* Committee on Foreign Investment in the United States (CFIUS), One Year After Dubai Ports World: Hearing Before the Committee on Financial Services, 110 Cong. 2 (2007) (Statement of Rep. Carolyn Maloney) (noting the strong belief of lawmakers in the "benefits of safe foreign investment, jobs in the United States, and greater opportunities for American business abroad" and the need therefore to ensure that "vetting foreign investments must not become so unwieldy or so uncertain that valuable foreign investment is needlessly discouraged, hampering economic growth").

## II.    THE PRESIDENT'S DECISION UNDERMINES RATHER THAN PROTECTS NATIONAL SECURITY

### A. The Decision Damages Critical Strategic Alliances to America's Detriment

President Biden's decision to block this transaction violates his own Executive Order No. 14017. That order, which has the force of law,[48] established that it is the policy of the United States that "close cooperation on resilient supply chains with allies and partners who share our values will foster collective economic and national security and strengthen the capacity to respond to international disasters and emergencies."[49] The United States depends upon cooperation and trade with like-minded allies with shared interests and a common commitment to democratic norms and human rights, such as Japan, to address economic and geopolitical issues and threats.

For instance, Japan houses over 50,000 U.S. troops and extensively relies on the United States to protect its security interest.[50] The State Department approved

---

[48] *See*, *e.g*., 91 C.J.S. United States § 48 (2010) ("An executive order …has the effect of a statute and is a part of the law of the land, and, hence, it is a source of public policy.").

[49] Exec. Order No. 14017, 86 Fed. Reg. 11849 (Feb. 24, 2021).

[50] Gearoid Reidy, *Biden's Steel Move Is No Way to Treat an Ally*, Bloomberg (Jan. 6, 2025), https://www.bloomberg.com/opinion/articles/2025-01-06/biden-s-move-to-block-us-steel-deal-is-no-way-to-treat-japan.

the sale of $3.64 billion in air-to-air missiles to Japan in January 2025,[51] and Japan

buys 97 percent of its imported weapons from the United States.[52]

Blocking this transaction portrays Japan – a nation that has proven itself one

of America's most trusted allies – as a national security threat. Indeed, Japan's

Prime Minister Shigeru Ishiba has expressed serious concerns about the President's

blocking of the transaction, warning that it could discourage future Japanese

investment in the United States.[53]

### B. The Decision Encourages Retaliatory Actions by Foreign Governments Targeting U.S. Investments Overseas

The national security review process undertaken by CFIUS does not operate

in a vacuum; rather, it operates within a broader and interconnected global

marketplace. The politicization of the process encourages retaliatory action by

foreign governments to impose barriers on U.S. investments abroad.[54] Such actions

---

[51] Mitch McConnell, *Nippon Steel Isn't the Enemy*, Wall Street Journal (Jan. 8, 2025), https://www.wsj.com/opinion/nippon-steel-isnt-the-enemy-unions-geostrategy-632b05e2.

[52] Editorial Board, *US Will Pay a Price for Blocking Nippon Steel Deal*, Bloomberg (Sept. 6, 2024), https://www.bloomberg.com/opinion/articles/2024-09-06/us-will-pay-a-price-for-blocking-nippon-steel-deal.

[53] Daniel Bob, *Blocking the Nippon-U.S. Steel deal risked national security*, Pittsburgh Post-Gazette (Jan. 8, 2025), https://www.post-gazette.com/opinion/guest-columns/2025/01/08/nippon-us-steel-deal-biden-trump-national-security/stories/202501080010.

[54] *See, e.g.*, CFIUS Reform: H.R. 5337, The Reform of National Security Reviews of Foreign Direct Investment Act: Hearing Before the Subcommittee on Commerce, Trade, and Consumer Protection of the Committee on Energy and

would reduce the availability of foreign investment opportunities that often serve to promote domestic economic growth and the business interests of corporate America.

### C. The Decision Weakens America's Strategic Position Against China

The President's decision undermines a core national security strategy – to strengthen alliances to counter China's growing economic and strategic influence. The policy of reorganizing the United States' supply chains away from adversaries such as China and toward allies such as Japan is a keystone of United States national security policy, predicated on the principle that national security requires greater connectivity and cooperation between allies.

A bi-partisan select committee established by the House of Representatives to study the strategic competition between the United States and China arrived at the same conclusion, endorsing greater connectivity between the United States and its allies to act as a counterbalance to China.[55] In 2023, that committee

---

Commerce, 109 Cong. 13 (2006) (Statement of John Castellani); The Need for CFIUS to Address Homeland Security Concerns: Hearing Before the Comm. On Homeland Security, 109 Cong. 35 (2006) (Statement of Stuart Eizenstat) (noting the likelihood that "restrictions imposed on foreign companies in the United States will invite similar restrictions in foreign countries against U.S. companies.").

[55] H. Select Comm. on the Strategic Competition Between the U.S. and the Chinese Communist Party, 118th Cong., *Reset, Prevent, Build: A Strategy to Win America's Economic Competition with the Chinese Communist Party* (Dec. 12, 2023), https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/reset-prevent-build-scc-report.pdf [https://perma.cc/5A7Q-YL9U].

recommended that "Congress should add Japan to the 'whitelist' of Excepted Foreign States" for CFIUS review, reflecting Japan's status as one of America's most trusted allies.

The steel industry illustrates why this strategy matters. China produces more steel than the rest of the world combined, using its dominant position to manipulate the market and harm its U.S. competitors.[56] Blocking the transaction advances China's position in the global steel market by fragmenting allied industrial capacity and maintaining the status quo of smaller, less competitive individual companies vulnerable to China and its state-backed steel manufacturing titans. Allowing the transaction to proceed would instead enhance overall American and allied steel companies' ability to compete globally. Moreover, blocking it makes no national security sense, particularly while simultaneously promoting initiatives like the "Chip 4 Alliance" between the United States, Japan, South Korea, and Taiwan for semiconductor production.[57] Insofar as blocking the deal risks driving a wedge in

---

[56] *Id.* ("China does not just dominate the steel production market; it also manipulates it by producing more steel than global demand can absorb.  Such "dumping" results in low quality steel at China's importers – including the United States.").

[57] Eric Jung, *The "Chip 4 Alliance" and Taiwan-South Korea Relations*, Global Taiwan (Sept. 20, 2023), https://globaltaiwan.org/2023/09/the-chip-4-alliance-and-taiwansouth-korea-relations/.

the bilateral relationship between the United States and Japan, only China's

geopolitical interests are served.[58]

## CONCLUSION

The process undertaken with respect to President Biden's decision to block the Nippon Steel acquisition represents an unprecedented departure from statutory requirements Congress established for CFIUS reviews. The record shows multiple violations of these requirements: a failure to base the decision on reasoned CFIUS analysis as the statute demands, and a departure from the mandated process for evaluating potential mitigation measures.

It threatens to transform what has historically been an objective national security review into a tool for political intervention, with dangerous consequences for domestic commercial industry, U.S. investment opportunities abroad, and our own national security. Absent a plausible national security rationale and given President Biden's receptivity to the direct involvement by third parties seeking to advance their own commercial interests, and his pronouncement to block the transaction prior to receiving input from CFIUS, the integrity of CFIUS as an institutional backstop for national security harms is at risk.

---

[58] *See, e.g.*, Gearoid Reidy, *Biden's Steel Move Is No Way to Treat an Ally*, Bloomberg (Jan. 6, 2025), https://www.bloomberg.com/opinion/articles/2025-01-06/biden-s-move-to-block-us-steel-deal-is-no-way-to-treat-japan.

For the foregoing reasons, the Court should vacate and enjoin President

Biden's order blocking the transaction.


      Respectfully submitted.

/s/ DJ Rosenthal                 /s/ Scott Watnik
DJ Rosenthal, Esq.            Scott Watnik, Esq.
Bar No. 65863                 Bar No. 65867
LIGHTLINE STRATEGIES        T. Jackson Brake, Esq.
10029 Carmelita Drive       Bar No. 65849
Potomac, MD 20854         WILK AUSLANDER LLP
(301) 455-5099              825 Eighth Avenue, Suite 2900
dj@lightlinestrategies.com    New York, NY 10019
                             (646) 375-7648
*Counsel for Amici Curiae*   swatnik@wilkauslander.com

                             *Counsel for Amici Curiae*


Dated: February 10, 2025


## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6499 words

excluding the parts of the brief exempted by Federal Rule of Appellate Procedure

32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6)

because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text and footnotes.

<u>/s/ Scott Watnik</u>
Scott Watnik, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

<u>/s/ Scott Watnik</u>
Scott Watnik, Esq.