ORAL ARGUMENT NOT YET SCHEDULED

No. 25-1004

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

UNITED STATES STEEL CORPORATION, *et al.*,

*Petitioners*,

v.

COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES, *et al.*,

*Respondents*.

———————————

On Petition for Review of Actions of President Biden
and of the Committee on Foreign Investment in the United States
——————————————————————

**BRIEF FOR THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, THE UNITED STATES COUNCIL FOR INTERNATIONAL BUSINESS, THE GLOBAL BUSINESS ALLIANCE, AND THE NATIONAL FOREIGN TRADE COUNCIL AS *AMICI CURIAE* IN SUPPORT OF THE PETITIONERS**
——————————————————————

Jennifer B. Dickey
Christopher J. Walker
U.S. CHAMBER LITIGATION
  CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Gregory G. Garre
Brent T. Murphy
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
gregory.garre@lw.com

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies the following:

### 1. Parties And Amici

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief of Petitioners: *Amici Curiae* The Chamber of Commerce of the United States of America, the United States Council for International Business, the Global Business Alliance, and the National Foreign Trade Counsel.

### 2. Rulings Under Review

Reference to the ruling at issue appears in the Brief of Petitioners.

### 3. Related Cases

Counsel is not aware of any related cases.

*/s/ Gregory G. Garre*
Gregory G. Garre

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), *Amici Curiae* hereby certify the following:

The Chamber of Commerce of the United States of America ("Chamber") is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation and no publicly held company has a 10% or greater ownership interest in the Chamber.

The United States Council for International Business ("USCIB") is a nonprofit, tax-exempt organization incorporated in New York. USCIB has no parent corporation and no publicly held company has a 10% or greater ownership interest in USCIB.

The Global Business Alliance ("GBA") is a nonprofit, tax-exempt organization incorporated in Delaware. GBA has no parent corporation and no publicly held company has a 10% or greater ownership interest in GBA.

The National Foreign Trade Council ("NFTC") is a nonprofit, tax-exempt organization incorporated in New York. NFTC has no parent corporation and no publicly held company has a 10% or greater ownership interest in NFTC.

*/s/ Gregory G. Garre*
Gregory G. Garre

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES ....................................................iv

GLOSSARY.....................................................................vi

INTEREST OF *AMICI CURIAE* ...............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................3

ARGUMENT ...................................................................5

I.     The Process And Decision-Making In This Case Are Contrary To The Statutory Goals Of CFIUS..............................................................5

II.    The Decision In This Case Will Harm American Businesses And The U.S. Economy .................................................................10

III.   The Decision In This Case Will Harm American Businesses Investing Abroad And The Rules-Based System Of International Investment ...........13

CONCLUSION ..................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL STATUTES

50 U.S.C. § 4565(b)(1)(A)(i) ...............................................................6

50 U.S.C. § 4565(k)(2)-(3) ..................................................................5

Pub. L. No. 115-232, 132 Stat. 1636 (2018)....................................6, 16

### INTERNATIONAL STATUTES

Foreign Exchange and Foreign Trade Act, Law No. 228 (Japan Dec.
    1949) ..........................................................................................14

Investment Canada Act, R.S.C. 1985, ch. 28 (2024)............................14

National Security and Investment Act 2021, ch. 25 (UK Apr. 2021) .....14

Regulation (EU) 2019/452 of the European Parliament and of the
    Council, 62 Official J.E.U., L 079 I (Mar. 2019) .............................15

Screening of Third Country Transactions Act (Act No. 28/2023) (Ir.
    2023) ..........................................................................................14

Wet veiligheidstoets investeringen, fusies en overnames 18 mei 2022
    (Investment, Mergers and Acquisitions Security Screening Act
    (Neth. May 2022)) ........................................................................15

### OTHER AUTHORITIES

Alis Asadurian et al., U.S. Department of Commerce, Office of the
    Under Secretary for Economic Affairs, *Foreign Direct Investment
    in the United States* 1 (Sept. 2024), https://www.commerce.gov/
    sites/default/files/2024-10/FDI-Report-Final.pdf.............................10

Global Business Alliance, *Foreign Direct Investment in the United
    States 2024* (2024), https://globalbusiness.org/wp-
    content/uploads/2024/10/FDIUS-2024-8.pdf.......................10, 11, 13

iv

**Page(s)**

House Select Committee on the Strategic Competition Between the U.S. and the Chinese Communist Party, 118th Cong., *Reset, Prevent, Build: A Strategy to Win America's Economic Competition with the Chinese Communist Party* (Dec. 12, 2023), https://selectcommitteeontheccp.house.gov/media/policy-recommendations/reset-prevent-build-strategy-win-americas-economic-competition-chinese ...........................................................7

Letter from Aimen N. Mir, Deputy Assistant Secretary for Investment Security, U.S. Treasury, to Mark Plotkin & Theodore Kassinger (Mar. 5, 2018), https://www.sec.gov/Archives/edgar/data/804328/000110465918015036/a18-7296_7ex99d1.htm ....................................................8

Letter from Global Business Alliance et al. to Secretary Yellen (Sept. 11, 2024), https://globalbusiness.org/wp-content/uploads/2024/09/Treasury-Steel-Letter-2024.09.10.pdf ....................................................3

John G. Murphy, *Three Risks to International Investment (and the Golden Eggs It Lays)*, U.S. Chamber of Commerce (Feb. 14, 2024), https://www.uschamber.com/international/three-risks-to-international-investment-and-the-golden-eggs-it-lays.....................................6, 7

News Release, U.S. Bureau of Economic Analysis, U.S. Department of Commerce, *Direct Investment by Country and Industry, 2023* (July 23, 2024), https://www.bea.gov/sites/default/files/2024-07/dici0724.pdf ........................................................................10, 14

Order Regarding the Proposed Acquisition of a Controlling Interest in Aixtron SE by Grand Chip Investment GmbH, 2016 Daily Comp. Pres. Doc. No. 813, 2016 WL 11768149 (Dec. 2, 2016) ....................................8

Order Regarding the Proposed Acquisition of Lattice Semiconductor Corp. by China Venture Capital Fund Corp., 2017 Daily Comp. Pres. Doc. No. 633, 2017 WL 11660340 (Sept. 13, 2017)....................................8

Order Regarding the Proposed Takeover of Qualcomm Inc. by Broadcom Ltd., 2018 Daily Comp. Pres. Doc. No. 154, 2018 WL 11390159 (Mar. 12, 2018) .....................................................................9

# GLOSSARY

| | |
|---|---|
| BEA 2023 Report | News Release, U.S. Bureau of Econ. Analysis, U.S. Department of Commerce, *Direct Investment by Country and Industry, 2023* (July 23, 2024), https://www.bea.gov/ sites/default/files/2024-07/dici0724.pdf |
| CFIUS | Committee on Foreign Investment in the United States |
| Chamber | The Chamber of Commerce of the United States of America |
| GBA | The Global Business Alliance |
| GBA 2024 Report | Glob. Bus. All., *Foreign Direct Investment in the United States 2024* (2024), https://globalbusiness.org/wp-content/ uploads/2024/10/FDIUS-2024-8.pdf |
| NFTC | The National Foreign Trade Council |
| USCIB | The United States Council for International Business |

## INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the Nation's business community.

The United States Council for International Business ("USCIB") is the principal business organization representing U.S. business interests internationally. It serves as the U.S. affiliate to leading international business organizations, including the International Chamber of Commerce, the International Organisation of Employers, and Business at OECD. USCIB's members include U.S.-based global companies and professional services firms from every sector of the economy, with operations in every region of the world, generating $5 trillion in annual revenues and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

employing over 11 million workers.  It regularly files *amicus curiae* briefs in cases, like this one, that impact American companies doing business abroad.

The Global Business Alliance ("GBA") is the only trade association exclusively comprised of international companies with operations in the United States.  GBA promotes and defends an open economy that welcomes international companies to invest in America.  Its members are American companies with global heritage and an indispensable part of the nation's economic success.  It regularly files *amicus curiae* briefs in cases, like this one, that impact international companies operating in the United States.

The National Foreign Trade Council ("NFTC") is the premier business association advancing international trade and tax policies that support access to the global marketplace.  Founded in 1914, NFTC promotes an open, rules-based global economy on behalf of a diverse membership of U.S.-based businesses.  NFTC works on behalf of its member companies to engage in advocacy and education on international tax, international trade, global supply chains, and national security policies.  It regularly files *amicus curiae* briefs in cases, like this one, involving significant issues related to the intersection of the Nation's international trade and national security policies.

*Amici* have a strong interest in this case because many of their members are engaged in cross-border investments, mergers, acquisitions, and other transactions

involving U.S. businesses subject to review by the Committee on Foreign Investment in the United States ("CFIUS"), and by similar bodies abroad.[2]  All parties consented to the filing of this brief.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

For the reasons United States Steel Corp., Nippon Steel North America, Inc., and Nippon Steel Corp. (together, "Petitioners") explain in their brief, the process that President Biden and CFIUS used to block Petitioners' proposed merger was arbitrary and unlawful.  *Amici* submit this brief to emphasize the significant real-world harms that the order, if allowed to stand, would inflict on American workers and businesses, and ultimately on the American economy at large.

Congress enacted the CFIUS process to protect American national security by providing oversight of foreign investment in strategically important American businesses and industries.  It was *not* created as a tool for political posturing or enacting industrial policy masquerading as national security.  But that is precisely how President Biden used the process here:  as a blank check to reject an important investment in American industry by one of our nation's closest economic, military,

---

[2]  In September 2024, *amici* wrote to then-Treasury Secretary Janet Yellen and the other members of CFIUS, urging them not to allow political pressure to affect CFIUS's review of this merger.  *See* Letter from Global Business Alliance et al. to Treasury Secretary Janet Yellen (Sept. 11, 2024), https://globalbusiness.org/wp-content/uploads/2024/09/Treasury-Steel-Letter-2024.09.10.pdf.

and cultural allies. President Biden's abuse of the CFIUS process—aided by CFIUS's failure to follow its own statutorily required procedures—contravenes Congress's goals in creating this mechanism.

And it will have serious ramifications for American businesses at home and abroad. The United States is the world's largest recipient of foreign direct investment. That investment brings hundreds of billions of dollars into the American economy every year, which in turn supports millions of jobs for American workers. President Biden and CFIUS's decision in this case threatens to chill that investment, jeopardizing the millions of American jobs such investment supports. If the Executive Branch can use the CFIUS process not to protect national security as Congress set forth, but instead as a veto for advancing other interests, companies considering investments in the United States will be left to wonder whether they will meet the same fate as Petitioners here. And that chill will extend not merely to investments from America's geopolitical foes, but also to our closest allies and largest investment partners, like Japan, Canada, the United Kingdom, and Germany.

What's more, President Biden and CFIUS's decision here sets a dangerous precedent for similar politically motivated actions by other nations. Just as foreign companies invest billions of dollars in the United States every year, American companies invest billions of dollars abroad in nearly every country around the world. Many of these countries—including the largest recipients of American investment,

like Japan, Canada, the United Kingdom, and member states of the European Union—have investment review regimes analogous to the CFIUS review process. And like CFIUS, their work is meant to safeguard these nations' national security interests in strategically important enterprises and industries. But if the precedent President Biden and CFIUS have set in this case is permitted to stand, it risks a cascade of reciprocal actions by other countries, who similarly may use national security reviews as a pretext to block investment by American companies for different political or policy reasons. And the losers will be not only American businesses, but the rules-based and open international investment system.

These negative outcomes are entirely avoidable if this Court rejects the unlawful, arbitrary, and politically motivated process here. The petition should be granted.

## ARGUMENT

### I.    The Process And Decision-Making In This Case Are Contrary To The Statutory Goals Of CFIUS

CFIUS is an inter-agency committee chaired by the Secretary of the Treasury and composed of various high-level government leaders, including the Attorney General and the Secretaries of Defense, Commerce, and Homeland Security. 50 U.S.C. § 4565(k)(2)-(3). In several statutory amendments over the last five decades, Congress has prescribed a very specific role for CFIUS: for transactions that would result in foreign control of an American business, "the Committee . . . shall review

5

the covered transaction to determine the effects of the transaction on the national security of the United States." *Id.* § 4565(b)(1)(A)(i).

As Congress recently explained when enacting the Foreign Investment Risk Review Modernization Act of 2018, CFIUS's role is meant to balance two priorities: "enthusiastically welcom[ing] and support[ing] foreign investment," while ensuring that such investment is "consistent with the protection of national security." Pub. L. No. 115-232, § 1702(b)(3), 132 Stat. 1636, 2175 (2018). The central purpose Congress intended CFIUS to accomplish, then, is to protect national security. And Congress has emphasized the importance of CFIUS remaining in that lane: "[CFIUS] should continue to review transactions for the purpose of protecting national security and *should not consider issues of national interest* absent a national security nexus." *Id.* § 1702(b)(9), 132 Stat. at 2176 (emphasis added).

The process and decision here ignored those instructions. Japan is one of our closest allies. Japanese investment in the United States directly supports nearly one million American jobs (and another 2-3 million jobs indirectly). John G. Murphy, *Three Risks to International Investment (and the Golden Eggs It Lays)*, U.S. Chamber of Commerce (Feb. 14, 2024), https://www.uschamber.com/international/ three-risks-to-international-investment-and-the-golden-eggs-it-lays. Globally, the "U.S.-Japan alliance is regularly called the 'cornerstone' of the free world's security arrangements in the Asia-Pacific region." *Id.* "Not only are more than 50,000

American military personnel based in Japan, but our bilateral alliance has been strengthened in recent years even as Tokyo has expanded its defense spending (much of it on U.S.-made defense systems)." *Id.* Little wonder, then, that there has "long been agreement that U.S.-Japanese investment strengthens rather than undermines our national security." *Id.*

Just last year, the bipartisan House Select Committee on the Chinese Communist Party recommended that Congress put Japan on a CFIUS "whitelist" of close allies—alongside Australia, Canada, New Zealand, and the United Kingdom— exempting investors from those countries from CFIUS jurisdiction for many U.S. transactions. *See* House Select Comm. on the Strategic Competition Between the U.S. and the Chinese Communist Party, 118th Cong., *Reset, Prevent, Build: A Strategy to Win America's Economic Competition with the Chinese Communist Party* 32 (Dec. 12, 2023), https://selectcommitteeontheccp.house.gov/media/policy-recommendations/reset-prevent-build-strategy-win-americas-economic-competition-chinese. As Petitioners further explain, this bipartisan support for adding Japan to CFIUS's "whitelist" is because of the exceedingly low likelihood that a Japanese investment would pose a national security risk. No President—from either political party—has ever blocked an acquisition by a Japanese company in the history of CFIUS; and numerous transactions involving Japanese acquisitions of

companies with sensitive technologies or in sensitive industries have been approved in recent years. *See* Pet'rs' Br. 13.

There is nothing exceptional about this merger from a national security perspective, and it bears no resemblance to other recent transactions that the Executive Branch has sought to block.    Recent examples across multiple administrations include:    President Obama's decision to block the proposed acquisition of Aixtron SE's U.S. semiconductor business by Chinese investors; President Trump's decision to block the proposed acquisition of Lattice Semiconductor by investors with Chinese ties; and President Trump's decision to block the proposed takeover of semiconductor-maker Qualcomm by Singapore-based Broadcom.[3] *See* Order Regarding the Proposed Acquisition of a Controlling Interest in Aixtron SE by Grand Chip Investment GmbH, 2016 Daily Comp. Pres. Doc. No. 813, 2016 WL 11768149 (Dec. 2, 2016); Order Regarding the Proposed Acquisition of Lattice Semiconductor Corp. by China Venture Capital Fund Corp., 2017 Daily Comp. Pres. Doc. No. 633, 2017 WL 11660340 (Sept. 13, 2017); Order

---

[3]    CFIUS explained that the national security rationale for blocking the Qualcomm deal was not the Singapore ownership of Broadcom, but rather to prevent "an opening for China to expand its influence on the 5G standard-setting process" based on Broadcom's stated plans for changes to Qualcomm's business, and to protect Defense Department supply chains.    Letter from Aimen N. Mir, Deputy Assistant Secretary for Investment Security, U.S. Treasury, to Mark Plotkin & Theodore Kassinger at 2-3 (Mar. 5, 2018), https://www.sec.gov/Archives/edgar/data/804328/000110465918015036/a18-7296_7ex99d1.htm.

Regarding the Proposed Takeover of Qualcomm Inc. by Broadcom Ltd., 2018 Daily Comp. Pres. Doc. No. 154, 2018 WL 11390159 (Mar. 12, 2018).  Each of these presented genuine risks to national security that do not exist here.

President Biden's real justification for blocking the U.S. Steel transaction, repeatedly and emphatically announced in public remarks, was not national security related—it was nakedly political.  For example, before the CFIUS process even began, President Biden announced that he had "told our steel workers I have their backs, and I meant it," and therefore that "it is vital for [U.S. Steel] to remain an American steel company."  Pet'rs' Br. 15 (citation omitted).  This announcement followed extensive lobbying by the United Steelworkers union.  *See id.* at 16-17. And it was reinforced by President Biden's later statements that he "promise[d]" that U.S. Steel remaining an "American company" was "going to happen"; that he had "made it clear" that was his decision; and that he "ha[d]n't changed [his] mind" during the CFIUS review process.  *Id.* at 18 (emphasis and citations omitted).  Given this backdrop, the CFIUS review process was meaningless.

That is not the role that Congress designed for CFIUS.  Indeed, it is directly contrary to the directives Congress has set out for CFIUS review in congressional findings.  Without this Court's intervention, there is no check on the Executive Branch's ability to engage in the same decision-making in the future.

9

## II.     The Decision In This Case Will Harm American Businesses And The U.S. Economy

This abuse of the CFIUS process will have far-reaching effects for U.S. businesses and the American economy.  Since 2006, the United States has been the world's largest recipient of foreign direct investment.  Alis Asadurian et al., U.S. Department of Commerce, Off. of the Under Sec'y for Econ. Affs., *Foreign Direct Investment in the United States* 1 (Sept. 2024), https://www.commerce.gov/sites/ default/files/2024-10/FDI-Report-Final.pdf.   In 2023—the most recent year for which the U.S. Bureau of Economic Analysis has published data—the United States received $289 billion worth of foreign direct investment, bringing the total value of foreign direct investment in the United States to almost $5.5 trillion.  Glob. Bus. All., *Foreign Direct Investment in the United States 2024* at 1 (2024), https://globalbusiness.org/wp-content/uploads/2024/10/FDIUS-2024-8.pdf  ("GBA 2024 Report"); *see also* News Release, U.S. Bureau of Econ. Analysis, U.S. Department of Commerce, *Direct Investment by Country and Industry, 2023* (July 23,   2024),   https://www.bea.gov/sites/default/files/2024-07/dici0724.pdf   ("BEA 2023 Report").

Those investments have a tremendous impact on America's economy.  As a recent Department of Commerce report summarized, "today, foreign direct investment directly supports nearly eight million U.S. jobs and accounts for exponentially more indirect jobs—those jobs that exist to produce the goods and

services needed by [foreign direct investment]-funded workers." Asadurian, *supra*, at 1. This investment "accounts for nearly a quarter of all U.S. exports and over 12% of all U.S. research and development (R&D) expenditures." *Id.* And these investments span a wide variety of industries, including manufacturing, chemicals, finance, insurance, wholesale trade, and information. GBA 2024 Report at 1.

Maintaining this flow of critical foreign investment depends on the United States' reputation as a stable, attractive, and low-risk destination for investing. That reputation depends in turn on the predictability, transparency, and fairness of our laws, rules, and processes for reviewing foreign investments.

The process and decision made here is antithetical to maintaining the United States' reputation as a safe haven for foreign investors. Shortly before the CFIUS review process even began, President Biden announced his intention to block the merger based on impermissible considerations. *See* Pet'rs' Br. 15-18. In light of this announcement, CFIUS failed to conduct a reasoned, risk-based national security analysis of the transaction, refused to follow long-established CFIUS procedures, and disregarded the evidence in the record. *Id.* at 18-21. Each CFIUS agency, moreover, refused to express its views regarding the transaction's effect on national security and whether the proposed national security agreement mitigated any risks to national security. *Id.* at 21-24, 26-28. These actions violate due process, and CFIUS's actions are unlawful and arbitrary and capricious under the Administrative

Procedure Act. *Id.* at 54-67. With the outcome a foregone conclusion, it is not surprising that the record lacks the factual support necessary for CFIUS to act under its statutory authority.

These failures by President Biden and CFIUS to ensure a constitutionally fair and lawfully non-arbitrary review process upend the rules-based and open economic system that the United States has maintained for decades. And they will severely chill investment by businesses who now see President Biden and CFIUS trading this process's former predictability for a new uncertainty. That chill will not only be felt by companies from countries that the United States counts as geopolitical foes. To the contrary, and much more significantly, it will chill the desire to invest even among allies with whom the United States enjoys a close relationship.

When businesses are considering whether to invest in the United States, for example, by acquiring an American company, those foreign businesses must be able to determine the likelihood that any proposed deal will actually be completed. That is because such transactions carry significant burdens in terms of both time and capital. For instance, a company must assess the strategic benefits of the proposed transaction, perform due diligence, and undertake the legal cost of negotiating an agreement. And it may need to arrange financing for the deal from issuing additional stock, or by going to banks, private credit, or other investment partners. Whether those costs are worth bearing requires both the acquiring company and the target

company to "price in" the likelihood of government approval. Now, financial decisionmakers in even friendly nations will think to themselves, if the unprecedented can happen to businesses from Japan, it could happen to businesses from *anywhere*. And if, as a result, such decisionmakers conclude that government approval of a transaction is uncertain, companies will think twice before they undertake all of these costs, because even transactions that make economic sense under a fairly applied regulatory process may be rejected.

That's no small problem. The vast majority of foreign direct investment in the United States comes from our closest strategic and economic allies. After Japan, the next five largest sources of foreign direct investment are Canada, Germany, the United Kingdom, France, and Ireland. GBA 2024 Report at 3. Indeed, Japan, Canada, Germany, and the UK alone account for *more than half* of cumulative foreign direct investment in the United States. *Id.* If companies based in even these close allies cannot expect an evenhanded, rules-based national security review at CFIUS, then it will put hundreds of billions of dollars in annual investment—and thousands or even millions of jobs—in jeopardy.

## III. The Decision In This Case Will Harm American Businesses Investing Abroad And The Rules-Based System Of International Investment

If allowed to stand, President Biden and CFIUS's political decision here would not merely chill foreign direct investment in the United States. Foreign direct investment is a two-way street. Just as businesses outside the United States seek to

13

invest here, American businesses in turn are an enormous source of foreign direct investment abroad. Indeed, U.S. businesses invested more than $360 billion overseas in 2023 alone, bringing the cumulative level of U.S. investment abroad to almost $6.7 trillion. BEA 2023 Report at 1. And American companies make those investments in nearly every country worldwide. *Id.* at 2.

Many if not most of the places where American companies invest abroad have analogous investment review regimes to CFIUS, with the goal of preserving national security when investments involve strategically important enterprises or industries. If President Biden and CFIUS's decision is allowed to stand, and such politically motivated decisions are allowed to become routine, there is a serious risk that other countries will adopt similar practices, using national security reviews to block American investments on political grounds.

For example, the largest historical destinations for American investment abroad have been close partners of the United States, including Canada, the United Kingdom, Japan, Ireland, and the Netherlands. BEA 2023 Report at 2. All of these countries, like the United States, have statutes and regulations that provide for national security review of foreign direct investment. *See* Investment Canada Act, R.S.C. 1985, ch. 28 (2024); National Security and Investment Act 2021, ch. 25 (UK Apr. 2021); Foreign Exchange and Foreign Trade Act, Law No. 228 (Japan Dec. 1949) (as amended); Screening of Third Country Transactions Act (Act No.

28/2023) (Ir. 2023); Wet veiligheidstoets investeringen, fusies en overnames 18 mei 2022 (Investment, Mergers and Acquisitions Security Screening Act (Neth. May 2022)).  The European Union has adopted similar regulations for investment review by member countries.  *See* Regulation (EU) 2019/452 of the European Parliament and of the Council, 62 Official J.E.U., L 079 I (Mar. 2019).  Given that Europe has received more than half of the total cumulative amount that American businesses have invested abroad—an amount that continues to increase to the tune of billions of dollars per year—if the practice of weaponizing and politicizing national security review procedures were to become widespread, the American business community could stand to lose great sums.

And that risk not only impacts the bottom line of American businesses—it impacts American national security too.  Foreign investment by American businesses is a tremendous source of goodwill for the United States, and it promotes closer political and strategic ties between the United States and countries receiving American investment—including those that are not our close allies.  To the extent other countries seek to reciprocate and retaliate under similar theories, the loss of investment opportunities for American companies brings with it a diminishment of American goodwill.  And it will deprive the American economy of financial benefits that otherwise redound to protect U.S. national security.

Congress has explicitly recognized this fact, explaining that "maintaining the commitment of the United States to an open investment policy encourages other countries to reciprocate and helps open new foreign markets for United States businesses"; such "foreign investment," in turn, "provides substantial economic benefits to the United States, . . . thereby enhancing national security" in the process. Pub. L. No. 115-232, § 1702(b)(1)-(2), 132 Stat. at 2175. President Biden's unlawful decision and CFIUS's flawed process here undercut all of this.

                                        * * * * *

President Biden's abusive attempt to invoke the CFIUS process to block the U.S. Steel merger for domestic political reasons is not only illegitimate as a matter of law (as Petitioners explain), it also undermines U.S. interests by threatening a host of real-world consequences for foreign direct investment.  This threat jeopardizes both the willingness of foreign companies to invest in America, and the ability of American companies to invest abroad.  Congress never intended that result.

16

## CONCLUSION

The Court should grant the petition for review.

Dated:  February 10, 2025                    Respectfully submitted,

*/s/ Gregory G. Garre*

Jennifer B. Dickey                           Gregory G. Garre
Christopher J. Walker                        Brent T. Murphy
U.S. CHAMBER LITIGATION                      LATHAM & WATKINS LLP
  CENTER                                     555 Eleventh Street, NW
1615 H Street, NW                            Suite 1000
Washington, DC 20062                         Washington, DC 20004
(202) 463-5337                               (202) 637-2200
                                             gregory.garre@lw.com

*Counsel for Amici Curiae*

17

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,565 words.  I further certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Gregory G. Garre*
Gregory G. Garre