[ORAL ARGUMENT NOT YET SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

UNITED STATES STEEL CORPORATION, *et al.*,

    Petitioners,

    v.

COMMITTEE ON FOREIGN INVESTMENT IN
THE UNITED STATES, *et al.*,

    Respondents.

No. 25-1004

---

**RESPONDENTS' OPPOSITION TO MOTION TO INTERVENE**

ERIC D. McARTHUR
    *Deputy Assistant Attorney General*

SHARON SWINGLE
SEAN R. JANDA
CATHERINE PADHI
SOPHIA SHAMS
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7264*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-2495*
    *sophia.shams@usdoj.gov*

## INTRODUCTION

This case arises from the President's decision to block the proposed acquisition of U.S. Steel by Nippon Steel based on his determination that the transaction threatened to impair the national security of the United States. U.S. Steel and Nippon Steel have challenged that decision, asserting generally that the President's decision and the underlying administrative process failed to comport with various requirements. Now, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union seeks to intervene in this action as a respondent alongside the federal government, primarily because it believes that if the proposed transaction were consummated, that transaction would harm the Union and its members.

That motion should be denied. United Steelworkers has not established any legally cognizable interest in the President's order or this litigation sufficient to give them Article III standing to intervene, much less the significant protectible interest required to support intervention as of right. To the contrary, the President's order reflects his determination that the proposed transaction could impair the national security. And the relevant statutory scheme is focused at every turn on safeguarding the national security—not on vindicating downstream economic interests like those asserted by United

1

Steelworkers. The Union thus has no protected interest in the President's exercise of his national security authorities to prohibit the transaction.

And even beyond that, problems with the Union's attempted intervention abound. United Steelworkers has not demonstrated that this suit will impair its ability to pursue through independent mechanisms any legally protected interest it may have in preventing the transaction, nor has the Union explained why the government does not adequately represent the Union's asserted interest in defending the President's decision. Moreover, numerous equitable and practical concerns preclude the Union's proposed intervention. Adding a party to this expedited litigation—which includes voluminous sealed material in the administrative record—at this late date would create substantial problems. And the proposed intervention would undermine the substantial Executive Branch interests in controlling the defense of the President's order in this highly sensitive national security litigation.

## STATEMENT

**1.** Section 721 of the Defense Production Act of 1950, as amended, provides the President with authority to "to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." 50 U.S.C. § 4565(d)(1). A "covered transaction" includes "[a]ny merger,

acquisition, or takeover . . . by or with any foreign person that could result in foreign control of any United States business." *Id.* § 4565(a)(4)(B)(i).

The Committee on Foreign Investment in the United States is an interagency body, chaired by the Secretary of the Treasury, that aids the President in reviewing the national security risks of such transactions. As part of that review process, the Director of National Intelligence prepares "a thorough analysis of any threat to the national security of the United States" posed by the transaction, incorporating "the views of all affected or appropriate agencies of the intelligence community." 50 U.S.C. § 4565(b)(4)(A). As warranted, the Committee then conducts a "risk-based analysis," which reflects the Committee's "assessment of the threat, vulnerabilities, and consequences to national security related to the transaction." *Id.* § 4565(*l*)(4)(A). Factors relevant to this national security assessment include, for example, "domestic production needed for projected national defense requirements," the "capacity of domestic industries to meet national defense requirements," as well as the "potential national security-related effects" on U.S. "critical infrastructure" and "critical technologies." *Id.* § 4565(f).

The Committee may refer a transaction to the President at any time during the review or investigation period. 50 U.S.C. § 4565(*l*)(2). And the President may suspend or prohibit the transaction if he finds that "there is

credible evidence that leads [him] to believe that" the foreign entity "might take action that threatens to impair the national security," and if other provisions of law "do not, in the judgment of the President, provide" adequate protection against the threat. *Id.* § 4565(d)(4). These findings, and the President's decision to suspend or prohibit a transaction, are not subject to judicial review. *Id.* § 4565(e)(1). This Court has, however, held that a party who claims that the President's prohibition deprived it of property without due process of law may properly seek judicial review of its constitutional claim. *Ralls Corp. v. Committee on Foreign Inv. in the U.S.*, 758 F.3d 296, 316 (D.C. Cir. 2014).

**2.** Petitioner U.S. Steel, an American corporation, is the third-largest steel producer in the United States. App. 321. Petitioner Nippon Steel, a Japanese corporation, is the fourth-largest steelmaker in the world as of 2022. App. 316-17. In December 2023, U.S. Steel and Nippon Steel announced a proposed merger, under which Nippon would, through a wholly owned subsidiary, acquire all of U.S. Steel. *See* Br. 14-15.

Because the transaction involved the acquisition of a domestic business by a foreign entity, it was subject to review by the Committee. *See* 50 U.S.C. § 4565(a)(4)(B), (b)(1). Petitioners formally notified the Committee of the transaction in March 2024. App. 267-68. Over the following nine months, the

Committee engaged in an extensive review of the transaction, and the Committee and petitioners engaged in substantial back-and-forth. *See* App. 315-16, 488, 517. That process involved the Committee's reviewing voluminous information that petitioners submitted with their notice, in response to 19 rounds of questions, in at least six meetings, and in substantial correspondence. *See id.*

On December 23, 2024, the Committee referred the transaction to then-President Biden. *See* App. 607. As the Committee had previously explained to petitioners, it identified two primary national security risks arising from the transaction: first, that Nippon "may make decisions that reduce U.S. domestic steel production capacity" directly, App. 489; and second, that "a Nippon Steel-owned U.S. Steel could reduce its participation in U.S. trade remedy investigations and reviews, with a possible adverse impact on the commercial viability of the domestic steel industry," App. 491. *See also* App. 605. In addition, although the Committee had considered mitigation measures proposed by petitioners to address those risks, the Committee was unable to reach a consensus on whether those measures would "resolve[] the national security concerns posed by the transaction." App. 606 (quotation omitted).

On January 3, 2025, the President prohibited the proposed transaction. In reaching that result, the President found that the proposed transaction

"threatens to impair the national security of the United States" and that other provisions of law "do not, in [his] judgment, provide adequate and appropriate authority" to "protect the national security in this matter." App. 151.

**3.** Petitioners brought this suit challenging the President's order. *See* 50 U.S.C. § 4565(e)(2). Petitioners generally contend that the President's order and the Committee's referral violated their due process rights, that the Committee's referral violated the Administrative Procedure Act and the Defense Production Act, and that the President's order was ultra vires. Petitioners accordingly ask that the Court vacate the President's order and remand the matter to the Committee so that it may reconsider the proposed merger. Br. 49, 70.

On January 13, 2025, this Court entered an expedited briefing schedule, under which petitioners filed their opening brief on February 3, the government's response brief is due on March 3, petitioners' reply brief is due on March 17, and argument shall be set "on the first appropriate date following the completion of briefing." Order 1-2, Jan. 13, 2025.

Two days after petitioners submitted their opening brief, United Steelworkers filed a motion to intervene as a respondent. The Union is "the exclusive bargaining representative of 12,000 workers employed by U.S. Steel." Mot. 2. In its motion, United Steelworkers generally claims an interest

6

in preventing the proposed transaction given the potential detrimental effects of the transaction on the Union and the steelworkers it represents. Mot. 9, 11-23.

## ARGUMENT

This Court should deny United Steelworkers' motion to intervene. United Steelworkers primarily asks this Court to allow it to intervene as of right, *see* Mot. 11-23, though it briefly suggests it should also be permitted permissive intervention, *see* Mot. 23-24. Neither argument has merit.

"No statute or rule provides a general standard to apply in deciding whether intervention on appeal should be allowed." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 276 (2022). The resolution of such a motion is thus "committed to the discretion of the court before which intervention is sought." *Id.* at 278-79. The Supreme Court has instructed that the exercise of that discretion should be guided by "the policies underlying intervention in the district courts," including "the legal interest that a party seeks to protect through intervention on appeal." *Id.* at 277 (quotation omitted).

More specifically, a party seeking to intervene in district court as a matter of right must demonstrate that: (1) its motion is "timely"; (2) it has an "interest relating to the property or transaction that is the subject of the action"; (3) the disposition "of the action may as a practical matter impair or impede the movant's ability to protect its interest"; and (4) the existing parties

7

do not "adequately represent that interest." Fed. R. Civ. P. 24(a). The putative intervenor must "satisfy all four elements of the Rule in order to intervene as of right." *Jones v. Prince George's County*, 348 F.3d 1014, 1019 (D.C. Cir. 2003). A court may grant permissive intervention on a timely motion if the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Even then, "permissive intervention is an inherently discretionary enterprise," and thus a court may decline to permit it based on other considerations, such as "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *EEOC v. National Children's Ctr., Inc.*, 146 F.3d 1042, 1045-46 (D.C. Cir. 1998) (quotation omitted).

Here, United Steelworkers fails to demonstrate a basis for intervention. Although it claims a generalized interest in preventing Nippon's acquisition of U.S. Steel, it lacks any cognizable interest in the challenged Presidential order, which was based on a finding of national security risks—not on a finding of the economic issues of concern to the Union. Nor can United Steelworkers show that the federal government does not adequately represent its asserted interest in defending the President's order or that this suit may, as a practical matter, impair any cognizable interest it has in preventing the transaction. Finally, equitable and practical considerations preclude its participation in this suit.

8

## A.     The Union Lacks a Cognizable Interest in This Suit

Intervention is designed to allow a party with a cognizable interest in the case to participate to ensure that its interest is not compromised in the party's absence. To that end, two related doctrines impose thresholds for participation: A prospective intervenor must establish Article III standing and must show that it has a judicially cognizable interest sufficient to justify intervention. United Steelworkers' failure to make that showing compels denial of its intervention motion. Although the Union claims a general interest in preventing the proposed transaction, it has no cognizable—much less legally protectible—interest in the President's prohibition of the transaction, which must by statute be based on the President's assessment of the national security risks posed by the transaction.

**1.** As an initial matter, a party that "tries to intervene as [a] defendant" in a lawsuit must "demonstrate Article III standing." *Crossroads Grassroots Policy Strategies v. Federal Election Comm'n*, 788 F.3d 312, 316 (D.C. Cir. 2015). To establish Article III standing, "the intervenor must show injury in fact, causation, and redressability." *Id.* In particular, a defendant-intervenor must demonstrate that it would suffer an injury if the plaintiff were granted its requested relief. *Id.* at 318. That injury, in turn, must be "an invasion of a

legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical." *Id.* at 316 (quotation omitted).

In attempting to articulate such an injury, the Union asserts three harms it would suffer if the transaction were consummated. First, the Union states that Nippon's control over U.S. Steel might reduce U.S. Steel's willingness to participate in trade remedy proceedings, which would in turn cause the Union to expend additional resources pursuing those proceedings. Mot. 12-15. Second, the Union worries that Nippon would close some of U.S. Steel's blast-furnace mills, which would injure steelworkers that the Union represents. Mot. 15-20. And third, the Union states that the proposed merger would reduce its relative economic power and undercut its ability to negotiate on behalf of its members. Mot. 20-22. Each of these asserted harms fails to establish United Steelworkers' standing to intervene in this litigation.

First, these assertions demonstrate that, at best, the Union is only indirectly affected by the President's decision to prohibit the transaction under the Defense Production Act—a decision addressed not to the Union but to petitioners. The Union's claim to standing is thus defeated by the well-established principle that a third party that does not face enforcement action itself lacks standing to litigate the Executive's enforcement decisions. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also id.* ("A private citizen lacks

10

a judicially cognizable interest in the prosecution or nonprosecution of another."). This principle applies to criminal and civil enforcement alike; thus, for example, an entity has "no judicially cognizable interest in procuring" or preventing "enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).

So too here. The order that petitioners challenge reflects the President's determination to exercise his authority to prohibit the proposed acquisition in the interest of national security, and the Union has no judicially cognizable interest in that Presidential determination. Thus, for example, the Union properly does not claim that it could have sought judicial review if the President had permitted the transaction to proceed. The Union similarly has no ability to intervene in this lawsuit to defend a prohibition that it had no legally cognizable interest in procuring in the first place.

That principle holds even though the United States shares some of the Union's concerns regarding the potential consequences of the proposed merger. As the administrative record makes clear, two of the Union's concerns—that U.S. Steel might become a less active participant in trade remedy proceedings and that U.S. Steel might directly decrease its domestic production—similarly underpinned the Committee's national security risk assessment. *See, e.g.*, App. 489-91. Nonetheless, these concerns are relevant to

11

the President's order not because such outcomes might indirectly affect the Union but instead because those outcomes might substantially erode the overall strength of the domestic steel industry—and a strong domestic steel industry "represents an essential national security priority and is critical for resilient supply chains." App. 148; *see also* 50 U.S.C. § 4565(f) (identifying as factors relevant to the national security analysis the "capacity of domestic industries to meet national defense requirements," as well as the "potential national security-related effects" on U.S. "critical infrastructure" and "critical technologies"). Although the Union supports the outcome of the President's decision, its approval of the manner in which the President exercised his authority is not the type of concrete and direct interest that confers standing to intervene. *See Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013).

Moreover, the Union's asserted harms rest on a misunderstanding of the nature of this litigation and the relief that petitioners seek. In this case, petitioners claim that the process that led to the President's prohibition was flawed, and petitioners request that the prohibition be vacated and the matter remanded to the Committee for further proceedings. *See* Br. 70. It is thus possible that, even if petitioners prevail, the President will ultimately block the transaction following additional administrative proceedings based on the national security risks identified in any such further proceedings. And the

12

Union does not claim that such a remand or further administrative proceedings would injure it; instead, the Union claims only that it will be harmed if the transaction is finally consummated. At this point, however, that possibility is speculative and fails to "satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

**2.** Relatedly, to support a request for intervention as of right, a prospective intervenor must demonstrate, among other things, a "significantly protectable interest" at stake. *Donaldson v. United States*, 400 U.S. 517, 531 (1971); *see also* Fed. R. Civ. P. 24(a)(2). That barrier requires that a prospective intervenor do more than articulate some asserted harm or interest related to the action; instead, the intervenor must demonstrate that the interest it asserts is "legally protectible." *Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 315 (1985); *see Diamond v. Charles*, 476 U.S. 54, 75 (1986) (O'Connor, J., concurring in part and concurring in the judgment) ("Clearly, *Donaldson*'s requirement of a 'significantly protectable interest' calls for a direct and concrete interest that is accorded some degree of legal protection."). The Supreme Court has made clear that satisfying that standard requires a substantially more direct interest than does Article III and that indirect harms—like those claimed by United Steelworkers—do not suffice.

13

In *Donaldson*, for example, the government sought to enforce an administrative summons issued by the Internal Revenue Service to Donaldson's former employer and the employer's accountant for records related to Donaldson's tax liability. 400 U.S. at 518-20. The Supreme Court rejected Donaldson's argument that he could intervene in that suit as of right. While the employer's and accountant's disclosure of records potentially establishing Donaldson's tax liability surely would have caused him Article III injury, the Court concluded that Donaldson's claimed interest "cannot be the kind contemplated by Rule 24(a)(2)" because it was not independently legally protected. *See id.* at 530-31.

United Steelworkers' claimed interest in this litigation stems from its assertion that if the proposed transaction were consummated (which could, as explained, only occur following additional administrative proceedings on remand, even if petitioners prevail), the Union and its members would experience various downstream economic effects. Even apart from the fact that those asserted concerns are noncognizable and cannot support Article III standing, they fail to establish any legally protected interest under Rule 24(a)(2)'s standard. Indeed, nowhere does the Union claim, for example, that U.S. Steel has a legal obligation to work with the Union to pursue trade remedy proceedings or that the specific bargaining power that the Union

14

happens to enjoy is protected by some independent source of law. United Steelworkers thus fails to establish any legally protected interest that could support its attempt to intervene.

### B.  Intervention Is Not Necessary to Protect the Union's Interests

Regardless, the Union fails to support its motion for intervention as of right because it has not demonstrated that "the disposition of [this] action" may "impair or impede [its] ability to protect [its] interest," or that its interest is not "adequately represented by existing parties." *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1322-23 (D.C. Cir. 2013) (quotation omitted).

**1.** The Union has not demonstrated that the disposition of this action will effectively impair or impede its ability to protect any legally cognizable interest in preventing the proposed transaction. As explained, petitioners' claims in this case relate only to the Committee's referral and the President's order, and petitioners do not contemplate receiving relief from this Court permitting them immediately to consummate the transaction. Instead, they seek only a remand for the Committee to reconsider the transaction.

To the extent the Union has any legally protected interest in preventing the transaction, those claims would be unaffected by this lawsuit even if petitioners were to prevail. A remand would not impede the Union's ability to

15

oppose the merger by bringing whatever claims it may have in independent litigation. *Cf. Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 725 F.2d 584, 586 (10th Cir. 1984) (denying a motion to intervene as a matter of right because there was an alternative procedure available to protect the applicant's interest). Moreover, because petitioners do not ask this Court to resolve any questions relating to the interests that United Steelworkers has claimed, this Court's ultimate opinion—even if favorable to petitioners— would not impair the Union's ability to enforce those interests in a separate suit.

**2.** The Union's interests in defending the President's order are also already adequately represented by the government. Here, the Union and the government seek the same ultimate result: for the President's order prohibiting the transaction to remain in effect. *See* Mot. 23. In nonetheless contending that the government is an inadequate representative of that interest, the Union contends that it has different underlying "interests that animate the Union's desire to intervene in this case—protecting job and economic security" for its members and "preserving the Union's ability to focus its resources on other matters"—than the interests "that will shape the Government's approach to this case." Mot. 22-23.

But nowhere does the Union explain in concrete terms how those different underlying "desire[s]" render the government incapable of protecting the Union's bottom-line interest in having the petition for review be denied. The Union does not, for example, identify any arguments on the merits of petitioners' claims that it believes the government will forgo but that the Union would advance. And indeed, it is hard to understand how the interests "animat[ing] the Union's desire to intervene," Mot. 22, have any reasonable connection to what is actually at issue in this lawsuit. Those underlying interests have little, if anything, to do with petitioners' due process and administrative law claims—and the Union's repeated highlighting of its tangential interests only underscores the lack of a close nexus between their interests and this suit.

### C.    The Union Otherwise Cannot Justify Intervention

As explained, United Steelworkers has no substantial interest in this suit, which concerns the President's decision to prohibit on national security grounds a proposed transaction between two other parties. Allowing the Union to nevertheless intervene would raise substantial practical and equitable concerns that should preclude their participation in this suit.

**1.** United Steelworkers fails to explain how its intervention would help the Court; to the contrary, permitting the Union to participate as a party in this

17

suit would create practical problems. As explained, the Union seeks to intervene because it opposes a merger between U.S. Steel and Nippon Steel based on the potential downstream effects that the merger could have.

That asserted interest, however, is unconnected to petitioners' claims in this case, which center on whether the Committee's and President's actions comported with due process and administrative law principles. The Union has no particular insight into the process that played out between the government and petitioners or into whether the government's actions were reasonable and reasonably explained. Indeed, the Union's motion lacks any specificity as to what relevant arguments it would advance were it allowed to intervene. It is thus unclear how the Union's participation in this suit would help clarify matters for the Court—or why, to the extent that United Steelworkers has identified any relevant areas on which it may have unique insight that would be helpful to the Court, it could not provide its views through an amicus brief rather than as an intervenor.

Conversely, the Union's attempt to intervene in this suit would cause significant practical problems in promptly resolving this case, which is proceeding on an expedited schedule. The unclassified volumes of the administrative record in this case consist not only of public material that could readily be shared with intervenors but also of a substantial volume of material

18

that is currently being maintained under seal, either because it contains petitioners' confidential business information or because it contains other information that implicates sensitive government interests. Because much of the sealed material involves petitioners' own confidential information, the government was able to serve the unclassified administrative record on petitioners. But petitioners might well reasonably object to any attempt to provide their confidential information to the Union. And not only might the inability to access the unclassified administrative record hamper the Union's ability to participate in this case in a way that would be helpful to the Court, but any need to adjudicate on a document-by-document (or even paragraph-by-paragraph) basis which portions of the administrative record may be provided to the Union would constitute a significant and unnecessary burden on the parties' (and potentially the Court's) resources.

These problems would be compounded by the Union's delay in seeking intervention. Although the Court entered its expedited briefing schedule shortly after the petition for review was filed, United Steelworkers waited until after petitioners had filed their opening brief to move to intervene—and now respondents' brief is due in less than two weeks. On that timeline, any diversion of the parties' or Court's resources to resolve questions about the

19

Union's ability to access sensitive material in the administrative record would be unwarranted.

**2.** In addition, permitting intervention here would undermine the authority that Congress has placed in the Executive Branch to conduct litigation. By statute, the "Solicitor General," and other "officer[s] of the Department of Justice" as the Attorney General may direct, have responsibility for "attend[ing] to the interests of the United States" in the courts. 28 U.S.C. § 517. And the Solicitor General in particular has long had the authority to determine whether to seek further review before the Supreme Court. 28 C.F.R. § 0.20(b).

As the Supreme Court has explained, vesting litigation oversight authority in the Attorney General and Solicitor General "represents a policy choice by Congress." *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 96 (1994). The Solicitor General has a "broad[] view of litigation in which the Government is involved throughout the state and federal court systems" and is therefore better positioned to evaluate the overall costs and benefits of pursuing a particular appeal or advancing particular arguments than are others with more "parochial view[s]" of a given case. *Id.*

The Executive's interest is particularly acute in this litigation, which involves a national security judgment made by the President of the United

States in the context of an important statutory scheme. Given the nature of that scheme, the Executive has a substantial interest in controlling the arguments presented to this Court regarding the statutory scheme and the scope of judicial review. The Executive similarly has an interest in ensuring that the foundations and contours of the President's national security determinations are clearly and correctly communicated to the Court.

In light of the President's and Executive Branch's substantial interests in retaining control of the defense of the President's order in this litigation, there is certainly no basis to permit the Union to intervene and seek to usurp the authority that Congress has granted to the Executive.

# CONCLUSION

For the foregoing reasons, the Union's motion to intervene should be denied.

Respectfully submitted,

ERIC D. McARTHUR*
    *Deputy Assistant Attorney General*

SHARON SWINGLE
SEAN R. JANDA
CATHERINE PADHI

*/s/ Sophia Shams*

SOPHIA SHAMS
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7264*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-2495*
    *sophia.shams@usdoj.gov*

February 2025

---

* The Acting Assistant Attorney General is recused in this matter.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this opposition to the motion to intervene satisfies the type-volume limitation in Rule 27(d)(2)(A) because it contains 4,458 words. This motion also complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it was prepared using Microsoft Word 2016 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Sophia Shams*
SOPHIA SHAMS

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Sophia Shams*
SOPHIA SHAMS