<u>ORAL ARGUMENT SCHEDULED FOR APRIL 24, 2025</u>

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES STEEL CORPORATION;<br>NIPPON STEEL NORTH AMERICA, INC;<br>and NIPPON STEEL CORPORATION<br><br>*Petitioners*,<br><br>v.<br><br>THE COMMITTEE ON FOREIGN<br>INVESTMENT IN THE UNITED STATES,<br>ET AL.<br><br>*Respondents*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 25-1004 |

<u>REPLY OF UNITED STEELWORKERS<br>IN SUPPORT OF MOTION TO INTERVENE</u>

**I.   BACKGROUND**

On January 6, 2025, the United States Steel Corporation, Nippon Steel North America, Inc., and Nippon Steel Corporation (collectively "Petitioners") filed a Petition seeking review of President Biden's executive order blocking a multi-billion-dollar merger between those entities. The Petition named the Committee on Foreign Investment in the United States ("CFIUS"), President Joseph R. Biden, Treasury Secretary Janet Yellen, and Attorney General Merrick Garland (all in their professional capacities) as Respondents. The Petitioners' primary theory is that

1

President Biden's order is defective and must be set aside because it was the product of alleged political backscratching involving the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW" or the "Union").

On February 5, 2025, USW filed a timely Motion to Intervene, which established that USW had standing to intervene as a matter of right under Rule 24(a), and that it also satisfied the standard for permissive intervention under Rule 24(b). As expected, both Petitioners and Respondents filed Oppositions to that Motion. Pet'rs' Opp'n to Mot. to Intervene ("Pet'rs' Br."); Resp'ts' Opp'n to Mot. to Intervene ("Resp'ts' Br."). However, both Petitioners and Respondents fail to grapple with the Union's starring role in Petitioners' theory of the case, or the Union's unique relationship to the national security risks that CFIUS identified in its review. As such, both Petitioners and Respondents fail to show why the Union's motion should not be granted.

## II.    ARGUMENT

### A. The Union should be permitted to intervene as a matter of right under Fed. R. Civ. P. 24(a)(2).

1.     According to the Petitioners' own filings, USW is at the center of this case. Both the Petition and Petitioners' Opening Brief rail against the Union's purported corruption of the CFIUS process. *See, e.g.*, Pet. 3–4 ("The impetus for this abuse of the CFIUS process came from David McCall, the president of

[USW]."); Pet'rs' Opening Br. ("Opening Br.") 3–4, 16–18. What is more, on the same day Petitioners initiated this action, they also filed a separate lawsuit in a different court against the President of USW, alleging that he unlawfully interfered with the CFIUS process in violation of the Sherman Antitrust Act, RICO, and Pennsylvania state law. *See* Complaint, *U.S. Steel Corp. v. Cleveland-Cliffs Inc.*, No. 25-cv-15 (W.D. Pa. Jan. 6, 2025), ECF No. 1. While we disagree with Petitioners' portrayal of the role of USW and its President, suffice it to say that it is ironic, if not totally unreasonable, for Petitioners to premise the arguments in their Petition on the Union's purportedly unlawful conduct, attribute President Biden's ultimate decision to that conduct, separately sue the Union's President on the basis of that conduct, and then turn around and argue that the Union is somehow a stranger to the controversy when it seeks to intervene in order to defend itself and its interests.[1]

---

[1] Particularly mystifying is Petitioners' contention that the Union "is not a party to any active or impending lawsuit that has any overlapping claim or defense with this action." Pet'rs' Br. 27. To the contrary, Petitioners devote a significant portion of their Complaint in this other case arguing against the Union's anticipated *Noerr-Pennington* defense on the grounds that the CFIUS process was a "sham" due to the Union's political influence—precisely the same contention that underlies their Petition here. *Compare* Complaint ¶¶ 176–195, *U.S. Steel* (Case No. 25-cv-15), *with* Pet. 3, 41–62, *and* Pet'rs' Br. 7. As Petitioners well know, USW has an interest in addressing that contention and ensuring that President Biden's order is upheld.

3

Fundamental to the Parties' argument on that point is the repeated contention that the Union has no interest in—and can offer no insight into—the national security considerations underlying the President's decision. *See, e.g.*, Resp'ts' Br. 19. But the national security concerns identified by CFIUS in this case and detailed in its December 14 Letter—the viability of the American steel industry and the necessity of industry cooperation in pursuing trade remedies, *see* Pet. Ex. G (Dec. 14 CFIUS Letter), at 5–8—are risks that directly affect the Union's membership. Moreover, the Union has accumulated considerable expertise on those topics due to its long-time role as the dominant union representing American steelworkers. And even if the Union's motivation for pressing its national security concerns in this case resides in economic self-interest instead of geopolitical grand strategy, that would weigh in favor of intervention, not against. *See Fund for Animals v. Norton*, 322 F.3d 728, 736–37 & n.9 (D.C. Cir. 2003) (government defendant does not adequately represent an intervenor's interests for purposes of Rule 24(a)(2) when those interests are "more narrow and 'parochial'" than the government's).

Moreover, to the extent Petitioners' claims are not about national security but the process itself, the Union is in a unique position (as a participant and alleged co-conspirator) to defend its involvement in that process. Indeed, it is likely the Union will be in a better position to make those arguments on its own behalf than

4

any official (or attorney) in the current President's administration as the Union's efforts were all undertaken prior to January 20.[2]

**2.** USW demonstrated in its Motion that it has Article III standing to intervene as a matter of right in light of its legally recognized and protectible interests in connection with the proposed merger. *See* Mot. to Intervene 11–22. Both Petitioners and Respondents nonetheless argue that the Union lacks standing, contending that USW's only injuries in this case are the "downstream economic effects" of a successful merger, which they contend are too speculative to constitute an injury-in-fact. *See* Pet'rs' Br. 8–19; Resp'ts' Br. 10–14. But those so-called "downstream effects" are the same risks underlying the President's decision to block the merger, and which CFIUS considered in its review. *See* 50 U.S.C. § 4565(f)(2). Each of the injuries described by the Union in its Motion is rooted not in the Union's speculation about future events or the actions of third parties, but instead is drawn from the written findings in CFIUS' letter detailing the national security risks associated with the merger. *See* Pet. Ex. G, at 5 ("there is a risk that a Nippon Steel-owned U.S. Steel could reduce its participation in U.S. trade remedy investigations and reviews, with a possible adverse impact on the commercial viability of the domestic steel industry"); *id.* at 17 ("in the long term,

---

[2] On February 21, 2025, the government stated in a filing that "the new administration requires additional time to evaluate this matter." Mot. for Extension ¶ 2.

5

overall cost and market considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production in the United States in favor of production in lower cost jurisdictions"). As precedent in this Circuit makes clear, the potential vacatur of the Executive Order that currently shields the Union and its members from those risks constitutes an injury-in-fact sufficient to support standing. *See Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 318 (D.C. Cir. 2015) (citing cases for the proposition that "even where the possibility of prevailing on the merits after remand is speculative, a party seeking to uphold a favorable ruling can still suffer a concrete injury in fact").

 Nor are these risks nearly as contingent as the Parties suggest. Petitioners have stated that approval of the proposed merger—the very process the Union is seeking to prevent by intervening here—is the only thing preventing its consummation. Pet. 12. Petitioners also contend that a CFIUS review that accords with due process (i.e., the remedy it is seeking here) would certainly lead to "approval of the merger and no referral to the President." Opening Br. 51. Were the merger to be approved, the Union's bargaining power will be instantly and irreversibly reduced. That sort of competitive injury has been deemed sufficient to support Article III standing by at least one court in this jurisdiction. *See Transp. Trades Dep't v. Nat'l Mediation Bd.*, 530 F. Supp. 3d 64, 70 (D.D.C. 2021) (union had standing to challenge regulation that "fundamentally alter[ed] the environment

in which rival parties—employees who wish to be represented, employees who do not wish to be represented, the union, and perhaps even the employer—defend their concrete interests"); *see also Save Jobs USA v. DHS*, 942 F.3d 504, 509 (D.C. Cir. 2019) ("[A]n individual who competes in a labor market has standing to challenge allegedly unlawful government action that is likely to lead to an increased supply of labor—and thus competition—in that market.").

Moreover, the Union's assertion that Nippon will be incentivized to invest more heavily in its more profitable plants outside of the United States is not speculative at all. It is an accurate statement of present-tense facts combined with common-sense economic logic. *See* Mot. to Intervene 16 (citing financial reports and CFIUS findings concluding that Nippon's foreign plants are more profitable than the U.S plants it seeks to acquire); Pet. Ex. E (Aug. 31 CFIUS Letter), at 3 (same). Courts "routinely" credit "allegations of future injury that are firmly rooted in the basic laws of economics" in "competitor standing cases." *United Transp. Union v. ICC*, 891 F.2d 908, 913 n.7 (D.C. Cir. 1989). Naturally, a post-merger Nippon would have every incentive to invest in its higher-margin operations overseas. *See* Pet. Ex. G, at 17. The same arguments apply to Nippon's incentive not to vigorously pursue trade remedies in cooperation with the Union, particularly given Nippon's documented history of violating those same trade laws. *See* Pet. Ex. G, at 5–7, 14, 15 ("Nippon Steel may also decline to support U.S. Steel's use

7

of trade remedy tools, creating vulnerabilities in the efficacy of trade relief measures."); *id.* at 18 ("Nippon Steel is far more likely to be found dumping or benefiting from countervailable subsidies than to seek relief from those practices.").

Petitioners cite *FDA v. Alliance for Hippocratic Medicine (AHM)*, 602 U.S. 367, 394–96 (2024), for the proposition that the Union's expenditure of more resources in trade remedy proceedings is not an injury that can support standing. Pet'rs' Br. 10. Petitioners overreach. *AHM* held only that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394. That is very different than here, where Petitioners' merger would interfere with the Union's ability to perform a "core business activit[y]," namely advocating to protect its members from unfair international competition. *Id.* at 395. Moreover, the Union's injury in this respect is not only the increased cost of pursuing trade remedies, but also the harm to the effectiveness of the remedies on which steelworkers rely. *See* Pet. Ex. G, at 15, 20 (explaining how the expected failure of Nippon to fully participate in trade remedy proceedings will reduce their efficacy).

One last note on standing: the Parties treat the question of standing and the requirement that an intervenor have an "interest relating to the property or transaction" as distinct. *See* Pet'rs' Br. 25; Resp'ts' Br. 14. That is wrong. *See Fund*

8

*For Animals* 322 F.3d at 735 ("Our conclusion that the NRD has constitutional standing is alone sufficient to establish that the NRD has 'an interest relating to the property or transaction which is the subject of the action.'"). Here, as in *Fund For Animals*, because the Union has constitutional standing to intervene, it satisfies the second element of Rule 24(a).

**3.** Third and last, the Parties' parade of procedural horribles that would occur if the Union's motion is granted is overblown. For one thing, allowing the Union to intervene will not unleash a flood of intervenors in this case or any other. Any other motions to intervene in this case would be untimely under Fed. R. App. P. 15(d).[3] Nor need the Court worry that permitting intervention here—where the Union and its officers are repeatedly invoked by name and where the Union's injuries are specifically described in the administrative record—would mean that every union would be allowed to challenge any "merger that would increase the size of an employer." Pet'rs' Br. 14. As for Respondents' novel contention that allowing the Union to intervene would somehow undermine the Executive's interest in "retaining control of the defense of the President's order," that argument only highlights the Union's legitimate need to protect its interests should the government opt to ignore the Union's "more 'parochial view[s].'" Resp'ts' Br. 20–

---

[3] To the extent Respondents suggests that the Union's Motion to Intervene was not timely, *see* Resp'ts' Br. 19, that is clearly not the case. The Motion was filed within thirty days, as required by Fed. R. App. P. 15(d).

9

21; *see also Fund for Animals*, 322 F.3d at 736 (intervention appropriate where "the interests of the [intervenor] and those of the [defendant] might diverge during the course of litigation").

Finally, turning to the Parties' more plausible concerns: the Union is willing to commit, as a condition for intervening, that it will not seek to unseal any documents or otherwise delay the expedited briefing schedule. *See Fund for Animals*, 322 F.3d at 737 n.11 ("An intervention of right . . . may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."). Further, if permitted to intervene, the Union would file its brief on the merits when Respondents' briefs are due. The Union shares the Parties' desire to resolve this matter—as well as the attendant litigation in Pennsylvania—as quickly as possible.

### B. In the alternative, the Court should exercise its discretion to allow the Union to permissively intervene under Fed. R. Civ. P. 24(b).

As USW has explained in both its original Motion and this Reply, it is uniquely entangled in this case. Petitioners accuse the Union of various misrepresentations and conspiracies that are not only at the very heart of their contentions here, but which also are simultaneously the subject of a lawsuit in another jurisdiction that shares many common questions of law and fact. Accordingly, even if the Court concludes that mandatory intervention is not warranted, the unique facts alleged in the Petition—which put the Union's

10

purported role in the events at the center of this case—counsel in favor of permitting the Union to intervene under Rule 24(b) to defend itself against those accusations, as well as to protect its members from what CFIUS has identified as the detrimental effects of the merger. *See, e.g., Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 18 (D.D.C. 2010) (in deciding a motion under Rule 24(b), the court should consider "whether [the party] seeking intervention will significantly contribute to . . . the just and equitable adjudication" of the case) (quoting *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986)).

### C. If not allowed to intervene, the Union should be permitted to file an Amicus Brief.

Both Parties indicate that it would be appropriate for USW, if it is not allowed to intervene, to provide its views by filing an Amicus Brief. *See* Pet'rs' Br. 4–5; Resp'ts' Br. 18. Thus, should the Court conclude that intervention is neither required nor permitted, it should grant permission for the Union to file an Amicus Brief on behalf of Respondents.

### III. CONCLUSION

For the foregoing reasons, and the reasons stated in its Motion to Intervene, USW should be allowed to intervene in this case. In the alternative, the Court should grant USW permission to file an Amicus Brief.

Dated: February 24, 2025         Respectfully submitted,

*/s/ Bruce R. Lerner*
Bruce R. Lerner
Joshua B. Shiffrin
Derrick C. Rice
BREDHOFF & KAISER, P.L.L.C
805 15th Street NW, Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Fax: (202) 842-1888
blerner@bredhoff.com
jshiffrin@bredhoff.com
drice@bredhoff.com

David R. Jury
Nathan L. Kilbert
Anthony Resnick
UNITED STEELWORKERS
60 Boulevard of the Allies, Room 807
Five Gateway Center
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org
nkilbert@usw.org
aresnick@usw.org

*Counsel for Intervenors United Steelworkers*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I hereby certify that the foregoing Reply in Support of Motion to Intervene contains 2,589 words, excluding the items listed in Fed. R. App. P. 32(f), and was composed in Times New Roman font, 14-point. The motion complies with applicable type-volume and typeface requirements. Fed. R. App. P. 32(a)(5)–(6); Fed. R. App. P. 27(d)(2).

Dated: February 24, 2025            */s/ Bruce R. Lerner*
Bruce R. Lerner
BREDHOFF & KAISER, P.L.L.C.
805 15th Street NW, Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Fax: (202) 842-1888
blerner@bredhoff.com

**CERTIFICATE OF SERVICE**

I certify that on this February 24, 2025, the foregoing Reply in support of Motion to Intervene and attachments was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the D.C. Circuit, which will provide electronic notice to all counsel of record.

Dated: February 24, 2025

*/s/ Bruce R. Lerner*
Bruce R. Lerner
BREDHOFF & KAISER, P.L.L.C.
805 15th Street NW, Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Fax: (202) 842-1888
blerner@bredhoff.com